Nos. 23-1778, 23-1790, 23-1808, 23-1984,
23-2544, 23-2559, 23-2560, 23-2612 (consolidated)

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

PJM POWER PROVIDERS GROUP, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————————————

*On Petitions for Review of Orders of the
Federal Energy Regulatory Commission*

———————————————

### JOINT APPENDIX
### VOLUME 1 OF 3
### Pages JA1 – JA255

———————————————

Steffen Johnson
Nicholas Gladd
Kelsey Curtis
Wilson Sonsini Goodrich &
  Rosati, P.C.
1700 K Street NW
Washington, DC 20006
(202) 973-8800

*Counsel for Petitioner
PJM Power Providers Group*

Matthew E. Price
Anand Viswanathan
Zachary B. Cohen
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Constellation Energy
Generation, LLC*

Additional Counsel Listed on Inside Cover

Matthew R. Christiansen
  General Counsel
Robert H. Solomon
  Solicitor
Jared B. Fish
  Attorney
888 First Street N.E.
Washington, DC 20426
(202) 502-8101

*Counsel for Respondent*
*Federal Energy Regulatory*
*Commission*

Gerit F. Hull
American Municipal Power, Inc.
1111 Schrock Road, Suite 100
Columbus, OH 43229
(614) 540-0852

*Counsel for American Municipal*
*Power, Inc.*

Regina A. Iorii
Delaware Department Of Justice
820 N. French Street, 4th Floor
Wilmington, DE 19801
(302) 577-8159

*In the Capacity of Counsel for the*
*Delaware Division of the Public*
*Advocate Only*

Paul W. Hughes
David G. Tewksbury
Andrew A. Lyons-Berg
Connor J. Suozzo
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

*Counsel for Petitioners*
*The Electric Power Supply*
*Association & NRG Business*
*Marketing LLC*

Jeffrey A. Lamken
Lucas M. Walker
Jennifer E. Fischell
Jackson A. Myers
Mololamken LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2000

*Counsel for PJM*
*Interconnection, L.L.C.*

Thomas L. Rudebusch
Duncan Weinberg Genzer &
Pembroke PC
1667 K Street, NW, Suite 700
Washington, DC 20006
(202) 467-6370

*Counsel for Delaware Municipal*
*Electric Corporation, Inc.*

Robert A. Weishaar, Jr.
Mcnees Wallace & Nurick LLC
1200 G Street, NW, Suite 800
Washington, DC 20005
(202) 898-5700

*Counsel for the Delaware
Public Service Commission*


Miles H. Mitchell
Ransom E. Ted Davis
Maryland Public Service
Commission
6 St. Paul Street
Baltimore, MD 21202
(410) 767-8076

*Counsel for the Maryland
Public Service Commission*

Adrienne E. Clair
Jecoliah R. Williams
Thompson Coburn LLP
1909 K Street, NW, Suite 600
Washington, DC 20006
(202) 585-6900

*Counsel for Old Dominion
Electric Cooperative*

Scott H. Strauss
Peter J. Hopkins
Jeffrey A. Schwarz
Spiegel & Mcdiarmid LLP
1875 Eye Street, NW, Suite 700
Washington, DC 20006
(202) 879-4000

*Counsel for Maryland Office
of People's Counsel*

Jeffrey W. Mayes
Monitoring Analytics, LLC
2621 Van Buren Avenue,
Suite 160
Eagleville, PA 19403
(610) 271-8057

*Counsel for the Independent
Market Monitor for PJM
(Monitoring Analytics, LLC)*

# INDEX

## VOLUME 1

PJM Power Providers Group Petition for Review, Case No. 23-1778 (3d Cir. Apr. 24, 2023) ................................................................. JA1

Constellation Energy Generation, LLC Petition for Review, Case No. 23-1790 (3d Cir. Apr. 26, 2023) ............................................ JA5

Electric Power Supply Association Petition for Review, Case No. 23-1808 (3d Cir. Apr. 28, 2023) ...................................................... JA7

NRG Power Marketing LLC Petition for Review, Case No. 23-1984 (3d Cir. May 30, 2023) ................................................................. JA9

Constellation Energy Generation, LLC Petition for Review, Case No. 23-2544 (3d Cir. Aug. 24, 2023) .......................................... JA11

Electric Power Supply Association Supplemental Petition for Review, Case No. 23-2559 (3d Cir. Aug. 25, 2023) ........................... JA14

NRG Power Marketing LLC Supplemental Petition for Review, Case No. 23-2560 (3d Cir. Aug. 25, 2023) ........................... JA17

PJM Power Providers Group Petition for Review, Case No. 23-2612 (3d Cir. Sept. 5, 2023) ............................................................. JA20

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Order on Proposed Tariff Revisions & Dismissing Complaint, 182 FERC ¶ 61,109 (Feb. 21, 2023) ("Initial Order"), R.141 .................................................................... JA24

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Notice of Denial of Rehearing by Operation of Law & Providing for Further Consideration, 183 FERC ¶ 62,040 (Apr. 24, 2023) ("Denial Order"), R.148 .............................. JA135

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Order Addressing Arguments Raised on Rehearing, 184 FERC ¶ 61,055 (July 27, 2023) ("Rehearing Order"), R.155 .................................................................. JA136

## VOLUME 2

Certified Index To The Record ....................................................... JA256

*PJM Interconnection, L.L.C.*, FERC Docket No. ER23-729, Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to section 205 of the Federal Power Act (filed Dec. 23, 2022), R.1 ................................... JA287

> Attachment A: Revisions to the PJM Open Access Transmission Tariff (Marked/Redline Format) ..................... JA322

*PJM Interconnection, L.L.C.*, FERC Docket No. EL23-19, Section 206 Filing Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area (filed Dec. 23, 2022), R.2, Pages 1-6, 33-34 ............................................... JA350

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Protest of Pine Gate Renewables, LLC (filed Jan. 20, 2023), R. 94 ....................................................................... JA358

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of Old Dominion Electric Cooperative in Support of Filing by PJM Interconnection, LLC (filed Jan. 20, 2023), R. 98, Pages 1, 6-9................................. JA371

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motions to Intervene and Initial Comments of the Maryland Office of People's Counsel (filed Jan. 20, 2023), R.100 ............................................................................................. JA376

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of the Pennsylvania Public Utility Commission to PJM's 2024/2025 Base Residual Auction Modification Filings (filed Jan. 20, 2023), R.107 ............................ JA386

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Protest of the PJM Power Providers Group (filed Jan. 20, 2023), R.109 ................................. JA391

    Attachment A, Affidavit of the Hon. Joseph T. Kelliher ¶ 41 ..................................................................... JA441

    Attachment B, Affidavit of Roy J. Shanker ¶¶ 49-50 ............. JA444

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, NRG Power Marketing LLC et al. Protest and Request for Privileged Treatment (filed Jan. 20, 2023), R.116 ....... JA448

    Attachment A, Affidavit of Joseph A. Holtman ¶¶ 6-7, 10-29 ..................................................................... JA476

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of the Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (filed Jan. 20, 2023), R.122 ..................................................................... JA489

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Protest of the Electric Power Supply Association (filed Jan. 20, 2023), R.123 ......................................... JA497

    Attachment A, Affidavit of Paul M. Sotkiewicz ¶¶ 17, 39-45 ..................................................................... JA529

## VOLUME 3

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of the Independent Market Monitor for PJM (filed Jan. 20, 2023), R. 124 ................................. JA536

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of Constellation Energy Generation, LLC (filed Jan. 20, 2023), R.127 ...................................................... JA544

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motion for Leave to Answer and Answer of PJM Interconnection, L.L.C. (filed Feb. 2, 2023), R.130.......................... JA567

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Answer and Motion for Leave to Answer of the Independent Market Monitor for PJM (filed Feb. 6, 2023), R.132........................................................................................ JA602

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motion for Leave to Answer and Answer of Public Interest Organizations (Sierra/NRDC) (filed Feb. 6, 2023), R.135..................................................................... JA609

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motion for Leave to Answer and Answer of the PJM Power Providers Group (filed Feb. 9, 2023), R.137................. JA623

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Answer and Motion for Leave to Answer of the Independent Market Monitor for PJM (filed Feb. 17, 2023), R.139........................................................................................ JA641

*PJM Interconnection, L.L.C.*, FERC Docket No. ER23-729, Request for Rehearing of the PJM Power Providers Group (filed Mar. 23, 2023), R.142.................................................... JA648

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Electric Power Supply Association et al. Request for Rehearing (filed Mar. 23, 2023), R.143 ........................ JA690

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Request for Rehearing of Constellation Energy Generation, LLC (filed Mar. 23, 2023), R.145 ................................. JA742

iv

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Request for Rehearing of the American Clean Power Association, Solar Energy Industries Association, and Advanced Energy United (filed Mar. 23, 2023), R.146.................... JA766

No. 23-_____

---

# In the United States Court of Appeals for the Third Circuit

————

THE PJM POWER PROVIDERS GROUP, PETITIONER

*v.*

FEDERAL ENERGY REGULATORY COMMISSION, RESPONDENT

————

## PETITION FOR REVIEW

————

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*, and Rule 15(a) of the Federal Rules of Appellate Procedure, The PJM Power Providers Group (P3) petitions this Court for review of the following divided ruling of the Federal Energy Regulatory Commission (FERC):

> *PJM Interconnection, L.L.C.*, Order on Proposed Tariff Revisions and Dismissing Complaint, Docket Nos. ER23-729-000, ER23-19-000, 182 FERC ¶ 61,109 (Feb. 21, 2023) ("February 21 Order" or simply "Order").

A copy of the February 21 Order is attached as Exhibit A.

This Order grants PJM Interconnection, L.L.C. (PJM)'s request to modify the Tariff governing an auction in which generators committed to provide electricity during future periods. Before the Order, the Tariff had required PJM to provide generators with the "planning parameters" for

JA1

the relevant auctions "prior to the conduct of" the auctions.  Exh. A at 4
& n.16.  The Order, however, allows PJM to change a key planning pa-
rameter retroactively—*after* the auction at which the generators submit-
ted their bids.  As the dissent recognized, that Order is "facially unlaw-
ful"—a "straightforward" violation of "[t]he filed rate doctrine and the
rule against retroactive rulemaking" as set forth in "upwards of 100 years
of court precedent."  Exh. A at 91-93 (Danly, J., dissenting).

Venue and jurisdiction are proper in this Court under Section 313
of the Federal Power Act, 16 U.S.C. § 825*l*.  As to venue, PJM—which
oversees the market for the "public utilit[ies] to which the order re-
lates"—is "located [and] has its principal place of business" in this Cir-
cuit.  16 U.S.C. § 825*l*(b).  The zone for which PJM seeks to retroactively
reduce the price is "located" in this Circuit.  *Id.*  And P3's members are
private entities to which the order relates and own and operate numerous
electric generation assets "located" in this Circuit.  *Id.*

Jurisdiction is proper because P3 timely filed a request for rehear-
ing of the February 21 Order on March 23, 2023, *see* 16 U.S.C. § 825*l*; and
on April 24, 2023, the Commission issued a notice stating that given its
failure to act on Petitioner's rehearing request "within 30 days," it "may

2

be deemed to have been denied" by operation of law.  Notice of Denial of

Rehearing by Operation of Law and Providing for Further Consideration,

Docket Nos. ER23-729-001, EL23-19-001, 183 FERC ¶ 62,040 (April 24,

2023) ("April 24 Notice"); see 16 U.S.C. § 825*l*; 18 C.F.R. § 385.713(f)

("Unless the Commission acts upon a request for rehearing within 30

days after the request is filed, the request is denied.").  The April 24 No-

tice is attached hereto as Exhibit B.

The Commission stated that it will address the rehearing request

in a future order and may modify the February 21 Order at that time but

that does not affect this Court's jurisdiction.  "[I]f the Commission fails

to act on [a] rehearing application within thirty days, the application may

be deemed denied, allowing the aggrieved party to proceed to federal

court" even where, as here, the Commission intends to issue a future or-

der on the rehearing request. *Allegheny Def. Project v. Fed. Energy Regul.*

*Comm'n*, 964 F.3d 1, 3 (D.C. Cir. 2020).  In short, "after thirty days [have]

elapsed from the filing of a rehearing application without Commission

action," "petitions for review … are properly before this Court for review."

*Id.* at 18-19; *see also id.* at 5, 16 (noting that the Federal Power Act and

**JA3**

Natural Gas Act are "interpreted similarly," as much of the relevant language is "identical").

Pursuant to Federal Rule of Appellate Procedure 26.1, P3 has attached a Corporate Disclosure Statement.  Under 18 C.F.R. § 385.2012 and 28 U.S.C. § 2112(a), P3 is electronically filing a date-stamped receipt of this petition with FERC.

Respectfully submitted,

*/s/ Steffen N. Johnson*

STEFFEN N. JOHNSON
NICHOLAS M. GLADD
  *Wilson Sonsini*
  *Goodrich & Rosati, P.C.*
  *1700 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 973-8800*
  *sjohnson@wsgr.com*

*Counsel for Petitioner*
*The PJM Power Providers Group*

APRIL 24, 2023

4

**JA4**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

CONSTELLATION ENERGY )
GENERATION, LLC, )
  )
     *Petitioners*, )
  )
    v. )    No. _____
  )
FEDERAL ENERGY )    **PETITION FOR REVIEW**
REGULATORY COMMISSION, )
  )
    *Respondent*. )
  )

# PETITION FOR REVIEW

Pursuant to Fed. R. App. P. 15 and 16 U.S.C. § 825*l*(b), Constellation Energy Generation, LLC ("Constellation"), hereby petitions for review in the United States Court of Appeals for the Third Circuit two orders issued by the Federal Energy Regulatory Commission in FERC Docket Nos. ER23-729 and EL23-19 (not consolidated). FERC issued the first order on February 21, 2023. *See PJM Interconnection, L.L.C.*, Order on Proposed Tariff Revisions and Dismissing Complaint, 182 FERC ¶ 61,109 (2023) (Attachment A). Constellation timely sought rehearing of the Order on Proposed Tariff Revisions and Dismissing Complaint on March 23, 2023. FERC issued the second order on April 24, 2023. *See PJM Interconnection, L.L.C.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 183 FERC ¶ 62,040 (2023) (Attachment B).

Venue is appropriate in this Circuit because the public utility to which the order relates, PJM Interconnection, L.L.C., maintains its principal place of business in Audubon, Pennsylvania.  *See* 16 U.S.C. § 825*l*(b).

April 26, 2023                                    Respectfully submitted,

                                                  */s/ Matthew E. Price*
                                                  Matthew E. Price
                                                  Zachary B. Cohen
                                                  JENNER & BLOCK LLP
                                                  1099 New York Ave., NW, Suite 900
                                                  Washington, DC 20001
                                                  Telephone: (202) 639-6000
                                                  mprice@jenner.com
                                                  zcohen@jenner.com

                                                  *Counsel for Constellation Energy*
                                                  *Generation, LLC*

**No. 23-____**

*In the*

# United States Court of Appeals

*for the*

# Third Circuit

---

ELECTRIC POWER SUPPLY ASSOCIATION,

*Petitioner,*

– v. –

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

---

## PETITION FOR REVIEW

---

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*,

and Rule 15(a) of the Federal Rules of Appellate Procedure, Electric

Power Supply Association ("Petitioner"), hereby petitions the Court

for judicial review of the following order issued by Respondent,

Federal Energy Regulatory Commission (the "Commission"):

1. *PJM Interconnection, L.L.C.,* Order on Proposed Tariff Revisions
   and Dismissing Complaint, Docket Nos. EL23-19-000, ER23-729-
   000*,* 182 FERC ¶ 61,109 (February 21, 2023) ("February 21
   Order").

The February 21 Order is attached hereto as **Exhibit A**.

On March 23, 2023, Petitioner timely filed a request for rehearing of the February 21 Order. Rather than addressing that rehearing request on its merits, on April 24, 2023, the Commission issued a notice of denial of rehearing by operation of law (the "April 24 Notice"), which states that Petitioner's rehearing request was denied by operation of law. *See* 16 U.S.C. § 825*l*. The April 24 Notice is attached hereto as **Exhibit B**.

The Commission's action is therefore ripe for review. *See Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020).

Dated: April 28, 2023              Respectfully submitted,

                                   */s/ Paul W. Hughes*

                                   PAUL W. HUGHES
                                   DAVID G. TEWKSBURY
                                   ANDREW A. LYONS-BERG
                                   *McDermott Will & Emery LLP*
                                   *500 North Capitol Street, NW*
                                   *Washington, DC 20001*
                                   *(202) 756-8000*

                          *Counsel for Electric Power Supply Association*

No. 23-____

*In the*

# United States Court of Appeals
*for the*
# Third Circuit

---

NRG POWER MARKETING LLC,

*Petitioner*,

– v. –

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

---

## PETITION FOR REVIEW

---

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*, and Rule 15(a) of the Federal Rules of Appellate Procedure, NRG Power Marketing LLC ("Petitioner"), hereby petitions the Court for judicial review of the following order issued by Respondent, Federal Energy Regulatory Commission (the "Commission"):

1. *PJM Interconnection, L.L.C.,* Order on Proposed Tariff Revisions and Dismissing Complaint, Docket Nos. EL23-19-000, ER23-729-000, 182 FERC ¶ 61,109 (February 21, 2023) ("February 21 Order").

The February 21 Order is attached hereto as **Exhibit A**.

On March 23, 2023, Petitioner timely filed a request for rehearing of the February 21 Order. Rather than addressing that rehearing request on its merits, on April 24, 2023, the Commission issued a notice of denial of rehearing by operation of law (the "April 24 Notice"), which states that Petitioner's rehearing request was denied by operation of law. *See* 16 U.S.C. § 825*l*. The April 24 Notice is attached hereto as **Exhibit B**.

The Commission's action is therefore ripe for review. *See Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020).

Dated: May 30, 2023                 Respectfully submitted,

*/s/ Paul W. Hughes*

PAUL W. HUGHES
DAVID G. TEWKSBURY
ANDREW A. LYONS-BERG
*McDermott Will & Emery LLP*
*500 North Capitol Street, NW*
*Washington, DC 20001*
*(202) 756-8000*

*Counsel for NRG Power Marketing LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

CONSTELLATION ENERGY              )
GENERATION, LLC,                  )
                                  )
    *Petitioner*,           )
                                  )
    v.                      )    No. _____
                                  )
FEDERAL ENERGY                    )    **PETITION FOR REVIEW**
REGULATORY COMMISSION,            )
                                  )
    *Respondent*.           )
_____  )

## PETITION FOR REVIEW

Pursuant to Fed. R. App. P. 15 and 16 U.S.C. § 825*l*(b), Constellation Energy Generation, LLC ("Constellation"), hereby petitions for review in the United States Court of Appeals for the following order issued by the Federal Energy Regulatory Commission in FERC Docket Nos. ER23-729 and EL23-19 (not consolidated): *PJM Interconnection, L.L.C.*, Order Addressing Arguments Raised on Rehearing, 184 FERC ¶ 61,055 (July 27, 2023) (Attachment A).

Constellation timely sought rehearing of the underlying order, *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (Feb. 21, 2023).  Venue is appropriate in this Circuit because the public utility to which the order relates, PJM Interconnection, L.L.C., maintains its principal place of business in Audubon, Pennsylvania. *See* 16 U.S.C. § 825*l*(b).

Constellation states that this Petition relates to Constellation's Appeal No. 23-1790 pending before this Court, which the Court consolidated with Appeal No. 23-1778 *et al.* ("Consolidated Appeal").  The Consolidated Appeal pertains to orders issued by FERC in the same dockets, but preceding the Order Addressing Arguments Raised on Rehearing.[1]  In the Consolidated Appeal, FERC has already filed the Certified Index to the Record and briefing is underway.  For these reasons, Constellation respectfully requests that the Court consolidate this Petition with the Consolidated Appeal.

---

[1] Constellation has filed this Petition out of an abundance of caution.  Section 313 of the Federal Power Act (16 U.S.C. § 825*l*) provides FERC 30 days to issue an order on rehearing.  Here, FERC issued a non-substantive order denying Constellation's petition for rehearing as a matter of law after 30 days.  *PJM Interconnection, L.L.C.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 183 FERC ¶ 62,040 (2023).  FERC then issued a subsequent order—the subject to this Petition—more than three months later.

The U.S. Court of Appeals for the District of Columbia Circuit has recently indicated that where, as here, FERC issues a further order after the rehearing deadline has passed, that order constitutes an amendment to the original order under review, and no new petition for review is required.  *See Evergy Kansas Cent., Inc. v. FERC*, No. 22-1221, 2023 WL 4874699 at *3 (D.C. Cir. Aug. 1, 2023); *Sierra Club v. FERC*, 68 F. 4th 630, 646 (D.C. Cir. 2023).  Nevertheless, this Circuit has not yet so ruled, so Constellation files this petition for review.

August 24, 2023                          Respectfully submitted,

                                         */s/ Matthew E. Price*
                                         Matthew E. Price
                                         Zachary B. Cohen
                                         JENNER & BLOCK LLP
                                         1099 New York Ave., NW, Suite 900
                                         Washington, DC 20001
                                         Telephone: (202) 639-6000
                                         mprice@jenner.com
                                         zcohen@jenner.com

                                         *Counsel for Constellation Energy
                                         Generation, LLC*

No. 23-____

*In the*

# United States Court of Appeals

*for the*

# Third Circuit

———————————————

ELECTRIC POWER SUPPLY ASSOCIATION,

*Petitioner*,

– v. –

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

———————————————

## SUPPLEMENTAL PETITION FOR REVIEW

———————————————

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*, and Rule 15(a) of the Federal Rules of Appellate Procedure, Electric Power Supply Association ("Petitioner"), hereby petitions the Court for judicial review of the following orders issued by Respondent, Federal Energy Regulatory Commission (the "Commission"):

1. *PJM Interconnection, L.L.C.,* Order on Proposed Tariff Revisions and Dismissing Complaint, Docket Nos. EL23-19-000, ER23-729-000*,* 182 FERC ¶ 61,109 (February 21, 2023) ("February 21 Order").

2. *PJM Interconnection, L.L.C.*, Order Addressing Arguments Raised on Rehearing, Docket Nos. ER23-729-001, EL23-19-001, 184 FERC ¶ 61,055 (July 27, 2023) ("Rehearing Order").

Copies of the February 21 Order and the Rehearing Order are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

On March 23, 2023, Petitioner timely filed a request for rehearing of the February 21 Order. Rather than addressing that rehearing request on its merits, on April 24, 2023, the Commission issued a notice of denial of rehearing by operation of law (the "April 24 Notice"), which states that Petitioner's rehearing request was denied by operation of law. *See* 16 U.S.C. § 825*l*. The April 24 Notice is attached hereto as **Exhibit C**. On April 28, Petitioner filed a petition for review of the February 21 Order, which has been docketed as No. 23-1808 and consolidated with Nos. 23-1778, 23-1790, and 23-1984. The Commission issued the Rehearing Order on July 27, 2023. *See generally* Ex. B.

Petitioner therefore files this supplemental petition for review to encompass the Rehearing Order that issued after Petitioner filed its previous petition, and requests that the Court consolidate this matter with Nos. 23-1808, 23-1778, 23-1790, and 23-1984.

Dated: August 25, 2023                    Respectfully submitted,

                                          /s/ *Paul W. Hughes*

                                          PAUL W. HUGHES
                                          DAVID G. TEWKSBURY
                                          ANDREW A. LYONS-BERG
                                          CONNOR J. SUOZZO
                                          *McDermott Will & Emery LLP*
                                          *500 North Capitol Street, NW*
                                          *Washington, DC  20001*
                                          *(202) 756-8000*

              *Counsel for Electric Power Supply Association*

No. 23-____

*In the*

# United States Court of Appeals

*for the*

# Third Circuit

_____

NRG BUSINESS MARKETING LLC,

*Petitioner*,

– v. –

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

_____

**SUPPLEMENTAL PETITION FOR REVIEW**

_____

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*, and Rule 15(a) of the Federal Rules of Appellate Procedure, NRG Business Marketing LLC ("Petitioner"), as successor to NRG Power Marketing LLC ("NRG-PML"), hereby petitions the Court for judicial review of the following orders issued by Respondent, Federal Energy Regulatory Commission (the "Commission"):

1. *PJM Interconnection, L.L.C.,* Order on Proposed Tariff Revisions and Dismissing Complaint, Docket Nos. EL23-19-000, ER23-729-000, 182 FERC ¶ 61,109 (February 21, 2023) ("February 21 Order").

2. *PJM Interconnection, L.L.C.*, Order Addressing Arguments Raised on Rehearing, Docket Nos. ER23-729-001, EL23-19-001, 184 FERC ¶ 61,055 (July 27, 2023) ("Rehearing Order").

Copies of the February 21 Order and the Rehearing Order are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

On March 23, 2023, NRG-PML timely filed a request for rehearing of the February 21 Order. Rather than addressing that rehearing request on its merits, on April 24, 2023, the Commission issued a notice of denial of rehearing by operation of law (the "April 24 Notice"), which states that NRG-PML's rehearing request was denied by operation of law. *See* 16 U.S.C. § 825*l*. The April 24 Notice is attached hereto as **Exhibit C**. On May 30, NRG-PML filed a petition for review of the February 21 Order, which has been docketed as No. 23-1984 and consolidated with Nos. 23-1778, 23-1790, and 23-1808. The Commission issued the Rehearing Order on July 27, 2023. *See generally* Ex. B. On August 1, 2023, NRG-PML was merged into Petitioner, with Petitioner as the surviving entity.

Petitioner, as successor to NRG-PML, therefore files this supplemental petition for review to encompass the Rehearing Order that issued after NRG-PML filed its previous petition,[1] and requests that the

---

[1] Petitioner is concurrently filing a motion in No. 23-1984 asking that it be substituted for NRG-PML.

Court consolidate this matter with Nos. 23-1984, 23-1778, 23-1790, and
23-1808.

Dated: August 25, 2023                    Respectfully submitted,

                                          /s/ *Paul W. Hughes*

                                          PAUL W. HUGHES
                                          DAVID G. TEWKSBURY
                                          ANDREW A. LYONS-BERG
                                          CONNOR J. SUOZZO
                                          *McDermott Will & Emery LLP*
                                          *500 North Capitol Street, NW*
                                          *Washington, DC 20001*
                                          *(202) 756-8000*

                    *Counsel for NRG Business Marketing LLC*

No. 23-_____

# In the United States Court of Appeals for the Third Circuit

―――――――

THE PJM POWER PROVIDERS GROUP, PETITIONER

*v.*

FEDERAL ENERGY REGULATORY COMMISSION, RESPONDENT

―――――――

## PETITION FOR REVIEW

―――――――

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*, and Rule 15(a) of the Federal Rules of Appellate Procedure, The PJM Power Providers Group ("P3") petitions this Court for review of the following order of the Federal Energy Regulatory Commission (FERC):

> *PJM Interconnection, L.L.C.*, Order Addressing Arguments Raised on Rehearing, Docket Nos. ER23-729-001, EL23-19-001, 184 FERC ¶ 61,055 (July 27, 2023) ("Rehearing Order").

A copy of the Rehearing Order is attached as Exhibit A.

On April 24, 2023, pursuant to section 313(b) of the FPA, 16 U.S.C. § 825l(b), Rule 15(a) of the Federal Rules of Appellate Procedure, and Circuit Rule 15 of the Rules of this Court, P3 petitioned the Court for judicial review of the following FERC order in Docket Nos. ER23-729-000 and EL23-19-000 ("Original Petition"): *PJM Interconnection, L.L.C.*,

Order on Proposed Tariff Revisions and Dismissing Complaint, Docket
Nos. ER23-729-000, EL23-19-000, 182 FERC ¶ 61,109 (Feb. 21, 2023)
("Order," attached as Exhibit B).  P3's Original Petition was docketed as
Case No. 23-1778, which was later consolidated with other petitions for
review of the Order.[1]  The Original Petition is attached as Exhibit C.

Although the rehearing requests filed in the agency proceeding
were denied by operation of law on April 24, 2023, *see PJM Interconnec-
tion, L.L.C.*, Notice of Denial of Rehearing by Operation of Law, 183
FERC ¶ 62,040, Docket Nos. ER23-729-001 and EL23-63-002 (April 24,
2023), FERC issued the Rehearing Order on July 27, 2023, to address
multiple requests for rehearing filed in response to the February 21, 2023
Order.  Over a forceful dissent from Commissioner James Danly, FERC's
Rehearing Order "modif[ied] the discussion in the February 2023 Order
and continue[d] to reach the same result in th[e] proceeding."  Rehearing
Order, 184 FERC ¶ 61,055 at P 3.

The D.C. Circuit recently held that new petitions for review are ap-
propriate when FERC issues a rehearing order after the underlying

---

[1] 23-1778, Dkt. No. 32 (June 1, 2023) (clerk's order consolidating Case
Nos. 23-1778, 23-1790, 23-1808, and 23-1984).

rehearing requests have been denied by operation of law and after the petitioners have petitioned for review from that original denial. *Vistra Corp. v. FERC*, —F.4th—, 2023 WL 5209555, at *7 n.16 (D.C. Cir. 2023). Specifically, the D.C. Circuit held that it "ha[d] jurisdiction to review the new petitions," which it consolidated with the original petitions. *Id.* at *7 & n.16. That is true even if the rehearing order does not change the original result. *Id.* at *7 n.16; *cf. NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 801-02 (D.C. Cir. 2008) ("[W]hen FERC makes no change in the result on rehearing but merely supports the old outcome with new arguments, a party can obtain judicial review without filing a new petition for rehearing."). This Court thus has jurisdiction over this matter, and venue is proper pursuant to section 313(b) of the FPA, 16 U.S.C. § 825l(b).

Pursuant to Federal Rule of Appellate Procedure 26.1, P3 has attached a Corporate Disclosure Statement. Pursuant to Federal Rule of Appellate Procedure 15(c), a copy of this petition will be served on FERC's Solicitor, Robert H. Solomon. Under 18 C.F.R. § 385.2012 and 28 U.S.C. § 2112(a), P3 is electronically filing a date-stamped receipt of this petition with FERC.

Respectfully submitted,

/s/ Steffen N. Johnson

STEFFEN N. JOHNSON
NICHOLAS M. GLADD
  Wilson Sonsini
  Goodrich & Rosati, P.C.
  1700 K Street, N.W.
  Washington, DC 20006
  (202) 973-8800
  sjohnson@wsgr.com

Counsel for Petitioner
The PJM Power Providers Group

SEPTEMBER 5, 2023

182 FERC ¶ 61,109
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

| | |
|---|---|
| PJM Interconnection, L.L.C. | Docket Nos. ER23-729-000 |
| | EL23-19-000 |

ORDER ON PROPOSED TARIFF REVISIONS AND DISMISSING COMPLAINT

(Issued February 21, 2023)

1.      On December 23, 2022, pursuant to section 205 of the Federal Power Act (FPA)[1] and Part 35 of the Commission's Rules of Practice and Procedure,[2] PJM Interconnection, L.L.C. (PJM) filed proposed revisions to the PJM Open Access Transmission Tariff (Tariff) to exclude planned generation capacity resources from the calculation of the Locational Deliverability Area Reliability Requirement (LDA Reliability Requirement) if the addition of such resources materially increases the reliability requirement and such resources do not participate in the capacity auction.[3]  On December 23, 2022, pursuant to section 206 of the FPA,[4] PJM also filed a complaint alleging that the LDA Reliability Requirement, absent the changes proposed in the concurrent FPA section 205 filing, results in an unjust and unreasonable auction outcome.  As discussed below, we accept PJM's FPA section 205 proposal, effective December 24, 2022, as requested, and dismiss PJM's complaint as moot.

I.      **Background**

2.      PJM conducts capacity auctions on a forward basis to ensure that sufficient capacity is available to provide reliable energy to its customers during periods of peak

---

[1] 16 U.S.C. § 824d.

[2] 18 C.F.R. pt. 35 (2021).

[3] PJM Interconnection, L.L.C., Intra-PJM Tariffs, OATT Definitions L - M - N (35.0.0) and OATT, Attach. DD 5.12, Conduct of RPM Auctions (22.0.0).

[4] 16 U.S.C. § 824e.

Document Accession #: 20230621-3009   Filed Date: 03/21/2023

demand.[5]  These auctions include an annual Base Residual Auction (BRA) and three Incremental Auctions for each delivery year (collectively referred to as "capacity auctions").[6]  Each auction is cleared using a supply curve consisting of the supply offers submitted by sellers and administratively determined demand curves.[7]  PJM uses an optimization algorithm to evaluate auction inputs and determine the supply offers that clear an auction and receive capacity commitments at the clearing price.[8]

3.     PJM establishes demand curves for the PJM region as a whole, as well as for Locational Deliverability Areas (LDA) if certain criteria are met.[9]  PJM calculates the demand curves for LDAs using the LDA Reliability Requirement.[10]  The LDA Reliability Requirement is the projected internal capacity in the LDA plus the Capacity Emergency Transfer Objective (CETO) for the delivery year less the minimum internal resources required for all Fixed Resource Requirement entities[11] in such LDA.[12]  CETO is defined

---

[5] PJM, Intra-PJM Tariffs, Attach. DD 1, Introduction (1.0.0); PJM ER23-729-000 Transmittal at 6.

[6] PJM, Intra-PJM Tariffs, Attach. DD § 5.4, Reliability Pricing Model Auctions (7.0.0).  These auctions are currently running on a compressed schedule.

[7] PJM, Intra-PJM Tariffs, Attach. DD § 5.10 Auction Clearing Requirements (30.0.0).

[8] PJM, Intra-PJM Tariffs, Attach. DD § 5.12 Conduct of RPM Auctions (20.0.0).

[9] PJM determines which LDAs to model in each auction by, inter alia, comparing the import limit of an LDA (also known as the Capacity Emergency Transfer Limit) to the amount of capacity that needs to be imported into an LDA to remain within a loss of load expectation of one event in 25 years when the area is experiencing a localized capacity emergency (also known as the Capacity Emergency Transfer Objective or CETO).  *See also* PJM, Intra-PJM Tariffs, Attach DD § 5.10(a)(ii) Variable Resource Requirement Curve (30.0.0).

[10] PJM, Intra-PJM Tariffs, Attach DD § 5.10(a)(ii)(C) Variable Resource Requirement Curve (30.0.0).  PJM uses a region-wide reliability requirement for the region as a whole.

[11] The Fixed Resource Requirement (FRR) Alternative provides an alternative means for an eligible load-serving entity to satisfy its capacity obligations outside of the capacity auctions.  *See* PJM, Intra-PJM Tariffs, Reliability Assurance Agreement (RAA) Schedule 8.1 Fixed Resource Requirement Alternative (3.0.0).

[12] PJM, Intra-PJM Tariffs, § I.1 L-M-N, OATT Definitions (32.2.0) (defining

as "the amount of electric energy that a given area must be able to import in order to remain within a loss of load expectation of one event in 25 years when the area is experiencing a localized capacity emergency, as determined in accordance with the PJM Manuals."[13]  PJM Manual 20 specifies that CETO shall be modeled including any "planned generation resource" that has an executed Interconnection Service Agreement (ISA).[14]  PJM Manual 14B clarifies that units without an ISA that have cleared in a prior BRA are also included.[15]

4.     The Tariff requires PJM to determine the LDA Reliability Requirement for each LDA for which a demand curve has been established on or before February 1 prior to conducting the relevant BRA.[16]  However, a number of capacity auctions have been delayed and the auctions are now running on compressed schedules.[17]  The instant filing concerns the BRA for delivery year 2024/2025 (2024/2025 BRA).  For this auction, PJM was required to post the planning parameters on August 29, 2022.[18]  The auction bidding

---

Locational Deliverability Area Reliability Requirement).

   [13] PJM, Intra-PJM Tariffs, RAA Article 1 – Definitions (36.0.0).

   [14] PJM Manual 20:  PJM Resource Adequacy Analysis, § 4.3 Modeling Specifics, Revision 12 (Aug. 25, 2021), https://www.pjm.com/-/media/documents/manuals/m20.ashx.

   [15] PJM Manual 14B:  PJM Region Transmission Planning Process, C.2.6 CETO/CETL as an Input to RPM, Revision 51 (Dec. 15, 2021), https://www.pjm.com/-/media/documents/manuals/m14b.ashx.

   [16] PJM, Intra-PJM Tariffs, Attach DD § 5.10(a)(vi)(B) Process for Establishing Parameters of Variable Resource Requirement Curve (30.0.0).

   [17] *See, e.g.*, *PJM Interconnection, L.L.C.*, 177 FERC ¶ 61,209 (2021); *Indep. Mkt. Monitor for PJM v. PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,137 (2021); *PJM Interconnection, L.L.C.*, 177 FERC ¶ 61,050 (2021); *Calpine Corp. v. PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,061 (2020); *Calpine Corp. v. PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,051 (2019); *PJM Interconnection, L.L.C.*, 164 FERC ¶ 61,153 (2018).

   [18] PJM Auction Schedule, https://www.pjm.com/markets-and-operations/rpm.aspx (accessed on January 6, 2023).

**JA26**

Docket Nos. ER23-729-000 and EL23-19-000                                     - 4 -

window opened December 7, 2022, and closed December 13, 2022.  PJM was scheduled to post the auction results on December 20, 2022 but has not yet done so.[19]

## II.   Filings

### A.   ER23-729-000 FPA Section 205 Filing

5.      In this filing, PJM proposes to change the way Planned Generation Capacity Resources[20] are factored into LDA Reliability Requirement.  Specifically, PJM proposes changes that would allow PJM, during the auction process, to exclude Planned Generation Capacity Resources from the calculation of the LDA Reliability Requirement if the addition of such resources materially increases the LDA Reliability Requirement and such resources do not participate in the relevant capacity auction.[21]  PJM argues this change is necessary to have an accurate LDA Reliability Requirement in clearing the auctions.  PJM states that the current auction rules do not allow PJM to update the LDA Reliability Requirement during the auction process, which can result in prices that do not reflect the actual reliability needs of small LDAs.[22]

#### 1.   Calculation of LDA Reliability Requirements

6.      PJM explains that, in its basic form, the LDA Reliability Requirement is expressed formulaically as: internal projected capacity (expressed in Unforced Capacity[23]) + CETO

---

[19] *Id.*

[20] The Reliability Assurance Agreement defines a Planned Generation Capacity Resources as a Generation Capacity Resource, or additional megawatts to increase the size of a Generation Capacity Resource, participating in the generation interconnection process for which, inter alia, Interconnection Service is scheduled to commence on or before the first day of the delivery year for which such resource is to be committed in a capacity and an Interconnection Service Agreement has been executed prior to any Incremental Auction for such delivery year in which such resource plans to participate.  PJM, Intra-PJM Tariffs, RAA, Article 1 – Definitions (36.0.0).

[21] PJM ER23-729-000 Transmittal at 1.

[22] *Id.* at 2.

[23] The Reliability Assurance Agreement defines Unforced Capacity as "installed capacity rated at summer conditions that is not on average experiencing a forced outage or forced derating, calculated for each Capacity Resource on the 12-month period from October to September without regard to the ownership of or the contractual rights to the capacity of the unit."  PJM, Intra-PJM Tariffs, RAA, Article 1 – Definitions (36.0.0).

for the LDA.[24]  PJM states that Planned Generation Capacity Resources are included in the LDA Reliability Requirement as internal projected capacity.[25]  PJM further explains that the PJM Manuals state that any "planned generation resource" with an executed ISA is modeled for CETO (i.e., the planned resource is assumed to offer into the relevant auction).[26]  Therefore, PJM states, for a given capacity auction, PJM calculates CETO including all resources with an executed ISA that specifies a commercial operation date that falls on or before the first day of the relevant delivery year.

7.      PJM states that the increase in projected internal capacity is generally offset entirely by the corresponding decrease to the CETO value.  However, PJM states that is not the case when the "reliability value" of a given resource or resources used to calculate CETO is lower than the projected internal "capacity value."[27]  PJM identifies two instances when this can happen.  First, PJM explains that when a large Planned Generation Capacity Resource is added to a relatively small LDA, the load in that LDA becomes more dependent on the resource.  PJM clarifies that although the resource provides a large amount of internal capacity towards the LDA's requirements, the possibility of the resource experiencing a forced outage also significantly increases the LDA's reliability risk.  Second, PJM states that Intermittent Resources[28] can have a lower capacity value for an LDA than the regional transmission organization (RTO)-wide average if the resource's production does not align with the LDA's needs.  As an example, PJM states that a proportionately large quantity of solar resources has a relatively lower capacity value in near winter-peaking LDAs.

---

[24] PJM ER23-729-000 Transmittal at 12-13 (citing PJM, Intra-PJM Tariffs, Definitions L-M-N (definition of Locational Deliverability Area Reliability Requirement).

[25] *Id*. at 13.

[26] *Id.* (citing *PJM Manual 18:  PJM Capacity Mkt.*, PJM Interconnection, L.L.C., at 28 n.7 (Sept. 21, 2022), https://www.pjm.com/-/media/documents/manuals/m18.ashx; *PJM Manual 20: PJM Resource Adequacy Analysis*, PJM Interconnection, L.L.C., at 32 (Aug. 25, 2021), https://www.pjm.com/-/media/documents/manuals/m20.ashx.).

[27] *Id.* at 14.  Projected internal capacity value is based on a class average forced outage rate, for generation resources, or Effective Load Carrying Capability, for solar resources, derived from the PJM region.  *Id.*

[28] The Tariff defines an Intermittent Resource as a Generation Capacity Resource with output that can vary as a function of its energy source, such as wind, solar, run of river hydroelectric power and other renewable resources.  PJM, Intra-PJM Tariffs, Common Service Provisions § I.1 (Definitions – I – J – K) (14.0.0).

8.      PJM therefore states that if certain Planned Generation Capacity Resources are modeled in the CETO but do not offer into the auction as anticipated, the LDA Reliability Requirement is overstated.  PJM explains that it realized this flaw in the Tariff in attempting to clear the 2024/2025 BRA.  PJM explains that a significant amount of Planned Generation Capacity Resources in the Delmarva Power & Light - South LDA (Delmarva) that were expected to participate in the 2024/2025 BRA based on their in-service dates chose not to do so.[29]  PJM states that these resources were included in the calculation of the LDA Reliability Requirement for Delmarva, and, as a result, Delmarva's LDA Reliability Requirement increased by approximately 12% from the prior year.[30]  However, PJM contends that these planned resources should not have been included in the LDA Reliability Requirement because they did not offer into the auction, and are therefore not expected to be physically available to serve as capacity in the 2024/2025 delivery year.[31]

9.      PJM explains that, should PJM complete the 2024/2025 BRA under the current rules, the clearing price for Delmarva would be more than four times higher than if the planned resources that did not offer were excluded from the LDA Reliability Requirement.[32]  PJM indicates that this increased price would not reflect the actual reliability needs of Delmarva and would force load-serving entities in the LDA to procure more capacity than is needed to meet the area's actual reliability needs.[33]

10.     PJM proposes several Tariff revisions to correct this problem.  First, PJM proposes to modify the definition of LDA Reliability Requirement to state that, effective with the 2024/2025 delivery year, PJM shall exclude, from the calculation of LDA Reliability Requirement, any Planned Generation Capacity Resources that do not participate in the relevant auction if including them would increase the LDA Reliability Requirement by more than one percent.[34]  PJM explains that for a BRA, this increase is measured relative to the LDA Reliability Requirement used from the prior year's BRA.  PJM states that, for

---

[29] PJM ER23-729-000 Transmittal at 2.

[30] *Id.* at 2, 11.

[31] *Id.* at 16.  PJM clarifies that the LDA Reliability Requirement is only unreasonable because the Planned Generation Capacity Resources did not actually offer.  Had the resources offered in the auction as expected, PJM explains, the increased LDA Reliability Requirement would have been correct.  *Id.* at 18.

[32] *Id.* at 2.

[33] *Id.* at 3.

[34] *Id.* at 20-21.

Incremental Auctions, the LDA Reliability Requirement would be compared with that used in the prior relevant capacity auction associated with the same delivery year. PJM states that it is reasonable to use a one percent materiality threshold because "it is the cumulative addition of sufficiently large Planned Generation Capacity Resources in a small LDA that causes the identified issue."[35] PJM also argues that using a percentage avoids having to define a megawatt (MW) value for what constitutes a "small" LDA.[36] PJM further proposes changes to Tariff, Attachment DD, section 5.12 to require PJM to consider the most updated LDA Reliability Requirement in the optimization algorithm when evaluating the sell offers and other inputs during the auction process.[37]

## 2.    **Effective Date**

11.    PJM requests waiver of the Commission's 60-day prior notice requirement to allow the proposed revisions to become effective one day after the date of its FPA section 205 filing, on December 24, 2022.[38] PJM states good cause exists to grant waiver because the proposed changes would reduce charges that load-serving entities would otherwise have to pay.[39]

12.    PJM argues that the Commission may accept PJM's proposed Tariff revisions effective for the most recent auction (i.e., 2024/2025 BRA) because the auction has not concluded.[40] PJM explains that, while the deadline for submitting sell offers has passed, PJM has not yet awarded any capacity commitments. PJM further explains that the Tariff describes the auction process after the offer window closes and requires PJM "to evaluate the Sell Offers and other inputs to such auction to determine the Sell Offers that clear

---

[35] *Id.* at 20.

[36] *Id.* at 20-21.

[37] *Id.* at 21.

[38] *Id.* at 5; 18 C.F.R. § 35.3(a)(1) (2021).

[39] PJM ER23-729-000 Transmittal at 5 (citing *Cent. Hudson Gas & Elec. Corp.*, 60 FERC ¶ 61,106, at 61,338, *order on reh'g*, 61 FERC ¶ 61,089 (1992) (*Cent. Hudson*) ("We will generally grant waiver of the 60-day prior notice requirement in the following instances: . . . (2) filings that reduce rates and charges—such as rate decreases or new services that provide the customer of a utility with an opportunity to reduce its purchases of other, more expensive service from the same utility.")).

[40] *Id.* at 3 (citing PJM, Intra-PJM Tariffs, Attach. DD § 5.12 Conduct of RPM Auctions).

Document Accession #: 20230421-3009    Filed Date: 03/21/2023

such auction."[41]  PJM argues that the auction is not closed until PJM has cleared the auction and awarded capacity commitments.  PJM further contends that the Tariff requirement for PJM to post the auction results "as soon . . . as possible" "implicitly acknowledges that there is an auction process where PJM produces a supply curve based on all of the valid Sell Offers and validates initial solutions before finalizing the auction results."[42]

13.    PJM argues that its proposal is consistent with the filed rate doctrine and the rule against retroactive ratemaking for several reasons.[43]  First, PJM states that the proposed Tariff changes do "not violate any specific deadline or date contained within the text of the Tariff."[44]  PJM argues that the Tariff only requires PJM to post the auction results as soon as possible and does not provide a specific deadline.[45]  PJM concludes that this provision is "acknowledgement that additional process is necessary before the full effectuation of the filed-rate via validation and finalization of the results and the awarding of capacity commitments to Capacity Market Sellers."[46]

14.    Second, citing *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,208 (2020), PJM argues that the Commission has previously granted waiver of a planning parameter posting deadline in Tariff, section 5.10 during the auction process.  PJM states that, in that case, the Commission found that the waiver request was prospective because PJM sought waiver of "its future obligation to clear the Second Incremental Auction using the updated PJM Region Peak Load Forecast it posted before February 1, 2020" and instead, PJM sought to clear the auction in July 2020 "using an updated forecast that reflects the significant economic impact of COVID-19."[47]  PJM states that the proposed Tariff changes will similarly only impact future actions not yet taken in the auction process—

---

[41] *Id.*

[42] *Id.* at 22.

[43] *Id.* at 24.

[44] *Id.* at 24, 25 (citing *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (D.C. Cir. 2021) (*Okla. Gas*)).

[45] *Id.* at 26.

[46] *Id.* at 26-27.

[47] *Id.* at 27 (citing *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,208 (2020) (Planning Parameter Order)).

namely, clearing the 2024/2025 BRA using a correct LDA Reliability Requirement.[48]
PJM clarifies that it is not proposing any modifications to activities or deadlines which
have already passed, but instead proposes to prospectively include an additional factor to
be considered in the optimization algorithm when evaluating the auction inputs before the
2024/2025 BRA results are determined.[49] PJM notes that, absent this change, PJM would
be forced to use a "materially inaccurate" LDA Reliability Requirement in clearing the
2024/2025 BRA.[50] PJM contends that this would result in an unjust and unreasonable
outcome inconsistent with the Commission's statutory duty to ensure just and reasonable
rates.

15.    Third, PJM contends that the Tariff changes effectuate an existing Tariff provision
providing prior notice to customers that PJM may seek Commission approval of Tariff
modifications where "imminent severe economic harm to electric consumers requires a
prompt section 205 filing."[51] PJM contends that the Commission has previously
acknowledged that this provision gives PJM the authority to make emergency filings with
the Commission and that PJM may apply for waiver of the Commission's 60-day prior
notice requirement "under such circumstances."[52] PJM states that it is filing the proposed
Tariff revisions pursuant to this Tariff provision, section 9.2(b), "given the 'imminent
severe economic harm'" to Delmarva customers if the auction is cleared under the
"outdated" LDA Reliability Requirement.[53] PJM further explains that the Commission
has previously found Tariff section 9.2(b) gives PJM "the ability to respond to emergency
circumstances" in declining to require PJM to implement a "circuit breaker" to cap
excessive charges during shortage pricing conditions.[54] PJM states the Commission
further cited Tariff section 9.2(b) in finding that "PJM has authority to act if it determines
that an emergency requires the suspension of shortage pricing to address imminent harm
to reliability or consumers," and "[i]n its role as an RTO, PJM has a responsibility to

---

[48] *Id.* at 24.

[49] *Id.* at 4.

[50] *Id.*

[51] *Id.* at 24 (citing PJM, Intra-PJM Tariffs, § I.9.2(b) Rights of the Transmission
Provider).

[52] *Id.* at 28-29 (citing *PJM Interconnection, L.L.C.*, 141 FERC ¶ 61,096, at P 11
(2012) (Shortage Pricing Order)).

[53] *Id.* at 29.

[54] *Id.* at 28 (citing *PJM Interconnection, L.L.C.*, 139 FERC ¶ 61,057 at P 232
(2012)).

determine when/if such an emergency filing should be made with the Commission and can apply for a waiver of the Commission's 60-day prior notice requirement under such circumstances."[55]  PJM argues that Tariff section 9.2(b) was intended for this type of circumstance and would have no meaning if it could not be applied here.

16.     Fourth, PJM argues that, because no capacity awards have been made or final results posted, there is not a final rate for the 2024/2025 BRA for which any entity has an entitlement or settled expectation at this time.[56]

17.     PJM states that some stakeholders may object to the requested effective date because the Tariff requires the LDA Reliability Requirement to be posted in advance of the auction.[57]  However, PJM states that the Tariff also requires PJM to adjust the LDA Reliability Requirement to reflect any Price Responsive Demand[58] which clears the auction.[59]  PJM therefore argues that participants do not have an expectation that the LDA Reliability Requirement posted in advance of the auction will remain the same through the auction process.

---

[55] *Id.* at 28-29 (citing Shortage Pricing Order, 141 FERC ¶ 61,096 at P 11).

[56] *Id.* at 24.

[57] *Id.* at 23.

[58] The RAA defines Price Responsive Demand (PRD) as "end-use customer load registered by a PRD Provider pursuant to Reliability Assurance Agreement, Schedule 6.1 that have, as set forth in more detail in the PJM Manuals, the metering capability to record electricity consumption at an interval of one hour or less, Supervisory Control capable of curtailing such load (consistent with applicable RERRA requirements) at each PRD Substation identified in the relevant PRD Plan or PRD registration in response to a Maximum Generation Emergency declared by the Office of the Interconnection (prior to 2022/Delivery Year) or a Performance Assessment Interval that triggers a PRD performance assessment (effective with 2022/2023 Delivery Year), and a retail rate structure, or equivalent contractual arrangement, capable of changing retail rates as frequently as an hourly basis, that is linked to or based upon changes in real-time Locational Marginal Prices at a PRD Substation level and that results in a predictable automated response to varying wholesale electricity prices."  PJM, Intra-PJM Tariffs, RAA, Article 1 – Definitions (36.0.0).

[59] PJM ER23-729-000 Transmittal at 23 (citing PJM, Intra-PJM Tariffs, Attach. DD § 5.11(e) Posting of Information Relevant to the RPM Auctions).

Document Accession #: 20230421-3099   Filed Date: 03/21/2023

18.     PJM acknowledges that sellers have submitted offers based on the planning parameters that have been posted.[60]   However, PJM argues that it is the actions of the sellers who chose not to participate in the auction, rather than the posted planning parameters, that created the unjust and unreasonable mismatch between prices and actual reliability conditions in Delmarva.  Therefore, PJM argues, "there was no specific planning parameter reliance let alone a capacity award that would trigger application of the filed-rate doctrine."[61]

19.     Finally, PJM argues that Tariff, Attachment DD, section 5.11(e) states that capacity auction results may be subject to change by the Commission when there are errors.[62]   PJM argues that the 2024/2025 BRA results would be in error absent the proposed Tariff changes because PJM would not be able to clear the auction in a way that minimizes the cost of satisfying reliability requirements as required by the Tariff.[63]   PJM acknowledges that this provision is focused on PJM's ability, rather than the Commission's, to correct errors but argues that the provision still puts market participants "on notice of the Commission's inherent FPA section 206 authority to correct anomalous results before the market closes and capacity awards are made."[64]   PJM also states that this provision explicitly provides that the initially posted auction results may be reviewed by the Commission, and thus, participants were on notice that the Commission may correct an error to the initial posting of auction results and change any such initial results to ensure just and reasonable rates.  PJM states that it "does not have the ability to correct this situation, but the Commission can by accepting PJM's proposed correction and directing PJM to finalize the results on that basis."[65]   PJM states that, given that the Tariff, Attachment DD, section 5.11(e) places market participants on notice of potential changes to fix errors after the initial auction results are posted, "the Tariff surely also

[60] *Id.* at 24-25.

[61] *Id.* at 25 (citing PJM, Intra-PJM Tariffs, Attach. DD § 5.11(e) Posting of Information Relevant to the RPM Auctions ("If PJM discovers a potential error in the initial posting of auction results for a particular Reliability Pricing Model Auction, it shall notify Market Participants as soon as possible after it is found" and that the deadlines for correcting such an error "shall not apply if the referenced auction results are under publicly noticed review by the FERC.").

[62] *Id.* at 30.

[63] *Id.* at 31 (citing PJM, Intra-PJM Tariffs, Attach. DD § 5.12(a) Conduct of RPM Auctions).

[64] *Id.* at 30.

[65] *Id.* at 31.

allows the Commission to prospectively fix such errors prior to the completion of the auction and the actual awarding of capacity obligations," which PJM states is "precisely what PJM is proposing through this filing."[66]

## B.   **Complaint**

20.    Concurrently with its FPA section 205 filing, PJM filed a complaint pursuant to FPA section 206, alleging that the existing LDA Reliability Requirement, absent PJM's proposed Tariff revisions, would result in an unjust and unreasonable auction outcome that would be inconsistent with actual market fundamentals because the LDA Reliability Requirement does not reflect the actual supply and demand of the Delmarva LDA.[67] PJM notes that, under the existing Tariff, load in the Delmarva LDA would pay over $100 million in excess of what is necessary for capacity for the 2024/2025 delivery year.[68] PJM explains that its FPA section 206 complaint filing contains identical proposed Tariff amendments as its FPA section 205 filing, but that the complaint filing gives the Commission the ability to direct different Tariff reforms, should the Commission choose to do so.[69] PJM states that should PJM's FPA section 205 filing be accepted, PJM places parties on notice that it would consider this FPA section 206 filing to be moot and withdrawn.[70]

21.    PJM also states that it believes that the LDA Reliability Requirement issue is narrow enough to be addressed without reopening the offer window, but states "that in the unlikely event that PJM is required to take this extraordinary step in the future due to an issue with more significant impacts, it may be necessary to consider potentially restarting the BRA including reopening the bidding window."[71] PJM also notes that, if the Commission has concerns with updating the rules of the auction while the auction is

---

[66] *Id.* at 31.

[67] PJM EL23-19 Transmittal at 1-2.

[68] *Id.* at 34.

[69] *Id.* at 6 (citing *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108 (D.C. Cir. 2017)).

[70] *Id.* at 2 n.4, 36.

[71] *Id.* at 31.

in progress, it can direct PJM to restart the 2024/2025 BRA with the amended rules
described in this filing under the Commission's FPA section 206 authority.[72]

22.    PJM requests that the Commission set a refund effective date of December 23,
2022, the date of filing.[73]  PJM states that the proposed refund effective date is significant
because the complaint was filed prior to the posting of any BRA results associated with
the 2024/2025 delivery year, and as such, provides notice to market participants that any
indicative auction results that may be posted for this BRA are subject to change based on
a revised LDA Reliability Requirement.

## III.    Notice and Responsive Pleadings

23.    Notice of PJM's filings were published in the *Federal Register*, 88 Fed. Reg. 70
(Jan. 3, 2023), with interventions and protests due on or before January 20, 2022.
Notices of intervention and timely motions to intervene were filed by the entities listed in
Attachment A.  Sierra Club filed a motion to intervene out of time.

24.    Timely comments were filed by the following parties:  American Clean Power
Association, Solar Energy Industries Association, and Advanced Energy United
(collectively, the Clean Energy Associations); American Municipal Power, Inc. (AMP);
Constellation Energy Generation, LLC (Constellation); the Delaware Public Service
Commission, the Delaware Division of the Public Advocate, the Delaware Municipal
Electric Corporation, the Maryland Public Service Commission, and the Virginia State
Corporation Commission (collectively, the Delmarva Load Parties); Electric Power
Supply Association (EPSA); Freepoint Solar LLC (Freepoint); Invenergy Wind
Development North America LLC, Invenergy Solar Development North America LLC
and Invenergy Thermal Development LLC (Invenergy); Buckeye Power, Inc. and East
Kentucky Power Cooperative, Inc. (collectively, Joint Electric Cooperatives); Leeward
Renewable Energy, LLC and Leeward Renewable Energy Development, LLC (Leeward);
Lotus Infrastructure, LLC (Lotus); LS Power Development, LLC (LS Power); Maryland
Office of People's Counsel (Maryland People's Counsel); Monitoring Analytics, LLC,
acting in its capacity as the Independent Market Monitor for PJM (Market Monitor); New
Jersey Board of Public Utilities (New Jersey Board); NRG Power Marketing, LLC and
Midwest Generation, LLC (NRG); Organization of PJM States, Inc. (OPSI); Old
Dominion Electric Cooperative (ODEC); Public Utilities Commission of Ohio's Federal
Energy Advocate (Ohio FEA); Pennsylvania Public Utility Commission (Pennsylvania
Commission); Pine Gate Renewables, LLC (Pine Gate); PJM Power Providers Group
(P3); Public Citizen, Inc. (Public Citizen); Public Service Electric and Gas Company,

---

[72] *Id.* at 31 n.42.

[73] *Id.* at 32-33.

Docket Nos. ER23-729-000 and EL23-19-000                                         - 14 -

PSEG Power LLC, and PSEG Energy Resources & Trade LLC (collectively, PSEG);
Vistra Corp. (Vistra).

25.     On February 2, 2023, PJM filed an answer.  On February 3, 2023, the Market
Monitor filed an answer.  On February 6, 2023, ODEC, Sierra Club and Natural
Resources Defense Council (Sierra/NRDC), and Constellation filed answers.  On
February 8, 2023, PJM filed an additional limited answer.  On February 9, 2023, EPSA
and P3 filed answers.  On February 16, 2023, the Market Monitor filed an additional
answer.  On February 17, 2023, Leeward filed an answer.

## IV.     **Comments**

### A.     **PJM's Proposal to Modify LDA Reliability Requirements**

#### 1.     **Comments**

26.     Several parties support PJM's proposed revisions.[74]  The Delmarva Load Parties
urge the Commission to accept PJM's filing as an appropriate and timely remedy that is
consistent with the filed rate doctrine and the rule against retroactive ratemaking.[75]  The
Market Monitor supports the application of PJM's solution to the 2024/2025 BRA.  The
Market Monitor states that PJM is correct that, without a modification consistent with
PJM's proposed rule change, the capacity prices in Delmarva would be significantly
greater than the efficient and competitive level because the supply and demand
fundamentals in the model do not reflect reality.[76]

27.     Although the Market Monitor supports PJM's proposal for the 2024/2025 BRA,
for future auctions, the Market Monitor would prefer the Commission to require all
planned resources to commit to a must offer requirement by a defined date prior to the
posting of auction parameters by PJM.[77]  ODEC contends that PJM's proposal is
narrowly tailored to address the problem detailed in PJM's filing regarding the 2024/2025
BRA and also applicable beyond the immediate BRA, so it should provide PJM and

---

[74] Delmarva Load Parties Comments at 4; Maryland People's Counsel Comments
at 4; New Jersey Board Comments at 2; Pennsylvania Commission Comments at 3-4;
ODEC Comments at 2, 8; OPSI Comments at 3.

[75] Delmarva Load Parties Comments at 1-5.

[76] Market Monitor Comment at 2.

[77] *Id.* at 5.

Document Accession #: 20230621-3009   Filed Date: 06/21/2023

market participants with certainty and protection against unrealistic LDA Reliability Requirements in future capacity auctions.[78]

28.     AMP supports PJM's proposal for the 2024/2025 BRA but argues that "it is possible that PJM's proposal will fall short of preventing similarly unjust, unreasonable, and unduly discriminatory results in future auctions."[79]  Ohio FEA states that while it has concerns with PJM's proposal, to the extent the Commission determines an adjustment should be made, it should apply only to the 2024/2025 BRA.[80]

29.     Several parties argue that PJM's FPA section 205 filing has not been shown to be just and reasonable.[81]  Specifically, commenters argue that PJM has not justified focusing its solution on Planned Generation Capacity Resources that fail to offer in the BRA.  For example, EPSA argues that PJM arbitrarily proposes to modify the LDA Reliability Requirement in circumstances where planned resources do not submit offers, but not where they offer but do not clear in the relevant BRA, even though the effect is functionally the same from a reliability perspective.[82]  Similarly, Freepoint argues that PJM does not address the situation where a planned resource is removed from the offer stack and rejected as mitigated.[83]

30.     NRG states that it asked PJM for an explanation of the large jump in the Delmarva LDA Reliability Requirement from the 2023/2024 BRA to the 2024/2025 BRA, and PJM pointed to "historical winter forced outages levels and an expected increase in the penetration of solar resources . . . ."[84]  NRG argues that PJM's proposed remedy, however, implicitly assumes that the "increase in solar penetration" and other new entry in Delmarva will not occur to the extent these planned resources were not offered into the

---

[78] ODEC Comments at 8.

[79] AMP Comments at 4.

[80] Ohio FEA Comments at 4.

[81] Constellation Protest at 16; EPSA Protest at 19-20; Invenergy Protest at 7; Leeward Protest at 11; P3 Protest at 30; Vistra Protest at 3, 10.

[82] EPSA Protest at 24; *see also* Constellation Protest at 7; Freepoint Comments at 8.

[83] Freepoint Comments at 8.

[84] NRG Protest at 22 (citing NRG Holtman Aff. ¶ 27; NRG Aff. Ex. C).

2024/2025 BRA.[85]  NRG explains that, under its current approach, PJM assumes that all of the planned resources with executed ISAs will be in-service by the delivery year, while under its instant proposal PJM assumes that none of the planned resources not offered will be in-service by the delivery year.[86]  NRG argues that the latter speculation is unsupported and threatens to undermine reliability.  NRG states that PJM is proposing to truncate a price signal that may still be needed to ensure reliability.[87]

31.    Similarly, EPSA argues that PJM fails to consider that planned and existing Intermittent Resources are exempt from the must-offer obligation, so the capacity offered into a capacity auction is not necessarily an accurate indicator of CETO or the LDA Reliability Requirement.[88]  EPSA explains that the LDA Reliability Requirement and CETO are calculated based on projected internal capacity and not capacity commitments, and therefore account for the fact that resources that are in service and available to produce energy will affect reliability outcomes regardless of whether they have a capacity commitment.[89]  EPSA further argues that the MW of Intermittent Resources offering into capacity auctions has decreased as the penetration of such resources has increased, suggesting that even resources that will be online in time for the 2024/2025 delivery year may have chosen not to accept a capacity commitment.[90]  P3 similarly argues that PJM has not provided an explanation for why its proposed solution only applies to Planned Generation Capacity Resources, or why it is not unduly discriminatory to adjust the LDA Reliability Requirement for Planned Resources that do not offer but not for other resources exempt from the must offer obligation.[91]

32.    Leeward contends that PJM's proposal as it applies to future auctions is overbroad and would allow PJM to unilaterally make an after-the-fact determination that an auction outcome is unjust and unreasonable, based upon an arbitrary and non-transparent

---

[85] *Id.* at 23 (citing NRG Aff. Ex. C).

[86] *Id.* (citing PJM ER23-729-000 Transmittal at 13; PJM EL23-19-000 Transmittal at 18); *see also* EPSA Protest at 21-26 (citing EPSA Sotkiewicz Aff. ¶¶ 48-50).

[87] *Id.* at 24 (citing NRG Holtman Aff. ¶¶ 28-31; *ISO New England Inc.*, 162 FERC ¶ 61,205, at P 21 (2018)).

[88] EPSA Protest at 21-26 (citing EPSA Sotkiewicz Aff. ¶¶ 48-50); *see also* P3 Protest at 40.

[89] *Id.* at 22.

[90] *Id.* at 23-25.

[91] P3 Protest at 40.

Document Accession #: 20230421-3069     Filed Date: 04/21/2023

assessment.[92]  NRG argues that PJM's proposal defeats the purpose of posting planning parameters in advance of the auction and will chill beneficial bilateral contracting and hedging activities around the capacity auction.[93]  NRG argues that there is no "workable or meaningful" way for market participants to price the risk that PJM will modify the LDA Reliability Requirement after offers have been submitted in a way which could result in a large reduction in the clearing price.[94]

33.     P3 contends that, although PJM asserts that the LDA Reliability Requirement will be more accurate under PJM's proposal, PJM ignores the fact that it will necessarily render sell offers less accurate, because they will be based on the initial LDA Reliability Requirement, which PJM describes in the instant filings as "inaccurate."[95]  Given this, P3 argues that PJM should provide evidence that its proposed solution will reflect supply and demand dynamics.[96]

34.     EPSA argues that PJM's proposal is unjust and unreasonable because it fails to strike a balance between reducing prices for load and ensuring suppliers needed for reliability receive adequate compensation.[97]  EPSA argues that this is evidenced by the market failing to send the necessary price signals for the replacement of the Indian River 4 Generating Station, which is now under a Reliability Must Run agreement after seeking to retire after failing to clear prior BRAs.[98]  EPSA contends that PJM has also overlooked other serious reliability issues, such as that Intermittent Resources do not help small LDAs satisfy their reliability objectives because of the high correlation in outages when

---

[92] Leeward Protest at 6, 11; *see also* Clean Energy Associations Protest at 3.

[93] NRG Protest at 20.

[94] *Id.*

[95] P3 Protest at 41-42 (citing PJM ER23-729-000 Transmittal at 20-22).

[96] *Id.* at 42.

[97] EPSA Protest at 27.

[98] *Id.  See, e.g.*, *NRG Power Mktg. LLC*, 179 FERC ¶ 61,156 (2022) (*NRG*) (accepting Reliability Must Run rate schedule for filing, suspending it for a nominal period, to be effective June 1, 2022, subject to refund, and establishing hearing and settlement procedures).

they are most needed and that resources cannot adequately reflect their risks in their capacity offers.[99]

35.     Some commenters argue PJM has not sufficiently justified the proposed materiality threshold as just and reasonable.[100] P3 argues that PJM has not explained how it arrived at the one percent threshold.[101] Constellation states that PJM has failed to demonstrate that a year-over-year change in the LDA Reliability Requirement is a just and reasonable trigger to modify the auction inputs.[102] Constellation and P3 also argue that PJM has not explained how often the materiality threshold will trigger, but assert that it may be triggered often.[103] Constellation contends that PJM has not explained whether an LDA Reliability Requirement could increase under circumstances unrelated to Planned Generation Capacity Resource entry and argues that, if so, a more surgical trigger may be warranted.[104] P3 argues that PJM has not explained how the threshold would impact reliability and clearing prices.[105] P3 contends that PJM has provided no concrete evidence concerning the rate impact on Delmarva—much less the other LDAs— either for the 204/2025 BRA or future auctions.[106]

## 2.     Answers

36.     PJM reiterates that its proposal represents a just and reasonable approach to reflect actual participation of Planned Generation Capacity Resources in the LDA Reliability Requirement so that the requirement is representative of the actual reliability needs of the LDA.[107] PJM states that P3 erroneously asserts that PJM's proposal does not address the

---

[99] EPSA Protest at 27.

[100] Constellation Protest at 16; EPSA Protest at 25-26; Freepoint Comments at 8; Invenergy Protest at 7; P3 Protest at 40-41; Vistra Protest at 11.

[101] P3 Protest at 40-41.

[102] Constellation Protest at 16-18.

[103] P3 Protest 40-4; Constellation Protest at 17.

[104] Constellation Protest at 17.

[105] P3 Protest at 40-41.

[106] *Id.* at 41.

[107] PJM February 2 Answer at 28.

identified issue because it does not consider Intermittent Resources.[108]  PJM clarifies that
Planned Generation Capacity Resources can include Intermittent Resources and so
Intermittent Resources that do not offer into the capacity auctions will be excluded from
the calculation of the LDA Reliability Requirement as well.

37.     PJM also disagrees with protesters' arguments that the proposal is flawed because
it excludes only resources that do not participate in the capacity auctions from the LDA
Reliability Requirement and includes resources that do not clear.[109]  PJM explains that
load cannot rely on resources that do not participate in the capacity auctions as capacity
for the relevant delivery year.  PJM states that such resources are appropriately excluded
from the LDA Reliability Requirement because, even if such resources were in-service
by the start of the delivery year, there is no need for CETO to account for the potential of
those resources having forced outages (for thermal resources) or not aligning output with
the riskiest hours of the year (for Intermittent Resources) since load is not depending on
them as capacity resources.  PJM further argues that it is appropriate to focus on
resources that did not participate in the auction, rather than resources that do not clear the
auction, because any resources that participated would necessarily have cleared the
auction due to the overstated LDA Reliability Requirement.[110]

38.     PJM also continues to argue that its proposed materiality threshold is just and
reasonable.[111]  PJM contends that it is not necessary to apply PJM's proposed solution in
every LDA because the impact of Planned Generation Capacity Resources not being
offered into the capacity auctions is immaterial in large LDAs and does not require
updating the Locational Deliverability Area Reliability Requirement.  In response to
protesters' argument that the trigger should be higher so it only narrowly targets
Delmarva, PJM argues that a one percent threshold is prudent in the event future updates
are necessary in other LDAs.[112]  PJM notes that Delmarva is the only LDA with an LDA
Reliability Requirement that increased by more than one percent for the 2024/2025 BRA
relative to the 2023/2024 BRA and, as a result, the proposed revision would only apply to
Delmarva with respect to the 2024/2025 BRA.  However, PJM states that the one percent
materiality threshold also prevents anomalies that could significantly impact prices in the
future.  PJM states that it only has to propose a just and reasonable materiality threshold

---

[108] *Id.* at 28-29 (citing PJM, Intra-PJM Tariffs, § I.1 Definitions I-J-K (14.0.0)).

[109] *Id.* at 29.

[110] *Id.* at 30.

[111] *Id.*

[112] *Id.* at 31 (citing Constellation Protest at 20).

and that the Commission "is not required to choose the best solution, only a reasonable one."[113]

39.    The Market Monitor contends that the policy objections to PJM's filings are "hyperbolic and misplaced."[114]  The Market Monitor argues that PJM's proposal is not subjective or arbitrary but would instead apply an objective rule to ensure the prices resulting from the BRA reflect actual supply and demand.[115]  The Market Monitor argues that if the prices are correct, the market incentives are correct and consistent with reliability needs.[116]

### B.    Filed Rate Doctrine

#### 1.    Comments in Support of PJM's FPA Section 205 Proposal

40.    Some parties agree with PJM that modifying the 2024/2025 BRA results at this stage would not violate the filed rate doctrine.[117]  Certain commenters agree with PJM that the proposed changes are prospective because PJM has not yet completed the 2024/2025 BRA.[118]  The Delmarva Load Parties note that PJM is still in the process of evaluating the sell offers and other inputs to the 2024/2025 BRA and has not made any capacity awards for the relevant delivery year or posted final results for the auction.[119]  Accordingly, the Delmarva Load Parties argue that it is appropriate for PJM to

---

[113] *Id.* (citing *PJM Interconnection, L.L.C.*, 147 FERC ¶ 61,103, at P 59 (2014); *Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) ("FERC is not required to choose the best solution, only a reasonable one."); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) ("FERC has interpreted its authority to review rates under the FPA as limited to an inquiry into whether the rates proposed by a utility are reasonable—and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs.")).

[114] Market Monitor February 3 Answer at 1.

[115] *Id.* at 1-2.

[116] *Id.* at 4.

[117] Delmarva Load Parties Comments at 5; New Jersey Board Comments at 2; Pennsylvania Commission Comments at 3.

[118] Delmarva Load Parties Comments at 5 n. 13; New Jersey Board Comments at 2, 5.

[119] Delmarva Load Parties Comments at 5 n. 13.

prospectively revise its optimization algorithm to ensure correct price signals and avoid anomalous results. New Jersey Board similarly notes that capacity sellers have submitted offers, but argues that PJM has yet to accept, reject, or otherwise act on them.[120] New Jersey Board states that the only formal action PJM has completed in the 2024/2025 BRA is the publication of the initial auction parameters, but that PJM has yet to "run its optimization algorithm, formally clear results, and award capacity commitments."[121]

41.      New Jersey Board asserts that the lack of any completed transaction or sale of capacity in the 2024/2025 BRA also logically precludes the possibility that a Tariff amendment implemented now and applied to the auction could constitute a retroactive change.[122] New Jersey Board explains that both the U.S. Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) have made clear, the filed rate doctrine prohibits "a regulated seller of [power] . . . from collecting a rate other than the one filed with the Commission . . . for [power] *already sold*."[123] Therefore, New Jersey Board avers that the filed rate doctrine is not implicated when tariff changes will only apply to yet-to-be concluded sales of energy or capacity because, by definition, changes to a yet-to-be-determined wholesale rate cannot be retroactive, nor can rules be retroactively applied to a transaction that has not yet occurred.

42.      New Jersey Board also argues that existing Commission precedent indicates that tariff changes that occur after a transaction is initiated but prior to its completion can validly apply, and generally do apply, to that transaction.[124] Specifically, in the interconnection context, New Jersey Board argues that the almost "unbroken Commission practice" has been to hold that "interconnection agreements filed after the designated effective date of an amended tariff are governed by the amended tariff," rather than the version of the tariff that was in effect while the agreement was being negotiated.[125] New Jersey Board adds that the D.C. Circuit also held that a Commission decision to depart from that precedent and apply the version of a tariff that was in effect

---

[120] New Jersey Board Comments at 6-7.

[121] *Id.* (citing PJM ER23-729-000 Transmittal at 3-4).

[122] *Id.* at 7.

[123] *Id.* (citing *Old Dominion Elec. Coop., Inc. v. FERC*, 892 F.3d 1223, 1227 (D.C. Cir. 2018) (*Old Dominion*) (quoting *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (*Arkla*)) (emphasis added)).

[124] *Id.* at 8.

[125] *Id.* (citing *W. Deptford Energy LLC v. FERC*, 766 F.3d 10, 19-22 (D.C. Cir. 2014) (*West Deptford*)).

when a project entered the interconnection queue was arbitrary and capricious. New Jersey Board contends that by analogy, the version of the Tariff that governs the actual clearing of the 2024/2025 BRA should be the version in effect at the time PJM concludes the auction by calculating and publishing the formal clearing result, not when the auction process began or when capacity market sellers entered into the BRA's equivalents of sales negotiations by submitting their offers.

43.     Pennsylvania Commission argues that the Commission should generally avoid changing rules while offers are outstanding, but that such changes are appropriate where, as here, (1) the tariff change is shown to be appropriate and uncontroversial if the rule were solely to be applied to future auctions, and (2) the additional costs to customers if the change were not to occur provides no benefit to those customers.[126]

44.     ODEC states that it supports PJM's actions to prevent "imminent severe economic harm to electric consumers" as its Tariff permits.[127]  ODEC states that the level of the estimated price increase presents imminent severe economic harm to Delmarva customers.

## 2.     **Protests**

### a.     **General**

45.     Protestors argue that PJM's proposal is barred by the filed rate doctrine and the rule against retroactive ratemaking.[128]  EPSA and Constellation argue that even if the existing rules would produce an unjust and unreasonable result, the filed rate doctrine does not provide the Commission with discretion to waive the filed rate or retroactively change or adjust a rate for good cause or for any other equitable consideration.[129]

---

[126] Pennsylvania Commission Comments at 3.

[127] ODEC Comments at 10 (citing PJM ER23-729-000 Transmittal at 28 (citing PJM, Intra-PJM Tariffs, § 9.2(b) Rights of the Transmission Provider)).

[128] Vistra Protest at 2-3 (citing *Old Dominion*, 892 F.3d at 1230 (citing *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 794-97 (D.C. Cir. 1990) (*Columbia Gas*)); Vistra Protest at 6, 9.  *See also* Clean Energy Associations Protest at 2, 5; Constellation Protest at 12; EPSA Protest at 5-16; Leeward Protest at 7; NRG Protest at 5; P3 Protest at 14-15.

[129] EPSA Protest at 16 (citing *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 117 (1990); *Old Dominion*, 892 F.3d at 1226).  *See also* Constellation Protest at 12 (citing *Pub. Utils. Comm'n of the State of Cal. v. FERC*, 988 F.2d 154, 168 n.12 (D.C. Cir. 1993) (*Pub. Utils. Comm'n of Cal.*); *Old Dominion*, 892 F.3d at 1230 (citing

46.     Protestors also disagree that applying PJM's proposal to the 2024/2025 BRA can be considered prospective.[130]  Several parties disagree with PJM that the proposed changes would only impact actions not yet taken in the 2024/2025 BRA because the Tariff requires that the LDA Reliability Requirement be established before PJM clears the auction.[131]  EPSA argues that the Tariff requires that the previously established parameters be used to determine the demand curves used to clear the auction.[132]  P3 argues that, whether the auction remains ongoing is irrelevant to the filed rate doctrine because PJM's requested relief would require back-tracking to modify already-established auction parameters.[133]  NRG argues that PJM proposes to prospectively apply new Tariff language that allows for retroactive modification of a key planning parameter, the LDA Reliability Requirement, after the applicable deadline for posting planning parameters has passed and activities in reliance on the posted parameters have concluded.[134]  NRG avers that the fundamental purpose of the filed rate doctrine, as well as the corollary prohibition against retroactive ratemaking, is to "ensure predictability"[135] and, as the courts have recognized, "[t]his kind of post hoc tinkering . . . undermine[s] the predictability which the doctrine seeks to protect."[136]

47.     Several parties argue the Planning Parameter Order is not relevant to the instant proceeding because PJM requested that waiver before the auction window opened.[137]

---

*Columbia Gas*, 895 F.2d at 794-97))).

[130] Invenergy Protest at 2, 4.

[131] EPSA Protest at 12-13; NRG Protest at 5; Vistra Protest at 3.

[132] EPSA Protest at 10-11 (citing PJM, Intra-PJM Tariffs, Attach. DD, § 5.10(vi)(A) Auction Clearing Requirements).

[133] P3 Protest at 18-19.

[134] NRG Protest at 5.

[135] *Id.* at 10 (citing *OXY USA, Inc. v. FERC,* 64 F.3d 679, 699 (1995); *Consol. Edison Co. of N.Y. v. FERC*, 347 F.3d 964, 969 (D.C. Cir. 2003) (*Consol. Edison*) ("By authorizing only prospective rate changes, these doctrines ensure rate predictability" (citing *Columbia Gas*, 895 F.2d at 793))).

[136] *Id.* (citing *Pub. Util. Comm'n of Cal.*, 894 F.2d at 1383).

[137] Lotus Protest at 8 (citing PJM Interconnection, L.L.C., Request for Waiver, Docket No. ER20-1870-000, at 2 (filed May 20, 2020)); Vistra Protest at 8 (citing Planning Parameters Order, 171 FERC ¶ 61,208); *see also* Freepoint Comments at 6

Vistra maintains that the instant circumstances, where auction results have been developed based on Commission-approved Tariff provisions, are not similar to the unforeseeable and dramatic economic consequences of the COVID-19 pandemic.[138] Vistra argues that the instant scenario is not unique or dramatic, noting that the Market Monitor's analysis of the 2023/2024 BRA highlighted that at least 30% of intermittent and storage resources did not offer into the 2023/2024 BRA.[139]

48.     Several parties also note that the Commission previously denied a request for waiver to modify the auction rules after the offer window had closed.[140]  Vistra explains that the Commission, in denying the waiver, explained its reluctance to alter the rules of the auction after it had begun:

> Changing the rules governing an *already-commenced* auction
> is a significant step that affects both the outcome of that
> particular auction as well as parties' confidence in the rules
> governing future proceedings. That is particularly so here,
> where the record indicates that PJM proposed the waiver in
> order to avoid the outcome that the already-commenced
> auction would have produced.[141]

49.     Freepoint argues that in *Oklahoma Gas*, the D.C. Circuit agreed with the Commission's determination that the one-year billing requirement was part of the filed rate and therefore could not be waived retroactively.[142]  Similarly, Freepoint asserts, the Tariff definition of LDA Reliability Requirement that PJM seeks to change was effective

---

(Planning Parameters Order, 171 FERC ¶ 61,208).

[138] Vistra Protest at 8.

[139] *Id.* (citing The Independent Market Monitor for PJM, Analysis of the 2023/2024 RPM Base Residual Auction (Oct. 28, 2022) at P 31. https://www.monitoringanalytics.com/reports/Reports/2022/IMM_Analysis_of_the_2023 2024_RPM_Base_Residual_Auction_20221028.pdf).

[140] Lotus Protest at 8 (citing PJM Interconnection, L.L.C., Request for Waiver, Docket No. ER18-2068, at 2 (filed Jul. 26, 2018)); NRG Protest at 15 (*PJM Interconnection, L.L.C.*, 166 FERC ¶ 61,072, at P 33 (2019) (*GreenHat*); Vistra Protest at 3.

[141] Vistra Protest at 3 (citing *GreenHat*, 166 FERC ¶ 61,072 at P 33 (emphasis in original)).

[142] Freepoint Comments at 5 (citing *Okla. Gas*, 11 F.4th 824-25, 827).

for the 2024/2025 BRA that commenced on December 7, 2022, and, therefore, cannot be waived or changed retroactively.

50.    Parties also argue that PJM's choice to postpone posting BRA results does not mean that the auction was not completed.[143] Several parties assert that the auction is completed because PJM's filings make clear that PJM has already determined the 2024/2025 BRA results and, because it took issue with those results, has simply delayed posting them.[144] P3 argues that the Tariff provides no mechanism by which PJM can validly obtain "preliminary auction data" or "preliminary price calculations" of the type PJM describes in its filing.[145] EPSA argues that PJM must have already initially cleared the auction because that is the only way it could have identified what PJM views as an "anomalous auction result."[146] Constellation argues that posting the results of an auction to formalize the results is a ministerial activity that is not sufficient to undo an already-run auction.[147] Clean Energy Associations assert that PJM is overtly attempting to "skirt" the filed rate doctrine and rule against retroactive ratemaking by withholding auction results in order to create a window of opportunity to change its market rules under the guise of a prospective FPA section 205 filing.[148] EPSA argues that the lack of final auction results does not mean that participants did not rely on existing market rules or parameters posted prior to the auction.[149]

---

[143] Clean Energy Associations at 6; EPSA Protest at 13; Freepoint Comments at 5; Invenergy Protest at 4; NRG Protest at 10 (citing PJM, Intra-PJM Tariffs, Attach. DD, § 5.11(e) Posting of Information Relevant to the RPM Auctions); P3 Protest at 20; Pine Gate Protest at 6-7.

[144] EPSA Protest at 8; Invenergy Protest at 4; NRG Protest at 12 (citing PJM ER23-729-000 Transmittal at 2; PJM EL23-19-000 Transmittal at 3); P3 Protest at 20.

[145] P3 Protest at 20 (citing PJM ER23-729-000 Transmittal at 2-3).

[146] EPSA Protest at 8 (citing PJM ER23-729-000 Transmittal at 9); *see also* Leeward Protest at 8.

[147] Constellation Protest at 13 (citing *ISO New England Inc.*, 180 FERC ¶ 61,036, at PP 14-15 (2022) (rejecting attempts to change auction rules after the RTO ran the auction but before the Commission completed the process for confirming that ISO New England Inc. (ISO-NE) followed its auction rules)); *see also* P3 Protest at 10.

[148] Clean Energy Associations Protest at 5.

[149] EPSA Protest at 13.

51.     Vistra states that artificially dividing the auction into two segments by saying that
the proposed amendment prospectively applies to results that PJM has not finalized and
released, but does not apply to the offers and auction administration that occurred prior to
finalizing the results would create the exact kind of harm and uncertainty that the filed
rate doctrine and rule against retroactive ratemaking were designed to avoid.[150]

52.     NRG notes the Commission's longstanding policy of not re-running auctions.[151]
NRG asserts that should PJM's proposal be approved, it and other market participants
"cannot effectively revisit their economic decisions" or "retroactively alter their
conduct."[152]  P3 argues that approving PJM's proposed rate change for the 2024/2025
BRA would also be counter to the Commission's "entire catalog of precedent" on
forward capacity market deadlines.[153]  Several parties also argue that the filed rate

---

[150] Vistra Protest at 10 (citing *Qwest Corp. v. Koppendrayer*, 436 F.3d 859, 864
(8th Cir. 2006) ("The purpose of the rule against retroactivity, and the closely related
filed rate doctrine, is to ensure predictability."); *Pub. Utils. Comm'n of Cal.*, 988 F.2d at
163 ("Predictability is an underlying purpose of both the filed rate doctrine and the rule
against retroactive ratemaking."); *Towns of Concord, Norwood, & Wellesley v. FERC*,
955 F.2d 67, 71 (D.C. Cir. 1992) (*Towns of Concord*) (citing Elec. Dist. No. 1 v. FERC,
774 F.2d 490, 493 (D.C. Cir. 1985) ("necessary predictability" for industry participants
prior to when, rather than after, their business decisions are made is the "whole purpose"
of the filed rate doctrine))).

[151] NRG Protest at 15.

[152] *Id.* (citing *N.Y. Indep. Sys. Operator, Inc.*, 92 FERC ¶ 61,073, at 61,307 (2000),
*on reh'g,* 97 FERC ¶ 61,154 (2001); *Indep. Mkt. Monitor for PJM v. PJM
Interconnection, L.L.C.*, 176 FERC ¶ 61,137, at P 77 (2021), *on reh'g*, 178 FERC ¶
61,022 (2022); *Cal. Indep. Sys. Operator Corp.*, 151 FERC ¶ 61,247, at n.46 (2015);
*Astoria Generating Co. L.P. v. N.Y. Indep. Sys. Operator, Inc.*, 140 FERC ¶ 61,189, at P
141 (2012), *on reh'g*, 151 FERC ¶ 61,044, *on reh'g*, 153 FERC ¶ 61,274 (2015); *PJM
Interconnection, L.L.C.*, 128 FERC ¶ 61,157, at P 63 (2009); *Astoria Generating Co. v.
N.Y. Indep. Sys. Operator, Inc.*, 139 FERC ¶ 61,244, at P 132 (2012); *Bangor Hydro-
Elec. Co. v. ISO New England Inc.*, 97 FERC ¶ 61,339, at 62,589-91 (2001) (*Bangor
Hydro*), *on reh'g*, 98 FERC ¶ 61,298 (2002)).

[153] P3 Protest at 18 (citing *ISO New England Inc.*, 176 FERC ¶ 61,176, at P 12
(2021) ("the filed rate doctrine forbids a regulated entity from charging rates for its
services other than those properly on file with the appropriate federal regulatory
authority.  The corollary rule against retroactive ratemaking prohibits the Commission
from adjusting current rates to make up for a utility's over- or under-collection in prior
periods.").

doctrine applies to the rules governing the auction, rather than just to the clearing prices, and so the rules cannot be changed after running the auction without violating the filed rate doctrine.[154] EPSA notes that the Tariff requires PJM to determine and post the LDA Reliability Requirements in advance of the auction.[155] P3 similarly argues the filed rate includes the existing optimization algorithm, the auction parameters used as inputs, and the resulting clearing prices.[156] P3 argues that sellers relied on these rate and non-rate terms, and they cannot be retroactively changed without violating the filed rate doctrine.

53.    Clean Energy Associations aver that PJM is proposing a new definition of LDA Reliability Requirement to apply before the alleged close of the 2024/2025 BRA, even though a materially different definition of LDA Reliability Requirement was in effect at the opening of the 2024/2025 BRA, which violates the filed rate doctrine.[157] NRG opines that the issue is not whether the auction is open or closed; it is whether "the filed rates in existence at the time" when the relevant action occurred – i.e., when pre-auction actions were undertaken in reliance on the posted parameters or, at latest, when the auction was conducted – allowed for this adjustment.[158] Pine Gate argues that market participants

---

[154] EPSA Protest at 15 (citing *Pub. Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 168 FERC ¶ 61,042 at P 89 (2019) ("We also find that Public Citizen is incorrect in identifying the result of each Auction as the 'filed rate' because, in the market-based rate context, the rate on file with the Commission is the Tariff describing the Auction procedures, not the prices that may change over time."); *Bangor Hydro*, 97 FERC ¶ 61,339 at 62,589-90 ("[T]he clearing prices that were calculated for the period in question were the result of a formula that was prescribed by the market rules and applied as intended by them, and therefore the clearing prices comply with ISO-NE's tariff."); *Black Oak Energy, LLC v. N.Y. Indep. Sys. Operator, Inc.*, 122 FERC ¶ 61,261, at P 32 (2008) (noting that market rules "are the filed rate"); *ALLETE, Inc. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 119 FERC ¶ 61,142 at P 36 (2007); *ISO New England Inc.*, 90 FERC ¶ 61,141, at 61,425 (2000)). *See also* NRG Protest at 12-13; P3 Protest at 16; Pine Gate Protest at 5; LS Power Protest at 2-3.

[155] EPSA Protest at 15; P3 Protest at 15-16.

[156] P3 Protest at 15-16.

[157] Clean Energy Associations Protest at 6-7 (citing *West Deptford*, 766 F.3d at 12).

[158] NRG Protest at 12; *see also* Invenergy Comments at 2; EPSA Protest at 15 (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 153 FERC ¶ 61,101, at P 40 (2015), *on reh'g*, 155 FERC ¶ 61,174 (2016), *aff'd sub nom. MISO Transmission Owners v. FERC*, 860 F.3d 837 (6th Cir. 2017); *AEP Appalachian Transmission Co.*, 164 FERC ¶ 61,180, at P 18 (2018) (finding "that retroactive approval of the formula rate change

Document Accession #: 20230721-3069   Filed Date: 07/21/2023

were entitled to notice of prospective changes to the Tariff at the time the auction window closed.[159]  Constellation states that market participants could expect PJM to check the results of the auction algorithms prior to posting results but should not expect PJM to modify those algorithms prior to posting results, which is what PJM proposes to do in the instant filings.[160]

54.     Clean Energy Associations state that the courts recognized two circumstances in which rate adjustment may take effect prior to a FPA section 205 filing:  (1) when parties are aware that a rate is tentative and may be later adjusted with retroactive effect; or (2) when they have agreed to make a rate effective retroactively, neither of those circumstances are present here.[161]  Specifically, Clean Energy Associations argue that market participants had no notice that the 2024/2025 BRA would be subject to the market rules that PJM now seeks to implement.[162]

55.     Protesters argue that allowing PJM to change the auction rules after the offers have been submitted would set a dangerous precedent and undermine confidence in the

---

results in a violation of the filed rate doctrine and the prohibition against retroactive ratemaking"); *Midcontinent Indep. Transmission Sys. Operator, Inc.*, 161 FERC ¶ 61,020, at PP 7-8 (2017) (finding that filed rate doctrine barred application of true-up mechanism that had been accepted effective January 1, 2017, and rejecting argument that "because the true-up for the 2016 rate year will not be calculated until June 1, 2017, and will not actually affect customers' rates until January 1, 2018, it is a 'forward-looking rate mechanism'"); *Haviland Holdings, Inc. v. Pub. Serv. Co. of N.M.*, 107 FERC ¶ 61,034, at P 17 (2004) (finding that "the events subject to [a] complaint occurred prior to the . . . effective date of [a final rule]" and that procedures required by that rule "are not relevant to the Commission's determination on the issues in this proceeding")).

[159] Pine Gate Protest at 7; *see also* Freepoint Comments at 5-6.

[160] Constellation Protest at 13.

[161] Clean Energy Associations Protest at 7 (citing *Exxon Co. U.S.A. v. FERC*, 182 F.3d 30, 49 (D. C. Cir. 1999) (noting that "the rule against retroactive ratemaking does not extend to cases in which [customers] are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service") (internal quotation marks omitted); *Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 744 (D.C. Cir. 1992) (finding the Commission's decision to make the rate change effective prior to the effective date proper because the parties had contracted to make the rate retroactive and a waiver was not against the public interest)); *see also* Pine Gate Protest at 5-6.

[162] Clean Energy Associations Protest at 7.

market rules broadly.[163]  Clean Energy Associations argue that PJM's refusal to release the results of the 2024/2025 BRA materially undermines market participants' need for transparency and price predictability and that accepting PJM's proposal would set a precedent that any RTO can alter auction results if the RTO disagrees with the outcome.[164]  Leeward states that PJM's proposal would deter potential sellers from participating in the capacity market, thereby harming the competitive process and raising costs to consumers.[165]  P3 argues that adopting PJM's interpretation of the filed rate doctrine would create "terrible" precedent with ripple effects beyond PJM.[166]  Vistra argues that the Commission should remain mindful that accepting PJM's filing would have far reaching implications in every market for years to come with increased costs and reduced reliability associated with "profound regulatory uncertainty."[167]

### b.    Existing Tariff Provisions

56.    Several parties take issue with PJM's claim that its proposal is consistent with the filed rate doctrine and the rule against retroactive ratemaking because it will not violate any existing Tariff deadlines.  EPSA argues that under Tariff, Attachment DD, sections 5.10 and 5.11, PJM is required to determine and post certain information ahead of the BRA, such as the LDA Reliability Requirement, and that the LDA Reliability Requirement cannot now be changed without violating the Tariff.[168]

---

[163] *Id.* at 3, 19; Constellation Protest at 4; Freepoint Comments at 9; Invenergy Protest at 2; Lotus Protest at 10; Ohio FEA Comments at 4; NRG Protest at 20; Pine Gate Protest at 2; PSEG Protest at 2, 6; EPSA Protest at 19-20 (citing *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,153, at P 322 (2020) (2020 Reserves Order) (rejecting requests for an offset be applied to a previously-run BRA, finding that "even if we were to re-calculate the VRR curve and other capacity auction parameters based on a new E&AS Offset, there is no way to accurately determine how market participants would have offered in those BRAs based on the new parameters.")).

[164] Clean Energy Associations Protest at 4 (citing *PJM Interconnection, L.L.C.*, 139 FERC ¶ 61,057, at P 36 (2012)).

[165] Leeward Protest at 6; *see also* Pine Gate Protest at 10 (arguing development in Delmarva will be stifled).

[166] P3 Protest at 25-27.

[167] Vistra Protest at 3.

[168] EPSA Protest at 6-10.

57.     Protesters also argue that PJM is in violation of its Tariff requirement to post the auction results as soon as possible.[169]  Several parties contend that PJM has made a choice to withhold auction results, even though it is possible to post them, because PJM wishes to change the outcome.[170]  P3 argues that, even if the auction results contained an error, PJM was still obligated to post them.[171]  Clean Energy Associations argue that the Tariff does not allow PJM to use the interim period between when the auction runs and when PJM posts results as an opportunity to make changes to its market rules.[172]  EPSA contends the plain language of the Tariff is that PJM must post the final results promptly after clearing the auction under the rules set forth in the Tariff and compiling the relevant data.[173]

### i.     **Attachment DD, section 5.11(e)**

58.     Protestors disagree with PJM's argument that its proposal is consistent with the filed rate doctrine and the rule against retroactive ratemaking because Tariff, Attachment DD, section 5.11(e) provides notice to market participants that the auction results would be subject to change.[174]  NRG states that nothing in Tariff, Attachment DD, section 5.11(e) or any other Tariff provision suggests that the tasks to be completed between the closing of the auction window and the posting of auction results include anything but the mechanical and ministerial exercise of clearing the auction under the rules in effect when

---

[169] *Id.* at 11, 11 n. 34; Leeward Protest at 7; P3 Protest at 2; Pine Gate Protest at 7-8; Clean Energy Associations Protest at 7-8 (citing PJM, Intra-PJM Tariffs, Attach. DD, § 5.11(e) Posting of Information Relevant to the RPM Auctions ("After conducting the Reliability Pricing Model Auctions, PJM will post the results of each auction as soon thereafter as possible"); NRG Protest at 11 (citing *U.S. v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 764 (6th Cir. 2016); *D.D. ex rel. V.D v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 514 (2d Cir. 2006) (explaining that "just because the as-soon-as-possible-requirement is flexible does not mean it lacks a breaking point"))

[170] Clean Energy Associations Protest at 6; Leeward Protest at 8; P3 Protest at 14; Vistra Protest at 2 (citing PJM ER23-729-000 Transmittal at 2-3; PJM EL23-19-000 Transmittal at 4, 9-10).

[171] P3 Protest at 12.

[172] Clean Energy Associations Protest at 7.

[173] EPSA Protest at 11.

[174] Clean Energy Associations Protest at 8; Invenergy Protest at 6; Vistra Protest at 7.

it was conducted – i.e., during the offer period.[175] Clean Energy Associations contend that the Commission should expressly find that Tariff, Attachment DD, section 5.11(e) does not provide notice that PJM could make major changes to the BRA input assumptions after offers have been submitted and the auction run and cannot be construed as allowing PJM to delay posting auction results until PJM receives Commission approval to make changes that PJM believes will result in a more desirable outcome.[176]

59.     Protesters contend that PJM's argument here fails as the existing LDA Reliability Requirement does not represent an error in calculating auction results under the current Tariff rules, but rather the instant proposal is a change to those rules in order to alter the auction outcome.[177] Leeward notes that PJM has not alleged that an error has occurred and contends that PJM cannot do so because the auction results are the result of the rules in the filed Tariff.[178] Clean Energy Associations contend that such an interpretation would also allow PJM to unilaterally alter auction results whenever it disagrees with a particular outcome, despite that auction result being the product of the processes set forth in PJM's filed rate, which the Commission has approved.[179] EPSA argues that even if the 2024/2025 BRA results are the result of an error, the courts have found that the filed rate doctrine prohibits the Commission from authorizing or requiring a utility to adjust current rates to make up for past errors in projections.[180] Additionally, P3 states that even if PJM identifies an "error" in the clearing prices and the auction results are under publicly noticed FERC review, those conditions would only suspend the specific 5:00 p.m. deadlines listed in Tariff, Attachment DD, section 5.11(e), which P3 notes PJM has not

---

[175] NRG Protest at 11.

[176] Clean Energy Associations Protest at 8, 10.

[177] Clean Energy Associations Protest at 8; Constellation Protest at 14; EPSA Protest at 16; Invenergy Protest at 6; P3 Protest at 12; Pine Gate Protest at 8; Vistra Protest at 7.

[178] Leeward Protest at 8-9.

[179] Clean Energy Associations Protest at 10 (citing *Monterey MA, LLC v. PJM Interconnection, L.L.C.*, 165 FERC ¶ 61,201, at P 45 (2018) ("'[T]ariffs must have a reasonable construction and should be interpreted in such a way as to avoid unfair, unusual, absurd or improbable results.'") (quoting *Penn Cent. Co. v. Gen. Mills, Inc.*, 439 F.2d 1338, 1341 (8th Cir. 1971))).

[180] EPSA Protest at 16 (citing *Town of Norwood, Mass. v. FERC*, 53 F.3d 377, 381 (D.C. Cir. 1995) ("The retroactive ratemaking doctrine prohibits the Commission from authorizing or requiring a utility to adjust current rates to make up for past errors in projections.")).

been relieved of via public notice by the Commission that it is reviewing the auction results pursuant to that section.[181]

60.    NRG states that while Tariff, Attachment DD, section 5.11(e) provides for deadlines set forth therein not to apply when auction results "are under publicly noticed review by FERC," the predicate for this suspension is that PJM has identified "a potential error in the initial posting of auction results," and even if PJM's dissatisfaction with the results of the 2024/2025 BRA could be considered a "potential error," which NRG argues it cannot, there has been no initial posting of the results of the 2024/2025 BRA.[182]

61.    NRG contends that Tariff, Attachment DD, section 5.11(e) relates solely to the posting of the auction results and does not authorize post-auction adjustments of any kind to the LDA Reliability Requirements that are used to clear the auction.[183]  Rather, NRG contends that the Reliability Requirements used to clear the auction are adjusted to account for Price Responsive Demand before the auction, and those adjustments are reflected in the posted planning parameters.[184]

62.    EPSA similarly disagrees with PJM's argument that its proposal satisfies the filed rate doctrine simply because the Tariff requires PJM to adjust the LDA Reliability Requirement to reflect price responsive demand.[185]  EPSA argues that because Price Responsive Demand is reflected on the load side, rather than an offer on the supply side, any such modification to the LDA Reliability Requirement would not alter the auction clearing price.  EPSA and NRG also argue that just because Tariff, Attachment DD, section 5.11(e) gives notice of one specific, limited adjustment, it does not mean that PJM can make after-the-fact changes to any and all other aspects of the LDA Reliability Requirement.[186]  NRG argues that, to the contrary, it suggests no other changes are allowed and notes that the U.S. Supreme Court has said that the "interpretive canon,

---

[181] P3 Protest at 13, 13 n.52.

[182] NRG Protest at 12 n. 39 (citing PJM, Intra-PJM Tariffs, Attach. DD, § 5.11(e) Posting of Information Relevant to the RPM Auctions).

[183] *Id.* at 13.

[184] *Id.* at 13 n. 44 (citing PJM, PJM Manual 18: PJM Capacity Market, § 2.4.4 (Sept. 21, 2022), https://www.pjm.com/-/media/documents/manuals-/m18.ashx; PJM, Intra-PJM Tariffs, Attach. DD § 5.10(a) Auction Clearing Requirements); *see also* P3 Protest at 22-23; EPSA Protest at 14 (citing EPSA Sotkiewicz Aff. ¶¶ 43-45).

[185] EPSA Protest at 14.

[186] *Id.* (citing EPSA Sotkiewicz Aff. ¶¶ 43-45); NRG Protest at 13.

*expressio unius est exclusio alterius*, 'expressing one item of [an] associated group or series excludes another left unmentioned.'"[187]  Pine Gate states that the permissible changes for Price Responsive Demand are generally known in advance, limited in scope, and made based on objective criteria.[188]

### ii.    Tariff, section 9.2(b)

63.    Protesters disagree with PJM's argument that its proposal is consistent with the filed rate doctrine and the rule against retroactive ratemaking because Tariff, section 9.2(b) provides notice to market participants that auction results would be subject to change if PJM deemed them unreasonable.[189]  EPSA notes Tariff, section 9.2(b) does not say anything about the effectiveness of any proposed changes in a filing, nor speak to the filed rate doctrine.[190]  P3 contends that PJM's argument misinterprets the provision at issue and misunderstands the "boundaries of the statutory requirements that comprise the filed rate doctrine."[191]

64.    NRG asserts that there is nothing in Tariff, section 9.2(b) or any other provision of the Tariff that constitutes a formula or that could otherwise be said to make PJM's after-the-fact adjustment to the LDA Reliability Requirement for the 2024/2025 BRA prospective.[192]  NRG states that this provision did not provide market participants in the

---

[187] NRG Protest at 13-14 (citing *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002)).

[188] Pine Gate Protest at 6.

[189] Clean Energy Associations Protest at 11; Leeward Protest at 9; P3 Protest at 21-22; Vistra Protest at 7.

[190] EPSA Protest at 12.

[191] P3 Protest at 22 (citing *Okla. Gas*, 11 F.4th at 831).

[192] NRG Protest at 9 (citing *Old Dominion*, 892 F.3d at 1231 ("When the very terms of the filed rate warn customers, at the time they contract for service, that the price charged will fluctuate based on an identified formula with specified cost drivers, then the rate is allowed to change when fluctuations in those cost drivers occur.  That, after all, is how formulae work.  And that comports with the filed rate doctrine because the rate changes are foreordained, not retroactive.")).

Docket Nos. ER23-729-000 and EL23-19-000                                    - 34 -

2024/2025 BRA with notice that the LDA Reliability Requirements were subject to revision after the offer period for the auction closed.[193]

65.     P3 argues that severe economic harm is irrelevant to the filed rate doctrine's requirements for notice.[194]  Other parties contend that PJM has not met its burden under Tariff, section 9.2(b) to demonstrate imminent harm to reliability or imminent severe economic harm.[195]  Constellation avers that it not unusual in PJM's capacity market for an LDA's clearing prices to differ at a fourfold basis among prior BRA clearing prices in response to supply and demand fundamentals, especially in a small, constrained LDA.[196]  Constellation states that Tariff, section 9.2(b) requires more than a showing of a price increase to justify an FPA section 205 filing, arguing that PJM's filing contains no explanation of specific harm, how the harm is imminent, or why the harm is severe as compared to typical or expected auction clearing price fluctuations.[197]  Constellation also contends that PJM should not be allowed to avoid the notice standard in its Tariff if its own inaction renders the economic harm "imminent."[198]  Vistra contends that PJM has not established or provided evidence of how significant any potential price increases will actually be for electric consumers or whether any such impact would be unjust and unreasonable.[199]  Vistra states that the Commission has not previously made a determination of imminent economic harm in any substantially similar situation with respect to Tariff, section 9.2(b), and that it should not do so here.

66.     Clean Energy Associations argues that even assuming arguendo that the high price in the 2024/2025 BRA in Delmarva would constitute "imminent severe economic harm to

---

[193] *Id.* at 9-10 (citing *Old Dominion*, 892 F.3d at 1231).

[194] P3 Protest at 23-24 (citing *Old Dominion*, 892 F.3d at 1230 (citing *Columbia Gas*, 895 F.2d at 794-797; *West Deptford*, 766 F.3d at 12; *Arkla,* 453 U.S. at 578)).

[195] Vistra Protest at 7, 13; *see also* Constellation Protest at 5-6; P3 Protest at 23-24 (arguing a properly applied Tariff that produces an economically rational result cannot be characterized as imminent severe economic harm).

[196] For example, Constellation states that in the 2021/2022 BRA, the highest-clearing LDA had a clearing price of approximately $204/MW-day, while the RTO-wide clearing price in the 2022/23 BRA was four times lower at approximately $50/MW-day. Constellation Protest at 9.

[197] *Id.* at 6.

[198] *Id.* at 6-7.

[199] Vistra Protest at 13.

electric consumers," this section only allows PJM to submit a filing to change the Tariff prospectively after limited consultation with its stakeholders.[200]  P3 and EPSA similarly argue that Tariff, section 9.2 only provides notice that PJM may make FPA section 205 filings with prospective-only application.[201]

67.     Pine Gate also states that PJM is incorrect in its assertion "that the Commission's previous application of [section 9.2] to shortage pricing events in PJM is applicable here."[202]  Pine Gate asserts that capacity markets are different from energy markets in that capacity auctions occur months or years in advance of the delivery year, and that PJM holds Incremental Auctions that are designed to address precisely this type of discrepancy in auction results.  Pine Gates argues that this calls into question whether the harm to consumers would be imminent or severe by the time the of the 2024/2025 delivery year.

### c.    Settled Expectations

68.     Several protestors argue that market participants made irrevocable business decisions based on the existing Tariff and the published planning parameters.[203]  Clean Energy Associations state that market participants made business decisions to participate in the 2024/2025 BRA and post the requisite collateral based on the existing Tariff that is on file with the Commission.[204]  Some parties contend that sellers and customers both anticipated the high clearing price in Delmarva based on the planning parameters, including the LDA Reliability Requirement, and made decisions accordingly.[205]  EPSA argues that when 2024/2025 BRA market activities started, market participants had settled expectations as to the rules going forward and the demand for capacity.  EPSA argues that allowing PJM to change the parameters as part of the market clearing algorithm would upset settled expectations because participants would not have the ability to change their offers in response.[206]  EPSA contends that the Commission has

---

[200] Clean Energy Associations Protest at 11.

[201] EPSA Protest at 12; P3 Protest at 23-24.

[202] Pine Gate Protest at 9.

[203] Invenergy Protest at 1-5; EPSA Protest at 13; Leeward Protest at 6; Lotus Protest at 10; NRG Protest at 2; Vistra Protest at 9, 14.

[204] Clean Energy Associations Protest at 7; *see also* Pine Gate Protest at 6.

[205] LS Power Protest at 3-4; *see also* NRG Protest at 18-19 (citing NRG, Hotlman Aff. ¶¶ 15-19).

[206] EPSA Protest at 19-20 (citing 2020 Reserves Order, 171 FERC ¶ 61,153 at P 322 (rejecting requests an offset be applied to a previously-run BRA, finding that "even if

Document Accession #: 20230421-3095   Filed Date: 03/21/2023

recognized that it is not possible to know the impact on the offers of market participants if auction parameters are changed after the fact.[207]

69.     Several protestors argue that sellers must be able to rely on the posted parameters to make business decisions in future auctions.[208]   Invenergy argues that offering into the auction represents a serious commitment that could easily represent millions of dollars in potential revenue or penalties.[209]   Certain commenters note that PJM has previously argued that posting the auction parameters in advance is critical to allowing sellers to make decisions regarding bilateral contracts, capacity imports or exports, and capacity market participation.[210]   EPSA argues that the Commission has also recognized that planning parameter information allows participants to develop offers, engage in bilateral contracting, and make decisions at various BRA milestones.[211]   With respect to bilateral contracting, EPSA argues that both sides of bilateral transactions have settled expectations based on the planning parameters and undermining those expectations

---

we were to re-calculate the VRR curve and other capacity auction parameters based on a new E&AS Offset, there is no way to accurately determine how market participants would have offered in those BRAs based on the new parameters.")); EPSA Protest, Attach. A, Sotkiewicz Aff. ¶¶ 29-31.

[207] *Id.* at 20 (citing 2020 Reserves Order, 171 FERC ¶ 61,153 at P 322).

[208] *See e.g.* Vistra Protest at 6.

[209] Invenergy Protest at 5.

[210] LS Power Protest at 3 (citing *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275, at P 198 (2009)); NRG Protest at 17 (citing PJM, Answer, Docket No. ER09-412-000, at 33 (filed Feb. 2, 2009) ("PJM's posting of the fundamental auction parameters on February 1 is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or export, and the manner in which they participate in the Base Residual Auction.")); EPSA Protest at 18 (citing *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275, at P 198 (2009)).

[211] EPSA Protest at 10 (citing *PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,122, at P 15 (2022)); *see also* NRG Protest at 16-17 (citing *Duquesne Light Co.*, 122 FERC ¶ 61,039, at PP 92, 141 (2008); *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275 at PP 198, 200 (2009) ("PJM's posting of the fundamental auction parameters . . . is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or export, and the manner in which they participate in the Base Residual Auction.")).

makes bilateral contracting much riskier, if not impossible.[212]  Leeward argues that
market participants rely on PJM's planning parameters to evaluate their commercial risk,
and that under the instant proposal, sellers could be forced to commit to capacity market
offers that were not designed around the final planning parameters.[213]

70.     Vistra contends that allowing PJM to change the rules of auctions after offers have
been submitted, even prospectively, severely compromises market participants' ability to
make thoughtful investment decisions.[214]  Vistra contends that it is unjust and
unreasonable and unduly discriminatory and preferential to change the rules after market
participants have reasonably relied upon the rules in effect at that time.[215]  Vistra also
argues that PJM's requested outcome would allow filed rates to be amended at any time
up until auction results are posted, invoices are printed, or a ministerial act confirms
terms and conditions, but after market participants have made economic decisions and
transacted accordingly.[216]

71.     Vistra argues that in one recent instance, the Commission did require that market
participants have the opportunity to modify certain types of early offers in response to
rule changes made prior to the auction process, however, the rule changes were early in
the auction process.[217]  Vistra states such timing is not the case here and allowing market
participants to reoffer at this point could not fully resolve the harm, given the business
decisions that have already been made in advance of the 2024/2025 BRA.[218]

72.     P3 argues that the Commission has previously denied requests to rerun RTO
auctions in order to provide remedial relief in FPA section 206 complaint proceedings or
in response to judicial remands, on the grounds that doing so would "undermine
confidence in markets."[219]  P3 also argues that the Commission has emphasized that

---

[212] *Id.* at 20; EPSA Protest, Attach. A, Sotkiewicz Aff. ¶¶ 29-31.

[213] Leeward Protest at 6.

[214] Vistra Protest at 6.

[215] *Id.* at 14.

[216] *Id.* at 2.

[217] *Id.* at 14 (citing *ISO New England Inc.*, 175 FERC ¶ 61,172, at P 63 (2021)).

[218] *Id.* at 14-15.

[219] P3 Protest at 25 (citing *PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,237, at P
10 (2019) (noting the Commission "generally does not order a remedy that requires re-
running a market because market participants participate in the market with the

Docket Nos. ER23-729-000 and EL23-19-000                                    - 38 -

abiding by market rules is necessary to enable an RTO to effectively administer wholesale markets.[220]  P3 states that, consistent with that principle, the Commission has generally disfavored rerunning markets because the harm outweighs the benefit—even in instances where, unlike here, an RTO has committed an error implementing its existing tariff.[221]  P3 contends that it is indisputable that rerunning auctions creates regulatory risk going forward and dissuades investors from investing capital in a market where the results of auctions are constantly subject to later change and that the Commission has previously denied such remedial relief in the name of regulatory uncertainty.[222]  P3 also contends that the Commission also has a longstanding policy of disfavoring "last minute" FPA section 205 tariff changes even where, unlike here, those changes would be prospective, because those changes would upset settled expectations and reliance on current RTO tariff provisions.[223]

73.    P3 contends that if the rules of a particular BRA can be changed after the auction, it significantly increases the risk of any capital deployed in the market, which translates into higher offer prices reflecting the resulting risk premiums, and could make it difficult

---

expectation that that rules in place and the outcomes will not change after the results are set); *PJM Interconnection, L.L.C.*, 161 FERC ¶ 61,252, at P 59 (2017); *Astoria Generating Co. LP v. N.Y. Indep. Sys. Operator, Inc.*, 140 FERC ¶ 61,189, at P 141 (2012); *PPL EnergyPlus v. N.Y. Indep. Sys. Operator Corp.*, 115 FERC ¶ 61,383, at P 30 (2006); *Cal. Indep. Sys. Operator Corp.*, 120 FERC § 61,271, at P 24 (2007); *N.Y. Indep. Sys. Operator, Inc*., 113 FERC ¶ 61,340, at P 17 (2005); *Pac. Gas Transmission Co.*, 82 FERC ¶ 61,227, at 61,875 (1998) (holding that despite a finding of violation "the public interest in market stability outweighs the need for reposting"); *Pan-Alberta Gas (U.S.) Inc. v. Pac. Gas & Elec. Co.*, 72 FERC ¶ 61,092, at 61,505 (1995) (finding that despite a violation in capacity allocation, setting aside a transaction would "cause a disruption in the market.")); P3, Kelliher Aff. 25).

[220] *Id.* at 26 (citing *GenOn Energy Mgmt., LLC v. ISO New England Inc.*, 152 FERC ¶ 61,044, at P 50 (2015); *Ne. Utils. Serv. Co.*, 135 FERC ¶ 61,123, at P 13 (2011) (emphasizing it is important to abide by RTO market rules to enable effective administration of RTO markets); P3 Kelliher Aff. 26).

[221] *Id.* (citing *Bangor Hydro*, 97 FERC ¶ 61,339 at 62,590, *reh'g denied*, 98 FERC ¶ 61,298 (2002); P3 Kelliher Aff. 26).

[222] *Id.* (citing *Midwest Indep. Transmission Sys. Operator, Inc*., 162 FERC ¶ 61,173, at P 19 (2018); *PJM Interconnection, LLC*, 161 FERC ¶ 61,252 at P 58 (2017); P3 Kelliher Aff. 27).

[223] *Id.* at 26-27 (citing *ISO New England, Inc*., 132 FERC ¶ 61,136, at P 22 (2010); P3 Kelliher Aff. 27-28).

for resource owners and investors to deploy the capital needed to develop and maintain the resource fleet required to serve the demands of consumers in the PJM region.[224]

### 3.   **Answers**

#### a.   **General**

74.    PJM argues that the submission of offers does not and cannot as a matter of law justify an unjust and unreasonable rate that does not go into effect until June 1, 2024 (i.e., the beginning for the 2024/2025 delivery year).[225]  PJM argues that the rule against retroactive ratemaking and the filed rate doctrine are inapplicable here because there is no rate to change nor proposal to retroactively charge customers based on past losses.[226] PJM further argues that its filings do not propose to retroactively change non-rate terms either, because PJM proposes to leave the requirement to post the LDA Reliability Requirement in advance of the auction unchanged.[227]  PJM argues instead that it proposes to prospectively update that publicly posted value when clearing the auction.[228]

75.    EPSA disagrees, arguing that PJM acknowledges it has made preliminary price calculations, which according to EPSA, means that PJM has cleared the auction.[229] EPSA contends that PJM's refusal to finalize the results cannot be used to avoid the filed rate doctrine and notes that PJM did not respond to protestors arguing that the Tariff requires PJM to determine the LDA Reliability Requirement in advance of the BRA and then use that value to clear the auction.[230]  EPSA contends PJM's proposal to use the updated LDA Reliability Requirement for the auction is a violation of the Tariff.

---

[224] *Id.* at 24.

[225] PJM February 2 Answer at 2.  The Market Monitor states it supports PJM's comments on the legal questions related to the filed rate doctrine.  Market Monitor February 3 Answer at 1.

[226] *Id.* at 12 (citing *Pub. Util. Comm'n of Cal.*, 988 F.2d at 161; *City of Piqua, Ohio v. FERC*, 610 F.2d 950, 954 (D.C. Cir. 1979) (*City of Piqua*)).

[227] *Id.* (citing *Okla. Gas*, 11 F.4th at 830 (D.C. Cir. 2021)).

[228] *Id.* at 13.

[229] EPSA Answer at 4 (citing PJM February 2 Answer at 8).

[230] *Id.* at 5 (citing PJM, Intra-PJM Tariffs, Attach. DD § 5.10(vi)(A) Auction Clearing Requirements).

76.      Regarding whether the 2024/2025 BRA is "complete," P3 argues that PJM has not
identified any specific Tariff-based steps that PJM is required to take, but has not yet
taken, to conduct the 2024/2025 BRA.[231]  P3 argues that the fact that PJM and the Market
Monitor have already applied their market power mitigation rules and determined the
offers were competitive further confirms that PJM fully conducted the BRA.[232]  Leeward
contends that, because the auction is complete, PJM must satisfy the *Mobile-Sierra*[233]
"public interest" standard of review because the auction is akin to a freely-negotiated
contract.[234]

77.      The Market Monitor argues that P3 and EPSA misunderstand the auction clearing
process.[235]  The Market Monitor explains that PJM can run the auction software multiple
times before approving final results.  The Market Monitor further explains that, with
respect to the 2024/2025 BRA, PJM ran the auction software to ensure compliance with
the Tariff and discovered an issue.  Because PJM did not approve and post the results, the
Market Monitor contends the auction is not cleared and there is no final rate.  The Market
Monitor also argues that neither of PJM's filings request retroactive effective dates and
therefore neither implicates the filed rate doctrine.[236]

78.      PJM argues that the LDA Reliability Requirement is an input to the wholesale rate
and the Commission has held that the filed rate doctrine does not attach when updating
inputs until after the auction has cleared.[237]  PJM also notes that formula rates may be

---

[231] P3 Answer at 4.

[232] P3 Answer at 4 *Id.* (citing PJM February 2 Answer at 7-8; Market Monitor
February 3 Answer at 3).

[233] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956)
(Mobile); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) (Sierra).

[234] Leeward Answer at 4-6 (citing to *Devon Power LLC*, 137 FERC ¶ 61,073
(2011), *petition denied, New England Power Generators Ass'n v. FERC*, 707 F.3d 364,
371 (D.C. Cir. 2013)).

[235] Market Monitor February 16 Answer at 2, 5.

[236] *Id.* at 3.

[237] PJM February 2 Answer at 13 (citing *ISO New England Inc.*, 165 FERC ¶
61,088, at P 24 (2018)).

Document Accession #: 20230421-3095    Filed Date: 03/21/2023

changed prospectively even after the inputs have been collected and the resulting rate generated and implemented.[238]

79.    EPSA contends that PJM's argument that the LDA Reliability Requirement is subject to change because it is "just an input to the wholesale rate" does not make sense.[239]  EPSA explains that PJM has cited precedent acknowledging that the rate on file is the Tariff describing the auction rules.[240]  EPSA further argues that the "supposedly unjust and unreasonable clearing prices" in Delmarva do not justify the relief requested by PJM.[241]  EPSA argues that even if PJM had been able to demonstrate that its existing rules are unjust and unreasonable, retroactive relief would be barred because "'[a]pplication of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results.'"[242]

80.    PJM also argues that the filed rate doctrine and rule against retroactive ratemaking are designed to prevent retroactive increases of rates for power that has already been consumed.[243]  PJM contends that the courts have clarified that FPA section 206 authorizes retroactive rate decreases but not increases.[244]  Further, PJM states that the courts have found that the filed rate doctrine and rule against retroactive ratemaking are designed to allow purchasers of power to know the consequences of purchasing decisions.[245]  PJM contends that none of the filed rate doctrine precedent bears on the

---

[238] *Id.* at 4 (citing *Pub. Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 171 FERC ¶ 61,090, at P 22 (2020) (accepting change to formula rate effective June 2020, but directing any true-up from 2019 to reflect the formula in effect as of 2019)).

[239] EPSA Answer at 5 (citing PJM February 2 Answer at 13).

[240] *Id.* at 5-6 (citing PJM February 2 Answer at 23 n.65 (citing *Pub. Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 168 FERC ¶ 61,042 at P 89, (2019)).

[241] *Id.* at 6.

[242] *Id.* at 8 (citing *Marcus v. AT&T Corp.*, 138 F.3d at 46, 58 (2d Cir. 1998)).

[243] PJM February 2 Answer at 15 (citing *Okla. Gas*, 11 F.4th 821 ; *Old Dominion*, 892 F.3d 1223 ; *Pub. Util. Comm'n of Cal.*, 988 F.2d 154; *Columbia Gas*, 895 F.2d 791; *Arkla*, 453 U.S. 571).

[244] *Id.* (citing *City of Anaheim, Cal. v. FERC*, 558 F.3d 521, 524 (D.C. Cir. 2009)).

[245] *Id.* at 16 (citing *Pub. Util. Comm'n of Cal.*, 988 F.2d at 163-64).

instant proposal, in which PJM proposes to prospectively prevent an unjust and unreasonable rate.

81.    EPSA disagrees that the filed rate doctrine is only used to reduce rates for consumers.[246]  On the contrary, EPSA contends, some of the seminal decisions of the U.S. Supreme Court addressing the filed rate doctrine involved customers seeking lower rates.[247]

82.    PJM further argues that the proposed revisions do not undermine either of the two primary purposes of the filed rate doctrine:  to prevent regulated companies from engaging in price discrimination between customers and to preserve the exclusive role of the Commission's primary jurisdiction over reasonableness of rates and the need to ensure regulated companies only charge the rates on file.[248]  Specifically, PJM argues, load in Delmarva will all be charged the same rate and the filings preserve the Commission's role to ensure just and reasonable rates.

83.    PJM further argues the Commission has broad statutory authority to ensure just and reasonable rates under FPA section 309,[249] and neither the filed rate doctrine nor the rule against retroactive ratemaking bars the Commission from exercising that authority.[250] PJM explains the courts have found that the Commission can consider equities in remedies under FPA section 309.[251]

---

[246] EPSA Answer at 6.

[247] *Id.* (citing *Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 222 (1998) ("even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff"); *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 131 (1990) (rejecting argument by the Interstate Commerce Commission that "the carrier should not receive a windfall, i.e., the higher filed rate"); *Keogh v. Chi. & N.W. Ry. Co.*, 260 U.S. 156, 162-63 (1922) (finding that the filed rate doctrine barred recovery for antitrust damages against carriers who colluded to set artificially high shipment rate); *Louisville & N.R. Co. v. Maxwell*, 237 U.S. 94, 98-100 (1915) (carrier permitted to charge customer filed rate that was higher than rate quoted to customer)).

[248] PJM February 2 Answer at 11, 17.

[249] 16 U.S.C. § 825h.

[250] PJM February 2 Answer at 23.

[251] *Id.* at 24 (citing *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952, t 954-55

84.     EPSA and P3 disagree with PJM, arguing that the Commission's authority under FPA section 309 is limited to actions that "'conform with the purposes[] and policies of Congress and do[] not contravene any terms of the [FPA].'"[252] Because the FPA does not allow PJM to retroactively modify rates, EPSA argues, the Commission cannot do so under FPA section 309 either.

85.     Constellation argues that New Jersey Board's analogy between the capacity auction and filing an interconnection agreement is misplaced. Constellation argues that there is no Commission precedent for the proposition that an auction is only complete once the results are posted and capacity commitments are awarded, and on the contrary, the Commission has indicated that posting auction results is a ministerial activity that is not sufficient to undo an already-run auction.[253] Constellation notes that PJM has also taken this position, arguing that "posting of the auction results is a ministerial act that informs market participants of the results already determined" by the approved capacity market rules in place when PJM conducted the auction.[254] Constellation further contends that it is illogical to equate the process of negotiating an interconnection agreement with the process of PJM unilaterally administering a capacity auction, and that, in contrast to interconnection agreement-related cases cited by the New Jersey Board, here there is no question about which Tariff provisions were effective during the events in question, rendering the analogy inapplicable.[255]

86.     P3 contends that PJM appears to argue in its answer that there is no such thing as a "non-rate term" in the context of a wholesale market design tariff, which is inconsistent with judicial precedent.[256] P3 also argues that PJM's argument that the filed rate doctrine

---

(D.C. Cir. 2016)).

[252] EPSA Answer at 8-9 (citing *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 158 (D.C. Cir. 1967)); P3 Answer at 12-13 (citing *Verso Corp. v. FERC*, 898 F.3d 1, 11 (D.C. Cir. 2018); *TNA Merch. Projects, Inc. v. FERC*, 857 F.3d 354, 359 (D.C. Cir. 2017); *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 158 (D.C. Cir. 1967)).

[253] Constellation Answer at 5-6 (citing *ISO New England Inc.*, 180 FERC ¶ 61,036, at PP 14-15 (2022)) (rejecting attempts to change auction rules after the RTO ran the auction but before the Commission completed the process for confirming that the RTO followed its auction rules)).

[254] *Id.* 6 (citing PJM, Answer, Docket No. EL14-55-000, at 20 (filed Oct. 22, 2014)).

[255] *Id.* at 6-7.

[256] P3 Answer at 8-9 (citing *Okla. Gas*, 11 F.4th at 829 ("As the statutory terms make clear, the filed rate is not limited to rates per se, but also extends to matters directly

and rule against retroactive ratemaking only apply to rate increases is inconsistent with
judicial precedent.  P3 contends that the filed rate doctrine and rule against retroactive
ratemaking apply with equal force to rate increases and rate decreases.[257]  P3 also argues
that the filed rate doctrine and rule against retroactive ratemaking apply regardless of
whether power has already been consumed.[258]

87.    P3 contends that PJM's "flawed" interpretation of the filed rate doctrine would
mean that the rules and rates set forth in a market design tariff could be changed
retroactively any time up until a service is provided and a tariff-dictated rate is paid for
that service, which would invite numerous complaints challenging any number of auction
parameters that do not turn out to be exactly accurate.[259]

---

affecting rates.") (cleaned up) (quoting *Nantahala Power & Light Co. v. Thornburg*, 476
U.S. 953, 966-67 (1986)); *accord N. Nat. Gas Co. v. State Corp. Comm'n*, 372 U.S. 84,
90-91 (1963) (citing *Dayton-Goose Creek R. Co. v. U.S.*, 263 U.S. 456, 478 (1924));
*Okla. Gas*, 11 F.4th at 829-30 (finding billing limitations in Southwest Power Pool Inc.'s
tariff to be "[n]on-rate terms within the tariff that may not be changed retroactively");
*Old Dominion*, 892 F.3d at 1231-32 (applying the filed rate doctrine and rule against
retroactive ratemaking to a tariff provision establishing cap on offers in PJM's energy
market)).

[257] *Id.* at 11 (citing *Arkla*, 453 U.S. at 578 (explaining that the rule against
retroactive ratemaking "bars the Commission's retroactive substitution of an
unreasonably high or low rate with a just and reasonable rate."); *Old Dominion*, 892 F.3d
at 1227 ("[T]he rule against retroactive ratemaking prohibits the Commission from
adjusting current rates to make up for a utility's over- or under-collection in prior
periods.") (internal quotations omitted) (quoting *Towns of Concord*, 955 F.2d at 71 n.2;
*Okla. Gas*, 11 F.4th at 829-30 (internal quotations omitted) (quoting *Old Dominion*, 892
F.3d at 1230)).

[258] *Id.* at 12 (citing *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th
Cir. 2004) ("Once filed with a federal agency, such tariffs are the equivalent of a federal
regulation.") (internal quotations and citations omitted); *accord Lowden v. Simonds-
Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520 (1939) (explaining that the obligations set
forth in a common carrier tariff bound "both carriers and shippers with the force of law"
to perform pursuant to the terms of the tariff, including terms that dictated "prior
arrangements . . . required" to "facilitate the rendition of service"); *West Deptford*, 766
F.3d 10 (applying filed rate doctrine in the context of PJM's interconnection rule
provisions establishing the interconnection customer's eventual cost responsibility for
network upgrades necessitated by its interconnection request)).

[259] *Id.* at 14.

Document Accession #: 20230421-3069    Filed Date: 03/21/2023

88.    Constellation asserts that granting PJM's proposal will undermine confidence in PJM's market construct over the long-term, incenting market participants to leave the markets prematurely and leading to increased consumer costs or potential reliability issues.[260]  Constellation argues that the Commission has declined to disrupt settled expectations in the past because of the harm to third parties, even if doing so might produce more efficient outcomes.[261]  Constellation notes that commenters have filed sworn statements in these proceedings demonstrating that they made commercial decisions based on existing auction parameters and the current Tariff.[262]

### b.    Existing Tariff Provisions

89.    PJM states that it is in full compliance with the Tariff because the Tariff requires PJM to post results as soon as possible upon completion of the auction.[263]  PJM clarifies that it has performed only preliminary price calculations for the 2024/25 BRA but suspended auction clearing before it was completed.[264]

### i.    Attachment DD, section 5.11(e)

90.    P3 argues that PJM fails to address its arguments that Tariff, Attachment DD, section 5.11(e) is not applicable to the instant filings.[265]  P3 contends that, in failing to respond, PJM appears to have "jettisoned" its argument that this case involves the type of "error" contemplated by the Tariff.  The Market Monitor contends this argument is not

---

[260] Constellation Answer at 2 (citing *Coal. of MISO Transmission Customers v. Midcontinent Indep. Sys. Operator, Inc.*, 181 FERC ¶ 61,005, at P 65 (2022) (rejecting proposal because, "while the proposed mechanism could provide price relief to a small subset of load and potentially provide modest reliability benefits to the [RTO] system, we agree with [commenters] that such a mechanism would otherwise undermine [the RTO's] capacity construct")).

[261] *Id.* at 4 (citing *GreenHat*, 166 FERC ¶ 61,072 at P 33).

[262] *Id.* at 3-4.

[263] PJM February 2 Answer at 7.

[264] *Id.* at 8.

[265] P3 Answer at 6.

relevant to the 2024/2025 BRA because no results have been posted, so whether the Tariff allows PJM to modify posted results is not at issue in these filings.[266]

## ii.     **Tariff, section 9.2(b)**

91.     In response to arguments that Tariff, section 9.2(b) does not apply, PJM disagrees with Constellation's argument that it is not unusual for an LDA's clearing price to increase fourfold from prior BRA clearing prices, and this result is not sufficient to demonstrate imminent severe economic harm.[267]  PJM argues that this argument is irrelevant because those prior BRA clearing prices appropriately reflected actual supply and demand fundamentals, which is not the case for Delmarva in the 2024/2025 BRA.

92.     Sierra/NRDC and ODEC argue that, PJM has sufficiently demonstrated that both severe and imminent economic harm to support the application of Tariff, section 9.2(b).[268]  Sierra/NRDC further argues that Tariff, section 9.2(b) provides sufficient notice that the auction rules would be modified in these circumstances.[269]  ODEC argues that the cost increase could be between $85 million and $144 million, if PJM is measuring the four times increase against the prior year's clearing price or if Delmarva cleared at the market cap, respectively.[270]  Sierra/NRDC state that average wages for workers in the Delmarva Peninsula, where Delmarva is located, are significantly lower than the U.S. average and that the five-year average poverty rate increased by 0.8% from 2006 to 2019, while the national rate decreased.[271]  Sierra/NRDC further argues that low-income populations have disproportionately high energy burdens, twice that of average income households and three times greater than higher income households, because they often use less-efficient appliances or live in older dwellings in need of repair.[272]  Sierra/NRDC explain that high energy burdens and costs can force choices between energy, health, food, and housing which can lead to a wide range of adverse outcomes.

---

[266] Market Monitor February 16 Answer at 2.

[267] PJM February 2 Answer at 10.

[268] Sierra/NRDC Answer at 4; ODEC Answer at 4.

[269] Sierra/NRDC Answer at 13.

[270] ODEC Answer at 3.

[271] Sierra/NRDC Answer at 4.

[272] *Id.* at 5-7 (citing Delaware Energy Efficiency Advisory Council, Delaware Division of Energy & Climate, *Scope of Work: Low-Income Advisory Comm.*, at 3 (2017)).

Sierra/NRDC estimates that Delmarva customers will have to pay a total of $175 million more than if PJM's proposal were to be accepted, or roughly one half of one week's gross income for every wage earner in the region, if the market clears at the cap.[273]

### c.     Settled Expectations

93.     PJM contends that sellers should not need to adjust their sell offers for the 2024/2025 BRA based on an updated LDA Reliability Requirement because the auction results are a product of both the demand and the supply offers.  PJM argues that "any prediction of anticipated clearing prices based on a posted Locational Deliverability Area Reliability Requirement is not guaranteed."[274]  PJM contends that sellers that chose to make business decisions based on anticipated prices did so at their own risk.  PJM also contends that because the 2024/2025 BRA has not been completed and no results have been announced, there is no rate that any investors could validly have relied on.[275]

94.     PJM argues that there can be no settled expectations when no capacity rate for the 2024/2025 BRA has been established and no capacity commitments have been awarded.[276]  PJM further notes that the Commission has recognized a difference between upsetting the expectations of market participants and retroactive ratemaking.[277]  PJM continues that, in cases where protestors asserted that the proposed tariff revisions would disrupt settled expectations mid-course and harm market participants who relied on the existing Tariff in calculating prices and entering into contracts, the Commission has considered a "balancing of interests" or "balancing of equities" in determining the appropriate outcome.[278]  In these instances, PJM argues, the Commission has found that

---

[273] *Id.* at 8.

[274] PJM February 2 Answer at 13-14.

[275] *Id.* at 12.

[276] *Id.* at 2 (citing *ISO New England Inc.*, 148 FERC ¶ 61,185, at P 29 (2014) ("There is a difference between upsetting the expectations of market participants, which might be the case here, and retroactive ratemaking.")).

[277] *Id.* at 17 (citing *ISO New England Inc.*, 148 FERC ¶ 61,185, at P 29 (2014), *reh'g denied*, 150 FERC ¶ 61,129 (2015)).

[278] *Id.* (citing *ISO New England Inc.*, 148 FERC ¶ 61,185, at P 29 (2014), *reh'g denied*, 150 FERC ¶ 61,129 (explaining that the Commission accepted proposed tariff revisions after conducting a balancing of interests and determining that proposal's benefits, which included preventing consumers from paying "for non-existent capacity or [the possibility of] fac[ing] a multi-year capacity shortfall," outweighed "market participants' reliance upon the existing FCM rules."); *see also ISO New England Inc.*, 145

Docket Nos. ER23-729-000 and EL23-19-000                                    - 48 -

proposed changes with 60 days of prior notice constitute a prospective change and do not necessarily violate the filed rate doctrine even after the capacity auction is completed.[279] PJM further contends that, in conducting the "balancing of interests" or "balancing of equities" tests, the Commission has focused on "preventing consumers from having to pay for non-existent capacity"[280] and protecting consumers by "ensuring that reserve requirements are met and system reliability is protected"[281] and found these consumer interests outweigh any settled expectations or reliance arguments from market sellers. PJM notes that, in these cited cases, the Commission accepted such revisions to be effective for capacity auctions that were already completed.[282] PJM contends that the instant filings similarly pass the balancing test because "[n]othing in the posted Locational Deliverability Area Reliability Requirement should impact a Market Participant's offer into the [capacity auctions] . . . ."[283] PJM explains that the LDA Reliability Requirement is posted to provide transparency and for informational purposes only.

95.     EPSA disagrees and contends that PJM has previously emphasized the importance of the posted parameters to market participants' decisions and actions.[284]  Specifically, EPSA states that PJM has previously stated that "PJM's posting of the fundamental auction parameters on February 1 is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or export, and the manner in which they participate in the Base Residual Auction."[285]  EPSA contends that the

---

FERC ¶ 61,095, at P 29 (2013) (noting the Commission has used this balancing test to accept or reject proposed tariff revisions)).

[279] *Id.* (citing *ISO New England Inc.*, 176 FERC ¶ 61,125, at P 128 (2021)).

[280] *Id.* (citing *ISO New England Inc.*, 148 FERC ¶ 61,185, P 29 (2014)).

[281] *Id.* (citing *ISO New England Inc.,* 145 FERC ¶ 61,095, at P 29 (2013)).

[282] *Id.* at 18-19 (citing *ISO New England Inc.*, 148 FERC ¶ 61,185, P 29 (2014); *ISO New England Inc.,* 145 FERC ¶ 61,095, at P 28 (2013)).

[283] *Id.* at 19-20.

[284] EPSA Answer at 9.

[285] *Id.* at 9-10 (quoting PJM, Answer, Docket No. ER09-412-000, at 33-34 (filed Feb. 2, 2009); citing *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275, at P 198 (2009) (noting that PJM had asserted that its "posting of the fundamental auction parameters on February 1 is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or export, and the manner in which they participate in the

Commission has made similar findings[286] and that it would be a violation of the Commission's obligations under the Administrative Procedure Act for the Commission to reverse course and find there is no reliance on auction parameters.[287]  EPSA further argues that PJM's argument that the clearing price depends actions of suppliers is a non-sequitur and does not mean that PJM can modify other aspects of the clearing price.[288]

96.     PJM further argues that the instant proposal is "entirely distinguishable from the ISO-NE case in which the Commission found that equitable considerations weighed against accepting the changes."[289]  PJM explains that its proposal is much  narrower. PJM also argues that the circumstances presented in PJM's filings are completely different from the *Maryland Public Service Commission* case cited by certain protestors because no rate from the 2024/2025 BRA has been determined or announced so no parties could have relied on such a nonexistent rate.[290]  Regarding the *Public Citizen v. MISO* case cited by EPSA, PJM contends that this case is taken out of context as there, the Commission was simply explaining that it did not need to review and approve auction results before they became final.[291]

---

Base Residual Auction")).

**[286]** *Id.* at 10 (citing *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275, at P 200 (2009)).

**[287]** *Id.* (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (stating that an agency departing from its own precedent must "display awareness that it is changing position" and "show that there are good reasons for the new policy"); *West Deptford*, 766 F.3d 10, 20 (explaining that "[i]t is textbook administrative law that an agency must 'provide[] a reasoned explanation for departing from precedent or treating similar situations differently'")).

**[288]** *Id.* at 11.

**[289]** PJM February 2 Answer at 21 (citing *ISO New England Inc.*, 170 FERC ¶ 61,187, at P 15 (2020)).

**[290]** *Id.* at 22 (citing *Md. Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, 124 FERC ¶ 61,276 (2008), *reh'g denied,* 127 FERC ¶ 61,274 (2009)).

**[291]** *Id.* at 22-23 (citing *Pub. Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 168 FERC ¶ 61,042, at P 89 (2019) (rejecting Public Citizen's argument that the Commission must review electric market clearing prices before the rate goes into effect to determine if the rate is just and reasonable "because, in the market-based rate context, the rate on file with the Commission is the Tariff describing the Auction procedures, not

97.     Constellation also argues that the Commission has previously asserted that "equitable considerations weigh[] against" accepting tariff changes where parties submit auction bids "under one set of expectations, and [the RTO] then propose[s] to consider those . . . bids under different expectations—in essence, changing the market rules after parties had already made their decisions in reasonable reliance on the then-applicable Tariff provisions."[292]  Constellation further notes the Commission has found that changing auction rules after commercial decisions would erode confidence in markets.[293]

## C.      **PJM's Existing Tariff**

### 1.      **Comments**

#### a.      **General**

98.     With respect to PJM's arguments in its FPA section 206 filing, several commenters agree with PJM that the auction results will not be just and reasonable absent a correction to the LDA Reliability Requirement because the results do not otherwise reflect supply and demand fundamentals in Delmarva.[294]  Parties argue that the price increase resulting from the originally posted LDA Reliability Requirement is not just and reasonable because it will not serve any useful purpose or offer any benefit to load, such as increased reliability.[295]  ODEC states that when there are no discernable benefits from increased prices, the rates cannot possibly satisfy the requirement that customers receive benefits that are at least roughly commensurate with costs.[296]

99.     Parties also argue the current Tariff rules are not just and reasonable because they would result in overstating the LDA Reliability Requirement for Delmarva and therefore

---

the prices that may change over time")).

   [292] Constellation Answer at 4-5 (citing *ISO New England Inc.*, 175 FERC ¶ 61,195, at P 131 (2021)).

   [293] *Id.* at 3 (citing *ISO New England Inc.*, 170 FERC ¶ 61,187, at P 17 (2020)).

   [294] Delmarva Load Parties Comments at 4; Market Monitor Comments at 1; Maryland People's Counsel Comments at 4; New Jersey Board Comments at 1; ODEC Comments at 6-7; OPSI Comments at 3; Pennsylvania Commission Comments at 3-4.

   [295] Market Monitor Comments at 1; ODEC Comments at 6-7; Pennsylvania Commission Comments at 3-4.

   [296] ODEC Comments at 7 (citing *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009)).

require load in Delmarva to buy more capacity than required for reliability at a price that does not reflect the reliability needs.[297] New Jersey Board contends the price is excessive because the model incorrectly perceives a capacity shortage.[298] ODEC argues that the preliminary Delmarva clearing prices are artificially increased.[299]

100.    New Jersey Board avers that several factors have contributed to the problem with the LDA Reliability Requirement, including the shortened time period between the BRA and the delivery year, which provides less time for generators to reach commercial operation, as well as the effects of the COVID-19 pandemic and supply chain disruptions.[300] Maryland People's Counsel contends that clearing the 2024/2025 BRA using the initial LDA Reliability Requirement will result in the average Delmarva customer paying an incremental average increase of approximately $24/MWh for the 2024/2025 delivery year, or $24/month. Maryland People's Counsel explains this is about 25% of PJM's reported average all-in wholesale power cost for 2022.[301] Maryland People's Counsel argues that the combination of the 2024/2025 BRA results, absent PJM's remedy, and the "excessive" rate requested by NRG for the Indian River Unit 4 Reliability Must Run contract would "magnify the very adverse rate consequences" for electric consumers in Delmarva.[302]

101.    Other parties contend that high prices in Delmarva are just and reasonable. Constellation argues that unusually high prices in Delmarva are consistent with past auction results and with a region that needs to incent new supply.[303] P3 argues that PJM

---

[297] Delmarva Load Parties Comments at 4; Market Monitor Comments at 1, 4; New Jersey Board Comments at 1-3; ODEC Comments at 7-8.

[298] New Jersey Board Comments at 2 (citing PJM ER23-729-000 Transmittal at 2-3).

[299] ODEC Comments at 6-7.

[300] New Jersey Board Comments at 4; *see also* Pennsylvania Commission Comments at 2 (arguing the short lead time between the auction and the delivery year may deter planned generation from offering).

[301] Maryland People's Counsel Comments at 3 at n. 1. Maryland People's Counsel states this number assumes a customer consuming 1,000 kilowatt-hours in a month.

[302] *Id.* at 7-8 (citing *NRG*, 179 FERC ¶ 61,156).

[303] Constellation Protest at 8-10.

has not explained why a high price signal in an LDA that is short on generation and where generation has struggled to be built in a timely manner is unwarranted.[304]

102.    Some parties argue that PJM has not demonstrated that the existing Tariff is unjust and unreasonable.[305]  Several parties also contend that the LDA Reliability Requirement result was not the result of an error, unforeseeable anomaly, or unjust or unreasonable Tariff provision.[306]  Vistra contends that no change in circumstance has occurred since the Commission accepted the existing Tariff provisions as just and reasonable and that a price increase is not sufficient to demonstrate the auction results are unjust and unreasonable.[307]  EPSA argues that PJM has not demonstrated anything unjust and unreasonable about establishing the LDA Reliability Requirement in advance of the auction based on the information available to PJM at that time, even if the information turns out to be inaccurate.[308]  To the contrary, EPSA argues it is reasonable for the LDA Reliability Requirement to be firmly established so that parties can make decisions regarding bilateral contracts and the manner in which they participate in the BRA.[309]  P3

---

[304] P3 Protest at 45.

[305] Vistra Protest at 3, 10; *see also* Clean Energy Associations Protest at 2, 11; Freepoint Protest at 7-8; Leeward Protest at 11 (urging the Commission to direct PJM to clear the 2024/2025 BRA consistent with the as-filed Tariff); Lotus Protest at 3; P3 Protest at 43-44 (arguing PJM has not attempted to demonstrate that any part of the Tariff is not just and reasonable).

[306] Vistra Protest at 5, 10-11; Clean Energy Associations Protest at 12.

[307] Vistra Protest at 5, 10-11.

[308] EPSA Protest at 18 (citing *Cf. Joint Consumer Representatives v. PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,187, at P 32 (2015) (rejecting complaint regarding PJM's failure to update its load forecasts based on updated model where "PJM complied with its [Tariff] by developing its 2015 PJM Peak Load Forecast according to its manuals and posting it prior to February 1, 2015" and finding that "there will inevitably be some difference between PJM's load forecast and the amount of capacity that PJM ultimately needs in a given Delivery Year")).

[309] EPSA Protest at 18-19 (citing *Duquesne Light Co.*, 122 FERC ¶ 61,039 at P 92 (2008); *Md. Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, 127 FERC ¶ 61,274, at P 25 (2009) ("[W]e conclude that Duquesne's [capacity market] liability extends to all auctions in which its load forecasts are included. We also agree with PJM that these obligations are set at the time that PJM establishes its [capacity] auction parameters. This conclusion is warranted given the necessary reliance that market participants place on these published forecasts")).

contends that making assumptions to forecast future market conditions is inherent to PJM's model.[310] Freepoint contends that the only evidence presented by PJM to support that its Tariff is unjust and unreasonable is the auction outcome in one "small LDA," Delmarva, and argues that PJM does not present any testimony or supporting documentation that reflects an "endemic" problem with the existing Tariff. [311]

103.    P3 argues that the auction results cannot be too preliminary to implicate the filed rate doctrine while also being final enough to be unjust and unreasonable.[312]  P3 contends that, if the results are in fact preliminary, then PJM must describe the process it used to calculate the results, how that method relates to the existing Tariff, and "why those preliminary results impeach the Tariff despite the fact that they were not produced by strictly following the Tariff."[313]

104.    Vistra states that PJM has not articulated a standard that would govern when the Commission should take the extraordinary action of changing market rules after the auction process has been completed, and, therefore, accepting these filings could create a slippery slope for other auctions.[314]

### b.    Planned Generation Capacity Resource Offers in Delmarva were Foreseeable

105.    Several protestors argued PJM knew, or should have known, that some or all of the Planned Generation Capacity Resources in question would not offer into the capacity market, and therefore the last-minute nature of PJM's filings is not justified.  Several parties note that the market participants were able to forecast the high clearing prices in Delmarva with public information, and PJM should have been able to do so too.[315]

---

[310] P3 Protest at 32-33 (citing P3 Shanker Aff. 11 (citing *PJM Generation Adequacy Analysis: Tech. Methods Capacity Adequacy Plan. Dep't* dated October 2003 *available at* https://www.pjm.com/-/media/planning/res-adeq/20040621-white-paper-sections12.ashx)).

[311] Freepoint Comments at 7-8.

[312] P3 Protest at 44.

[313] *Id.* at 44.

[314] Vistra Protest at 3-4.

[315] NRG Protest at 18 n. 68 (citing NRG Hotlman Aff. ¶ 15).

106.    Parties also argue that PJM had access to additional sources of information.  First, parties argue that all resources, including Planned Generation Capacity Resources, were required to declare their intention to participate in the 2024/2025 BRA before the planning parameters were posted as part of the minimum offer price rule (MOPR)[316] process.[317]  Second, parties argue that PJM's auction schedule lists a deadline for resources to provide notice of their intent to offer into the auction, also in advance of posting the planning parameters.[318]  Leeward argues that their failure to provide such notice was an "unmistakable indication" that these resources would not participate in the auction.[319]  Third, parties argue that all market sellers are required to receive provisional approval from PJM for a capacity modification request to add a new resource to their portfolio.[320]  Lotus explains that these requests cannot be created once the auction begins.[321]  Lotus contends that any resource that did not submit a capacity modification request essentially provided notice that they did not intend to offer.

107.    Fourth, parties note that Planned Generation Capacity Resources are not subject to a must offer requirement and so had no obligation to offer into the 2024/2025 BRA.[322]

---

[316] *See* PJM, Intra-PJM Tariffs, Attach. DD § 5.14 Clearing Prices and Charges (34.3.0).

[317] Lotus Protest at 3-5 (citing PJM, Intra-PJM Tariff, Tariff, Attach. DD § 5.14(h-1)(1)(C) Clearing Prices and Charges); *see also* PSEG Protest at 8; Invenergy Protest at 6 (citing PJM, Intra-PJM Tariff, Tariff Attach. DD, § 5.14(h-2) Clearing Prices and Charges); Clean Energy Associations Protest at 15 (citing PJM, Intra-PJM Tariffs, Attach. DD, § 5.14 (h-2)(1)(A) Clearing Prices and Charges); Freepoint Comments at 12.

[318] Clean Energy Associations Protest at 15 (citing Tariff, Attach. DD, § 5.14 (h-2)(1) (A) Clearing Prices and Charges); Constellation Protest at 6-7, 15; Freepoint Comments at 12; Invenergy Protest at 6 (citing PJM Auction Schedule, available at: https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/rpm-auction-schedule.ashx)); Leeward Protest at 4 (citing PJM, Intra-PJM Tariffs, Attach. DD, § 5.14 Clearing Prices and Charges); Lotus Protest at 6; PSEG Protest at 8.

[319] Leeward Protest at 4 (citing PJM, Intra-PJM Tariffs, Attach. DD, § 5.14 Clearing Prices and Charges).

[320] Lotus Protest at 6; Freepoint Comments at 12.

[321] Lotus Protest at 6.

[322] Clean Energy Associations Protest at 12-13; Freepoint Protest at 14; Vistra Protest at 9; P3 Protest at 36-37 (citing PJM, Intra-PJM Tariffs, Attach. DD § 6.6A(c) Offer Requirement for Capacity Performance Resources (exempting Intermittent

Clean Energy Associations disagree with PJM's characterization that it was the failure of certain resources to offer into the 2024/2025 BRA, rather than the posted LDA Reliability Requirement, which renders the auction results unjust and unreasonable.[323] Clean Energy Associations assert that there are many valid reasons why Planned Capacity Generation Resources with signed ISAs might not participate in a capacity auction, including concern regarding non-performance penalties.[324] Clean Energy Associations state that PJM itself acknowledges that such resources need to "gauge whether the resource will be in-service by the Delivery Year and whether to take on the risks associated with being a committed capacity resource."[325] Several parties also argue that PJM's interconnection queue backlog should have suggested that Planned Generation Capacity Resources may have trouble meeting deadlines.[326] PSEG believes PJM had, or should have had, the information as to the current status of planned resources through its responsibilities to administer the queue.[327] PSEG argues that, to the extent that the project developers experienced changes or delays with respect to the in-service dates of their projects, they would have been required to notify PJM, and in some circumstances, to obtain PJM's approval for the changes or delayed in-service dates.[328] Similarly, P3 argues that PJM has information about the development milestones of all resources seeking to interconnect to the PJM-operated transmission system.[329] Clean Energy Associations note that, as a result of interconnection queue backlogs, many projects have faced

---

Resources from the must-offer requirement); *id.* § 5.6.1; P3 Shanker Aff. 14-15).

[323] Clean Energy Associations Protest at 13.

[324] *Id.* at 13-15; *see also* Freepoint Protest at 14-15.

[325] Clean Energy Associations Protest at 13 (citing PJM ER23-729-000 Transmittal at 18).

[326] Leeward Protest at 4-5; P3 Protest at 36-37; Clean Energy Associations Protest at 14).

[327] PSEG Protest at 7.

[328] *Id.* (citing PJM, Intra-PJM Tariffs, Part IX.B App. 2, § 3 Modification of Facilities (PJM to study whether a planned modification would constitute a material modification); PJM, Intra-PJM Tariffs, Part VI, Attach. P, App. 2, § 3.4 Suspension (relating to the developer's right to request the suspension of work by the interconnected transmission owner associated with the construction and installation of interconnection facilities)).

[329] P3 Protest at 37 (citing PJM, Intra-PJM Tariffs, Attach. DD § 5.11A Posting of Information Relevant to the RPM Auctions).

challenges in timing and finalizing necessary steps for construction.[330]  Additionally, P3 contends that PJM is well aware of the supply chain disruptions caused by the COVID-19 pandemic, U.S. trade policies, and general economic downturn, all of which are affecting generation project timelines.[331]

108.   Freepoint states that planned resources must post and allocate collateral in their e-credit account in order to participate in the capacity auction and PJM would have known if that had been done.[332]  Lotus argues that neither the Tariff nor the Manuals required that PJM calculate CETO using planned resources with signed ISAs, and PJM had discretion to adjust the calculation of LDA Reliability Requirement before the Tariff required it be posted.  However, Lotus contends that, even if PJM did not feel it had that discretion, PJM need not have waited until clearing the auction to seek a remedy from the Commission.  Similarly, Freepoint asserts that PJM is not required to include Planned Generation Capacity Resources in their modeling according to the Tariff.[333]

109.   Finally, parties argue that PJM should have known that Delmarva was at risk of a capacity shortfall based on prior auction data and reports.[334]  Lotus states that PJM should have been able to calculate that the LDA Reliability Requirement in Delmarva increased by more than the available existing capacity.[335]  Clean Energy Association argue that, if not for PJM taking out-of-market action with its Reliability Must Run contract keeping the 411.9 MW Indian River 4 generating unit online, Delmarva may have been short in

---

[330] Clean Energy Associations Protest at 14 (citing SEIA, Impact of the Auxin Solar Tariff Petition 6-7 (Apr. 26, 2022), https://www.seia.org/sites/default/files/2022-04/FINAL%20Auxin%20Impact%20Analysis%202022-04-26_0.pdf.).

[331] P3 Protest at 37 (citing PJM ER23-729-000 Transmittal at 27).

[332] Freepoint Comments at 12.

[333] *Id.* at 13.

[334] Constellation Protest at 5-7; Invenergy Protest at 6; Lotus Protest at 9; Leeward Protest at 4 (citing PJM, 2023/2024 RPM Base Residual Auction Results, at 14, available at https://pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2023-2024/2023-2024-base-residual-auction-report.ashx; Clean Energy Associations Protest at 15-16 (PJM, 2023/2024 RPM Base Residual Auction Results 14, https://pjm.com/-/media/markets-ops/-rpm/rpm-auction-info/2023-2024/2023-2024-base-residual-auction-report.ashx.).

[335] Lotus Protest at 9 (citing Monitoring Analytics, "Analysis of the 2023/2024 RPM Base Residual Auction," (Oct. 28, 2022), available at: http://www.monitoringanalytics.com/reports/Reports/2022/IMM_Analysis_of_the_20232024_RPM_Base_Residual_Auction_20221028.pdf).

the last BRA.[336]  Clean Energy Associations contends that PJM has known for years that Delmarva is also transmission-constrained, but no additional transmission capacity has been built due to flaws in the current transmission planning process.[337]  Leeward argues that PJM cannot rely on the Manuals, which are mere "guidance documents," and ignore other information available to PJM that indicated that Delmarva could fall short.[338]

110.    Some protesters argue that, based on some or all of the above factors, PJM had ample opportunity to modify the Tariff rules in advance of the 2024/2025 BRA.[339] Invenergy asserts that PJM could have delayed the opening of the auction window to make its proposed rate change, or otherwise revised its modeling parameters before the auction window closed.[340]  Vistra argues it was readily evident that inclusion or exclusion of a relatively larger Planned Generation Capacity Resource in a relatively smaller LDA could have a foreseeable, and potentially significant, impact on the auction clearing price for that LDA.[341]  Vistra contends that the Delmarva clearing price is the predictable product of the Commission-approved Tariff, and that it cannot be the responsibility of market participants to mitigate PJM's failure to anticipate a foreseeable event.[342]

## 2.    Answers

111.    Sierra/NRDC argue that capacity prices are unjust and unreasonable when they are in excess of the level needed for reliability and are not connected to supply and demand

---

[336] Clean Energy Associations Protest at 16 (citing PJM, Comments, Docket No. ER22-1539-000, at 1 (filed May 6, 2022) (noting PJM's conclusion that "certain transmission constraints related to the deactivation of this unit would adversely affect the reliability of the Transmission System, absent upgrades to the system"); *see also* Constellation Protest at 8 (citing *NRG*, 179 FERC ¶ 61,156 ).

[337] Clean Energy Associations Protest at 16 n. 54.

[338] Leeward Protest at 10.

[339] Clean Energy Associations Protest at 17; Freepoint Comments at 12; Invenergy Comments at 6; Pine Gate Protest at 8; Vistra Protest at 9.

[340] Invenergy Protest at 6.

[341] Vistra Protest at 9 (citing PJM EL23-19-000 Transmittal at 16-17; PJM ER23-729-000 Transmittal at 13-15); *see also* Pine Gate Protest at 9; P3 Protest at 36-37.

[342] Vistra Protest at 8-9.

fundamentals.[343]  PJM contends that, though some parties have argued the Delmarva price should be high, no party has justified the use of an incorrect LDA Reliability Requirement for Delmarva.[344]

112.    Constellation argues that PJM misunderstands its statutory burden in claiming no commentor has successfully defended the Delmarva LDA Reliability Requirement value; PJM bears the burden of showing how its proposal is just and reasonable.[345]  P3 also argues that multiple protestors justified the existing Tariff as just and reasonable[346] and that these arguments and evidence in support of the existing Tariff raise the bar for PJM to prove that the existing Tariff is unjust and unreasonable.[347]  The Market Monitor disagrees, arguing that PJM is not required to show that its existing Tariff is unjust and unreasonable under FPA section 205.[348]  The Market Monitor further argues that once PJM has satisfied its burden under FPA section 205, the protestors have the burden to demonstrate the proposal is not just and reasonable.

113.    Constellation contends that PJM wrongly asserts that Delmarva was the only LDA in the 2024/2025 BRA that met its proposed materiality threshold, and that the posted parameters on PJM's website show four additional LDAs that would exceed the threshold.[349]  Constellation states that this fact further undermines PJM's claim that its proposal is narrowly tailored.[350]

---

[343] Sierra/NRDC Answer at 9.

[344] PJM February 2 Answer at 7.

[345] Constellation Answer at 8-9; P3 Answer at 7; *see also* EPSA Answer at 13.

[346] P3 Answer at 7 (citing P3 Protest at § II.C.ii; EPSA Protest at 28-43); *see also* ESPA Answer at 14.

[347] *Id.* at 7 (citing *Sw. Power Pool, Inc.*, 180 FERC ¶ 61,192, at P 52 (2022) (finding that, after protesters provide probative evidence weighing against a proposed tariff change under FPA section 205, the proponents of the tariff change "could not prevail by resting solely on their prima facie evidence")).

[348] Market Monitor February 16 Answer at 2-3.

[349] Constellation Answer at 9.

[350] *Id.* at 9.

114.    PJM states that Delmarva is, in fact, the only LDA with an increase in LDA
Reliability Requirement greater than one percent in the 2024/2025 BRA.[351]  PJM
explains that Constellation's answer refers to the August 29, 2022 values, but that PJM
updated several LDA Reliability Requirement values on October 24, 2022, to account for
behind the meter generation and Fixed Resource Requirement capacity plans.  PJM
further explains that PJM updated the planning parameters excel spreadsheet posted on its
website but failed to update the planning parameters report.[352]  PJM clarifies that it used
the October 24, 2022 LDA Reliability Requirement values in "the conduct of the
2024/2025 BRA."[353]

115.    PJM also argues it could not have reasonably foreseen the auction results prior to
the close of the offer window.[354]  PJM explains that certifications for the MOPR and
notices of intent to offer are not binding on whether resources offer into the auction.[355]
PJM also argues that the results of the prior auction and accompanying analyses
suggesting Delmarva may go short did not have bearing on whether sellers would offer
into the 2024/2025 BRA.[356]  The Market Monitor argues that whether the auction results
were foreseeable is irrelevant because the results are not just and reasonable either
way.[357]  The Market Monitor argues that the standard is whether the prices that PJM
ultimately posts are a result of the actual supply of and demand for capacity in Delmarva
and PJM's proposal meets that standard.[358]

116.    EPSA disagrees with the Market Monitor, arguing there is nothing in the Tariff or
the FPA that would justify this standard.[359]  EPSA contends that the Tariff makes clear
that auctions are to be conducted in advance, based on necessarily imperfect forecasts and

---

[351] PJM February 8 Answer at 2.

[352] *Id.* at 2-3.

[353] *Id.* at 3.

[354] PJM February 2 Answer at 25.

[355] *Id.* at 25-27.

[356] *Id.* at 27.

[357] Market Monitor February 3 Answer at 3; Market Monitor February 16 Answer
at 2.

[358] *Id.*

[359] EPSA Answer at 7; *see also* P3 Answer at 14-15.

assumptions.  EPSA argues that there is nothing in the Tariff that would justify the
Market Monitor's new standard that auction results are only just and reasonable if they
reflect the actual supply and demand.  P3 contends that, if the Market Monitor were
correct about the standard, each price would need to be analyzed *ex post* to determine
whether the "actual" supply and demand perfectly matched the *ex ante* supply and
demand parameters established based on forecasts or assumptions, which would be
highly burdensome to stakeholder and the Commission.[360]

117.    The Market Monitor responds that the appropriate standard for determining
whether rates in a competitive auction are just and reasonable is whether they reflect
supply and demand.[361]  The Market Monitor explains that, if the results do reflect supply
and demand, they can be deemed competitive and efficient.  The Market Monitor further
contends that this standard "is at the core of the Commission's policy of regulation
through competition"[362] and that the Commission has a longstanding policy of relying on
competition to ensure just and reasonable prices.[363]

---

[360] P3 Answer at 15.

[361] Market Monitor February 16 Answer at 3.

[362] *Id.* at 4 (citing *EDF Trading N. Am.*, LLC, 181 FERC ¶ 61,221 (2022) ("These
standards allow for a presumption of just and reasonable tariff rates based on a 90-day
liquidity review period.  The purpose of the demonstration using these index liquidity
standards is to determine whether a hub is a reliable measure of the market forces of
supply and demand in the area.") (citing *El Paso Elec. Co.*, 148 FERC ¶ 61,051, at P 7
(2014); *Idaho Power Co.*, 121 FERC ¶ 61,181, at P 27 (2007); *PacifiCorp*, 95 FERC
¶ 61,145, at 61,463 (2001); *Pinnacle W. Energy Corp.*, 92 FERC ¶ 61,248, at 61,791
(2000)); *Midcontinent Indep. Sys. Operator, Inc.*, 180 FERC ¶ 61,141, at P 277 (2022)
("The UCAP/ISAC ratio also prevents the need to modify its LOLE model and convert
Reserve Requirements and Local Clearing Requirements into SAC terms, and maintains
an appropriate supply and demand balance in the Auction. We agree with MISO and
Potomac Economics that the proposed ratio is reasonable.")).

[363] *Id.* (citing *Regional Transmission Organizations*, Order No. 2000, FERC Stats.
& Regs.¶31,089, mimeo at 144– 145324 (1999) ("The Commission has a responsibility
under FPA sections 205 and 206 to ensure that rates for wholesale power sales are just
and reasonable, and has found that market-based rates can be just and reasonable where
the seller has no market power. The Commission has determined that to show a lack of
market power, the seller and its affiliates must not have, or must have adequately
mitigated, market power in the generation and transmission of electric energy, and cannot
erect other barriers to entry by potential competitors" (citing *Heartland Energy Services,
Inc.*, 68 FERC ¶61,233 at 62,060 (1994); *Louisville Gas & Electric Company*, 62 FERC

118.    Constellation notes that commenters argue that the high price produced by the preliminary auction results provides no real benefit to consumers, but Constellation argues this highlights that PJM's proposal only shifts price in one direction, which could further erode confidence in the market.[364]  In response to ODEC's comments that the 2024/2025 BRA results are unjust and unreasonable because load does not benefit from the increased clearing price, Constellation argues that transmission cost causation principles do not apply here.[365]  Constellation clarifies that transmission costs are allocated consistently with causation because there is no transmission market, but, the instant proceeding involves whether to alter the results of an auction after it has closed.[366]

119.    P3 disputes PJM's statement that it could not have reasonably foreseen the auction results, noting that PJM's July 2022 sensitivity study showed that if as little as 260 MW were removed from the Delmarva LDA, which P3 argues is the equivalent of failing to offer, the price would clear at the $431.26/MW-day price cap.[367]

---

¶61,016 at 61,143-44 (1993); *Louisiana Energy and Power Authority v. FERC*, 141 F.3d 364 (D.C. Cir. 1998) (court upholds Commission's use of market-based rate authority)), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶31,092 (2000), *aff'd sub nom.* Pub. Util. Dist. No. 1 of Snohomish County, Washington v. FERC, 272 F.3d 607 (D.C. Cir. 2001); *Public Citizen, Inc. v. FERC*, 7 F.4th 1177, 1193 (2021) ("Market-based rate regulation is based on the premise that, '[i]n a competitive market, where neither buyer nor seller has significant market power, * * * the terms of their voluntary exchange are reasonable, and * * * [the] price' they negotiate will be 'close to marginal cost, such that the seller makes only a normal return on its investment.' … On that understanding, we have held that the Commission can rationally allow markets to set 'just and reasonable' prices as long as the Commission takes the necessary steps to ensure that market participants cannot wield anticompetitive market power.")))·

[364] Constellation Answer at 5.

[365] *Id.* at 7 (citing ODEC Comments at 8 (citing *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009))).

[366] *Id.*

[367] P3 Answer at 5.  Note that the actual price cap for Delmarva in the 2024/2025 BRA is $426.17.  See P3 Shanker Aff. 24 n. 28.

### D.    **Alternative Solutions**

### 1.    **Comments**

120.    Several parties request that the Commission not adopt the relief requested by PJM, if the Commission determines that PJM's existing Tariff is unjust and unreasonable.[368] Some protestors argue that, should the Commission allow PJM to change the rules at this stage of the auction, PJM must allow participants to modify their capacity supply offers.[369]    Clean Energy Associations request that if the Commission determines that PJM's existing Tariff is unjust and unreasonable, the Commission order a full re-run of the 2024/2025 BRA that incorporates accurate modeling assumptions.[370]    The Market Monitor, however, argues that the 2024/2025 BRA does not need to be rerun (i.e., PJM does not need to re-open the offer window) because there is no reason to believe offers were affected by the overstated demand.[371]

121.    LS Power argues that, should the Commission restart the auction process, the Commission must also correct two other capacity market rules it argues are unjust and unreasonable.  Specifically, LS Power states PJM has acknowledged that its capacity accreditation approach for Capacity Interconnection Rights is flawed, and that this issue is pending before the Commission in Docket No. EL23-13-000.[372]    Second, LS Power argues it was unjust and unreasonable for the Market Monitor to mitigate sellers to offer caps which used a low expected Capacity Performance penalty risk, as demonstrated by

---

[368] *See, e.g.* Clean Energy Associations Protest at 2.

[369] LS Power Protest at 7; EPSA Protest at 30 (citing *ISO New England Inc.*, 175 FERC ¶ 61,172, at P 63 (2021)).

[370] Clean Energy Associations Protest at 2-3, 18 (citing *Black Oak Energy, LLC*, 167 FERC ¶ 61,250, at P 28 (2019) (stating "in making such remedial determinations, the Commission's authority is at its 'zenith'") (citing *La. Pub. Serv. Comm'n v. FERC*, 866 F.3d 426, 429 (D.C. Cir. 2017) ("[T]he breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily ... to the fashioning of policies, remedies and sanctions."); *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 159 (D.C. Cir. 1967) ("[W]e observe that the breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions.")).

[371] Market Monitor Comments at 5.

[372] LS Power Protest at 4-5 (citing Roy Shanker, PhD, Complaint, Docket No. EL23-13-000 (filed Nov. 30, 2022)).

the high volume of penalties in the wake of Winter Storm Elliot.[373]  LS Power contends that it is not reasonable to only correct flaws which result in lower prices but ignore those that result in higher prices.[374]

122.    ODEC urges the Commission not to allow modifications to PJM's proposal, such as resubmission of offers, which could delay providing a remedy to the unjust and unreasonable clearing prices.[375]

123.    Several parties proposed alternative ways for PJM to ensure LDA Reliability Requirement is more accurate.  Vistra argues that, if the Commission finds changes are required, the Commission could direct PJM, for future auctions, to amend the Tariff to require planned generation to notify PJM of its intent to participate in the auction in advance of the auction so that PJM can adjust the posted LDA Reliability Requirement accordingly.[376]  The Market Monitor recommends that, going forward, the Commission direct PJM to modify its Tariff to require all planned resources to commit to a must offer requirement by a defined date prior to the posting of auction parameters by PJM.[377]  EPSA suggests requiring planned resources to commit whether they will be in service for the relevant delivery year ahead of the Third Incremental Auction, at which point PJM would then adjust the LDA Reliability Requirement based on the resources that will actually be in service during the delivery year, at the same time as it makes adjustments to account for changes in the load forecast.[378]  Alternatively, EPSA notes PJM could require all resources without a must-offer requirement to make a binding commitment to

---

[373] *Id.* at 5-7 (citing *Indep. Mkt. Monitor for PJM v. PJM Interconnection, L.L.C.*, 174 FERC ¶ 61,212 (2021) (granting complaint by the Market Monitor); *Indep. Mkt. Monitor for PJM v. PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,137 (2021) (establishing replacement market seller offer cap), *on reh'g*, 178 FERC ¶ 61,121 (2022)); *see also* Invenergy Protest at 5 (referencing PJM, Intra-PJM Tariffs, Attach. DD § 10A).

[374] LS Power Protest at 7.

[375] ODEC Comments at 9.

[376] Vistra Protest at 11-12; *see also* Ohio FEA Comments at 5; P3 Protest at 3-4, 9-10.

[377] Market Monitor Comments at 5.

[378] EPSA Protest at 26.

offer or not offer into the BRA and all subsequent Incremental Auctions for that delivery year prior to PJM posting the planning parameters.[379]

124.    Constellation contends that, assuming *arguendo* that a year-over-year increase in an LDA Reliability Requirement is an appropriate trigger to authorize PJM to modify the LDA Reliability Requirement after the offer window is closed, any relief ordered by the Commission with respect to the 2024/2025 BRA for Delmarva should adopt the highest threshold possible to remedy the issue while avoiding unanticipated and inappropriate changes in market outcomes in other LDAs.[380]

125.    The Market Monitor also requests the Commission direct PJM to develop a different way of calculating effective load carrying capacity (ELCC), which is used to accredit wind, solar, and storage capacity.[381]  The Market Monitor argues that PJM's current approach is to use the aggregate ELCC value in calculating the internal capacity for LDA Reliability Requirement, which leads to the mismatch between internal capacity and CETO at issue here.  The Market Monitor states one potential solution is to require the use of the lower of the LDA ELCC and the PJM default ELCC when calculating the capacity value of the resource, in order to match the capacity value in CETO.

126.    Others argue that PJM should propose revisions to the PJM Business Practice Manuals rather than to the Tariff.[382]  Freepoint suggests one such revision could be a binding deadline for market participants to notify PJM of their intent to offer before the parameters are finalized.[383]

127.    Some parties also requested the Commission direct additional process to consider this issue.  PSEG requests that, if the Commission accepts PJM's proposal, it do so only for the 2024/2025 BRA, and then initiate an FPA section 206 proceeding to address the underlying problems raised in PJM's filings, as well as direct PJM to propose Tariff revisions to ensure PJM promptly informs market participants about any issues that could impact auction results, establish a framework for evaluating when an issue arises that could impact the validity of an auction, and prevent PJM from delaying posting auction

---

[379] *Id.*; EPSA Protest, Attach. A, Sotkiewicz Aff. ¶¶ 124-127.

[380] Constellation Protest at 5.

[381] Market Monitor Comments at 5.

[382] Freepoint Comments at 13; Leeward Protest at 9; *see also* Clean Energy Associations Protest at 17 (citing PJM Manual 20 § 4.3 (13) (Modeling Specifics) (Aug. 25, 2021), https://www.pjm.com/-/media/documents/manuals/m20.ashx).

[383] Freepoint Comments at 13.

results when an identified issue does not materially impact the outcome of the auction.[384] AMP urges the Commission to convene a technical conference focused on additional changes to PJM's capacity construct, including: (1) expansion of PJM's proposal to address planned resources that do not participate in the BRA to all instances, not just those resulting in a 1% year-over-year ("material") increase in the LDA Reliability Requirement, and (2) consideration of whether insufficiently small LDA sizing in PJM contributes to inefficient capacity auction results, warranting a reevaluation of PJM's zonal capacity construct structure.[385]

128. Public Citizen requests that the Commission set the 2024/2025 BRA results for hearing and establish a refund effective date, per 16 USC § 824e, and determine as part of that hearing whether market participants in Delmarva engaged in intentional capacity withholding.[386] Public Citizen also argues that PJM should be required to file future capacity auction results as a stand-alone rate filing under FPA section 205 of the Federal Power Act to ensure rates cannot go into effect until they have been noticed for comment.[387]

129. Some parties request that the Commission direct PJM to work with stakeholders to identify whether an issue exists in administering the BRA and develop an appropriate long-term, prospective solution for future auctions, if any change is needed.[388] EPSA requests the Commission direct PJM to conduct a stakeholder process or should initiate its own further proceedings to allow for the development of a replacement rate that will allow market participants to rely on posted auction parameters prospectively.[389] Although Constellation opposes PJM's proposal, Constellation argues that, should the Commission find PJM's Tariff unjust and unreasonable, accepting PJM's proposal for the 2024/2025 BRA and directing PJM to develop a more comprehensive solution through an expedited stakeholder process would be consistent with prior Commission precedent to avoid unnecessary auction delays.[390]

---

[384] PSEG Protest at 3.

[385] AMP Comments at 4-5.

[386] Public Citizen Protest at 1.

[387] *Id.* at 2 (citing *ISO New England, Inc.*, 119 FERC ¶ 61,239 (2007)).

[388] Constellation Protest at 19-20; EPSA Protest at 21; Leeward Protest at 11; Vistra Protest at 11-12.

[389] EPSA Protest at 21.

[390] Constellation Protest at 18-19 (citing *PJM Interconnection, L.L.C.,* 174 FERC ¶

130.    Lotus argues the Commission should find that the exiting Tariff already includes sufficient mechanism for planned resources to communicate whether they intend to offer into the auction or not.[391]

131.    Others request further Commission process.  Invenergy argues that the Commission must require PJM to provide an additional explanation of how its proposed changes to the method of calculating LDA Reliability Requirements are reasonable and should direct PJM to undertake a more comprehensive reassessment of its capacity market rules, including capacity market offer caps.[392]  Constellation suggests a paper hearing seeking more information regarding PJM's proposed year-over-year LDA Reliability Requirement trigger, justification for the one percent materiality threshold, and why other potential solutions would not be appropriate.[393]  Constellation argues that the Commission has ordered similar narrow briefing in the context of other proceedings in which the Commission found certain Tariff provisions to be unjust and unreasonable. Constellation states that in these situations the Commission ordered a paper hearing to develop a record on the replacement rate and directed PJM to run its capacity auction under the prior mechanism.[394]

---

61,212, at PP 72-74 (2021) (concluding that it is "an appropriate and equitable exercise of [the Commission's] discretion not to further delay the upcoming auction while the Commission determines the just and reasonable replacement rate"); *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, at P 115 (2006) (accepting tariff provision to give discretion to the market monitor but allocating nine months for PJM to develop objective criteria to serve as the long-term solution); *Cal. Indep. Sys. Operator Corp.*, 116 FERC ¶ 61,274, at P 1402 (2006) (explaining that "[a]lthough additional features could enhance [the proposal], we find that these additional enhancements do not outweigh the need to implement without further delay the numerous benefits that the [proposed] tariff provides."); *Sw. Power Pool, Inc.*, 114 FERC ¶ 61,289, at PP 2, 3 (2006) (explaining that "[w]e recognize that the implementation of organized markets is to some extent an iterative process that requires modifications to tariff provisions"), *on reh'g*, 116 FERC ¶ 61,289, at P 54 (2006))).

[391] Lotus Protest at 3.

[392] Invenergy Protest at 5-7.

[393] Constellation Protest at 19-20.

[394] *Id.* at 20 (citing *PJM Interconnection, L.L.C.*, 174 FERC ¶ 61,212, at PP 72-73 (2021)).

2. <u>Answers</u>

132.    PJM argues that the 2024/2025 BRA does not need to be rerun with a new offer window because the capacity market is designed to motivate sellers to offer based on marginal costs, so modifications to the LDA Reliability Requirement should not impact a resource's offer.[395]  PJM contends that, regardless, it is not workable to allow sellers to update their offers because changed circumstances may cause some sellers to make different decisions about whether to offer.[396]  PJM explains that any changes in offers will result in more updates to LDA Reliability Requirement, which would then trigger reoffering, in a circular cycle that "would paralyze the conduct of the auctions."[397]

133.    The Market Monitor also reiterates that there is no reason to believe that sellers' offers were affected by the overstated capacity demand included in Delmarva's LDA Reliability Requirement.[398]  The Market Monitor argues that competitive market offers in a rerun auction would be the same.  The Market Monitor contends that market participants are not entitled to confirmation of their assumptions about the supply that will actually offer in a given auction, and that relying on the auction parameters in formulating offers is not consistent with competitive behavior in a competitive market.  Rather, the Market Monitor contends that competitive offers are a function of sellers' marginal cost of providing capacity.  Sierra/NRDC notes that, in light of the Market Monitor's statements that the capacity auction was competitive, it is not clear what purpose rerunning the auction with a new offer window would serve "other than facilitating strategic offer behavior."[399]

134.    EPSA disagrees, arguing that not all sellers are subject to the must offer requirement and those that are not may choose not to offer into the 2024/2025 BRA based on the changes to the LDA Reliability Requirement and expected clearing price.[400]  The Market Monitor responds that EPSA fails to explain why new offers are needed to

---

[395] PJM February 2 Answer at 14.

[396] *Id.* at 14-15.

[397] *Id.* at 15.

[398] Market Monitor February 3 Answer at 3.

[399] Sierra/NRDC Answer at 11.

[400] EPSA Answer at 15.

ensure offers are competitive.[401]  The Market Monitor also argues the EPSA does not address concerns that allowing new offers could result in offers that are not competitive.

135.    PJM states that the Market Monitor's preferred approach to create a must offer requirement for planned resources may be a viable alternative that could potentially be applied to future capacity auctions after the 2024/2025 BRA.[402]  PJM clarifies that this solution should not be applied to the 2024/2025 BRA because it would require restarting the auction process but that PJM can explore the merits of the proposal through the stakeholder process.[403]  ODEC similarly argues that any further changes to PJM's proposal or additional process should be in addition to granting PJM's request to implement its proposal for the 2024/2025 BRA.[404]

136.    Sierra/NRDC similarly argue against taking action beyond PJM's FPA section 205 proposal in these dockets without further process.[405]  With respect to proposals to require planned generation to notify PJM of its intent to participate in the auction, Sierra/NRDC argue further investigation is needed to explore if this would enable anti-competitive offers.  Sierra/NRDC oppose both the Market Monitor's proposal to change the ELCC calculation methodology and LS Power's proposal to change the Market Monitor's mitigation of seller offer caps, stating that these proposals are unrelated to the instant filings and still under consideration in the PJM stakeholder process.[406]  Sierra/NRDC further asserts that the Market Monitor's proposal to use the lower of a generating resource's LDA ELCC and the PJM default ELCC in calculating the LDA Reliability Requirement would understate the resource adequacy value of such generating resources in LDAs that are not transmission constrained, and undermine the reliability benefits that RTOs bring by operating systems for a large region.[407]

137.    P3 states the Market Monitor's contention that there is no reason to believe offers were affected by overstated demand ignores testimony to the contrary.[408]  P3 argues that

---

[401] Market Monitor February 16 Answer at 5.

[402] PJM February 2 Answer at 31.

[403] *Id.* at 32.

[404] ODEC Answer at 5-6; *see also* Sierra/NRDC Answer at 10.

[405] Sierra/NRDC Answer at 11-12.

[406] *Id.* at 10-11.

[407] *Id.* at 12.

[408] P3 Answer at 16 (citing NRG Protest, Attach. A, Holtman Aff. 4-11); *see also*

the Tariff expressly provides sellers flexibility to craft their offers and, for some resources, their decision about whether to participate in the BRA, based on their commercial judgement as informed by the planning parameters. [409] P3 argues that simply because suppliers offered competitively based on one set of planning parameters does not mean that those same suppliers would offer at all, or at the same level, under revised parameters.

### E.    Timing Concerns

#### 1.    Comments

138.    Vistra contends that granting PJM's filings will further exacerbate existing issues with delays in the BRA.[410]  Vistra argues that running auctions on a less than 12-month cycle for a delivery period of less than three years in the future has undermined the predictability of a market whose primary feature is to provide predictable investment signals and incent development of new generation when and where needed.  Vistra also states that pre-auction activities for the next auction are ongoing, noting that January 30, 2023 is the deadline for auction participants to submit must-offer exceptions.  Vistra states that auction participants will have to make decisions regarding risk and retirement before they know the outcome of the prior auction or the Commission's determination in the instant proceeding.  Vistra asserts that this could result in the premature retirement of resources because the asset owner does not have the data upon which to make an informed decision with respect to offer price or potential risk.

139.    Leeward argues that the 2025/2026 BRA, for which pre-auction activities began on January 15, 2023, should be delayed until the 2024/2025 BRA results are released.[411]  Leeward states that all capacity resources that plan to participate in the BRA are required to provide PJM with notice of intent to participate 120 days prior to the auction and, without the results of the 2024/2025 BRA, market participants do not know whether they are considered a new or existing resource or whether they have a capacity commitment before entering the 2025/2026 BRA.[412]  Leeward contends that auction elements such as the Market Seller Offer Cap and the must offer requirement for existing resources require

---

EPSA Answer at 10-11.

[409] *Id.* at 16.

[410] Vistra Protest at 15-16.

[411] Leeward Protest 11.

[412] *Id.* at 11-12 (citing PJM, Intra-PJM Tariffs, Attach. DD § 5.14 Clearing Prices and Charges).

resources to know if they are classified as planned or existing resources prior to the opening of the auction and can have a material impact on how a seller formulates offers and participates in the BRA.[413]

140.    Delmarva Load Parties contend that avoiding further delays in the BRA timeline is particularly critical as PJM stakeholders seek to reestablish the three-year forward procurement of capacity resources that has already been delayed by various proceedings before the Commission.[414]  New Jersey Board states that prolonged delays in fixing this market dysfunction will only leave market participants without final capacity market results, and lead to damaging uncertainty for market participants on both the supply and demand side.[415]

141.    The Ohio FEA explains that Ohio's regulated electric distribution utilities rely upon a competitive auction process to procure generation service for non-shopping customers.[416]  Ohio FEA explains that, due to Commission orders modifying the PJM capacity rules, the Public Utilities Commission of Ohio has had to significantly modify and truncate the default service auction schedules, which deprived Ohio ratepayers of the benefits associated with staggering and laddering auction products of multiple durations.[417]

142.    Clean Energy Associations contend that PJM is retaining credit posted by capacity market sellers in order to participate in the 2024/2025 BRA, thereby financially harming market participants who cannot use their posted credit for other business purposes.[418]

---

[413] *Id.* at 12.

[414] Delmarva Load Parties Comments at 5.

[415] New Jersey Board Comments at 2.

[416] Ohio FEA Comments at 5.

[417] *Id.* at 5-6.

[418] Clean Energy Associations Protest at 4 (citing PJM, Intra-PJM Tariffs, Attach. Q § VI.b Supplemental Credit Requirements for Screened Transactions; *see also* Leeward Protest at 6-7.

Case: 23-1778   Document: 88-1   Page: 102   Date Filed: 12/11/2023
Document Accession #: 20230621-3089   Filed Date: 06/21/2023

Docket Nos. ER23-729-000 and EL23-19-000                          - 71 -

143.   The Market Monitor argues that re-opening the 2024/2025 BRA auction window would be inefficient and further delay auction results unnecessarily at a time when the auction has already been significantly delayed.[419]

## 2.   Answers

144.   PJM argues that the 2025/2026 BRA does not need to be delayed because only a limited amount of planned generation was offered into the 2024/2025 BRA and would be subject to the must offer requirement as an existing resource if it cleared.[420]  PJM notes Leeward's portfolio of renewable energy facilities would not be subject to the must offer requirement regardless of whether they cleared the 2024/2025 BRA.[421]  With respect to capacity market sellers who change their mind on deactivating based on the 2024/2025 BRA results, PJM states that sellers can simply withdraw the deactivation notice and continue to participate in the 2025/2026 BRA.

145.   Sierra/NRDC agree with the Market Monitor that restarting the 2024/2025 BRA with a new offer window would be unnecessary and cause further delay to an already-delayed auction.[422]

## V.   Discussion

### A.   Procedural Matters

146.   Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2021), the notices of intervention and timely, unopposed motions to intervene serve to make the entities that filed them parties to the proceedings in which they were filed.

147.   Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d) (2021), we grant Sierra Club's late-filed motion to intervene given its interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

148.   Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2021), prohibits an answer to a protest or answer unless otherwise

---

[419] Market Monitor Comments at 5.

[420] PJM February 2 Answer at 32-33.

[421] *Id.* at 33.

[422] Sierra/NRDC Answer at 11.

Case: 23-1778    Document: 88-1    Page: 103    Date Filed: 12/11/2023
Document Accession #: 20190521-9066    Filed Date: 01/21/2023

Docket Nos. ER23-729-000 and EL23-19-000                                    - 72 -

ordered by the decisional authority.  We accept the answers filed by PJM, the Market Monitor, Constellation, ODEC, Sierra/NRDC, P3, EPSA, and Leeward because they have provided information that assisted us in our decision-making process.

## B.    **Substantive Matters**

149.    As discussed below, we find PJM's proposed Tariff revisions to be just and reasonable and therefore accept them, to become effective December 24, 2022, as requested.  We find that PJM's proposed Tariff revisions will help ensure a competitive outcome for capacity auctions by more closely aligning the LDA Reliability Requirement with actual reliability needs.  We find that it is appropriate for PJM to consider an additional factor in the optimization algorithm – whether Planned Generation Capacity Resources that do not participate in the auction would materially increase the LDA Reliability Requirement and exclude such resources from the LDA Reliability Requirement if the resulting change exceeds the materiality threshold.  As discussed below, we dismiss the related FPA section 206 complaint as moot.

### 1.    **Tariff Revisions**

150.    We accept PJM's proposed Tariff revisions as just and reasonable.  The proposed revisions will enable PJM, under specific circumstances, to revise the LDA Reliability Requirement to incorporate updated information regarding which Planned Generation Capacity Resources are offering into the BRA.  We agree with PJM that this will help ensure that load-serving entities are charged for capacity based on an LDA Reliability Requirement that reflects actual reliability needs in a manner consistent with supply and demand fundamentals.  Such an outcome is consistent with the goals of the PJM capacity market, which are to secure sufficient capacity in the delivery year and send a long-term price signal to ensure the reliability of PJM's system.[423]  In other words, PJM's proposal will help meet the capacity market's underlying goals by setting clearing prices that are based on accurate reliability assessments.

151.    Protesters argue that PJM's proposal is arbitrary because it does not address circumstances where Planned Generation Capacity Resources offer but either do not clear or are mitigated.  We disagree that these circumstances are functionally similar.  Capacity

---

[423] *See* PJM, Intra-PJM Tariffs, Attach. DD, Introduction (1.0.0) ("[T]he Reliability Pricing Model provides:  [ . . .] (b) a competitive auction mechanism to secure the forward commitment of additional Capacity Resources and Qualifying Transmission Upgrades as necessary to satisfy the portion of LSEs' Unforced Capacity Obligations not satisfied through Self-Supply, in order to ensure the reliability of the PJM Region for future Delivery Years; (c) long-term pricing signals for the development of Capacity Resources, including demand resources and planned generation resources, to ensure the reliability of the PJM Region").

Document Accession #: 20230721-3063    Filed Date: 07/21/2023

offers signal that the resource intends to be available to serve as capacity in the relevant delivery year at a price equal to or above their capacity supply offer, even if they do not actually clear in the BRA.  It is therefore appropriate for those resources to be included in the calculation of the LDA Reliability Requirement; the Tariff defines LDA Reliability Requirement as projected internal capacity plus CETO, and these resources will serve as capacity if they clear in the BRA.

152.    By contrast, once the materiality threshold is satisfied for a given LDA, under its proposal PJM will remove only Planned Generation Capacity Resources that do not offer in the BRA or Incremental Auction, as such resources cannot reasonably be assumed to be available to serve as capacity in the relevant delivery year.  Planned Generation Capacity Resources that offer but do not clear are distinguishable from those that do not offer.  While it is true that some of the Planned Generation Capacity Resources that do not offer could become operational during the delivery year, these resources will not have capacity commitments.  As PJM explains, such resources are appropriately excluded from the LDA Reliability Requirement if they did not participate in the auction because even if such resources were in service by the start of the delivery year, there is no need to model the increased reliability risk since load is not depending on them as capacity resources.[424]

153.    We disagree with NRG that PJM's proposal will prevent the market from sending a price signal that additional capacity is needed.  As the Market Monitor notes, the prices resulting from PJM's proposal will accurately reflect supply and demand and, if the prices are accurate, the market incentives will be correct and consistent with reliability needs.[425]  With regard to PJM having provided NRG a different explanation for the increase in LDA Reliability Requirement, that argument is not relevant to the question of whether PJM's instant proposal is just and reasonable.  We note that there are many factors that can impact the calculation of LDA Reliability Requirements, and PJM proposes to change only one of those factors.  As a result, our finding here is limited to the analysis of whether it is just and reasonable for PJM to remove Planned Generation Capacity Resources that do not offer in the auctions from the most up to date LDA Reliability Requirements once the materiality threshold is crossed.  We need only determine, under FPA section 205, whether the proposed filing is just and reasonable; the Commission is not obligated to consider whether the proposal is more or less reasonable than other alternatives.[426]

---

[424] *See* PJM February 2 Answer at 29.

[425] *See* Market Monitor February 3 Answer at 4.

[426] *See, e.g., Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) (when determining whether a rate was just and reasonable, the Commission properly did

154.    We also disagree that PJM's proposal is unduly discriminatory or preferential because the proposed revisions to the LDA Reliability Requirement are limited to Planned Generation Capacity Resources, rather than all resources that are exempt from the must-offer requirement.  We find that planned and existing resources are not similarly situated with respect to determining reliability needs in a given delivery year because planned resources have not yet achieved commercial operation.  As such, they face construction and other risks that make it more likely that they will be unavailable to provide capacity in some or all of the relevant delivery year, in contrast to existing resources.  We also note that, as PJM clarified in its answer, PJM's proposal does not improperly exclude planned Intermittent Resources, because a new Intermittent Resource is considered a Generation Capacity Resource pursuant to the Tariff.[427]  As a result, PJM's proposal will remove any Planned Generation Capacity Resource that does not offer into the auction from the LDA Reliability Requirement, regardless of whether it is an Intermittent Resource.

155.    We further disagree with Leeward that PJM's proposal would result in LDA Reliability Requirement modifications based on "arbitrary" or "non-transparent" assessments.  We find that the proposed Tariff provisions clearly explain the limited circumstances under which PJM will modify the LDA Reliability Requirement.  We find that the provisions are neither arbitrary nor non-transparent since PJM's materiality threshold places an objective and transparent limit on when PJM can modify the LDA Reliability Requirement after the auction window opens.

156.    NRG argues that market sellers rely on posted parameters for bilateral contracting and hedging activities and that accepting PJM's proposed Tariff revisions would be irreconcilable with the Commission's prior holdings that market participants should be able to rely on posted auction parameters and auction rules.[428]  Vistra contends that allowing PJM to change the rules of auctions after offers have been submitted, even prospectively, severely compromises market participants' ability to make thoughtful investment decisions.[429]  However, we find that the fact that some market participants have, in the past, incorporated the LDA Reliability Requirement in their business

not consider "whether a proposed rate schedule is more or less reasonable than alternative rate designs")).

[427] *See* PJM February 2 Answer at 28-29 (citing PJM, Intra-PJM Tariffs, Definitions I-J-K).

[428] NRG Protest at 15-20 (citing *Duquesne Light Co*., 122 FERC ¶ 61,039 at P 92 (2008)).

[429] Vistra Protest at 6.

decisions and commercial transactions outside of the PJM-administered capacity market does not render PJM's proposal unjust and unreasonable.

157.    Just as with other uncertain factors that may influence auction prices, such as the choices of other market participants, in future years entities can account for the potential for adjustments to the LDA Reliability Requirement in carrying out their business decisions and commercial transactions.[430]

158.    NRG and P3 argue that capacity offers should be allowed to reflect any changes in the LDA Reliability Requirement.  We disagree.  Fundamentally, changes to the LDA Reliability Requirement affect the shape of the capacity market demand curves, and no party has suggested that the shape of the demand curve impacts their costs.  Rather, we agree with PJM, the Market Monitor, and commenters that capacity market offers should be dictated by capacity resource costs and not by expectations of demand.  Inputs to the capacity price, including the actions and offers of other sellers, as well as changes to the LDA Reliability Requirement, can impact the final auction clearing price.

159.    We reject EPSA's argument that PJM's proposal fails to strike a balance between reducing prices for load and ensuring suppliers needed for reliability receive adequate compensation.  As discussed above, PJM's proposal should improve price signals relative to the existing methodology because the proposal will, once a materiality threshold is satisfied, remove Planned Generation Capacity Resources that do not offer and so are not likely to be available to serve as capacity in the relevant delivery year.  In this circumstance, the price for such an LDA will be reduced, but it will provide price signals that reflect actual reliability needs.  We will not opine on the Indian River Reliability Must Run agreement, which is the subject of another pending proceeding and not at issue here, or EPSA's arguments that PJM has overlooked other reliability issues.  These arguments are outside the scope of this FPA section 205 filing.

160.    We also find that the proposed one percent materiality threshold is just and reasonable, because, as PJM explains, it is typically the cumulative addition of sufficiently large Planned Generation Capacity Resources in a small LDA that can trigger the issue identified in the instant filing.  We agree with PJM that the one percent threshold avoids having to arbitrarily define what constitutes a "small" LDA.[431]  We disagree that the threshold should be higher as to more narrowly target Delmarva and the specific situation in the 2024/2025 BRA.  As PJM explains in its answer, its proposal already targets smaller LDAs, because the threshold is a percentage, and small LDAs would more easily trigger a one percent threshold as compared to larger LDAs, where

---

[430] *See infra* P 160.  As discussed in section B.3 below, we also determine that applying PJM's proposed changes to the 2024/2025 BRA is just and reasonable.

[431] PJM ER23-729-000 Transmittal at 19-20.

impacts from Planned Generation Capacity Resources not being offered into the auctions are more likely to be immaterial and not impact the LDA Reliability Requirement.[432]  We find that PJM's proposed one percent threshold achieves its stated purpose by enabling PJM to revise the LDA Reliability Requirement in the event that enough Planned Generation Capacity Resources that are expected to offer in that LDA do not, such that the LDA's Reliability Requirement is materially increased as compared to the prior delivery year.

161.    We disagree with protestors that PJM has failed to demonstrate that a year-over-year change in LDA Reliability Requirement is a reasonable trigger for PJM to update the value.  It is true that there are several factors that can impact the LDA Reliability Requirement, but PJM's proposal specifies that PJM will only modify the LDA Reliability Requirement where the increase is "due to the cumulative addition of such Planned Generation Capacity Resources" that do not participate in the relevant auction.[433]  Therefore, we disagree with protestors that PJM's proposal is not clear, or that additional information is needed, and instead, we find that PJM's proposal is narrowly targeted to the identified issue.

162.    Finally, we grant PJM's request for waiver of the Commission's 60-day prior notice requirement to allow an effective date of December 24, 2022.[434]

## 2.    Filed Rate Doctrine

163.    The filed rate doctrine "ensure[s] rate predictability and prevent[s] discriminatory or extortionate pricing"[435] by "bind[ing] regulated entities to charge only the rates filed

---

[432] We also note that PJM states that Delmarva is the only LDA with an LDA Reliability Requirement that increased more than one percent for the 2024/2025 BRA. PJM February 2 Answer at 31.

[433] PJM ER23-729-000 Transmittal at 21.

[434] 18 C.F.R. § 35.11.

[435] *Old Dominion*, 892 F.3d at 1230. The filed rate doctrine as originally developed under the Interstate Commerce Act required only that the railroad or trucking firm must post and abide by the rate on file.  *Maislin Indus., US, Inc. v. Primary Steel, Inc.*, 497 US 116, 126 (1990) ("In order to render rates definite and certain, and to prevent discrimination and other abuses, the statute require[s] the filing and publishing of tariffs specifying the rates adopted by the carrier, and ma[kes] these the *legal* rates, that is, those which must be charged to all shippers alike.") (quoting *Ariz. Grocery Co. v. Atchison, T. & S. F. R. Co.*, 284 U.S. 370, 384 (1932)).

Document Access Case: 23-1778   Document: 88-1   Page: 108   Date Filed: 12/11/2023
Document Accession No. 20230821-9005   Filed Date: 08/21/2023

Docket Nos. ER23-729-000 and EL23-19-000                                   - 77 -

with FERC."[436]  "The considerations underlying the doctrine . . . are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant."[437]  The corollary rule against retroactive ratemaking "prohibits the Commission from adjusting current rates to make up for a utility's over-or-under-collection in prior periods."[438]  While, the courts have over the years emphasized different purposes of the filed rate doctrine—primary jurisdiction,[439] predictability,[440] consumer protection,[441] equity[442]—they have consistently held that those purposes are secured by the "cardinal principal of ratemaking," which prohibits a public utility from

---

[436] *Okla. Gas*, 11 F.4th at 829.

[437] *Arkla*, 453 U.S. at 577-78 (1981); *see also Cogentrix Energy Power Mgmt., LLC v. FERC*, 24 F.4th 677, 683 (D.C. Cir. 2022) ("the filed rate doctrine and the rule against retroactive ratemaking play an important role in helping the Commission fulfill its statutory responsibility to ensure that regulated entities charge only rates that are just and reasonable").

[438] *Towns of Concord*, 955 F.2d at 71 n.2.

[439] *Arkla*, 453 U.S. at 577-78 (1981) ("The considerations underlying the doctrine … are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant.") (quoting *City of Cleveland v. FPC*, 174 U.S. App. D.C. 1, 10, 525 F.2d 845, 854 (1976)).

[440] *Columbia Gas Transmission Corp. v. FERC*, 831 F.2d 1135, 1141 (D.C. Cir. 1987) ("Providing the necessary predictability is the whole purpose of the well-established 'filed rate' doctrine, which 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.'").

[441] *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 816-17 (D.C. Cir. 1998) (the filed rate doctrine "ensure[s] that customers can rely on a pipeline's compliance with its tariff in conducting their own business activities.") (quoting *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 577 (D.C.Cir.1990)).

[442] *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 969 (D.C. Cir. 2003) ("by preventing discriminatory pricing, [the filed rate doctrine and rule against retroactive ratemaking] promotes[s] equity.") (citing *Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999).

changing the rates collected for services rendered. [443] As discussed below, we find that applying PJM's proposed Tariff revisions to the 2024/2025 BRA, as contemplated by PJM's filing, does not violate the filed rate doctrine or the rule against retroactive ratemaking.

164.    PJM's capacity market provides "a competitive auction mechanism to secure the forward commitment of additional Capacity Resources . . . in order to ensure the reliability of the PJM Region for future Delivery Years."[444] As part of the capacity auction, PJM is required to conduct a BRA for each delivery year "to secure commitments of Capacity Resources as needed to satisfy" the capacity obligations to meet future peak demand as set forth in the Tariff.[445] At this stage of the auction process, no capacity commitments have been secured, no Capacity Clearing Price[446] has been established, and the rate that will be charged for the delivery year (June 1, 2024 – May 31, 2025) has yet to be determined.

165.    As relevant here, for the purposes of the filed rate doctrine, the rate on file with the Commission is the BRA procedures.[447] Those rules for conducting the auction stand in

---

[443] *City of Piqua*, 610 F.2d at 954.

[444] PJM, Intra-PJM Tariffs, Attach. DD, § 1(b) Introduction (1.0.0).

[445] PJM, Intra-PJM Tariffs, Attach. DD, § 5.4(a) Reliability Pricing Model Auctions (7.0.0).

[446] Capacity Resource Clearing Price is defined as "the price calculated for a Capacity Resource that offered and cleared in a Base Residual Auction or Incremental Auction, in accordance with Tariff, Attachment DD, section 5." PJM, Intra-PJM Tariffs, I.1 Definitions C-D (32.2.0).

[447] *See West Deptford*, 766 F.3d 10, 22 (explaining that, in the analogous context of formula rates, that the "'formula itself is the filed rate that provides sufficient notice to ratepayers,'" not the outputs of that formula) (quoting *Pub. Utils. Comm'n v. FERC*, 254 F.3d 250, 254 n.3 (D.C. Cir. 2001)); *Pub. Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 168 FERC ¶ 61,042, at P 89 (2019) (finding that, in the market-based rate context, the "filed rate" is "the Tariff describing the Auction procedures, not the prices that may change over time."); *Black Oak Energy, LLC v. N.Y. Indep. Sys. Operator, Inc.*, 122 FERC ¶ 61,261, at P 32 (2008) ( "the ISO has the authority, and is required, to correct all prices that do not reflect operation of the ISO market rules (which are the filed rate)"); *NRG Power Mktg., Inc.*, 91 FERC ¶ 61,346, 62,165 (2000) (explaining that "the 'filed rate' for the NYISO energy market is not a static number but rather a formula rate" that is calculated consistent with "market rules provid[ing] that the market clearing prices paid to sellers and charged to buyers will be calculated using Locational Based Marginal

for a stated (i.e., numerical) rate. The filed rate doctrine thus applies to those rules as it would a stated rate, requiring that the rules be on file with the Commission and that changes apply only prospectively. But the fact that the relevant rules must be on file with the Commission does not resolve the question before us, namely whether PJM's proposed change to those rules is retroactive and, therefore, inconsistent with FPA section 205(c) and FPA section 206(a).[448]

166.    Courts have held that changes to a rate are impermissibly retroactive only where regulated entities or customers have already transacted pursuant to the rate – i.e., where purchases or sales have occurred.[449] Protestors point to no precedent in which a change to a rate or non-rate term has been determined to be retroactive before a transaction has been made pursuant to it.

167.    We find that, at the time PJM filed its proposed Tariff revisions, applying those revisions to the 2024/2025 BRA would not violate the filed rate doctrine or constitute retroactive ratemaking.[450] At that time, no capacity commitments had yet been secured,

---

Pricing.").

[448] *Towns of Concord*, 955 F.2d 67, 71–72 ("Whatever the justification, it is generally agreed that with respect to the Federal Power Act, the filed rate doctrine rests on two provisions: section 205(c) . . . and section 206(a). . . . Together, these provisions prohibit 'a regulated seller of power from collecting a rate other than the one filed with the Commission and prevent the Commission itself from imposing a rate increase for power already sold.'") (quoting *Arkla*, 453 U.S. at 578) (cleaned up).

[449] *Old Dominion*, 892 F.3d 1223, 1226–27 (At bottom, that doctrine means that "a regulated seller of [power]" is prohibited "*from collecting* a rate other than the one filed with the Commission," and "the Commission itself" cannot retroactively "impos[e] a rate increase for [power] *already sold*.") (quoting *Arkla*, 453 U.S. 571) (emphasis added); *Cogentrix Energy Power Mgmt., LLC v. FERC*, 24 F.4th at 684 ("Cogentrix and Vistra are attempting to collect additional rates 'for a service that has already been rendered,' which would be a violation of the rule against retroactive ratemaking."); *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1320 (D.C. Cir. 2004) (imposition of additional charges on customers "allocated on the basis of their prior purchases" violates the filed rate doctrine); *Associated Gas Distribs. v. FERC*, 898 F.2d 809, 810-11 (D.C. Cir. 1990) (Williams, J., concurring) ("It is for purposes of this doctrine [retroactive ratemaking doctrine] that a court must ask whether the costs are past."); *City of Girard, Kan. v. FERC*, 790 F.2d 919, 924 (D.C. Cir. 1986) ("utility may not set rates to recoup past losses").

[450] Planning Parameters Order, 171 FERC ¶ 61,208 at P 15 (finding prospective PJM's future obligation to clear an auction using an updated peak load forecast that

Docket Nos. ER23-729-000 and EL23-19-000                                    - 80 -

no transaction had yet been consummated, meaning that neither PJM nor any supplier had the attendant rights or obligations, no capacity had been delivered pursuant to such commitments, and no charges had been billed or collected. As PJM explains in its Transmittal, at that point in the 2024/2025 BRA process, no capacity seller had received a capacity award or been required to take on a capacity obligation, nor can any capacity seller know the price that they would ultimately receive from PJM in exchange for that obligation, should they secure it.[451] We conclude that, in these circumstances, where the rate on file with the Commission—i.e., the BRA procedures—exists "to secure commitments of Capacity Resources" and the price that suppliers will receive in exchange,[452] a change to those procedures is not retroactive for the purposes of the filed rate doctrine if the capacity supply obligations and the corresponding rights and obligations—including the right to a particular capacity price—have not yet actually been awarded. To accept PJM's section 205 proposal and apply it to the 2024/2025 BRA we need not determine the precise point in time at which a change to those procedures would be retroactive. Here we decide only that changes are not retroactive if applied before capacity supply obligations and the corresponding rights and obligations have been awarded.[453]

168.    That interpretation gives effect, in the context of auction procedures, such as those governing the BRA, to the long line of U.S. Supreme Court and D.C. Circuit cases on the filed rate doctrine. As those cases make clear, the filed rate doctrine and the rule against retroactive ratemaking exist to collectively ensure that the Commission has the opportunity to review a public utility's rates before they are charged to the customer and that, once charged, neither the Commission nor the public utility can change those rates, even to address over- or under-recovery of costs during a prior period.[454] Where, as here,

---

reflects the significant economic impact of the COVID-19 pandemic).

[451] PJM February 2 Answer at 11-12. Indeed, under the Tariff, no charges are collected for the capacity services procured through the BRA until the delivery year in question (in this case, June 2024).

[452] PJM, Intra-PJM Tariffs, Attach. DD, § 5.4(a) Reliability Pricing Model Auctions (7.0.0).

[453] Further, as explained below, *see infra* PP 173-179, that does not mean that any change to those procedures is permissible. The Commission puts great weight on the importance of not disturbing settled expectations and will permit a change under these circumstances only where it finds the change to be just and reasonable and not duly discriminatory or preferential, which includes a consideration of any effects on settled expectations.

[454] *Arkla*, 453 U.S. 571.

the rate on file is a set of procedures for producing an obligation to supply power and the rate received in exchange for that obligation, we find that the requirements of FPA section 205(c) and 206(a) can be satisfied—meaning that a change in those procedures would not be retroactive—at least up until that point at which the obligation is actually incurred. Up until that point, a change in the relevant procedures can still be presented to the Commission under section 205(c) or required under section 206(a) before the end result of that process, namely the establishment of the rights and obligations that the process exists to determine.

169.    We recognize that promoting predictability is one of the values that courts have identified as undergirding the filed rate doctrine and the rule against retroactive ratemaking.[455] And, as discussed further below, we recognize the importance of regulatory stability and respecting settled expectations, even before rights and obligations have been actually awarded or adjudicated. But while ensuring predictability is important across the board, the "nearly impenetrable shield" created by the filed rate doctrine and its corollary rule against retroactive ratemaking comes into play *only* when a change would be genuinely retroactive. Where, as here, a change would be prospective in nature, the consequences for predictability and settled expectations are something for the Commission to weigh when determining whether that change would be just and reasonable and not unduly discriminatory or preferential.[456]

170.    We also find that PJM can implement a Tariff amendment at this stage of the auction process despite market sellers' submission of offers. Indeed, as the Commission

---

[455] *Towns of Concord*, 955 F.2d at 75 (stating that these two principles allow "purchasers of gas to know in advance the consequences of the purchasing decision they make," thereby "[p]roviding the necessary predictability"); *Columbia Gas Transmission Corp. v. FERC*, 831 F.2d 1135, 1141 (D.C. Cir. 1987) ("Providing the necessary predictability is the whole purpose of the well-established 'filed rate' doctrine, which 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.'"); *Columbia Gas*, 895 F.2d at 793 (stating that the purpose of the filed rate doctrine "is to maintain predictability in the rates that will be charged, and this purpose is accomplished by the guarantee that rate changes will only be made prospectively.").

[456] *ISO New England Inc.*, 148 FERC ¶ 61,185, at P 29 (2014); *ISO New England Inc. & New England Power Pool*, 145 FERC ¶ 61,095, 61,521, at P 28 (2013) (finding that "the earlier effective date would not violate the principles underlying the rule against retroactive ratemaking. The changes would apply only prospectively and after notice. To the extent that the revisions might upset the expectations of market participants (which is distinguishable from retroactive ratemaking), we are not persuaded that their reliance on the current definition outweighs the benefits expected to result from the change.").

Document Accession #: 20230821-5084    Filed Date: 01/21/2023

has found in the capacity market context, "offers are not rates" but merely "request[s] to receive the market clearing price"[457]  Here, the capacity commitment and the market clearing price are the outcome of the auction process and represent the rights and obligations associated with the rate paid by load and received by sellers – a rate at a value that has not yet been established, pursuant to commitments that have not yet been secured.

171.    We also find that PJM's implementation of the Tariff amendments does not retroactively amend any rate or non-rate term of the Tariff.  Simply because one section of the Tariff requires PJM to take a particular action at one stage of the auction process, such as posting the LDA Reliability Requirement by a particular date,[458] does not preclude PJM from prospectively updating the manner in which that LDA Reliability Requirement is incorporated into a later phase of the auction process pursuant to a separate section of the Tariff that requires PJM to consider the auction inputs and calculate a clearing result to minimize the cost of satisfying the reliability requirement.[459] Moreover, treating each input to the running of the auction, and process for establishing such input, as a distinct non-rate term would be inconsistent with Commission precedent recognizing that the rate on file is the set of market rules governing the capacity auction.[460]

172.    We disagree with protesters that PJM violated the Tariff by failing to post the results of the auction.  The Tariff does not impose a deadline on PJM to complete the process of conducting and administering the BRA.  PJM is only required to post the auction results "as soon thereafter as possible"—after "conducting the Reliability Pricing Model Auctions."[461]  PJM is required to conduct a BRA for each delivery year "to secure commitments of Capacity Resources" and such commitments have neither been secured, nor have any rates been established for capacity commitments.  PJM is an independent regional transmission operator with no financial interest in the capacity auction results,[462]

---

[457] *Indep. Mkt. Monitor for PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,121, at PP 101-02 (2022).

[458] PJM, Intra-PJM Tariffs, Attach. DD, § 5.10(a) Auction Clearing Requirements (30.0.0).

[459] PJM, Intra-PJM Tariffs, Attach. DD, § 5.12(a) Conduct of RPM Auctions (20.0.0).

[460] See cases cited *supra* note 462.

[461] PJM, Intra-PJM Tariffs, Attach. DD, § 5.11(e) Posting of Information Relevant to the RPM Auctions (17.0.0).

[462] *See Standardization of Generator Interconnection Agreements & Procs.*, Order

and is specifically vested with the right to file pursuant to section 205 to make changes relating to the terms and conditions of its Tariff—changes which the Commission retains the authority to review and reject as unjust, unreasonable, unduly discriminatory or preferential.[463]

### 3.    Settled Expectations

173.    Having found that applying the proposed Tariff revisions to the 2024/2025 BRA does not violate the filed rate doctrine, we next find that doing so is just and reasonable. In these particular circumstances, we disagree with protestors' arguments that the Commission should not permit PJM to apply the proposed Tariff revisions to the 2024/2025 BRA because it would upset parties' "settled expectations."[464]  As discussed below, we find that the benefits of accepting the proposed Tariff revisions effective December 24, 2022, as requested, outweigh any reliance or expectation as to the LDA Reliability Requirement posted in August 2022.

174.    We recognize the importance of regulatory stability and respecting settled expectations, even before rights and obligations have been actually awarded or adjudicated.  For that reason, the Commission may, depending on the facts and circumstances in a particular case, prevent public utilities from implementing changes—

---

No. 2003, 104 FERC ¶ 61,103, at P 827 (2003) (finding that "an RTO or ISO … is less likely to act in an unduly discriminatory manner than a Transmission Provider that is a market participant.").

[463] PJM, Intra-PJM Tariffs, Tariff, section 9.2(a) Rights of the Transmission Provider (1.1.0) ("PJM shall have the exclusive and unilateral right to file pursuant to Section 205 of the Federal Power Act and the FERC's rules and regulations thereunder to make changes in or relating to the terms and conditions of the PJM Tariff.").

[464] *See* EPSA Protest at 19-20 (citing 2020 Reserves Order, 171 FERC ¶ 61,153 at P 322 (rejecting requests an offset be applied to a previously-run BRA, finding that "even if we were to re-calculate the VRR curve and other capacity auction parameters based on a new E&AS Offset, there is no way to accurately determine how market participants would have offered in those BRAs based on the new parameters.")); EPSA Protest, Attach. A, Sotkiewicz Aff. ¶¶ 29-31; *see also* LS Power Protest at 3-4 and NRG Protest at 18-19 (citing NRG, Hotlman Aff. ¶¶ 15-19) (contending that sellers and customers anticipated that the 2024/2025 BRA would produce a high clearing price in Delmarva based on the planning parameters, including the LDA Reliability Requirement, and made decisions accordingly).

even ones that may well lead to better results—on the basis that they would disrupt settled expectations.[465]

175.    Specifically, the Commission will consider disruptions to parties' "settled expectations" in determining whether a proposal is just and reasonable.[466]  In such cases, the Commission has considered a "balancing of interests" or "balancing of equities" in determining the appropriate outcome.[467]  Indeed, the Commission has rejected filings by PJM on the basis of settled expectations, even where the results created significant financial hardship.[468]  At the same time, the Commission has accepted Tariff revisions where the benefits outweigh any adverse effects on settled expectations.[469]

176.    We do so here.  First, we are not persuaded that "settled expectations" justify rejection of PJM's filing as applied to the 2024/2025 BRA.  As PJM points out, despite this proposal being filed after capacity offers were presented to PJM, resources offering competitively in the auction would not have taken the LDA Reliability Requirement into account in formulating their capacity offers.[470]  As we found above, competitive capacity offers are based on the seller's cost of supplying capacity in the delivery year, and accordingly should not be affected by an input into the shape of the demand curve.[471]  No

---

[465] For example, the Commission rejected a PJM filing that might have otherwise resulted in a more efficient outcome, on the basis that granting the requested waiver would unduly disrupt settled expectations.  *GreenHat*, 166 FERC ¶ 61,072 at P 34; *see also ISO New England Inc. & New England Power Pool Participants Comm.*, 132 FERC ¶ 61,136, at P 22 (2010) (rejecting revisions to formula used to calculate payments in Forward Reserve Market as "unnecessary" and upsetting expectations that load-serving entities have had based on current Tariff provisions "without any demonstrated benefit.").

[466] *ISO New England Inc.*, 148 FERC ¶ 61,185, at P 26 (2014) (finding a difference between upsetting the expectations of market participants and retroactive ratemaking).

[467] *Id.*

[468] *GreenHat*, 166 FERC ¶ 61,072, at P 34 (2019).

[469] *ISO New England & New England Power Pool*, 145 FERC ¶ 61,095, at PP 28, 30 (2013).

[470] PJM February 2 Answer at 14; *see e.g.* Market Monitor Comments at 5 and Market Monitor February 3 Answer at 3.

[471] *See supra* at P 158.

Document Accession #: 20230621-3061   Filed Date: 01/31/2023

Docket Nos. ER23-729-000 and EL23-19-000                                   - 85 -

party in the record has demonstrated that the LDA Reliability Requirement affects the fundamentals of such competitive offers.

177.   Second, we reiterate that we carefully consider settled expectations concerns, especially claims that market participants relied on expected auction rules in order to engage in other market activity such as bilateral supply sales and retail hedging arrangements.  We are not persuaded that market participants' purported reliance on a single input, with no knowledge of the final capacity price, in making commercial transactions results in a detrimental reliance concern.  Nevertheless, even to the extent those claims have merit, we find that, on the record in this case, the balance of the interests here weighs heavily in favor of accepting PJM's proposal effective December 24, 2022.

178.   That is because there are significant benefits that would result from applying the proposed Tariff revisions to the 2024/2025 BRA, in particular preventing consumers from being charged unnecessarily high capacity prices that do not reflect actual reliability needs or supply and demand fundamentals.  As noted above, PJM estimates customers would be required to pay four times more for capacity under the existing Tariff than under the proposed revisions,[472] which PJM explains would result in load paying over $100 million in excess of what is necessary for capacity for the 2024/2025 delivery year.[473]  Commenters contend this could result in a cost increase, with estimates ranging between $85 and $175 million,[474] and potentially increase the electric bill of the average customer in Delmarva by $24 per month for the delivery year.[475]  As discussed above, that exorbitant price increase would not be the result of supply and demand fundamentals—or an actual reliability need—meaning that there is no economic or reliability justification for those additional costs.  Accordingly, weighing the totality of the evidence before us, we conclude that the benefits associated with accepting the Tariff revisions for the 2024/2025 BRA outweigh any disruption to settled expectations that may exist on this record.

179.   Considering the important benefits expected to result here, this case is distinguishable from those where the Commission was reticent to disrupt settled

---

[472] *See supra* at P **Error! Reference source not found.**

[473] *See supra* at P **Error! Reference source not found.**  As noted, Sierra/NRDC provide a higher estimate: Suggesting that the customer impact would be $175 million, which they contend would fall disproportionately on customers in an area where wage levels are significantly below the national average.  Sierra/NRDC Answer at 4-8.

[474] *See supra* at P **Error! Reference source not found.**

[475] *See supra* at P **Error! Reference source not found.**

Document Accession No. 20230321-3069    Filed Date: 03/21/2023

expectations, i.e., where the proposed tariff revisions were "unnecessary" and "without any demonstrated benefit."[476]  Here, PJM supports the substance of the proposed Tariff revisions as necessary and beneficial, as explained in section B.1 above and reflected in the record evidence regarding the considerable customer impacts.[477]  Accordingly, we find it is appropriate to implement this proposal now rather than waiting until future auctions.

180.    Notwithstanding our determination that PJM's section 205 application is just and reasonable, we acknowledge that there have been continuing disputes and complaints about the operation of PJM's capacity market from a wide spectrum of stakeholders throughout the thirteen states and the District of Columbia served by PJM.  To consider these issues generally, outside the parameters and constraints of a particular proceeding, the Commission will convene a forum to examine the PJM capacity market and how best to ensure that it achieves its objective of ensuring resource adequacy at just and reasonable rates.[478]  We will provide details about this forum in the near future.

### 4.    <u>Complaint</u>

181.    PJM requests that the Commission dismiss its complaint as moot if the Commission accepts its FPA section 205 filing effective, as requested.[479]  Because we accept PJM's FPA section 205 filing, we dismiss the complaint as moot and need not address any of the parties' alternative proposals, or any of the requests regarding auction timing.

<u>The Commission orders</u>:

    (A)    PJM's proposal is hereby accepted, effective December 24, 2022, as requested, as discussed in the body of this order.

    (B)    PJM's complaint is hereby dismissed as moot, as discussed in the body of this order.

---

[476] *See ISO New England*, 145 FERC ¶ 61,095, at P 30 (2014).

[477] *See id.*

[478] *See, e.g. PJM Interconnection, L.L.C*, 151 FERC ¶ 61,208, at P 5 (2015).

[479] PJM EL23-19 Transmittal at 2 n. 4, 36.

Docket Nos. ER23-729-000 and EL23-19-000                                    - 87 -

By the Commission.   Commissioner Danly is dissenting with a separate statement
attached.
Commissioner Christie is concurring with a separate statement
attached.

( S E A L )


                                        Debbie-Anne A. Reese,
                                         Deputy Secretary.

**JA110**

Docket Nos. ER23-729-000 and EL23-19-000                                    - 88 -

## **Attachment A – Intervenors**

Intervenors in both dockets marked with an asterisk.

Advanced Energy United*
AES Clean Energy Development, LLC*
American Clean Power Association*
American Electric Power Service Corporation on behalf of its affiliates Appalachian
     Power Company, Indiana Michigan Power Company, Kentucky Power Company,
     Kingsport Power Company, Ohio Power Company, Wheeling Power Company, and
     AEP Energy Partners, Inc.*
American Municipal Power, Inc.*
Backbone Mountain Windpower LLC, Chief Conemaugh Power II, LLC, Chief Keystone
     Power II, LLC, Meyersdale Windpower LLC, Mill Run Windpower LLC, Parkway
     Generation Keys Energy Center LLC, Parkway Generation Operating LLC,
     Parkway Generation Sewaren Urban Renewal Entity LLC, Somerset Windpower
     LLC, Walleye Power, LLC, and Waymart Wind Farm LLC*
Boston Energy Trading and Marketing LLC*
Buckeye Power, Inc.*
Caithness Energy, L.L.C.*
Calpine Corporation*
Constellation Energy Generation, LLC*
Cypress Creek Renewables, LLC on behalf of itself and its affiliates*
DC Public Service Commission*
Delaware Division of the Public Advocate*
Delaware Municipal Electric Corporation, Inc.*
Delaware Public Service Commission*
Direct Energy Business Marketing, LLC and Midwest Generation, LLC*
Dominion Energy Services, Inc. on behalf of Virginia Electric and Power Company d/b/a
     Dominion Energy Virginia*
Duke Energy Business Services LLC, on behalf of its franchised public utility affiliates
     Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc., Duke Energy Indiana, LLC,
     Duke Energy Carolinas, LLC, Duke Energy Progress, LLC, and Duke Energy
     Florida, LLC*
Duquesne Light Company*
East Kentucky Power Cooperative, Inc.*
EDF Renewables, Inc.*
EDP Renewables North America LLC*
Electric Power Supply Association*
Enel North America, Inc.*
Exelon Corporation and its affiliates*
FirstEnergy Service Company, as agent for its franchised public utility affiliates Ohio
     Edison Company, The Cleveland Electric Illuminating Company, The Toledo

Document Access FERC: ER20230321-3082 Filed Date: 01/21/2023
Case: 23-1778    Document: 88-1    Page: 120    Date Filed: 12/11/2023

Docket Nos. ER23-729-000 and EL23-19-000                                    - 89 -

Edison Company, Pennsylvania Power Company, Pennsylvania Electric Company, Metropolitan Edison Company, West Penn Power Company, Jersey Central Power & Light Company, Monongahela Power Company, The Potomac Edison Company, and Allegheny Energy Supply Company*

Freepoint Solar LLC*

H-P Energy Resources LLC*

Illinois Commerce Commission*

Invenergy Wind Development North America LLC, Invenergy Solar Development North America LLC and Invenergy Thermal Development LLC*

J-POWER USA Development Co., Ltd.*

Leeward Renewable Energy, LLC and Leeward Renewable Energy Development, LLC*

Lightsource Renewable Energy US, LLC*

Lightstone Marketing Inc. on behalf of itself and its affiliates, Darby Power, LLC, Gavin Power, LLC, Lawrenceburg Power, LLC and Waterford Power, LLC*

Lotus Infrastructure, LLC*

LS Power Development, LLC*

Maryland Office of People's Counsel*

Maryland Public Service Commission*

Modern Energy Resources, LLC*

Monitoring Analytics, LLC, acting in its capacity as the Independent Market Monitor for PJM*

Natural Resource Defense Council and Sustainable FERC Project*

New Jersey Board of Public Utilities*

New Jersey Clean Energy Ventures Corporation*

New Jersey Division of Rate Counsel*

NJR Clean Energy Ventures Corporation*

North Carolina Electric Membership Corporation*

NRG Power Marketing, LLC and Midwest Generation, LLC*

Organization of PJM States, Inc.*

Old Dominion Electric Cooperative*

Orsted Wind Power North America LLC*

Palladium Energy, LLC*

Pennsylvania Public Utility Commission*

Pine Gate Renewables, LLC*

PJM Power Providers Group*

PPL Electric Utilities Corporation*

Public Citizen, Inc.*

Public Service Electric and Gas Company, PSEG Power LLC, and PSEG Energy Resources & Trade LLC*

Public Utilities Commission of Ohio's Federal Energy Advocate*

Rockland Electric Company*

Shell Energy North America (US), L.P.*

Sierra Club*

Document Accession #: 20130621-5069    Filed Date: 07/21/2023

Solar Energy Industries Association*
Southern Maryland Electric Cooperative, Inc.*
Tangent Energy Solutions, Inc.*
The Retail Energy Supply Association (EL19-23-000)
Virginia State Corporation Commission (ER23-729-000)
Vistra Corp.*

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                    Docket Nos.  ER23-729-000
                                                           EL23-19-000

(Issued February 21, 2023)

DANLY, Commissioner, *dissenting*:

1.    I dissent from this facially unlawful order[1] approving a public utility's violation of its filed rate in order to reject a capacity auction result and manufacture a rate approximately four times lower.[2]  That public utility, PJM Interconnection, L.L.C. (PJM), seeks to invalidate and reset 2024/2025 Base Residual Auction clearing prices in the zone covering southern Delaware.  PJM also proposes a prospective Federal Power Act (FPA) section 205 rate change[3] that would allow it to adjust fundamental auction parameters during the running of future auctions.  I would:

   a)  reject PJM's section 205 rate proposal for failing to meet the required showing that it is just and reasonable;

   b)  reject PJM's illegal attempt to retroactively apply its rate proposal to the auction already run as a plain violation of the filed rate doctrine and the rule against retroactive ratemaking;[4] and

---

[1] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (2023) (Order).

[2] *See* PJM December 23, 2022 Transmittal Letter, at 2 ("should PJM complete the auction . . . PJM estimates that the clearing price . . . would be more than four times *what the clearing price should be*") (emphasis added); *id.* at 9 ("the clearing price may be approximately four times what it should be"); *see also* NRG Marketing LLC, et al. January 20, 2023 Protest (NRG Protest), Att. A, Aff. of Joseph A. Holtman, at P 28 ("Working from a clearing price at the cap of $426.17/MW-day, PJM's statement implies [a] clearing price at or below $106.54/MW-day."); Order, 182 FERC ¶ 61,109 at P 92 (citing estimates of a rate reduction between $85 and $175 million).

[3] 16 U.S.C. § 824d.

[4] *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (*Arkla*); *Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951) (*Mont.-Dakota*); *Ok. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829-31 (D.C. Cir. 2021) (*Oklahoma Gas*).

**JA114**

c) require PJM to show cause pursuant to FPA section 206 as to how the Reliability Pricing Model and PJM's administration of it are just and reasonable.[5]

2.      The majority does none of this.  Instead, despite what former FERC Chairman Joseph T. Kelliher warns in the record, the majority "not only ignore[s] the limits that the FPA places upon it but also upwards of 100 years of court precedent" by approving a plainly retroactive rate change that will almost certainly be overturned by the appellate courts in "a stinging and embarrassing court defeat that would eclipse the debacle of *Atlantic City I* and *II*."[6]

3.      If anything, Chairman Kelliher understates the damage.  The precedent that the majority's order sets will undermine confidence in all FERC-jurisdictional markets—not merely the PJM capacity market[7]—and the entire market-based rate regime.  Formula rates are also now in jeopardy as any part of the formula apparently can be deemed an "input" subject to retroactive revision.

4.      Taken at its word, the majority's order is a misguided attempt to protect consumers.  This attempt, however, will cause more harm to consumers than had the majority left the auction results in place.  Consumers reap the benefits of market efficiency and competitive pricing.  Those benefits become costs when the markets cease functioning because market participants—and investors—have lost confidence in them.[8]

---

[5] 16 U.S.C. § 824e.

[6] PJM Power Providers Group January 20, 2023 Protest (P3 Protest), Att. A, Aff. of the Hon. Joseph T. Kelliher, at P 46 (citing *At. City Elec. Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002) (*Atlantic City I*), *enforcing mandate*, 329 F.3d 856 (2003) (*Atlantic City II*)).

[7] *See* The American Clean Power Association, et al. January 20, 2023 Protest and Comments (Clean Energy Associations Protest), at 4 ("if accepted, [PJM's filing] could set precedent that *any RTO* can alter capacity market auction results if the RTO disagrees with the outcome.  Such precedent would undermine the 'level of investor confidence that is sufficient to ensure resource adequacy at just and reasonable rates.'") (emphasis in original) (citations omitted).

[8] *See* Pine Gate Renewables, LLC January 20, 2023 Protest (Pine Gate Renewables Protest), at 11 ("By accepting [PJM's filing], the Commission risks undermining investor confidence in the PJM capacity market, *driving up the cost of capital to develop new capacity in the PJM region, and ultimately producing rates that are not just and reasonable.*") (emphasis added).

Document Accession #: 20230721-3089    Filed Date: 07/21/2023

## I.    The Commission Has No Power to Accept a Retroactive Rate Change

5.     The filed rate violation in this case is straightforward.[9]  "The filed rate doctrine and the rule against retroactive ratemaking leave the Commission *no discretion* to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations."[10]  I am dismayed how the court's repeated declaration that we have "no discretion" continues to be misinterpreted by my colleagues, but I will restate what I have explained in numerous dissents to the Commission's issuance of unlawful retroactive waivers,[11]

> Unambiguous, uninterrupted and controlling judicial precedent holds that a utility can only charge the rate on file. This is called the filed rate doctrine.[12]  It is a core tenet of utility regulation.  The Commission also has no authority to permit utilities to charge rates other than those on file unless there is advance notice that the rate may change or the Commission has approved a tariff allowing the utility to charge different rates prospectively.  This is called the rule against retroactive ratemaking.[13]  This rule is also a core tenet of utility regulation and is a necessary adjunct to the filed rate doctrine.  There would be little point in having rates on file if rate changes can be retroactively applied.  Both the filed rate

---

[9] *See id.* at 5 (PJM's filings "constitute a rather straightforward attempt to violate both the filed rate doctrine and rule against retroactive ratemaking.")

[10] *Old Dominion Elec. Coop., Inc. v. FERC*, 892 F.3d 1223, 1230 (D.C. Cir. 2018) (citing *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 794-97 (D.C. Cir. 1990)) (emphasis added); *see also Arkla*, 453 U.S. at 578 (finding that "the Commission itself has no power to alter a rate retroactively") (footnote omitted).

[11] *See, e.g.*, *Cal. Indep. Sys. Operator Corp.*, 176 FERC ¶ 61,159 (2021) (Danly, Comm'r, dissenting at P 2).

[12] *Id.* (Danly, Comm'r, dissenting at P 2 & n.5) (citing *Waiver of Tariff Requirements*, 171 FERC ¶ 61,156, at P 5 & n.13 (2020) (Proposed Policy Statement) (citing *Arkla*, 453 U.S. at 577; *Mont.-Dakota*, 341 U.S. at 251-52)).

[13] *Id.* (Danly, Comm'r, dissenting at P 2 & n.6) (citing Proposed Policy Statement, 171 FERC ¶ 61,156 at P 5 (citing *Arkla*, 453 U.S. at 578)).

doctrine and the rule against retroactive ratemaking also
apply to non-rate terms and conditions in filed tariffs.[14]

6.     The PJM tariff—the rate on file—includes scores of rules to run a Base Residual
Auction to purchase capacity.  One "key planning parameter" is the "[Locational
Deliverability Area] Reliability Requirement," which the tariff requires PJM to post with
"other planning parameters 'for a Delivery Year *prior to conducting the Base Residual
Auction for such Delivery Year*."[15]

> More specifically, for the three Base Residual Auctions
> starting with the 2024/2025 [Base Residual Auction], PJM
> received Commission approval to post the planning
> parameters 100 days "prior to the relevant [Base Residual
> Auction]."  With respect to the Reliability Requirement
> parameters, the [PJM] Tariff expressly provides that PJM
> "shall determine the PJM Region Reliability Requirement and
> *the [Locational Deliverability Area] Reliability Requirement*
> for each [Locational Deliverability Area] for which a
> Variable Resource Requirement Curve has been established
> for such Base Residual Auction . . . *prior to the conduct of the
> Base Residual Auction* . . . .[16]

No one disputes that the Locational Deliverability Area Reliability Requirement "is an
anchor point of the Variable Resource Requirement Curve."[17]  This seems unassailable

---

[14] *Id.* (Danly, Comm'r, dissenting at P 2 & n.7) (citing Proposed Policy Statement,
171 FERC ¶ 61,156 at P 6; *Oklahoma Gas*, 11 F.4th  at 829-30 & n.3).  *See generally* P3
Protest, Att. A, Aff. of the Hon. Joseph T. Kelliher, at PP 10-13 (Chairman Kelliher's
concise restatement of the law regarding the filed rate doctrine and rule against
retroactive ratemaking).

[15] NRG Protest at 5-6 (citing PJM Tariff, Att. DD, § 5.11(a); PJM Tariff, Att. DD,
§ 15) (emphasis in original).

[16] *Id.* at 6 (citing *inter alia*, PJM Tariff, Attachment DD, § 5.10(vi)(B)) (emphasis
in original); *see also id.* at 6, n.13 (citing PJM Tariff, Attachment DD, § 5.10(vi)(A)
("[t]he parameters of the Variable Resource Requirement Curve will be established prior
to the conduct of the Base Residual Auction for a Delivery Year and will be used for such
Base Residual Auction.")).

[17] *See id.* at 6, n.13; *but see* Order, 182 FERC ¶ 61,109 at P 177 (characterizing the
Locational Deliverability Area Reliability Requirement as a "single input" in the tariff).
This particular "single input" is how much capacity the area needs to buy.  Calling it a
"single input" is like calling the particular car I am purchasing a "single input" in

Document Accession #: 20231221-3083 Filed Date: 12/21/2023
Case: 23-1778 Document: 88-1 Page: 126 Date Filed: 12/11/2023

Docket Nos. ER23-729-000 and EL23-19-000                                      - 5 -

since the point of the capacity auction is to ensure sufficient supply in the Locational Deliverability Area to meet that Resource Requirement.

7.      To recap and put the filed rate at issue in this case in simple terms that anyone can understand, the PJM tariff requires that it post the reliability requirement for each area *before* the auction.  There is nothing in the PJM tariff providing notice that this provision is tentative or subject to later adjustment, nor any provision in the tariff that indicates any retroactive change to this rate provision will be permitted.[18]  The majority writes this requirement out of the tariff with retroactive effect.  That is the filed rate violation.  The majority's rationale to the contrary fails.

8.      To put this case in context, imagine a game of blackjack at the only casino in the territory—the Federal Energy Regulatory Casino.  Players win if the total of their cards is higher than the dealer's hand but not exceeding 21.  The cards are dealt.  Everyone places their bets.  The dealer draws 17.  Even though 17 is a predictable—and even likely— hand, the dealer announces it is "anomalous" and *makes up a new rule on the spot*:  17 is the new blackjack.  No one is allowed to draw again or change their bets.  The house wins, but most of the players are now losers—except, perhaps, those who never understood the rules in the first place.  The house saves a bit of money on one hand, but no one ever plays blackjack at the Federal Energy Regulatory Casino again.  That is *this* case.  The only difference is that the capacity market is not a game but rather the mechanism by which we ensure sufficient generation resources are built and maintained to keep the lights on.

## A.      The Majority Distorts the Filed Rate

9.      The majority correctly states that "for the purposes of the filed rate doctrine, the rate on file with the Commission is the [Base Residual Auction] procedures."[19]  Then they go off the rails.  Notwithstanding all the plain tariff provisions establishing the key Locational Deliverability Area Resource Requirement planning parameter "prior" to the Base Residual Auction—which seem to me to be about as clear as any tariff provisions can be—the majority announces that the filed rate is not fixed "if the capacity supply

---

determining the price I pay for a car.

   [18] Accordingly, neither recognized exception to the filed rate doctrine and rule against retroactive ratemaking applies to this provision.  *See* Clean Energy Associations Protest at 7 (the two exceptions are "(1) when parties are aware that a rate is tentative and may be later adjusted with retroactive effect; or (2) when they have agreed to make a rate effective retroactively") (citing *Exxon Co. U.S.A. v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999); *Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 744 (D.C. Cir. 1992)).

   [19] Order, 182 FERC ¶ 61,109 at P 165 & n.447 (citing cases).

Docket Nos. ER23-729-000 and EL23-19-000                                    - 6 -

obligations and the corresponding rights and obligations—including the right to a particular capacity price—have not yet actually been awarded."[20]  They then double down on that point by "find[ing] that the requirements of FPA section 205(c) and 206(a) can be satisfied—meaning that a change in those procedures would not be retroactive—*at least up until* that point at which the obligation is actually incurred."[21]

10.     This determination promises to be nothing short of a revelation to all of the participants in every FERC-approved auction process.  Until today the filed rate was all the rules in the tariffs that stakeholders in each region spent thousands of hours negotiating and that the Commission previously approved in lengthy orders, often after several rounds of litigation, compliance, and extensive settlement proceedings.  Nope.  None of those provisions are the filed rate until PJM or another Regional Transmission Organization (RTO) or Independent System Operator (ISO) decides it has poked around the "preliminary" auction results and found a price it likes enough to conclude the auction and declare the winners.[22]

11.     Worse yet, the majority signals that rates may not be final until *even later* by highlighting that "at the time PJM filed its proposed Tariff revisions . . . no capacity commitments had yet been secured, no transaction had yet been consummated, meaning that neither PJM nor any supplier had the attendant rights or obligations, *no capacity had been delivered pursuant to such commitments, and no charges had been billed or collected*."[23]  I struggle to understand what possible use a forward capacity market could have if auction rates are subject to change until "capacity has been delivered" and "charges . . . billed or collected."  A *forward* capacity auction establishes a clearing price based on seller offers.  The clearing price tells the sellers whether their unit will be needed in three years.  If the price is not final until after the three years, there is no such

---

[20] *Id.* P 167.

[21] *Id.* P 168 (emphasis added).

[22] *See* Clean Energy Associations Protest at 3 ("If [PJM's filing] is accepted, market participants will lose confidence that future capacity market auction results will reflect competitive forces *as PJM will effectively have a unilateral right to administratively adjust auction results at its discretion on a* post-hoc *basis*.") (emphasis added).

[23] Order, 182 FERC ¶ 61,109 at P 167 (emphasis added); *see also id.* P 168 ("the filed rate doctrine and the rule against retroactive ratemaking exist to collectively ensure that the Commission has the opportunity to review a public utility's rates *before they are charged* to the customer and that, *once charged*, neither the Commission nor the public utility can change those rates.") (emphasis added).

Document Accession #: 20230721-3063   Filed Date: 07/21/2023

thing as a *forward* capacity auction except as an illusory exercise or sophisticated entrapment.

12.     The biggest problem with the majority's new interpretation of the tariff is that there is nothing in the tariff that supports it.  The provision that "PJM is only required to post the auction results 'as soon thereafter as possible'—after 'conducting the Reliability Pricing Model Auctions'"[24] does not open a window for PJM to throw out every other auction rule in the tariff.  A requirement not to delay posting auction results is not a license to change the Locational Deliverability Area Reliability Requirement any time PJM feels like it, and it is specious to so claim.[25]  The fact that PJM has run numerous auctions by this point and never previously interpreted its tariff to allow it to change the rules up until winners were announced also suggests that no such right exists.

### B.     The Majority Distorts Precedent

13.     The majority cites a lot of cases on various points related to the filed rate doctrine, and not one of them supports its new interpretation that filed auction rules can be freely changed up until contracts "have actually been awarded."  But of course they cannot, there are no such cases.  The majority creates this new exception to the filed rate on its own initiative, despite having "no discretion" to do so.[26]  And it is widely understood—including by every trinket seller on eBay—that auctions must have clear rules or chaos ensues.

14.     Indeed, the Commission's own precedent is to the contrary:  "Changing the rules governing an *already-commenced* auction is a significant step that affects both the outcome of that particular auction as well as parties' confidence in the rules governing future proceedings."[27]  In that case, the Commission denied PJM's attempt to change the rules during an auction after the default of a large Financial Transmission Rights trader.  The majority explains away its contrary precedent by asserting that it "may, depending on the facts and circumstances in a particular case, prevent public utilities from implementing changes—even ones that may well lead to better results—on the basis that

---

[24] *Id.* P 172 (citing PJM, Intra-PJM Tariffs, Tariff, Attach. DD, § 5.11(e) Posting of Information Relevant to the RPM Auctions (17.0.0)).

[25] *See* Electric Power Supply Association January 20, 2023 Protest, at 11-12 (EPSA Protest).

[26] *Old Dominion Elec. Coop., Inc. v. FERC*, 892 F.3d at 1230 (citing *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d at 794-97).

[27] Vistra Corp. January 20, 2023 Protest, at 3 (quoting *PJM Interconnection, L.L.C.*, 166 FERC ¶ 61,072, at P 33 (2019)) (emphasis in original).

they would disrupt settled expectations."[28]  As discussed further below, there is no "settled expectations" test to determine whether the rate on file must be honored.[29]  If it is the rate on file, it is the rate on file.  The end.

### C.    The Majority Distorts Time

15.    Lacking any precedent for their new filed rate interpretation, the majority asserts that adjusting a key planning parameter after the auction has run is not "*genuinely retroactive*,"[30] and that "[t]o accept PJM's section 205 proposal and apply it to the 2024/2025 BRA *we need not determine the precise point in time at which a change to those procedures would be retroactive*."[31]  I do not know how to distinguish "genuine" and "disingenuous" retroactivity and I confess to no more than an enthusiastic layman's understanding of general relativity,[32] but even I know that if an event has already happened, it is in the past.  If it has yet to happen, it is in the future.  The event in the PJM tariff that must happen "prior" to the auction—establishing the Local Deliverability Area Reliability Requirement—already happened, as did the running of the auction.  The majority, however, keeps its own time.[33]

16.    By way of another hypothetical that anyone can understand:  If I eat cake contrary to my diet, I have broken my diet.  I can change my diet, but I cannot change the fact that I ate cake.  Even if I feel better believing cake was always on my diet, it is a lie.  Either way, I gain weight.

17.    The majority routinely engages in the same time jumping in the scores of cases where it grants retroactive waivers of tariff deadlines that already have passed.[34]

---

[28] Order, 182 FERC ¶ 61,109 at P 174 & n.466 (citing cases).

[29] *See infra* PP 24-27.

[30] Order, 182 FERC ¶ 61,109 at P 169 (emphasis added).

[31] *Id.* P 167 (emphasis added).

[32] I still do not understand the mechanism behind apsidal precession.

[33] Like Billy Pilgrim in *Slaughterhouse-Five*, the majority has "come unstuck in time."  Vonnegut, Kurt, Jr., *Slaughterhouse-Five or The Children's Crusade*, at 20 (New York:  A Seymour Lawrence Book/Delacorte Press, 1969).

[34] *See, e.g.*, *Borough of Chambersburg*, 179 FERC ¶ 61,014 (2022) (Danly, Comm'r, dissenting at P 3) ("I should not have to explain how time works, but by waiving an April 1, 2021 deadline that was not sought until March 22, 2022, the Commission is *retroactively* writing a mandatory notice deadline out of the PJM tariff"

Unfortunately, the parties that relied on the Local Deliverability Area Reliability Requirement back when it was established, submitting binding capacity offers and entering into bilateral transactions, do not have the same ability to go back in time and undo the actions they took.

18.     How do we know parties acted in reliance on the posted auction parameters back when they had the opportunity to do so?  *First*, because it is obvious.  The bulk power markets are among the most sophisticated markets in the world with critical infrastructure and billions of dollars at stake, not the neighborhood bake sale.  Do we really think sophisticated participants do not know how to hedge the strong likelihood of high prices in a small zone?

19.     *Second*, because they told us so.  Record evidence from one generator, for example, confirms that it "lost business because it reasonably priced capacity in its bilateral retail offers based on its reliance on the PJM tariff.  Ironically, the losers would also include other entities that relied on the posted parameters and the auction rules and *made prudent decisions about bilateral contracting and hedging consistent with such reliance.*"[35]  Unlike the Commission and PJM in today's order, these parties cannot retroactively undo what they have already done.

20.     There is no record evidence of any parties that *did not rely* on PJM's posted auction planning parameters, and any party that lacks this basic level of market competency ought to reconsider its participation in the markets.[36]  By resetting auction

---

with the effect that the deadline "was a nullity and . . . notice in the PJM tariff is fact, fiction, or aspiration depending upon the whims of the Federal Energy Regulatory Commission.") (emphasis in original).

[35] NRG Protest, Att. A, Aff. of Joseph A. Holtman at P 27 (emphasis added); *see also id.* at PP 10-13 (explaining the basics of how bilateral contracting relies upon posted auction parameters); *see also* P3 Protest, Att. B, Aff. of Dr. Roy J. Shanker at PP 41-43 ("*Each party to the auction could or should have known these risks, and made their own independent assessment . . . and how it would impact their behavior*" and noting that "[v]arious parties who sell commercial forecasts of PJM markets and related intelligence specifically forecasts that [the southern Delaware area] would be materially short and prices would reach the cap") (citations omitted) (emphasis in the original).

[36] *See* P3 Protest, Att. B, Aff. of Dr. Roy J. Shanker at PP 20-22 (recounting basic market design elements as they relate to planning forecasts, concluding that "[a]ll parties should have been aware of this"); *see id.* PP 33-40 (explaining market fundamentals in this auction in the small southern Delaware zone).  Note that individual customers do not buy capacity in the auction; their *utilities* do.  A utility should know how markets work and not pass unhedged costs onto "customers in an area where wage levels are significantly below the national average" or that utility is imprudent.  Order, 182 FERC

Document Accession #: 20231221-3059     Filed Date: 12/21/2023
Case: 23-1778     Document: 88-1     Page: 131     Date Filed: 12/11/2023

Docket Nos. ER23-729-000 and EL23-19-000                                      - 10 -

results, the majority almost certainly awards an unexpected windfall to parties who failed to hedge—at the expense of parties who did.[37] So we are almost certainly rewarding the market participants that were the least capable back at the time the planning parameters were established (or, possibly, we are rewarding the participants taking the most risks). Again, the point is that none of these parties can go back in time—like PJM and the majority—to change their behavior.

21.     The absurdity of the majority's interpretation of time is fully exposed when we also recognize that it only applies to certain favored parties—in this case RTOs or ISOs: consider whether the majority would allow generator sellers to revise their capacity offers after the auction had been run but before results were posted like it allows PJM to change the reliability requirement.[38] Of course not.[39] Only the majority's friends get to time travel.

### D.     The Majority Distorts Space

22.     The majority not only attempts to distort time but space:

> Simply because *one section of the Tariff* requires PJM to take
> a particular action at one stage of the auction process, such as
> posting the LDA Reliability Requirement by a particular date,
> does not preclude PJM from prospectively updating the
> manner in which that LDA Reliability Requirement is
> incorporated into a later phase of the auction process *pursuant
> to a separate section of the Tariff* that requires PJM to

---

¶ 61,109 at P 178, n.474.

[37] P3 Protest, Att. B, Aff. of Dr. Roy J. Shanker P 50 (explaining hedging basics and predicted activity going into the Base Residual Auction given the posted planning parameters in the southern Delaware zone).

[38] *See* EPSA Protest, Att. A, Aff. of Dr. Paul M. Sotkiewicz at P 22 ("By PJM's logic [and the majority's] of what prospective means, Capacity Market Sellers can request the Commission to allow them to change their decisions after offers have been submitted as long as they are changed prior to the announcement of the [Base Residual Auction or Incremental Auction results], and thus be considered 'prospective.'").

[39] *See* Order, 182 FERC ¶ 61,109 at P 176 (generators will not be allowed to change their offers after PJM changes the Locational Deliverability Area Reliability Requirement).

> consider the auction inputs and calculate a clearing result to
> minimize the cost of satisfying the reliability requirement.[40]

The argument here is that a set of provisions in one part of the tariff may no longer be part of the filed rate after new sections of the tariff have also started being applied. If that were the case, the tariff would say so. Absent an express provision permitting tariff provisions to be superseded in defined circumstances, the Commission must honor the entire rate on file, no matter where the section is placed in the tariff (space), or when it is operable (time).

### E.    The Majority Distorts the Principle that "Parts Comprise the Whole"

23.    The majority next claims that "treating each input to the running of the auction, and process for establishing such input, as a distinct non-rate term would be inconsistent with Commission precedent recognizing that the rate on file is the set of market rules governing the capacity auction."[41] This is another distortion—this time of the basic principle that parts comprise the whole. "Inputs" that are part of the filed rate are not exempt from the filed rate doctrine. Again, there would have to be an express tariff provision identifying which "inputs" in the filed rate can be ignored.

### F.    The Majority Distorts "Settled Expectations"

24.    After eviscerating the filed rate doctrine, the majority replaces it with a new test where the Commission will "consider disruptions to parties' 'settled expectations' in determining whether a *proposal* is just and reasonable."[42] To be clear, the "proposal" in question is whether the Commission will change the filed rate with retroactive effect, specifically whether "'settled expectations' justify rejection of PJM's filing as applied to the 2024/2025 [Base Residual Auction]"—the auction that already happened.[43] The majority concludes that once we do some "'balancing of interests' or 'balancing of

---

[40] *Id.* P 171 (emphasis added) (citations omitted).

[41] *Id.*; *see also id.* P 165 n.447 (listing cases). The cited cases merely stand for the proposition that for formula rates, the formula is the rate. None of these cases say that parts of the formula in the filed rate are not actually filed rates.

[42] *Id.* P 175 (emphasis added).

[43] *Id.* P 176.

equities' in determining the appropriate outcome," it is clear that the auction must be reset.[44]

25.     There are many problems with this argument.  I highlight three.  *First*, the majority's new "settled expectations" test is no substitute for the filed rate doctrine and rule against retroactive ratemaking that the majority leaves in tatters.  To replace the filed rate doctrine would require legislation or overturning a century of binding judicial precedent.[45]

26.     *Second*, the new "settled expectations test" unfairly diminishes generators'—and all participants'—actual expectations, which are that the auction rules in the tariff will be followed.[46]  The majority asserts that it "carefully consider[ed] settled expectations concerns, *especially claims that market participants relied on expected auction rules* in order to engage in other market activity such as bilateral supply sales and retail hedging arrangements."[47]  But the majority finds no "detrimental reliance concern" arising out of "market participants' *purported reliance on a single input*" in the "expected auction rules."[48]  If substantial record evidence of parties entering into "bilateral supply sales and retail hedging arrangements"—all binding financial commitments—does not raise "detrimental reliance concern[s],"[49] what does?  And why would anyone rely on a silly thing like the rules when entering into such arrangements?

27.     *Third*, the new "settled expectations test" misapprehends the Commission's role.  The Commission is not a court of equity.[50]  "As a federal agency, FERC is a 'creature of statute,' having 'no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress.'"[51]  The Commission does not balance

---

[44] *Id.* P 175 (citation omitted).

[45] *See supra* P 2.

[46] *See supra* PP 19-20.

[47] Order, 182 FERC ¶ 61,109 at P 177 (emphasis added).  These "claims" are supported by extensive record evidence.

[48] *Id.* (emphasis added).

[49] *Id.*

[50] *See* P3 Protest, Att. A, Aff. of the Hon. Joseph T. Kelliher at P 33.

[51] *Atlantic City I*, 295 F.3d at 8 (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)) (emphasis in *Atlantic City I*).

anything to determine the filed rate. It is a good thing, too, because the majority is not very good at it—entirely failing to appreciate the untold economic harm undermining all FERC-jurisdictional markets has versus a high clearing price in one zone, in one auction.

### G.    The Majority Distorts Markets

28.    The majority intends to benefit consumers with this order. They extol the "significant benefits that would result from applying the proposed Tariff revisions [retroactively] to the 2024/2025 BRA, in particular preventing consumers from being charged unnecessarily high capacity prices that do not reflect actual reliability needs or supply and demand fundamentals."[52] This certainly sounds like a great thing. Except "saving consumers money" is an incomplete description of what the Commission is tasked to do. Our job is to ensure just and reasonable rates. And market rates are not just and reasonable if no one trusts the market.

29.    There is overwhelming record evidence of the damage the majority's retroactive change to the auction rules will impose.[53] But "[t]he one thing we do not do is re-run auctions," even as a *remedy* when there are fundamental problems with how an auction was run.[54]

30.    Rerunning an auction is apparently too destabilizing to consider. Yet here the majority does something arguably worse: rather than rerun the auction, they simply reset the price. The majority knows its decision will not withstand judicial review, but they also know that the Commission does not rerun auctions as a form of relief. So if today's action is deemed unlawful by the courts, there will be no effective remedy. In such

---

[52] Order, 182 FERC ¶ 61,109 at P 178. There also is substantial record evidence that the auction results did reflect "actual reliability needs or supply and demand fundamentals." *See, e.g.*, P3 Protest at 41 (citing P3 Protest, Att. B, Aff. of Dr. Roy J. Shanker at PP 24, 35); *see also* EPSA Protest, Att. A, Aff. of Dr. Paul M. Sotkiewicz at PP 73-75 (identifying reliability issues in southern Delaware).

[53] *See, e.g.*, P3 Protest, Att. A, Aff. of the Hon. Joseph T. Kelliher at PP 40-46; P3 Protest, Att. B, Aff. of Dr. Roy J. Shanker at PP 49-52; NRG Protest, Att. A, Aff. of Joseph A. Holtman at PP 28-34; EPSA Protest, Att. A, Aff. of Dr. Paul M. Sotkiewicz at PP 32-38.

[54] *Indep. Mkt. Monitor for PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,121 (2022) (Danly, Comm'r, dissenting at P 16) (citing *PJM Interconnection, L.L.C.*, 161 FERC ¶ 61,252 (2017); *reh'g denied*, 169 FERC ¶ 61,237 (*passim*) (2019) (explaining decision declining to rerun auctions)); *see* P3 Protest, Att. A, Aff. of the Hon. Joseph T. Kelliher at P 43.

Document Access Case: 23-1778 Document: 88-1 Page: 135 Date Filed: 12/11/2023
Document Accession #: 20230721-3083 Filed Date: 07/21/2023

Docket Nos. ER23-729-000 and EL23-19-000                                    - 14 -

circumstances—where no auction outcome can be trusted—it would be better if we scrapped the markets altogether and returned to traditional cost-of-service ratemaking.

31.    It appears the Commission is headed down that path whether it realizes it or not. In a concurrence I issued last week, I quoted P3—a coalition representing generators in PJM—about the current situation of the PJM market:

> While capacity markets were established in PJM as a tool to ensure resource adequacy in future delivery years, a series of recent regulatory, policy and other changes counter any notion that the capacity market will send a signal to current investors seeking to invest at risk capital in assets that will deliver reliability at least cost.  Changes to the Market Seller Offer Cap . . . have removed any independent judgement of asset owners to make decisions about the viability of their assets going forward.  Changes to the Minimum Offer Price Rule . . . have effectively eliminated protections against the exercise of buyer market power, while the so-called protections against seller market power have gone to the extreme of having capacity offers effectively set by the PJM Independent Market Monitor.  Other decisions related to the [Operating Reserves Demand Curves] and the removal of the 10% adder from capacity market offers have served to compound the problem.  The proposed changes [in this proceeding] continue a pattern of complete devaluation and corruption of a market established to compensate investment in long-term capacity resources.[55]

As of today, we can add to this list the resetting of prices after capacity auctions have been run.

32.    In the same concurrence, I further warned that:

> there appears to be an implicit but prevailing view shared by many consumers and regulators that "regulatory, policy and other changes"[56] to the PJM capacity market and mitigation construct are always justified if they lower prices, so much so

---

[55] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,073 (2023) (Danly, Comm'r, concurring at P 3) (citing PJM Power Providers Group, Protest, Docket No. ER22-2984-000, at 4 (Oct. 21, 2022) (P3 Demand Curve Proceeding Protest)).

[56] P3 Demand Curve Proceeding Protest at 4.

Document Access... #: 20231221-5093   Filed Date: 12/21/2023
Case: 23-1778   Document: 88-1   Page: 136   Date Filed: 12/11/2023

Docket Nos. ER23-729-000 and EL23-19-000                                    - 15 -

> that it appears to me that the only evidence that could be
> brought to bear that would finally convince them that prices
> are actually confiscatory would be the impending financial
> collapse of the entire existing generation fleet. It may come
> to this. However, for obvious reasons, generators generally
> are not in a position—and likely never will be—to publicly
> predict and support with data their own potential
> bankruptcies. Generators have investors.
>
> We thus should carefully listen when groups like P3 routinely
> warn us about "a pattern of complete devaluation and
> corruption of a market established to compensate investment
> in long-term capacity resources."[57] We should also remember
> that evidence of imminent collapse is not the required
> statutory showing. Under foundational precedent, regulated
> utilities are entitled to an opportunity to recover their
> prudently-incurred costs.[58]

33.     It is true that the filed rate doctrine can produce harsh results, particularly in an
auction in a small area with less supply than it needs. But that is how markets work. The
good is low rates in surplus conditions. The flip side is high rates in shortfall conditions.
And there is a solution to "high" rates that does not involve the Commission taking the
law into its own hands and interfering with markets. All that a public utility like PJM has
to do is file a clear tariff revision that provides notice for when "anomalous"[59] market
outcomes can be revisited before posting auction results.[60] The one thing we cannot do is
change the score after the game so that our favorite team wins.

---

[57] *Id.*

[58] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,073 (Danly, Comm'r, concurring
at PP 4-5) (citing *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944); *see also Mkt.-
Based Rates for Wholesale Sales of Elec. Energy, Capacity & Ancillary Servs. by Pub.
Utils.*, Order No. 697, 119 FERC ¶ 61,295, *clarified*, 121 FERC ¶ 61,260 (2007), *order
on reh'g*, Order No. 697-A, 123 FERC ¶ 61,055, at P 409, *clarified*, 124 FERC ¶ 61,055,
*order on reh'g*, Order No. 697-B, 125 FERC ¶ 61,326 (2008), *order on reh'g*, Order No.
697-C, 127 FERC ¶ 61,284 (2009), *order on reh'g*, Order No. 697-D, 130 FERC
¶ 61,206 (2010), *aff'd sub nom. Mont. Consumer Counsel v. FERC*, 659 F.3d 910 (9th
Cir. 2011)).

[59] *See* Transmittal Letter at 9.

[60] No such clear notice currently is in the PJM tariff that would have prevented the
allegedly "anomalous" outcome in this case, notwithstanding PJM's claims to the

## II.　　The Commission Should Reject PJM's Section 205 Filing

34.　　I further dissent on the majority's decision to accept the prospective application of PJM's proposal to adjust the Local Deliverability Area Reliability Requirement during the auction. By "prospective," I mean in the traditional sense of applying this rule change to future auctions—not the one already run. While the Commission "need only find that the [FPA section 205] proposal is just and reasonable, not that it is the only or even the most just and reasonable proposal,"[61] PJM has failed that burden in this case.

35.　　I agree with the extensive analysis in the protests that PJM's proposal "would effectively make the Locational Deliverability Area Reliability Requirement a moving target, thereby disrupting the expectations of market participants."[62] I am persuaded that a "moving target" during an auction is a bad idea.

36.　　While the Commission's role is not to determine whether a proposal is the "most just and reasonable," it is useful to know whether there are alternatives to the proposed rate that lack its infirmities. There is record evidence of such alternatives in this case. Rather than an "intervention into the middle of a Tariff approved process,"[63] PJM could "change the timeline on which *both* existing and planned Capacity Resources with options to offer into [the Base Residual Auction] must exercise that option."[64] This could be accomplished by changing the option deadline "from the actual [Base Residual Auction] to 30 days before the Planning Parameters are posted."[65] It thus appears that

---

contrary. *See id.* at 26 (citing PJM Tariff, § 9.2(b)). *But see* P3 Protest, Att. A, Aff. of the Hon. Joseph T. Kelliher at PP 20-23 (refuting PJM's notice claims).

[61] *Southwest Power Pool, Inc.*, 166 FERC ¶ 61,019, at P 31 (2019) (citing *Cities of Bethany*, 727 F.2d 1131, 1136 (D.C. Cir. 1984), *cert denied*, 469 U.S. 917 (1984) (describing the Commission's authority under section 205 of the FPA as "limited to an inquiry into whether the rates proposed by a utility are reasonable—and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs")).

[62] EPSA Protest at 19; *see also id.* at 17-27 (cataloguing the unjustness and unreasonableness of PJM's proposal).

[63] P3 Protest, Att. B, Aff. of Dr. Roy J. Shanker P 54.

[64] *Id.* P 9 (emphasis in the original).

[65] *Id.*; *see id.* PP 63-64 (explaining same).

solutions may be available that do not disrupt auction processes.  I would reject PJM's proposal.[66]

## III.  The Commission Should Pursue Remedies Against PJM

37.  The most disturbing aspect of this case is the damage it inflicts that probably cannot be remedied.  As I discuss above, rerunning the auction or restoring the original prices likely would be as destabilizing as today's order.[67]  I am concerned about the long-term implications for the markets administered not only by PJM but in other regions.  There is significant evidence—particularly increasing reliability risk throughout the country—that the FERC-jurisdictional power markets are sick and dying, and it is the Commission's fault.

38.  The Commission announces it will convene a forum to review the health of the PJM capacity market.[68]  I do not object to a forum, but when the house is burning down, consulting with the Homeowners Association is insufficient.  You put out the fire.  I would institute an FPA section 206 proceeding regarding the PJM capacity market, specifically investigating whether the existing PJM capacity construct is just and reasonable.  I would target at least the following issues:

- Buyer-side manipulation of capacity market prices by offering below cost;

- Over-mitigation of sellers to the point that all offers are essentially set by the Independent Market Monitor;

- Elimination of any assessment of risk from seller offers;

- Changes to the demand curve to reduce prices when there is surplus supply and increase volatility as supply decreases; and

---

[66] I would also reject PJM's alternative section 206 proposal seeking to find the existing Locational Deliverability Area Reliability Requirement posting and timing requirements unjust and unreasonable and seeking as the replacement rate the same rate proposal as that sought under section 205.  *See* Order, 182 FERC ¶ 61,109 at P 20 (discussing section 206 complaint).

[67] *See supra* PP 29-30.  That does not mean it should not be considered, and to the extent any party seeks rehearing, I welcome arguments on appropriate relief in the event the Commission revisits this case on remand from a federal appellate court.

[68] Order, 182 FERC ¶ 61,109 at P 180.

Document Accession #: 20230321-3063    Filed Date: 03/21/2023

Docket Nos. ER23-729-000 and EL23-19-000                                                                    - 2 -

- Resetting auction prices after the auction is run.

39.     I welcome additional feedback on potential topics, whether at the forum, in this proceeding, or elsewhere.  I particularly welcome proposed solutions to identified problems.

For these reasons, I respectfully dissent.

_____
James P. Danly
Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                    Docket Nos.    ER23-729-000
                                                             EL23-19-000

(Issued February 21, 2023)

CHRISTIE, Commissioner, *concurring*:

1.      In no universe would the results of PJM's most recent capacity auction applicable to the Delmarva Power & Light South (DPL-S) Local Delivery Area (LDA) be considered just and reasonable.[1]  Nor is this outcome merely a topic for academic debate. Real people — the consumers in the Delmarva zone — may pay in excess of $100 million more than necessary because of this operational outcome.[2]

2.      To illustrate further, in its section 205 filing, PJM stated:

Based on preliminary auction data, as a result of the confluence of events in this small LDA, should PJM complete the auction and award capacity commitments, PJM estimates that the clearing price for the DPL-S LDA (and the revenues received by the Capacity Market Sellers in this small LDA) *would be more than four times what the clearing price should be*. . . . To put that into perspective, the clearing price for the DLP-S LDA from the 2023/2024 BRA was $69.95/MW-day. . . . Such an aberrant auction outcome must be avoided for the 2024/2025 BRA to ensure that the final auction results are just and reasonable rates and reflective of the actual reliability requirements in the affected LDA.[3]

---

[1] The procedural posture of these results is described at length in the order.

[2] PJM EL23-19 Transmittal at 34 ("The effect of the auction results would require the load in the particular LDA at issue to be responsible for paying over one hundred million dollars in excess of what is necessary for capacity associated with the 2024/2025 Delivery Year.").

[3] PJM ER23-729-000 Transmittal at 2-3 (emphasis added) (footnote omitted).

Document Accession #: 20230321-9005   Filed Date: 03/21/2023

3.      Using the "four-times" PJM estimate, Old Dominion Electric Cooperative (ODEC) noted:

> To provide additional context with respect to the economic impact associated with PJM's estimated four-fold increase in clearing price, ODEC calculated that, unless corrected, the excessive clearing price would result in cost increases to Delmarva Zone load of either *$85 million or $144 million* under two possible scenarios.[4]

4.      Using the same "four-times" estimate, the Maryland Office of People's Counsel (Maryland OPC) notes that without approval of PJM's proposed remedy, electric consumers in this LDA would experience "a major increase in power costs."[5] Specifically, Maryland OPC calculates the average electric consumer of 1000 kilowatt-hours a month in the DLP-S LDA would experience an extraordinary electric bill increase of an average of $24 a month.[6]

5.      So what to do?  PJM knows that the costs that will occur as a result of the confluence of events in this LDA are unjust and unreasonable and — *to its credit* — has stepped up and forthrightly proposed two controversial solutions:  (i) an FPA section 205 filing or (ii) an FPA section 206 filing.  The section 205 tariff revisions will apply to the 2024/2025 auction results and to auctions going forward; generally, the section 206 filing raises the question of whether the LDA Reliability Requirement is unjust and

---

[4] ODEC February 6, 2023 Answer at 3 (emphasis in original); *see also id*. at 3-4 (explaining that ODEC performed these calculations using two scenarios:  (i) ODEC assumed that the clearing price in DPL-S is four times the value for DPL-S from the 2023/2024 BRA results (i.e., $280/MW-day) and (ii) ODEC assumed the clearing price in DPL-S is the Point (a) UCAP Price on the Variable Resource Requirement curve from the 2024/2025 Reliability Pricing Model BRA Planning Parameters maximum allowable value of $426/MW-day.).

[5] Maryland OPC January 20, 2023 Comments at 3.

[6] *Id*. at n.1 ("[Maryland] OPC's rough calculation of the cost impact of this change, absent PJM's proposed remedy, is an incremental average increase of the electric bill of approximately $24/MWh for the 24/25 Delivery Year, or $24/month, for the average customer consuming 1,000 kilowatt-hours in a month and resident in the DPL South LDA (including Maryland's eastern shore area).  This increase (to occur for the period June 1, 2024 to May 31, 2025 (the 24/25 BRA Delivery Year)) is about 25% of PJM's reported average all-in wholesale power cost reported for 2022.").

unreasonable without the same tariff revisions that the section 205 filing proposes be made.[7]

6.      In addition to the reasoning articulated at length in the order, I support approving PJM's section 205 filing because the auction results are so blatantly unjust and unreasonable that voting to allow those results to stand is unacceptable to me.[8]  But I think we need to do more.  As I wrote in my concurrence just last week to PJM's Quadrennial Review filing,[9] the elephant in the room must be addressed:  Whether PJM's capacity market construct can still ensure sufficient power supplies to deliver reliability at just and reasonable rates.  I further said in that concurrence that:

> [T]his proceeding is not the proper proceeding for the Commission to undertake a review of the entire PJM capacity market construct in order to ask whether it is still fit for purpose, and, just as importantly, to consider alternatives to the entire construct.  I believe, however, that such a review is both timely and compelling.[10]

7.      While this proceeding is also not the proper one for such a comprehensive review, I am pleased that this order does announce that the Commission will conduct a forum on the PJM capacity market at a date, time and location to be announced soon.[11]  This is a welcome step forward and will provide a forum to begin these unavoidable discussions on the future of the PJM capacity market construct.

            For these reasons, I respectfully concur.

_____
Mark C. Christie
Commissioner

_____

[7] However, the section 206 filing gives the Commission the ability to direct different Tariff reforms.

[8] Because we are approving the section 205 filing, I agree we should dismiss PJM's concurrent section 206 filing.

[9] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,073 (2023) (Christie, Comm'r, concurring at P 2) (available at https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-pjms-quadrennial-review-er22-2984).

[10] *Id.* at P 4.

[11] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109, at P 180 (2023).

183 FERC ¶ 62,040
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.

Docket Nos. ER23-729-001
EL23-19-001

## NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION

(April 24, 2023)

Rehearing has been timely requested of the Commission's order issued on February 21, 2023, in this proceeding. *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (2023). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the requests for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Deputy Secretary.

184 FERC ¶ 61,055
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
                        James P. Danly, Allison Clements,
                        and Mark C. Christie.

PJM Interconnection, L.L.C.                    Docket Nos.  ER23-729-001
                                                            EL23-19-001

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued July 27, 2023)

1.    On February 21, 2023, the Commission issued an order accepting proposed
revisions filed pursuant to section 205 of the Federal Power Act (FPA)[1] by PJM
Interconnection, L.L.C. (PJM) to its Open Access Transmission Tariff (Tariff) to
exclude planned generation capacity resources from the calculation of the Locational
Deliverability Area Reliability Requirement (LDA Reliability Requirement) if the
addition of such resources materially increases the reliability requirement and such
resources do not participate in the capacity auction.[2]  The Commission also in the
February 2023 Order dismissed as moot a complaint (Complaint) filed by PJM alleging
that the LDA Reliability Requirement, absent the changes in its FPA section 205 filing
(Section 205 Filing), results in an unjust and unreasonable auction outcome.

2.    Rehearing of the February 2023 Order was timely requested by:  American Clean
Power Association, Solar Energy Industries Association, and Advanced Energy United
(collectively, Clean Energy Associations); Constellation Energy Generation, LLC
(Constellation); Electric Power Supply Association (EPSA), the NRG Companies,[3] LS
Power Development, LLC (LS Power), and Vistra Corp. (collectively, Joint Parties);
Leeward Renewable Energy, LLC and Leeward Renewable Energy Development, LLC

---

[1] 16 U.S.C. § 824d.

[2] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (2023) (February 2023 Order).

[3] For purposes of this proceeding, the NRG Companies are:  NRG Power
Marketing LLC, Direct Energy Business Marketing, LLC, and Midwest Generation,
LLC.

(together, Leeward); and the PJM Power Providers Group (P3) (collectively with Clean
Energy Associations, Constellation, Joint Parties, and Leeward, Petitioners).

3.     Pursuant to *Allegheny Defense Project v. FERC*,[4] the rehearing requests filed in
this proceeding may be deemed denied by operation of law.  However, as permitted by
section 313(a) of FPA,[5] we are modifying the discussion in the February 2023 Order and
continue to reach the same result in this proceeding, as discussed below.[6]

# I.  Background

## A.  PJM's Reliability Pricing Model and the LDA Reliability Requirement

4.     As a regional transmission organization (RTO), PJM is responsible for ensuring
reliability within its region.[7]  PJM procures sufficient capacity to meet its reliability needs
through its Reliability Pricing Model (RPM) capacity market by conducting capacity
auctions to procure the appropriate amount of power supply resources needed to meet
predicted energy demand three years in the future.[8]  These auctions include an annual

---

[4] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[5] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a
court of appeals, as provided in subsection (b), the Commission may at any time, upon
reasonable notice and in such manner as it shall deem proper, modify or set aside, in
whole or in part, any finding or order made or issued by it under the provisions of this
chapter.").

[6] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the
outcome of the February 2023 Order.  *See Smith Lake Improvement & Stakeholders Ass'n
v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[7] *See Del. Dep't of Nat. Res. & Env't. Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir.
2015); PJM, Transmittal, Docket No. ER23-729-000, at 6 (Dec. 23, 2022) (Transmittal)
("One of PJM's primary responsibilities as a [RTO] is to ensure that there is a sufficient
amount of electrical capacity within its system to provide reliable electricity to its
consumers during periods of peak demand.").

[8] *See* PJM Manual 18: PJM Capacity Market, § 1.3 Definition and Purpose of the
Reliability Pricing Model, Revision 56 (Feb. 9, 2023),
https://www.pjm.com/~/media/documents/manuals/m18.ashx (PJM Capacity Market
Manual) ("The RPM is a multi-auction structure designed to procure resource and [Price
Responsive Demand] commitments to satisfy the region's unforced capacity obligation
through the following market mechanisms: a Base Residual Auction, Incremental
Auctions and a Bilateral Market."); PJM, Intra-PJM Tariffs, OATT ATTACHMENT
DD.1. Introduction (1.0.0) ("the [RPM] provides: . . . (b) a competitive auction

Base Residual Auction (BRA) and three Incremental Auctions for each delivery year, which runs from June 1 to May 31 (Delivery Year).[9] Resource owners submit offers in the capacity auctions that would commit the resources to be available to provide capacity for a given Delivery Year.

5. The capacity auctions determine which resources receive capacity commitments and at what price using: (1) an administratively-set "demand curve," called the Variable Resource Requirement Curve (VRR Curve), representing prices consumers should pay for various quantities of capacity; and (2) a "supply curve" based on all of the sell offers from sellers at a specific price.[10] PJM establishes demand curves for the PJM region as a whole, as well as for areas within PJM that have limits on the amount of capacity they can import, called Locational Deliverability Areas (LDA), if certain criteria are met.[11] PJM uses an optimization algorithm to evaluate seller offers and other inputs in each capacity auction and uses the supply curve and VRR Curve to determine the seller offers that clear.[12] Resources that clear the capacity auctions receive a capacity commitment

---

mechanism to secure the forward commitment of additional Capacity Resources and Qualifying Transmission Upgrades as necessary to satisfy the portion of [load-serving entities'] Unforced Capacity Obligations not satisfied through Self-Supply, in order to ensure the reliability of the PJM Region for future Delivery Years; (c) long-term pricing signals for the development of Capacity Resources, including demand resources and planned generation resources, to ensure the reliability of the PJM Region"); Transmittal at 6.

[9] PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.4 Reliability Pricing Model Auctions (7.0.0), § 5.4.

[10] Transmittal at 6; PJM Capacity Market Manual, § 3.1 Overview of Demand in the Reliability Pricing Model; *id.* § 4.1 Overview of Supply in the Reliability Pricing Model.

[11] PJM, Intra-PJM Tariffs, OATT Definitions – L – M - N (34.0.0) (defining Locational Deliverability Area).

[12] *Id.*, OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (22.0.0), § 5.12(a). Offers generally clear starting with the lowest price offered and continuing until the supply curve intersects the VRR Curve; all offers that clear in the PJM region or applicable LDA are awarded a capacity commitment associated with a clearing price that is equal to the highest offer necessary to meet the applicable area's reliability needs. Transmittal at 7.

Document Accession #: 20230627-5120   Filed Date: 07/17/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 4 -

and corresponding capacity revenues that are invoiced on a weekly basis during the relevant Delivery Year.[13]

6.      The LDA Reliability Requirement is an input into the VRR Curve (the demand curve).  The LDA Reliability Requirement[14] is the projected internal capacity in the LDA, plus the Capacity Emergency Transfer Objective (or CETO)[15] for the Delivery Year, less the minimum capacity from internal resources required for all Fixed Resource Requirement entities.[16]  In modeling CETO for each LDA, PJM's manuals specify that PJM includes not only existing resources, but also planned generation resources that have an executed interconnection service agreement and resources that do not have an interconnection service agreement but have cleared a prior BRA (referred to collectively herein as Planned Generation Capacity Resources).[17]

---

[13] PJM Manual 27: Open Access Transmission Tariff Accounting, § 9.1 Billing Process Overview, Revision 97 (Feb. 1, 2023), https://www.pjm.com/-/media/documents/manuals/m27.ashx; PJM Manual 29: Billing, § 1.1 Billing Overview, Revision 30 (Oct. 1, 2022), https://www.pjm.com/~/media/documents/manuals/m29.ashx.

[14] PJM, Intra-PJM Tariffs, OATT Definitions – L – M - N (34.0.0) (defining Locational Deliverability Area Reliability Requirement); Transmittal at 10-11.

[15] CETO is the amount of capacity that needs to be imported into the LDA to remain within a loss of load expectation of one event in 25 years when the area is experiencing a localized capacity emergency.  PJM, Intra-PJM Tariffs, Reliability Assurance Agreement (RAA), RAA ARTICLE 1, RAA ARTICLE 1 -- DEFINITIONS (39.0.0); PJM Manual 20:  PJM Resource Adequacy Analysis, § 4.1 Overview, Revision 12 (Aug. 25, 2021), https://www.pjm.com/-/media/documents/manuals/m20.ashx.

[16] The Fixed Resource Requirement Alternative provides an alternative means for an eligible load-serving entity to satisfy its capacity obligations outside of the capacity auctions.  *See id.*, RAA SCHEDULE 8.1 (3.0.0).

[17] PJM Manual 20:  PJM Resource Adequacy Analysis, § 4.3 Modeling Specifics, Revision 12 (Aug. 25, 2021), https://www.pjm.com/-/media/documents/manuals/m20.ashx; PJM Manual 14B:  PJM Region Transmission Planning Process, § C.2.6 CETO/CETL as an Input to RPM, Revision 52 (Apr. 10, 2023), https://www.pjm.com/-/media/documents/manuals/m14b.ashx; *see also* PJM, Intra-PJM Tariffs, RAA ARTICLE 1 -- Definitions (39.0.0) (defining Planned Generation Capacity Resource).

### B.    Section 205 Filing and Complaint

7.    On December 23, 2022, PJM filed in Docket No. ER23-729-000 proposed revisions to the PJM Tariff pursuant to FPA section 205 to allow PJM, during the auction process, to exclude Planned Generation Capacity Resources from the calculation of the LDA Reliability Requirement if the addition of such resources materially increases the LDA Reliability Requirement and such resources do not participate in the relevant capacity auction.[18]  PJM asserted that the proposed amendment was needed to allow PJM to use an accurate LDA Reliability Requirement in clearing the capacity auctions.[19]

8.    PJM stated that a significant amount of Planned Generation Capacity Resources that were expected to participate in the BRA for Delivery Year 2024/2025 (2024/2025 BRA) based on the expected in-service dates in their interconnection service agreements did not offer into the BRA, despite being included in the LDA Reliability Requirement.[20]  Increases in projected internal capacity usually are offset in the LDA Reliability Requirement by a corresponding decrease in that LDA's CETO value—i.e., because with more projected internal capacity, less capacity needs to be imported into the LDA to remain within the targeted loss of load expectation.  However, PJM explained that this is not the case when large Planned Generation Capacity Resources and proportionately large quantities of planned solar resources are added to a relatively small LDA that is winter peaking.[21]

9.    PJM stated that, in these circumstances, the Planned Generation Capacity Resources do not provide as much reliability value.  PJM identified two primary reasons for this result:  (1) the load in a small LDA will be relatively dependent on a large resource, increasing the relative reliability risk if that resource experiences a forced outage; and (2) solar resources are not as productive in the winter.[22]  PJM explained that the inclusion of these types of Planned Generation Capacity Resources when the resources do not actually participate in the capacity auction thus results in an LDA Reliability Requirement reflecting demand for more resources than the LDA's actual reliability needs.[23]  In that case, the "impact on the market is the increase in demand with

---

[18] Transmittal at 1-2; February 2023 Order, 182 FERC ¶ 61,109 at PP 1, 5.

[19] Transmittal at 2.

[20] *Id.*

[21] *Id.* at 13-14.

[22] *Id.* at 14.

[23] *Id.* at 16

Docket Nos. ER23-729-001 and EL23-19-001                                    - 6 -

no offsetting increase in supply," artificially inflating clearing prices.[24]  PJM contended
that the inclusion of such planned resources that did not offer into the auction led to the
LDA Reliability Requirement for the Delmarva Power & Light - South LDA (Delmarva)
being overstated.  PJM estimated that, if it were to complete the 2024/2025 BRA under
the previously effective rules, the clearing price for Delmarva would be more than four
times higher than if the planned resources that did not offer were excluded from the LDA
Reliability Requirement.[25]

10.    PJM proposed Tariff revisions to more accurately reflect reliability needs by
providing the ability to update the LDA Reliability Requirement based on the actual
supply of resources that submitted offers into the BRA.[26]  Specifically, PJM proposed to
exclude from the LDA Reliability Requirement calculation Planned Generation Capacity
Resources that do not participate in the capacity auction when the LDA Reliability
Requirement increased by more than one percent compared with the values used in
relevant capacity auctions from the prior Delivery Year due to the addition of those
resources.[27]  PJM requested that the proposed Tariff revisions be applied beginning with
the 2024/2025 BRA, asserting that this change was prospective, as the BRA process
remained ongoing.[28]  PJM was required to post the planning parameters for the
2024/2025 BRA on August 29, 2022.  The BRA bidding window opened on December 7,
2022 and closed December 13, 2022.  PJM had been scheduled to post the 2024/2025

---

[24] Independent Market Monitor for PJM (Market Monitor) Comments at 3:

> [I]n a small LDA . . . where a new unit is a large share of total
> internal resources, the net impact of adding the new resource
> is to increase the demand for capacity.  The reason for this
> result is that the need for imports to provide reliability is not
> reduced by MW equal to the MW of the new resource
> because the outage of the new resource must be addressed by
> imports.  When the unit offers its capacity, the increase in
> demand is less than the increase in supply (the [Installed
> Capacity] capacity value of the new resource), but it is still an
> increase.

[25] Transmittal at 2-3.

[26] *Id*. at 3, 18-19.

[27] *Id*. at 19.

[28] *Id*. at 22-25.  PJM's Market Monitor agreed with PJM's analysis.
Market Monitor February 6, 2023 Answer at 1.

BRA results on December 20, 2022, but did not do so pending review of the Section 205 Filing.[29]

11.    Concurrently, PJM filed in Docket No. EL23-19-000 its FPA section 206[30] Complaint, alleging that the existing LDA Reliability Requirement, absent the revisions proposed in the Section 205 Filing, would result in an unjust and unreasonable auction outcome that would be inconsistent with actual market fundamentals.[31]  PJM explained that the Complaint contained identical proposed revisions to the Section 205 Filing, but that PJM was submitting the Complaint "out of an abundance of caution," to provide the Commission with the ability to make modifications to the proposed Tariff remedy, if it chose to do so.[32]  PJM stated that the Complaint would become moot if the Commission accepted the Section 205 Filing.[33]

### C.    February 2023 Order

12.    In the February 2023 Order, the Commission found PJM's proposed Tariff revisions in the Section 205 Filing to be just and reasonable and accepted them, effective December 24, 2022.[34]  The Commission found that applying PJM's proposed Tariff revisions to the 2024/2025 BRA did not violate the filed rate doctrine or the rule against retroactive ratemaking because, at the time PJM submitted the Section 205 Filing, no capacity commitments had yet been secured and no transactions had been consummated.[35]  The Commission acknowledged the importance of regulatory stability

---

[29] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 4.

[30] 16 U.S.C. § 824e.

[31] PJM, Transmittal, Docket No. EL23-19-000, at 1-2 (filed Dec. 23, 2022) (EL23-19 Transmittal).

[32] *Id*. at 2 n.4.

[33] *Id*. at 2 n.4, 6, 36.

[34] February 2023 Order, 182 FERC ¶ 61,109 at PP 1, 149.

[35] *Id*. PP 163, 167 (citing *Maislin Indus., US, Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126 (1990); *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (*Arkla*); *Cogentrix Energy Power Mgmt., LLC v. FERC*, 24 F.4th 677, 683 (D.C. Cir. 2022) (*Cogentrix*); *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021) (*OG&E*); *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1230 (D.C. Cir. 2018) (*Old Dominion*); *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 969 (D.C. Cir. 2003) (*Consolidated Edison*); *Towns of Concord v. FERC*, 955 F.2d 67, 71 n.2 (D.C. Cir. 1992); *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 816-17 (D.C. Cir. 1998);

and respecting settled expectations, but explained that the "nearly impenetrable shield" created by the filed rate doctrine and rule against retroactive ratemaking comes into play only when a change would be genuinely retroactive.[36]  In addition to finding that applying the proposed Tariff revisions to the 2024/2025 BRA did not violate the filed rate doctrine, the Commission also found that the benefits of doing so outweighed any reliance or expectations as to the LDA Reliability Requirements that PJM posted in August 2022.[37]  With respect to the substance of PJM's proposal in the Section 205 Filing, the Commission found that the proposed Tariff revisions would help ensure that load-serving entities are charged for capacity based on an LDA Reliability Requirement that reflects actual reliability needs in a manner consistent with supply and demand fundamentals, consistent with the goals of PJM's capacity market.[38]

13.   Because the Commission accepted the revisions proposed in PJM's Section 205 Filing, it dismissed the Complaint as moot.[39]  Notwithstanding the Commission's determination that the Tariff revisions proposed in PJM's Section 205 Filing are just and reasonable, the Commission acknowledged concerns voiced by stakeholders regarding the operation of PJM's capacity market and stated that it would convene a forum to examine the PJM capacity market and how best to ensure that it achieves its objective of ensuring resource adequacy at just and reasonable rates.[40]

14.   Following the February 2023 Order, on February 27, 2023, PJM posted results for the 2024/2025 BRA reflecting the updated LDA Reliability Requirement for Delmarva.[41]

---

*Columbia Gas Transmission Corp. v. FERC*, 831 F.2d 1135, 1141 (D.C. Cir. 1987); *City of Piqua v. FERC*, 610 F.2d 950, 954 (D.C. Cir. 1979) (*City of Piqua*)).

[36] *Id*. P 169; *see Old Dominion*, 892 F.3d at 1230.

[37] February 2023 Order, 182 FERC ¶ 61,109 at P 173.

[38] *Id*. P 150.

[39] *Id*. P 181.

[40] *Id*. P 180.  At the forum, held on June 15, 2023 (June 15 Forum), the Commission sought to engage varied perspectives on the current state of the PJM capacity market, potential improvements, and related proposals to address resource adequacy.  *PJM Capacity Mkt. F.*, Supplemental Notice of Forum, Docket No. AD23-7-000 (May 23, 2023).

[41] PJM, *PJM Capacity Auction Procures Adequate Resources* (Feb. 27, 2023), https://www.pjm.com/-/media/about-pjm/newsroom/2023-releases/20230227-pjm-capacity-auction-procures-adequate-

### D.    Requests for Rehearing

15.    On rehearing, Petitioners primarily renew arguments raised in the protests regarding PJM's ability to apply the Tariff revisions to the 2024/2025 BRA without running afoul of the filed rate doctrine and the rule against retroactive ratemaking,[42] as well as concerns regarding the substance of the Tariff revisions.[43]

16.    Petitioners assert that the Commission's acceptance of the Tariff revisions in the Section 205 Filing to apply to the 2024/2025 BRA violated the filed rate doctrine and the rule against retroactive ratemaking.[44]  Generally, Petitioners continue to argue that the Commission erred by permitting PJM to change its market rules for determining a

resources.ashx#:~:text=Overall%20resources%20offered%20into%20the,Energy%20Effi ciency%20Resources%2C%20has%20declined.

[42] *See* Clean Energy Associations Rehearing Request at 3, 4, 5-13; Constellation Rehearing Request at 2-5, 7-21; Joint Parties Rehearing Request at 1-3, 7-23, 46-48; Leeward Rehearing Request at 4-20; P3 Rehearing Request at 7-18.

[43] *See* Joint Parties Rehearing Request at 23-39, 48-50; P3 Rehearing Request at 7-8, 18-40.

[44] *See* Clean Energy Associations Rehearing Request at 3, 4, 5-9 (asserting that the Commission erred by holding that applying PJM's proposal to the 2024/2025 BRA would not violate the filed rate doctrine or constitute retroactive ratemaking (citing 16 U.S.C. § 824d(d); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966-67 (1986) (*Nantahala*); *Arkla*, 453 U.S. at 577; *Ariz. Grocery Co v. Atchison*, 284 U.S. 370, 384 (1932); *Old Dominion*, 892 F.3d at 1230-31; *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007); *Town of Norwood v. FERC*, 217 F.3d 24, 28 (1st Cir. 2000), *cert. denied*, 532 U.S. 993 (2001); *City of Girard, Kan. v. FERC*, 790 F.2d 919, 924 (D.C. Cir. 1986)); Constellation Rehearing Request at 2-3, 4, 7-15 (citing *Nantahala*, 476 U.S. at 966; *Arkla*, 453 U.S at 577-78); Joint Parties Rehearing Request at 1, 7-9, 46-47 (citing *Arkla*, 453 U.S. at 578; *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915) (*Maxwell*); *OG&E*, 11 F.4th at 829; *Old Dominion*, 892 F.3d at 1232); Leeward Rehearing Request at 4-5, 6-9 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (*Fox*); *Arkla*, 453 U.S. at 577-78; *Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951); *OG&E*, 11 F.4th at 829-31; *Old Dominion*, 892 F.3d at 1230; February 2023 Order, 182 FERC ¶ 61,109 at P 171; *id.* (Danly, Comm'r, dissenting at PP 6-7, 9)); *Pub. Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 168 FERC ¶ 61,042, at P 89 (2019); P3 Rehearing Request at 7, 8-18 (citing 16 U.S.C. § 824d; *Nantahala*, 476 U.S. at 966-67; *Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520-21 (1939) (*Lowden*); *OG&E*, 11 F.4th at 829-32; *Old Dominion*, 892 F.3d at 1230-32).

Docket Nos. ER23-729-001 and EL23-19-001                                          - 10 -

capacity auction input (i.e., the LDA Reliability Requirement) after the Tariff deadline for calculating and posting the inputs and when the BRA was complete but for the posting of the results.[45]

17.     Petitioners also take issue with the Commission's reasoning that the rate change accepted in the February 2023 Order is not retroactive because it was applied before capacity supply obligations and the corresponding rights and obligations had been awarded in the 2024/2025 BRA.[46]  Petitioners assert that the Commission departed without explanation from filed rate doctrine precedent by claiming that the Tariff revisions are not "genuinely retroactive,"[47] and creating a new and unsupported exception to the filed rate doctrine and rule against retroactive ratemaking.[48]  Joint Parties, Constellation, and Leeward continue to argue on rehearing that PJM violated its Tariff by its delay in posting the BRA results.[49]

18.     Petitioners further object to the Commission's settled expectations analysis, arguing that the Commission erred in concluding that the benefits of accepting the Tariff revisions proposed in the Section 205 Filing outweighed reliance by market participants

---

[45] *See* Constellation Rehearing Request at 4, 7; Joint Parties Rehearing Request at 8-9, 46-47; Leeward Rehearing Request at 4-5, 8-9; P3 Rehearing Request at 7, 13-14.

[46] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 167.

[47] *See id.* P 169; Joint Parties Rehearing Request at 9-10, 47; P3 Rehearing Request at 10, 12-13.

[48] *See* Joint Parties Rehearing Request at 14-15; Leeward Rehearing Request at 6, 9-10.

[49] Joint Parties Rehearing Request at 39-41, 50 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e); *Judulang v. Holder*, 565 U.S. 42, 53 (2011); *Am. Fed'n of Gov't Emps., AFL-CIO v. FLRA*, 24 F.4th 666, 677 (D.C. Cir. 2022); *Am. Rivers v. FERC*, 895 F.3d 32, 51 (D.C. Cir. 2018); *Tenn. Gas Pipeline v. FERC*, 824 F.2d 78, 84 (D.C. Cir. 1987); February 2023 Order, 182 FERC ¶ 61,109 at P 172; NRG Companies Protest at 11); Leeward Rehearing Request at 5-6, 19-20 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e); *id.* OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (20.0.0), § 5.12; February 2023 Order, 182 FERC ¶ 61,109 at P 9; *id.* (Christie, Comm'r, concurring at PP 1, 6)).  Leeward further contends that the PJM Tariff does not provide PJM the ability to review the BRA results subjectively.  Leeward Rehearing Request at 5-6, 6, 14-18; Constellation Rehearing Request at 18.

on the LDA Reliability Requirement posted prior to the BRA,[50] and departed without explanation from its prior policy declining to permit changes to rules governing an auction that already has commenced.[51]

19.    Joint Parties and P3 continue to assert that PJM failed to demonstrate that the Tariff revisions accepted in the Section 205 Filing are just and reasonable, even as applied to capacity auctions following the 2024/2025 BRA.[52]  They continue to voice concerns with multiple aspects of PJM's proposal, including:  modifying only one of the auction inputs;[53] treating Planned Generation Capacity Resources differently from other resources that do not submit offers into the capacity auctions;[54] and the one percent threshold for adjusting the LDA Reliability Requirement.[55]  In addition, Constellation argues that the Commission erred by failing to apply the heightened

---

[50] Clean Energy Associations Rehearing Request at 3, 4, 9-12 (citing 5 U.S.C. § 706(2)(A); *Env't Def. Fund v. FERC*, 2 F.4th 953, 967-68 (D.C. Cir. 2021); *Emera Me. v. FERC*, 854 F.3d 9, 28 (D.C. Cir. 2017)); Constellation Rehearing Request at 3, 5, 18-21 (citing *Emera Me.*, 854 F.3d at 22); Joint Parties Rehearing Request at 2-3, 18-23, 48 (citing *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*); *Old Dominion*, 892 F.3d at 1230; *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018); *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 963 (D.C. Cir. 2003); *Tenneco Gas v. FERC*, 969 F.2d 1187, 1214 (D.C. Cir. 1992); February 2023 Order, 182 FERC ¶ 61,109 at PP 173, 177-79; *id.* (Danly, Comm'r, dissenting at P 5)).

[51] Clean Energy Associations Rehearing Request at 4, 9-10 (citing *Fox*, 556 U.S. at 515-16; *PJM Interconnection, L.L.C.*, 166 FERC ¶ 61,072, at P 33 (2019) (GreenHat Order), *order on clarification*, 167 FERC ¶ 61,209 (2019)); Constellation Rehearing Request at 11-12 (citing GreenHat Order, 166 FERC ¶ 61,072 at P 33; *ISO New England Inc.*, 170 FERC ¶ 61,187, at P 17 (2020); *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,208, at P 261 (2015)); Joint Parties Rehearing Request at 22 (citing *ISO New England, Inc.*, 162 FERC ¶ 61,205, at P 21 (2018)).

[52] Joint Parties Rehearing Request at 23-46, 48-50; P3 Rehearing Request at 7-8, 18-40.

[53] Joint Parties Rehearing Request at 23-31, 48; P3 Rehearing Request at 24.

[54] Joint Parties Rehearing Request at 24-31, 48-49; P3 Rehearing Request at 37-39.

[55] Joint Parties Rehearing Request at 33-34, 49.

*Mobile-Sierra*[56] public interest standard to its review of proposed changes to market rules for a BRA after seller offers were received;[57] and failing to respond meaningfully to Constellation's argument that PJM had not shown the requisite "imminent severe economic harm" to make the Section 205 Filing without stakeholder review.[58]

20.     Clean Energy Associations argue that the Commission erred by improperly concluding that the Section 205 Filing will result in just and reasonable rates, when it had a sufficient record to find PJM's existing capacity market rules unjust and unreasonable under FPA section 206 and determine a just and reasonable remedy.[59]  Joint Parties argue that the Commission erred by refusing to permit market participants to re-offer into the 2024/2025 BRA to account for the changed circumstances and failing to grapple with Petitioners' arguments or to support its decision with substantial evidence.[60]

21.     Petitioners all request that the Commission reject the Section 205 Filing on rehearing.[61]  Clean Energy Associations also request that the Commission find PJM's

---

[56] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956) (*Mobile*); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) (*Sierra*).

[57] Constellation Rehearing Request at 3, 5, 21-22 (citing *New England Power Generators Ass'n v. FERC*, 707 F.3d 364, 371 (D.C. Cir. 2013)).

[58] *Id*. at 3, 5, 22-23 (citing *PSEG Energy Res. & Trade v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011)).

[59] Clean Energy Associations Rehearing Request at 4, 13-15 (citing 5 U.S.C. § 706(2)(A); *Env't Def. Fund*, 2 F.4th at 967-68; *Emera Me*., 854 F.3d at 28).

[60] Joint Parties Rehearing Request at 41-46, 50 (citing 5 U.S.C. § 706(2)(E); 16 U.S.C. § 825*l*(b); *Am. Clean Power Ass'n v. FERC*, 54 F.4th 722, 728 (D.C. Cir. 2022) (*ACPA*); *New England Power Generators Ass'n, Ltd. v. FERC*, 881 F.3d 202, 211 (D.C. Cir. 2015) (*NEPGA*)).

[61] Constellation Rehearing Request at 23 (requesting that the Commission preclude PJM from applying its Tariff revisions to the 2024/2025 BRA and direct PJM to make capacity awards based on the original BRA results); P3 Rehearing Request at 18, 39, 41 (urging the Commission to grant rehearing and reject PJM's proposal because applying PJM's proposal to the 2024/2025 BRA would violate the filed rate doctrine and rule against retroactive ratemaking and because PJM did not satisfy its statutory burden to support the proposal); Joint Parties Rehearing Request at 3 (requesting that the Commission grant rehearing "and stop issuing orders like the [February 2023 Order] that undermine confidence in the markets the Commission regulates"); Leeward Rehearing Request at 21 (requesting that the Commission reject the Section 205 Filing and direct

existing market rules are unjust and unreasonable under FPA section 206, and direct as the appropriate remedy a full rerun of the 2024/2025 BRA that incorporates accurate modeling assumptions.[62]

## II.  **Discussion**

22.    PJM, like other RTOs, "serve[s] multiple functions," including "constantly balancing supply and demand," ensuring the reliability of the system, and administering wholesale capacity markets to enable the system to meet predicted peak power demands in upcoming Delivery Years.[63]  Consistent with its responsibilities,[64] PJM determined, based on preliminary auction data during the 2024/2025 BRA that the method of calculating the LDA Reliability Requirement "in its present form involving small LDAs" would not reflect that LDA's actual reliability needs.[65]

23.    PJM submitted Tariff revisions under section 205 of the FPA to address this issue. As the applicant, PJM had the burden of showing that its proposed Tariff revisions were just and reasonable and not unduly discriminatory or preferential.  The Commission found that PJM met this burden, and accepted the Tariff revisions in the February 2023 Order.  As discussed below, we continue to find the Tariff revisions just and reasonable.  According to Petitioners, both actions—PJM's submission of the filing and the Commission's acceptance—were invalid with respect to the 2024/2025 BRA, which

---

PJM to comply with the existing Tariff by posting and honoring the results of the 2024/2025 BRA); Clean Energy Associations Rehearing Request at 3, 9, 11, 13-15.

[62] Clean Energy Associations Rehearing Request at 3, 11, 13-15 (citing Clean Energy Associations Protest at 3, 19-20); *see also id.* at 9 (asserting that the Commission should reverse its acceptance of the Section 205 Filing and adopt alternative relief to avoid market harm).

[63] *Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1186-87 (D.C. Cir. 2021) (citing FERC, Energy Primer: Energy Primer: A Handbook for Energy Market Basics 61 (April 2020), https://www.ferc.gov/sites/default/files/2020-06/energyprimer-2020_Final.pdf (accessed July 30, 2021)).

[64] *See, e.g.*, 18 C.F.R. § 35.34; *PJM Interconnection, L.L.C.*, 109 FERC ¶ 61,094 (2004) (stating that "PJM is responsible for the reliability of the entire PJM footprint"); *Reg'l Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,103-104 (1999) (cross-referenced at 89 FERC ¶ 61,285), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000) (cross-referenced at 90 FERC ¶ 61,201), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

[65] Transmittal at 2.

they contend already had run at the time the filing was submitted.  Although the filed
rate doctrine, when it applies, presents "a nearly impenetrable shield for consumers" and
the Commission alike,[66] Petitioners seek to extend the doctrine's application beyond the
bounds justified by the rate on file in this proceeding.  Here, Petitioners agree that the
relevant rate on file is the market rules governing the conduct of the BRAs.[67]  The very
purpose of these rules is to secure capacity commitments and determine capacity prices,
and it therefore stands to reason—as the Commission did in the February 2023 Order—
that a revision to the BRA procedures is not retroactive for the purposes of the filed rate
doctrine if applied before the commitments have been awarded and rates established for
such commitments.[68]  By contrast, Petitioners' interpretation reads restrictions into the
forward capacity auction not found in PJM's Tariff or consistent with PJM's
responsibilities as the RPM administrator and RTO.

24.     We also continue to find that the Commission appropriately balanced concerns
that applying the Tariff revisions to the 2024/2025 BRA would upset market participants'
settled expectations against the significant benefits of granting PJM's requested effective
date.  Petitioners' arguments to the contrary primarily reflect their mistaken belief that the
Tariff revisions constitute a violation of the rule against retroactive ratemaking.
Furthermore, evidence that some market participants may have relied on auction
parameters, including the LDA Reliability Requirement, does not in itself demonstrate
that the Tariff revisions are unjust and unreasonable.  Here, the Commission
appropriately found that the significant benefits of preventing customers from being
charged unnecessarily high capacity prices that do not reflect actual reliability needs or
supply and demand fundamentals outweighed potential disruption to any settled
expectations.[69]

25.     Furthermore, we find that the Tariff revisions will continue to produce just and
reasonable results as applied to future capacity auctions.  Petitioners allege that the

---

[66] *See OG&E*, 11 F.4th at 826, 829 (citing *Arkla*, 453 U.S. at 578); *Old Dominion*,
892 F.3d at 1230; *Pub. Utils. Comm'n of Cal. v. FERC*, 894 F.2d 1372, 1383 (D.C. Cir.
1990) (*CPUC*).

[67] P3 Rehearing Request at 9; Constellation Rehearing Request at 6-7; Leeward
Rehearing Request at 7; Clean Energy Associations Rehearing Request at 6; Joint Parties
Rehearing Request at 13.

[68] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 167.

[69] *Id*. P 178 (noting PJM's estimate that customers would be required to pay four
times more for capacity under the existing Tariff than under the proposed revisions,
which would result in load paying over $100 million in excess of what is necessary for
capacity for the 2024/2025 Delivery Year (citing Transmittal at 34)).

Document Access Case: 23-1778   Document: 88-1   Page: 158   Date Filed: 12/11/2023
Document Accession #: 20230327-3157   Filed Date: 03/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                                          - 15 -

Commission lacked substantial evidence to accept the Tariff revisions. However, the February 2023 Order is based on evidence that the proposal will result in rates that accurately reflect reliability needs and supply and demand fundamentals.[70]  These are areas in which the Commission's expertise is often brought to bear.  The Commission "extensively regulates the structure of the PJM capacity auction to ensure that it efficiently balances supply and demand, producing a just and reasonable clearing price."[71]  PJM presented a proposal that targets the precise issue it identified as causing auction results that would not reflect actual reliability needs, i.e., the situation where the LDA Reliability Requirement that was initially posted included Planned Generation Capacity Resources that PJM expected to participate in a BRA based on their in-service dates but did not.  PJM's proposal to adjust the LDA Reliability Requirement for Planned Generation Capacity Resources that offer into the BRA, whether or not they clear, will yield more accurate results because these resources are not only present in the LDA, but they have actually indicated their intent to provide capacity by offering into the RPM.  In this light, the Commission "may permissibly rely on economic theory alone to support its conclusions so long as it has applied the relevant economic principles in a reasonable manner and adequately explained its reasoning."[72]  Having found PJM's proposal just and reasonable, the Commission need not consider Petitioners' alternatives.

### A.   Procedural Matters

26.     On April 7, 2023, Old Dominion Electric Cooperative (ODEC) filed a motion for leave to answer and answer in response to the requests for rehearing.  Rule 713(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.713(d)(1) (2022), prohibits an answer to a request for rehearing.  Accordingly, we deny ODEC's motion for leave to answer and reject its answer.

27.     In addition, although we address Leeward's arguments below, we remind Leeward that Rule 713(c)(2) requires that a rehearing request include a separate section entitled "Statement of Issues" listing each issue presented to the Commission "in a separately

---

[70] *Id*. P 150.

[71] *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 157 (2016).

[72] *Cent. Hudson Gas & Elec. Corp. v. FERC*, 783 F.3d 92, 109 (2d Cir. 2015); *see also Citadel FNGE Ltd. v. FERC*, No. 22-1090, 2023 WL 4672098 at *9 (D.C. Cir. 2023) (the Commission may rely on predictive judgments in areas where it has expertise (citing *NextEra Energy Res., LLC v. FERC*, 898 F.3d 14, 24 (D.C. Cir. 2018))); *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1008-09 (D.C. Cir.1987) (explaining that the Commission does not need to "conduct experiments in order to rely on the prediction that an unsupported stone will fall; nor need they do so for predictions that competition will normally lead to lower prices").

enumerated paragraph that includes representative Commission and court precedent on which the participant is relying."[73] Leeward's request for rehearing includes a section labeled "Statement of Issues," but does not list the issues in separately enumerated paragraphs, and cites no Commission precedent other than the February 2023 Order.

## B. **Substantive Matters**

### 1. **Filed Rate Doctrine**

28.     In the February 2023 Order, the Commission found that applying PJM's Tariff revisions to the 2024/2025 BRA did not violate the filed rate doctrine or the rule against retroactive ratemaking.[74] The Commission explained that, for purposes of the filed rate doctrine, PJM's relevant rate on file with the Commission is the BRA procedures, i.e., the market rules governing the conduct of the capacity auctions, to which the filed rate doctrine applies as it would to a stated, numerical rate.[75] Although changes to the BRA procedures thus may apply only prospectively, the Commission explained that changes to a rate are only impermissibly retroactive "where regulated entities or customers have already transacted pursuant to the rate—i.e., where purchases or sales have occurred."[76] Here, the Commission found that no such transaction had occurred as capacity sellers had not yet received capacity awards or been required to take on capacity obligations—nor could sellers even know the price they ultimately would receive for any potential capacity obligation—and a change to the BRA procedures therefore was not retroactive for the purposes of the filed rate doctrine.[77]

---

[73] 18 C.F.R. § 385.713(c)(2).  Under Rule 713, any issue not so listed will be deemed waived.  *Id.*

[74] February 2023 Order, 182 FERC ¶ 61,109 at PP 163-72.

[75] *Id.* P 165 (citing *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (*West Deptford*); *Pub. Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 168 FERC ¶ 61,042 at P 89; *Black Oak Energy, LLC v. N.Y. Indep. Sys. Operator, Inc.*, 122 FERC ¶ 61,261, at P 32 (2008) (*Black Oak*); *NRG Power Mktg., Inc.*, 91 FERC ¶ 61,346, at 62,165 (2000)).

[76] *Id.* P 166 (citing *Cogentrix*, 24 F.4th at 684; *Old Dominion*, 892 F.3d at 1226-27; *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1320 (D.C. Cir. 2004) (*PG&E*); *Associated Gas Distribs. v. FERC*, 898 F.2d 809, 810-11 (D.C. Cir. 1990); *City of Girard, Kan. v. FERC*, 373 F.3d 1315, 1320 (D.C. Cir. 1986)).

[77] *Id.* P 167 ("We conclude that, in these circumstances, where the rate on file with the Commission—i.e., the BRA procedures—exists 'to secure commitments of Capacity Resources' and the price that suppliers will receive in exchange, a change to

29.     The Commission stated that, in the context of the BRA procedures, its interpretation gives effect to precedent establishing that the filed rate doctrine and the rule against retroactive ratemaking exist to ensure that the Commission has the opportunity to review a public utility's rates before they are charged to the customer but, once charged, neither the Commission nor the public utility can change those rates.[78]  Given its finding that the proposed change would be prospective in nature, the Commission explained that the doctrine's goal of promoting predictability does not present a bar to accepting the Tariff revisions, but rather constitutes a consideration for the Commission to weigh in determining whether or not the proposal is just and reasonable and not unduly discriminatory or preferential.[79]

30.     The Commission further found that implementing a Tariff amendment after market sellers had submitted their offers into the 2024/2025 BRA did not violate the filed rate doctrine because "offers are not rates," but rather requests to receive the market clearing price; by contrast, the rate at issue—the capacity commitments and clearing price resulting from application of the BRA procedures—had not yet been established.[80] Nor did implementing the Tariff revisions retroactively amend any rate or non-rate term of PJM's Tariff, the Commission held, as the fact that one section of the Tariff requires PJM to post the LDA Reliability Requirement by a particular date "does not preclude PJM from prospectively updating the manner in which the LDA Reliability Requirement is incorporated into a later phase of the auction process pursuant to a separate section of the Tariff that requires PJM to consider the auction inputs and calculate a clearing result to minimize the cost of satisfying the reliability requirement."[81]

---

those procedures is not retroactive for purposes of the filed rate doctrine if the capacity supply obligations and the corresponding rights and obligations—including the right to a particular capacity price—have not yet actually been awarded." (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.4 Reliability Pricing Model Auctions (7.0.0), § 5.4(a))).

[78] *Id.* P 168 (citing *Arkla*, 453 U.S. 571).

[79] *Id.* P 169 (citing *ISO New England Inc.*, 148 FERC ¶ 61,185, at P 29 (2014), *order on reh'g*, 150 FERC ¶ 61,129 (2015); *ISO New England Inc.*, 145 FERC ¶ 61,095, at P 28 (2013)).

[80] *Id.* P 170 (citing *Indep. Mkt. Monitor for PJM v. PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,137 (2021) (*IMM v. PJM*), *order on reh'g*, 178 FERC ¶ 61,121, at PP 101-02 (2022) (*IMM v. PJM* Reh'g)).

[81] *Id.* P 171 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a); *id.* OATT ATTACHMENT DD.5.12

31.     Finally, the Commission disagreed with arguments that PJM had violated the Tariff by not posting the BRA results, explaining that the Tariff does not impose a deadline for completing the BRA, but rather requires PJM to post the results "as soon . . . as possible" after conducting the capacity auctions.[82]

### a.     Requests for Rehearing

32.     On rehearing, Petitioners continue to assert that the Commission's acceptance of the Tariff revisions in the Section 205 Filing with PJM's requested effective date violates the filed rate doctrine and the rule against retroactive ratemaking.[83]   In particular, Petitioners advance arguments that the Commission violated the filed rate doctrine and rule against retroactive ratemaking by authorizing PJM to modify the LDA Reliability Requirement after the value had been finalized under the Tariff.[84]

---

Conduct of RPM Auctions (20.0.0), § 5.12(a)); *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,208, at P 15 (2020) (Planning Parameters Order).

[82] *Id.* P 172 (quoting PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e)).

[83] *See* Clean Energy Associations Rehearing Request at 3, 4, 5-9; Constellation Rehearing Request at 2, 3, 7-15; Joint Parties Rehearing Request at 1, 7-9, 46-47; Leeward Rehearing Request at 6-9; P3 Rehearing Request at 7, 8-18.

[84] Joint Parties Rehearing Request at 1, 7-9, 46-47 (citing *Arkla*, 453 U.S. at 578; *Maxwell*, 237 U.S. at 97; *OG&E*, 11 F.4th at 829; *Old Dominion*, 892 F.3d at 1232;); Constellation Rehearing Request at 2, 3, 7-15 (citing *Nantahala*, 476 U.S. at 966; *Arkla*, 453 U.S at 577-78); Leeward Rehearing Request at 4-5, 7-8; P3 Rehearing Request at 7, 8-18 (citing 16 U.S.C. § 824d; *Nantahala*, 476 U.S. at 966-67; *Lowden*, 306 U.S. at 520-21; *OG&E*, 11 F.4th at 829-32; *Old Dominion*, 892 F.3d at 1230-32).  *See* Leeward Protest at 7-9; Clean Energy Associations Protest at 5-11; P3 Protest at 14-27; *id.*, attach. A, Affidavit of the Hon. Joseph T. Kelliher ¶¶ 17-34 (Kelliher Aff.); Vistra Corp. Protest at 6-10; EPSA Protest at 5-16; *id.*, attach. A, Affidavit of Paul M. Sotkiewicz, Ph.D. ¶¶ 15-31 (Sotkiewicz Aff.); Constellation Protest at 10-15 (Constellation Protest). Constellation contends that the Commission also violated the filed rate doctrine and rule against retroactive ratemaking by permitting PJM to rerun the 2024/2025 BRA after PJM already has formed valid auction clearing prices by leaning on a "hypertechnical" distinction between the auction process and the award of contracts.  Constellation Rehearing Request at 2, 4, 15-18 (citing *Old Dominion*, 892 F.3d at 1230; Constellation Protest at 12-14); *see also* Leeward Rehearing Request at 9 (asserting that the optimization algorithm automatically generates clearing prices and PJM is only permitted to announce the results); P3 Rehearing Request at 7, 9, 14 (Commission erred

33.     Petitioners agree with the Commission's statement in the February 2023 Order that the BRA procedures are the filed rate,[85] but dispute its corresponding conclusion that PJM may apply the Tariff revisions in the Section 205 Filing to the 2024/2025 BRA.[86]  For example, Joint Parties contend that the Commission's acknowledgment that the BRA procedures are the rate on file cannot be reconciled with its conclusion that a change to the BRA procedures is not retroactive as long as the capacity supply obligations have not yet been awarded.[87]  Constellation likewise questions the consistency of the Commission's finding that the BRA procedures are the filed rate

---

by permitting PJM to change the rules of the BRA and the clearing prices produced by the rules after the BRA had been conducted).

[85] P3 Rehearing Request at 9 ("The filed rate doctrine applies with equal strength in the context of competitive wholesale markets and the non-rate terms set forth in RTO/ISO tariffs, including PJM's" (citing *Old Dominion*, 892 F.3d at 1230)); Constellation Rehearing Request at 6-7 (stating that there is "no dispute that PJM's market rules for calculating auction parameters" such as the LDA Reliability Requirement, constitute the filed rate (citing *Nantahala*, 476 U.S. at 966; February 2023 Order, 182 FERC ¶ 61,109 at P 165; *Pub. Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 168 FERC ¶ 61,042 at P 89)); Leeward Rehearing Request at 7 (stating that the Commission correctly acknowledges that the BRA procedures are the rate on file and the filed rate doctrine applies to those rules as it would to a stated rate, requiring that changes apply only prospectively (citing February 2023 Order, 182 FERC ¶ 61,109 at P 165)); *see also* Clean Energy Associations Rehearing Request at 6 (stating that the filed rate doctrine and rule against retroactive ratemaking apply to both rates and the non-rate terms and conditions of tariffs, such as market rules (citing 16 U.S.C. § 824d(d); *Nantahala*, 476 U.S. at 966-67); Joint Parties Rehearing Request at 13 (arguing that the filed rate doctrine is not limited to charges and the Commission acknowledged in the February 2023 Order that the BRA procedures are the rate on file (citing *Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 223 (1998); *OG&E*, 11 F.4th at 830; *Dreamscape Design, Inc. v. Affinity Network, Inc.*, 414 F.3d 665, 668 (7th Cir. 2005); February 2023 Order, 182 FERC ¶ 61,109 at P 165).

[86] *See* Joint Parties Rehearing Request at 7; Leeward Rehearing Request at 7-8; Clean Energy Associations Rehearing Request at 6-7; P3 Rehearing Request at 9-10; Constellation Rehearing Request at 6-7, 11.

[87] Joint Parties Rehearing Request at 13 (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 165, 167).

with its determination to permit PJM to amend the rules for calculating the LDA Reliability Requirement after that value is used in the BRA.[88]

34.    Specifically, Petitioners focus on the fact that the PJM Tariff in effect at the time the 2024/2025 BRA began required PJM to post the LDA Reliability Requirement and other planning parameters for a given Delivery Year "prior to conducting the [BRA] for such Delivery Year."[89]  Constellation argues that the Commission's acceptance of the Section 205 Filing "constitutes a textbook violation of the filed rate doctrine and the rule against retroactive ratemaking" because the Commission allowed PJM to amend its rules for calculating the LDA Reliability Requirement after PJM ran the 2024/2025 BRA, and also permitted PJM to re-clear the 2024/2025 BRA after PJM had already formed valid auction clearing prices.[90]  Constellation asserts that PJM:  (1) calculated and posted its planning parameters, including the LDA Reliability Requirement, on August 29, 2022, consistent with Tariff provisions requiring the parameters to be determined and posted prior to the conduct of the BRA;[91]  (2) accepted binding offers between December 7 and

---

[88] Constellation Rehearing Request at 11 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 171; PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a)(vi)(B); *id.* OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(a)(iv); *see id.* (stating that the market rules are the filed rate and RTOs are obligated to calculate prices in accordance with market rules and to correct prices that do not reflect operation of the market rules (citing *AEP Appalachian Transmission Co.*, 164 FERC ¶ 61,180, at P 18 (2018); *Ark. Pub. Serv. Comm'n v. Entergy Corp.*, 142 FERC ¶ 61,012, at P 41 (2013); *Black Oak*, 122 FERC ¶ 61,261 at P 32; *Allete, Inc. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 119 FERC ¶ 61,142, at P 36 (2007) (*Allete*)).

[89] *See* Leeward Rehearing Request at 7 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(a)); *id.* at 7-8 (stating that the LDA Reliability Requirement is a "key planning parameter" for the BRA, and that PJM was required to post the LDA Reliability Requirement prior to the BRA, consistent with the Tariff requirement to "determine . . . the [LDA] Reliability Requirement for each [LDA] for which an [VRR] Curve has been established for such [BRA] . . . prior to the conduct of the [BRA]," to achieve the BRA's purpose of ensuring sufficient supply in the LDA to meet the Variable Resource Requirement (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a)(vi)(A); February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 6)).

[90] Constellation Rehearing Request at 6, 7-18.

[91] *Id.* at 8 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), §§ 5.10(a)(vi)(A)-(B); *id.* OATT

December 13, 2022, which could not be withdrawn after the auction closed;[92] and then, (3) ran the optimization algorithm using the LDA Reliability Requirement from its existing methodology to form a clearing price for the region and each LDA.[93] Constellation contends that submitting PJM's change in methodology for calculating the LDA Reliability Requirement only after taking these three steps and reviewing the clearing prices is retroactive and runs afoul of the Tariff's requirement to calculate parameters prior to the conduct of the auction.[94]

35.     Joint Parties similarly assert that acceptance of PJM's proposal violates the filed rate doctrine and prohibition against retroactive ratemaking because the Commission allowed PJM to change the rules for the 2024/2025 BRA after the auction window closed and the Tariff allowed for no after-the-fact adjustments to the LDA Reliability Requirements used to the clear the BRA.[95]  "By allowing PJM to change a value fixed

---

ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(a)).

[92] *Id.* (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.8 Submission of Sell Offers and Buy Bid (5.0.0), § 5.8(d)); *id*. (citing PJM Tariff, Attach. DD, § 5.6.6(b) (providing that "no bilateral transactions for Capacity Resources applicable to the period covered by an auction will be processed" until "that auction is completed")).

[93] *Id.* at 8-9 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), §§ 5.10(a), 5.10(a)(vi)(B); *id*. OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (20.0.0), § 5.12; *id*. OATT ATTACHMENT DD.5.14 Clearing Prices and Charges (35.0.0), § 5.14(f); Transmittal, at 8-9).

[94] *Id.* at 9 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a)(vi)(B); *id.* OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(a)); *id.* at 11 (citing February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 22)).

[95] Joint Parties Rehearing Request at 2, 7-9 (arguing that the "relevant tariff language could not have been clearer, and the facts are no less clear cut" that PJM was required to post the LDA Reliability Requirement prior to the BRA and use the VRR Curves incorporating the posted parameters for such BRA (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a)(vi)(A)-(B); *id.* PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(a)); *id.* at 7-8 (stating that the Commission has no power to alter rates retroactively, which is "exactly what the Commission did" in the February 2023 Order (citing *Arkla*, 453 U.S. at 578; *OG&E*, 11 F.4th at 829; *Old Dominion*, 892 F.3d at 1232; *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 556 (D.C. Cir. 2014); *OXY USA, Inc. v. FERC*, 64 F.3d 679, 700 (D.C.

and finalized in the past," Joint Parties contend, "the Commission altered the filed rate retroactively."[96]  Likewise, Leeward contends that the revisions accepted in the February 2023 Order violate the filed rate doctrine because PJM proposed revisions to revise the calculation of, and repost the LDA Reliability Requirement for, the 2024/2025 BRA after PJM initially posted it on August 29, 2022 and the deadline for posting the LDA Reliability Requirement and auction parameters for the 2024/2025 BRA had passed.[97]

36.     Petitioners generally argue that PJM's Tariff does not provide PJM with discretion to take any actions beyond applying the optimization algorithm to clear the auction. Leeward asserts that the Commission erred in concluding that PJM has the authority to conduct a subjective review of the BRA results.[98]  According to Leeward, the Commission is mistaken in asserting that the capacity commitment and market clearing price are the outcome of the auction process and that the rate paid by load and received by sellers had not yet been established at the time of the February 2023 Order.[99]  Leeward maintains that, although the Commission repeats PJM's assertion that the auction has not yet concluded, the cited Tariff section "is silent on the topic of when or under what conditions an auction is or is not concluded."[100]  Leeward maintains that PJM conducts its auction by running the optimization algorithm, which automatically generates clearing

---

Cir. 1995); *E. Tenn. Nat. Gas Co. v. FERC*, 863 F.2d 932, 941 (D.C. Cir. 1988); *Pub. Serv. Co. of N.H. v. FERC*, 600 F.2d 94, 958 (D.C. Cir. 1979); *Tex. E. Transmission Corp. v. FERC*, 72 FERC ¶ 61,152, at 61,766-67 (1995), *aff'd sub. nom. Tex. E. Transmission Corp. v. FERC*, 102 F.3d 174 (5th Cir. 1996)).

[96] *Id.* at 9.

[97] Leeward Rehearing Request at 8 ("Permitting a retroactive change to the LDA Reliability Requirement is directly contrary to the Commission's finding that the BRA procedures are the filed rate, which required that PJM establish the LDA Reliability Requirement *prior to the auction*, which has since concluded" (citing PJM, Compliance Filing, Docket No. EL19-58-010 (filed Jan. 21, 2022); *PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,122 (2022); February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 6); PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(vi)(B); NRG Companies Protest at 6 n.13); *see id.* at 12-14 (setting forth the timeline for PJM's BRA process).

[98] *Id.* at 9, 14-18.

[99] *Id.* at 9.

[100] *Id.* at 14-15 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 12 n.40; PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (20.0.0), § 5.12)).

prices based on seller offers and predetermined Tariff inputs, without any additional analysis required by PJM. Rather, Leeward contends that, once the optimization algorithm determines the offers that cleared the auction, all PJM is "required or permitted" to do under the Tariff is to announce the auction results.[101] Leeward asserts that, although PJM does not explain what it means by a "preliminary" price calculation, its claim to be in compliance with the Tariff by performing only preliminary price calculations for the 2024/2025 BRA and suspending auction clearing before it was completed is either disingenuous or an admission that it violated the Tariff.[102] Leeward alleges that it is "mathematically impossible" for PJM to have estimated that the clearing price for Delmarva would be four times more than it should be without first having determined the clearing price under the existing rules and comparing the result under a rerun of the algorithm using different inputs.[103] Leeward and Clean Energy Associations each contend that section 5.12 of PJM's Tariff does not support the Commission's claim that the Tariff requires PJM to evaluate offers and inputs to determine that the offers clear the auction.[104]

37.     Similarly, even assuming that the Commission were correct that the filed rate doctrine applies only after a transaction is entered into and "consummated," P3 maintains the Commission erred in concluding that no binding commitments had been made in the 2024/2025 BRA prior to PJM's Section 205 Filing, as PJM had applied its BRA

---

[101] *Id.* at 9, 16 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e); *id.* OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (20.0.0), §§ 5.12, 5.12(a)); *see also id.* at 15 (noting that section 5.12 requires that the determination of which seller offers clear an auction be based solely on the results of employing the optimization algorithm); *id.* at 16-17 (arguing that section 5.12 provides that the optimization algorithm will be applied to calculate the clearing result and "[n]o further review is permitted").

[102] *Id.* at 17 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 89; PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (20.0.0), § 5.12(a)).

[103] *Id.* at 18.

[104] *Id.* (citing February 2023 Order, 182 FERC ¶ 61,109 at P 12 & n.40); Clean Energy Associations Rehearing Request at 12-13 (arguing that the section 5.12(a) of Attachment DD does not require or allow PJM to consider the auction inputs and calculate a clearing result to minimize the cost of satisfying the reliability requirement, but only provides for PJM to apply the optimization algorithm to calculate the clearing result).

Document Access... ...20230627-516... ...led Date: 09/27/2023   Case: 23-1778   Document: 88-1   Page: 167   Date Filed: 12/11/2023

Docket Nos. ER23-729-001 and EL23-19-001                                          - 24 -

procedures and secured irrevocable capacity commitments.[105] P3 asserts that PJM had fully conducted the BRA by following all of the BRA procedures for determining the clearing prices, and that the only aspect of the BRA procedures not satisfied prior to commencing this proceeding was the requirement to post the results "as soon thereafter as possible" after conducting the BRA.[106]

38.    According to Constellation, PJM's role in the BRA following the receipt of offers is limited to employing its optimization algorithm to evaluate offers, calculating the clearing prices for each LDA, and posting the results "as soon thereafter as possible."[107] Constellation argues that PJM completed the first two steps and contends that inserting a new step to review the results before posting, "after the process was complete but for the ministerial step of posting the results," is retroactive.[108] Constellation disagrees with the Commission's reasoning that no capacity seller had received an award or been required to take on a capacity obligation, as it asserts that "[t]he result was established, and the auction winners determined, as soon as the algorithm was run."[109]

39.    Petitioners further assert that accepting the Section 205 Filing to apply to the 2024/2025 BRA did not provide market participants with the requisite notice of a rate change, and also did not fall within the recognized exceptions to the filed rate doctrine and rule against retroactive making.[110] Clean Energy Associations maintain that the

---

[105] P3 Rehearing Request at 13.

[106] *Id.* at 14 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e); P3 Protest at 10-14).

[107] Constellation Rehearing Request at 16 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e); *id.* OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (20.0.0), § 5.12; *id.* OATT ATTACHMENT DD.5.14 Clearing Prices and Charges (35.0.0), § 5.14 (a)).

[108] *Id.* at 16-17 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.14 Clearing Prices and Charges (35.0.0), § 5.14(a)); *see id.* at 17 n.69 (disagreeing that section 9.2(b) of the Tariff gives PJM discretion to modify the results, arguing that this provision only modifies the time in which PJM can make an FPA section 205 filing and not "*carte blanche* to modify any aspect of the Tariff"); *see also id.* at 15 (asserting that PJM had completed "virtually the entire auction process" under the prior Tariff rules except for posting the BRA results and only made the Section 205 Filing "after 'peeking' at the results and deciding it did not like what it saw," at which point it was too late to change the methodology).

[109] *Id.* at 17 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 169).

[110] *See* Joint Parties Rehearing Request at 13-14 (asserting that there can be no

Commission failed to address the core of protestors' concerns—i.e., that market participants are entitled to notice that auction parameters may change *before* the transaction occurs and that PJM thus failed to provide market participants with adequate notice that the 2024/2025 BRA would be subject to revised market rules. Clean Energy Associations assert that the Commission found instead that the Section 205 Filing is just and reasonable on the merits because it will enable PJM, in specific circumstances, to incorporate updated information into the LDA Reliability Requirement, but that, even if true, this point does not address their concern that market participants are entitled to notice about parameters before a transaction occurs.[111]

40.     Constellation maintains that the notice exception to the filed rate doctrine does not apply here, where the Tariff gave participants no notice that PJM would update the LDA Reliability Requirement after the offer deadline or completion of the BRA.[112] Moreover, Constellation argues that the Commission in the February 2023 Order failed to respond to Constellation's assertion that section 5.11(e) of Attachment DD expressly permits PJM to adjust the LDA Reliability Requirement after the bidding window closes to reflect Price Responsive Demand "implies that changes to the LDA Reliability Requirement are unavailable in other situations such as the one at hand."[113] Nor, Constellation asserts,

---

"colorable claim" that market participants had notice sufficient to qualify for the notice exception to the filed rate doctrine and prohibition against retroactive ratemaking with respect to the 2024/2025 BRA).

[111] Clean Energy Associations Rehearing Request at 8-9 (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 151-53; Clean Energy Associations Protest at 7; Pine Gate Renewables, LLC Protest at 6 (Pine Gate Protest); Invenergy Wind Development North America LLC, Invenergy Solar Development North America LLC and Invenergy Thermal Development LLC Protest at 1-5 (Invenergy Protest); EPSA Protest at 13; Leeward Protest at 6; Lotus Infrastructure, LLC Protest at 10 (Lotus Protest); NRG Companies Protest at 2; Vistra Corp. Protest at 9, 14).

[112] Constellation Rehearing Request at 14-15 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e); *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 801 (D.C. Cir. 2007); *see also* Leeward Rehearing Request at 8, 10 n.43 (stating that the PJM Tariff did not provide notice that the requirement to post the auction parameters prior to the BRA was tentative or subject to later adjustment and the limited exceptions to the filed rate doctrine recognized by the courts do not apply (citing *Exxon Co. USA v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999); *Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 744 (D.C. Cir. 1992); February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 7)).

[113] *Id.* (citing Constellation Protest at 13 n.33; PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e)); *see also*

does section 5.11(e) provide more general notice of a potential modification to the results for purposes of the filed rate doctrine, as PJM is permitted to post modified results only if it discovers an error "in the initial posting of auction results for a particular [RPM] auction," which does not apply here as PJM's concern "is with the rules themselves."[114]

41.      The Commission's conclusion that changing the LDA Reliability Requirement is not genuinely retroactive does not, according to Petitioners, resolve the filed rate doctrine concerns raised in their requests for rehearing.[115]   Joint Parties, Leeward, and P3 assert that the Commission created a new exception to the filed rate doctrine and rule against retroactive ratemaking based on the fact that no capacity commitments had been secured or transactions consummated at the time PJM submitted the Section 205 Filing that is not supported by precedent or the PJM Tariff.[116]

---

Joint Parties Rehearing Request at 8 n.36 (stating that the Commission in the February 2023 Order "wisely chose" not to endorse PJM's argument that the Tariff permits it to adjust the LDA Reliability Requirement after the window closes, as this argument is "misleading in that the only adjustments made pursuant to [the] cited tariff provision are for purposes of posting auction results" (citing EPSA Protest at 13-14; Sotkiewicz Aff. ¶¶ 39-45; NRG Companies Protest at 13 & n.44)).

[114] *Id.* at 16 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e)).  Constellation notes that PJM also may modify the results under special circumstances related to market power mitigation that are not applicable here.  *Id.* (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.6.2 Process (0.0.0), § 6.2(c); *NSTAR Elec. & Gas Corp.*, 481 F.3d at 801).

[115] *See* Joint Parties Rehearing Request at 9.

[116] *Id.* at 14-18, 47-48 (citing *L.A. Cty. v. Humphries*, 562 U.S. 29, 38 (2010); *Fox*, 556 U.S. at 515; *Arkla*, 453 U.S. at 578; *Old Dominion*, 892 F.3d at 1230, 1232; *West Deptford*, 766 F.3d at 20; *Consolidated Edison*, 347 F.3d at 969; *Associated Gas Distribs.*, 898 F.2d at 810; February 2023 Order, 182 FERC ¶ 61,109 at PP 166-167 & n.449; *id.* (Danly, Comm'r, dissenting at P 13); P3 Protest, Kelliher Aff. ¶¶ 13-15); *id.* at 2, 9-14, 47 (arguing that the Commission erred by asserting that PJM's proposed change to the LDA Reliability Requirement is not "genuinely retroactive" and failing to respond to arguments regarding the applicability of the filed rate doctrine (citing *Fox*, 556 U.S. at 515; *Mont.-Dakota Utils. Co.*, 341 U.S. at 251-52; *ACPA*, 54 F.4th at 728; *OG&E*, 11 F.4th at 829-31; *NEPGA*, 881 F.3d at 211; *TransCanada*, 811 F.3d at 12; *West Deptford*, 766 F.3d at 20; *GameFly*, 704 F.3d at 148; *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 20 (D.C. Cir. 2010) (*AGA*))); Leeward Rehearing Request at 6, 10-12 (asserting that "[n]o such exception" exists in Commission or court precedent "for good reason," as the filed rate doctrine is intended to ensure predictability and approving PJM's proposal to

42.     Joint Parties, Clean Energy Associations, and P3 similarly contend that the
Commission's determination in the February 2023 Order constitutes a new and
unsupported interpretation of the filed rate doctrine.[117]  Joint Parties assert that the
unsupported claim of "disingenuous" retroactivity constitutes "an unacknowledged and
unexplained departure" from precedent on the filed rate doctrine that fails to consider
protestors' objections and contrary precedent.[118]  Joint Parties argue that the
Commission's reasoning in the February 2023 Order that PJM's Tariff does not preclude
it from "prospectively updating the manner in which [the LDA Reliability Requirement]
is incorporated into a later phase of the auction process" distorts the facts, as PJM made
an adjustment to the LDA Reliability Requirement itself after that value became final
under the Tariff.[119]

43.     P3 asserts that the Commission's determination in the February 2023 Order that
the filed rate doctrine does not apply until a capacity transaction is "'consummated,' *i.e.,*

---

retroactively change its posted parameters for the 2024/2025 BRA runs counter to the
Commission's determination that the BRA procedures are the filed rate as well as with
long-standing precedent that market participants should be able to rely on auction
parameters and rules (citing *Towns of Concord*, 955 F.2d at 71; Leeward Answer at 4-6;
*Devon Power* LLC, 137 FERC ¶ 61,073 (2011) (*Devon Power*), *petition denied New
England Power Generators Ass'n*, 707 F.3d at 371); P3 Rehearing Request at 11-12.
Joint Parties assert that the Commission "implicitly conceded" in the February 2023
Order that neither of the judicially recognized exceptions to the filed rate doctrine and
rule against retroactive ratemaking apply. *Id.* (citing *OG&E*, 11 F.4th at 830-31;
*Consolidated Edison*, 347 F.3d at 969; February 2023 Order, 182 FERC ¶ 61,109 (Danly,
Comm'r, dissenting at P 7 & n.18); P3 Protest, Kelliher Aff., ¶¶ 13-15).

       [117] Joint Parties Rehearing Request at 9-11; Clean Energy Associations Rehearing
Request at 6; P3 Rehearing Request at 8, 10-12, 18.

       [118] Joint Parties Rehearing Request at 9-10 (citing February 2023 Order, 182
FERC ¶ 61,109 at P 169; *id.* (Danly, Comm'r, dissenting at P 15); *ACPA*, 54 F.4th at 728;
*Fox*, 556 U.S. at 515; *NEPGA*, 881 F.3d at 211; *TransCanada*, 811 F.3d at 12; *GameFly*,
704 F.3d at 148; *West Deptford*, 766 F.3d at 20).

       [119] *Id.* at 10-11 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 171); *id.* at
11 (asserting that the fact that PJM changed the value and not the way the value is used is
clear from the proposed Tariff language stating that PJM may exclude certain resources'

---

capacity from the LDA Reliability Requirement, and from the fact that this new language
is included in the definition of the term LDA Reliability Requirement).

until a capacity commitment has been fully satisfied and financially settled in the [D]elivery [Y]ear,"[120] "blows through the well-established boundaries set by judicial precedent, and then goes miles beyond those boundaries" to embrace "a novel, unprecedented legal interpretation" that effectively eliminates the filed rate doctrine and rule against retroactive ratemaking in the context of wholesale electricity markets administered by RTOs/independent system operators (ISO) and favors RTOs/ISOs over market participants and customers.[121] P3 asserts that this interpretation of the filed rate doctrine has no basis in the FPA, as FPA section 205 binds PJM to the terms in its filed tariff, including non-rate terms.[122]

44.     "Even if there were a threshold requirement that the parties transact pursuant to the filed rate in order for it to apply (which is not the case)," Leeward posits, "the parties to the instant case have already transacted pursuant to the BRA procedures by submitting *binding* offers based on auction parameters—including the LDA Reliability Requirement—that were posted prior to the start of the auction."[123] Moreover, Leeward asserts that adoption of this requirement would "render meaningless the entire forward capacity auction structure," by preventing the clearing price from being final until capacity is delivered under the commitments in "another three years."[124] In addition to a "blatant filed rate doctrine violation," P3 alleges that the Commission's acceptance of PJM's Section 205 Filing constitutes "an equally blatant violation of the APA," because the Commission failed to address arguments and evidence indicating that PJM had fully conducted the BRA by securing capacity commitments.[125] P3 asserts that the Commission's decision is "particularly egregious" because it leads to "asymmetries"

---

[120] P3 contends that the Commission does not define the term "consummated," but states that the February 2023 Order describes the term to mean capacity has been delivered pursuant to auction commitments and charges have been billed or collected. P3 Rehearing Request at 8 n.32 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 167).

[121] *Id.* at 8; *id.* at 18 (asserting that the Commission's decision to accept PJM's proposal directly contravenes the FPA and "nearly a century of filed rate doctrine precedent," and does so based on a rationale that fails to satisfy the Commission's Administrative Procedure Act (APA) obligations (citing *Mich. v. EPA*, 576 U.S. 743, 750 (2015); *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1070-75 (D.C. Cir. 2003)).

[122] *Id.* at 10-12 (citing 16 U.S.C. §§ 824d(a), (c), (d); *OG&E*, 11 F.4th at 829-30).

[123] Leeward Rehearing Request at 11.

[124] *Id.* (citing February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 11)).

[125] P3 Rehearing Request at 15.

Docket Nos. ER23-729-001 and EL23-19-001                                              - 29 -

for capacity sellers, who, under the Commission's interpretation, have no right to rely on
the capacity market rules as PJM's filed rate until financial settlement is complete but in
the meantime must comply with those rules and invest in their resources in reliance on
those rules, as the Commission states in the February 2023 Order that sellers are not
permitted to resubmit seller offers in order to reflect the changes in the LDA Reliability
Requirement.[126]  Leeward contends that upon completion of the auction, the seller
offers are accepted and capacity commitments have been secured, so even under the
Commission's reasoning, the proposed revisions would violate the filed rate doctrine.[127]

45.     Petitioners further caution that the Commission's interpretation of the filed rate
doctrine will have far-reaching impacts, threatening the integrity of competitive markets
and even the filed rate doctrine itself.[128]  For example, Constellation alleges that the
Commission's decision to permit PJM to change the LDA Reliability Requirement "so
long as 'no capacity commitments ha[ve] yet been secured'" and "no transactions have

---

[126] *Id.* at 15-16 (citing *OG&E*, 11 F.4th at 829; *Old Dominion*, 892 at 1230;
February 2023 Order, 182 FERC ¶ 61,109 at PP 158, 167); *id.* (contrasting the
Commission's reasoning that the filed rate doctrine does not apply because "no rights and
obligations have been awarded" with the "significant investments" resource owners that
cleared in the 2024/2025 BRA will need to make in their resources, based on "rights and
obligations" conferred in the BRA, to satisfy capacity commitments); *id.* at 16 (asserting
that the Commission "fail[ed] to recognize this asymmetry, much less attempt to explain
how it is consistent with the FPA" (citing *Balt. Gas & Elec. Co. v. Nat. Res. Def.
Council, Inc.*, 462 U.S. 87, 105 (1983) (*Baltimore Gas*))); *id.* at 14-15 (stating that the
capacity sellers who were selected through the BRA process were bound by their offers,
once cleared by the optimization algorithm, which P3 labels "the quintessence of a
'capacity commitment'" (citing *New England Power Generators Ass'n v. ISO New
England, Inc.*, 172 FERC ¶ 61,005, at n.12 (2020))).

[127] Leeward Rehearing Request at 20 (citing February 2023 Order, 182 FERC
¶ 61,109 at P 167).

[128] *See* P3 Rehearing Request at 8-9 (citing Kelliher Aff. ¶¶ 24-30); Constellation
Rehearing Request at 11 (stating that the Commission's position runs the risk of
eliminating the filed rate doctrine for wholesale auction rules); Clean Energy
Associations Rehearing Request at 6-7 (asserting that the Commission's interpretation
would allow utilities to alter the non-rate terms and conditions in their tariffs that
underpin future transactions, such as the Tariff rules and procedures that must occur
prior to a capacity commitment, as long as capacity commitments have not yet occurred,
eroding confidence in the PJM capacity market and all of the Commission-jurisdictional
wholesale markets (citing February 2023 Order, 182 FERC ¶ 61,109 at P 167; Clean
Energy Associations Protest at 6-7)).

yet been consummated," lacks a limiting principle, and would allow PJM to make "any number" of market revisions or structural changes to the clearing process, "or even eliminate the auction altogether" to achieve its desired outcome.[129]   Constellation asserts that the Commission's claim that "[s]imply because one section of the Tariff requires PJM to take a particular action at one stage of the auction process, such as posting the LDA Reliability Requirement by a particular date, [that] does not preclude PJM from prospectively updating the manner in which that LDA Reliability Requirement is incorporated into a later phase of the auction" permits an RTO/ISO to change market rules "at any time up to the moment it issues a formal capacity award."[130]   P3 similarly maintains that this "novel interpretation" would apply in the context of all RTO/ISO markets, as under the Commission's interpretation in the February 2023 Order any RTO/ISO, and indeed any utility with a rate on file, could change its terms of service at any time, "even after that service has been rendered, *e.g.*, after a capacity auction has been administered," as long as it has not financially settled the transaction, which in the capacity market context is typically several years in the future.[131]   This legal framework, P3 asserts, would undermine both the purposes of the filed rate doctrine and investor confidence in the RTO/ISO markets and is inconsistent with the Commission's previous commitment to competitive markets.[132]

46.      Additionally, Petitioners take issue with the precedent the Commission cited in the February 2023 Order for the proposition that courts have held that rate changes are impermissibly retroactive only where regulated entities or customers already have transacted pursuant to the rate.[133]   Clean Energy Associations and Joint Parties both allege that *Old Dominion* cannot be read to support this proposition because, although the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) held that

---

[129] Constellation Rehearing Request at 14 (quoting February 2023 Order, 182 FERC ¶ 61,109 at P 167); *id.* (citing P3 Protest, attach. B, Affidavit of Roy J. Shanker, Ph.D. ¶ 58 (Shanker Aff.)).

[130] *Id.* at 10-11 (quoting February 2023 Order, 182 FERC ¶ 61,109 at P 171).

[131] P3 Rehearing Request at 16-17 & n.68.

[132] *Id.* at 17-18 (citing Kelliher Aff. ¶¶ 4, 23-25).

[133] *See* Joint Parties Rehearing Request at 15-17 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 166 & n.449); Clean Energy Associations Rehearing Request at 7 (asserting that the Commission misconstrued the precedent cited to support its position that rate changes are only impermissibly retroactive "where regulated entities or customers have already transacted pursuant to the rate—i.e., where purchases or sales have occurred" (citing February 2023 Order, 182 FERC ¶ 61,109 at P 166)); Leeward Rehearing Request at 6-9; P3 Rehearing Request at 12-13.

Document Access Case: 23-1778 Document: 88-1 Page: 174 Date Filed: 12/11/2023
Document Accession #: 20231227-3100 Filed Date: 01/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                                    - 31 -

the filed rate doctrine means that the Commission "cannot retroactively 'impose a rate increase for power already sold,'" it also stated that "[t]he filed rate doctrine and the rule against retroactive ratemaking leave the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations."[134] P3 also claims that the Commission reads the cases cited in support of its interpretation "for more than they are worth," by concluding that rate changes are impermissibly retroactive "*only*" where a transaction already has been consummated.[135] P3 contends that none of the precedent cited by the Commission proscribes the filed rate doctrine and rule against retroactive ratemaking to only these circumstances.[136]

47.     Joint Parties allege that the Commission further erred by attempting to shift the burden to protestors and the dissent to identify precedent in which a change to a rate or non-rate term had been determined to be retroactive before a transaction has been made pursuant to it, because the onus was not on the parties to find precedent expressly rejecting "an exception that the Commission only just invented."[137] Joint Parties further assert that the Commission failed to acknowledge or justify its departure from its own precedent. Joint Parties state that the Commission has, in fact, found proposed deviations from filed rates to be retroactive before a transaction has been made pursuant to them and, consistent with the fact that the filed rate doctrine does not just apply to charges, "in the absence of a 'transaction' at all."[138] As examples, Joint Parties point to the Commission's orders denying two requests for waiver of reporting deadlines in

---

[134] Clean Energy Associations Rehearing Request at 7 (citing *Old Dominion*, 892 F.3d at 1226-27, 1230); Joint Parties Rehearing Request at 16 (asserting that the court in *Old Dominion* rejected the proposed rate change "on the grounds that it would have done exactly what the [February 2023] Order has allowed PJM to do here" in retroactively changing the terms of the filed rate (citing *Arkla*, 453 U.S. at 578; *Old Dominion*, 892 F.3d at 1230, 1232; *Associated Gas Distribs.*, 898 F.2d at 810)).

[135] P3 Rehearing Request at 12-13 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 166 n.449).

[136] *Id.* at 13 (citing *Cogentrix*, 24 F.4th 677; *Old Dominion*, 892 F.3d 1223; *PG&E*, 373 F.3d 1315; *Associated Gas Distribs.*, 898 F.2d 809; *City of Girard*, 790 F.2d 919).

[137] Joint Parties Rehearing Request at 17 (citing *Maxwell*, 237 U.S. at 97; *AGA*, 593 F.3d at 19-21; February 2023 Order, 182 FERC ¶ 61,109 at P 166; *id.* (Danly, Comm'r, dissenting at P 2)).

[138] *Id.* at 17-18 (citing *Fox*, 556 U.S. at 515; *West Deptford*; 766 F.3d at 20; February 2023 Order, 182 FERC ¶ 61,109 at P 166).

pipeline tariffs and one request for waiver of a deadline in a transmission provider's generator interconnection procedures because they were "retroactive in nature and thus prohibited by the filed rate doctrine."[139] Joint Parties state that, in those cases, no relevant transaction had been agreed or consummated. P3 argues that the Commission ignores court precedent explaining that the filed rate doctrine and rule against retroactive ratemaking applies before a transaction has occurred pursuant to the filed rate.[140] Clean Energy Associations assert that the D.C. Circuit's holdings in *Cogentrix* that costs could be recovered under a newly approved rate schedule only after filed with and approved by the Commission and that an attempt "to collect additional rates 'for a service that has already been rendered'" would violate the rule against retroactive ratemaking likewise does not support the proposition that rate changes are impermissibly retroactive only where entities or customers have already transacted pursuant to the rate.[141]

48.     Constellation states that, although the Commission asserts that rate changes are prospective "at least up until that point at which the obligation is actually incurred" based on a "long line of U.S. Supreme Court and D.C. Circuit cases," the February 2023 Order does not cite any decisions authorizing an RTO to change market rules for an auction after it has already run.[142]

49.     Constellation asserts that the Commission's decisions applying the filed rate doctrine in the formula rate context are analogous to the market rules in this proceeding. Specifically, Constellation points to a case in which the Commission accepted revisions to utilities' formula rates effective January 1, 2017, but held that the utilities could not use the revised rate in calculated true-ups for the 2016 rate year, despite arguments that the true-up would not be calculated until 2017 or impact customer bills until 2018.[143] Constellation also draws on the formula rate analogy to dispute the Commission's

---

[139] *Id.* at 18, 47-48 (citing *TransCameron Pipeline, LLC*, 180 FERC ¶ 61,011, at P 5 (2022) (*TransCameron*); *Rover Pipeline LLC*, 180 FERC ¶ 61,033, at P 5 (2022) (*Rover*); *Salt Creek Solar, LLC v. Sw. Power Pool, Inc.*, 180 FERC ¶ 61,116, at P 38 (2022) (*Salt Creek*)).

[140] P3 Rehearing Request at 13 (citing *Lowden*, 306 U.S. at 520-21; *Old Dominion*, 892 F.3d at 1231-32).

[141] Clean Energy Associations Rehearing Request at 8 (citing *Cogentrix*, 24 F.4th at 679, 684; February 2023 Order, 182 FERC ¶ 61,109 at P 166).

[142] Constellation Rehearing Request at 17 (citing Planning Parameters Order, 171 FERC ¶ 61,208 at P 20).

[143] *Id.* at 12-13 (citing *Midcontinent Indep. Sys. Operator, Inc.*, 161 FERC ¶ 61,020, at P 7 (2017)).

Document Access... F: 20120627-... FERC PDF (Un... Case: 23-1778   Document: 88-1   Page: 176   Date Filed: 12/11/2023 F... Date... 07/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 33 -

alleged conclusion that the methodology for establishing the auction parameters is not part of the filed rate,[144] reasoning that PJM's methodology for calculating the LDA Reliability Requirement is equivalent to the formula (i.e., the filed rate) and the values resulting from the calculation are the formula rate outputs.[145]  Constellation thus argues that PJM may correct the resulting figures if it misapplies the filed method in calculating a planning parameter, but may only change the method itself on a prospective basis.[146]

50.     Finally, Petitioners continue to argue that PJM violated the provisions of its Tariff requiring it to post the LDA Reliability Requirements prior to the BRA and to post the auction results after the BRA.  Clean Energy Associations and Joint Parties argue that the Commission did not adequately address arguments that PJM violated portions of its Tariff requiring PJM to post the LDA Reliability Requirements before the auction process begins.[147]  In particular, Clean Energy Associations contend that the Commission's conclusion that the PJM Tariff did not preclude PJM from prospectively updating the manner in which the LDA Reliability Requirements are incorporated into a later phase of the auction process misses protestors' point that "it was not just PJM's action of postponing the deadline that violated the Tariff, but postponing the deadline *while PJM knew the results of the auction*."[148]  Joint Parties argue that the Commission

---

[144] *Id.* at 13 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 171).

[145] *Id.* (citing *Pub. Utils. Comm'n of Cal. v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001); *Commonwealth Edison Co.*, 182 FERC¶ 61,156, at P 2 (2023); February 2023 Order, 182 FERC ¶ 61,109 at P 165).

[146] *Id.* at 13-14 (citing *Black Oak*, 122 FERC ¶ 61,261 at P 32; *Allete*, 119 FERC ¶ 61,142 at P 36).

[147] Clean Energy Associations Rehearing Request at 12-13 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a)); Joint Parties Rehearing Request at 11-13 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a)(vi)(A), (B); EPSA Protest at 6-11; NRG Companies Protest at 5-8; February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 6)); Joint Parties Rehearing Request at 39-41, 50 (citing *Judulang*, 565 U.S. at 53; *Am. Rivers*, 895 F.3d at 51; *Tenn. Gas Pipeline*, 824 F.2d at 84).

[148] Clean Energy Associations Rehearing Request at 12 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 171; Clean Energy Associations Protest at 4-11); *see id*. at 12-14 (arguing that section 5.12(a), which the Commission cited as authorizing PJM to postpone the deadline, does not permit PJM to calculate a result to minimize the cost of satisfying the reliability requirement, but only provides for PJM to adopt an optimization algorithm to be applied to the clearing result).

did not even attempt to reconcile its view that the auction parameters are separate from the value PJM must apply in clearing the auction with the Tariff language, which makes clear that the LDA Reliability Requirements must be determined prior to the conduct of the BRA and that the resulting VRR Curves will be used for the BRA.[149]

51.    Joint Parties and Constellation also raise similar concerns with the Commission's response to arguments that PJM violated its Tariff by delaying the posting of 2024/2025 BRA results.[150]  In particular, Joint Parties claim that the Commission did not explain what the Tariff requirement to post the results "as soon thereafter as possible" is supposed to mean—"and it is hard to imagine the Commission being so forgiving if PJM had held up posting of final results in order to propose a change expected to increase clearing prices"—and that PJM's independence and FPA section 205 filing rights have no bearing on the question of what this language means or whether the delay was permissible under the Tariff.[151]  With no limiting principle imposed "either on the timing or what PJM may seek to do," Joint Parties argue that the revisions accepted in the February 2023 Order permit PJM to change any of its auction rules and thus render

---

[149] Joint Parties Rehearing Request at 12 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a)(vi)(A)).

[150] *Id.* at 39-41, 50; Constellation Rehearing Request at 18.  Leeward similarly argues that although the auction was complete upon the running of the optimization algorithm model, and PJM was thus required to post the results "as soon thereafter as possible," the Commission's determination in the February 2023 Order allows PJM to characterize the auction as ongoing because it has failed to comply with the filed Tariff. Leeward Rehearing Request at 19-20 ("The majority's acceptance of PJM's contention that the auction is not final because, among other things, PJM has not posted the auction results is reminiscent of the child who murders his parents and then demands mercy because he is an orphan." (citing February 2023 Order, 182 FERC ¶ 61,109 at 172)).

[151] Joint Parties Rehearing Request at 39-41, 50 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e); *Judulang*, 565 U.S. at 53; *Tenn. Gas Pipeline*, 824 F.2d at 84; *Am. Fed'n of Gov't Emps., AFL-CIO*, 24 F.4th at 677; *Am. Rivers*, 895 F.3d at 51; February 2023 Order, 182 FERC ¶ 61,109 at P 172; NRG Companies Protest at 11).

the Tariff language meaningless.[152]  Constellation asserts that the Commission erred in responding to its argument about PJM's posting requirements in the Tariff, asserting that protestors were not objecting to the time or date of the results, but rather making the point that the requirement to post as soon as possible "confirms that PJM has no discretion but to reveal the results after running the auction, and to correct errors found," and thus that proposing changes exceeds the scope of PJM's Tariff authority.[153]

### b.     Commission Determination

52.     Petitioners accurately describe the basic contours of the filed rate doctrine, but misapprehend its application to the rate on file in this proceeding.  Courts have explained that "[t]he basic principle" of the filed rate doctrine "is simple: [s]ince all rates subject to the Commission's jurisdiction must be filed and filed rates cannot be changed except as provided, utilities must sell their energy at the filed rate."[154]  The corollary rule against retroactive ratemaking "prohibits the Commission from adjusting current rates to make up for a utility's over-or-under-collection in prior periods."[155]  The D.C. Circuit has explained that, in effect, this rule "tends to make this highly regulated market approximate ordinary ones, where, for example, General Motors may not, after a sale, demand another $500 to cover its costs, and a buyer may not demand a refund because he just discovered that a competitor had been offering similar cars for less."[156]  The filed rate doctrine is, however, a "two-way street"; just as a utility or RTO/ISO may not charge a rate for service other than the rate on file, the Commission

---

[152] *Id.* at 40 (citing *Baltimore Gas*, 462 U.S at 105; February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 12)).

[153] Constellation Rehearing Request at 18 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 172).

[154] *Borough of Ellwood City v. FERC*, 583 F.2d 642, 649 (3d Cir. 1978) (affirming the Commission's discretion to excuse past failure to file rate schedule due to widespread misapprehension of the Commission's jurisdiction); *see also OG&E*, 11 F.4th at 829 (the filed rate doctrine "binds regulated entities to charge only the rates filed with FERC"); February 2023 Order, 182 FERC ¶ 61,109 at PP 163, 165 (describing the purpose and goals of the filed rate doctrine and rule against retroactive ratemaking).

[155] *Towns of Concord*, 955 F.2d at 71 n.2.

[156] *CPUC*, 894 F.2d at 1383.

may not retroactively substitute "an unreasonably high or low rate with a just and reasonable rate."[157]

53.    Petitioners suggest that the Commission did just that by permitting equitable considerations—namely, the potential for consumers in the Delmarva LDA to pay disproportionately high capacity prices that do not reflect actual reliability needs—to interfere with its application of the filed rate doctrine.[158]  Courts have been clear that the filed rate doctrine, "[w]hen it applies," creates "a nearly impenetrable shield for consumers" that the Commission may not circumvent even "for good cause or for any other equitable considerations."[159]  Here, the Commission determined that the filed rate doctrine did not apply to PJM's prospective Tariff revisions.[160]  The Commission thus did not waive the operation of the filed rate, for good cause or otherwise.

54.    We continue to find that, in these circumstances, the change accepted in the February 2023 Order to the rate on file—i.e., the BRA procedures—is not retroactive for the purposes of the filed rate doctrine.  Petitioners' assertions that it is "inherently contradictory" to identify the BRA procedures as the rate on file and find that changing those procedures is not retroactive prior to the award of capacity commitments[161] reflect a misunderstanding of the nature of the BRA procedures and the Tariff revisions accepted in the February 2023 Order.  The purpose of the BRA is "'to secure commitments of

---

[157] *Id.* (quoting *City of Piqua*, 610 F.2d at 954).

[158] *See* P3 Rehearing Request at 9-10 (citing *Old Dominion*, 892 F.3d at 1230); Joint Parties Rehearing Request at 16, 46-47; Constellation Rehearing Request at 6-7; Leeward Rehearing Request at 6-9; Clean Energy Associations Rehearing Request at 5-6.

[159] *OG&E*, 11 F.4th at 826, 829 (citing *Old Dominion*, 892 F.3d at 1230); *see also Arkla*, 453 U.S. at 578 (explaining that not even "the Commission itself" has authority to contravene the prospective application of rates); *CPUC*, 894 F.2d at 1383 ("the Commission does not have the authority to ignore the law to achieve an equitable result") quoting *City of Piqua*, 610 F.2d at 954)); *see also* Clean Energy Associations Rehearing Request at 5; Constellation Rehearing Request at 6; Leeward Rehearing Request at 4, 6-7.

[160] February 2023 Order, 182 FERC ¶ 61,109 at P 167.

[161] Joint Parties Rehearing Request at 13; *see also* Constellation Rehearing Request at 11 ("To begin, it is unclear how the Commission can reconcile its statement that the 'BRA procedures' are the filed rate with its permission for PJM to amend the rules for calculating the LDA Reliability Requirement after the figure is used in the Auction." (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 165, 171)).

Capacity Resources' and the price that suppliers will receive in exchange."[162] Accordingly, the Commission reasonably determined that a revision to the market rules governing the conduct of the BRA "is not retroactive for purposes of the filed rate doctrine if the capacity supply obligations and the corresponding rights and obligations—including the right to a particular capacity price—have not yet actually been awarded."[163]

55.     The fact that section 5.10(a) of Attachment DD requires PJM to establish the parameters, including the LDA Reliability Requirement, for the VRR Curve that will be used in the BRA prior to the BRA, does not contradict this conclusion.[164]  As the Commission explained in the February 2023 Order, the requirement "to take a particular action at one stage of the auction process, such as posting the LDA Reliability Requirement by a particular date, does not preclude PJM from prospectively updating the manner in which the LDA Reliability Requirement is incorporated into a later phase of the auction process"—specifically, section 5.12 of Attachment DD, which addresses PJM's evaluation of the seller offers and clearing of the capacity auctions.[165]  PJM met

---

[162] February 2023 Order, 182 FERC ¶ 61,109 at P 167 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.4 Reliability Pricing Model Auctions (7.0.0), § 5.4(a)); PJM Capacity Market Manual, § 1.3 Definition and Purpose of the Reliability Pricing Model ("The [BRA] allows for the procurement of resource commitments to satisfy the region's unforced capacity obligation and allocates the cost of those commitments among the [load-serving entities] through a Locational Reliability Charge."); *see also* PJM, RPM Base Residual Auction FAQs, at 1 (Oct. 10, 2016) (same).

[163] February 2023 Order, 182 FERC ¶ 61,109 at P 167.  Consistent with this reasoning, we find that Constellation's argument that permitting PJM to re-clear the 2024/2025 BRA violates the filed rate doctrine is not pertinent because PJM did not rerun the BRA.  *See* Constellation Rehearing Request at 15-18.  Rather, PJM implemented Tariff revisions on a prospective basis in an auction that was still ongoing.  February 2023 Order, 182 FERC ¶ 61,109 at P 169; *see infra* P 58.

[164] *See* Joint Parties Rehearing Request at 12-13 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a)(vi)(A)); Constellation Rehearing Request at 4, 8; Leeward Rehearing Request at 8-9.

[165] February 2023 Order, 182 FERC ¶ 61,109 at P 171; *see also Va. Elec. Power Co.*, 173 FERC ¶ 61,129, at PP 28-29 (2020) (granting limited waiver to allow PJM to omit pandemic-related outage data in calculating certain capacity resources' final equivalent demand forced-outage rate values for an incremental auction); *LS Power Dev., LLC*, 173 FERC ¶ 61,241, at PP 13-14 (2020) (similar); *Old Dominion Elec. Coop.*, 173 FERC ¶ 61,271, at PP 14-15 (2020) (similar).

Document Accession #: 20231027-3109    Filed Date: 10/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 38 -

the deadline for posting the LDA Reliability Requirement for the 2024/2025 BRA[166] and the revisions to the BRA procedures accepted in the February 2023 Order do not retroactively alter this discrete requirement.[167]

56.    Similarly, we are not persuaded by Joint Parties' contention that the use of the word "determine" in section 5.10(a)(vi)(B) connotes that the LDA Reliability Requirements are incapable of adjustment when read in the broader context of Attachment DD.[168]  As an initial matter, this restrictive interpretation could be inconsistent with the objective in section 5.10 of the Tariff requiring PJM to develop VRR Curves "to establish the level of Capacity Resources that will provide an acceptable level of reliability consistent with the Reliability Principles and Standards," which could require adjusting certain parameters, such as the LDA Requirement of a specific LDA, to ensure that PJM fulfills its responsibilities.[169]  In any case, Joint Parties' reading also is belied by the fact that, even prior to the revisions accepted in the February 2023 Order, Attachment DD provides for the LDA Reliability Requirement to be adjusted after the

---

[166] For the 2024/2025 BRA, this deadline was August 29, 2022.  *See* February 2023 Order, 182 FERC ¶ 61,109 at P 4; *see also* PJM February 2, 2023 Answer at 13 ("Indeed, it would be unnecessary to repost an updated [LDA] Reliability Requirement for [Delmarva] given that this updated reliability requirement would only be used for clearing the auction and is informed by offers that have already been submitted during the bidding window.  Therefore, PJM is not proposing to change (retroactively or not) the posting requirement in Tariff, Attachment DD, section 5.11(a).").

[167] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 171 (explaining that treating each auction input as a separate non-rate term for the purposes of the filed rate doctrine would contravene precedent recognizing that the market rules governing the capacity auction collectively constitute the filed rate).  Notably, the Tariff revisions accepted in the February 2023 Order do not revise section 5.10, and the revisions to the LDA Reliability Requirement definition and section 5.12 do not override any existing requirements or deadlines, but rather provide PJM the ability to adjust the LDA Reliability Requirement in targeted circumstances.

[168] Joint Parties Rehearing Request at 12-13 (asserting that the word "determine" is "commonly understood to mean 'to fix conclusively or authoritatively," as distinct from a guess that the Commission can change later (citing *Merriam-Webster Dictionary*, definition of "determine," https://www.merriam-webster.com/dictionary/determine)).

[169] PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10(a).

Document Access Case: 23-1778 Document: 88-1 Page: 182 Date Filed: 12/11/2023
Document Accession #: 20231227-3100 Filed Date: 09/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                  - 39 -

initial posting deadline to account for Price Responsive Demand[170] and permits adjustment under certain circumstances when PJM discovers errors.[171]  In other words, the notion that the LDA Reliability Requirements are not permitted to be modified is contradicted by the fact that the Tariff expressly contemplates reasons why they might be changed.

57.    Joint Parties' comparison to "changing election eligibility rules, after voting has concluded, to exclude the votes of all left-handed individuals" and claiming that this change is not retroactive because "election rules exist for the purpose of determining who won the vote and the winner has not yet been declared" is not apt.[172]  Aside from the fact that election results are not directly comparable to the results of a competitive auction reflecting both supply and demand variables, permitting PJM to update an auction parameter to ensure accuracy[173] does not deprive the market participants of any right that they had at the time they submitted their offers.  As discussed below,[174] updating the LDA Reliability Requirement in the VRR Curves should not affect a market participant's supply offer; it simply makes the auction results more accurate for the relevant LDA.

58.    Petitioners' arguments that the auction had already concluded at the time PJM submitted the Section 205 Filing, rendering the Tariff revisions retroactive, focus on the optimization algorithm that PJM employs to evaluate seller offers and other inputs

---

[170] *Id.*, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), §§ 5.11(a)(v), (e); *see also* Planning Parameters Order, 171 FERC ¶ 61,208 at PP 14-15 (granting waiver of Attachment DD § 5.10(e) to permit PJM to use a revised updated peak load forecast to clear the incremental auction).

[171] PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e) ("If PJM discovers a potential error in the initial posting of auction results for a particular Reliability Pricing Model Auction, it shall notify Market Participants as soon as possible after it is found, but in no event later than 5:00 p.m. of the fifth Business Day following the initial publication of the results of the auction.").

[172] Joint Parties Rehearing Request at 13 (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 165, 167).

[173] *See supra* PP 8-10 (explaining that PJM submitted the Section 205 Filing due to the potential for clearing prices that do not reflect actual reliability needs in the LDA when Planned Generation Capacity Resources expected to participate in the BRA do not offer); February 2023 Order, 182 FERC ¶ 61,109 at P 150.

[174] *See infra* section II.B.2.b.

to determine the seller offers that clear such auction.[175] But that interpretation requires Petitioners to find restrictions on PJM's agency in conducting the capacity auction that are neither found in the Tariff nor consistent with PJM's role as an RTO administering the auctions.[176] We do not agree that PJM "conducts" the BRA solely by running the optimization algorithm, which automatically generates the results for PJM to post without further consideration or evaluation.[177] The Tariff does not define the word "conduct" in terms of PJM running the capacity auctions,[178] but does provide that PJM's Office of the Interconnection[179] "shall conduct and administer the [BRA] and Incremental Auctions in

---

[175] *See* Leeward Rehearing Request at 9, 14-18; P3 Rehearing Request at 14; Constellation Rehearing Request at 16-17; Clean Energy Associations Rehearing Request at 12-13.

[176] 18 C.F.R. § 35.34 (setting requirements for RTOs "for the purpose of promoting efficiency and reliability in the operation and planning of the electric transmission grid"); *Big Sandy Peaker Plant, LLC v. PJM Interconnection, L.L.C.*, 154 FERC ¶ 61,216, at P 50 (2016) (the Commission gives "reliability-related discretion to [ISOs], and [will] not second-guess their decisions in that regard"); *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, at P 8 (2006) *order on reh'g*, 119 FERC ¶ 61,318 (2007), *petition denied*, *Pub. Serv. Elec. & Gas. v. FERC*, 324 Fed.Appx. 1 (D.C. Cir. 2009) (explaining, in the order accepting a settlement establishing the RPM, that PJM "operates the largest competitive wholesale electricity market in the country …that provides for efficient sharing of resources," "is responsible for ensuring the reliability of the system it operates," and "oversees capacity obligations of its Load Serving Entities to ensure that it has sufficient generating capacity to satisfy its reliability responsibilities"); *PJM Interconnection, L.L.C.*, 109 FERC ¶ 61,094 at P 30 ("PJM is responsible for the reliability of the entire PJM footprint"); *PJM Interconnection, L.L.C.*, 96 FERC ¶ 61,061, at 61,229 (2001) (stating that an RTO "must have exclusive authority for maintaining the short-term reliability of the grid that it operates"), *order on reh'g*, 101 FERC ¶ 61,345, at PP 15-16 (2002) (determining that PJM met the independence criterion for RTO status).

[177] *See* Leeward Rehearing Request at 9.

[178] *See* PJM February 2, 2023 Answer at 7 ("While the term 'conducting' is not explicitly defined in the Tariff, it refers to the process of clearing and finalizing the auction results.").

[179] References to PJM conducting the capacity auctions refer to the PJM Office of the Interconnection, unless otherwise noted. *See, e.g.*, PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.4 Reliability Pricing Model Auctions (7.0.0), § 5.4.

accordance with this Attachment, the Operating Agreement, and the Reliability
Assurance Agreement," which includes "[r]eceiving Buy Bids and Sell Offers,
determining Locational Deliverability Requirements and Variable Resource Requirement
Curves, and determining the clearing price that reflects all such inputs."[180]   The fact that
PJM "employ[s]" the optimization algorithm in connection with its duty to evaluate the
seller and other inputs and determine the offers that clear[181] does not substitute for PJM's
distinct responsibility to ensure that the BRA fulfills its purpose of securing capacity
commitments to meet PJM's reliability requirements and that clearing prices meet the
standards in the Tariff.[182]   Indeed, the Tariff requires PJM to apply the optimization
algorithm to calculate a clearing result that minimizes the cost of satisfying the reliability
requirements across the PJM Region.[183]   Contrary to the implication that PJM simply
clicks a button to generate the final, immutable auction results, the Tariff expressly
contemplates various actions by PJM prior to finalizing and posting the results, such as

---

[180] *Id.*, OATT ATTACHMENT DD.3 Responsibilities Of The Office Of The
(10.0.0), § 3.2; *see also id.*, OATT ATTACHMENT DD.5.4 Reliability Pricing Model
Auctions (7.0.0), § 5.4 ("PJM shall conduct for each Delivery Year a [BRA] to secure
commitments of Capacity Resources as needed to satisfy the portion of the RTO
Unforced Capacity Obligation not satisfied through Self-Supply of Capacity Resources
for such Delivery Year.").

[181] *Id.*, OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (20.0.0),
§ 5.12.

[182] *Id.*, OATT ATTACHMENT DD.5.14 Clearing Prices and Charges (35.0.0),
§ 5.14 (setting forth the standards by which PJM "shall calculate a clearing price" for
each BRA and incremental auction).

[183] *Id.*, OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (22.0.0),
§ 5.12(a).  Contrary to the dissent (at P 36), interpreting PJM's role in conducting the
auction in the context of its express responsibility to apply the optimization algorithm to
minimize reliability costs does not usurp—but rather harmonizes—the terms of PJM's
filed rate.  *See PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,053, at P 14 (2021)
(explaining that the Commission "must review the entire agreement and particular words
should be considered, not as if isolated from the context, but in light of the obligations as
a whole and the intention of the parties as manifested therein" (quoting *Xcel Energy
Servs. Inc. v. Am. Transmission Co., LLC*, 140 FERC ¶ 61,058, at P 60 (2012)).

Docket Nos. ER23-729-001 and EL23-19-001                                    - 42 -

applying mitigation[184] and adjusting for Price Responsive Demand.[185]  By contrast, nothing in the Tariff suggests that the auction is complete until PJM has completed its evaluation and posted the auction results, for which there is no set deadline.[186]  The Market Monitor confirmed that this reading is consistent with PJM's practice, explaining that "[r]egardless of how many times PJM runs the software, the auction is not complete and the market is not cleared until PJM approves and posts the final numbers."[187]

---

[184] *See id.*, OATT ATT DD.6.2, OATT ATTACHMENT DD.6.2 Process (0.0.0), § 6.2(b) (providing for PJM to apply mitigation "following [its] conduct of a [BRA] or Incremental Auction pursuant to Tariff, Attachment DD, section 5.12, but prior to the Office of the Interconnection's final determination of clearing prices and charges pursuant to Tariff, Attachment DD, section 5.14").

[185] *Id.*, OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11(e) (permitting adjustments for Price Responsive Demand and errors in the initial posting of auction results); *see also* PJM Capacity Market Manual, § 2.4.5 Adjustments to RPM Auction Parameters for EE Resources (providing that if a "first-pass auction solution" clears fewer energy efficiency resource megawatts than the amount by which the PJM-wide reliability requirement and each affected LDA Reliability Requirement was increased, the reliability requirements will be reduced and the auction will be solved again); PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.15. Coordination With Economic Planning (4.0.0), § 15 (providing for PJM's Office of the Interconnection to review each LDA that has a Locational Price Adder following each BRA).  *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (identifying, as a "cardinal principle of contract construction," that "a document should be read to give effect to all its provisions and to render them consistent with each other"); *Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., Inc.*, 86 FERC ¶ 61,174, at 61,598 (1999) ("It is well established in contract law that a contract should be construed so as to give effect to all of its provisions and to avoid rendering any provision meaningless.").

[186] *See* PJM February 2, 2023 Answer at 8 (stating that "PJM has not completed the auction clearing process or finalized any auction" for the 2024/2025 BRA, but only "made preliminary price calculations based on the offers submitted during the auction window," which have not been completed or finalized, and are not required by any Tariff deadline to be completed or finalized by a certain date); *infra* P 75 (discussing PJM's obligation to post the results "as soon . . . as possible" following the auction).

[187] Market Monitor February 17, 2023 Answer at 5; *see id.* at 2 (explaining that "PJM runs auction software to ensure compliance with the tariff and market logic, and there can be multiple runs of the software and issues may be identified and fixed in that process").  As the Market Monitor explains, it is the posting of the final results that determines when the auction ends.  *Contra* Dissent at P 21.

Document Access Case: 23-1778 Document: 88-1 Page: 186 Date Filed: 12/11/2023
Document Access: FERC: 20231127-3120 Filed Date: 11/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 43 -

Although the optimization algorithm itself may not require "any human review or deliberation,"[188] we continue to find that this does not obviate the role of PJM in conducting and clearing the BRA.[189] Based on that conclusion, the Commission reasonably construed the Tariff to find that applying the algorithm is one step in the auction process, which does not determine when the auction was completed for the purposes of the filed rate doctrine.

59.     We further disagree with Constellation's assertion that the inclusion in Attachment DD, section 5.11(e) of PJM's ability to adjust the LDA Reliability Requirement to reflect Price Responsive Demand should be interpreted to bar any other changes.[190] Constellation's argument rests on an overbroad interpretation of the principle *expressio unius est exclusio alterius*, i.e., that express inclusion of one thing implies the exclusion of others.[191] As an initial matter, the inclusion in PJM's Tariff of a provision permitting adjustments to the LDA Reliability Requirement to reflect Price Responsive Demand is not relevant to the question of when a change to the rate on file (i.e., the BRA

---

[188] Leeward Rehearing Request at 9. We further note that Leeward's assertions that "[t]he optimization algorithm has already determined the Sell Offers that cleared the auction," and that the reference to "results" in Commissioner Christie's concurrence belies "the fiction that the auction is still ongoing," *id.* at 9, 17, conflict with its argument in its protest that, PJM was "declining to complete the 2024/2025 BRA," and "[a]s a result, no Capacity Market Seller will be awarded a capacity commitment for the 2024/2025 BRA until the auction is completed." *Id.* at 11.

[189] *See Consol. Edison Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 341 (D.C. Cir. 2007) (recognizing that despite a tariff violation, the Commission may choose not to apply the tariff to provide refunds if doing so is consistent with market conditions and the need to balance fair prices with system reliability); Market Monitor February 17, 2023 Answer at 3 (explaining that "[r]unning the auction software does not create a filed rate").

[190] *See* Constellation Rehearing Request at 15 (citing Constellation Protest at 13 n.33).

[191] *See id.*; *NLRB. v. Sw. Gen., Inc.*, 580 U.S. 288, 302 (2017). This canon does not apply to every listing or grouping, but rather "has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *U. S. v. Vonn*, 535 U.S. 55, 65 (2002)); *see also NLRB*, 580 U.S. at 302 ("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health.").

Document Access Case: 23-1778 Document: 88-1 Page: 187 Date Filed: 12/11/2023
Document Accession #: 20230927-3109 Filed Date: 09/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                - 44 -

procedures) becomes retroactive for the purposes of the filed rate doctrine.[192]  Moreover, whether incorporated in one provision or several, the fact that PJM's Tariff references certain circumstances in which the LDA Reliability Requirements may be adjusted does not preclude PJM from submitting an FPA section 205 filing to amend its Tariff to permit other adjustments to the LDA Reliability Requirements.

60.    The Commission need not find that accepting the revisions falls under an exception to the filed rate doctrine[193] because, as explained above, the rate change is prospective.  In the February 2023 Order, the Commission granted PJM's request for waiver of the Commission's 60-day prior notice requirement to allow an effective date of December 24, 2022.[194]  The Section 205 Filing thus complies with the Commission's prior notice requirements.

61.    For the same reason, we do not agree that the Commission crafted a new and unsupported exception to the filed rate doctrine.[195]  No exception is necessary because the Commission determined in the February 2023 Order that the proposed Tariff revisions changed future rates.  Contrary to Leeward's assertion,[196] this does not conflict with the objective of the filed rate doctrine to ensure predictability.[197]  In the context of the filed

---

[192] *See supra* P 54 (a revision to the BRA procedures is prospective if the capacity supply obligations and the corresponding rights and obligations—including the right to a particular capacity price—have not yet actually been awarded).

[193] *See* Constellation Rehearing Request at 14-15; Joint Parties Rehearing Request at 13-14.

[194] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 162; 18 C.F.R. § 35.11.

[195] *See* Joint Parties Rehearing Request at 2, 9-18, 47; Leeward Rehearing Request at 6, 10-12; P3 Rehearing Request at 11-12.

[196] Leeward Rehearing Request at 10 (citing *Towns of Concord*, 955 F.2d at 71; *Transwestern Pipeline Co.*, 897 F.2d at 577; *Associated Gas Distribs.*, 893 F.2d at 354); *see also* Constellation Rehearing Request at 7 (emphasizing the importance of predictability in making economic decisions (citing *Consolidated Edison*, 347 F.3d at 969; *Elec. Dist. No. 1 v. FERC*, 774 F.2d 490, 493 (D.C. Cir. 1985); *Midcontinent Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,032, at P 40 (2021); *Price Formation in Energy & Ancillary Mkts. Operated by Reg'l Transmission Organs. & Indep. Sys. Operators*, 153 FERC ¶ 61,221, at P 65 (2015)).

[197] *West Deptford*, 766 F.3d at 12 (explaining that the "requirement of transparent, public filing of rates ensures evenhandedness, fairness, stability, and predictability in the prices charged for electrical energy"); *Associated Gas Distribs.*, 893 F.2d at 355-56 (finding that a "purchase deficiency" allocation mechanism violated the filed rate

rate doctrine, courts have described predictability as arising from the prohibition against adjusting current rates to make up for over- or under-collections in prior periods.[198] The filed rate doctrine ensures market participants have notice of what they are going to pay, or be paid, before they take or provide service. In this case, sellers will know the accurately calculated VRR Curve and resulting rates before they receive capacity commitments or provide service. Predictability, particularly in the capacity auction context, does not mean that sellers are entitled to a particular auction outcome when they submit their offers. The outcome in the February 2023 Order comports not only with the goal of predictability, but also with the statutory objective of consumer protection by protecting customers in an LDA from paying rates that do not reflect actual reliability needs.[199] Moreover, the precedent Leeward cites to assert that market participants must be able to rely on posted auction parameters pertains to the ability to challenge auction *results after the fact*, not change the rates before they are determined, subject to the public interest application of the just and reasonable standard.[200]

62.     Nor did this determination involve a novel or overly narrow interpretation of the filed rate doctrine and rule against retroactive ratemaking.[201] As further discussed below,

doctrine because "[a]s in Columbia Gas, 'the effect of [these orders] is quite clear: downstream purchasers [such as petitioners here] are expected to pay a surcharge, over and above the rates on file at the time of sale, for gas they had already purchased'" (citing *Columbia Gas Transmission Corp.*, 831 F.2d at 1140)).

[198] *Consolidated Edison*, 347 F.3d at 969 (citing *Columbia Gas*, 895 F.2d 791, 793 (D.C. Cir. 1990)); *see also Pub. Utils. Comm'n of Cal.*, 988 F.2d at 164 (explaining that the filed rate doctrine and rule against retroactive ratemaking "are designed to allow 'purchasers of gas to know the consequences of purchasing decisions they make,' and thus are not violated when purchasers have sufficient notice that a rate is subject to change).

[199] *See Xcel Energy Servs., Inc. v. FERC*, 815 F.3d 947, 953 (D.C. Cir. 2016) (stating that the "primary aim of the FPA is the protection of consumers from excessive rates and charges"). It is long-established that the "primary aim [of the FPA] is the protection of consumers from excessive rates and charges." *Mun. Light Bds. of Reading & Wakefield v. FPC*, 450 F.2d 1341, 1348 (D.C. Cir. 1971).

[200] *See* Leeward Rehearing Request at 10-11 & n.45 (citing Leeward Answer at 4-6; *Devon Power* LLC, 137 FERC ¶ 61,073). As explained in section II.B.3.b below, we do not find that the *Mobile-Sierra* public interest standard is implicated by the proposed Tariff revisions accepted in the February 2023 Order.

[201] *See* Clean Energy Associations Rehearing Request at 6; Joint Parties Rehearing Request at 9-11; P3 Rehearing Request at 8, 10-12, 18.

we continue to find that this determination is consistent with precedent and the Commission's statutory obligations under the FPA. As an initial matter, P3 is mistaken in asserting that the Commission's acceptance of the Tariff revisions to apply to the 2024/2025 BRA "has no basis in the text of the FPA."[202] "[T]he filed rate doctrine rests on two provisions: section 205(c), which requires utilities to file rate schedules with the Commission, and section 206(a), which allows the Commission to fix rates and charges, but only prospectively."[203] P3 suggests that FPA section 205 does not support the Commission's interpretation of the filed rate doctrine in this proceeding because, "[a]ccording to its plain language," it applies broadly to "[a]ll rates and charges made, *demanded*, or received," binding the utility as to the rate and non-rate terms in its filed tariff regardless of whether there is a transaction.[204] Offers into PJM's capacity market, however, are not "rates made, demanded, or received" under FPA section 205(a).[205] An offer into a capacity market is, in actuality, a "demand" to sell at the clearing price—i.e., the capacity rate charged by PJM—and not at the price in the seller's offer, and thus is not a rate "demanded" by the seller.[206] As described above, courts look to the nature of the transaction or obligation at issue in determining the rates that must be on file and the nature of prospective changes. By contrast, P3's interpretation would prohibit any change to a rate once "demanded" without regard to the timing of a transaction or obligation, is inconsistent with the fact-specific analysis courts have used for decades to

---

[202] P3 Rehearing Request at 10.

[203] *Towns of Concord*, 955 F.2d at 71-72.

[204] P3 Rehearing Request at 10-11 ( stating that section 205 "requires a utility's filed rate to include 'all rates and charges . . . and the classification, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services'" and "prohibits a utility from changing 'any such rate, charge, classification, or service,' and 'any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public'" (citing 16 U.S.C. §§ 824d(a), (c), (d); *OG&E*, 11 F.4th at 829-30)).

[205] *IMM v. PJM* Reh'g, 178 FERC ¶ 61,121 at P 102 n.231 (citing 16 U.S.C. § 824d(a)).

[206] *Id*. P 102 n.231. To the extent that P3 intends to identify the auction clearing price as the rate demanded, the clearing price had not been set at the time PJM submitted the Section 205 Filing.

Document Access Case: 23-1778 Document: 88-1 Page: 190 Date Filed: 12/11/2023
Document Accession #: 20230327-5130 Filed Date: 03/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                                    - 47 -

determine retroactivity[207] and would undermine the right of public utilities to propose rate changes under FPA section 205.[208]

63.     The Commission's interpretation is further consistent with longstanding precedent permitting pipelines and utilities to revise rates prospectively before the rate has been charged and the obligation incurred.  Indeed, parties sign long term, non-fixed rate contracts with *Memphis* clauses[209] for service clearly subject to the risk that the pipeline or utility will make a filing to increase that rate, or change the terms and conditions of service, during the term of the contract.[210]  The statutory protection for the customer is that the utility must provide notice of the proposed rate change by filing with the Commission, as provided in FPA section 205(d),[211] and the Commission must find that the proposed rate change is just and reasonable before the utility can begin collecting the changed rate.  The Commission also has found that merely because utilities conduct forward auctions, the utility is not prevented from making prospective tariff changes to revise various aspects of the required performance as long as the Commission finds those provisions just and reasonable.[212]  In a case in which the Commission sought to deny a

---

[207] *See infra* note 227; *see also e.g.*, *Simon v. KeySpan Corp.,* 694 F.3d 196, 208 (2d Cir. 2012) ("[w]e conclude that the filed rate doctrine applies on these facts").

[208] *See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9-10 (D.C. Cir. 2002) (the Commission cannot require transmission owners to relinquish their FPA section 205 rights to file changes to their rate design and terms and conditions of service).

[209] *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.*, 358 U.S. 103 (1958) (seller could unilaterally raise contract rates by filing the new rates with the Commission, when the contract permitted the seller to do so).

[210] *See Midwest ISO Transmission Owners v. FERC*, 373 F. 3d 1361 (D.C. Cir. 2004) (affirming the Commission's allocation of costs to parties holding grandfathered contracts).

[211] 16 U.S.C. § 824d(d) (requiring, but allowing the Commission to waive, 60 days' notice for rate changes).

[212] *PJM Interconnection, L.L.C.*, 147 FERC ¶ 61,103, at 61,413-14 (2014) ("Here, however, PJM is not changing rates, or terms and conditions of service, relating to past performance; it is only changing the requirements applicable to future performance. Under these circumstances, PJM's proposed tariff provisions will have a prospective application only and thus not violate the filed rate doctrine.  Any entity that enters into a long-term obligation, does so with notice that a public utility, such as PJM, may seek to implement a prospective tariff change, pursuant to FPA section 205.");

customer the benefit of a change in rates before it took service, the court rebuffed that attempt.[213]  While the Commission should and must take into account whether such revisions affect parties' expectations to determine whether the change is just and reasonable, the possibility of some change does not necessarily invoke the filed rate doctrine.

64.     Rather than "read[ing] the filed rate doctrine and rule against retroactive ratemaking out of existence,"[214] the determination in the February 2023 Order gives effect, in the context of auction procedures "[w]here . . . the rate on file is a set of procedures for producing an obligation to supply power and the rate received in exchange for that obligation," to precedent establishing that the Commission has the opportunity to review public utility rates before they are charged to customers and, once charged, neither the Commission or the public utility may change those rates.[215]  This does not constitute a departure from the Commission's filed rate precedent,[216] but is instead consistent with the Commission's holdings.[217]

65.     We also remain unconvinced that the fact that sellers submit binding offers while the auction is still ongoing renders changing the demand curve – the VRR Curve – prior to the award of capacity commitments impermissibly retroactive or otherwise in violation

---

*ISO New England Inc.*, 145 FERC ¶ 61,095 at P 28 (accepting a revision to a capacity market that changed the conditions of service for resources committed in a prior auction).

[213] *West Deptford*, 766 F.3d at 19.

[214] P3 Rehearing Request at 8.

[215] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 168 (citing *Arkla*, 453 U.S. 571).

[216] Joint Parties Rehearing Request at 9-10 (citing *Fox*, 556 U.S. at 515); P3 Rehearing Request at 12 (citing *Fox*, 556 U.S. at 515; *Bittner v. U.S.*, 143 S.Ct. 713, 772 (2023); *EDF Renewables, Inc. v. Sw. Power Pool, Inc.*, 181 FERC ¶ 61,140, at PP 75-84 (2022)).  To the extent P3 suggests that the Commission's interpretation implies that the filed rate doctrine would apply only to rates and charges, and not to non-rate terms, P3 Rehearing Request at 12, the Commission did not intend this reading.  *See* February 2023 Order, 182 FERC ¶ 61,109 at P 168 (explaining the application of the filed rate doctrine to the relevant rate on file, PJM's BRA procedures); *id.* at P 171 (confirming that PJM's implementation of the Tariff revisions does not retroactively amend "any rate or non-rate term of the Tariff").

[217] *See infra* P 67.

of the filed rate doctrine.[218]  P3 suggests, as an example, that the Commission could "fundamentally alter" the performance requirements for Capacity Performance resources after a seller commits to becoming a Capacity Performance resource for a Delivery Year, as long as the Commission does so before settling the resource's capacity transactions for that Delivery Year, which might occur up to four years after the resource owner makes the capacity commitment.[219]  As the Commission explained in the February 2023 Order, changing the LDA Reliability Requirement for a single LDA should not have a material effect on seller offers, which, if competitive, should be based on the seller's cost of supplying capacity in the Delivery Year, and not the LDA Reliability Requirements.[220] Moreover, the Commission considers the potential disruption to settled expectations in assessing whether proposals are just and reasonable, and has rejected filings on this basis, even where the filing might otherwise have resulted in a more efficient outcome.[221]  Nor do the Tariff revisions give rise to an unlawful asymmetry between seller obligations and the utility's or RTO's ability to propose changes under the filed rate doctrine.  Seller offers are "request[s] to receive the market price,"[222] and do not, by themselves, constitute capacity commitments reflecting that a transaction has been consummated for purposes of the filed rate doctrine.[223]  The Commission, given its finding that changes to

---

[218] Leeward Rehearing Request at 11, 20; P3 Rehearing Request at 15-16.

[219] P3 Rehearing Request at 17.

[220] February 2023 Order, 182 FERC ¶ 61,109 at PP 158, 176.

[221] GreenHat Order, 166 FERC ¶ 61,072 at P 34; *see also ISO New England Inc.*, 132 FERC ¶ 61,136, at P 22 (2010) (rejecting revisions to formula used to calculate payments in Forward Reserve Market on the basis that they "appear unnecessary" and would upset load-serving entities' expectations without demonstrated benefits).

[222] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 170 (explaining that seller offers are not rates, and the obligations and rights associated with the rate paid by load and received by sellers have not been established until the auction is complete (citing *IMM v. PJM* Reh'g, 178 FERC ¶ 61,121 at PP 101-02)).  In addition, the Commission explained in the February 2023 Order that the fact that a change prior to award of capacity supply obligations and the corresponding rights and obligations may not be retroactive does not mean that the Commission would accept any such change as permissible.  *Id.* P 167 n.453 ("The Commission puts great weight on the importance of not disturbing settled expectations," and will accept a change proposed under these circumstances only if it finds the proposed change just and reasonable and not unduly discriminatory, which includes considering any effects on settled expectations).

[223] P3 Rehearing Request at 13 (asserting that PJM had applied its BRA procedures and secured irrevocable capacity commitments through the 2024/2025 BRA

the BRA procedures are prospective if applied prior to the award of capacity supply
obligations and corresponding rights and obligations, concluded that it "need not
determine the precise point in time at which a change to those procedures would be
retroactive."[224]  It is neither necessary nor appropriate to extend the analysis in this
proceeding to speculative applications beyond the scope of this proceeding, such as P3's
hypothetical with Capacity Performance resources.  We nevertheless note that, unlike
sellers submitting offers in the capacity auctions, Capacity Performance resources that
have received commitment have been awarded capacity obligations.

66.    We similarly do not agree with Petitioners' arguments that the Commission's
interpretation of the filed rate doctrine in the February 2023 Order "threatens to unwind
the Commission's commitment to competitive wholesale markets over the past two
decades"[225] and imperils the integrity of the filed rate doctrine.[226]  Petitioners interpret the
determination in the February 2023 Order in an overly broad manner.  In applying the
filed rate doctrine, the Commission takes into account the circumstances of the
proceeding and, in particular, the nature of the rate on file.[227]  Here, the Commission

---

before it submitted the Section 205 Filing).  P3 cites *Fed Cetera, LLC v. National Credit
Servs. Inc.*, 938 F.3d 466, 471-72 (3d Cir. 2019), to suggest that an agreement can be
considered "consummated" when a contract is formed, but does not explain how the
context-specific analysis applied with respect to the federal contract for debt collection
services in that case, *id.* at 473, obligates the Commission to reach a similar conclusion in
the context of the BRA procedures governing the conduct of PJM's capacity auctions.
*See supra* P 63.

[224] February 2023 Order, 182 FERC ¶ 61,109 at P 167.

[225] P3 Rehearing Request at 9.

[226] *See, e.g.*, *id.* at 8-9 ("The [February 2023] Order represents one of the most
egregious and consequential violations of the filed rate doctrine and rule against
retroactive ratemaking in the Commission's history."); Constellation Rehearing Request
at 10-11, 14; Clean Energy Associations Rehearing Request at 6-7; Leeward Rehearing
Request at 6-9.

[227] *See, e.g., Pub. Util. Dist. No. 1 of Grays Harbor Cty. Wash. v. IDACORP Inc.*,
379 F.3d 641, 651 (9th Cir. 2004) (examining the nature of market-based rates in relation
to the filed rate doctrine and confirming that  the filed rate doctrine applied); *NSTAR
Elec. & Gas Corp. v. FERC*, 481 F.3d at 801 (examining the filed rate and determining
that the "text and structure" supported a conclusion that certain agreements were not
retroactive); *AEP Appalachian Transmission Co.*, 164 FERC ¶ 61,180 at P 18
("[R]etroactive approval of the formula rate change results in a violation of the filed rate
doctrine and the prohibition against retroactive ratemaking.").

explained that its conclusion that a change to the BRA procedures is not retroactive for the purposes of the filed rate doctrine where the capacity supply obligations and corresponding rights and obligations have not yet been awarded applies in circumstances, such as the instant proceeding, "where the rate on file with the Commission . . . exists 'to secure commitments of Capacity Resources' and the price that suppliers will receive in exchange."[228]  Nonetheless, the "limiting principle" of the filed rate doctrine remains the same:  sellers may not collect a rate for service other than the one on file with the Commission,[229] and the Commission may not permit a retroactive rate change even for good cause and equitable considerations.[230]  Moreover, as noted above, even where a rate change is prospective and is consistent with the filed rate doctrine, the Commission will separately consider the potential for disruption to market participants' settled expectations in assessing whether the proposal is just and reasonable.[231]

67.　　We continue to find that the Commission's interpretation of the filed rate doctrine in the February 2023 Order "gives effect, in the context of auction procedures, such as those governing the BRA, to the long line of U.S. Supreme Court and D.C. Circuit cases on the filed rate doctrine."[232]  The recognition that the Commission lacks discretion to waive the operation of a filed rate or retroactively change a rate[233] does not change this outcome, as the precedent demonstrates that rate changes are not impermissibly retroactive where the relevant transaction has not yet been consummated.[234]  Joint Parties assert that the cases cited in the February 2023 Order do not support the Commission's explanation that rates are impermissibly retroactive based on whether regulated customers already have transacted pursuant to the rate because, although "[i]t is true enough that the fact patterns . . . involved entities that had already 'transacted pursuant to

---

[228] February 2023 Order, 182 FERC ¶ 61,109 at P 168.

[229] *Old Dominion*, 892 F.3d at 1226-27.

[230] *id.* at 1230.

[231] *See infra* section II.B.2.b.

[232] February 2023 Order, 182 FERC ¶ 61,109 at P 168 & P 166 n.459 (citing *Cogentrix*, 24 F.4th at 684; *Old Dominion*, 892 F.3d 1223, 1226-27; *PG&E*, 373 F.3d at 1320; *Associated Gas Distribs.*, 898 F.2d at 810-11 (Williams, J., concurring); *City of Girard*, 790 F.2d at 924).

[233] *See* Clean Energy Associations Rehearing Request at 7; Joint Parties Rehearing Request at 16.

[234] February 2023 Order, 182 FERC ¶ 61,109 at P 166 n.459.

Document Accession #: 20230327-3129   Filed Date: 03/27/2023

the rate,'" the holdings were not limited to these facts.[235]  Joint Parties cite *Los Angeles County, California v. Humphries* for the proposition that the holding in a Supreme Court opinion "can extend through its logic beyond the specific facts of [a] particular case."[236]  In that case, the Supreme Court found that a general holding applying the relevant statute to address the showing that a civil rights plaintiff suing a municipality must make applied to both prospective damages and monetary relief, even though only monetary damages were at issue by the time the case reached the Supreme Court.[237]  The fact that the Court found that the holding, in that instance, applied beyond the facts of the case does not compel us to adopt Petitioners' preferred interpretation, which would disregard the specific circumstances of a case in determining whether the filed rate doctrine extends to a rate on file, in a manner inconsistent with courts' application of the doctrine, as demonstrated in the Supreme Court and D.C. Circuit cases cited in the February 2023 Order.[238]

---

[235] Joint Parties Rehearing Request at 16 (citing *Old Dominion*, 892 F.3d at 1230; February 2023 Order, 182 FERC ¶ 61,109 at P 166 & n.449); *see also* P3 Rehearing Request at 13 (arguing that the cited cases do not restrict the filed rate doctrine only to the circumstances therein).

[236] 562 U.S. at 38.

[237] *Id.*

[238] *See, e.g.*, *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1052 (3d Cir. 1993) (explaining that "a reasonable rate is that which [the Commission] fixes" and "[o]nce the reasonable rate is determined, gas companies may not collect any other rate"); *West Deptford*, 766 F.3d at 20-22 (remanding for explanation of consistency with Commission practice of holding that the tariff in effect at the time that an interconnection agreement is filed is the filed rate, for purposes of compliance with the filed rate doctrine); *PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,327, at P 18 (2015), *order on reh'g*, 156 FERC ¶ 61,090, at P 22 (2016) (the filed rate is the tariff at the time the interconnection service agreement is signed), *petition denied*, *ESI Energy, LLC v. FERC*, 892 F.3d 321 (D.C. Cir. 2018).  Consistent with the discussion above, the statement in *Old Dominion* that the Commission lacks discretion to waive the filed rate (*see* Joint Parties Rehearing Request at 16, Clean Energy Associations Rehearing Request at 7), does not counteract the Commission's holding, as implementing prospective rate changes does not require waiver.

68.　　Joint Parties also are mistaken that the Commission impermissibly shifted the
burden of proof to identify precedent contrary to its interpretation.[239]　As the proponent
of the Section 205 Filing, PJM had the burden of proof in this proceeding to demonstrate
the that Section 205 Filing is just and reasonable and not unduly discriminatory or
preferential,[240] and consistent with the requirements of the FPA, including the
requirement to provide adequate prior notice of rate changes.[241]　In noting that protestors
"point to no precedent in which a change to a rate or non-rate term has been determined
to be retroactive before a transaction has been made pursuant to it,"[242] the Commission
did not shift the ultimate burden of persuasion to other parties, but rather considered the
precedent cited and confirmed that it was consistent with the conclusion that accepting
the Section 205 Filing would not run afoul of the filed rate doctrine and rule against
retroactive ratemaking.

69.　　We continue to find that the precedent cited in the February 2023 Order supports
the conclusion that, in these circumstances, a change to the BRA procedures is not
retroactive for the purposes of the filed rate doctrine if the capacity supply obligations
have not yet been awarded.　P3 claims that *Old Dominion* supports its contention that the
filed rate must be followed "regardless of whether any transactions have, or ever will be,
consummated pursuant to that filed rate."[243]　In particular, P3 points to the court's
statements that the filed rate in that proceeding assured market participants that the rates

---

[239] Joint Parties Rehearing Request at 17 (citing *Maxwell*, 237 U.S. at 97; *AGA*,
593 F.3d at 19-21; February 2023 Order, 182 FERC ¶ 61,109 at P 166; *id.* (Danly,
Comm'r, dissenting at P 2)).

[240] 16 U.S.C. § 824d; 5 U.S.C. § 556(d) (under the APA, "the proponent of a rule
or order has the burden of proof" except as otherwise provided by statute); *Advanced
Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) ("When acting on a
public utility's rate filing under section 205, the Commission undertakes an essentially
passive and reactive role and restricts itself to evaluating the confined proposal.")
(internal quotation omitted)).

[241] 16 U.S.C. § 824d(d) (requiring 60 days' prior notice of rate changes, which
may be waived by the Commission for good cause shown); 18 C.F.R. § 35.11; February
2023 Order, 182 FERC ¶ 61,109 at P 162 (granting waiver of the Commission's 60-day
prior notice requirement).

[242] February 2023 Order, 182 FERC ¶ 61,109 at P 166.

[243] P3 Rehearing Request at 11 & n.50 (citing *Old Dominion*, 892 F.3d at 1231-
32).

Case: 23-1778    Document: 88-1    Page: 197    Date Filed: 12/11/2023
Document Access on P: 20230627-9100    Filed Date: 01/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                                    - 54 -

charged would not exceed the $1,000/MWh cap on charges.[244]  In *Old Dominion*, however, the supplier already had provided the service—i.e., sold capacity into PJM's day-ahead market during the Polar Vortex of January 2014—and the D.C. Circuit affirmed the Commission's conclusion that the rates could not be raised retroactively to exceed the cap and recover its costs.[245]  The court's statement that the filed rate doctrine prohibits "toss[ing] that cap aside after the fact,"[246] therefore does not contravene the Commission's explanation that changes are only impermissibly retroactive where parties already have been awarded rights or incurred obligations pursuant to the rate.[247]

70.    The cases Joint Parties and P3 cite for the proposition that the Commission has found rate changes to be retroactive prior to, or in the absence of, a transaction[248] do not alter this conclusion.  Joint Parties and P3 misconstrue both the February 2023 Order and the cases they cite as contrary to its holding.  Joint Parties appear to believe that identifying applications of the filed rate doctrine to non-rate terms, where a purchase or sale has not occurred, demonstrates that the Commission's interpretation of the filed rate doctrine here is "factually incorrect."[249]  Specifically, Joint Parties cite three cases

---

[244] *Id.*

[245] *Old Dominion*, 892 F.3d at 1228-30.  The court further noted that the Commission accepted prospective changes to allow sellers to submit offers above the cap, effective one day after the date PJM submitted its filing, but "left the past rates as it found them."  *Id.* at 1232.

[246] *Id.*

[247] February 2023 Order, 182 FERC ¶ 61,109 at PP 166-67; *see Old Dominion*, 892 F.3d at 1226-27 (explaining that the filed rate doctrine means that "a regulated seller of [power]" is prohibited "from collecting a rate other than the one filed with the Commission," and that "the Commission itself" cannot retroactively "impos[e] a rate increase for [power] already sold" (quoting *Arkla*, 453 U.S. 571) (emphasis added)).  Similarly, we disagree with Clean Energy Associations' assertion that *Cogentrix* does not support the Commission's interpretation.  Clean Energy Associations Rehearing Request at 8 (citing *Cogentrix*, 24 F.4th at 679, 684).  Clean Energy Associations do not explain their claim that the D.C. Circuit's statement that attempting to collect additional rates for service that already has been rendered does not support the Commission's position that changes to a rate are impermissible only where regulated entities or customers have transacted pursuant to the rate, and we see no inconsistency.

[248] Joint Parties Rehearing Request at 17-18; P3 Rehearing Request at 13 (citing *Lowden*, 306 U.S. at 520-21; *Old Dominion*, 892 F.3d at 1231-32)).

[249] Joint Parties Rehearing Request at 17.

involving requests for waivers of deadlines that already have passed.[250] The Commission acknowledged in the February 2023 Order, however, that the filed rate doctrine applies equally to non-rate terms,[251] and the cases Joint Parties cite do not contradict the conclusion that rate changes are permissible where, as here, regulated entities or customers have not yet incurred commitments or been awarded rights pursuant to the relevant filed rate. PJM met the August 2022 deadline for posting the auction parameters and did not seek to modify or waive that deadline. The rate that PJM sought to change in this proceeding is the set of market rules governing its BRA, and the purpose of the BRA is to secure obligations to supply capacity and set the rate paid for those obligations.[252] Hence, PJM's filed rate did not prohibit it from proposing under FPA section 205 to adjust the LDA Reliability Requirement prior to the time that capacity supply obligations and the corresponding rights were awarded under the 2024/2025 BRA.[253]

71.      Joint Parties cite to cases where parties sought to waive a discrete component of a filed rate—i.e., a deadline—where the deadline giving rise to the relevant obligation already had passed. For example, in *TransCameron* and *Rover*, the Commission denied as impermissibly retroactive a request to waive a missed deadline to file an informational report reflecting operational purchases and sales of gas for the preceding year.[254] Thus, the deadline itself was the non-rate tariff term the pipelines sought to waive, and the obligation to provide the applicable service by filing the report had been missed. Similarly, in *Salt Creek*, the Commission denied as impermissibly retroactive a request to

---

[250] *Id.* at 18 (citing *TransCameron*, 180 FERC ¶ 61,011 at P 5; *Rover*, 180 FERC ¶ 61,033 at P 5; *Salt Creek*, 180 FERC ¶ 61,116 at P 38).

[251] *See supra* n.216; *see also OG&E*, 11 F.4th at 830 ("The [FPA] provides no grounds for distinguishing rate and non-rate terms, but rather binds parties to the terms in the filed tariff.").

[252] February 2023 Order, 182 FERC ¶ 61,109 at PP 166, 168.

[253] *Id.* P 167; *see also* Planning Parameters Order, 171 FERC ¶ 61,208 at PP 14-15 (granting prospective waiver of the auction clearing requirements in § 5.10(e) of Attachment DD to permit PJM to use a revised updated peak load forecast to clear the incremental auction); *Va. Elec. Power Co.*, 173 FERC ¶ 61,129, at PP 28-29 (2020) (granting limited waiver to allow PJM to omit pandemic-related outage data in calculating certain capacity resources' final equivalent demand forced-outage rate values for an incremental auction); *LS Power Dev., LLC*, 173 FERC ¶ 61,241, at PP 13-14 (2020) (same); *Old Dominion Elec. Coop.*, 173 FERC ¶ 61,271, at PP 14-15 (2020) (same).

[254] Joint Parties Rehearing Request at 18 (citing *TransCameron*, 180 FERC ¶ 61,011 at P 5; *Rover*, 180 FERC ¶ 61,033 at P 5).

Document Accession #: 20231227-3100  Filed Date: 01/27/2023

waive a financial security requirement and related deadlines that had already passed to allow the applicant to be included in an interconnection queue cluster study.[255]  We do not believe that these cases support Joint Parties' contention that the Commission departed from this precedent in the February 2023 Order.[256]  Instead, we find that the Commission appropriately accepted the Tariff revisions with the requested effective date in the context of the rate on file in this FPA section 205 proceeding and sufficiently explained its determination in the context of the Commission's statutory obligations and longstanding precedent.[257]

72.     *Lowden*, a case involving the filed rate doctrine under the Interstate Commerce Act, is in accord.  The carriers in *Lowden* provided the relevant service—installing doors on boxcars to prevent grain from leaking out during transportation—and the Supreme Court found that the shippers' purported refusal to pay for the service did not override their obligation to pay under the tariff.[258]  Although P3 points to the terms of the tariff including "prior arrangements" to suggest that the rate was binding prior to this transaction,[259] the Supreme Court explained that the tariff required the shippers to make "prior arrangements" with the carriers in order to receive the service, and that shippers did so in the same letter where they attempted to refuse payment for the service.[260] *Lowden* thus stands for the unexceptional proposition that "[u]ntil changed, tariffs bind

---

[255] *Salt Creek*, 180 FERC ¶ 61,116 at PP 1, 10-11.

[256] Joint Parties Rehearing Request at 18 (citing *Fox*, 556 U.S. at 515; *West Deptford*, 766 F.3d at 20); *see West Deptford*, 766 F.3d at 20 (explaining that the Commission "must 'provide[ ] a reasoned explanation for departing from precedent or treating similar situations differently'") (citation omitted)).

[257] *See* February 2023 Order, 182 FERC ¶ 61,109 at PP 165-66, 168.

[258] *Lowden*, 306 U.S. at 517 (framing the issue as "whether a carrier's charges for services, *actually utilized by a shipper* and authorized by a *tariff* requiring prior arrangements for the services, are uncollectable when the services are rendered on orders, preceded or accompanied by denials of legal liability" (emphasis added)).

[259] P3 Rehearing Request at 13 n.60.

[260] *Lowden*, 306 U.S. at 518, 520 (explaining that "[t]o facilitate the rendition of the service prior arrangements are required," and that the shippers' letter demonstrating its desire to receive the cars "fully coopered and ready for loading" met this condition).

both carriers and shippers with the force of law," but does not prohibit changes to the rates prior to receiving service or assuming an obligation.[261]

73.    With respect to Constellation's claim that the Commission did not cite "a single decision authorizing an RTO to change market rules for an auction after it has already run,"[262] the Commission did not need to cite such a case because, here, the BRA had not "already run," but was ongoing at the time PJM submitted the Section 205 Filing.  We further disagree with Constellation's attempt to distinguish the Planning Parameters Order.[263]  Although that order stemmed from different circumstances—a waiver request to use an updated load forecast reflecting the COVID-19 pandemic for the second incremental auction—the Commission's determination that the waiver request was prospective because it would involve using an updated parameter to clear the auction is directly applicable to this proceeding.[264]

---

[261] *Id.* at 521.

[262] Constellation Rehearing Request at 17.

[263] *Id.* at 17 n.74 (asserting that the case cited by PJM permitting PJM to change the Peak Load Forecast for the Second Incremental Auction for the 2021/2022 delivery year in light of COVID is distinguishable because the order issued prior to the offer window opening, PJM updated the parameter rather than the methodology for calculating the parameter, and PJM made the filing due to an exigent circumstance (citing Planning Parameters Order, 171 FERC ¶ 61,208 at P 20).

[264] Planning Parameters Order, 171 FERC ¶ 61,208 at P 15.  Although Constellation asserts that the request in that proceeding was distinguishable because the waiver issued before the offer window opened, we note that the order did not cite this timing as the reason for finding the request to be prospective.  Moreover, Petitioners' arguments suggest that changing the parameters after they were posted would violate the filed rate doctrine, even if the change was made prior to the auction window opening.  *See* Joint Parties Rehearing Request at 46-47 (alleging that the Commission violated the filed rate doctrine by permitting PJM to modify the LDA Reliability Requirement that was required to be finalized and fixed prior to the auction); Constellation Rehearing Request at 4, 8; Leeward Rehearing Request at 8-9.  Moreover, the fact that the Commission permitted a parameter to be updated via waiver instead of accepting a FPA section 205 change to the BRA procedures for calculating a parameter does not change whether the effect of the order is retroactive or prospective, and the ultimate result for market participants is the same, i.e., an updated parameter that better reflects supply and demand fundamentals will be used to clear the auction.

Document Access... ...0127-5103 27-11-03 ... Date Filed: 04/27/2023
Case: 23-1778 Document: 88-1 Page: 201 Date Filed: 12/11/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 58 -

74.     Constellation also misconstrues the Commission's formula rate precedent.[265]
Capacity auctions, where market participants submit offers consistent with the auction
rules to receive the market-based clearing prices, are not exactly the same as formula
rates, where the inputs into the formula template produce the prices paid.  The two are
analogous for purposes of the filed rate doctrine to the extent that the rate on file is not
the actual price produced but the set of rules that produces the price.  Formula rates,
however, usually involve a method to calculate the initial charge based on projections
(rates calculated in advance based on projected cost inputs for the upcoming year) as well
as a true-up mechanism (procedures to recalculate the final charge after the close of the
year to reflect actual costs),[266] whereas PJM's capacity auction rates only set forth
procedures used to calculate prices to be paid once the auction process is complete.
Constellation is correct that the Commission has found that revisions to formula rates—
like revisions to auction rates—must be applied prospectively, which for proposed
revisions to the true-up mechanism means that the true-up of the estimated costs for the
preceding year must be calculated using the true-up formula that was in effect for that
period.  This finding does not conflict with the February 2023 Order, as it is based on
"the fact that the filed rate applied to service provided" in that prior year.[267]  Here, no
service has yet been provided and no obligation or commitment has yet been incurred.

75.     Finally, we continue to find that PJM has not violated the provisions of its Tariff
requiring it to post the LDA Reliability Requirement prior to the BRA and to post the
auction results after the BRA.[268]  Petitioners insinuate that PJM violated its Tariff to
further an inappropriate objective,[269] but cite no Tariff provisions that require PJM to post

---

[265] Constellation Rehearing Request at 12-13 (citing *Midcontinent Indep. Sys
Operator, Inc.*, 161 FERC ¶ 61,020 at P 7).

[266] *Midcontinent Indep. Sys Operator, Inc.*, 161 FERC ¶ 61,020 at P 7.

[267] *Id.* ("However, the fact that the calculation of the rate for a given rate year is
comprised of a projected rate and subsequent true-up does not change the fact that the
filed rate applied to service provided in 2016, and that the revisions to the formula rates
accepted in the December 30 Order became effective after this service was provided.").
Nor do we agree, as Joint Parties assert, that the Commission's application of the filed
rate doctrine in the February 2023 Order "casts doubt on the finality" of any rate that is
not a fixed rate, including formula rates.  Joint Parties Rehearing Request at 22 (citing
February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 3)).  The
Commission's determination in the February 2023 Order did not, as explained herein,
change the application of the filed rate doctrine to formula rates or otherwise.

[268] *See* February 2023 Order, 182 FERC ¶ 61,109 at PP 171-72.

[269] *See* Clean Energy Associations Rehearing Request at 12 (claiming that PJM

the auction results by a date certain. We find that PJM's delay in finalizing the auction
and posting the results pending the Commission's consideration of its Section 205 Filing
complies with the requirement in its Tariff to post the results "as soon…as possible" after
"conducting the [RPM] Auctions."[270] In particular, we find that PJM's submission of the
Section 205 Filing and Complaint, and resulting delay in finalizing the BRA to ensure
that the LDA Reliability Requirement for Delmarva reflected the LDA's actual reliability
needs and did not result in an artificially inflated clearing price, constituted a reasonable
exercise of the minor flexibility built into Attachment DD section 5.11(e) under the
circumstances here,[271] flexibility that we trust PJM will use only in similarly exigent
circumstances.[272]

### 2.    Settled Expectations

76.    Having found that applying the Tariff revisions to the 2024/2025 BRA did not
violate the filed rate doctrine, the Commission in the February 2023 Order considered
whether doing so would not be just and reasonable in these circumstances to the extent
applying the Tariff revisions to the ongoing BRA could upset parties' settled

---

"manufactured a window of opportunity for the sole purpose of being able to call its
Tariff changes proposed in the Section 205 Filing 'prospective'"); Joint Parties Rehearing
Request at 40 (contending that the Commission's interpretation permits PJM to post the
results only "as soon as possible after PJM gets the auction rules modified to yield its
preferred auction results" and to permit PJM to change the LDA Reliability Requirement
"any time PJM feels like it") quoting NRG Companies Protest at 11-12 and February
2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 12))).

[270] PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.11 Posting of
Information Relevant (17.0.0), § 5.11(e). As noted in the February 2023 Order, PJM is
vested with the right to propose changes to the Tariff terms and conditions under FPA
section 205, which the Commission has the authority to review. February 203 Order,
182 FERC ¶ 61,109 at P 172.

[271] *See also supra* P 58 (discussing the provisions in Attachment DD requiring
PJM to apply mitigation and permitting adjustments for Price Responsive Demand and
errors in the initial posting of auction results prior to the final determination and posting
of clearing prices).

[272] *See* PJM February 2, 2023 Answer at 8 ("To be sure, PJM does not take the
position that the term 'as soon as possible' means it can delay posting final results
indefinitely. Rather, PJM intends to promptly post the 2024/2025 BRA results after the
auction is cleared and finalized (*i.e.*, after conducting the auction).") PJM finalized the
2024/2025 BRA and posted the final auction results on February 27, 2023, less than a
week after issuance of the February 2023 Order.

expectations.[273]  The Commission concluded that the potential disruption of settled expectations did not warrant rejection of PJM's Section 205 Filing.[274]  In particular, the Commission found that capacity offers are based on the cost of supplying capacity and thus should not be materially affected by an input into the shape of the auction's demand curve (i.e., the VRR Curve).[275]  The Commission also was not persuaded that market participants' purported reliance on one input to the VRR Curve, without knowledge of the final capacity price, gave rise to a concern that market participants relied to their detriment on the capacity auction market rules in engaging in activity such as bilateral sales and retail hedging agreements.[276]  Even to the extent that there may have been detrimental reliance, the Commission found that the significant benefits that would result from applying the Tariff revisions to the 2024/2025 BRA—and, in particular, preventing customers from being charged capacity prices that did not reflect actual reliability needs or supply and demand fundamentals—weighed heavily in favor of acceptance.[277]

77.     Additionally, in accepting the Tariff revisions, the Commission found that the fact that some market participants have, in the past, incorporated the LDA Reliability Requirement into their business decisions and commercial transactions outside of the PJM-administered capacity market does not render PJM's proposal unjust and unreasonable.[278]  Just as with other uncertain factors that may affect capacity clearing prices, the Commission observed that market participants could factor the potential for adjustments to the LDA Reliability Requirement into their business decisions in future years.[279]

---

[273] February 2023 Order, 182 FERC ¶ 61,109 at PP 173-80 (citing EPSA Protest at 19-20; Sotkiewicz Aff. ¶¶ 29-31; LS Power Protest at 3-4; NRG Companies Protest at 18-19); *see id.* P 175 (explaining that the Commission has rejected filings by PJM on the basis of settled expectations, even where the results created financial hardship, but has accepted Tariff revisions where the benefits outweighed any adverse effects on settled expectations (citing GreenHat Order, 166 FERC ¶ 61,072 at P 34; *ISO New England Inc.*, 145 FERC ¶ 61,095 at PP 28, 30).

[274] *Id.* P 176.

[275] *Id.*

[276] *Id.* P 177.

[277] *Id.* PP 177-78.

[278] *Id.* P 156.

[279] *Id.* P 157.

Docket Nos. ER23-729-001 and EL23-19-001                                    - 61 -

### a.   **Requests for Rehearing**

78.     Petitioners disagree with the Commission's analysis in the February 2023 Order balancing market participants' "settled expectations" stemming from the LDA Reliability Requirement posted prior to the 2024/2025 BRA against the benefits of the Tariff revisions.[280]

79.     As an initial matter, Joint Parties, Leeward, Clean Energy Associations, and P3 each assert that the Commission's assessment of the relative benefits and costs of applying PJM's proposal to the 2024/2025 BRA is irrelevant, as the Commission lacked discretion to waive the filed rate doctrine to make the revisions effective retroactively.[281] Leeward contends that this "new test" reflects a "flawed construction of the filed rate doctrine," which does not permit the Commission to consider equities to retroactively

---

[280] Clean Energy Associations Rehearing Request at 3, 4, 9-12 (arguing that the Commission erred by improperly concluding that the benefits of accepting the Section 205 Filing outweigh any reliance on the LDA Reliability Requirement posted in August 2022 (citing 5 U.S.C. § 706(2)(A); *Env't Def. Fund*, 2 F.4th at 967-68; *Emera Me.*, 854 F.3d at 28)); Constellation Rehearing Request at 3, 5, 18-21 (stating that the Commission erred by determining, contrary to record evidence, that suppliers lacked detrimental reliance interests in the LDA Reliability Requirement and that short-term rate benefits outweighed any reliance interests (citing *Emera Me.*, 854 F.3d at 22); Joint Parties Rehearing Request at 2-3; 18-23; 48 (asserting that the Commission erred by failing to weigh the totality of the evidence before it regarding the benefits of, and harm inflicted by, PJM's proposal and failing to consider the impacts of the February 2023 Order on market participants' confidence in the market and PJM's market rules (citing *State Farm*, 463 U.S. at 43; *Old Dominion*, 892 F.3d at 1230; *Genuine Parts Co.*, 890 F.3d at 312; *Lakeland Bus Lines, Inc.*, 347 F.3d at 963; *Tenneco Gas*, 969 F.2d at 1214; February 2023 Order, 182 FERC ¶ 61,109 at PP 173, 177-79; *id.* (Danly, Comm'r, dissenting at P 5))).

[281] Joint Parties Rehearing Request at 18-19 (citing *Maislin Indus., U.S., Inc.*, 497 U.S. at 117; *Maxwell*, 237 U.S. at 97; OG&E, 11 F.4th at 825-26; February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 5)); Leeward Rehearing Request at 11-12 (citing *OG&E*, 11 F.4th at 829-830, 832; February 2023 Order, 182 FERC ¶ 61,109 at PP 169, 175, 178; *id.* (Danly, Comm'r, dissenting at P 27)); Clean Energy Associations Rehearing Request at 7, 10-11 (citing February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 25)); P3 Rehearing Request at 9-10 n.40 (citing *OG&E*, 11 F.4th at 826).

Case: 23-1778    Document: 88-1    Page: 205    Date Filed: 12/11/2023
Document Accession #: 20230627-9109    Filed Date: 04/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 62 -

alter a filed rate to allow consumers to realize purported benefits from a modified LDA Reliability Requirement.[282]

80.    In addition to questioning the Commission's authority to undertake the balancing analysis, Petitioners also object to the analysis itself, and in particular to the Commission's determination that market participants' purported reliance on a single auction input did not necessarily give rise to a detrimental reliance concern.[283]    Assuming that the Commission were free to engage in a balancing of the equities, Joint Parties argue that the Commission failed to do so in any meaningful sense in the February 2023 Order, "only consider[ing] evidence on one side of the scale" regarding the possibility of increased capacity costs to customers under the existing Tariff, and disregarding countervailing considerations.[284]    Joint Parties also claim that, in reaching its conclusion that market participants did not rely on the posted LDA Reliability Requirement, the Commission failed to engage with evidence:  (1) from NRG Companies about their expectations regarding the clearing price based on the posted value and existing market rules and economic decisions purportedly made based on those expectations; (2) that a market research and consulting firm had published a report predicting that the auction price would reach the cap;[285] and (3) that PJM's own analysis of the prior 2023/2024 BRA showed that a clearing price at the market cap was "entirely predictable."[286]    Joint Parties argue that the Commission also failed to consider an "important aspect of the

---

[282] Leeward Rehearing Request at 11.

[283] See February 2023 Order, 182 FERC ¶ 61,109 at P 177; see Clean Energy Associations at 8 (asserting that market participants made business decisions to participate in the 2024/2025 BRA and post the requisite collateral in reliance on the Tariff on file with the Commission at the time (citing Clean Energy Associations Protest at 7; Pine Gate Protest at 6; Invenergy Protest at 1-5; EPSA Protest at 13; Leeward Protest at 6; Lotus Protest at 10; NRG Companies Protest at 2; Vistra Corp. Protest at 9,14).

[284] Joint Parties Rehearing Request at 19 (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 177-79).

[285] The cap for clearing prices when there is insufficient supply to meet reliability needs is the greater of the gross Cost of New Entry for the Reference Resource or 150% of the net Cost of New Entry for the Reference Resource.  See Transmittal at 7-8.

[286] Joint Parties Rehearing Request at 20 (citing NRG Companies Protest, attach. A, Affidavit of Joseph A. Holtman ¶¶ 15-27 (Holtman Aff.); LS Power Protest at 3-4 & nn.12-13; Sotkiewicz Aff. ¶¶ 48, 104-08; Shanker Aff. ¶ 39; Lotus Protest at 9-10 & n.36).

Case: 23-1778 Document: 88-1 Page: 206 Date Filed: 12/11/2023
Document Accession #: 20231027-3145 Filed Date: 04/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 63 -

problem"[287] in concluding that the benefits of PJM's proposal outweighed any
detrimental reliance concerns because it failed to consider the fact that NRG contacted
PJM regarding the LDA Reliability Requirement posted for Delmarva and PJM
confirmed that the value was accurate.[288]  Instead, Joint Parties contend that PJM
"effectively induced [ ] NRG to detrimentally rely on the posted parameters," prior to
submitting the Section 205 Filing proposing to adjust them.[289]

81.     Constellation likewise contends that the record shows that market participants
relied heavily on individual planning parameters to estimate likely clearing prices and
determine whether to enter into bilateral contracts or hedging arrangements, suggesting
that, by contrast, the Commission did not support its assertion that the reliance on single
input resulted in a detrimental reliance concern.[290]  Additionally, Constellation argues
that suppliers not subject to the must-offer requirement, such as intermittent and
hydroelectric resources, rely on the market rules to decide whether the anticipated auction
clearing price justifies accepting a capacity obligation, and if so what price and quantity
to offer.[291]

82.     Clean Energy Associations, Joint Parties, and Constellation further assert that the
Commission failed to consider harm to confidence in the market in its analysis.[292]  Joint
Parties also assert that the Commission's weighing of the totality of the evidence failed to
account for the economic harm of undermining the Commission-jurisdictional markets,

---

[287] *Id.* at 21 (quoting *State Farm*, 463 U.S. at 43).

[288] *Id.* (citing Holtman Aff. ¶ 16 & Ex. C).

[289] *Id.*; *see also* Constellation Rehearing Request at 9-10 (asserting that market
participants rely on PJM's planning parameters to estimate auction clearing prices and
decide whether to enter into bilateral contracts or hedging arrangements and, indeed,
"PJM posts the figures in the first place … precisely to induce these actions," i.e., to
ensure that the auction procures sufficient capacity (citing *PJM Interconnection, L.L.C.*,
117 FERC ¶ 61,331 at P 13; EPSA Protest, attach. A Sotkiewicz Affidavit, ¶¶ 17-18, 29-
31; Shanker Aff. ¶ 50; Holtman, ¶¶ 10-13)).

[290] Constellation Rehearing Request at 18-19 (citing Holtman Aff. ¶¶ 10-13;
Sotkiewicz Aff. (pin cite not provided); February 2023 Order, 182 FERC ¶ 61,109
at P 177).

[291] *Id.* at 10.

[292] *See* Clean Energy Associations Rehearing Request at 9-11 (asserting that
accepting the Section 205 Filing harms confidence in markets); Joint Parties Rehearing
Request at 21-23; Constellation Rehearing Request at 19-21.

or to weigh this harm against the benefit of avoiding a high clearing price in a single zone and BRA.[293]  Stating that it does not object "in principle to updating the planning parameters (with notice in the Tariff) to reflect meaningful changes leading up to an auction," Constellation argues that the effects of changing the market rules for the 2024/2025 BRA will "irreversibly harm suppliers' ability to rely on the stated market rules," increasing risk to market participants, potentially suppressing investment in needed capacity, and even threatening grid reliability.[294]  Constellation points to reports of decreasing reserve margins in PJM and warns that the option to lean on capacity markets to correct the shortfall will not be available "particularly at the most efficient price level, if investors cannot rely on the market rules."[295]

83.     Petitioners suggest that this harm is exacerbated by the Commission departing without explanation from its policy against changing auction rules once an auction has commenced.  Clean Energy Associations allege that accepting the Section 205 Filing has inappropriately opened the door to future mid-auction rule changes.[296]  "As deleterious as this proceeding has been for confidence in the 2024/205 BRA," Clean Energy Associations insist, "the prospect of unforeseeable mid-auction course corrections from PJM *in any future capacity auction* further skews the 'balance of interests' here."[297]  Clean Energy Associations argue that the Commission erred by failing to acknowledge its

---

[293] Joint Parties Rehearing Request at 21-22 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 78; *id.* (Danly, Comm'r, dissenting at P 27)); *id.* at 22-23 (arguing that the Commission failed to address concerns and evidence of petitioners and Commissioner Danly regarding harm to the market (citing 5 U.S.C. §§ 551-559 (2018); *ACPA*, 54 F.4th at 728; *AGA*, 593 F.3d at 20; *Genuine Parts Co.*, 890 F.3d at 312; February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P3); EPSA Protest at 28; NRG Companies Protest at 21; Holtman Aff. ¶ 32-34; Vistra Corp. Protest at 1-4; P3 Protest at 15; Clean Energy Associations Protest at 3-4; Pine Gate Protest at 4)).

[294] Constellation Rehearing Request at 19-20 (contrasting these effects with the four-fold price increased in Delmarva, which Constellation suggests is "not unusual" (citing Constellation Protest at 9-10)).

[295] *Id.* at 20-21 (citing PJM, *Energy Transition in PJM: Res. Rets., Replacements & Risks* at 16-17 (Feb. 24, 2023), https://www.pjm.com/-/media/library/reports-notices/special-reports/2023/energy-transition-in-pjmresource-retirements-replacements-and-risks.ashx).

[296] Clean Energy Associations Rehearing Request at 11 (citing February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at PP 25-26)).

[297] *Id.*

change from its prior policy against changing the rules governing an auction that already has commenced.[298] Constellation, Clean Energy Associations, and Joint Parties assert that the Commission departed without explanation from precedent denying PJM's request for waivers after running its monthly financial transmission rights auction but before reporting the results based on the impact of changing the rules for an already-commenced auction, particularly "where the record indicates that PJM proposed the waiver in order to avoid the outcome that the already-commenced auction would have produced."[299] In the same vein, Constellation contends that the Commission failed to consider the concerns that it usually cites in declining to rerun markets, even when they were completed in error, and did not justify its change in policy.[300]

## b. **Commission Determination**

84.     Petitioners' assertions that the Commission lacked discretion to engage in balancing the benefits of the Tariff revisions proposed in the Section 205 Filing against the potential disruption to market participants' settled expectations rely on the false premise that the revisions constitute a retroactive rate change prohibited by the filed rate doctrine.[301] "There is a difference between upsetting the expectations of market

---

[298] Clean Energy Associations Rehearing Request at 4, 9-10 (citing *Fox*, 556 U.S. at 515-16; *GreenHat Order*, 166 FERC ¶ 61,072 at P 33).

[299] Constellation Rehearing Request at 11-12 (quoting *GreenHat Order*, 166 FERC ¶ 61,072 at P 33); *see id.* at 12 (citing additional cases for this principle (citing *ISO New England Inc.*, 170 FERC ¶ 61,187 at P 17; *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,208 at P 261)); Clean Energy Associations Rehearing Request at 10; *see id.* at 9-10 (citing the same and arguing that the Commission did not in the February 2023 Order confront its precedent regarding the need for market certainty and reticence to revise auction rules once an auction has commenced); Joint Parties Rehearing Request at 22 (contending that the concern is even more acute here, where the purpose of the capacity market is to produce investor confidence and ensure resource adequacy (citing *GreenHat Order*, 166 FERC ¶ 61,072 at P 33; *ISO New England, Inc.*, 162 FERC ¶ 61,205 at P 21; *ISO New England Inc.*, 132 FERC ¶ 61,136, at P 29 (2010)).

[300] Constellation Rehearing Request at 20 (citing *Fox*, 556 U.S. at 515; *PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,237, at P 10 (2019); February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 30); *ISO New England Inc.*, 170 FERC ¶ 61,187 at P 17; *Dominion Energy Mktg., Inc. v. ISO New England, Inc.*, 155 FERC 61,121, at P 23 (2016)).

[301] *See* Joint Parties Rehearing Request at 18-19; Leeward Rehearing Request at 11-12; Clean Energy Associations Rehearing Request at 7, 10-11; P3 Rehearing Request at 9-10 n.40.

participants… and retroactive ratemaking."[302]  And although the filed rate doctrine and the rule against retroactive ratemaking do not permit the Commission to waive the operation of a filed rate or accept retroactive rate changes even "for good cause or for any other equitable considerations,"[303] the Commission may, and has, balanced equitable considerations in assessing the justness and reasonableness of FPA section 205 filings with prospective application.[304]

85.     Having determined the rate change to be prospective, the Commission appropriately balanced arguments that applying the Tariff revisions to the 2024/2025 BRA would upset parties' settled expectations against the significant benefits of applying the Tariff revisions to the 2024/2025 BRA.[305]  Petitioners' arguments on rehearing do not demonstrate that the Commission erred in concluding that those benefits outweigh the potential disruption to settled expectations.  Contrary to Joint Parties' assertion,[306] the

---

[302] *ISO New England Inc.*, 148 FERC ¶ 61,185 at P 29.

[303] *Old Dominion*, 892 F.3d at 1230.

[304] February 2023 Order, 182 FERC ¶ 61,109 at P 175; *see also PJM Interconnection, L.L.C.*, 183 FERC ¶ 61,001, at PP 21, 29, 32 (2023) (accepting revisions to the PJM Tariff over objections that they would disrupt settled expectations); *PJM Interconnection, L.L.C.*, 161 FERC ¶ 61,197, at P 175 (2017), *order on reh'g*, 170 FERC ¶ 61,217 (2020) (accepting proposed revisions to PJM's pseudo-tie requirements based on a balancing of the equities, after considering arguments that the Commission should not permit a change to PJM's deliverability requirement for the years 2017-2020 because protestors relied on the deliverability standard in the existing Tariff in submitting their offers); *ISO New England Inc.*, 148 FERC ¶ 61,185 at P 29, *order on reh'g*, 150 FERC ¶ 61,129 at PP 13-15 (finding that the benefits of proposed tariff revisions, "including preventing consumers from having to pay for non-existent capacity or possibly face a multi-year capacity shortfall," outweighed disruption to settled expectations); *ISO New England Inc.*, 132 FERC ¶ 61,136 at P 30 (rejecting a proposal "based on a balancing of the equities, including our determination that the proposed revision is not necessary").

[305] February 2023 Order, 182 FERC ¶ 61,109 at PP 176-78; *see also Citadel FNGE Ltd.*, 2023 WL 4672098 at *9, 11 (agreeing that the Commission reasonably concluded that, due to inelasticity of demand and lack of new supply, application of transmission constraint penalty factors was "not worth the candle," i.e., would lead to inflated prices without commensurate benefits).

[306] Joint Parties Rehearing Request at 20 (arguing that the Commission's determination reflected a "clipped view of the record" (quoting *Lakeland Bus Lines, Inc.*, 347 F.3d at 963)).

record evidence supports this conclusion.[307]  In particular, the Commission found that capacity offers should not have been materially impacted by changes to the LDA Reliability Requirements, that purported reliance on a single action input (i.e., the Delmarva LDA Reliability Requirement) with no knowledge of the final capacity price did not give rise to a detrimental reliance concern, and that applying the Tariff revisions to the 2023/2024 BRA would yield significant benefits.[308]  This conclusion does not suggest consideration of only "one side of the scale,"[309] but rather reflects the Commission's careful weighing of the relevant considerations.[310]

86.     The Commission considered evidence that NRG Companies confirmed the accuracy of the Delmarva LDA Reliability Requirement prior to the BRA, as well as NRG Companies' assertion that they detrimentally relied on that value.[311]  Evidence that one party expressly inquired about the LDA Reliability Requirement and may have made decisions in reliance on that value in arranging a bilateral transaction outside the PJM-administered BRA does not outweigh the significant benefits from applying the revisions to the 2024/2025 BRA.  Nor do we find that evidence of reports suggesting the potential for high prices in Delmarva tips the balance in favor of conducting the BRA with a

---

[307] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 177 (finding that, on the record of the case, the balance of interests weigh heavily in favor of accepting the Section 205 Filing with PJM's requested effective date).

[308] *Id.* PP 176-78.

[309] Joint Parties Rehearing Request at 19.

[310] *See, e.g.,* February 2023 Order, 182 FERC ¶ 61,109 at P 173 & n.464 (considering evidence regarding settled expectations (citing EPSA Protest at 19-20; Sotkiewicz Aff. ¶¶ 29-31; LS Power Protest at 3-4; NRG Protest at 18-19; Holtman Aff. ¶¶ 15-19)); *id.* P 178 (concluding that benefits outweigh disruption to settled expectations based on the "totality of the evidence"); *infra* PP 86-87.  As a general matter, courts have deferred to the Commission's weighing of various considerations in cases involving other factual circumstances.  *See, e.g.*, *Citadel FNGE Ltd.*, 2023 WL 4672098 at *8; *Advanced Energy Mgmt. All.*, 860 F.3d at 662; *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54-55 (D.C. Cir. 2014*); NRG Power Mktg., LLC v. FERC*, 718 F.3d 947, 955-56 (D.C. Cir. 2013); *Md. Pub. Serv. Comm'n v. FERC*, 632 F.3d 1283, 1286 (D.C. Cir. 2011); *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009); *Pub. Utils. Comm'n v. FERC*, 254 F.3d at 254.

[311] Joint Parties Rehearing Request at 21 (citing Holtman Aff. ¶ 16 & Ex. C). *See* February 2023 Order, 182 FERC ¶ 61,109 at P 153.

parameter that does not accurately reflect reliability needs and supply and demand fundamentals.[312]

87.    We disagree that PJM posts the parameters to induce reliance.[313]  Posting the entire panoply of parameters provides general transparency to the market participants, but, as explained below, changing the LDA Reliability Requirement should not require changes to market participants' offers.[314]  Constellation argues that parties look to the parameters to make bilateral and hedging arrangements or, in the case of resources with a must-offer requirement, to decide whether and how to participate.[315]  While this information may be of use to participants, Constellation does not allege the precise number is of such paramount importance; the updated Delmarva LDA Reliability Requirement reflecting actual reliability needs and prices for the Delmarva LDA were still high relative to other areas.[316]  Furthermore, we continue to find that resources

---

[312] Joint Parties Rehearing Request at 20 (citing Holtman Aff. ¶¶ 15-27; LS Power Protest at 3-4 & nn.12-13; Sotkiewicz Aff. ¶¶ 48, 104-08; Shanker Aff. ¶ 39; Lotus Protest at 9-10 & n.36).

[313] *Id.* at 21; Constellation Rehearing Request at 19 (questioning "why PJM publicly posts the parameters before the auction at all if market participants need not rely on them"); *see* PJM February 2, 2023 Answer at 21 ("Simply put, updating a previously posted [LDA] Reliability Requirement does not disrupt any settled expectation, because there is no guarantee of what the final BRA clearing price will be based upon the information made available prior to the auction.").

[314] *See infra* P 112; PJM February 2, 2023 Answer at 20:

[t]he posting of the [LDA] Reliability Requirement prior to the conduct of the BRA is intended to provide transparency to Market Participants and are for informational purposes only.  Nothing in the posted [LDA] Reliability Requirement should impact a Market Participant's offer into the RPM Auctions given the underlying reason for a single clearing price market, which is to incent Market Sellers to submit the marginal cost of the resources.  Further, any Market Participants that claim to have made irreversible business decisions based on the posted [LDA] Reliability Requirement did so by attempting to predict the clearing price for the 2024/2025 BRA, but did so at their own risk.

[315] Constellation Rehearing Request at 10, 18-19.

[316] The clearing price in the 2024/2025 BRA for Delmarva was $90.64/MW-day compared to $28.92/MW-day in the Rest of RTO region.  Only one other LDA, DEOK, cleared at a higher price than Delmarva, at $96.24/MW-day.  *See* PJM 2024/2025 Base

Document Access.....: 20220627-3110 FERC PDF (Unofficial) 04/27/2023
Case: 23-1778     Document: 88-1     Page: 212     Date Filed: 12/11/2023

Docket Nos. ER23-729-001 and EL23-19-001                                        - 69 -

offering competitively into the BRA should not need to rely on the LDA Reliability
Requirement in formulating their capacity offers, and that a change in a single input
without certainty of the final capacity price should not induce reliance that would render
the Tariff revisions unjust and unreasonable.[317]   In any event, based on the totality of
the evidence,[318] we find that the benefits of permitting PJM to update LDA Reliability
Requirements to reflect actual reliability needs as proposed in the Section 205 Filing
outweigh any reliance interest market participants may have had.[319]

88.     We recognize the importance of regulatory stability and settled expectations,[320]
and confirm that the Commission considered arguments regarding potential harm to
confidence in the markets in its analysis.[321]   On balance, however, we find that
speculation that parties will not participate due to the unlikely and infrequent potential
for changes to auction parameters—where supported as just and reasonable and not
unduly discriminatory or preferential—during an auction, is balanced out by the
importance of market participants being able to have confidence that the obligations
they receive and charges they pay accurately reflect reliability needs and supply and
demand fundamentals.  We further note that broader concerns about the RPM are better
addressed in ongoing proceedings considering capacity market issues in PJM, such
as in comments on the Commission's June 15 Forum on PJM's capacity market.[322]

---

Residual Auction Report at 5, https://pjm.com/-/media/markets-ops/rpm/rpm-auction-
info/2024-2025/2024-2025-base-residual-auction-report.ashx.

[317] February 2023 Order, 182 FERC ¶ 61,109 at PP 174, 177.

[318] In particular, PJM explained that the existing Tariff would result in load paying
over $100 million in excess of what is necessary for capacity for the 2024/2025 delivery
year.  Transmittal at 34.  Some customers contended that this estimate could be higher,
with Sierra Club and Natural Resources Defense Council estimating that Delmarva
customers would have to pay a total of $175 million more than if PJM's proposal were to
be accepted.  Natural Resources Defense Council and Sierra Club Answer at 4.

[319] February 2023 Order, 182 FERC ¶ 61,109 at P 178.

[320] See id. P 174.

[321] Id. P 180 (acknowledging continuing concerns regarding the operation of
PJM's capacity market and directing a forum to discuss these issues).

[322] PJM Capacity Mkt. F., Notice of Request for Comments, Docket No. AD23-7-
000 (June 30, 2023).

89.     To that end, we recognize that "[c]hanging the rules governing an *already-commenced* auction is a significant step that affects both the outcome of that particular auction as well as parties' confidence in the rules governing future proceedings."[323] Indeed, as the rehearing requests observe and as discussed below, the Commission has at times rejected efforts to change market rules where an auction has begun precisely because of the value it places on reliance interests and settled expectations.[324]  But that value is not absolute.  There may be circumstances where such a significant step is warranted in light of countervailing interests.  This proceeding presents one of those cases.  And it is, for that reason, distinguishable from the circumstances of those other proceedings where the Commission declined to accept changes during an ongoing auction.  For example, in one of Constellation's cited examples, *ISO New England Inc.*,[325] the Commission balanced the benefits of proposed revisions to ISO New England Inc.'s (ISO-NE) tariff and found, on reconsideration, that those benefits did not outweigh the disruptions to settled market expectations or the potential for harm to market participants from changing the calculation used to determine the economic life of capacity resources after the deadline for market participants to submit de-list bids to retire or permanently leave the capacity market.[326]  ISO-NE's internal market monitor determines the expected remaining economic life of the resource seeking to de-list in connection with determining the price at which the resource can retire or leave the market, and the Commission thus agreed that market participants who chose not to submit de-list bids in the current auction based on the existing tariff provisions might have submitted bids under the proposed revisions.[327]

---

[323] Constellation Rehearing Request at 12 (quoting GreenHat Order, 166 FERC ¶ 61,072 at P 33); Clean Energy Associations Rehearing Request at 9-10 (quoting GreenHat Order, 166 FERC ¶ 61,072 at P 33).  Clean Energy Associations further assert that market participants should "be aware of the standard that will be used." Clean Energy Associations Rehearing Request at 10 (quoting *PPL EnergyPlus, LLC*, 115 FERC ¶ 61,383, at P 29 (2006)).  We note that the quoted language did not involve mid-auction changes but rather involved requiring an ISO to ensure that its unofficial interpretations regarding the timing to determine the start of the auction were incorporated into the filed rate so that all market participants could have a standard to determine timely bids.

[324] *See supra* P 65.

[325] Constellation Rehearing Request at 12, 20 (citing *ISO New England Inc.*, 170 FERC ¶ 61,187 at P 17).

[326] *ISO New England Inc.*, 170 FERC ¶ 61,187 at PP 15-18.

[327] *Id.* PP 3, 17.

90.     The GreenHat Order also is not a fair comparison for the circumstance in this proceeding.  That proceeding involved PJM's request to waive four elements of its Tariff and to replace them with rules that had not yet been formed.[328]  Applying its waiver analysis, the Commission found that this proposal was not limited in scope and did not meet the waiver criterion for harm to third parties,[329] based on record evidence that market participants relied on the existing rule in submitting their offers.[330]  In this FPA section 205 proceeding (ER23-729-000), the Commission found that the benefits of accepting the proposal to apply to the 2024/2025 BRA outweighed the potential disruption to settled expectations.  The Commission's balancing of benefits against settled expectations to reach this conclusion therefore does not constitute a change in policy from these orders but rather an application of a case-by-case analysis to the facts of this proceeding.  Even if we were to consider this determination to be a change in policy of the kind addressed in *Fox*, the balancing the Commission undertook in the February 2023 Order itself demonstrates that the Commission thus "provided a reasoned explanation for its action," and the reasons for such departure.[331]

### 3.     Tariff Revisions

91.     In the February 2023 Order, the Commission found just and reasonable PJM's proposal to revise the LDA Reliability Requirement, under certain circumstances, to incorporate updated information regarding which Planned Generation Capacity Resources are offering into the BRA.[332]  The Commission explained that the proposed

---

[328] GreenHat Order, 166 FERC ¶ 61,072 at P 33.

[329] The Commission has granted waiver of tariff provisions where: (1) the applicant acted in good faith; (2) the waiver is of limited scope; (3) the waiver addresses a concrete problem; and (4) the waiver does not have undesirable consequences, such as harming third parties.  *See, e.g., Citizens Sunrise Transmission LLC*, 171 FERC ¶ 61,106, at P 10 (2020); *Midcontinent Indep. Sys. Operator, Inc.*, 154 FERC ¶ 61,059, at P 13 (2016).

[330] GreenHat Order, 166 FERC ¶ 61,072 at P 34 (finding that PJM "ha[d] not demonstrated that its interest in alleviating the impact of GreenHat's default justifies its request to bypass the rules governing the already-commenced July monthly [Financial Transmission Rights] auction").

[331] *Fox*, 556 U.S. at 515.

[332] February 2023 Order, 182 FERC ¶ 61,109 at PP 150-162.

Document Access No. 20150527-5140 FERC PDF (Unofficial) 05/27/2015
Case: 23-1778    Document: 88-1    Page: 215    Date Filed: 12/11/2023

Docket Nos. ER23-729-001 and EL23-19-001                                        - 72 -

Tariff revisions would help meet the goals of the PJM capacity market by setting clearing prices that are based on accurate reliability assessments.[333]

92.    The Commission disagreed with protestors' arguments that the proposal was arbitrary or unduly discriminatory because PJM proposed to include Planned Generation Capacity Resources in the LDA Reliability Requirement calculation based on their participation in the capacity auctions.  In particular, the Commission disagreed that Planned Generation Capacity Resources that offer into the auction but either do not clear or are mitigated are functionally similar to Planned Generation Capacity Resources that do not offer at all, explaining that "[c]apacity offers signal that the resource intends to be available to serve as capacity in the relevant [D]elivery [Y]ear at a price equal to or above their capacity supply offer, even if they do not actually clear in the BRA," and therefore are appropriately included as projected internal capacity in the calculation of the LDA Reliability Requirement.[334]  By contrast, the Commission explained that Planned Generation Capacity Resources that do not offer into the capacity auctions cannot reasonably be assumed to be available to serve as capacity in the Delivery Year and are appropriately excluded from the LDA Reliability Requirement because, even if they become operational by the Delivery Year, they will not have capacity commitments and load will not depend on them as capacity resources.[335]  The Commission further disagreed with arguments that the proposal was unduly discriminatory or preferential because the proposed revisions are limited to Planned Generation Capacity Resources, rather than all resources that are exempt from the must-offer requirement.  The Commission explained that Planned Generation Capacity Resources are not similarly situated to existing resources with respect to determining reliability needs because Planned Generation Capacity Resources have not yet achieved commercial operation and thus face construction and other risks, making it more likely that they will not be able to provide capacity in some or all of the relevant Delivery Year.[336]

93.    The Commission also held that changing the LDA Reliability Requirement did not mean that PJM must allow sellers to adjust their seller offers, as changes to the LDA Reliability Requirement affect the shape of the demand curves, and capacity market seller

---

[333] *Id.* P 150; *id.* P 153 (disagreeing that PJM's proposal will prevent the market from sending a price signal that additional capacity is needed, explaining that the prices resulting from PJM's proposal will accurately reflect supply and demand, creating market incentives that are correct and consistent with reliability needs (citing Market Monitor February 6, 2023 Answer at 4)).

[334] *Id.* P 151.

[335] *Id.* P 152 (citing PJM February 2, 2023 Answer at 29).

[336] *Id.* P 154.

offers should reflect the resource's costs rather than demand.[337]  The Commission further held that PJM's proposed one percent threshold provided a reasonable mechanism to enable PJM to revise the LDA Reliability Requirement when enough Planned Generation Capacity Resources do not offer into the BRA as expected, such that the LDA's Reliability Requirement would be materially increased.[338]

### a.  Requests for Rehearing

94.     Joint Parties and P3 continue to assert on rehearing that PJM has not shown its proposal to be just and reasonable, even as applied to future BRAs that have not yet commenced.[339]  They each allege that the Commission's determination to accept the Tariff revisions was not supported by substantial evidence and failed to confront contrary evidence presented by the protestors.[340]  Joint Parties argue that the Commission erred by: failing to explain why it is appropriate to modify just one of the forecasted auction variables used by PJM;[341] accepting PJM's proposal to exclude Planned Generation Capacity Resources that do not submit offers into the capacity auctions, which arbitrarily treats Planned Generation Capacity Resources differently than resources that do not

---

[337] *Id.* P 158.

[338] *Id.* P 160.

[339] Joint Parties Rehearing Request at 23-39, 48-50; P3 Rehearing Request at 18-40.

[340] *See* Joint Parties Rehearing Request at 20, 31-34, 42, 48-50; P3 Rehearing Request at 7-8, 18-19 (arguing that the Commission's conclusion that PJM's proposal is just and reasonable is not based on substantial evidence concerning the rate change, does not articulate a rational connection between the record evidence and the decision to approve the rate change, and both ignores and misconstrues contrary evidence and arguments concerning the merits of PJM's proposal (citing 5 U.S.C. § 706(2); *Fox*, 556 U.S. at 515; *Mich. v.* EPA, 576 U.S. at 750; *Mo. Pub. Serv. Comm'n*, 337 F.3d at 1070-75; *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374-75 (1998) (*Allentown*); *State Farm*, 463 U.S. at 43; *N. States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994); *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1514 (D.C. Cir. 1984)).

[341] Joint Parties Rehearing Request at 23-31, 48 (citing *Allentown*, 522 U.S. at 374; *Baltimore Gas*, 462 U.S. at 105; *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1153 (D.C. Cir 2011); *GameFly*, 704 F.3d at 148; *Tenn. Gas Pipeline*, 824 F.2d at 84; *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (*PPL Wallingford*); *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009) (*ICC*)).

submit offers into the auctions;[342] overlooking the impact of its decision on bilateral contracting and hedging;[343] failing to respond meaningfully to arguments that PJM's one percent threshold for adjusting the LDA Reliability Requirement is arbitrary;[344] failing to demonstrate that it had fulfilled its obligation under the FPA to consider investor interests;[345] and failing to engage with arguments and evidence regarding supply issues in Delmarva and the reliability implications of the February 2023 Order declaring such issues to be beyond the scope of the proceeding.[346]

95.     P3 argues that the Commission falls short of its obligations under the APA because it "sidestep[ped] the record evidence" in the proceeding and instead based its determination on unsupported and insufficient assertions that PJM's proposal would produce a lower clearing price than the existing Tariff and would more closely align the LDA Reliability Requirement with actual reliability needs.[347]  P3 asserts that PJM "pinned its proposal entirely" on asserting that the proposed revisions would produce a clearing price one-fourth the price produced by the *ex ante* Tariff, but that asserting that a proposed rate is lower or "better" than the existing rate does not show that a rate is just and reasonable under FPA section 205.[348]  P3 also questions PJM's claim regarding the

---

[342] *Id.* at 24-31, 48-9 (citing *Allentown*, 522 U.S. at 374; *Baltimore Gas*, 462 U.S. at 105; *Bus. Roundtable*, 647 F.3d at 1153; *GameFly*, 704 F.3d at 148; *Tenn. Gas Pipeline*, 824 F.2d at 84).

[343] *Id.*  at 31-33, 49 (citing 5 U.S.C. § 706(2)(E); 16 U.S.C. § 825*l*(b); *ICC*, 576 F.3d at 477; *PG&E*, 373 F.3d at 1319).  *See, e.g.*, P3 Protest at 30-42; Kelliher Aff. ¶ 39; Shanker Aff. ¶¶ 53-59; EPSA Protest at 18-31; Sotkiewicz Aff. ¶¶ 32-38, 61-108; Constellation Protest at 16-18.

[344] Joint Parties Rehearing Request at 33-34, 49 (citing *PPL Wallingford*, 419 F.3d at 1198; *Genuine Parts Co.*, 890 F.3d at 312; *GameFly*, 704 F.3d at 148; February 2023 Order, 182 FERC ¶ 61,109 at P 160).

[345] *Id.* at 34-39, 49-50 (citing *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944); *AGA*, 593 F.3d at 20; *PPL Wallingford*, 419 F.3d at 1198; *State Farm*, 463 U.S. at 43).

[346] *Id.* at 37-39, 50 (citing *Genuine Parts Co.*, 890 F.3d at 312; *PPL Wallingford*, 419 F.3d at 1198).

[347] P3 Rehearing Request at 19-20 (citing *Mo. Pub. Serv. Comm'n*, 337 F.3d at 1070; *Elec. Consumers Res. Council*, 747 F.2d at 1517; Transmittal at 20; EL23-19 Transmittal at 34).

[348] *Id.* at 20-21.

clearing price produced by its proposal, asserting that PJM failed to explain how it calculated the indicative clearing price(s) and did not even provide an approximation of the magnitude of the indicative price(s) produced by the *ex ante* Tariff.[349]  P3 argues that the Commission failed to fulfill its statutory obligations because it did not require any information about PJM's indicative results and how PJM generated them.[350]

96.     Moreover, P3 asserts that the clearing price and consumer rate impact calculations provided by ODEC and the Maryland Office of People's Counsel (Maryland People's Counsel) are not valid because ODEC and Maryland People's Counsel used calculation methods that are "fundamentally unsound" and relied on PJM's unsupported assertion regarding the four-fold increase in Delmarva.[351]  By contrast, P3 asserts that it and other parties provided "reams of evidence" and expert witness testimony demonstrating that the proposal is unlawful.[352]  P3 argues that the Commission did not reference any record evidence to support the few "conclusory assertions" comprising its rationale for finding PJM's proposal just and reasonable,[353] and that the Commission's attempt to rely on

_____

[349] *Id.* at 21-22 ("*In fact, PJM did not even demonstrate that it used the approach proposed in this proceeding in making its internal assessment that* [the Delmarva clearing price] *should be one-fourth the price produced by the existing Tariff.*").

[350] *Id.* at 22-23.

[351] *Id.* at 23-24 (arguing that ODEC did not explain why the July 2022 BRA clearing price for Delmarva is an appropriate starting point for calculating the lower bound of the 2024/2025 BRA, or why it was appropriate to set its lower and upper bounds using data from two separate BRAs, and that Maryland People's Counsel provided no explanation whatsoever for its "rough calculation" of consumer rate impact (citing ODEC Answer at 3-4; Maryland People's Counsel Comments at 3 n.1)).

[352] *Id.* at 24 (asserting that the Commission ignored evidence that:  (1) every variable on the demand side of the BRA is based on forecasts and assumptions and can be off in either direction; (2) PJM's proposal only requires one variable to be adjusted after it is too late for the market to respond and only if the forecast is too high; (3) the clearing price produced by the optimization under the existing Tariff was economically rational for Delmarva; and (4) allowing PJM to "bait-and-switch" sellers after their offers have been submitted will undermine confidence in the market (citing P3 Protest at 21-22, 32-34, 41; Shanker Aff. at 24-29, 35-36)); *see also id.* at 26 (the Commission's failure to address contrary evidence rendered the order unlawful (citing *State Farm*, 463 U.S. at 52)).

[353] *Id.* at 25-26 (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 150, 153, 159, 160).  P3 states that the Commission spends the majority of the three relevant paragraphs in the February 2023 Order rejecting protestors' arguments against the

statements from PJM and the Market Monitor about supply and demand fundamentals
likewise does not support the outcome because neither PJM nor the Market Monitor
provided supporting evidence for their statements.[354]

97.     In addition to lack of evidentiary support, P3 asserts that the Commission's
rationale for accepting PJM's proposal is also unlawful under the APA because the
Commission misconstrues the relationship between supply and demand in a competitive
market.[355]  P3 claims that the Commission ignores the fact that supply and demand are
necessarily interrelated, and "attempts to treat supply and demand as hermetically sealed
off from each other in the context of the PJM capacity market."[356]  This error leads, P3
contends, to overstating the impact of a single demand-side auction parameter in pursuit
of more accurate demand side fundamentals in the auction, without also considering
supply fundamentals, and can have a significant impact on clearing prices without a
showing that the resulting rates will be just and reasonable.[357]  In addition, P3 argues that
the Commission misconstrues the supply-side market dynamics of PJM's auction by
taking the position that sellers of a product should make decisions about whether to sell
that product, and at what price, without regard for the market demand for the product.[358]
Even were the Commission correct that a change on the demand side of the BRA should
not alter a seller's offer price, P3 submits that demand-side conditions impact the market
behavior of sellers with the option not to offer capacity who must decide whether to offer
into a BRA or not, as well as resources that do have a must-offer obligation and must

---

proposal, instead of explaining how it will produce just and reasonable rates.  *Id.*
at 25 n.85.

[354] *Id.* at 26 (citing *Elec. Consumers Res. Council*, 747 F.2d at 1517).

[355] *Id.* at 27-34.

[356] *Id.* 28 (citing February 2023 Order, 182 FERC ¶ 61,109; *Hughes*, 578 U.S.
at 157; *FERC v. EPSA*, 577 U.S. 260, 269 (2016)).

[357] *Id.* at 28-30 (citing *Mo. Pub. Serv. Comm'n*, 337 F.3d at 1070; *Elec. Consumers
Res. Council*, 747 F.2d at 1517; February 2023 Order, 182 FERC ¶ 61,109 at PP 149-
150).

[358] *Id.* at 30-31 (pointing out that seller offers below the market seller offer cap do
not need to be cost-based, and arguing that sellers in PJM's capacity market rely heavily
on demand-side conditions, including auction planning parameters, to inform their
auction behavior (citing *Duquesne Light Co.*, 122 FERC ¶ 61,039, at P 141 (2008)); *PJM
Interconnection, L.L.C.*, 126 FERC ¶ 61,275, at P 198 (2009); February 2023 Order, 182
FERC ¶ 61,109 at P 158).

Document Access~~~~r~:~20230627-~~~~ Filed Date: 04/27/2023 Case: 23-1778 Document: 88-1 Page: 220 Date Filed: 12/11/2023

Docket Nos. ER23-729-001 and EL23-19-001                                          - 77 -

decide whether to engage in bilateral capacity transactions.[359] Finally, P3 asserts that the Commission's assumptions regarding demand-side changes are inconsistent with the design of RPM's Capacity Performance framework, as it goes against the requirement that sellers come up with estimates of the number of Performance Assessment Intervals in the Delivery Year and incorporate into their seller offers the costs associated with any quantifiable and reasonably-supported risks.[360]

98.     Joint Parties and P3 point out that the forecasts on which PJM relies to conduct the BRAs involve assumptions that are necessarily imprecise, and contend that PJM has not justified modifying only one forecasted variable when the forecast assumptions do not prove accurate.[361] Moreover, Joint Parties assert, EPSA's witness Dr. Sotkiewicz explained that the proposed adjustments are inconsistent with how PJM calculates the LDA Reliability Requirement:  PJM includes existing resources and planned resources that have executed interconnection service agreements in the projected capacity when it

---

[359] *Id.* at 31-32 (asserting that at least one party provided evidence that the planning parameters affected its decisions regarding whether to offer into the BRA or engage in a bilateral capacity transaction (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.4. General Provisions (7.1.0), § 4.6(a); *id.* OATT ATTACHMENT DD.3 Responsibilities Of The Office Of The (10.0.0), § 3.1; February 2023 Order, 182 FERC ¶ 61,109 at P 157; NRG Companies Protest at 18-19)).

[360] *Id.* at 32-33 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.6.8 Avoidable Cost Definition (2.0.0), § 6.8); *id.* at 33-34 (explaining that whether, and to what extent, Performance Assessment Intervals are likely to occur in the Delivery Year depends, in part, on the LDA's Reliability Requirement and whether sufficient supply will be available to serve the load in a particular LDA (citing *IMM v. PJM*, 176 FERC ¶ 61,137 at P 71)); *see also* Joint Parties Rehearing Request at 43 (asserting that the Commission erred by rejecting requests to rerun the BRA, given arguments that the risk of Performance Assessment Intervals imposes substantial costs on suppliers).

[361] P3 Rehearing Request at 35 (PJM's proposal permits it to adjust the LDA Reliability Requirement when its assumptions turn out to be inaccurate under certain circumstances, but not others); Joint Parties Rehearing Request at 24 (claiming that neither PJM in the Section 205 Filing nor the Commission in the February 2023 Order explained why it is necessary or appropriate to modify just one forecasted variable for the 2024/2025 BRA—i.e., Planned Generation Capacity Resources—and then to make adjustments "in one direction" (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.10 Auction Clearing Requirements (31.0.0), § 5.10; *id.* OATT ATTACHMENT DD.5.11 Posting of Information Relevant (17.0.0), § 5.11; *Joint Consumer Representatives v. PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,187, at P 32 (2015); EPSA Protest at 18; P3 Protest at 32-34)).

models the LDA Reliability Requirement, but now will adjust the LDA Reliability Requirement based solely on whether a planned resource offers into the capacity auction.[362]  According to Joint Parties, this constitutes "subtracting apples from oranges" and will cause serious problems.[363]

99.      Joint Parties and P3 renew objections that the Tariff revisions draw an arbitrary distinction by including Planned Generation Capacity Resources that offer into the BRA in the LDA Reliability Requirement calculation when other resources have the similar effects on reliability in the LDA.  P3 and Joint Parties continue to assert on rehearing that Planned Generation Capacity Resources that offer but do not clear in a BRA are functionally the same from a reliability perspective.[364]  They each also focus on resources without an RPM must-offer obligation, such as intermittent resources.  Joint Parties assert that intermittent resources often do not offer into the capacity auctions, but nevertheless may be in operation by the start of the Delivery Year and thus are the same, functionally, as an existing resource that did not participate in or clear the auction (which would be included in capacity).[365]  In addition, P3 argues that the Commission failed to adequately respond to arguments that the forecasting error that PJM believes renders its LDA Reliability Requirement inaccurate is caused by existing resources that do not have RPM must-offer obligations, in addition to Planned Generation Capacity Resources.[366]

---

[362] Joint Parties Rehearing Request at 24-25 (citing Sotkiewicz Aff. ¶¶ 46-72).

[363] *Id.* (citing *MCI Telecomms. Corp. v. FCC*, 143 F.3d 606, 608 (D.C. Cir. 1998); Sotkiewicz Aff. ¶ 50; *id.* at 30 (contending that the Commission failed to address arguments that PJM's proposal is incompatible with the fact that PJM's modeling calculates the LDA Reliability Requirement based solely on whether resources are anticipated to be physically present (citing Sotkiewicz Aff. ¶¶ 12, 48-49; P3 Protest at 33-34; *PPL Wallingford*, 419 F.3d at 1198; *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998); *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1303 (D.C. Cir. 1992))).

[364] *Id.* at 26 (citing Sotkiewicz Aff. ¶ 66); P3 Rehearing Request at 36 (asserting that Planned Generation Capacity Resources that offer into a BRA but do not clear are the same in terms of their capacity contributions to an LDA as Planned Generation Capacity Resources that choose not to offer).

[365] Joint Parties Rehearing Request at 25-26 (citing Sotkiewicz Aff. ¶¶ 57-60; Holtman Aff. ¶ 30).

[366] P3 Rehearing Request at 37-38 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 154; P3 Protest at 39-40; Shanker Aff. at 17, 36-37).

100.    Joint Parties and P3 further take issue with the Commission's rationale for distinguishing Planned Generation Capacity Resources that offer into a BRA as having signaled the intent to serve as capacity.[367]  Joint Parties claim that, the Commission failed to grapple with Dr. Sotkiewicz's undisputed testimony demonstrating that offers are not necessarily indicative of whether a Planned Generation Capacity Resource will be in operation by a particular Delivery Year.[368]  Joint Parties allege that the Commission's justifications in the February 2023 Order for accepting this aspect of PJM's proposal are illogical on an individual basis and inconsistent when read together.[369]  P3 maintains that the question of whether a resource is likely to exist in the Delivery Year is only relevant for purposes of assessing the reliability needs for that Delivery Year if the resource obtains a capacity commitment through a PJM capacity auction.[370]  In addition, P3 asserts that whether a resource qualifies as existing depends on whether it has cleared a previous capacity auction, and that resources can and do become existing resources before their commercial operation dates and can then offer into BRAs as existing resources prior to

---

[367] *Id.* at 36-37 (arguing that the Commission's attempt to distinguish the two based on the offering resources' intent to be available to serve as capacity falls short because the Commission does not explain why intent matters); Joint Parties Rehearing Request at 26-29.

[368] Joint Parties Rehearing Request at 26.

[369] *Id.* at 27-29 (citing *Bus. Roundtable*, 647 F.3d at 1153; *Air Transp. Ass'n of Am. v. Dep't of Transp.*, 119 F.3d 38, 43 (D.C. Cir. 1997); *Air Line Pilots Ass'n v. FAA*, 3 F.3d 49, 453 (D.C. Cir. 1993); *GameFly*, 704 F.3d at 148; *State Farm*, 463 U.S. at 43; *Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2018); *Ill. Pub. Telecomm. Ass'n v FCC*, 117 F.3d 555, 566 (D.C. Cir. 1997)); *see id.* at 26-27 (referring to the Commission's determinations that:  (1) Planned Generation Capacity Resources that do not submit offers and those that submit offers but do not clear are not functionally similar; (2) planned and existing resources are not similarly situated with respect to determining reliability needs in a given Delivery Year; and (3) even if some of the Planned Generation Capacity Resources that do not submit offers could become operational by the time of the relevant Delivery Year, these resources will not have capacity commitments (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 151-52, 154)).

[370] P3 Rehearing Request at 38-39 (asserting that the question of whether resources will achieve commercial operation by the Delivery Year is irrelevant to the reliability needs in that Delivery Year where two resources—one existing and one planned—each tell PJM that they are not willing to take on a capacity commitment).

Document Access Case: 23-1778 Document: 88-1 Page: 223 Date Filed: 12/11/2023
Document Access No. 20230727-5120 Filed Date: 07/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 80 -

achieving commercial operation.[371] P3 thus contends that the revisions accepted in the February 2023 Order are ultra vires under the FPA and Commission precedent and come at a time when the PJM capacity market is already under duress.[372]

101.    Joint Parties also continue to object to the one percent materiality threshold in the revisions accepted in the February 2023 Order, contending that this value was not supported by empirical evidence,[373] and that the Commission's conclusion that the threshold avoids having to arbitrarily define what constitutes a "small" LDA is "no answer at all" because it does not explain why the threshold is just and reasonable.[374]

102.    Joint Parties further argue that the Commission erred by failing to consider supplier interests or long-term harm to consumers from accepting the Section 205 Filing, even as applied prospectively to capacity auctions not yet commenced.[375] Joint Parties state that there is no evidence in the February 2023 Order that the Commission considered investor interests or even recognized the one-sided nature of PJM's proposal.[376] In addition to arguing that the Commission failed to consider the settled expectations of market participants, Joint Parties contend that the Commission failed to acknowledge or seriously consider the detrimental impacts on market participants' ability to rely on the posted auction parameters and rules going forward.[377] In particular, Joint Parties maintain that the revisions will chill investment, deter participation in capacity auctions by new resources and resources without must-offer obligations, and encourage

---

[371] *Id.* at 38 (asserting that, in such case, an existing resource without an RPM must-offer obligation would be similarly situated to a Planned Generation Capacity Resource "in all relevant respects").

[372] *Id.* at 39 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 180).

[373] Joint Parties Rehearing Request at 33 (citing EPSA Protest at 25-26; Sotkiewicz Aff. ¶ 37; Vistra Corp. Protest at 11-12).

[374] *Id.* at 33-34 (citing *PPL Wallingford*, 419 F.3d at 1198; *NorAm Transmission Co.*, 148 F.3d 1165; *Genuine Parts Co.*, 890 F.3d at 312; February 2023 Order, 182 FERC ¶ 61,109 at P 160).

[375] *Id.* at 34-39.

[376] *Id.* at 34-35 (arguing that the Commission's ratemaking obligations require a "balancing of the investor and consumer interests" (quoting *Morgan Stanley Cap. Grp. Inc. v. Pub Util. Dist. No.1 of Snohomish Cty., Wash.*, 554 U.S. 527, 532 (2008)).

[377] *Id.* at 35 (citing February 2023 Order, 182 FERC ¶ 61,109, Danly, Comm'r, dissenting at P 35).

premature deactivation of other resources.[378]  They contend that the Commission's declaration that the revisions will result in an LDA Reliability Requirement that reflects actual reliability needs consistent with supply and demand fundamentals is "simply wrong" because the lack of offer says nothing about actual supply and demand fundamentals or the price needed to maintain reliability with respect to Planned Generation Capacity Resources that will be operational during a Delivery Year.[379]  Joint Parties argue that the Commission's statement dismissing the Indian River Reliability Must Run agreement as the subject of another proceeding appears to have been directed to unrelated arguments by another protestor, and the Commission did not engage with evidence presented by Dr. Sotkiewicz that Indian River's circumstances reflect supply issues in Delmarva.[380]  Ultimately, Joint Parties assert that the Commission's focus on immediate rate impacts failed to consider both the rights of suppliers and the long-term interests of consumers in reliable supplies of electricity, and the resulting impacts on investment and market participation could jeopardize reliability and raise prices in the long-term.[381]

103.    Joint Parties argue that the Commission also failed to address protestors' concerns that it is not just and reasonable to adopt an LDA Reliability Requirement that is subject

---

[378] *Id.* at 36 (citing EPSA Protest at 20-21; Sotkiewicz Aff. ¶ 36); *id.* (citing testimony by Dr. Sotkiewicz stating that the Indian River facility in Delmarva plans to retire because it failed to clear in prior BRAs and suggesting that increased uncertainty in auction parameters and market rules will further discourage participation in RPM (citing EPSA Protest at 23, 27-28; Sotkiewicz Aff ¶¶ 38, 59-60, 70-72, 76-77)).

[379] *Id.* at 37 (citing *AGA*, 593 F.3d at 20; *PPL Wallingford*, 419 F.3d at 1198; February 2023 Order, 182 FERC ¶ 61,109 at PP 150, 159; Sotkiewicz Aff. ¶ 59).

[380] *Id.* at 37-38 (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 100, 159; Sotkiewicz Aff. ¶¶ 72, 90-95; Maryland People's Counsel Comments at 7).  Joint Parties also question the Commission's determination that arguments that PJM overlooked other reliability issues are outside the scope of the proceeding, as Joint Parties contend it is unclear to which arguments this is referring but that if the Commission is referring to EPSA's concern that PJM's proposal failed to consider PJM's modeling assumptions and thus will fail to send price signals necessary for reliability, these arguments go directly to the justness and reasonableness of the Section 205 Filing.  *Id.* at 38 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 159; EPSA Protest at 26, 28).

[381] *Id.* at 38-39 (citing *Nat'l Ass'n for the Advancement of Colored People v. FERC*, 425 U.S. 662, 669-70 (1976)).

to change after it has been posted.[382]  Joint Parties assert that the Commission did not adequately address evidence that allowing PJM to modify the LDA Reliability Requirement during the running of the BRA would reduce the value of the posted planning auction parameters and introduce unnecessary uncertainty for market participants.[383]  Joint Parties contend that the Commission's response that entities will, in the future, be able to account for potential adjustments to the LDA Reliability Requirement in their business decisions does not align with record evidence, "and the Commission nowhere explains how market participants are supposed to account for changes like that in this case, which would result in a clearing price being 76 percent lower than the previously expected price."[384]

104.    To the extent that the Commission does not apply the filed rate doctrine, Constellation argues that it must review any proposed changes to the market rules for an auction made after supplier offers are received under the heightened *Mobile-Sierra* public interest standard of review.[385]  Constellation asserts that its application to PJM's capacity auction is appropriate, even though the *Mobile-Sierra* standard typically applies only to contract rates, noting that the D.C. Circuit affirmed the Commission's application of the *Mobile-Sierra* standard for challenges to ISO-NE's capacity auction results based on its

---

[382] *Id.* at 31-33.

[383] *Id.* at 31 (citing Sotkiewicz Aff. ¶¶ 17, 25, 27-29; Holtman Aff. ¶ 32).

[384] *Id.* at 31-32 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 157; 16 U.S.C. § 825*l*(b); *ICC*, 576 F.3d at 477; *PG&E*, 373 F.3d at 1319; *see id.* at 32 (noting that Mr. Holtman testified that no discounting of the projected clearing price could capture a swing of the magnitude that would result from PJM's proposed after-the-fact adjustment in any meaningful way (citing Holtman Aff. ¶ 32)); *id.* (arguing that although the LDA Reliability Requirement is a single input, it is posted to allow market participants to make decisions regarding bilateral hedging and commercial decisions and provides input that is particularly critical to those decisions (citing February 2023 Order, 182 FERC ¶ 61,109 at P 177; *id.* (Danly, Comm'r, dissenting at n.17); *PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079 (2006); *PJM Interconnection, L.L.C.*, 107 FERC ¶ 61,112 (200); *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275, at P 198 (2009); PJM, Answer, Docket No. ER09-412-000, at 33 (filed Feb. 2, 2009); Holtman Aff. ¶ 15-19).

[385] Constellation Rehearing Request at 21 (citing *Mobile*, 350 U.S. 332; *Sierra*, 350 U.S. 348); *see id.* at 3, 5, 21-22 (arguing that the Commission erred by failing to apply the heightened *Mobile-Sierra* public interest standard to its review of proposed changes to market rules for a BRA after supplier offers were received (citing *New England Power Generators Ass'n*, 707 F.3d at 371).

Document Accession #: 20230727-3103 Filed Date: 07/27/2023

conclusion that the auction rates exhibited "many of the indicia of contract rates," such as a market-based mechanism to value capacity resources based on location and rates disciplined by a market that are consistent with the FPA's requirements.[386]  Constellation asserts that PJM's capacity market not only has these same features, but that the auction process also is akin to a contract negotiation—involving offers of the lowest price sellers would accept for a supply obligation and acceptance via the auction optimization.[387]  "It is hard to see," Constellation queries, "how PJM could succeed in showing that a Tariff revision is necessary to avoid serious harm to the public interest, given the limited issue it identified and the fact that this issue will not recur after PJM's revision is applied to future auctions."[388]

105.    Constellation asserts that the Commission described, but did not respond to, its argument that PJM lacked authority to make its filing without undergoing stakeholder review because there was no "imminent economic harm" as required under the Tariff.[389]  Constellation continues to assert that PJM had information "well in advance" of the BRA regarding whether Planned Generation Capacity Resources intended to offer into the BRA, and that, even if it had not had this information, the BRA results were not extreme enough to justify the Section 205 Filing.[390]

### b.    Commission Determination

106.    We continue to find that the Tariff revisions accepted in the February 2023 Order are just and reasonable and not unduly discriminatory or preferential.  Accepting the Tariff revisions in the Section 205 Filing will help ensure that the RPM is able to secure sufficient capacity in the relevant Delivery Year and send accurate long-term price signals to ensure the reliability of PJM's system.[391]  On rehearing, Joint Parties and P3

---

[386] *Id.* at 21-22 (citing *New England Power Generators Ass'n, Inc.*, 707 F.3d at 371 (citation omitted)).

[387] *Id.* at 22.

[388] *Id.*

[389] *Id.* at 23 (citing Constellation Protest at 5-10).

[390] *Id.*

[391] February 2023 Order, 182 FERC ¶ 61,109 at P 150 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.1. INTRODUCTION (1.0.0), § 1).

Document Access in FERC: 20191027-910s FERC PDF (Unofficial) 04/17/2023  Case: 23-1778   Document: 88-1   Page: 227   Date Filed: 12/11/2023

Docket Nos. ER23-729-001 and EL23-19-001                                      - 84 -

primarily reassert arguments already raised with respect to the Tariff revisions[392] that do not change our conclusion.  As discussed further below, the Commission's determination in the February 2023 Order is supported by substantial record evidence and is also consistent with reasonably applied principles of supply and demand.  We also continue to find that PJM justified its proposal to adjust the LDA Reliability Requirement based on a Planned Generation Capacity Resource's participation in the relevant BRA (instead of its presence in the LDA for the relevant Delivery Year based on an executed interconnection service agreement).  Likewise, we continue to find that PJM supported the one percent threshold used to measure a material increase to the LDA Reliability Requirement sufficient to trigger this adjustment.  We disagree that the potential for the Tariff revisions to affect market participants' hedging and bilateral arrangements, or any of the other potential market harms alleged, render the proposal unjust and reasonable.  Finally, as discussed further below, we confirm that Constellation is mistaken in asserting that the Commission should have reviewed the Tariff revisions under the public interest application of the just and reasonable standard, and in claiming that PJM lacked authority under its Tariff to submit the filing without full stakeholder review.

107.    The Commission limits its evaluation of a utility's proposed tariff revisions to an inquiry into "whether the rates proposed by a utility are reasonable—and does not extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs."[393]  The proposed revisions need not be the best or the only reasonable methodology.[394]  Here, PJM demonstrated that the proposed revisions will enable it, under appropriate circumstances, to update the LDA Reliability Requirement, ensuring that load-serving entities are charged for capacity based on an LDA Reliability Requirement that reflects actual reliability needs in a manner consistent with supply and demand fundamentals.[395]

---

[392] *See, e.g.*, P3 Protest at 30-42; Vistra Corp. Protest at 11-12; EPSA Protest at 18-31.

[393] *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984).

[394] *See Midcontinent Indep. Sys. Operator, Inc.*, 180 FERC ¶ 61,141, at P 79 (2022) (RTO bears the burden of showing that proposal under FPA section 205 is a just and reasonable proposal, but not that is the best or most just and reasonable option); *Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) ("[The Commission] is not required to choose the best solution, only a reasonable one."); *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 955 (D.C. Cir. 2007) ("We need not decide whether the Commission has adopted the best possible policy as long as the agency has acted within the scope of its discretion and reasonably explained its actions.").

[395] February 2023 Order, 182 FERC ¶ 61,109 at P 150.

Document Accession #: 20230627-3129  Filed Date: 06/27/2023

108.    We find no merit in P3's and Joint Parties' assertions that the Commission lacked substantial evidence to support accepting PJM's proposal.  As an initial matter, the Commission did not find PJM's proposal to be just and reasonable "simply because it would produce a clearing price one-fourth the price produced by the *ex ante* Tariff";[396] the Commission based its decision on evidence that the proposal would result in rates that accurately reflect reliability needs and supply and demand fundamentals.[397]  As such, the proposed Tariff revisions would help ensure the capacity market achieves its goal of securing sufficient capacity to maintain reliability through accurate long-term price signals.[398]  In accepting the Tariff revisions, the Commission considered evidence presented by PJM regarding the impact of Planned Generation Capacity Resources that do not offer into a BRA on the LDA Reliability Requirement, competitive capacity supply offers and price signals, and the validity of the proposed one percent threshold.[399]  P3 maintains that PJM should have provided evidence of how it calculated the preliminary prices that gave rise to concern about the effect of the existing Tariff on Delmarva, and that the Commission thus erred in "accept[ing] PJM's filing *without citing any record evidence whatsoever concerning the rates PJM's proposal would produce.*"[400]  We do not find this concern to be credible, as PJM explained the circumstances causing the higher prices,[401] the Tariff provisions governing its calculation, and how PJM's proposal would address this issue.[402]  With respect to these circumstances, the Market Monitor agreed that absent "a modification consistent with PJM's proposed rule change,

---

[396] P3 Rehearing Request at 20-21.

[397] February 2023 Order, 182 FERC ¶ 61,109 at P 150.

[398] PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.1. Introduction (1.0.0), § 1.

[399] *See* February 2023 Order, 182 FERC ¶ 61,109 at PP 150-161 (citing Transmittal at 19-20; PJM February 2, 2023 Answer at 28-29; Market Monitor February 6, 2023 Answer at 4).

[400] P3 Rehearing Request at 21.

[401] Transmittal at 9-10, 15-17 (explaining that "the application of the [LDA] Reliability Requirement increasing the reliability requirement based on the expected participation of Planned Generation Capacity Resources in a small LDA that then did not actually offer into the auction" caused the estimated price for Delmarva to be higher, without signaling a need for more capacity, and that this was caused by Planned Generation Capacity Resources being included in the modeling assumptions but not offering into the BRA).

[402] *Id*. at 10, 18-22.

Docket Nos. ER23-729-001 and EL23-19-001                                   - 86 -

the capacity prices in the [Delmarva] would be significantly greater than the efficient and competitive level because the supply and demand fundamentals in the model do not reflect reality."[403]  It was reasonable for PJM, as the RTO responsible for administering the capacity auctions and ensuring reliability, to submit the Section 205 Filing based on estimates of the prices in Delmarva and its concern that the LDA Reliability Requirement was "overstated" and "inaccurate."[404]

109.    Although not the sole basis for the Commission's determination, we disagree with the assertion that PJM's estimate was invalid, and thus that predictions relying on that estimate would be the "fruit of the poisonous tree."[405]  PJM estimated that, under the existing Tariff, load in the Delmarva LDA would pay over $100 million in excess of what is necessary for capacity for the 2024/2025 Delivery Year.[406]  PJM, as the independent entity that administers the market, is in the best position to estimate the clearing price before the auction is completed.  PJM is the only party to this proceeding with access to the capacity supply offers in the 2024/2025 BRA and the software that clears the market and generates the prices.  Accordingly, it is reasonable for market participants to use PJM's estimate of the potential clearing price in Delmarva as a basis for their estimates of the potential cost impact.[407]  We similarly disagree with P3's argument that PJM did not provide sufficient information about how PJM generated the preliminary results.[408]  To the contrary, PJM clearly explained that the estimates were based on market fundamentals, including supply and demand, the existing Tariff rules, the posted LDA

---

[403] Market Monitor Comments at 2.

[404] Transmittal at 2, 9, 10, 31; Market Monitor Comments at 3 ("In particular, the demand for capacity was overstated in [Delmarva], resulting in prices that would, absent the correction, be overstated compared to the efficient and competitive outcome that reflects actual supply and demand conditions."); New Jersey Board of Public Utilities Comments at 2 (stating that the clearing price would be excessive because the model incorrectly perceived a capacity shortage); *see, e.g.*, *Advanced Energy Mgmt. All.*, 860 F.3d at 666 (deferring to the Commission's estimate of the number of emergency hours in its capacity performance penalty formula).

[405] P3 Rehearing Request at 23 (citing ODEC Answer at 3-4; Maryland People's Counsel Answer at 3 n.1).

[406] Transmittal at 34.

[407] ODEC also based its estimate on assuming that the clearing price in Delmarva is the Point (a) UCAP Price on the VRR Curve from the 2024/2025 BRA planning parameters maximum allowable value of $426/MW-day.  ODEC Answer at 3-4.

[408] *See* P3 Rehearing Request at 21-23.

Reliability Requirement, and the final information about which Planned Generation Capacity Resources actually offered into the 2024/2025 BRA.[409]

110.   P3 further errs in alleging that, "[a]bsent supporting evidence," PJM's and the Market Monitor's explanations about supply and demand fundamentals are nothing more than "conclusory 'invocation[s] of theory.'"[410]   As courts have confirmed, it is within the Commission's purview to make market predictions based on economic theory, as long as it explains and applies the relevant economic principles in a reasonable manner.[411]   This is particularly true where it would be difficult to marshal empirical evidence,[412] such as here, where the Tariff revisions concern changing one auction parameter (the Delmarva LDA Reliability Requirement) in a highly complex auction that had not yet been completed.   We continue to find that it was appropriate for the Commission to consider the statements of PJM and the Market Monitor and determine that the Tariff revisions in the Section 205 Filing will ensure that the capacity market's demand for capacity (the VRR Curve) is established based on actual reliability needs and capacity prices that are not artificially inflated, but reflect actual supply and demand.   Accordingly, we confirm

---

[409] Transmittal at 9.

[410] P3 Rehearing Request at 26 (citing *Elec. Consumers Res. Council*, 747 F.2d at 1517).

[411] *Citadel FNGE Ltd.*, 2023 WL 4672098 at *12 (finding that the Commission's "logical economic reasoning" regarding the relationship between transmission penalty factors and wholesale rates was sufficient to sustain its judgment and the connection between wholesale and retail rates was "equally elementary" (citing *Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 561 (D.C. Cir. 2022))); *NextEra Energy Res., LLC*, 898 F.3d at 23 (finding that price suppression is an economic construct and that the Commission relied on substantial evidence in weighing conflicting expert testimony to reach its conclusion (citing *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 531 (D.C. Cir. 2010) (*per curiam*))); *Sacramento Mun. Util. Dist.*, 616 F.3d at 531 ("[I]t was perfectly legitimate for the Commission to base its findings about the benefits of marginal loss charges on basic economic theory, given that it explained and applied the relevant economic principles in a reasonable manner."); *Associated Gas Distribs.*, 824 F.2d at 1008-09 ("Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall; nor need they do so for predictions that competition will normally lead to lower prices.").

[412] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 76 ("at least in circumstances where it would be difficult or even impossible to marshal empirical evidence, the Commission is free to act based upon reasonable predictions rooted in basic economic principles").

that PJM supported the Tariff revisions with "relevant evidence as a reasonable mind might accept as adequate to support [the Commission's] conclusion."[413]

111.    We also do not find that the Tariff revisions are rendered unjust and unreasonable by the fact that sellers estimate Performance Assessment Intervals as a component of calculating the default offer cap used to determine whether sellers are required to submit data to support higher unit-specific offers.[414]  P3 asserts that "whether, and to what extent, Performance Assessment Intervals are likely to occur during a particular Delivery Year" depends on multiple variables, including the area's weather, transfer capability, the availability of sufficient supply to serve load, and each LDA's Reliability Requirement.[415]  The fact that the LDA Reliability Requirement may constitute one component of this estimate does not render the Tariff revisions unjust and unreasonable or weigh against permitting PJM to make the auction results more accurate.  Further, the number of Performance Assessment Intervals that will occur during a given Delivery Year is highly uncertain at the time of the auction, and depends on a range of unknown factors, including factors such as electric demands, extreme weather conditions, and generator performance on the PJM system.  P3 presents no evidence that PJM's update to the Delmarva LDA Reliability Requirement upset, in a material fashion, expectations regarding the number of Performance Assessment Intervals given the numerous other factors that will impact the number of Performance Assessment Intervals in the 2024/2025 Delivery Year.  As such, we disagree that sellers are harmed by not being able to reflect the updated LDA Reliability Requirement in their estimate of Performance Assessment Intervals.  All sellers created their estimates based on the same information, and no seller was able to adjust, nor should have needed to adjust, their offer based on an LDA Reliability Requirement that reflects actual reliability needs and supply and demand fundamentals.

112.    Furthermore, we continue to find that the determination that the Tariff revisions ensure that rates more accurately reflect supply and demand[416] is not only sufficiently

---

[413] *Murray Energy Corp. v. FERC*, 629 F.3d 231, 235 (D.C. Cir. 2011) (describing "substantial evidence" (quoting *Colo. Interstate Gas v. FERC*, 599 F.3d 698, 704 (D.C. Cir. 2010)).

[414] *IMM v. PJM*, 176 FERC ¶ 61,137 at PP 3, 71; PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.6.8 Avoidable Cost Definition (2.0.0), § 6.8.

[415] P3 Rehearing Request at 33 (citing *IMM v. PJM*, 176 FERC ¶ 61,137 at P 71)).

[416] February 2023 Order, 182 FERC ¶ 61,109 at PP 150, 153; *see also* Market Monitor February 6, 2023 Answer at 4 ("The prices resulting from PJM's proposal will correctly reflect supply and demand and are therefore the only correct prices in

Case: 23-1778  Document: 88-1  Page: 232  Date Filed: 12/11/2023
Document Accession #: 20230427-3140  Filed Date: 04/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 89 -

supported, but substantively correct.  P3 suggests that "[p]roducing a more accurate demand side of the auction might produce better *demand* fundamentals," but this does not mean that it will produce better supply and demand fundamentals overall, as adjusting demand after the supply offers have been submitted makes the offers less accurate.[417] The fact that the auction results reflect both supply and demand[418] does not negate the Commission's conclusion that making the demand curves more accurate renders the auctions' supply and demand fundamentals more accurate.  As PJM explained, a given LDA's Reliability Requirement—which establishes that LDA's demand for capacity—necessarily reflects the supply of the capacity available in the LDA.[419]  The initial LDA Reliability Requirements PJM posted ahead of the auction did not reflect actual reliability needs because the Planned Generation Capacity Resources PJM expected to participate in the 2024/2025 BRA—and thus included in the Delmarva LDA's Reliability Requirement—did not participate.  Nor does this mean that the supply offers must be adjusted for the adjustment to be just and reasonable.[420]  The Commission found the Tariff revisions in PJM's Section 205 Filing to be just and reasonable because they ensure the accuracy of the demand curve.  The supply curve was not at issue in the filing and we are not persuaded by the record here that PJM's update to the Delmarva Reliability Requirement has rendered the capacity supply offers sellers submitted in

---

this situation.  If the prices are correct, the market incentives are correct and consistent with reliability needs.").

[417] *See* P3 Rehearing Request at 29.

[418] *Hughes*, 578 U.S. at 157 ("FERC extensively regulates the structure of the PJM capacity auction to ensure that it efficiently balances supply and demand, producing a just and reasonable clearing price."); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 472 (4th Cir. 2014), *affirmed sub. nom. Hughes*, 578 U.S. 150 ("Both the capacity and energy markets are designed to efficiently allocate  supply and demand, a function which has the collateral benefit of incentivizing the construction of new power plants when necessary.").

[419] *See supra* P 6.

[420] *OXY USA Inc.*, 64 F.3d at 692 (as long as the Commission finds a methodology to be just and reasonable, that methodology "need not be the only reasonable methodology, or even the most accurate"); *PJM Interconnection, L.L.C.*, 147 FERC ¶ 61,060, at P 25, *order on reh'g*, 150 FERC ¶ 61,041 (2015) ("[T]he issue in a section 205 proposal is to determine whether PJM's proposal is just and reasonable, and not unduly discriminatory or preferential, not to determine whether alternative proposals are more or less reasonable.").

the 2024/2025 BRA less accurate, as P3 claims.  We continue to agree with PJM and the Market Monitor that capacity market offers should be dictated by capacity resource costs and not by the demand for capacity.  The LDA Reliability Requirement may constitute one component of a seller's estimate of Performance Assessment Intervals.  However, as noted above,[421] P3 presents no evidence that the update at issue here had a material impact upon the estimate of Performance Assessment Intervals in the 2024/2025 Delivery Year.  Even had P3 made this demonstration, we would find P3's assertion that a more accurate demand curve could somehow render the supply curve less accurate to be speculative, and in any case outweighed by the benefits of a more accurate demand curve.[422]  We continue to agree with PJM, the Market Monitor, and commenters that capacity market offers should be dictated by capacity resource costs and not by the demand for capacity.[423]  P3 argues that demand-side conditions impact the decisions of sellers without must-offer requirements who must determine whether and if so how to participate in the RPM, as well as the decisions of market participants to enter into hedging and bilateral arrangements.[424]  However, we find that, to the extent market participants have speculated on auction results based on the LDA Reliability Requirement in connection with such arrangements, this does not render the Tariff

---

[421] *See supra* P 111.

[422] *See* P3 Rehearing Request at 29 (asserting that demand-side adjustments "necessarily render[ ] the auction's supply fundamentals less sound").

[423] February 2023 Order, 182 FERC ¶ 61,109 at PP 158, 176; *see also* PJM February 2, 2023 Answer at 13-14 (explaining that the BRA results depend not only on demand but on what resources offer into the auction, so the posted LDA Reliability Requirement does not provide an accurate prediction of auction results); Market Monitor Comments at 5 (explaining that the BRA does not need to be rerun because "[m]arket participants offered competitively or were constrained to competitive offers by the market power mitigation rules, and there is no reason to believe that their offers were affected by the overstated demand. Market offers were competitive."); *id.* at 7 (same); Market Monitor February 6, 2023 Answer at 3 (asserting that competitive offers are a function of the marginal costs of providing capacity, and not a function of CETO or any other parameters).

[424] P3 Rehearing Request at 31-32 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.4. General Provisions (7.1.0), § 4.6(a); *id.* OATT ATTACHMENT DD.3 Responsibilities Of The Office Of The (10.0.0), § 3.1; February 2023 Order, 182 FERC ¶ 61,109 at P 157; NRG Companies Protest at 18-19).

revisions unjust and unreasonable, given that the revisions make the auction results more accurate.[425]

113.    Turning to Joint Parties' and P3's specific objections to the LDA Reliability Requirement adjustment in the Tariff revisions, we do not agree with their contentions that the inherently uncertain nature of forecasts means that it is unjust and unreasonable to permit PJM to modify one auction variable, but not others, when the forecast assumptions turn out to be incorrect.[426]  When the 2024/2025 BRA began in December 2022, loads in the 2024/2025 Delivery Year were unknown and thus based on a forecast (these loads are still unknown).  The participation of Planned Generation Capacity Resources became known to PJM through the course of the auction process, and was thus no longer a forecast.  However, the question before the Commission in assessing the Section 205 Filing was whether PJM had demonstrated that adjusting the LDA Reliability Requirement, under certain circumstances, was just and reasonable.  We continue to find that PJM made this demonstration.[427]  The Commission need not consider whether it also might be just and reasonable to adjust other variables not before us in this proceeding.[428]

---

[425] *See* PJM February 2, 2023 Answer at 14 (explaining that the purpose of the single clearing price market is to motivate sellers to submit offers based on costs (not including profit margins), so updating the LDA Reliability Requirement should not affect offers).  Moreover, we note that these bilateral arrangements are outside of the scope of the capacity auction, which is the subject of the Tariff revisions at issue in the Section 205 Filing.  Moreover, in future years entities can account for the potential for adjustments to the LDA Reliability Requirement—as with other uncertain factors that may influence auction prices—in carrying out their business decisions and commercial transactions.  February 2023 Order, 182 FERC ¶ 61,109 at P 157.

[426] P3 Rehearing Request at 35; Joint Parties Rehearing Request at 24.

[427] February 2023 Order, 182 FERC ¶ 61,109 at P 150.

[428] *Cities of Bethany*, 727 F.2d at 1136 (finding that, when determining whether a proposed rate was "just and reasonable" as required by the FPA, the Commission properly did not consider "whether a proposed rate schedule is more or less reasonable than the alternative rate designs"); *see also New England Power Co.*, 52 FERC ¶ 61,090, at 61,336 (1990), *aff'd, Town of Norwood v. FERC*, 962 F.2d 20 (D.C. Cir. 1992) (proposed rate design need not be perfect, it merely needs to be just and reasonable); *Louisville Gas & Elec. Co.*, 114 FERC ¶ 61,282, at P 29 (2006) (the just and reasonable standard under the FPA is not so rigid as to limit rates to a "best rate" or "most efficient rate" standard, but rather a range of different approaches often may be just and reasonable).

Document Access Case: 23-1778 Document: 88-1 Page: 235 Date Filed: 12/11/2023
Document Accession #: 20230727-3180 Filed Date: 07/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 92 -

114.    We are not persuaded by Joint Parties' objections to the Commission's
justification for accepting PJM's proposal to exclude Planned Generation Capacity
Resources from the LDA Reliability Requirement based on the resources not submitting
offers into the BRA, regardless of whether the resources that did not offer are expected to
be present in the LDA during the Delivery Year.  For example, Joint Parties object to the
Commission's conclusion in the February 2023 Order that it is appropriate to include
Planned Generation Capacity Resources in the LDA Reliability Requirement even if they
do not clear or are mitigated.[429]  Joint Parties contend that the Commission's suggestion
that a capacity offer that does not clear in the BRA continues to signal the intent to
provide capacity at a price equal to or above the capacity offer "defies reason," as the
failure to clear in the BRA "by definition" means that the clearing price was below the
offer price.[430]  Joint Parties focus on the Planned Generation Capacity Resources with
offers that do not clear, suggesting that these resources have the same effect as other
resources that are not included in the LDA Reliability Requirement, such as intermittent
resources that do not offer or Planned Generation Capacity Resources that do not offer.[431]
The point of the Commission's determination in the February 2023 Order, however, was
that permitting PJM to adjust the LDA Reliability Requirement for Planned Generation
Capacity Resources that offer into the BRA, whether or not they clear, will result in
auction results that are more accurate because these resources are not only present in the
LDA, but have actually indicated their intent to provide capacity by offering into the
RPM.  The Tariff revisions thus are targeted at the precise issue PJM intends to address,
i.e., the situation where Planned Generation Capacity Resources are expected to
participate in a BRA based on their in-service dates, but do not.[432]  We find this proposal

---

[429] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 151 (explaining that the
circumstances are not functionally similar because "[c]apacity offers signal that the
resource intends to be available to serve as capacity in the relevant delivery year at a
price equal to or above their capacity supply offer, even if they do not actually clear in
the BRA," and that it is accordingly appropriate for these resources to be included in the
calculation of the LDA Reliability Requirement).

[430] Joint Parties Rehearing Request at 27 (citing February 2023 Order, 182 FERC
¶ 61,109 at P 151).

[431] *Id.* at 25-26 (stating that intermittent resources that are not required to, and
often to do not, offer into the capacity auctions, but nevertheless may be in operation by
the start of the Delivery Year are functionally the same as an existing resources that did
not participate in or clear the auction); P3 Rehearing Request at 36 (asserting that planned
resources are the same in terms of their "their ability to serve an LDA's needs" whether
they offer and do not clear or choose not to offer).

[432] *See* Transmittal at 2, 11.  According to P3, this intent is as useless as "[i]f I
intend to clean the kitchen and offer to do so, but I don't get off the couch and do it

Document Accession #: 20231227-9100 Filed Date: 04/27/2023
Case: 23-1778   Document: 88-1   Page: 236   Date Filed: 12/11/2023

Docket Nos. ER23-729-001 and EL23-19-001                                            - 93 -

to be just and reasonable and not unduly discriminatory or preferential and confirm that, having so found, we do not need to consider alternative proposals.[433]

115.   Contrary to Joint Parties' continued assertions, this explanation does not conflict with including existing resources in the calculation of the LDA Reliability Requirement, whether or not they offer in the BRA.[434]   Joint Parties posit that, "under the Commission's logic," an existing resource's decision not to offer into the BRA signals an intent not to be available to serve as capacity in the relevant Delivery Year and the resource's capacity therefore should be excluded from the LDA Reliability Requirement, consistent with the reasoning in the February 2023 Order.[435]   As the Commission explained in the February 2023 Order, however, planned and existing resources are not similarly situated with respect to determining reliability needs for the relevant Delivery Year, because Planned Generation Capacity Resources have not yet achieved commercial operation, and as such "face construction and other risks that make it more likely that they will be unavailable to provide capacity in some or all of the relevant [Delivery Year], in contrast to existing resources."[436]   Joint Parties dismiss this explanation as a "complete non sequitur,"[437] again based on a reductive view of the Commission's logic: "any resource, whether planned or existing, that does not submit an offer has indicated that it is not available to provide capacity."[438]   While that may be true, existing resources that do not offer into the capacity market are still present in the LDA.  Given the limited

---

before my spouse does." P3 Rehearing Request at 37 (citing *Mo. Pub. Serv. Comm'n*, 337 F.3d at 1070-75; February 2023 Order, 182 FERC ¶ 61,109 at P 151).  Given the context of the capacity auctions, and the issue of Planned Generation Capacity Resources that are present in the LDA but do not offer into the BRA (i.e., family members present in the household that do not offer to clean the kitchen), the Planned Generation Capacity Resources offering into the BRA are more comparable to family members who have signaled that they are available to help clean the kitchen, whether or not that offer is taken.

[433] *See supra* n.428.

[434] Joint Parties Rehearing Request at 27-28 (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 151, 154).

[435] *Id*. at 28 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 151).

[436] February 2023 Order, 182 FERC ¶ 61,109 at P 151.

[437] Joint Parties Rehearing Request at 28 (citing *Tenn. Gas Pipeline*, 824 F.2d at 84).

[438] *Id*. (citing February 2023 Order, 182 FERC ¶ 61,109 at P 151).

exemptions to the must-offer requirement, these resources are likely to be producing energy in the Delivery Year and should therefore be included in the LDA Reliability Requirement as internal capacity that may be available during a local capacity emergency. It would not make sense to exclude these resources, and PJM does not, because that would result in an LDA Reliability Requirement that does not reflect actual reliability needs or supply and demand fundamentals. In contrast, there is no reason to suspect Planned Generation Capacity Resources that do not offer are likely to be present during the Delivery Year. We further note that this was especially true in the 2024/2025 BRA auction given that BRAs are typically held three years in advance of the Delivery Year, but the 2024/2025 BRA was held in December 2022, only one and a half years ahead of time. Petitioners are correct that there are many reasons a Planned Generation Capacity Resource may choose not to offer, of which not being commercially operational by the Delivery Year is only one. But that is precisely the point: PJM cannot know at the point the seller declines to offer exactly why the seller has done so, and so PJM proposed in the Tariff revisions, in the event that Planned Generation Capacity Resources that were expected to offer but do not, to assume such resources will not be operational during the Delivery Year when calculating LDA Reliability Requirements. We continue to find that this is a just and reasonable approach.

116.    Joint Parties contort the Commission's determination to suggest an inconsistency that is not present. As Joint Parties continue to stress, some Planned Generation Capacity Resources that did not submit offers "may in fact achieve commercial operation by the time of the relevant Delivery Year."[439]  A Planned Generation Capacity Resource that is in commercial operation during the 2024/2025 Delivery Year but did not offer into the 2024/2025 BRA has no affirmative capacity supply obligation during the 2024/2025 Delivery Year and, as such, PJM cannot regard them as a capacity resource for resource adequacy planning purposes at the time the BRA is conducted. Thus, we continue to find that it is appropriate to exclude these resources from the calculation of the LDA Reliability Requirement because load is not depending on them as capacity resources.[440] This finding does not "overlook[ ] the fact that …the Commission found the resource's decision whether to offer to be the determinative factor, regardless of whether the resource assumes a capacity commitment,"[441] because, as explained above, Joint Parties misconstrue that determination. The Commission did not find that whether a resource offers is "the determinative factor" for determining its impact on LDA Reliability

---

[439] *Id.* at 28-29 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 154).

[440] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 152 (citing Market Monitor February 6, 2023 Answer at 4).

[441] Joint Parties Rehearing Request at 29 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 151).

Requirement, "regardless of whether the resource assumes a capacity commitment."[442]
Rather, the Commission found that, for Planned Generation Capacity Resources, which
may or may not be operational by the Delivery Year, it is just and reasonable for PJM to
assume that resources that choose not to offer will not be available during the Delivery
Year.[443]  There is no reason (or need) to make the same assumption for existing resources
that do not offer, as those resources will continue to be available during the Delivery
Year unless they retire.

117.    For the same reasons, we also are not persuaded that the fact that PJM uses
Planned Generation Capacity Resources with executed interconnection service
agreements for purposes of modeling the LDA Reliability Requirement creates an
incongruence with the Tariff revisions accepted in the February 2023 Order.[444]  Although
PJM has demonstrated that adjusting the LDA Reliability Requirement will lead to more
accurate auction results, Joint Parties do not demonstrate that using Planned Generation
Capacity Resources with executed interconnection service agreements—a roughly
comparable value—in the modeling, will lead to "serious problems" rendering the
proposal unjust and unreasonable.

118.    We continue to find the one percent materiality threshold to be just and
reasonable, consistent with PJM's explanation that the cumulative addition of sufficiently
large Planned Generation Capacity Resources in a small LDA typically triggers the issue
addressed in the Section 205 Filing.[445]  Contrary to Joint Parties' contention, using this
threshold to exclude Planned Generation Capacity Resources that do not participate in the
relevant auction from the calculation of the LDA Reliability Requirement, if including
them would increase the LDA Reliability Requirement by more than one percent, is a
reasonable proxy for determining small LDAs in which these resources would have an
outsized effect.[446]  This is not arbitrary but rather recognizes that the small size of the
LDA gives rise to the impact of the Planned Generation Capacity Resources on the LDA,

---

[442] *Id.*

[443] *See* February 2023 Order, 182 FERC ¶ 61,109 at P 152 (stating that PJM's
proposal to exclude Planned Generation Capacity Resources that do not offer into the
BRA is reasonable because, even if such resources become operational during the
Delivery Year, load will not be depending on them as capacity resources).

[444] Joint Parties Rehearing Request at 24-25, 30.

[445] February 2023 Order, 182 FERC ¶ 61,109 at P 160.

[446] Joint Parties Rehearing Request at 34 (reasoning that under the Commission's
logic, "a driver's guess that Exit 15 is the correct exit should be regarded as reasoned,
because that guess avoids the need for guesswork at subsequent exits").

such that the one percent materiality threshold is a reasonable way of determining the LDAs in which this issue is occurring.

119.    We likewise are not persuaded that the Tariff revisions will result in harm to suppliers, consumers, or investors due to the alleged inability to rely on posted auction parameters which renders PJM's proposed rate unjust and unreasonable.[447]  We likewise are not persuaded that permitting PJM to use an LDA Reliability Requirement reflecting actual reliability needs will jeopardize long-term reliability.[448]  Joint Parties allege that the Commission's finding in the February 2023 Order was inconsistent with "the principal purpose of [the FPA] … to encourage the orderly development of plentiful supplies of electricity at reasonable prices."[449]  To the extent that Joint Parties assert that evidence regarding the Indian River Reliability Must Run Agreement was intended to illustrate supply issues in Delmarva,[450] we continue to find that the Tariff revisions will ensure that the auction results send appropriate price signals that accurately reflect supply and demand.[451]  Regardless of what other issues there may be, PJM's proposed Tariff provisions will ensure the LDA Reliability Requirement accurately reflects the available internal capacity in that LDA.  Moreover, as noted above, we do not agree that any arrangements that sellers may make in reliance on the demand parameters render the Tariff revisions unjust and unreasonable.[452]

120.    We do not agree with Constellation's argument that the Commission must review the Tariff revisions under the *Mobile-Sierra* public interest application of the just and reasonable standard.[453]  In the order to which Constellation cites to assert that PJM's

---

[447] Similar to the discussion *supra* section II.B.2.b, we conclude that any such potential harm is outweighed by the benefits of PJM's proposal in providing for a more accurate demand curve.

[448] Joint Parties Rehearing Request at 38-39.

[449] *Id*. at 38 (citing *Nat'l Ass'n for the Advancement of Colored People*, 425 U.S. at 669-70).

[450] *Id*. at 37-38 (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 100, 159; Sotkiewicz Aff. ¶¶ 72, 90-95; Maryland People's Counsel Comments at 7).

[451] February 2023 Order, 182 FERC ¶ 61,109 at P 153.

[452] *See supra* P 112.

[453] Constellation Rehearing Request at 21-22.  "Under *Mobile-Sierra* . . . the Commission must presume that rates set by power sales contracts that are freely negotiated at arm's-length between willing buyers and sellers meet the statutory 'just and reasonable' standard of review.  This presumption may be overcome only if the

market rules should be treated like contract rates subject to the *Mobile-Sierra* presumption, the court affirmed the Commission's exercise of its discretion to accept a settlement governing the restructuring of the ISO-NE capacity market, which included a provision specifying that the public interest standard would apply on certain future challenges of the auction results and transition payments.[454]  The court did not suggest that this should apply in all instances of auction results, and did not reach the question of whether the results were contract rates.  The Commission subsequently explained that, absent compelling circumstances, such as the Commission found to exist in *Devon Power*, the Commission will not exercise our discretion to approve the application of the public interest standard of review outside the context of contract rates.[455]  Constellation has not demonstrated that such compelling circumstances are present in this proceeding, which does not involve auction results, as the auction was ongoing at the time of the Section 205 Filing.[456]

---

Commission concludes that the underlying rate 'adversely affect[s] the public interest.'" *Devon Power*, 134 FERC ¶ 61,208 at P 10 (citing *Sierra*, 350 U.S. at 355; *Morgan Stanley*, 554 U.S. at 530).

[454] *Devon Power*, 137 FERC ¶ 61,073, *petition denied*, *New England Power Generators Ass'n*, 707 F.3d 364, 371 (finding that the Commission did not abuse its "considerable discretion" to adopt the public interest standard, as the Commission had offered sufficient support for its decision).  The Commission noted that it had approved the settlement at issue in the proceeding, including allowing application of the "public interest" standard in limited circumstances, because the settlement as a package presented a just and reasonable outcome, and in consideration of the fact that the settlement resulted from extensive negotiations and might not have been reached absent inclusion of the standard.  *Devon Power*, 137 FERC ¶ 61,073 at PP 18, 23-24.

[455] *High Island Offshore Sys., LLC*, 135 FERC ¶ 61,105, at P 25 (2011).

[456] *See PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,194, at PP 21-23 (2023) (confirming that the find that PJM's Capital Cost Recovery Rate is a tariff-based rate of general applicability subject to the just and reasonable standard of review under the "*Memphis*" clause in PJM's Tariff); *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs.*, 158 FERC ¶ 61,076, at PP 62-64 (2017) (declining to extend *Mobile-Sierra* protection to the California Independent System Operator Corp. and CalPX auction rates, noting that the circumstances "differ[ed] significantly" from those in New England proceeding, where the Commission approved a settlement that provided *Mobile-Sierra* protection for final rates resulting from the forward capacity auction mechanism provided for in the settlement and noting that the tariffs did not incorporate a public interest standard of review into their terms).

121.    Finally, we reject Constellation's contention that PJM did not demonstrate the requisite "imminent economic harm" to justify submitting the Section 205 Filing without stakeholder review.[457]  PJM complied with section 9.2(b) of its Tariff and section 7.5.1(ii) of the Consolidated Transmission Owners Agreement by providing more than the minimum 24 hours' notice to stakeholders of the emergency filing.[458]  Although the Tariff does not define "imminent severe economic harm to electric consumers" or specify a required showing to meet this standard, we agree that the potential price impacts of the 2024/2025 BRA justified PJM's submission of the Section 205 Filing without stakeholder consultation.[459]

---

[457] Constellation Rehearing Request at 23.  PJM has the right to make certain FPA section 205 filings of proposed revisions to the terms and conditions of its Tariff under section 9.2 of its Tariff, except for certain changes reserved to the transmission owners under section 9.1, with at least seven days' advance notice to the transmission owners and Members' Committee.  *See* PJM, Intra-PJM Tariffs, OATT 9.1 Rights of the Transmission Owners (2.1.0), § 9.1; *id.* OATT 9.2 Rights of the Transmission Provider: (1.1.0), § 9.2.

[458] PJM, Intra-PJM Tariffs, OATT 9.2 Rights of the Transmission Provider: (1.1.0), § 9.2(b) (requiring that PJM "shall provide as much advance notice and consultation with the Transmission Owners and the PJM Members Committee as is practicable in such circumstances"); PJM, Rate Schedule 42, Consolidated Transmission Owners Agreement, § 7.5.1(ii) (same).  *See PJM Interconnection, L.L.C.*, 183 FERC ¶ 61,001 (finding that PJM acted consistent with its tariff in filing revisions to the invoicing for Performance Assessment Intervals stemming from Winter Storm Elliott filed by PJM pursuant to section 9.2(b); *see also* PJM, Members Committee Agenda, PJM Interconnection, L.L.C., item 3 (Dec. 21, 2022) (noting that PJM will provide a 2024/2025 BRA update and consultation relating to proposed changes to the Tariff and the determination of the [LDA] Requirement") https://www.pjm.com/-/media/committees-groups/committees/mc/2022/20221221/agenda.ashx; 2024/2025 BRA Update and PJM Notice of Consultation with the Members Committee pursuant to Tariff Section 9.2(b) and Transmission Owners pursuant to CTOA Section 7.5.1(ii), PJM Interconnection, L.L.C. (Dec. 21, 2022), https://www.pjm.com/-/media/committees-groups/committees/mc/2022/20221221/item%2003-2024-2025-bra-update-and-pjm-notice-of-consultation-with-the-members-committee.ashx.

[459] *See* PJM February 2, 2023 Answer at 6 (stating that, as contrasted to matters already before the Commission for which PJM did not need to make emergency filings, "PJM's filings here raise a newly discovered issue related to an incorrect input, before the capacity auction results are completed"); *id.* at 9-10 (asserting that economic harm is imminent because if the Commission were to reject the filings, PJM would need to complete the BRA and post the results as soon as possible, and severe because the use of

### 4.    **Complaint**

122.    PJM stated in the Complaint that it considered the LDA Reliability Requirement issue narrow enough to be addressed without reopening the offer window, but suggested that the Commission could direct PJM to restart the 2024/2025 BRA with the amended rules if it had concerns with updating the auction rules while the BRA was in progress.[460] In light of PJM's request to dismiss the Complaint as moot if the Commission accepted the Tariff revisions in the Section 205 Filing, the Commission did so and stated that it need not address parties' alternative proposals, or any of the requests regarding auction timing.[461]

### a.    **Requests for Rehearing**

123.    Clean Energy Associations and Joint Parties both raise concerns with the Commission's determination not to require PJM to rerun the 2024/2025 BRA. Clean Energy Associations assert that the Commission erred by failing to even reach the question of whether PJM's existing capacity market rules were unjust and unreasonable; according to Clean Energy Associations there was sufficient record evidence for the Commission to have determined that PJM's existing capacity market rules are unjust and unreasonable and exercised the Commission's remedial authority under FPA section 206 to direct PJM to rerun the 2024/2025 BRA with accurate modeling assumptions.[462] In particular, Clean Energy Associations argue that PJM's resource requirement calculation incorporated multiple Planned Generation Capacity Resources that did not participate in the auction, causing the actual LDA Reliability Requirement to be lower than the

_____

an incorrect LDA Reliability Requirement would lead customers in Delmarva to pay unnecessarily capacity costs that are approximately four times higher than they would need to pay with the correct input).

[460] *See* EL23-19 Transmittal at 31 & n.42; February 2023 Order, 182 FERC ¶ 61,109 at P 21.

[461] February 2023 Order, 182 FERC ¶ 61,109 at P 181.

[462] Clean Energy Associations Rehearing Request at 4, 11-12, 13-15 (citing 16 U.S.C. § 824e; 5 U.S.C. § 706(2)(A); *Env't Def. Fund*, 2 F.4th at 967-68; *Emera Me.*, 854 F.3d at 28; *Black Oak Energy, LLC*, 167 FERC ¶ 61,250, at P 28 (2019); *Old Dominion Elec. Coop.*, 164 FERC ¶ 61,006, at P 30 (2018); *see id.* at 11-12 (asserting that this remedy would address market participant expectations while ensuring just and reasonable rates in the 2024/2025 BRA); *id.* at 13 (stating that the Commission has broad discretion in fashioning remedies when it determines that a rate is unjust and unreasonable under FPA section 206 and the Commission's authority is at its "zenith" when making remedial determinations).

calculated requirement, and resulting in a disproportionately large impact for ratepayers in Delmarva, given the size of the resources, the relatively small size of the zone, and the average wages for workers in the Delmarva Peninsula.[463]   Clean Energy Associations request that the Commission exercise its latitude under FPA section 206 and order a full rerun of the 2024/2025 BRA that incorporates accurate modeling assumptions on rehearing to "send the appropriate message to both customers and market participants."[464]

124.    Although advocating for the rejection of the Section 205 Filing,[465] Joint Parties argue that, having accepted the filing, the Commission erred by refusing to permit market participants to re-offer into the 2024/2025 BRA to account for the changed circumstances and by failing to grapple with Petitioners' arguments or to support its decision with substantial evidence.[466]   Joint Parties contend that the Commission "brushed … aside" arguments that, to the extent that it was going to grant the relief requested by PJM, it also needed to allow sellers an opportunity to modify their offers into the 2024/2025 BRA to account for the changed rules and auction parameters.[467]   Joint Parties assert that EPSA witness Dr. Sotkiewicz provided evidence describing the ways in which the LDA Reliability Requirement can inform market participants' offer decisions,[468] and that the Commission failed to engage with objections to PJM reopening a single BRA input without allowing participants to re-offer to account for other changes in

---

[463] *Id.* at 14 (citing Maryland People's Counsel Comments at 5; Market Monitor Comments at 3-4; ODEC Answer at 3; Natural Resources Defense Council and Sierra Club Answer at 4).

[464] *Id*. at 11-12, 15.

[465] Joint Parties Rehearing Request at 43 (stating that allowing parties to re-offer would only mitigate the harm of allowing after-the-fact changes to the 2024/2025 BRA results).

[466] *Id*. at 41-46, 50 (citing 5 U.S.C. § 706(2)(E); 16 U.S.C. § 825*l*(b); *ACPA*, 54 F.4th at 728; *NEPGA*, 881 F.3d at 211).

[467] *Id*. at 41 (citing *NorAm Transmission Co.*, 148 F.3d at 1165; February 2023 Order, 182 FERC ¶ 61,109 at P 158; EPSA Protest at 30-31; LS Power Protest at 7-8; EPSA Answer at 15-16; Clean Energy Associations Protest at 18-20).

[468] *Id*. at 42 (citing *Genuine Parts Co.*, 890 F.3d at 312; *Tenneco*, 969 F.2d at 1214; *Lakeland Bus Lines, Inc.*, 347 F.3d at 963; *Green v. Shalala*, 51 F.3d at 96, 102 (7th Cir. 1995); *Schurz Commc'ns, Inc. v. FCC*, 982 F.2d 1043, 1050 (7th Cir. 1992); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*, 802 F.2d 969, 975 (7th Cir. 1986); Sotkiewicz Aff. ¶¶ 25, 27-29, 32-38).

Case: 23-1778    Document: 88-1    Page: 244    Date Filed: 12/11/2023
Document Accession #: 20230427-3129    Filed Date: 04/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 101 -

circumstances.[469]  Although arguing that rerunning the market is warranted even in light of the Commission's policy against rerunning auctions, given the "arguably worse" action in the February 2023 Order resetting the price,[470] Joint Parties also submit that there would be no impediment to correcting the Commission's error on remand because FPA section 309[471] gives the Commission broad power to undo harms caused by its unlawful acts, and because the policy considerations that are behind the Commission's policy against rerunning auctions would not be present where the Commission was only reinstating the clearing price for the 2024/2025 BRA and not actually rerunning the auction.[472]  Leeward similarly argues that the correct approach to posting the auction results would be for the Commission to exercise its authority under FPA section 309 to deem PJM to have posted them in accordance with section 5.11(e) of the Tariff, as the auction was complete and the formalization of the results generated by the optimization algorithm is ministerial.[473]

## b.    Commission Determination

125.    As discussed above, we confirm that the Commission in the February 2023 Order appropriately accepted the Section 205 Filing.  We likewise continue to find that dismissal of the Complaint, consistent with PJM's request, was appropriate.  PJM requested the Commission find the Complaint moot if the Commission accepted the Section 205 Filing.[474]  Therefore, having accepted the Section 205 Filing, there was no Complaint for the Commission to consider, given that the complainant requested that it

---

[469] *Id*. at 42-43 (citing *GameFly*, 704 F.3d at 148; *ACPA*, 54 F.4th at 728; *NEPGA*, 881 F.3d at 211; February 2023 Order, 182 FERC ¶ 61,109 at P 158; EPSA Answer at 15-16; LS Power Protest at 5-8; Transmittal at 5).

[470] *Id*. at 43-44 (citing February 2023 Order, 182 FERC ¶ 61,109 (Danly, Comm'r, dissenting at P 30)).

[471] 16 U.S.C. § 825h.

[472] Joint Parties Rehearing Request at 44-46 (citing *TNA Merch. Projects, Inc. v. FERC*, 857 F.3d 354, 360 (D.C. Cir. 2017); *Xcel Energy Servs., Inc.*, 815 F.3d at 955-56; *OG&E*, 11 F.4th at 831).

[473] Leeward Rehearing Request at 19-20 (citing *Xcel Energy Servs., Inc.*, 815 F.3d at 955; *ISO New England Inc.*, 127 FERC ¶ 61,040, at P 28 (2009); *ISO New England, Inc.*, 180 FERC ¶ 61,036 (2022)).

[474] EL23-19 Transmittal at 2 n.4 ("Should PJM's [Section 205 Filing] be granted, PJM places parties on notice that it would consider this FPA section 206 filing to be moot and withdrawn.").

Document Accession #: 20230427-3100    Filed Date: 04/27/2023

be withdrawn.  Accordingly, we do not reach the issues raised with respect to the
Complaint and decline to direct any relief thereunder.  With respect to arguments that
the Commission should have permitted PJM to rerun the 2024/2025 BRA with updated
parameters—under either FPA section 205 or section 206—this remedy is beyond the
scope of the Section 205 Filing accepted in the February 2023 Order, which updates a
single auction parameter for prospective use in the auction.

The Commission orders:

       In response to the requests for rehearing, the February 2023 Order is hereby
modified and the result sustained, as discussed in the body of this order

By the Commission.  Commissioner Danly is dissenting with a separate statement
                     attached.
                     Commissioner Christie is concurring with a separate statement
                     attached.


( S E A L )




                              Kimberly D. Bose,
                                Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                                    Docket Nos.  ER23-729-001
                                                                            EL23-19-001

(Issued July 27, 2023)

DANLY, Commissioner, *dissenting*:

1.      PJM Interconnection, L.L.C.'s (PJM's) filed tariff provides that PJM "shall determine the PJM Region Reliability Requirement and *the Locational Deliverability Area Reliability Requirement* for each Locational Deliverability Area for which a Variable Resource Requirement Curve has been established for such Base Residual Auction . . . *prior to the conduct of the Base Residual Auction* . . . ."[1]  This is not a complicated provision, but to restate it in less technical terms, PJM must determine the quantity of capacity each area needs prior to running the capacity auction.  Nothing in the tariff permits PJM to revise this determination during or after "the conduct" of the auction except in narrow circumstances that are not at issue in this proceeding.

2.      After conducting the most recent auction, PJM determined that the prices in Southern Delaware were too high.  PJM did not post the auction results—which the tariff requires "as soon thereafter as possible"[2]—but instead sought the Commission's blessing to recalculate the quantity of capacity it had "determine[d] . . . prior to the conduct" of the auction—with the effect of reducing auction prices in Southern Delaware by a factor of four.  The majority granted PJM's request over numerous protests and my dissent,[3] and upholds that result in this order.

3.      This is a plain violation of the filed rate doctrine and the rule against retroactive ratemaking.  I incorporate my dissent here and, rather than repeating all those arguments,

---

[1] PJM, Intra-PJM Tariffs, OATT, Attach. DD, § 5.10(vi)(B) (31.0.0) (emphasis added); *see also id.*, Attach. DD, § 5.10(vi)(A) ("[t]he parameters of the Variable Resource Requirement Curve will be established prior to the conduct of the Base Residual Auction [(BRA)] for a Delivery Year and will be used for such Base Residual Auction."); *id.*, Attach. DD, § 5.11(a) (17.0.0); *id.*, Attach. DD, § 15 (4.0.0).

[2] *Id.*, Attach. DD, § 5.11(e), Posting of Information Relevant to the RPM Auctions (17.0.0).

[3] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (2023) (February 2023 Order) (Danly, Comm'r, dissenting) (Dissent).

**JA238**

focus on the novel reasoning regarding the filed rate doctrine and rule against retroactive ratemaking that the majority adds in its order on rehearing .[4]

4.      Nearly every line of the majority's "Determination" sections in the Rehearing Order constitute gross legal error.[5]   I am tempted to annotate these sections line by line to refute each legal flaw in detail, but will instead focus on three broad categories of errors:  the majority's misunderstandings about (1) how time works, (2) how words work, and (3) how FERC works.  I address these categories in turn.

## I.    Time Is a Constant[6]

5.      The majority's primary defense against retroactive ratemaking is its claim that it is only making prospective changes.  Even though PJM was required to—and did— "determine" the capacity requirement "prior to the conduct of the auction,"[7] "the Commission determined that the filed rate doctrine did not apply to PJM's prospective Tariff revisions" which changed PJM's capacity requirement determination after the auction had run.[8]

---

**[4]** *PJM Interconnection, L.L.C.*, 184 FERC ¶ 61,055 (2023) (Rehearing Order); *see id.* PP 52-75 (filed rate doctrine determination section).  I defer almost entirely to my Dissent on the majority's new "settled expectations" test (*see id.* PP 84-90 ("settled expectations" determination section)) and PJM's section 205 and 206 filings seeking a truly prospective tariff change (*see id.* PP 106-21,  125 (sections 205 and 206 determination sections)).

**[5]** *See, e.g.*, Rehearing Order, 184 FERC ¶ 61,055 at PP 52-75.

**[6]** *But see* Albert Einstein, Annalen der Physik 891, 897  (1905). That time is uniform is, of course, not strictly true.  Nevertheless, it is highly likely to be the prevailing condition under the circumstances typically encountered by humans engaged in the field of energy regulation generally, and Base Residual Auctions in particular.  *See also* Ira Flatow, *Resetting the Theory of Time,* NPR: Talk of the Nation (May 17, 2023, 1:00 PM), at https://www.npr.org/2013/05/17/184775924/resetting-the-theory-of-time ("Albert Einstein once wrote: People like us who believe in physics know that the distinction between past, present, and future is only a stubbornly persistent illusion.  Time, in other words, he said, is an illusion.").

**[7]** *Supra* P 1.

**[8]** Rehearing Order, 184 FERC ¶ 61,055 at P 53; *see id.* PP 60-61 (the majority need not determine whether exceptions to the filed rate doctrine apply because "the proposed Tariff revisions changed future rates").

6.     The first obstacle to the majority's assertion that nothing retroactive is happening here is the simple fact of how time works.  I cannot believe I have to keep explaining time, but if something happened in the past, it has already happened.  The fact that it happened cannot be undone.  Thus, for example, if a tariff includes a fixed deadline for an action, and the date of the deadline has passed without the action, the Commission has no power to waive the lapsed deadline and excuse the failure to take the action.  To do so is *retroactive* ratemaking.[9]

7.     The relevant tariff provision in this case includes a simple time requirement.  PJM must "determine" the capacity requirement "prior to the conduct of the auction."  It did so.  The majority changed that determination after the fact.  This constitutes a retroactive change.

8.     This is not a complicated concept.  If parents issue a rule that their toddler must eat dinner before ice cream, the toddler understands.  The Federal Energy Regulatory Commission is baffled.  What if dinner is bland?  What if scientists discover ice cream cures cancer?  What if the toddler throws a temper tantrum?  What if dinner is too expensive?  But none of this is relevant to the rule, which is "dinner before ice cream."  PJM's rule is "determine capacity requirements before auction."  Anything that changes that determination once the auction has started is a retroactive change.

9.     The majority alludes to an allegedly "fact-specific analysis courts have used for decades to determine retroactivity," but fails to cite any cases discussing this "fact-specific analysis."[10]  The majority further "conclude[s] that it 'need not determine the precise point in time at which a change to [auction] procedures would be retroactive,'" like this is some great mystery.[11]

10.    But retroactivity is only as complicated as you need it to be to bypass filed rates you do not like.  The fact-specific analysis is as follows:  Has it already happened?  And the precise point in time it started happening is irrelevant so long as it is *before now*.

---

[9] The majority engages in this exact form of retroactive ratemaking all the time. *See* Dissent at P 17 & n.34.

[10] Rehearing Order, 184 FERC ¶ 61,055 at P 62 & n.207; *see id.* P 66 & n.227. The cited cases stand for other points related to the filed rate doctrine and the rule against retroactive ratemaking, all supporting the conclusion that the majority is engaged in retroactive ratemaking in this proceeding.

[11] Rehearing Order, 184 FERC ¶ 61,055 at P 65 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 167).

11.     Now let us apply this searching inquiry to the relevant filed rate, that PJM must determine capacity requirements before the conduct of the auction:

> Has the auction already started?
>
> -   Yes.

Well, then, we can rest assured that any change to this filed tariff provision applying to the past—or even ongoing—auction would be retroactive.  So much for the complicated, fact-specific analysis.

12.     Unable to keep time, the majority next resorts to distorting precedent.  It states that it can revise filed auction procedures any way it likes "consistent with longstanding precedent permitting pipelines and utilities to revise rates prospectively before the rate has been charged and the obligation incurred."[12]  They claim this precedent affirms that "rate changes are permissible where, as here, regulated entities or customers have not yet incurred commitments or been awarded rights pursuant to the relevant filed rate."[13]  Since "no service has yet been provided and no obligation or commitment has yet been incurred," any change to the auction procedures is prospective.[14]

13.     The only problem with this argument is that there is no such precedent.  The first case in history that found that tariff auction rules and procedures can be changed up until obligations are incurred or services rendered was this one.  As petitioner the PJM Power Providers Group (P3) explains it,

> Although the Order cites several cases in support of [the assertion that changes to a rate are impermissibly retroactive *only* where

---

[12] Rehearing Order, 184 FERC ¶ 61,055 at P 63; *see id.* P 67 ("continu[ing] to find that the Commission's interpretation of the filed rate doctrine in the February 2023 Order 'gives effect, in the context of auction procedures, such as those governing the BRA, to the long line of U.S. Supreme Court and D.C. Circuit cases on the filed rate doctrine'") (citing February 2023 Order, 182 FERC ¶ 61,109 at P 168 & P 166 n.459 (citing *Cogentrix Energy Power Mgmt., LLC v. FERC*, 24 F.4th 677, 684 (D.C. Cir. 2022); *Old Dominion Elec. Coop.*, 892 F.3d 1223, 1226-27 (D.C. Cir. 2018) (*Old Dominion*); *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1320 (D.C. Cir. 2004); *Associated Gas Distribs. v. FERC*, 898 F.2d 809, 810-11 (D.C. Cir. 1990) (Williams, J., concurring); *City of Girard v. FERC*, 790 F.2d 919, 924 (D.C. Cir. 1986))).

[13] Rehearing Order, 184 FERC ¶ 61,055 at P 70; *id.* P 70 n.252 (citing February 2023 Order, 182 FERC ¶ 61,109 at PP 166, 168).

[14] *Id.* P 74.

Document Access Case: 23-1778    Document: 88-1    Page: 250    Date Filed: 12/11/2023
Document Access⌐ N:20230827-910⌐ Filed Date: 04/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 5 -

regulated entities or customers have already transacted pursuant to
the rate], the Commission reads those cases for more than they are
worth.  To be clear, the cases cited by the Order do support the
conclusion that a rate change is 'impermissibly retroactive' if
'regulated entities or customers have already transacted pursuant to
that rate—i.e., where purchases or sales have occurred.'
Unfortunately, that is not the conclusion the Commission drew from
those cases; the Commission went much further, concluding that
those cases show that rate changes are impermissibly retroactive
'*only*' where a transaction has already been consummated.  None of
the precedents the Order cites proscribes the filed rate doctrine and
rule against retroactive ratemaking to *only* those circumstances.
Further, the Order's conclusion to the contrary ignores court
precedent clearly explaining that the filed rate doctrine and rule
against retroactive ratemaking applies before a transaction has
actually occurred pursuant to the filed rate.[15]

14.    Nor would any such precedent withstand judicial scrutiny.  Why have auction
rules in a filed rate if they are non-binding until the auction has concluded and
obligations have been consummated?   In the face of such uncertainty, a "filed rate"
would be pointless.  In fact, let me save everyone the trouble and draft that new tariff for
PJM:

PJM will hold an annual capacity auction—or not—based on
whatever rules it deems appropriate before or during the auction,
including after PJM determines preliminary auction results.  All
generators must offer and can never increase their offers during an
auction no matter how the rules change.  Once auction clearing
prices are to PJM's liking and the Commission has approved the
results, and transactions have been consummated, charges billed and
collected, and capacity delivered,[16] the auction will be considered
finished and no further changes to the auction rules will be

---

[15] P3 Rehearing, Docket No. ER23-729-001, at 12-13 (citations omitted).  The
majority cites scores of cases, but none stand for the sweeping filed rate exception the
majority makes up here, that auction rules are discretionary until the auction is finalized.
*See*, *e.g.*, Rehearing Order, 184 FERC ¶ 61,055 at PP 63,  67 (citing cases).  What many
of these Commission cases do represent is a long and continuing assault *by the
Commission* on the filed rate doctrine and rule against retroactive ratemaking, but none
go nearly so far as today's ruling.

[16] *See* Dissent at P 11 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 167).

entertained.  Happy offering and good luck!

15.     The tariff does not yet say this, of course, but it may as well under the majority's new retroactivity rule.

## II.     Words Mean What They Mean

16.     If the majority is correct that the change to the capacity requirement determination in this proceeding is truly prospective, then they would not need another word to describe what the relevant tariff provision means, or the purported purpose of the tariff, or any of the other analyses they offer to bypass what the tariff plainly says.  But the majority cannot help themselves and advances argument after argument for alternative tariff interpretations.  None of them work.

### A.     The Majority Muddles the Relevant Tariff Provision

17.     When it can be bothered with the relevant tariff provision itself, which again is a straightforward requirement that PJM must "determine" the area capacity requirement "prior to the conduct of the auction," the majority claims that:

18.     "Determine" does not mean "determine."  The majority is "not persuaded . . . that the use of the word 'determine' . . . connotes that the [capacity requirements] are incapable of adjustment when read in the broader context of Attachment DD."[17]  To "determine" something now means something akin to "put in a placeholder number."

19.     "Prior" does not mean "prior."  The majority asserts that "[t]he fact that section 5.10(a) of Attachment DD requires PJM to establish the [capacity requirement] that will be used in the BRA *prior to the BRA*, does not contradict" its conclusion that the capacity requirement can be *re-determined* up until the time the capacity obligations and rights have "actually been awarded."[18]  So what the tariff really meant to say was that PJM will put in a placeholder number for the capacity requirement prior to the conduct of the auction but not finalize it until capacity obligations and rights have actually been awarded.

---

[17] Rehearing Order, 184 FERC ¶ 61,055 at P 56 (citing Joint Parties Rehearing Request at 12-13 (asserting that the word "determine" is "commonly understood to mean 'to fix conclusively or authoritatively,'" as distinct from a guess that the Commission can change later (citing *Merriam-Webster Dictionary*, definition of "determine," https://www.merriam-webster.com/dictionary/determine))).

[18] *Id.* P 55 (emphasis added) (citations omitted); *see also id.* P 54 (stating the majority's conclusion that the capacity requirement can be re-determined up until capacity rights and obligations are awarded).

20.    "Conduct" does not mean "conduct."  The majority claims that "[t]he Tariff does not define the word "conduct" in terms of PJM running the capacity auctions," and instead offers up a smorgasbord of all PJM's auction-related responsibilities up to and including when PJM *determin[es]* the clearing price that reflects all [auction] inputs," which is at some uncertain point potentially long after the auction has concluded.[19]

21.    "Auction" does not mean "auction" unless, like the verb "conduct," we mean only in the broad sense of when PJM "has completed its evaluation and posted the auction results, for which there is no set deadline."[20]  As part of its textual contortionism, the majority also writes the requirement that PJM post auction results "as soon thereafter [after conducting the auction] as possible" out of the tariff.[21]  And thus "the conduct of an auction" is transformed into a nebulous event that does not begin or end until the majority says it does.[22]

22.    As a result of the simple exercise of calling into doubt the plain meaning of every operative word in it, the tariff requirement to determine the capacity requirement prior to the conduct of the auction is transformed into unlimited discretion for PJM to adjust capacity requirements whenever it wants until it gets the prices it prefers.

---

[19] *Id.* P 58 & n.180 (emphasis added) (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.3 Responsibilities Of The Office Of The (10.0.0), § 3.2; *see also id.*, OATT ATTACHMENT DD.5.4 Reliability Pricing Model Auctions (7.0.0), § 5.4 ("PJM shall conduct for each Delivery Year a [BRA] to secure commitments of Capacity Resources as needed to satisfy the portion of the RTO Unforced Capacity Obligation not satisfied through Self-Supply of Capacity Resources for such Delivery Year.")).  It is unclear whether the majority means "determine" in this context as a final determination of capacity prices or prices still subject to subsequent adjustment, and there is no way to ever tell given the majority's own textual arguments.  *See supra* P 17 (discussion of what the majority thinks "determine" means in the relevant tariff provision).

[20] Rehearing Order, 184 FERC ¶ 61,055 at P 58.

[21] *See id.* P 75; *see* PJM, Intra-PJM Tariffs, OATT,  Attach. DD, § 5.11(e); *see also* Rehearing Order, 184 FERC ¶ 61,055 at P 73 (asserting that "the BRA had not 'already run,' but was ongoing at the time PJM submitted the Section 205 Filing").

[22] The majority does note the Market Monitor's assertion that "it is the posting of the final results that determines when the auction ends," but this has no effect on a requirement to determine capacity requires "prior to"—which in commonly accepted English means "before"—the auction starts.  *See* Rehearing Order, 184 FERC ¶ 61,055 at P 58 n.187.

Document Accession #: 20230327-3107    Filed Date: 03/27/2023

## B.    The Majority Minimizes the Relevant Tariff Provision

23.    The majority does not limit itself to warping every word of the relevant tariff provision.  They also do everything they can to minimize its importance.  They call into question whether auction procedures are truly worthy of the status of a "filed rate."

24.    Of course, the majority has no choice but to acknowledge the obvious truth that the tariff's auction procedures are the rate on file, which it does by comparing (and then contrasting) auction procedures and formula rates:  "[t]he two are analogous for purposes of the filed rate doctrine to the extent that *the rate on file is not the actual price produced but the set of rules that produces the price*."[23]  But some rates apparently are more worthy of filed rate protection than others:

> Formula rates, however, usually involve a method to calculate the initial charge based on projections (rates calculated in advance based on projected cost inputs for the upcoming year) as well as a true-up mechanism (procedures to recalculate the final charge after the close of the year to reflect actual costs), whereas PJM's capacity auction rates only set forth procedures used to calculate prices to be paid once the auction process is complete.[24]

25.    The majority underscores this point by repeatedly emphasizing that the capacity requirement determination PJM must make prior to the auction—one of those pesky auction "procedures" the tariff purports to mandate—is merely a "discrete requirement."[25]  Never mind that this "discrete requirement" in fact settles the quantity of capacity to be bought in each area and is therefore the single most important input to the capacity auction along with the seller offers.[26]

26.    The majority further belittles the tariff's auction procedures as an "optimization algorithm," and nothing more,[27] asserting that PJM's vaunted role goes beyond

---

[23] *Id.* P 74 (emphasis added).

[24] *Id.* P 74 (citing *Midcontinent Indep. Sys Operator, Inc.*, 161 FERC ¶ 61,020 at P 7 (2017)).

[25] *Id.* P 55 (citation omitted).

[26] *See* Dissent at P 6 n.17 ("This . . . 'single input' is how much capacity the area needs to buy.  Calling it a 'single input' is like calling the particular car I am purchasing a 'single input' in determining the price I pay for a car.").

[27] Rehearing Order, 184 FERC ¶ 61,055 at P 58.

mechanically running the "optimization algorithm."[28]  The majority thus "reasonably construed the Tariff to find that applying the [optimization] algorithm is one step in the auction process, which does not determine when the auction was completed for the purposes of the filed rate doctrine."[29]  According to the majority, the "optimization algorithm" is just a "step" toward the ultimate filed rate, and "posting the entire panoply of [auction] parameters" merely "provides general transparency to the market participants."[30]

27.    What is the point of these arguments?  Either the requirement to determine capacity requirements prior to the conduct of the auction is in the filed rate or it is not.  If it is, the Commission must give it effect.  No tariff provision states that the "optimization algorithm" or other auction procedures are not part of the filed rate until auction rates are finalized.

28.    If the "optimization algorithm," including the determination of how much capacity an area needs, is as trivial as the majority makes it out to be, why is it in the filed rate in the first place?  Why does the tariff require it to be determined at all?  And why was there so much record evidence of reliance interests on the capacity requirement determination?  The majority recites petitioner Constellation's argument "that parties look to the parameters to make bilateral and hedging arrangements or, in the case of resources with a must-offer requirement, to decide whether and how to participate," but the majority discounts this reliance.[31]  I do not know how much more reliance has to be demonstrated for a filed rate term to be considered important, nor do I understand the premise that "inputs," "algorithms," or any one of the "panoply of parameters" are lesser parts of the filed rate.

29.    The majority's next attack on the auction procedures as filed rates is the claim that seller "[o]ffers into PJM's capacity market . . . are not 'rates made, demanded, or received' under FPA section 205(a)" but "in actuality, a 'demand' to sell at the clearing price—i.e., the capacity rate charged by PJM—and not at the price in the seller's offer,

---

[28] *See id.* (casting aspersions on "the implication that PJM simply clicks a button to generate the final, immutable auction results").

[29] *Id.*

[30] *Id.* P 87.

[31] *Id.* (citing Constellation Rehearing Request at 10, 18-19); *see id.* (the majority states that "a change in a single input . . . should not induce reliance that would render the Tariff revisions unjust and unreasonable"); *see also* Dissent at PP 18-20 (discussing reliance interests in the posted capacity requirement).

and thus [an offer] is not a rate 'demanded' by the seller."[32]  Instead, "[s]eller offers are 'request[s] to receive the market price,'[33] and do not, by themselves, constitute capacity commitments reflecting that a transaction has been consummated for purposes of the filed rate doctrine."[34]  Thus, auction procedures in the tariff that might implicate seller offers—such as determining the amount of capacity an area needs to buy—apparently are also less worthy of protection under the filed rate doctrine than the eventual clearing prices.

30.     The problem with all these arguments is that the tariff never states which of the auction procedures can be ignored and which cannot, nor is there any precedent for finding some parts of the tariff more entitled to protection under the filed rate doctrine and rule against retroactive ratemaking than other parts of the tariff.  The simple rule is that if it is part of the filed rate, it is the filed rate.[35]  Maybe on compliance the majority should require PJM to annotate its tariff so market participants can tell which parts of it are filed rates and which parts are not.

### C.     The Majority Makes Up Superseding Tariff Provisions

31.     We next turn to other provisions in the tariff—whether in the tariff or not—that the majority claims supposedly supersede the actual governing tariff provision.  For this

---

[32] Rehearing Order, 184 FERC ¶ 61,055 at P 62 (citing *Indep. Mkt. Monitor for PJM v. PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,121, at P 102 n.231 (2022) (citing 16 U.S.C. § 824d(a))).

[33] *Id.* P 65 (quoting February 2023 Order, 182 FERC ¶ 61,109 at P 170 (explaining that seller offers are not rates, and the obligations and rights associated with the rate paid by load and received by sellers have not been established until the auction is complete (citing *IMM v. PJM* Reh'g, 178 FERC ¶ 61,121 at PP 101-02))).  In addition, the Commission explained in the February 2023 Order that a change prior to award of capacity supply obligations and the corresponding rights and obligations may not be retroactive does not mean that the Commission would accept any such change as permissible.  *Id.* P 167 n.453 ("The Commission puts great weight on the importance of not disturbing settled expectations," and will accept a change proposed under these circumstances only if it finds the proposed change just and reasonable and not unduly discriminatory, which includes considering any effects on settled expectations).

[34] *Id.* P 65 (citing P3 Rehearing Request at 13 (asserting that PJM had applied its BRA procedures and secured irrevocable capacity commitments through the 2024/2025 BRA before it submitted the Section 205 Filing)).

[35] Add this to the other truisms I keep having to repeat:  the past is the past; words mean what they mean; the filed rate is the filed rate.

analysis, the majority informs us that "[i]n applying the filed rate doctrine, the Commission takes into account the circumstances of the proceeding and, in particular, the nature of the rate on file."[36]   Again, there is no precedent that the "circumstances of the proceeding" or the "nature of the rate on file" overcome the actual words of the rate on file, but here we go.

32.    The majority's primary argument here is that the "purpose" of the tariff supplants its actual provisions.  According to the majority, "[t]he purpose of the BRA is 'to secure commitments of Capacity Resources' and the price that suppliers will receive in exchange."[37]   It is, moreover, "PJM's distinct responsibility to ensure that the BRA fulfills its purpose of securing capacity commitments to meet PJM's reliability requirements and that clearing prices meet the standards in the Tariff."[38]   And, according to the majority, "[t]he filed rate doctrine ensures market participants have notice of what they are going to pay, or be paid, before they take or provide service.  In this case, sellers will know the accurately calculated VRR Curve *and resulting rates* before they receive capacity commitments or provide service."[39]

---

[36] Rehearing Order, 184 FERC ¶ 61,055 at P 66.  In support, my colleagues cite *Public Utility District No. 1 of Grays Harbor Count Wash. v. IDACORP Inc.*, 379 F.3d 641,  651 (9th Cir. 2004) which they states "examin[es] the nature of market-based rates in relation to the filed rate doctrine and confirming that the filed rate doctrine applied", *NSTAR Electric & Gas Corporation v. FERC*, 481 F.3d 794, 801 (D.C. Cir. 2007), which they state "examin[es] the filed rate and determining that the 'text and structure' supported a conclusion that certain agreements were not retroactive [because there was express notice in the tariff that the filed rates were subject to revision]" and *AEP Appalachian Transmission Company*, 164 FERC ¶ 61,180, at P 18 which they quote as stating "[R]etroactive approval of the formula rate change results in a violation of the filed rate doctrine and the prohibition against retroactive ratemaking." *Id.* P 66 n.227. These cases all squarely support application of the filed rate doctrine and rejection of the majority's retroactive ratemaking in this proceeding.

[37] *Id.* P 54 (citing February 2023 Order, 182 FERC ¶ 61,109 at P 167 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.4 Reliability Pricing Model Auctions (7.0.0), § 5.4(a)); PJM Capacity Market Manual, § 1.3 Definition and Purpose of the Reliability Pricing Model ("The [BRA] allows for the procurement of resource commitments to satisfy the region's unforced capacity obligation and allocates the cost of those commitments among the [load-serving entities] through a Locational Reliability Charge."); PJM, RPM Base Residual Auction FAQs, at 1 (Oct. 10, 2016) (same)).

[38] Rehearing Order, 184 FERC ¶ 61,055 at P 58.

[39] *Id.* P 61 (emphasis added); *see also id.* P 64 ("the rate on file is a set of procedures for producing an obligation to supply power and the rate received in exchange

Document Accession #: 20230627-3109 Filed Date: 04/27/2023
Case: 23-1778    Document: 88-1    Page: 257    Date Filed: 12/11/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 12 -

33.     The error of the majority's "purpose of the tariff" talk is its blatantly unlawful conclusion that accomplishing these virtuous tariff purposes "*could require adjusting certain parameters*, such as the [capacity requirement] of a specific [area], to ensure that PJM fulfills its responsibilities."[40]  No.  This is not how the filed rate doctrine and rule against retroactive ratemaking work.  The majority does not get to retroactively "adjust[] certain parameters" of the filed rate to accomplish its own—or anyone else's— conception of the "purpose" of the filed rate.  The filed rate would have to say when the filed rate does not apply, not merely point to some other "purpose."

34.     And that brings us to the next attack.  The majority cites tariff provisions that provide express notice that the capacity requirement is subject to adjustment during the conduct of the auction, specifically to account for Price Responsive Demand and to correct errors in the initial posting of parameters.[41]  You know where this is headed—the majority asserts that "the notion that the [capacity requirements] are not permitted to be modified is contradicted by the fact that the Tariff expressly contemplates reasons why they might be changed."[42]  But that is the trick:  exceptions to the filed rate must be *expressed*.  The fact that the tariff calls out two narrow circumstances when capacity requirements can be adjusted does not open the door for capacity requirements to be adjusted whenever PJM or the majority want.

35.     The majority finds otherwise.  It extols the "exercise of the minor flexibility built into Attachment DD section 5.11(e) under the circumstances here, flexibility that we trust PJM will use only in similarly exigent circumstances."[43]  By "minor flexibility," the majority means PJM's (and its own) alleged ability to retroactively revise auction procedures, including the determination of capacity requirements prior to the conduct of

---

for that obligation").

[40] *Id.* P 56 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD., § 5.10 Auction Clearing Requirements (31.0.0), § 5.10(a)).

[41] *Id.* P 56 n.170(citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD., § 5.11 Posting of Information Relevant (17.0.0), §§ 5.11(a)(v), (e)); *see also id.* PP 58-59 (same).

[42] *Id.* P 56.

[43] *Id.* P 75 (citing *id.* P 58 (discussing the provisions in Attachment DD requiring PJM to apply mitigation and permitting adjustments for Price Responsive Demand and errors in the initial posting of auction results prior to the final determination and posting of clearing prices)).

Document Access Case: 23-1778 Document: 88-1 Page: 258 Date Filed: 12/11/2023
Document Access No: 20230327-3100 Filed Date: 04/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                    - 13 -

the auction. There is no such flexibility. The only adjustments PJM can make to the auction parameters are those expressly set forth in the tariff.

36.     Finally, we get to the rub of the majority's misapprehension of the filed rate doctrine: the majority wants the power to change any auction parameter in the PJM tariff to minimize costs, meaning to reduce auction prices. "Indeed, the Tariff requires PJM to apply the optimization algorithm to calculate a clearing result that minimizes the cost of satisfying the reliability requirements across the PJM Region."[44] But this is another broad tariff ideal that—no matter how admirable—cannot usurp the plain terms of the auction parameters on file.

37.     The majority retorts that "apply[ing] the optimization algorithm to minimize reliability costs does not usurp—but rather harmonizes—the terms of PJM's filed rate."[45] In support, it cites standard tariff interpretation cases[46] that hold:

> First, the Commission must consider whether the [tariff] "unambiguously addresses the matter at issue." If the language is unambiguous, the issue is resolved. . . . To determine ambiguity, the Commission considers whether a provision "'could suggest more than one meaning when viewed objectively by a *reasonably intelligent person* who has examined the context of the entire integrated [tariff] and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"[47]

The issue thus is whether "a reasonably intelligent person" as characterized in the Commission's longstanding precedent would find the relevant tariff provision in this proceeding to be ambiguous. Only in those circumstances would the Commission need to resort to the general "purpose" of a capacity auction to decipher ambiguous auction parameters.

---

[44] *Id.* P 58 & n.181 (citing PJM, Intra-PJM Tariffs, OATT ATTACHMENT DD.5.12 Conduct of RPM Auctions (22.0.0), § 5.12(a)).

[45] *Id.* P 58 n.183.

[46] *Id.* (citing *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,053, at P 14 (2021)).

[47] *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,053 at P 14 (quoting *Transmission Agency of N. Cal. V. FERC*, 628 F.3d 538, 547 (D.C. Cir. 2010); *Xcel Energy Servs. Inc. v. Am. Transmission Co., LLC*, 140 FERC ¶ 61,058, at P 60 (2012)) (emphasis added).

38.     I respectfully submit that no "reasonably intelligent person" would find ambiguity in the tariff provision that PJM "shall determine the PJM Region Reliability Requirement and *the Locational Deliverability Area Reliability Requirement* for each Locational Deliverability Area for which a Variable Resource Requirement Curve has been established for such Base Residual Auction . . . *prior to the conduct of the Base Residual Auction* . . . ."[48]  So the majority is stuck with the words of the relevant tariff provision, and its conception of the true cost-minimizing "purpose" of the capacity auction is irrelevant.

39.     I also reject the claim that the majority is "minimizing costs" to consumers when it blatantly undermines the integrity of every FERC-regulated market.[49]

## III.   **FERC Has Limited Powers**

40.     The other fundamental reason that I dissent from the majority's action on rehearing today is because it is an unprecedented power grab.  The Commission has no more authority to grant this retroactive rate change than to declare war on Texas.[50]  Yet the majority barely flinches when granting itself nearly unlimited powers to retroactively revise any market or auction-related tariff provision up until the time that prices are paid and services rendered.  Market tariffs are now whatever we say they were after the fact.  The Commission can now overturn market auction outcomes for any reason.

41.     Let there be no dispute that the majority's new self-asserted powers deprive market participants of their rights.[51]  The auction rules are no longer reliable.  "Posting the entire panoply of parameters provides general transparency to the market participants,"[52] but generators must offer their capacity with no assurance about what rules may eventually be applied.  This is the exact opposite of how rates are supposed to work—giving market participants notice of the rates, terms, and conditions that will be applied *before* their application.[53]

---

[48] PJM, Intra-PJM Tariffs, OATT, Attach. DD, § 5.10(a)(vi)(B) (emphasis added).

[49] *See* Dissent at PP 28-30.

[50] Most of Texas is in the ERCOT region, which purposefully takes measures to bypass the jurisdiction (and thus avoid the regulatory interference) of the Federal Energy Regulatory Commission.

[51] *Contra* Rehearing Order, 184 FERC ¶ 61,055 at P 57.

[52] *Id.* P 87.

[53] *Contra id.* P 61 (stating the half-truth that "[t]he filed rate doctrine ensures

42.     Yes, market participants will suffer for this order, but the real loser in this power grab is the energy consumer.  All of the benefits of the Commission's policy in favor of market-based rate regimes and bulk power markets have been sacrificed at the altar of saving an isolated subset of imprudent load-serving entities who (possibly) failed to hedge against predictable high prices in a small zone in a single auction.[54]

43.     If the majority's power grab is not reversed by an appellate court, the Commission will have largely extinguished the filed rate doctrine and rule against retroactive ratemaking's heretofore "'nearly impenetrable shield for consumers' that the Commission may not circumvent even 'for good cause or for any other equitable considerations.'"[55]  The majority will have transformed the Commission into a court of equity to decide what the "fairest" rate *should have been* based on whatever considerations the majority-of-the-moment deems most important:  minimizing short-term costs, propping up favored resources, or any other transient policy objective.

44.     The majority further seeks to deputize PJM—and presumably other RTOs—and grant them similar "flexibility" and unfettered discretion to make up the rules as they go along.  But PJM is nothing more than a utility with no ability to do anything beyond that which its tariff permits; it is not a free agent with unlimited discretion to run auctions however they want.[56]  Just as the Commission is limited to the powers granted it by

---

market participants have notice of what they are going to pay, or be paid, before they take or provide service," but omitting that this protection also covers rate terms and conditions such as auction procedures).

[54] *See id.* PP 18-20.

[55] *Id.* P 53 (citing *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021) (citing *Old Dominion*, 892 F.3d 1223, 1230 ); *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (explaining that not even "the Commission itself" has authority to contravene the prospective application of rates); *Pub. Utils. Comm'n of Cal. v. FERC*, 894 F.2d 1372, 1383 (D.C. Cir. 1990) ("the Commission [does not have] the authority to ignore the law [to achieve] an equitable result"); Clean Energy Associations Rehearing Request at 5; Constellation Rehearing Request at 6; Leeward Rehearing Request at 4, 6-7).

[56] *Contra* Rehearing Order, 184 FERC ¶ 61,055 at PP 58,  75.  And, it should be stated, private parties conducting auctions as they see fit would have to adhere to the rules of the auction as described *before* the auction took place.  To change the rules afterward would be to invite what I would expect to be a successful suit by the aggrieved auction participants under contract law.  Why would a private auctioneer be under less of an obligation to adhere to its rules than a public utility?

Document Accession #: 20230427-3122   Filed Date: 04/27/2023

Docket Nos. ER23-729-001 and EL23-19-001                                      - 2 -

statute,[57] an RTO is limited to the powers granted it by tariff.  The majority thinks itself unconstrained by such limitations.

45.     The Commission should have granted rehearing.  It should not have approved PJM's section 205 rate change.[58]  And it had no authority to permit the rate change to go into effect retroactively in the last auction in plain contravention of the filed rate doctrine and rule against retroactive ratemaking.

        For these reasons, I respectfully dissent.


_____

James P. Danly
Commissioner

---

[57] "As a federal agency, FERC is a 'creature of statute,' having 'no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress.'"  *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)) (emphasis in *Atlantic City Elec. Co.*).

[58] *See* Dissent at PP 34-36.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                         Docket No.      ER23-729-001
                                                                    EL23-19-001

(Issued July 27, 2023)

CHRISTIE, Commissioner, *concurring*:

1.      I concur to respond briefly to arguments concerning the use of the word "results" in my February 2023 Concurrence.[1]

2.      I used the word "results" in my concurrence. I also stated in the first footnote following my use of the word results, that *"[t]he procedural posture of these results* is described at length in the [February 2023] order."[2]  And, I then offered record references that the "results" about which I was offering my views were "'based on preliminary auction data'" from which PJM provided "'estimates,'" rather than reflecting "'final auction results.'"[3]

3.      Moreover, the February 2023 Order to which I concurred stated, *inter alia*:

        At this stage of the auction process, no capacity commitments have been
        secured, no Capacity Clearing Price has been established, and the rate that

---

[1] *See* Leeward Renewable Energy and Leeward Renewable Energy Development March 23, 2023 Request for Rehearing at 5-6, 17-18, 19.

[2] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (2023) (February 2023 Order) (Christie, Comm'r, concurring at P 1 n.1) (Christie February 2023 Concurrence) (emphasis added).

[3] Christie February 2023 Concurrence at P 2 (quoting PJM ER23-729-000 December 2, 2022 Transmittal at 2-3) (emphasis added).  *See also id*. at P 3 and n.4 (quoting and citing Old Dominion Electric Cooperative's (ODEC) February 6, 2023 Answer at 3 addressing *scenario* calculations with respect to the economic impact related to "'PJM's *estimate*[]'" and addressing ODEC's assumptions) (emphasis added); *id*. at P 4 nn.5-6 (citing and quoting Maryland Office of People's Counsel January 20, 2023 Comments at 3 and n.1 related to the "'rough calculations'" of the average cost impact based on PJM's estimate).

**JA254**

Docket Nos. ER23-729-001 and EL23-19-001                                    - 2 -

*will be charged for the delivery year (June 1, 2024 – May 31, 2025) has yet to be determined.*[4]

4.      These statements reinforce that my February 2023 Concurrence is consistent with the February 2023 Order—which makes sense, as that was my intent in issuing that statement with my vote on that order.


For these reasons, I respectfully concur.


_____
Mark C. Christie
Commissioner

---

[4] February 2023 Order, 182 FERC ¶ 61,109 (2023) at P 164.