Nos. 23-1778, 23-1790, 23-1808, 23-1984,
23-2544, 23-2559, 23-2560, 23-2612 (consolidated)

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

PJM POWER PROVIDERS GROUP, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

———————————————

*On Petitions for Review of Orders of the
Federal Energy Regulatory Commission*

———————————————

### JOINT APPENDIX
### VOLUME 2 OF 3
### Pages JA256 – JA535

———————————————

Steffen Johnson
Nicholas Gladd
Kelsey Curtis
Wilson Sonsini Goodrich &
  Rosati, P.C.
1700 K Street NW
Washington, DC 20006
(202) 973-8800

*Counsel for Petitioner
PJM Power Providers Group*

Matthew E. Price
Anand Viswanathan
Zachary B. Cohen
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Constellation Energy
Generation, LLC*

Additional Counsel Listed on Inside Cover

Matthew R. Christiansen
  General Counsel
Robert H. Solomon
  Solicitor
Jared B. Fish
  Attorney
888 First Street N.E.
Washington, DC 20426
(202) 502-8101

*Counsel for Respondent*
*Federal Energy Regulatory*
*Commission*

Gerit F. Hull
American Municipal Power, Inc.
1111 Schrock Road, Suite 100
Columbus, OH 43229
(614) 540-0852

*Counsel for American Municipal*
*Power, Inc.*

Regina A. Iorii
Delaware Department Of Justice
820 N. French Street, 4th Floor
Wilmington, DE 19801
(302) 577-8159

*In the Capacity of Counsel for the*
*Delaware Division of the Public*
*Advocate Only*

Paul W. Hughes
David G. Tewksbury
Andrew A. Lyons-Berg
Connor J. Suozzo
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

*Counsel for Petitioners*
*The Electric Power Supply*
*Association & NRG Business*
*Marketing LLC*

Jeffrey A. Lamken
Lucas M. Walker
Jennifer E. Fischell
Jackson A. Myers
Mololamken LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2000

*Counsel for PJM*
*Interconnection, L.L.C.*

Thomas L. Rudebusch
Duncan Weinberg Genzer &
Pembroke PC
1667 K Street, NW, Suite 700
Washington, DC 20006
(202) 467-6370

*Counsel for Delaware Municipal*
*Electric Corporation, Inc.*

Robert A. Weishaar, Jr.
Mcnees Wallace & Nurick LLC
1200 G Street, NW, Suite 800
Washington, DC 20005
(202) 898-5700

*Counsel for the Delaware*
*Public Service Commission*


Miles H. Mitchell
Ransom E. Ted Davis
Maryland Public Service
Commission
6 St. Paul Street
Baltimore, MD 21202
(410) 767-8076

*Counsel for the Maryland*
*Public Service Commission*

Adrienne E. Clair
Jecoliah R. Williams
Thompson Coburn LLP
1909 K Street, NW, Suite 600
Washington, DC 20006
(202) 585-6900

*Counsel for Old Dominion*
*Electric Cooperative*

Scott H. Strauss
Peter J. Hopkins
Jeffrey A. Schwarz
Spiegel & Mcdiarmid LLP
1875 Eye Street, NW, Suite 700
Washington, DC 20006
(202) 879-4000

*Counsel for Maryland Office*
*of People's Counsel*

Jeffrey W. Mayes
Monitoring Analytics, LLC
2621 Van Buren Avenue,
Suite 160
Eagleville, PA 19403
(610) 271-8057

*Counsel for the Independent*
*Market Monitor for PJM*
*(Monitoring Analytics, LLC)*

# INDEX

## VOLUME 1

PJM Power Providers Group Petition for Review, Case No. 23-1778 (3d Cir. Apr. 24, 2023) ................................................................. JA1

Constellation Energy Generation, LLC Petition for Review, Case No. 23-1790 (3d Cir. Apr. 26, 2023) ............................................ JA5

Electric Power Supply Association Petition for Review, Case No. 23-1808 (3d Cir. Apr. 28, 2023) ...................................................... JA7

NRG Power Marketing LLC Petition for Review, Case No. 23-1984 (3d Cir. May 30, 2023) ................................................................. JA9

Constellation Energy Generation, LLC Petition for Review, Case No. 23-2544 (3d Cir. Aug. 24, 2023) ......................................... JA11

Electric Power Supply Association Supplemental Petition for Review, Case No. 23-2559 (3d Cir. Aug. 25, 2023) ........................... JA14

NRG Power Marketing LLC Supplemental Petition for Review, Case No. 23-2560 (3d Cir. Aug. 25, 2023) ........................... JA17

PJM Power Providers Group Petition for Review, Case No. 23-2612 (3d Cir. Sept. 5, 2023) ................................................................ JA20

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Order on Proposed Tariff Revisions & Dismissing Complaint, 182 FERC ¶ 61,109 (Feb. 21, 2023) ("Initial Order"), R.141 .................................................................. JA24

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Notice of Denial of Rehearing by Operation of Law & Providing for Further Consideration, 183 FERC ¶ 62,040 (Apr. 24, 2023) ("Denial Order"), R.148 ............................... JA135

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Order Addressing Arguments Raised on Rehearing, 184 FERC ¶ 61,055 (July 27, 2023) ("Rehearing Order"), R.155.................................................................... JA136

## VOLUME 2

Certified Index To The Record ........................................ JA256

*PJM Interconnection, L.L.C.*, FERC Docket No. ER23-729, Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to section 205 of the Federal Power Act (filed Dec. 23, 2022), R.1 .................................. JA287

    Attachment A: Revisions to the PJM Open Access Transmission Tariff (Marked/Redline Format)..................... JA322

*PJM Interconnection, L.L.C.*, FERC Docket No. EL23-19, Section 206 Filing Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area (filed Dec. 23, 2022), R.2, Pages 1-6, 33-34 ............................... JA350

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Protest of Pine Gate Renewables, LLC (filed Jan. 20, 2023), R. 94 ........................................................ JA358

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of Old Dominion Electric Cooperative in Support of Filing by PJM Interconnection, LLC (filed Jan. 20, 2023), R. 98, Pages 1, 6-9................................ JA371

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motions to Intervene and Initial Comments of the Maryland Office of People's Counsel (filed Jan. 20, 2023), R.100............................................................................ JA376

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of the Pennsylvania Public Utility Commission to PJM's 2024/2025 Base Residual Auction Modification Filings (filed Jan. 20, 2023), R.107 ............................. JA386

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Protest of the PJM Power Providers Group (filed Jan. 20, 2023), R.109 ................................................. JA391

    Attachment A, Affidavit of the Hon. Joseph T. Kelliher ¶ 41 ....................................................................................... JA441

    Attachment B, Affidavit of Roy J. Shanker ¶¶ 49-50 ............. JA444

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, NRG Power Marketing LLC et al. Protest and Request for Privileged Treatment (filed Jan. 20, 2023), R.116 ....... JA448

    Attachment A, Affidavit of Joseph A. Holtman ¶¶ 6-7, 10-29 ..................................................................................... JA476

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of the Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (filed Jan. 20, 2023), R.122 ..................................................................................... JA489

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Protest of the Electric Power Supply Association (filed Jan. 20, 2023), R.123 .......................................... JA497

    Attachment A, Affidavit of Paul M. Sotkiewicz ¶¶ 17, 39-45 ...................................................................................... JA529

# VOLUME 3

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of the Independent Market Monitor for PJM (filed Jan. 20, 2023), R. 124 ................................. JA536

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of Constellation Energy Generation, LLC (filed Jan. 20, 2023), R.127 ...................................................... JA544

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motion for Leave to Answer and Answer of PJM Interconnection, L.L.C. (filed Feb. 2, 2023), R.130.......................... JA567

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Answer and Motion for Leave to Answer of the Independent Market Monitor for PJM (filed Feb. 6, 2023), R.132 .......................................................................................... JA602

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motion for Leave to Answer and Answer of Public Interest Organizations (Sierra/NRDC) (filed Feb. 6, 2023), R.135 ...................................................................... JA609

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motion for Leave to Answer and Answer of the PJM Power Providers Group (filed Feb. 9, 2023), R.137 ................. JA623

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Answer and Motion for Leave to Answer of the Independent Market Monitor for PJM (filed Feb. 17, 2023), R.139 .......................................................................................... JA641

*PJM Interconnection, L.L.C.*, FERC Docket No. ER23-729, Request for Rehearing of the PJM Power Providers Group (filed Mar. 23, 2023), R.142 .................................................................... JA648

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Electric Power Supply Association et al. Request for Rehearing (filed Mar. 23, 2023), R.143 ........................ JA690

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Request for Rehearing of Constellation Energy Generation, LLC (filed Mar. 23, 2023), R.145 ................................. JA742

iv

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Request for Rehearing of the American Clean Power Association, Solar Energy Industries Association, and Advanced Energy United (filed Mar. 23, 2023), R.146.................... JA766

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| PJM Power Providers Group, *et al.*, | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | Nos. 23-1778, 23-1790 and |
| Federal Energy Regulatory Commission, | ) | 23-1808 (consolidated) |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

**CERTIFIED INDEX TO THE RECORD**

Pursuant to the provisions of Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), the provisions of 28 U.S.C. § 2112, and Rule 17 of the Federal Rules of Appellate Procedure, the Federal Energy Regulatory Commission hereby certifies that the materials listed and described below are:  (1) the order complained of:  "Order on Proposed Tariff Revisions and Dismissing Complaint," 182 FERC ¶ 61,109, issued February 21, 2023; as well as "Order Addressing Arguments Raised on Rehearing and Accepting Notice of Change in Status," 184 FERC ¶ 61,055, issued July 27, 2023, in *PJM Interconnection, L.L.C.,* FERC Docket Nos. ER23-729 and EL23-19; and (2) the complete record upon which such orders were entered.

| Record Item No. | Description |
| --- | --- |

1.    Filed By: PJM Interconnection, L.L.C.
Date Filed: 12/23/2022
Accession No: 20221223-5161
Description: PJM Interconnection, L.L.C. submits tariff filing per
35.13(a)(2)(iii: LDA Reliability Requirement; Extended 28-day
Comment Period to be effective 12/24/2022 under ER23-729. Filing
Type : 10

2.    Filed By: PJM Interconnection, L.L.C.
Date Filed: 12/23/2022
Accession No: 20221223-5171
Description: PJM Interconnection, L.L.C. submits tariff filing per
385.206: LDA Reliability Requirement Complaint, Extended 28-day
Comment Period to be effective 12/24/2022 under EL23-19. Filing
Type : 230

3.    Filed By: Delaware Division of the Public Advocate
Date Filed: 12/27/2022
Accession No: 20221227-5020
Description: (doc-less) Motion to Intervene of Delaware Division of
the Public Advocate under ER23-729.

4.    Filed By: NRG Power Marketing LLC
Date Filed: 12/27/2022
Accession No: 20221227-5037
Description: (doc-less) Motion to Intervene of NRG Power Marketing
LLC under ER23-729.

5.    Filed By: Monitoring Analytics, LLC
Date Filed: 12/27/2022
Accession No: 20221227-5043
Description: (doc-less) Motion to Intervene of the Independent Market
Monitor for PJM under ER23-729.

| Record Item No. | Description |
|---|---|

6.  Filed By: Rockland Electric Company
    Date Filed: 12/27/2022
    Accession No: 20221227-5048
    Description: (doc-less) Motion to Intervene of Rockland Electric Company under ER23-729.

7.  Filed By: Calpine Corporation
    Date Filed: 12/27/2022
    Accession No: 20221227-5194
    Description: (doc-less) Motion to Intervene of Calpine Corporation under EL23-19.

8.  Filed By: Calpine Corporation
    Date Filed: 12/27/2022
    Accession No: 20221227-5195
    (doc-less) Motion to Intervene of Calpine Corporation under ER23-729.

9.  Issued By: SECRETARY OF THE COMMISSION, FERC
    Date Filed: 12/27/2022
    Accession No: 20221227-3013
    Description: Combined Notice of Filings #1, December 27, 2022: This notice contains information concerning multiple filings received by FERC.

10. Filed By: Enel North America, Inc.
    Date Filed: 12/27/2022
    Accession No: 20221227-5199
    Description: (doc-less) Motion to Intervene of Enel North America, Inc. under ER23-729 et., al.

11. Filed By: LS Power Development, LLC
    Date Filed: 12/27/2022
    Accession No: 20221227-5166
    Description: (doc-less) Motion to Intervene of LS Power Development, LLC under ER23-729.

Record
Item No.        Description

12.        Filed By: LS Power Development, LLC
           Date Filed: 12/27/2022
           Accession No: 20221227-5197
           Description: (doc-less) Motion to Intervene of LS Power
           Development, LLC under EL23-19.

13.        Filed By: Enel North America, Inc.
           Date Filed: 12/27/2022
           Accession No: 20221227-5199
           Description: (doc-less) Motion to Intervene of Enel North America,
           Inc. under ER23-729 et., al.

14.        Filed By: Rockland Electric Company
           Date Filed: 12/27/2022
           Accession No: 20221227-5046
           Description: (doc-less) Motion to Intervene of Rockland Electric
           Company under EL23-19.

15.        Filed By: Delaware Division of the Public Advocate
           Date Filed: 12/27/2022
           Accession No: 20221227-5019
           Description: (doc-less) Motion to Intervene of Delaware Division of
           the Public Advocate under EL23-19.

16.        Filed By: NRG Power Marketing LLC
           Date Filed: 12/27/2022
           Accession No: 20221227-5028
           Description: (doc-less) Motion to Intervene of NRG Power Marketing
           LLC under EL23-19.

17.        Filed By: Monitoring Analytics, LLC
           Date Filed: 12/27/2022
           Accession No: 20221227-5038
           Description: (doc-less) Motion to Intervene of the Independent Market
           Monitor for PJM under EL23-19.

5

Record
Item No.        Description

18.        Filed By: Constellation Energy Generation, LLC
           Date Filed: 12/28/2022
           Accession No: 20221228-5177
           Description: (doc-less) Motion to Intervene of Constellation Energy
           Generation, LLC under EL23-19, et. al

19.        Filed By: American Electric Power Service Corporation
           Date Filed: 12/29/2022
           Accession No: 20221229-5019
           Description: (doc-less) Motion to Intervene of American Electric
           Power Service Corporation under ER23-729.

20.        Filed By: American Electric Power Service Corporation
           Date Filed: 12/29/2022
           Accession No: 20221229-5106
           Description: (doc-less) Motion to Intervene of American Electric
           Power Service Corporation under EL23-19.

21.        Filed By: Shell Energy North America (US), L.P.
           Date Filed: 12/29/2022
           Accession No: 20221229-5170
           Description: (doc-less) Motion to Intervene of Shell Energy North
           America (US), L.P. under EL23-19, et. al

22.        Filed By: Duquesne Light Company
           Date Filed: 12/29/2022
           Accession No: 20221229-5122
           Description: (doc-less) Motion to Intervene of Duquesne Light
           Company under ER23-729, et. al

23.        Filed By: Maryland Public Service Commission
           Date Filed: 12/30/2022
           Accession No: 20221230-5153
           Description: Maryland Public Service Commission submits Notice of
           Intervention under ER23-729.

| Record Item No. | Description |
| --- | --- |

24.    Filed By: Maryland Public Service Commission
Date Filed: 12/30/2022
Accession No: 20221230-5158
Description: Maryland Public Service Commission submits Notice of Intervention under EL23-19.

25.    Filed By: Organization of PJM States, Inc.
Date Filed: 12/30/2022
Accession No: 20221230-5109
Description: (doc-less) Motion to Intervene of Organization of PJM States, Inc. under ER23-729.

26.    Filed By: Southern Maryland Electric Cooperative, Inc.
Date Filed: 12/30/2022
Accession No: 20221230-5110
Description: (doc-less) Motion to Intervene of Southern Maryland under ER23-729.

27.    Filed By: Southern Maryland Electric Cooperative, Inc.
Date Filed: 12/30/2022
Accession No: 20221230-5108
Description: (doc-less) Motion to Intervene of Southern Maryland Electric Cooperative, Inc. under EL23-19.

28.    Filed By: PSEG Power LLCPSEG Energy Resources & Trade LLC PSEG Companies, Public Service Electric and Gas Company,
Date Filed: 12/30/2022
Accession No: 20221230-5133
Description: (doc-less) Motion to Intervene of PSEG Companies, et. al. under ER23-729, et al

29.    Filed By: Tangent Energy Solutions, Inc.
Date Filed: 01/03/2023
Accession No: 20230103-5289
Description: (doc-less) Motion to Intervene of Tangent Energy Solutions, Inc. under ER23-729.

Record
Item No.        Description

30.        Filed By: Tangent Energy Solutions, Inc.
           Date Filed: 01/03/2023
           Accession No: 20230103-5291
           Description: (doc-less) Motion to Intervene of Tangent Energy
           Solutions, Inc. under EL23-19.

31.        Filed By: Electric Power Supply Association
           Date Filed: 01/03/2023
           Accession No: 20230103-5115
           Description: (doc-less) Motion to Intervene of Electric Power Supply
           Association under ER23-729

32.        Filed By: Electric Power Supply Association
           Date Filed: 01/03/2023
           Accession No: 20230103-5128
           Description: (doc-less) Motion to Intervene of Electric Power Supply
           Association under EL23-19.

33.        Filed By: American Electric Power Service Corporation
           Date Filed: 01/03/2023
           Accession No: 20230103-5165
           Description: (doc-less) Motion to Intervene of American Electric
           Power Service Corporation under ER23-729.

34.        Filed By: American Clean Power Association
           Date Filed: 01/04/2023
           Accession No: 20230104-5002
           Description: (doc-less) Motion to Intervene of American Clean Power
           Association under EL23-19, et. al

35.        Filed By: Modern Energy Resources, LLC
           Date Filed: 01/03/2023
           Accession No: 20230103-5204
           Description: (doc-less) Motion to Intervene of Modern Energy
           Resources, LLC under ER23-729.

8

Record
Item No.          Description

36.          Filed By: Modern Energy Resources, LLC
             Date Filed: 01/03/2023
             Accession No: 20230103-5215
             Description: (doc-less) Motion to Intervene of Modern Energy
             Resources, LLC under EL23-19.

37.          Filed By: American Clean Power Association
             Date Filed: 01/04/2023
             Accession No: 20230104-5002
             Description: (doc-less) Motion to Intervene of American Clean Power
             Association under EL23-19, et. al

38.          Filed By: PUBLIC CITIZEN, INC
             Date Filed: 01/04/2023
             Accession No: 20230104-5011
             Description: (doc-less) Motion to Intervene of Public Citizen, Inc
             under EL23-19 et al.

39.          Filed By: Dominion Energy Services, Inc.
             Date Filed: 01/04/2023
             Accession No: 20230104-5045
             Description: (doc-less) Motion to Intervene of Dominion Energy
             Services, Inc. under EL23-19.

40.          Filed By: Dominion Energy Services, Inc.
             Date Filed: 01/04/2023
             Accession No: 20230104-5046
             Description: (doc-less) Motion to Intervene of Dominion Energy
             Services, Inc. under ER23-729.

41.          Filed By: Exelon Corporation
             Date Filed: 01/05/2023
             Accession No: 20230105-5056
             Description: (doc-less) Motion to Intervene of Exelon Corporation
             under ER23-729.

| Record Item No. | Description |
|---|---|

42.      Filed By: Exelon Corporation
         Date Filed: 01/05/2023
         Accession No: 20230105-5060
         Description: (doc-less) Motion to Intervene of Exelon Corporation
         under EL23-19.

43.      Filed By: Pennsylvania Public Utility Commission
         Date Filed: 01/05/2023
         Accession No: 20230105-5172
         Description: (doc-less) Motion to Intervene of Pennsylvania Public
         Utility Commission under ER23-729, et. al.

44.      Filed By: LIGHTSOURCE BP
         Date Filed: 01/05/2023
         Accession No: 20230105-5104
         Description: (doc-less) Motion to Intervene of Lightsource Renewable
         Energy US, LLC under EL23-19, et. al.

45.      Filed By: PJM Power Providers Group
         Date Filed: 01/05/2023
         Accession No: 20230105-5105
         Description: (doc-less) Motion to Intervene of PJM Power Providers
         Group under ER23-729.

46.      Filed By: PJM Power Providers Group
         Date Filed: 01/05/2023
         Accession No: 20230105-5107
         Description: (doc-less) Motion to Intervene of PJM Power Providers
         Group under EL23-19

| Record Item No. | Description |
|---|---|

47.

Filed By: FirstEnergy Service Company Ohio Edison Company The Cleveland Electric Illuminating Company ,The Toledo Edison Company ,Pennsylvania Power Company ,Pennsylvania Electric Company ,Metropolitan Edison Company ,West Penn Power Company ,Jersey Central Power & Light Company ,Monongahela Power Company ,The Potomac Edison Company ,Allegheny Energy Supply Company, LLC ,
Date Filed: 01/06/2023
Accession No: 20230106-5060
Description: (doc-less) Motion to Intervene of FirstEnergy Service Company, et. al. under EL23-19, et. al

48.

Filed By: H-P Energy Resources LLC
Date Filed: 01/06/2023
Accession No: 20230106-5092
Date Filed: (doc-less) Motion to Intervene of H-P Energy Resources LLC under EL23-19.

49.

Filed By: H-P Energy Resources LLC
Date Filed: 01/06/2023
Accession No: 20230106-5097
Description: (doc-less) Motion to Intervene of H-P Energy Resources LLC under ER23-729.

50.

Filed By: Delaware Municipal Electric Corporation, Inc.
Date Filed: 01/09/2023
Accession No: 20230109-5070
Description: (doc-less) Motion to Intervene of the Delaware Municipal Electric Corporation, Inc. under EL23-19.

51.

Filed By: Delaware Municipal Electric Corporation, Inc.
Date Filed: 01/09/2023
Accession No: 20230109-5071
Description: (doc-less) Motion to Intervene of the Delaware Municipal Electric Corporation, Inc. under ER23-729.

Record
Item No.        Description

52.        Filed By: J-POWER USA Development Co., Ltd.
           Date Filed: 01/09/2023
           Accession No: 20230109-5065
           Description: (doc-less) Motion to Intervene of J-POWER USA
           Development Co., Ltd. under ER23-729, et. al.

53.        Filed By: PPL Electric Utilities Corporation
           Date Filed: 01/09/2023
           Accession No: 20230109-5072
           Description: (doc-less) Motion to Intervene of PPL Electric Utilities
           Corporation under EL23-19.

54.        Filed By: Palladium Energy, LLC
           Date Filed: 01/10/2023
           Accession No: 20230110-5042
           Description: (doc-less) Motion to Intervene of Palladium Energy,
           LLC under ER23-729, et. al.

55.        Filed By: East Kentucky Power Cooperative, Inc.
           Date Filed: 01/11/2023
           Accession No: 20230111-5021
           Description: (doc-less) Motion to Intervene of East Kentucky Power
           Cooperative, Inc. under EL23-19.

56.        Filed By: East Kentucky Power Cooperative, Inc.
           Date Filed: 01/11/2023
           Accession No: 20230111-5022
           Description: (doc-less) Motion to Intervene of East Kentucky Power
           Cooperative, Inc. under ER23-729.

57.        Filed By: New Jersey Division of Rate Counsel
           Date Filed: 01/11/2023
           Accession No: 20230111-5001
           Description: (doc-less) Motion to Intervene of New Jersey Division of
           Rate Counsel under EL23-19.

Record
Item No.        Description

58.    Filed By: North Carolina Electric Membership Corporation
       Date Filed: 01/12/2023
       Accession No: 20230112-5118
       Description: (doc-less) Motion to Intervene of North Carolina Electric
       Membership Corporation under ER23-729, et. al.

59.    Filed By: Solar Energy Industries Association
       Date Filed: 01/12/2023
       Accession No: 20230112-5031
       Description: (doc-less) Motion to Intervene of Solar Energy Industries
       Association under ER23-729 et al.

60.    Filed By: NJR Clean Energy Ventures Corporation
       Date Filed: 01/12/2023
       Accession No: 20230112-5047
       Description: (doc-less) Motion to Intervene of NJR Clean Energy
       Ventures Corporation under ER23-729 et al.

61.    Filed By: AES Clean Energy Development, LLC
       Date Filed: 01/12/2023
       Accession No: 20230112-5123
       Description: (doc-less) Motion to Intervene of AES Clean Energy
       Development, LLC under ER23-729.

62.    Filed By: AES Clean Energy Development, LLC
       Date Filed: 01/12/2023
       Accession No: 20230112-5146
       Description: (doc-less) Motion to Intervene of AES Clean Energy
       Development, LLC under EL23-19.

63.    Filed By: Caithness Energy, L.L.C.
       Date Filed: 01/13/2023
       Accession No: 20230113-5164
       Description: (doc-less) Motion to Intervene of Caithness Energy,
       L.L.C. under ER23-729, et. al

13

| Record Item No. | Description |
|---|---|

64.   Filed By: Lightstone Marketing LLC
      Date Filed: 01/13/2023
      Accession No: 20230113-5221
      Description: (doc-less) Motion to Intervene of Lightstone Marketing
      LLC under ER23-729.

65.   Filed By: The Retail Energy Supply Association
      Date Filed: 01/13/2023
      Accession No: 20230113-5163
      Description: (doc-less) Motion to Intervene of The Retail Energy
      Supply Association under EL23-19.

66.   Filed By: Direct Energy Business Marketing, LLC Midwest
      Generation, LLC
      Date Filed: 01/13/2023
      Accession No: 20230113-5204
      Description: (doc-less) Motion to Intervene of Direct Energy Business
      Marketing, LLC, et. al. under ER23-729.

67.   Filed By: Direct Energy Business Marketing, LLC Midwest
      Generation, LLC
      Date Filed: 01/13/2023
      Accession No: 20230113-5205
      Description: (doc-less) Motion to Intervene of Direct Energy Business
      Marketing, LLC, et. al. under EL23-19.

68.   Filed By: Delaware Public Service Commission
      Date Filed: 01/13/2023
      Accession No: 20230113-5081
      Description: (doc-less) Motion to Intervene of Delaware Public
      Service Commission under ER23-729, et. al

69.   Filed By: Backbone Mountain Wind power LLC et al
      Date Filed: 01/13/2023
      Accession No: 20230113-5217
      Description: (doc-less) Motion to Intervene of Backbone Mountain
      Windpower LLC, et. al. under EL23-19.

Record
Item No.        Description

70.      Filed By: Backbone Mountain Windpower et al
         Date Filed: 01/13/2023
         Accession No: 20230113-5223
         Description: (doc-less) Motion to Intervene of Backbone Mountain
         Windpower LLC, et al. under ER23-729.

71.      Filed By: DC Public Service Commission
         Date Filed: 01/17/2023
         Accession No: 20230117-5170
         Description: (doc-less) Motion to Intervene of DC Public Service
         Commission under EL23-19.

72.      Filed By: DC Public Service Commission
         Date Filed: 01/17/2023
         Accession No: 20230117-5171
         Description: (doc-less) Motion to Intervene of DC Public Service
         Commission under ER23-729.

73.      Filed By: Old Dominion Electric Cooperative
         Date Filed: 01/17/2023
         Accession No: 20230117-5177
         (doc-less) Motion to Intervene of Old Dominion Electric Cooperative
         under ER23-729.

74.      Filed By: Old Dominion Electric Cooperative
         Date Filed: 01/17/2023
         Accession No: 20230117-5178
         Description: (doc-less) Motion to Intervene of Old Dominion Electric
         Cooperative under EL23-19.

75.      Filed By: Pine Gate Renewables, LLC
         Date Filed:  01/17/2023
         Accession No: 20230117-5231
         Description: (doc-less) Motion to Intervene of Pine Gate Renewables,
         LLC under ER23-729, et. al

Record
Item No.          Description

76.          Filed By: Illinois Commerce Commission
             Date Filed: 01/18/2023
             Accession No: 20230118-5038
             Description: (doc-less) Notice of Intervention of the Illinois
             Commerce Commission under ER23-729.

77.          Filed By: American Municipal Power, Inc.
             Date Filed: 01/18/2023
             Accession No: 20230118-5108
             Description: (doc-less) Motion to Intervene of American Municipal
             Power, Inc. under ER23-729, et. al

78.          Filed By: Vistra Corp.
             Date Filed: 01/18/2023
             Accession No: 20230118-5132
             Description: (doc-less) Motion to Intervene of Vistra Corp. under
             EL23-19, et. al.

79.          Filed By: New Jersey Division of Rate Counsel
             Date Filed: 01/18/2023
             Accession No: 20230118-5010
             Description: (doc-less) Motion to Intervene of New Jersey Division of
             Rate Counsel under ER23-729.

80.          Filed By: Buckeye Power, Inc.
             Date Filed: 01/18/2023
             Accession No: 20230118-5116
             Description: (doc-less) Motion to Intervene of Buckeye Power, Inc.
             under EL23-19.

81.          Filed By: Illinois Commerce Commission
             Date Filed: 01/18/2023
             Accession No: 20230118-5041
             Description: (doc-less) Notice of Intervention of the Illinois
             Commerce Commission under EL23-19.

Record
Item No.        Description

82.        Filed By: New Jersey Board of Public Utilities
           Date Filed: 01/19/2023
           Accession No: 20230119-5079
           Description: (doc-less) Motion to Intervene of New Jersey Board of
           Public Utilities under EL23-19.

83.        Filed By: New Jersey Board of Public Utilities
           Date Filed: 01/19/2023
           Accession No: 20230119-5080
           Description: (doc-less) Motion to Intervene of New Jersey Board of
           Public Utilities under ER23-729.

84.        Filed By: Duke Energy Business Services LLC
           Date Filed: 01/19/2023
           Accession No: 20230119-5147
           Description: (doc-less) Motion to Intervene of Duke Energy Business
           Services LLC, et. al. under EL23-19.

85.        Filed By: Duke Energy Business Services LLC
           Duke Energy Ohio, Inc. and Duke Energy Kentucky, Inc. Duke
           Energy Indiana LLC, Duke Energy Carolinas LLC, Duke Energy
           Progress LLC
           Date Filed: 01/19/2023
           Accession No: 20230119-5155
           Description: (doc-less) Motion to Intervene of Duke Energy Business
           Services LLC, et. al. under ER23-729.

86.        Filed By: Virginia State Corporation Commission
           Date Filed: 01/19/2023
           Accession No: 20230119-5013
           Description: (doc-less) Notice of Intervention of Virginia State
           Corporation Commission under ER23-729.

Record
Item No.       Description

87.        Filed By: Boston Energy Trading and Marketing LLC
           Date Filed: 01/19/2023
           Accession No: 20230119-5009
           Description: (doc-less) Motion to Intervene of Boston Energy Trading
           and Marketing LLC under EL23-19.

88.        Filed By: Boston Energy Trading and Marketing LLC
           Date Filed: 01/19/2023
           Accession No: 20230119-5011
           Description: (doc-less) Motion to Intervene of Boston Energy Trading
           and Marketing LLC under ER23-729.

89.        Filed By: PUBLIC CITIZEN, INC
           Date Filed: 01/19/2023
           Accession No: 20230119-5025
           Description: Protest of Public Citizen, Inc. under EL23-19, et. al.

90.        Filed By: EDP Renewables North America LLC
           Date Filed: 01/19/2023
           Accession No: 20230119-5086
           Description: (doc-less) Motion to Intervene of EDP Renewables North
           America LLC under ER23-729.

91.        Filed By: EDP Renewables North America LLC
           Date Filed: 01/19/2023
           Accession No: 20230119-5090
           Description: (doc-less) Motion to Intervene of EDP Renewables North
           America LLC under EL23-19.

92.        Filed By: Advanced Energy United
           Date Filed: 01/19/2023
           Accession No: 20230119-5012
           Description: (doc-less) Motion to Intervene of Advanced Energy
           United under ER23-729, et. al.

| Record Item No. | Description |
|---|---|

93.     Filed By: Orsted Wind Power North America LLC
Date Filed: 01/20/2023
Accession No: 20230120-5071
Description: (doc-less) Motion to Intervene of Orsted Wind Power North America LLC under ER23-729.

94.     Filed By: Invenergy Wind Development North America LLC Invenergy Solar Development North America LLC Invenergy Thermal Development LLC,
Date Filed: 01/20/2023
Accession No: 20230120-5149
Description: Motion to Intervene and Comments of Invenergy Wind Development North America LLC, et. al. under ER23-729, et. al.

95.     Filed By: Freepoint Solar LLC
Date Filed: 01/20/2023
Accession No: 20230120-5213
Description: Motion to Intervene and Comments of Freepoint Solar LLC under ER23-729, et al.

96.     Filed By: Leeward Renewable Energy, LLC Leeward Renewable Energy Development, LLC
Date Filed: 01/20/2023
Accession No: 20230120-5267
Description: Motion to Intervene and Protest of Leeward Renewable Energy, LLC et al. under ER23-729, et al.

97.     Filed By: PPL Electric Utilities Corporation
Date Filed: 01/20/2023
Accession No: 20230120-5046
Description: (doc-less) Motion to Intervene of PPL Electric Utilities Corporation under ER23-729.

Record
Item No.          Description

98.          Filed By: Old Dominion Electric Cooperative
             Date Filed: 01/20/2023
             Accession No: 20230120-5014
             Description: Comments of Old Dominion Electric Cooperative under
             ER23-729, et al.

99.          Filed By: Delmarva Zone Parties
             Date Filed: 01/20/2023
             Accession No: 20230120-5100
             Description: Comments of Delmarva Zone Parties in Support of PJM's
             Proposal to Address the Locational Deliverability Area Reliability
             Requirement under ER23-729, et. al.

100.         Filed By: Maryland Office of People's Counsel
             Date Filed: 01/20/2023
             Accession No: 20230120-5105
             Description: Motion to Intervene and Initial Comments of Maryland
             Office of People's Counsel under EL23-19.

101.         Filed By: Maryland Office of People's Counsel
             Date Filed: 01/20/2023
             Accession No: 20230120-5115
             Description: Motion to Intervene and Initial Comments of Maryland
             Office of People's Counsel under ER23-729.

102.         Filed By: Organization of PJM States, Inc.
             Date Filed: 01/20/2023
             Accession No: 20230120-5176
             Description: Notice of Intervention and Comments of Organization of
             PJM States, Inc. under EL23-19 et al.

103.         Filed By: American Clean Power Association Solar Energy Industries
             Association Advanced Energy United
             Date Filed: 01/20/2023
             Accession No: 20230120-5121
             Description: Protest and Comments of the American Clean Power
             Association, et al. under ER23-729, et al.

Record
Item No.     Description

104.     Filed By: Pine Gate Renewables, LLC
Date Filed: 01/20/2023
Accession No: 20230120-5124
Description: Protest of Pine Gate Renewables, LLC under ER23-729, et al.

105.     Filed By: American Municipal Power, Inc.
Date Filed: 01/20/2023
Accession No: 20230120-5119
Description: Comments of American Municipal Power, Inc. under ER23-729, et al.

106.     Filed By: Ohio Federal Energy Advocate
Date Filed: 01/20/2023
Accession No: 20230120-5177
Description: (doc-less) Motion to Intervene of Ohio Federal Energy Advocate under EL23-19, et al.

107.     Filed By: Pennsylvania Public Utility Commission
Date Filed: 01/20/2023
Accession No: 20230120-5214
Description: Comments of the Pennsylvania Public Utility Commission to PJM's 2024/2025 Base Residual Auction Modification Filings under ER23-729, et. al.

108.     Filed By: Cypress Creek Renewables, LLC
Date Filed: 01/20/2023
Accession No: 20230120-5219
Description: (doc-less) Motion to Intervene of Cypress Creek Renewables, LLC under EL23-19, et. al.

109.     Filed By: PJM Power Providers Group
Date Filed: 01/20/2023
Accession No: 20230120-5248
Description: Protest of The PJM Power Providers Group under ER23 729, et al.

Record
Item No.      Description

110.      Filed By: LS Power Development, LLC
          Date Filed: 01/20/2023
          Accession No: 20230120-5262
          Description: Protest of LS Power Development, LLC under EL23-19,
          et al.

111.      Filed By: Buckeye Power, Inc. East Kentucky Power Cooperative,
          Inc.
          Date Filed: 01/20/2023
          Accession No: 20230120-5254
          Description: Comments of the Joint Electric Cooperatives under
          ER23-729.

112.      Filed By: NRG Power Marketing LLC Midwest Generation, LLC
          Direct Energy Business Marketing, LLC
          Date Filed: 01/20/2023
          Accession No: 20230120-5260
          Description: Protest of NRG Power Marketing LLC, et. al. under
          ER23-729, et. al.

113.      Filed By: Organization of PJM States, Inc.
          Date Filed: 01/20/2023
          Accession No: 20230120-5169
          Description: Notice of Intervention and Comments of the
          Organization of PJM States, Inc. under ER23-729.

114.      Filed By: Vistra Corp.
          Date Filed: 01/20/2023
          Accession No: 20230120-5263
          Description: Protest of Vistra Corp. under ER23-729 et al

115.      Filed By: Vistra Corp.
          Date Filed: 01/20/2023
          Accession No: 20230120-5264
          Description: Protest of Vistra Corp. under EL23-19 et al.

| Record Item No. | Description |
|---|---|

116.     Filed By: NRG Power Marketing LLC Midwest Generation, LLC
Direct Energy Business Marketing, LLC
Date Filed: 01/20/2023
Accession No: 20230120-5259
Description: Protest of NRG Power Marketing LLC, et. al. under ER23-729, et. al.

117.     Filed By: NRG Power Marketing LLC Midwest Generation, LLC
Direct Energy Business Marketing, LLC,
Date Filed: 01/20/2023
Accession No: 20230120-5260
Description: Protest of NRG Power Marketing LLC, et. al. under ER23-729, et. al.

118.     Filed By: Buckeye Power, Inc.
Date Filed: 01/20/2023
Accession No: 20230120-5138
Description: (doc-less) Motion to Intervene of Buckeye Power, Inc. under ER23-729.

119.     Filed By: EDF Renewables, Inc.
Date Filed: 01/20/2023
Accession No: 20230120-5178
Description: (doc-less) Motion to Intervene of EDF Renewables, Inc. under ER23-729, et al.

120.     Filed By: Natural Resource Defense Council Sustainable FERC Project
Date Filed: 01/20/2023
Accession No: 20230120-5201
Description: (doc-less) Motion to Intervene of Natural Resource Defense Council, et al. under ER23-729, et al.

Record
Item No.    Description

121.    Filed By: New Jersey Board of Public Utilities
Date Filed: 01/20/2023
Accession No: 20230120-5215
Description: Comments of New Jersey Board of Public Utilities under EL23-19, et. al.

122.    Filed By: Ohio Federal Energy Advocate
Date Filed: 01/20/2023
Accession No: 20230120-5229
Description: Comments of the Public Utilities Commission of Ohio's Office of the Federal Energy Advocate under EL23-19, et. al.

123.    Filed By: Electric Power Supply Association
Date Filed: 01/20/2023
Accession No: 20230120-5230
Description: Protest of the Electric Power Supply Association under ER23-19, et al.

124.    Filed By: Monitoring Analytics, LLC
Date Filed: 01/20/2023
Accession No: 20230120-5238
Description: Comments of the Independent Market Monitor for PJM under EL23-19, et. al

125.    Filed By: Lotus Infrastructure, LLC
Date Filed: 01/20/2023
Accession No: 20230120-5241
Description: Motion to Intervene and Limited Protest of Lotus Infrastructure, LLC under EL23-19, et al.

126.    Filed By: PSEG Companies PSEG Power LLCPSEG Energy Resources & Trade LLC, Public Service Electric and Gas Company
Date Filed: 01/20/2023
Accession No: 20230120-5245
Description: Comments of PSEG Companies under ER23-729, et. al.

| Record Item No. | Description |
|---|---|

127.    Filed By: Constellation Energy Generation, LLC
Date Filed: 01/20/2023
Accession No: 20230120-5250
Description: Comments of Constellation Energy Generation, LLC under EL23-19, et. al

128.    Filed By: Leeward Renewable Energy, LLC Leeward Renewable Energy Development, LLC
Date Filed: 01/20/2023
Accession No: 20230120-5267
Description: Motion to Intervene and Protest of Leeward Renewable Energy, LLC et al. under ER23-729, et. al.

129.    Filed By: Buckeye Power, Inc.
Date Filed: 01/24/2023
Accession No: 20230124-5067
Description: (doc-less) Motion to Intervene of Buckeye Power, Inc. under ER23-729. Erroneously filed

130.    Filed By: PJM Interconnection, L.L.C.
Date Filed: 02/02/2023
Accession No: 20230202-5138
Description: Motion for Leave to Answer and Answer of PJM Interconnection, L.L.C. to various January 20, 2023 Protests under ER23-72 9 et. al.

131.    Filed By: Sierra Club
Date Filed: 02/03/2023
Accession No: 20230203-5122
Description: (doc-less) Out-of-Time Motion to Intervene of Sierra Club under ER23-729, et. al.

| Record Item No. | Description |
|---|---|

132.    Filed By: Monitoring Analytics, LLC
Date Filed: 02/06/2023
Accession No: 20230206-5012
Description: Motion for Leave to Answer and Answer of Independent Market Monitor for PJM to the January 20, 2023 comments and protests under ER23-729, et. al.

133.    Filed By: Old Dominion Electric Cooperative
Date Filed: 02/06/2023
Accession No: 20230206-5079
Description: Motion for Leave to Answer and Answer of Old Dominion Electric Cooperative to the January 20, 2023 protests and certain comments of PJM Interconnection, L.L.C. under ER23-729, et. al

134.    Filed By: Constellation Energy Generation, LLC
Date Filed: 02/06/2023
Accession No: 20230206-5077
Description: Motion for Leave to Answer and Answer of Constellation Energy Generation, LLC to the comments of PJM Interconnection, L.L.C. under ER23-729, et. al.

135.    Filed By: Sierra Club NATURAL RESOURCES DEFENSE COUNCIL
Date Filed: 02/06/2023
Accession No: 20230206-5148
Description: Motion for Leave to Answer and Answer of Natural Resources Defense Council et al. to the December 23, 2022 filings under Section 205 and 206 of PJM Interconnection, L.L.C. under ER23-729, et. al.

Record
Item No.    Description

136.    Filed By: PJM Interconnection, L.L.C.
Date Filed: 02/08/2023
Accession No: 20230208-5034
Description: Motion to Leave to Answer and Answer of PJM
Interconnection, L.L.C. to the February 6, 2023 Motion for Leave to
Answer and Answer of Constellation Energy Generation, LLC under
ER23-729, et al.

137.    Filed By: PJM Power Providers Group
Date Filed: 02/09/2023
Accession No: 20230209-5111
Description: Motion for Leave to Answer and Answer of PJM Power
Providers Group to the February 2, 2023 et al. Answers of PJM
Interconnection, L.L.C. et al. under ER23-729, et. al.

138.    Filed By: Electric Power Supply Association
Date Filed: 02/09/2023
Accession No: 20230209-5130
Description: Motion for Leave to Answer and Answer of the Electric
Power Supply Association to Comments filed in support of the
December 23, 2022 filings of PJM Interconnection, L.L.C. under
EL23-19 et al.

139.    Filed By: Monitoring Analytics, LLC
Date Filed: 02/17/2023
Accession No: 20230217-5007
Description: Answer and Motion for Leave to Answer of the
Independent Market Monitor for PJM under EL23-19, et. al.

Record
Item No.    Description

140.    Filed By: Leeward Renewable Energy, LLC Leeward Renewable
Energy Development, LLC
Date Filed: 02/17/2023
Accession No: 20230217-5204
Description: Motion for Leave to Answer and Answer of Leeward
Renewable Energy, LLC and Leeward Renewable Energy
Development, LLC to the February 2, 2023 Answers of PJM
Interconnection, L.L.C. and the Independent Market Monitor for PJM
under ER23-729, et. al.

141.    Issued By: SECRETARY OF THE COMMISSION,
FERC COMMISSIONERS AND IMMEDIATE STAFF (THE
COMMISSION)
Date Filed: 02/21/2023
Accession No: 20230221-3085
Description: Order on Proposed Tariff Revisions and Dismissing
Complaint re PJM Interconnection, L.L.C. under ER23-729 et al.
Commissioner Danly is dissenting with a separate statement attached.
Commissioner Christie is concurring with a separate statement
attached.

142.    Filed By: The PJM Power Providers Group
Date Filed: 03/23/2023
Accession No: 20230323-5233
Description: PJM Power Providers Group submits Request for
Rehearing of the February 21, 2023 Order under ER23-729.

143.    Filed By: Electric Power Supply Association NRG Power Marketing
LLC Direct Energy Business Marketing, LLC, Midwest Generation,
LLC, LS Power Development, LLC, Vistra Corp.,
Date Filed: 03/23/2023
Accession No: 20230323-5237
Description: Electric Power Supply Association, et al. submit Request
for Rehearing of the February 21, 2023 Order under ER23-729, et al.

Record
Item No.      Description

144.    Filed By: Leeward Renewable Energy, LLC Leeward Renewable
        Energy Development, LLC
        Date Filed: 03/23/2023
        Accession No: 20230323-5240
        Description: Leeward Renewable Energy, LLC, et al. submit Request
        for Rehearing of the February 21, 2023, Order under ER23-729, et al.

145.    Filed By: Constellation Energy Generation, LLC
        Date Filed: 03/23/2023
        Accession No: 20230323-5241
        Description: Constellation Energy Generation, LLC submits Request
        for Rehearing of the February 21, 2023 Order under ER23-729, et al.

146.    Filed By: American Clean Power Association Advanced Energy
        United Solar Energy Industries Association
        Date Filed: 03/23/2023
        Accession No: 20230323-5242
        Description: American Clean Power Association, et al. submit
        Request for Rehearing of the February 21, 2023 Order under ER23
        729, et al.

147.    Filed By: Old Dominion Electric Cooperative
        Date Filed: 04/07/2023
        Accession No: 20230407-5096
        Description: Motion to Leave to Answer and Answer of Old
        Dominion Electric Cooperative to the Requests for Rehearing filed by
        American Clean Power Association, et al. on March 23, 2023, under
        ER23-729, et al.

148.    Issued By: SECRETARY OF THE COMMISSION, FERC
        Date Filed: 04/24/2023
        Accession No: 20230424-3006
        Description: Notice of Denial of Rehearing by Operation of Law and
        Providing for Further Consideration re PJM Interconnection, L.L.C.
        under ER23-729 et al.

| Record<br>Item No. | Description |
|---|---|
| 149. | Filed By: Constellation Energy Generation, LLC<br>Date Filed: 04/27/2023<br>Accession No: 20230427-5321<br>Description: Petition for Review filed in the United States Court of Appeals for the Third Circuit of Constellation Energy Generation, LLC under ER23-729, et al. (Case No. 23-1790). |
| 150. | Filed By: The PJM Power Providers Group<br>Date Filed: 04/28/2023<br>Accession No: 20230428-5510<br>Description: Petition for Review filed in the U.S. Court of Appeals for the Third Circuit of The PJM Power Providers Group under ER23 729, et al. (Case No. 23-1778). |
| 151. | Filed By: The PJM Power Providers Group<br>Date Filed: 04/28/2023<br>Accession No: 20230428-5510<br>Description: Petition for Review filed in the U.S. Court of Appeals for the Third Circuit of The PJM Power Providers Group under ER23 729, et al. (Case No. 23-1778). |
| 152. | Filed By: Electric Power Supply Association<br>Date Filed: 05/02/2023<br>Accession No: 20230502-5204<br>Description: Petition for Review filed in the U.S. Court of Appeals for the Third Circuit of Electric Power Supply Association under ER23 729, et al. (Case No. 23-1808) |
| 153. | Filed By: NRG Power Marketing LLC<br>Date Filed: 06/05/2023<br>Accession No: 20230605-5080<br>Description: Petition of NRG Power Marketing LLC, in The US Court of Appeals for the Third Circuit, for review of FERC's February 21, 2023 Order under ER23-729 et. al. (Case No 23-1984). |

Record
Item No.        Description

154.    Filed By: J-POWER USA Development Co., Ltd. J-POWER North
        America Holdings Co., Ltd. Jackson Generation, LLC , Birchwood
        Power Partners, L.P. ,
        Date Filed: 06/27/2023
        Accession No: 20230627-5130|
        Description: J-POWER USA Development Co., Ltd., et. al. submits
        Request to Update Official Service Lists under AD21-10, et. al.

155.    Issued By: SECRETARY OF THE COMMISSION,
        FERCCOMMISSIONERS AND IMMEDIATE STAFF (THE
        COMMISSION)
        Date Filed: 07/27/2023
        Accession No: 20230727-3110
        Description: Order Addressing Arguments Raised on Rehearing re
        PJM Interconnection, L.L.C. under ER23-729 et al. Commissioner
        Danly is dissenting with a separate statement attached. Commissioner
        Christie is concurring with a separate statement attached.


                    In witness whereof I have hereunto
                    subscribed and caused the seal of the Federal
                    Energy Regulatory Commission to be affixed this
                    3rd day of August 2023, at Washington, DC.



                    /s/ *Kimberly D. Bose*
                        Kimberly D. Bose,
                        Secretary.

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d) and the Court's

Administrative Order Regarding Electronic Case Filing, I hereby certify

that I have, this 3rd day of August 2023, served the foregoing upon the

counsel listed in the Service Preference Report via email through the

Court's CM/ECF system.


*/s/ Jared B. Fish*
Jared B. Fish
    Attorney



Federal Energy Regulatory
  Commission
888 First Street, NE
Washington, DC  20426
Tel.: (202) 502-8101
Email:  Jared.Fish@ferc.gov

PJM Interconnection, L.L.C.
2750 Monroe Blvd.
Audubon, PA 19403-2497

Chenchao Lu
Assistant General Counsel
T:  (610) 666-2255 | F: (610) 666-8211
Chenchao.Lu@pjm.com

**pjm**

December 23, 2022

The Honorable Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426

Re:     *PJM Interconnection, L.L.C.*, Docket No. ER22-___-000
        Proposed Amendment to the Locational Deliverability Area Reliability
        Requirement Filed Pursuant to section 205 of the Federal Power Act, Request for
        Waiver of Notice Requirement, and Request for an **Extended Comment Period of
        28 Days**.

Dear Secretary Bose:

PJM Interconnection, L.L.C. ("PJM"), pursuant to section 205 of the Federal Power

Act ("FPA"), 16 U.S.C. § 824d, and section 35.13 of the regulations of the Federal Energy

Regulatory Commission ("FERC" or the "Commission"), 18 C.F.R. part 35, hereby

proposes to revise the definition of Locational Deliverability Area Reliability

Requirement[1] in the PJM Open Access Transmission Tariff ("Tariff").  The proposed

revisions herein would allow PJM, during the auction process, to exclude Planned

Generation Capacity Resources from the calculation of the Locational Deliverability Area

Reliability Requirement if the addition of such resources materially increases the reliability

requirement and such resources do not participate in the Reliability Pricing Model

---

[1] Terms not otherwise defined herein shall have the same meaning as set forth in the Tariff and Amended and
Restated Operating Agreement of PJM Interconnection, L.L.C.

Kimberly D. Bose, Secretary
December 23, 2022
Page 2

("RPM") Auctions.  This amendment is needed to allow the RPM Auctions to use an accurate Locational Deliverability Area Reliability Requirement in clearing the auctions.

In conducting the 2024/2025 Base Residual Auction ("BRA"), a significant amount of Planned Generation Capacity Resources that were expected to participate in the auction based on the expected in-service date of the resources' Interconnection Service Agreements ("ISAs") did not offer in the auction despite being included in the Locational Deliverability Area Reliability Requirement. As a result, as further explained below, the Locational Deliverability Area Reliability Requirement for one particular Locational Deliverability Area ("LDA"), Delmarva Power & Light South ("DPL-S"), was overstated for the 2024/2025 BRA.  In short, the application of the Locational Deliverability Area Reliability Requirement in its present form involving small LDAs results in a mismatch with prices not reflecting the actual reliability requirements of the LDA. As the Commission has a statutory obligation to ensure that rates are just and reasonable, the narrow changes as proposed herein are necessary to ensure just and reasonable outcomes that are consistent with the reliability requirements of the LDA.

Based on preliminary auction data, as a result of the confluence of events in this small LDA, should PJM complete the auction and award capacity commitments, PJM estimates that the clearing price for the DPL-S LDA (and the revenues received by the Capacity Market Sellers in this small LDA) would be more than four times what the clearing price should be if the Planned Generation Capacity Resources that did not offer in the auction are excluded from the Locational Deliverability Area Reliability Requirement given that they did not offer into the BRA.  To put that into perspective, the clearing price

Kimberly D. Bose, Secretary
December 23, 2022
Page 3

for the DLP-S LDA from the 2023/2024 BRA was $69.95/MW-day.[2]  More important and

fundamental to this filing, the potential auction outcome, absent the proposed amendment,

would not reflect the actual reliability needs of the affected zone (in this case DPL-S) and

would force Load Serving Entities in this LDA to procure more capacity than is needed to

meet the area's actual reliability needs.  Such an aberrant auction outcome must be avoided

for the 2024/2025 BRA to ensure that the final auction results are just and reasonable rates

and reflective of the actual reliability requirements in the affected LDA.

To address this issue, PJM proposes to update the Locational Deliverability Area

Reliability Requirement based on the actual supply of resources that submitted offers into

the auction to accurately reflect the actual reliability needs in the LDA.  While PJM

acknowledges that the deadline for submitting Sell Offers associated with the 2024/2025

BRA has passed, the auction itself has not concluded as PJM is still in the process of

conducting the auction and has not awarded any capacity comments.  Specifically, the

Tariff explicitly details the auction process after the bidding window closes, which requires

PJM "to evaluate the Sell Offers and other inputs to such auction to determine the Sell

Offers that clear such auction."[3]  As part of this clearing, PJM utilizes an optimization

algorithm that considers various factors to "minimize the cost of satisfying the reliability

requirements across the PJM Region."[4]  It is not until this clearing has concluded and

Capacity Market Sellers are awarded capacity commitments for any cleared Capacity

Resources that the 2024/2025 BRA is closed.

---

[2] *PJM 2023/2024 RPM Base Residual Auction Results*, PJM Interconnection, L.L.C. (June 21, 2022), https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2023-2024/2023-2024-base-residual-auction-report.ashx.

[3] Tariff, Attachment DD, section 5.12.

[4] Tariff, Attachment DD, section 5.12(a).

Kimberly D. Bose, Secretary
December 23, 2022
Page 4

Here, PJM is not proposing any modifications to activities or deadlines associated with the 2024/2025 BRA that have already occurred or passed.  Instead, PJM proposes to prospectively include an additional factor to be considered in the optimization algorithm when evaluating the Sell Offers and other inputs for the 2024/2025 BRA *before* the results are determined and capacity awards are made.  Absent the ability to include this additional factor in the optimization algorithm, PJM would be forced to utilize a materially inaccurate Locational Deliverability Area Reliability Requirement that does not reflect the actual capacity needs of the particular LDA in question and would result in an unjust and unreasonable outcome. Such an outcome would be inconsistent with the Commission's statutory duty to ensure just and reasonable rates by precluding this additional factor (i.e., excluding resources that do not participate in the auction from the Locational Deliverability Area Reliability Requirement) from being considered *before* the auction closes and capacity commitments are made based on unjust and unreasonable results.

The proposed amendment to the Tariff is necessary because, as further explained below, the Locational Deliverability Area Reliability Requirement can be significantly increased by the inclusion of Planned Generation Capacity Resources in a small LDA because the planning models need to address the probability of forced outages of large Planned Generation Capacity Resources.   Similarly, Planned Generation Capacity Resources that are Intermittent Resources can also increase the reliability requirement if they do not operate coincident with peak periods.  However, if such Planned Generation Capacity Resources are not offered into the BRA, then the Locational Deliverability Area Reliability Requirement should be revised to reflect the actual reliability needs of the LDA

Kimberly D. Bose, Secretary
December 23, 2022
Page 5

for the relevant Delivery Year so that both supply and demand are accurately reflected in
the optimization algorithm.

This filing proposes a just and reasonable remedy that addresses a unique
circumstance that was recently discovered during the auction process for the BRA
associated with the 2024/2025 Delivery Year. The proposed Tariff amendment allows the
RPM Auctions to provide correct price signals based upon actual reliability needs.

To provide for market certainty, PJM requests waiver of the Commission's 60-
days' notice requirement[5] to allow for the proposed revisions to become effective one day
after the date of this filing (i.e., December 24, 2022). Courts have explained that "[t]he
Commission, for good cause shown, may allow changes to take effect without requiring
the sixty days' notice herein provided for by an order specifying the changes so to be made
and the time when they shall take effect and the manner in which they shall be filed and
published."[6] Here, good cause exists for the Commission to allow for the proposed changes
to become effective as soon as December 24, 2022, given that this filing would reduce
charges that Load Serving Entities would otherwise have to pay absent these revisions.[7]
Indeed, in addition the Commission's prior notice requirements and as discussed further
herein, the Tariff specifically authorizes PJM to make sure a filing on shortened notice to
the stakeholders explicitly putting all customers on notice of PJM's right to seek prompt
action to protect consumers.[8]

---

[5] *See* 18 C.F.R. § 35.3(a)(1).

[6] *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 969 (DC Cir. 2003) (quoting FPA, section 205(d)).

[7] *See Central Hudson Gas & Elec. Corp.*, 60 FERC ¶ 61,106, at 61,338 ("We will generally grant waiver of
the 60-day prior notice requirement in the following instances: . . . (2) filings that reduce rates and charges—
such as rate decreases or new services that provide the customer of a utility with an opportunity to reduce its
purchases of other, more expensive service from the same utility."), *reh'g denied*, 61 FERC ¶ 61,089 (1992).

[8] *See* Tariff, section 9.2(b).

Lastly, given the upcoming holidays, PJM requests that the Commission establish a 28-day comment period to provide additional time for comments.  In any event, PJM requests that comment period be aligned with the comment date set in the separate but related FPA section 206 filing submitted on this same date.

## I.    BACKGROUND

One of PJM's primary responsibilities as a regional transmission organization is to ensure that there is a sufficient amount of electrical capacity within its system to provide reliable electricity to its consumers during periods of peak demand.  PJM accomplishes this objective through its capacity market by conducting auctions, referred to as the RPM Auctions,[9] in which electricity suppliers submit offers to be available to provide capacity for a given Delivery Year, typically three years in the future.

The auction utilizes an administratively set demand curve—the Variable Resource Requirement Curve ("VRR Curve")—which represents the prices that consumers should pay for varying quantities of capacity.  In developing the demand curve, PJM forecasts the expected peak load for a particular Delivery Year and then sets a target level of capacity needed to reliability serve the load—also known as the Reliability Requirement—given the expected resource portfolio.  Meanwhile, the auction's supply curve is based on Sell Offers for capacity that Capacity Market Sellers submit at a specific price and, together, the offers comprise the auction's supply curve.

The PJM capacity market is a locational market, meaning that there are defined areas within PJM that have limits on the amount of capacity they can import.  Those areas

---

[9] As defined in the Tariff, RPM Auctions include a BRA, and typically three Incremental Auctions, associated with each Delivery Year.

Kimberly D. Bose, Secretary
December 23, 2022
Page 7

are referred to as LDAs, which recognize and quantify the locational value of capacity within the PJM region. The modeled LDAs are determined by, inter alia, comparing the import limit of a LDA (also known as the Capacity Emergency Transfer Limit or "CETL") to the amount of capacity that needs to be imported into a LDA to meet the reliability criterion (also known as the Capacity Emergency Transfer Objective or "CETO").[10] Sell Offers are located in specific LDAs based on where those resources are located.

In conducting the RPM Auctions, PJM employs an optimization algorithm for each RPM Auction to evaluate the Sell Offers and other inputs to such auction to determine the Sell Offers that clear such auction. The optimization algorithm uses the supply curve and VRR Curve to determine the quantity of Capacity Resources that will be awarded a capacity commitment for each RPM Auction. Offers generally clear in order of price, starting with the lowest price offered, and continuing until the aggregate supply curve intersects the VRR Curve. All offers that clear for the PJM Region or a given LDA are then awarded a capacity commitment associated with a clearing price that is equal to the last offer (i.e., the highest offer) necessary to meet the applicable area's reliability needs. In an LDA where the supply offers do not meet the demand curve, the cleared supply offers quantity is used to calculate the price on the demand curve,[11] which currently could be as high as the greater of the gross Cost of New Entry for the Reference Resource or 150% of the net Cost of New Entry for the Reference Resource.[12] In effect, when there is

---

[10] An LDA is modeled when the CETL is less than 1.15 times the CETO of an area. *See* Reliability Assurance Agreement, Schedule 10.1, section B ("RAA").

[11] *See* Tariff, Attachment DD, section 5.12(a).

[12] *See* Tariff, Attachment DD, section 5.10(a)(i).

Kimberly D. Bose, Secretary
December 23, 2022
Page 8

insufficient supply to meet the reliability needs, the clearing price will rise significantly, up to a cap equal to the greater of the gross Cost of New Entry for the Reference Resource or 150% of the net Cost of New Entry for the Reference Resource, to provide a market signal that additional resources are needed in a particular area.[13]

Upon the completion of the auction process, final auction results are posted as soon as possible, which sets the clearing price that Capacity Market Sellers would be paid in the defined Delivery Year for their committed Capacity Resource, while also setting the price that Load Serving Entities in a given area that will pay in the defined Delivery Year for the capacity that is procured. Those costs are then passed down from the Load Serving Entities to individual end-use customers within the PJM Region.

## II.     THE AUCTION PROCESS REVEALED AN UNANTICIPATED AND IMPROPER CONSEQUENCE FROM THE INCLUSION OF PLANNED GENERATION CAPACITY RESOURCES

The BRA for the 2024/2025 Delivery Year commenced on December 7, 2022, and the auction offer window closed on December 13, 2022. While the window for capacity offers for this BRA has closed, PJM is still in the process of conducting the auction clearing before the results are posted for Market Participants and any capacity commitments are awarded. While the Tariff does not specify a deadline to complete the auction or a deadline to post final auction results, it does require PJM to "post the results of each auction as soon

---

[13] The purpose of this cap is to help to guard against low reliability events in the event there are insufficient resources to meet the capacity needs of load in a particular area. The application of such a cap is appropriate and needed if an area is actually in need of additional supply. However, in the circumstance described herein, inclusion of Planned Generation Capacity Resources and planned Intermittent Resources that do not participate in the RPM Auction yields a Locational Deliverability Area Reliability Requirement that is not representative of the actual capacity needs of a particular LDA. Therefore, in such circumstances, an inaccurate Locational Deliverability Area Reliability Requirement does not represent the actual reliability needs of the LDA and would result in incorrect price signals potentially up to the cap if the quantity is sufficiently large.

Kimberly D. Bose, Secretary
December 23, 2022
Page 9

thereafter as possible."[14]  Here, under the circumstances described in further detail below

(an overstated and inaccurate Locational Deliverability Area Reliability Requirement in a

small LDA due to Planned Generation Capacity Resources not participating in the auction),

it is not possible to complete the 2024/2025 BRA and post auction clearing prices prior to

the resolution of these filings.  As such, no Capacity Market Seller will be awarded a

capacity commitment for the 2024/2025 BRA until the auction is completed.

In preliminary price calculations, PJM discovered that there could be an anomalous

auction result in the DPL-S LDA where the clearing price may be approximately four times

what it should be, despite the fact that the fundamentals (i.e., no new elections of Fixed

Resource Requirement ("FRR") Entities or significant change to demand, supply or

transmission capabilities) of the LDA remain largely unchanged from prior years.  To be

clear, to the extent the LDA is tight on capacity, prices would be expected to separate and

be higher than the rest of the RTO. However, in this case, as a result of this confluence of

events (the application of the Locational Deliverability Area Reliability Requirement

increasing the reliability requirement based on the expected participation of Planned

Generation Capacity Resources in a small LDA that then did not actually offer into the

auction) the prices become no longer linked to the actual reliability requirements of the

LDA and the reliability needs of the LDA are not properly reflected in the auction results.

Upon further investigation, PJM discovered the primary driver of the anomaly:

Certain Planned Generation Capacity Resources and planned Intermittent Resources in the

DLP-S LDA did not offer into the 2024/2025 BRA despite such resources being included

---

[14] Tariff, Attachment DD, section 5.11(e) requires PJM to "post the results of each auction as soon thereafter as possible."

in the modeling assumptions that formed the Locational Deliverability Area Reliability

Requirement.  The absence of these resources from the 2024/2025 BRA resulted in an

overstated Locational Deliverability Area Reliability Requirement that was greater than

and inconsistent with the actual reliability needs for the LDA.  Consequently, the BRA

clearing price for the 2024/2025 Delivery Year would not yield a just and reasonable

outcome absent accepting this filing or granting PJM's separate but related FPA section

206 filing.  This is because the inclusion of Planned Generation Capacity Resources that

do not participate in the RPM Auction yields a Locational Deliverability Area Reliability

Requirement that is higher than actual conditions and therefore is not representative of the

actual capacity needs of this particular LDA.

To prospectively remedy this issue, the Locational Deliverability Area Reliability

Requirement should be revised to allow PJM to exclude from the reliability requirement

calculation all Planned Generation Capacity Resources that did not participate in the

auction in LDAs where the reliability requirement materially increases by more than one

percent compared with the values used in the relevant RPM Auctions from the prior

Delivery Year due to the addition of such Planned Generation Capacity Resources.

### A. *The Locational Deliverability Area Reliability Requirement Is One Component of the Variable Resource Requirement Curve Used in the Reliability Pricing Model Auction.*

In conducting the RPM Auctions, PJM utilizes the VRR Curve for the PJM Region

as well as for certain LDAs "to establish the level of Capacity Resources that will provide

an acceptable level of reliability consistent with the Reliability Principles and Standards."[15]

The Locational Deliverability Area Reliability Requirement plays a central role in shaping

---

[15] Tariff, Attachment DD, section 5.10(a).

Kimberly D. Bose, Secretary
December 23, 2022
Page 11

each of the three points on the VRR Curve, which in turn is ultimately used as the demand

curve for the RPM Auctions.[16]

For the BRA associated with the 2024/2025 Delivery Year, the Locational

Deliverability Area Reliability Requirement for one particular LDA appeared to

significantly increase. More specifically, as shown in the table below, the Locational

Deliverability Area Reliability Requirement DPL-S LDA, which is the smallest modeled

LDA in PJM, increased by approximately 12% from the prior year. As further explained

below, the primary cause of the increase to the Locational Deliverability Area Reliability

Requirement for DPL-S was not load growth, but was instead due to a large quantity of

Planned Generation Capacity Resources and new Intermittent Resources that were

expected to be offered into the BRA associated with the 2024/2025 Delivery Year and were

therefore modeled in the CETO calculation as if load would have relied on such resources

as capacity.[17]

---

[16] *See id.*

[17] *PJM Manual 20: PJM Resource Adequacy Analysis*, PJM Interconnection, L.L.C., 32 (Aug. 25, 2021), https://www.pjm.com/-/media/documents/manuals/m20.ashx (Specifies that for purposes of determining what planned resources are included in the Locational Deliverability Area Reliability Requirement as projected internal capacity and the CETO modeling, any "planned generation resource addition or planned increase in rating that has executed an Interconnection Service Agreement (ISA) is modeled.").

Kimberly D. Bose, Secretary
December 23, 2022
Page 12

LDA Reliability Requirements and Capacity Import Limits for 2023/2024 and 2024/2025 BRAs

| | 2023/2024 BRA | | 2024/2025 BRA | | Delta | | | |
|---|---|---|---|---|---|---|---|---|
| LDA | Reliability Requirement (UCAP MW) | CETL (MW) | Reliability Requirement (UCAP MW) | CETL (MW) | Reliability Requirement (UCAP MW) | CETL (MW) | Reliability Requirement (Percent) | CETL (Percent) |
| MAAC | 63,819.0 | 6,381.0 | 63,518.0 | 5,965.0 | -301.0 | -416.0 | 0% | -7% |
| EMAAC | 35,590.0 | 8,704.0 | 35,415.0 | 8,594.0 | -175.0 | -110.0 | 0% | -1% |
| SWMAAC | 14,329.0 | 8,389.0 | 14,299.0 | 7,947.0 | -30.0 | -442.0 | 0% | -5% |
| PS | 11,217.0 | 9,022.0 | 11,166.0 | 8,287.0 | -51.0 | -735.0 | 0% | -8% |
| PS NORTH | 5,768.0 | 4,349.0 | 5,715.0 | 4,253.0 | -53.0 | -96.0 | -1% | -2% |
| DPL SOUTH | 3,141.0 | 2,008.0 | 3,514.0 | 2,009.0 | 373.0 | 1.0 | 12% | 0% |
| PEPCO | 7,163.0 | 7,160.0 | 7,151.0 | 7,033.0 | -12.0 | -127.0 | 0% | -2% |
| ATSI | 14,649.0 | 10,213.0 | 14,434.0 | 10,465.0 | -215.0 | 252.0 | -1% | 2% |
| ATSI-Cleveland | 5,363.0 | 4,728.0 | 5,374.0 | 4,941.0 | 11.0 | 213.0 | 0% | 5% |
| COMED | 24,077.0 | 5,781.0 | 23,859.0 | 4,640.4 | -218.0 | -1,140.6 | -1% | -20% |
| BGE | 7,522.0 | 5,615.0 | 7,514.0 | 5,397.0 | -8.0 | -218.0 | 0% | -4% |
| PL | 10,251.0 | 4,916.0 | 10,214.0 | 4,337.0 | -37.0 | -579.0 | 0% | -12% |
| DAYTON | 3,924.0 | 4,022.0 | 3,922.0 | 3,918.0 | -2.0 | -104.0 | 0% | -3% |
| DEOK | 6,847.0 | 5,632.0 | 6,881.0 | 4,999.0 | 34.0 | -633.0 | 0% | -11% |

**B.    *PJM Includes Planned Internal Capacity and the Capacity Emergency Transfer Objective in the Calculation of the Locational Deliverability Area Reliability Requirement.***

The increase to the Locational Deliverability Area Reliability Requirement for DPL-S caused by the Planned Generation Capacity Resources at issue was made consistent with the Tariff requirement.   More particularly, the Locational Deliverability Area Reliability Requirement is defined, in relevant part, as "the projected internal capacity in the Locational Deliverability Area plus the Capacity Emergency Transfer Objective for the Delivery Year, as determined by the Office of the Interconnection in connection with preparation of the Regional Transmission Expansion Plan."[18]  In turn, the CETO is defined as "the amount of electric energy that a given area must be able to import in order to remain within a loss of load expectation of one event in 25 years when the area is experiencing a localized capacity emergency."[19]  Based on these definitions, the Locational Deliverability Area Reliability Requirement is a function of the sum of the LDA's internal load demand

---

[18] Tariff, Definitions L-M-N (definition of Locational Deliverability Area Reliability Requirement).

[19] RAA, Definitions (definition of Capacity Emergency Transfer Objective).

Kimberly D. Bose, Secretary
December 23, 2022
Page 13

and the sum of (i) the CETO reductions triggered by including expected resources in the LDA and (ii) the total Unforced Capacity ("UCAP") value assigned to all expected internal capacity resources in the LDA. In its basic form, the Locational Deliverability Area Reliability Requirement is expressed formulaically as:

*Internal Projected Capacity (expressed in UCAP) + CETO for the LDA*

Planned Generation Capacity Resources, which include planned Intermittent Resources, are included in the Locational Deliverability Area Reliability Requirement as projected internal capacity and offset by decreases in the CETO. The PJM Manuals specify that for purposes of determining what planned resources are included in the Locational Deliverability Area Reliability Requirement as projected internal capacity and the CETO modeling, any "planned generation resource addition or planned increase in rating that has executed an Interconnection Service Agreement (ISA) is modeled."[20] Thus, consistent with this requirement, PJM includes all resources with an executed ISA that specifies a commercial operate date that falls on or before the first day of the Delivery Year (June 1) being analyzed in the Locational Deliverability Area Reliability Requirement prior to the auction.

At first glance, one may conclude that the increase in projected internal capacity should be entirely offset by a corresponding one-for-one decrease to the CETO value. In fact, this is the generally the case when a Planned Generation Capacity Resource is added

---

[20] *See PJM Manual 18: PJM Capacity Market*, PJM Interconnection, L.L.C., 28 n.7 (Sept. 21, 2022), https://www.pjm.com/-/media/documents/manuals/m18.ashx. ("PJM Manual 20: PJM Resource Adequacy Analysis, Section 4 PJM Capacity Emergency Transfer Objective Analysis, Subsection 4.3 Modeling Specifics for further details on the resources included in projected internal capacity.") In turn, PJM Manual 20explains that in modeling CETO, "planned generation resource addition or planned increase in rating that has executed an Interconnection Service Agreement (ISA) is modeled." *PJM Manual 20: PJM Resource Adequacy Analysis*, PJM Interconnection, L.L.C., 32 (Aug. 25, 2021), https://www.pjm.com/-/media/documents/manuals/m20.ashx.

Kimberly D. Bose, Secretary
December 23, 2022
Page 14

to a large LDA or when a planned solar resource is added to a summer peaking LDA.

However, this is not the case when large Planned Generation Capacity Resources and

planned solar resources are added to a relatively small LDA that is close to winter peaking

such as DPL-S.  That is because the reliability value of a large Planned Generation Capacity

Resource or planned solar resource used to calculate the CETO for a small LDA is lower

than the resource's projected internal capacity value, which is based on a class average

forced outage rate ("EFOR$_D$") or Effective Load Carrying Capability value, respectively,

derived from the PJM Region.

When a resource is significantly large relative to the size of the LDA in which it is

located, the load in that LDA becomes much more dependent on the resource.  Put another

way, a large resource in a small LDA takes on an outsized share of that load's requirement.

Thus, while such a resource is able to serve a significant portion of the load in the LDA,

the possibility of a forced outage for a large resource greatly increases the reliability risk

for such a small LDA.  Similarly, Intermittent Resources can have a lower capacity value

for an LDA than the RTO-wide average if the resources inability to produce energy aligns

with the riskiest hours of the year for the LDA more so than it does for the PJM Region.

This is particularly the case where a proportionately large quantity of solar resources are

planned in a near-winter peaking LDA, such as DPL-S, because solar resources are not as

productive in the winter than the summer periods.[21]

Due to the reduced reliability value that these resources have in a small LDA, the

CETO value must be adjusted to account for large Planned Generation Capacity Resources

---

[21] The winter requirements in the DPL-S may be driven by resistance heating load and the agricultural nature of this area given the sizable number of poultry farms in the region.

Kimberly D. Bose, Secretary
December 23, 2022
Page 15

and Intermittent Resources to meet a loss of load expectation of one event in 25 years, consistent with the CETO definition.[22]  In short, the addition of a large Planned Generation Capacity Resource and planned Intermittent Resources in a small LDA reduces the CETO less than the projected internal capacity UCAP value of the addition.  This is done to account for the greater dependence that the load in such LDA would have on an outsized resource or an Intermittent Resource, the output of which is misaligned with the riskiest hours of the year, which is not fully reflected in the UCAP value assigned in the projected internal capacity.  As a result, a smaller CETO reduction value is associated with the added Planned Generation Capacity Resource than the projected internal capacity UCAP value of the added Planned Generation Capacity Resource.  Simply put, the Planned Generation Capacity Resource creates a higher Locational Deliverability Area Reliability Requirement because the increase to the projected internal capacity is greater than the decrease to the overall CETO for the LDA.

C.     *Analysis of the Auction Submittals Revealed an Inconsistency with the CETO Assumptions for the DPL-S LDA.*

Under normal circumstances, the Locational Deliverability Area Reliability Requirement, calculated consistent with the approach described above, results in just and reasonable outcomes as it accounts for the greater dependency of such resources in an LDA.  As explained above, this is because the CETO allows the LDA to meet a loss of load expectation of one event in 25 years when a large Planned Generation Capacity Resource goes into service in a small LDA or when a planned Intermittent Resource is added to a winter peaking LDA.

---

[22] *See* RAA, Definitions (definition of Capacity Emergency Transfer Objective).

Kimberly D. Bose, Secretary
December 23, 2022
Page 16

In this instance, however, certain large Planned Generation Capacity Resource, which include a large quantity of planned Intermittent Resources, located in DPL-S and included in the modeling assumptions used to calculate the Locational Deliverability Area Reliability Requirement did not offer their capacity in the 2024/2025 BRA. As a result, the Locational Deliverability Area Reliability Requirement should not have been increased for the DPL-S LDA given that the large Planned Generation Capacity Resources and planned Intermittent Resources did not participate in the BRA for the 2024/2025 Delivery Year. This is because the load in that LDA would not be dependent on this resource for reliability. Put another way, certain large Planned Generation Capacity Resources and planned Intermittent Resources are not expected to be physically available to serve as capacity for the 2024/2025 Delivery Year so the Locational Deliverability Area Reliability Requirement should not include such resources. Otherwise, the inclusion of such resources would artificially inflate the clearing price for the LDA by signaling the need for additional capacity to meet the 1 in 25 loss of load expectation for resources that are not actually serving load as capacity (i.e., load is not dependent on such resources for reliability).

The consequence of including Planned Generation Capacity Resources in the Locational Deliverability Area Reliability Requirement when such resources do not actually participate in the RPM Auction is that the reliability requirement reflects a need for more resources than the actual reliability needs for the LDA. This in turn creates a VRR Curve in a small LDA that artificially reflects a higher demand for capacity than appropriate. This results in a fundamental mismatch between the actual load requirements and the resource supply stack, which ultimately yields an artificially inflated clearing price that is unjust and unreasonable. More particularly, based on preliminary auction data, PJM

estimates that the clearing price for the DPL-S LDA would be more than four times what it otherwise should be if the Locational Deliverability Area Reliability Requirement is updated to accurately reflect only those resources that actually participated in the BRA.

### D.    The Issue Identified in This Filing Cannot Be Fixed by the Incremental Auction Associated with the 2024/2025 Delivery Year.

PJM would not be able to correct the design flaw through sales of excess capacity commitments in the Incremental Auction.  The majority of the capacity is cleared in the BRA so prices and quantities in Incremental Auctions are generally much lower than in BRAs.  This is because there are generally a limited amount of resources that seek to procure replacement capacity or "buy back" their capacity commitments altogether.  Thus, any revenues obtained from selling back excess capacity in the Incremental Auction would not prevent uneconomic, unjust and unreasonable results that unduly harm consumers.

### E.    The Issue Identified in This Filing Also Cannot Be Fixed by Having PJM Assess Whether Resources Might Be Offered into the Auction Before Including Resources in the Locational Deliverability Area Reliability Requirement.

Consistent with its Manuals, PJM includes any planned generation resource addition or planned increase in rating that has executed an ISA in the Locational Deliverability Area Reliability Requirement and the commercial operation date specified in such ISA is on or before the first day of the Delivery Year being analyzed.[23]  It would not be appropriate for PJM to simply remove Planned Generation Capacity Resources that did not participate in the auction from the Locational Deliverability Area Reliability Requirement prior to the auction window closing based on PJM's speculation of whether such resources would be offered into the RPM Auctions for a couple of reasons.  First, the

---

[23] *See supra* note 20.

Kimberly D. Bose, Secretary
December 23, 2022
Page 18

Capacity Market Seller and/or developer of the resource are best equipped to gauge whether the resource will be in-service by the Delivery Year and whether to take on the risks associated with being a committed Capacity Resource.  Second, if PJM incorrectly assessed the viability of a resource and excluded such resource from the Locational Deliverability Area Reliability Requirement but the resource owner ended up submitting a Sell Offer for the resource, the reliability risk associated with that resource would not have been properly accounted.  That could result in a loss of load expectation that is greater than 1 in 25 years for the LDA.  This is why PJM is proposing a solution described below that does not require speculation from PJM to address the identified issue.

### III.  PROPOSED AMENDMENT TO THE LOCATIONAL DELIVERABILITY AREA RELIABILITY REQUIREMENT

To be clear, the Locational Deliverability Area Reliability Requirement appropriately accounts for all Planned Generation Capacity Resources, including planned Intermittent Resources, to meet the 1 in 25 loss of load expectation had those resources participated in the auction.  Rather, the issue is simply a gap in the Tariff rules that address a circumstance where large Planned Generation Capacity Resources, which include planned Intermittent Resources, have an outsized impact to the reliability needs in a small LDA and those resources do not participate in the RPM Auction.  This particular scenario has never occurred until the 2024/2025 BRA..

To address this recently identified issue, PJM proposes to remedy this issue by prospectively providing for the ability to amend the Locational Deliverability Area Reliability Requirement prior to the completion of the auction process in instances where Planned Generation Capacity Resources have the effect of materially increasing the reliability requirement for an LDA and do not participate in an RPM Auction.  More

Kimberly D. Bose, Secretary
December 23, 2022
Page 19

particularly, PJM proposes that during the auction process, it be required to exclude from the Locational Deliverability Area Reliability Requirement calculation Planned Generation Capacity Resources that do not participate in the BRA when the Locational Deliverability Area Reliability Requirement materially increased by more than one percent compared with the values used in the relevant RPM Auctions from the prior Delivery Year due to the addition of such Planned Generation Capacity Resources. To further clarify, the Locational Deliverability Area Reliability Requirement for the BRA would be compared with the Locational Deliverability Area Reliability Requirement from prior year's BRA. Meanwhile, the Locational Deliverability Area Reliability Requirement for the Incremental Auction would be compared with the Locational Deliverability Area Reliability Requirement from the applicable prior Base Residual or Incremental Auction from the same Delivery Year. For example, the Locational Deliverability Area Reliability Requirement for the 2024/2025 Base Residual Auction would be compared with the value used in the 2023/2024 Delivery Year, while the Third Incremental Auction for the 2026/2027 Delivery Year would be compared with the reliability requirement used in clearing the 2026/2027 Second Incremental Auction. This clarification is necessary given that PJM typically conducts multiple RPM Auctions throughout the year to procure capacity for different Delivery Years[24] so there are different sets of Locational Deliverability Area Reliability Requirements used for each Delivery Year.

It is reasonable to base the materiality threshold using one percent as the standard because it is the cumulative addition of sufficiently large Planned Generation Capacity Resources in a small LDA that causes the identified issue. Using a materiality standard of

---

[24] Tariff, Attachment DD, section 5.4.

Kimberly D. Bose, Secretary
December 23, 2022
Page 20

one percent avoids having to arbitrarily define a MW value for what constitutes a small LDA.

The ability to update the Locational Deliverability Area Reliability Requirement during the auction process would allow the reliability requirement to reflect Planned Generation Capacity Resources, including planned Intermittent Resources, which will actually be counted on by load in the LDA for reliability. This would avoid circumstances where the Locational Deliverability Area Reliability Requirement is increased to account for Planned Generation Capacity Resources where load does not depend on such resources for reliability from a capacity perspective.

### A.     PJM's Proposed Tariff Language is Just and Reasonable.

As explained above, without the ability to reflect information gathered during the auction process, the Locational Deliverability Area Reliability Requirement would not accurately reflect the actual reliability needs of the LDA and ultimately produce a VRR Curve that results in improper market signals (i.e., signaling the need for additional capacity to account for potential forced outages associated with an outsized resource for a small LDA). Based on the foregoing, a viable solution to accurately reflect the Locational Deliverability Area Reliability Requirement before the auction results are finalized is by providing the ability to exclude Planned Generation Capacity Resources from the reliability requirement when such resources are not offered into the RPM Auctions. Accordingly, PJM proposes to revise the definition of Locational Deliverability Area Reliability Requirement in the Tariff, as shown in blackline below:

> "Locational Deliverability Area Reliability Requirement" shall mean the projected internal capacity in the Locational Deliverability Area plus the Capacity Emergency Transfer Objective for the Delivery Year, as determined by the Office of the Interconnection in connection with

Kimberly D. Bose, Secretary
December 23, 2022
Page 21

preparation of the Regional Transmission Expansion Plan, less the minimum internal resources required for all FRR Entities in such Locational Deliverability Area. Notwithstanding the foregoing, effective with the 2024/2025 Delivery Year, during the auction process, the Office of Interconnection shall exclude from the Locational Deliverability Area Reliability Requirement any Planned Generation Capacity Resource in an LDA that does not participate in the relevant RPM Auction as projected internal capacity and in the Capacity Emergency Transfer Objective model where the Locational Deliverability Area Reliability Requirement for the Base Residual Auction increases by more than one percent over the reliability requirement used from the prior Delivery Year's Base Residual Auction (for Incremental Auctions the Locational Deliverability Area Reliability Requirement would be compared with the reliability requirement used in the prior relevant RPM Auction associated with the same Delivery Year) for that LDA due to the cumulative addition of such Planned Generation Capacity Resources.

Additionally, PJM also proposes to prospectively include an additional factor to be considered in the optimization algorithm when evaluating the Sell Offers and other inputs during the auction process. Specifically, PJM proposes to specify that the optimization algorithm will also utilize the most updated Locational Deliverability Requirement Reliability Requirement when evaluating the Sell Offers and other inputs during the auction process. Accordingly, for the optimization algorithm used in the BRA, PJM proposes to amend Tariff, Attachment DD, section 5.12(a), as shown in blackline below:

a) Base Residual Auction
For each Base Residual Auction, the optimization algorithm shall consider:
 . . .
•For the 2018/2019 Delivery Year and subsequent Delivery Years, the PJM Reliability Requirement; and
• For the 2024/2025 and subsequent Delivery Years, the Locational Deliverability Requirement Reliability Requirement, including any revised Locational Deliverability Area Reliability Requirement based on the actual participation of Planned Generation Capacity Resources in the relevant Base Residual Auction; and
•For the 2020/2021 Delivery Year and subsequent Delivery Years, the requirement that the cleared quantity of Summer-Period Capacity Performance Resources equal the cleared quantity of Winter-Period Capacity Performance Resources for the PJM Region.

Kimberly D. Bose, Secretary
December 23, 2022
Page 22

Likewise, for the optimization algorithm used in the Incremental Auctions,

PJM proposes to amend Tariff, Attachment DD, section 5.12(b), as shown in

blackline below:

> b) Scheduled Incremental Auctions.
>
> For purposes of a Scheduled Incremental Auction, the optimization algorithm shall consider:
>
> . . .
> • For the 2018/2019 Delivery Year and subsequent Delivery Years, for each LDA, such LDA's updated Reliability Requirement, and for the 2024/2025 Delivery Year and subsequent Delivery Years, including any revised Locational Deliverability Area Reliability Requirement based on the actual participation of Planned Generation Capacity Resources in the relevant Incremental Auction;

Absent the proposed ability to include this additional factor in the optimization

algorithm, PJM would be forced to utilize an inaccurate Locational Deliverability Area

Reliability Requirement that does not reflect the actual capacity needs of the particular

LDA in question and would result in an unjust and unreasonable outcome.

### B.    PJM's Proposed Remedy Can Prospectively Be Applied Beginning with the Current 2024/2025 BRA.

PJM's proposed solution to address this unique circumstance is prospective and can

be applied beginning with the current 2024/2025 BRA.  The Tariff requires PJM to "post

the results of each auction as soon . . . as possible" after conducting the RPM Auctions.

Thus, the Tariff implicitly acknowledges that there is an auction process where PJM

produces a supply curve based on all of the valid Sell Offers and validates initial solutions

before finalizing the auction results.  It is only during this auction process that PJM would

know whether Planned Generation Capacity Resources and planned Intermittent Resources

that were modeled in developing the Locational Deliverability Area Reliability

Requirement actually participated in the relevant RPM Auction.  This auction process

Kimberly D. Bose, Secretary
December 23, 2022
Page 23

remains ongoing given the issue that was discovered when clearing the auction for the 2024/2025 BRA.  Thus, if the Commission accepts PJM's proposed modification, PJM could simply apply the new rule in the auction process before posting final auction results associated with the 2024/2025 BRA.

PJM anticipates that certain entities may argue this approach is flawed because Market Participants should be able to rely on the Locational Deliverability Area Reliability Requirements that are posted as part of the planning parameters.  Such arguments, however, neglect to consider the fact that the Tariff already requires PJM to adjust the Locational Deliverability Area Reliability Requirement *after* the bidding window closes (but before the conclusion of the auction).  Specifically, PJM is required to make "any adjustments to PJM Region or LDA Reliability Requirements to reflect Price Responsive Demand with a PRD Reservation Price equal to or less than the applicable Base Residual Auction clearing price."[25]  In other words, when Price Response Demand clear an RPM Auction, the Locational Deliverability Area Reliability Requirement is adjusted to account for Price Responsive Demand on the demand side.  This effectively means that any previously posted Locational Deliverability Area Reliability Requirement necessarily changes and is updated during the auction process after the bidding window closes whenever Price Responsive Demand clears the auctions.  As a result, there is already no expectation that the Locational Deliverability Area Reliability Requirement is set in stone and cannot change after the bidding window closes.

---

[25] Tariff, Attachment DD, section 5.11(e).

## IV. THIS PROPOSED AMENDMENT IS ENTIRELY CONSISTENT WITH THE FILED-RATE DOCTRINE AND THE RULE AGAINST RETROACTIVE RATEMAKING

This proposal is entirely consistent with the filed-rate doctrine and the rule against retroactive ratemaking. Specifically, as explained below, because PJM's proposed tariff amendment: (i) does not violate any specific deadline or date contained within the text of the Tariff; (ii) effectuates an *existing* tariff provision providing prior notice to customers that PJM may seek Commission approval of tariff modifications where "imminent severe economic harm to electric consumers requires a prompt Section 205 filing;"[26] (iii) will only impact future actions not yet taken in the auction process—namely, the inclusion of the correct Locational Deliverability Area Reliability Requirement in the optimization algorithm used in conducting the 2024/2025 BRA; and (iv) because no capacity awards have been made or final results posted, there is not a final rate for which any entity has an entitlement or settled expectation at this time.

Notably, until the auction results are final and the auction results are validated, no Capacity Market Seller is awarded a capacity commitment for any resource that participated in the RPM Auction. In other words, the auction concludes only after Capacity Resources that clear an RPM Auction receive capacity commitments based on the posting of final auction results.

Undeniably, Capacity Market Sellers have submitted bids into the auction based on the planning parameters. But in this case, it was the action of certain Capacity Market

---

[26] Tariff, section 9.2(b) ("PJM may file with less than a full 7 day advance consultation in circumstances where imminent harm to system reliability or imminent severe economic harm to electric consumers requires a prompt Section 205 filing; provided that PJM shall provide as much advance notice and consultation with the Transmission Owners and the PJM Members Committee as is practicable in such circumstances, and no such emergency filing shall be made with less than 24 hours advance notice.").

Kimberly D. Bose, Secretary
December 23, 2022
Page 25

Sellers with planned resources in the DPL-S LDA that did not to participate in the auction,

rather than the posted planning parameters, which gave rise to the unjust and unreasonable

mismatch between prices and actual reliability conditions in this LDA. As a result, there

was no specific planning parameter reliance let alone a capacity award that would trigger

application of the filed-rate doctrine. Simply put, PJM is not proposing to change rates, or

terms and conditions of service, relating to its past duties. Rather, PJM is only proposing

to change the rules applicable to its future performance in completing the auction process.

Thus, PJM's proposed Tariff provisions will have a limited prospective application only

and thus not violate the filed-rate doctrine.

### A.    *The Circumstances Presented in this Filing Are Entirely Distinguishable from Prior Precedent.*

PJM's proposed Tariff amendment is consistent with the filed-rate doctrine and the

rule against retroactive ratemaking because it does not violate any textually designated

specific deadline. In *Oklahoma Gas*,[27] the United States Court of Appeals for the District

of Columbia Circuit ("D.C. Circuit") affirmed the Commission's denial of a request for

waiver of a specific provision of Southwest Power Pool, Inc.'s ("SPP") tariff, specifically

on the basis that the provision at issue contained a clear and unambiguous deadline. While

the applicable tariff provision explicitly required SPP to invoice certain charges *monthly*,

and to make any adjustments within *one year*, SPP took *eight years* to implement the

provision, during which time SPP did not invoice for the applicable charges. The court

found that "[b]ecause the one-year time bar for billing is part of the filed rate, FERC could

not retroactively waive it, even to remedy the arguable windfall for users of the upgraded

---

[27] *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (D.C. Cir. 2021) ("*Oklahoma Gas*").

Kimberly D. Bose, Secretary
December 23, 2022
Page 26

transmission networks."[28]  Clearly, the circumstances in the present case can be entirely

distinguished from those in *Oklahoma Gas* given that PJM has not concluded the

2024/2025 BRA and because the Tariff expressly contemplates and provides notice of the

ability of PJM to make emergency filings to address "imminent severe economic harm."[29].

The Commission similarly views a specific deadline or "date certain" as a relevant

factor when applying the filed-rate doctrine, as noted by Commissioner Danly this month

in *EDF Renewables, Inc*., an order involving a request for waiver.[30]

> Allow me to draw the correct distinction between the two
> species of cases that the majority seeks to confuse. **I have
> either supported or concurred in orders in which tariffs
> contained prior notice requirements in advance of the
> closing of a transaction or in advance of a deactivation.
> Those cases are different. In those cases, a date-certain
> had not passed. Had the waiver requests been denied, the
> entity could have delayed the closing date or deactivation
> date such that no tariff violation would ever have
> occurred. If granted, the parties could provide notice
> shortly before closing, whenever that closing might
> happen. By granting the waiver, the Commission is
> informing all parties that the Commission will not
> require the advance notice specified in the tariff. Because
> no required deadline had passed, that actually is a
> prospective waiver request.** But those are not the facts
> here, nor are they the facts in cases cited by the majority.[31]

Here, rather than identifying a specific deadline, the Tariff requires PJM to "post

the results of each auction as soon . . . as possible" after conducting the RPM Auctions, in

acknowledgement that additional process is necessary before the full effectuation of the

---

[28] *Id.* at 825.

[29] Tariff, section 9.2(b).

[30] *See EDF Renewables, Inc*. 181 FERC ¶ 61,189, at Danly Dissent (2022).

[31] *Id.* at Danly Dissent, P 6 (citing *CPV Fairview, LLC*, 174 FERC ¶ 61,029 (2021); *UGI Dev. Co.*, 172 FERC ¶ 61,196 (2020)).

Kimberly D. Bose, Secretary
December 23, 2022
Page 27

filed-rate via validation and finalization of the results and the awarding of capacity

commitments to Capacity Market Sellers.

Additionally, PJM's proposed Tariff amendment will only impact future actions

not yet completed in the auction process—namely, the application of the correct Locational

Deliverability Area Reliability Requirement for the DPL-S LDA.  This is consistent with

the Commission's June 15, 2020 order,[32] which permitted PJM to use a revised updated

PJM Region Peak Load Forecast for the Second Incremental Auction associated with the

2021/2022 Delivery Year, to reflect the impact of the unforeseeable economic

consequences of the COVID-19 pandemic.  In that case, PJM had timely posted (before

February 1, 2020) an updated PJM Region Peak Load Forecast for the 2021/2022 delivery

year, and complied with Tariff, Attachment DD, section 5.10(e).  However, in light of the

major forecasted economic consequences of the COVID-19 pandemic and their impact on

forecast PJM Regional load levels during the 2021/2022 delivery year, PJM sought

permission to use a revised updated PJM Region Peak Load Forecast (updated and different

from the PJM Region Peak Load Forecast that had previously been posted).  In granting

the waiver, the Commission found that "PJM's waiver request is prospective," because

"PJM is seeking a waiver of its future obligation to clear the Second Incremental Auction

using the updated PJM Region Peak Load Forecast it posted before February 1, 2020" and

"[i]nstead, PJM seeks to clear the auction in July 2020 using an updated forecast that

reflects the significant economic impact of COVID-19."[33]    Here, the Commission

acceptance of PJM's proposed Tariff amendment would similarly apply because it allows

---

[32] *See PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,208 (2020).

[33] *Id.* at P 15.

Kimberly D. Bose, Secretary
December 23, 2022
Page 28

PJM to use an updated Locational Deliverability Area Reliability Requirement to clear the

2024/2025 BRA.

> **B.      PJM's Tariff Expressly Allows PJM to Propose Changes Where There Is Imminent Severe Economic Harm to Electric Consumers as Is the Case Here.**

PJM's proposed Tariff amendment effectuates an *existing* Tariff provision

providing prior notice to customers that PJM may seek Commission approval of tariff

modifications where "imminent severe economic harm to electric consumers requires a

prompt Section 205 filing."  Specifically, Tariff, section 9.2(b) describes the "Rights of the

Transmission Provider," and explicitly states that:

> PJM may file with less than a full 7 day advance consultation
> in circumstances where imminent harm to system reliability
> or imminent severe economic harm to electric consumers
> requires a prompt Section 205 filing; provided that PJM shall
> provide as much advance notice and consultation with the
> Transmission Owners and the PJM Members Committee as
> is practicable in such circumstances, and no such emergency
> filing shall be made with less than 24 hours advance notice.

In its 2012 order on PJM's Order No. 719 compliance filing,[34] the Commission

acknowledged the importance of Tariff, section 9.2(b), and specifically cited this provision

as a basis for declining to require PJM to implement a "circuit breaker" to cap excessive

charges during shortage pricing conditions.  Specifically, the Commission found that

"section 9.2(b) of the PJM [Tariff] gives PJM  . . .  the ability to respond to emergency

circumstances, and [we] will not require PJM to implement, or rely on, circuit breaker

provisions."[35]  In its subsequent order on rehearing, the Commission, citing Tariff, section

9.2(b), explained that "PJM has authority to act if it determines that an emergency requires

---

[34] *PJM Interconnection, L.L.C.*, 139 FERC ¶ 61,057 (2012).

[35] *Id*. at P 232.

Kimberly D. Bose, Secretary
December 23, 2022
Page 29

the suspension of shortage pricing to address imminent harm to reliability or consumers," and "[i]n its role as an RTO, PJM has a responsibility to determine when/if such an emergency filing should be made with the Commission and can apply for a waiver of the Commission's 60-day prior notice requirement under such circumstances."[36] Although in that case the issue involved shortage pricing in the energy market, the Tariff provision at issue is not so limited and applies across-the-board as an effective notice provision to stakeholders to address "imminent severe economic harm to electric consumers" across PJM markets.

Here, PJM is doing exactly what the Commission previously stated and expected when there is the risk of imminent severe economic harm to consumers. As explained below, PJM is submitting this filing pursuant to Tariff, section 9.2(b) given the "imminent severe economic harm to electric consumers" in the DPL-S LDA since load could incur capacity costs that are more than four times the amount that the load should pay if the Locational Deliverability Area Reliability Requirement accurately reflects the reliability needs of the LDA based on actual participation seen in the auction. Thus, this type of imminent severe economic harm is precisely what the Tariff allows PJM to fix *before* the auction results are finalized. Otherwise, Tariff, section 9.2(b) would be meaningless if PJM is not allowed to apply the revised rule that addresses the identified Tariff gap described above before the auction results are finalized for the 2024/2025 BRA. In other words, the authority provided under Tariff, section 9.2(b) places all Market Participants on notice that PJM has the ability to propose a remedy to outcomes that would otherwise be unjust and unreasonable *before* it is too late (i.e., before final auction results are posted).

---

[36] *PJM Interconnection, L.L.C.*, 141 FERC ¶ 61,096, at P 11 (2012).

Kimberly D. Bose, Secretary
December 23, 2022
Page 30

Any other interpretation would make the inclusion of the term "imminent" meaningless as severe economic harm would have already resulted and there would be no reason to make an emergency filing at that point.

### C.    *RPM Auction Results May Be Subject to Change by the Commission When There Are Errors.*

In addition to the previously mentioned provision, PJM Tariff, Attachment DD, section 5.11(e) provides further notice to Market Participants and reinforces the Commission's inherent authority pursuant to section 206 of the FPA to ensure just and reasonable results. Although the section in part discusses PJM's ability to correct errors, it also places Market Participants on notice of the Commission's inherent FPA section 206 authority to correct anomalous results before the market closes and capacity awards are made. This provision explicitly provides that the initially posted auction results may be "review[ed] by FERC[,]"[37] which would suspend all deadlines contained in this subsection. The only logical interpretation of this provision is that upon review of a potential error, the Commission may correct any such potential error from the initial posting of the auction results.  Therefore, this Tariff language clearly places Market Participants on notice that the Commission may correct an error to the initial posting of auction results and change any such initial results to ensure just and reasonable rates.

Here, PJM discovered that there could be an unjust and unreasonable result if PJM were to procure an amount of capacity in excess of what is actually needed in the LDA based upon the non-participation of Planned Generation Capacity Resources.  Specifically, the inclusion of Planned Generation Capacity Resources in the Locational Deliverability

---

[37] Tariff, Attachment DD, section 5.11(e).

Area Reliability Requirement that did not offer in the 2024/2025 BRA is not representative of the actual capacity needs of the DPL-S LDA. If this overstated reliability requirement is not corrected, the outcome of the auction would be in error because the optimization algorithm would not be "applied to calculate the overall clearing result to minimize the cost of satisfying the reliability requirements across the PJM Region."[38]

PJM itself does not have the ability to correct this situation, but the Commission can by accepting PJM's proposed correction and directing PJM to finalize the results on that basis. Given that the Tariff, Attachment DD, section 5.11(e) places Market Participants on notice of potential changes to fix errors *after* the initial auction results are posted, the Tariff surely also allows the Commission to prospectively fix such errors prior to the completion of the auction and the actual awarding of capacity obligations, which is precisely what PJM is proposing through this filing.

## V.   STAKEHOLDER PROCESS

As noted, *supra*, absent acceptance of this filing, consumers in the DPL-S LDA would have to pay more than four times more for capacity in one Delivery Year than they otherwise should have paid if an accurate Locational Deliverability Area Reliability Requirement is used to clear the auction. Given this imminent severe economic harm to electric consumers in DPL-S if PJM were to complete the auction clearing process and award capacity commitments absent the proposed amendment, PJM did not seek stakeholder endorsement prior to submitting this proposed revision and is instead submitting this emergency filing pursuant to Tariff, section 9.2(b) and the Consolidated Transmission Owners Agreement ("CTOA"), section 7.5.1(ii). Consistent with those

---

[38] Tariff, Attachment DD, section 5.12(a).

provisions, PJM provided more than 24-hours' notice of the proposed revisions and the need to make this emergency filing to the Transmission Owners and the Members Committee of the proposed revisions on the December 21, 2022.[39] Accordingly, PJM fulfilled its consultation obligations under the Tariff and CTOA prior to the submission of this section 205 filing. Based on its review of the matter, the PJM Board of Managers also authorized PJM to submit the Tariff modifications pursuant to section 206 of the FPA along with this companion filing pursuant to section 205 of the FPA.

## VI.    WAIVER

To provide for market certainty as early as possible, PJM requests waiver of the Commission's 60-days' notice requirement[40] to allow for the proposed revisions to become effective one as soon as day after the date of this filing (i.e., December 24, 2022). Courts have explained that "[t]he Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published."[41] Here, good cause exists for the Commission to allow for the proposed changes to become effective as soon as December 24, 2022, given that

---

[39] *See Members Committee Agenda*, PJM Interconnection, L.L.C., item 3 (Dec. 21, 2022), https://www.pjm.com/-/media/committees-groups/committees/mc/2022/20221221/agenda.ashx, *see also 2024/2025 BRA Update and PJM Notice of Consultation with the Members Committee pursuant to Tariff Section 9.2(b) and Transmission Owners pursuant to CTOA Section 7.5.1(ii)*, PJM Interconnection, L.L.C. (Dec. 21, 2022), https://www.pjm.com/-/media/committees-groups/committees/mc/2022/20221221/item-03-2024-2025-bra-update-and-pjm-notice-of-consultation-with-the-members-committee.ashx.

[40] *See* 18 C.F.R. § 35.3(a).

[41] *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 969 (DC Cir. 2003) (quoting FPA, section 205(d)).

Kimberly D. Bose, Secretary
December 23, 2022
Page 33

this filing would reduce charges that Load Serving Entities would otherwise have to pay

absent these revisions.[42]

Lastly, given that this filing proposes amendments to the Tariff that are identical to

the proposed revisions in the separate 206 filing, PJM also requests that the Commission

establish the same 28-day comment period to be applicable to both filings.

## VII.    CORRESPONDENCE

The following individuals are designated for inclusion on the official service list in

this proceeding and for receipt of any communications regarding this filing:

| | |
|---|---|
| Craig Glazer | Chenchao Lu |
| Vice President–Federal Government Policy | Assistant  General Counsel |
| PJM Interconnection, L.L.C. | PJM Interconnection, L.L.C. |
| 1200 G Street, N.W., Suite 600 | 2750 Monroe Blvd. |
| Washington, D.C. 20005 | Audubon, PA 19403 |
| (202) 423-4743 (phone) | (610) 666-2255 (phone) |
| *Craig.Glazer@pjm.com* | (610) 666-8211 (fax) |
| | *Chenchao.Lu@pjm.com* |

## VIII.  DOCUMENTS ENCLOSED

This filing consists of the following:

1.      This transmittal letter; and

2.      Revisions to the Tariff (in redlined and clean format (as Attachments A
        and B, respectively) and in electronic tariff filing format as required by
        Order No. 714).[43]

---

[42] *See Central Hudson Gas & Elec. Corp.*, 60 FERC ¶ 61,106 at 61,338 (1992) ("We will generally grant waiver of the 60-day prior notice requirement in the following instances: . . . (2) filings that reduce rates and charges—such as rate decreases or new services that provide the customer of a utility with an opportunity to reduce its purchases of other, more expensive service from the same utility.").

[43] *Electronic Tariff Filings*, Order No. 714, 124 FERC ¶ 61,270 (2008), *final rule*, Order No. 714-A, 147 FERC ¶ 61,115 (2014).

Kimberly D. Bose, Secretary
December 23, 2022
Page 34

## IX.   SERVICE

PJM has served a copy of this filing on all PJM members, the PJM Independent Market Monitor, and on all state utility regulatory commissions in the PJM Region by posting this filing electronically.  In accordance with the Commission's regulations,[44] PJM will post a copy of this filing to the FERC filings section of its internet site, located at the following link:   http://www.pjm.com/documents/ferc-manuals/ferc-filings.aspx with a specific link to the newly filed document, and will send an email on the same date as this filing to all PJM members and all state utility regulatory commissions in the PJM Region[45] alerting them that this filing has been made by PJM and is available by following such link. PJM also serves the parties listed on the Commission's official service list for this docket. If the document is not immediately available by using the referenced link, the document will be available through the referenced link within 24 hours of the filing.  Also, a copy of this filing will be available on FERC's eLibrary website located at the following link: http://www.ferc.gov/docs-filing/elibrary.asp in accordance with the Commission's regulations and Order No. 714.

---

[44] *See* 18 C.F.R. §§ 35.2(e), 385.2010(f)(3).

[45] PJM already maintains, updates, and regularly uses email lists for all PJM members and affected state commissions.

Kimberly D. Bose, Secretary
December 23, 2022
Page 35

## X.    CONCLUSION

For the reasons set forth herein, PJM respectfully requests that the Commission

accept PJM's proposed amendment as a just and reasonable replacement rate.

Respectfully submitted,

/s/ *Chenchao Lu*

Craig Glazer
Vice President–Federal Government Policy
PJM Interconnection, L.L.C.
1200 G Street, N.W., Suite 600
Washington, D.C.  20005
(202) 423-4743 (phone)
*Craig.Glazer@pjm.com*

Chenchao Lu
Assistant General Counsel
PJM Interconnection, L.L.C.
2750 Monroe Blvd.
Audubon, PA 19403
(610) 666-2255 (phone)
(610) 666-8211 (fax)
*Chenchao.Lu@pjm.com*

**Attorney for
PJM Interconnection, L.L.C.**

December 23, 2022

# Attachment A

Revisions to the
PJM Open Access Transmission Tariff

(Marked/Redline Format)

**Definitions – L – M – N**

**Legacy Policy:**

"Legacy Policy" shall mean any legislative, executive, or regulatory action that specifically directs a payment outside of PJM Markets to a designated or prospective Generation Capacity Resource and the enactment of such action predates October 1, 2021, regardless of when any implementing governmental action to effectuate the action to direct payment outside of PJM Markets occurs.

**Limited Demand Resource:**

"Limited Demand Resource" shall have the meaning specified in the Reliability Assurance Agreement.

**Limited Demand Resource Reliability Target:**

"Limited Demand Resource Reliability Target" for the PJM Region or an LDA, shall mean the maximum amount of Limited Demand Resources determined by PJM to be consistent with the maintenance of reliability, stated in Unforced Capacity that shall be used to calculate the Minimum Extended Summer Demand Resource Requirement for Delivery Years through May 31, 2017 and the Limited Resource Constraint for the 2017/2018 and 2018/2019 Delivery Years for the PJM Region or such LDA.  As more fully set forth in the PJM Manuals, PJM calculates the Limited Demand Resource Reliability Target by first:  i) testing the effects of the ten-interruption requirement by comparing possible loads on peak days under a range of weather conditions (from the daily load forecast distributions for the Delivery Year in question) against possible generation capacity on such days under a range of conditions (using the cumulative capacity distributions employed in the Installed Reserve Margin study for the PJM Region and in the Capacity Emergency Transfer Objective study for the relevant LDAs for such Delivery Year) and, by varying the assumed amounts of DR that is committed and displaces committed generation, determines the DR penetration level at which there is a ninety percent probability that DR will not be called (based on the applicable operating reserve margin for the PJM Region and for the relevant LDAs) more than ten times over those peak days; ii) testing the six-hour duration requirement by calculating the MW difference between the highest hourly unrestricted peak load and seventh highest hourly unrestricted peak load on certain high peak load days (e.g., the annual peak, loads above the weather normalized peak, or days where load management was called) in recent years, then dividing those loads by the forecast peak for those years and averaging the result; and (iii) (for the 2016/2017 and 2017/2018 Delivery Years) testing the effects of the six-hour duration requirement by comparing possible hourly loads on peak days under a range of weather conditions (from the daily load forecast distributions for the Delivery Year in question) against possible generation capacity on such days under a range of conditions (using a Monte Carlo model of hourly capacity levels that is consistent with the capacity model employed in the Installed Reserve Margin study for the PJM Region and in the Capacity Emergency Transfer Objective study for the relevant LDAs for such Delivery Year) and, by varying the assumed amounts of DR that is committed and displaces committed generation, determines the DR penetration level at which there is a ninety percent probability that DR will

not be called (based on the applicable operating reserve margin for the PJM Region and for the relevant LDAs) for more than six hours over any one or more of the tested peak days.  Second, PJM adopts the lowest result from these three tests as the Limited Demand Resource Reliability Target.  The Limited Demand Resource Reliability Target shall be expressed as a percentage of the forecasted peak load of the PJM Region or such LDA and is converted to Unforced Capacity by multiplying [the reliability target percentage] times [the Forecast Pool Requirement] times [the DR Factor] times [the forecasted peak load of the PJM Region or such LDA, reduced by the amount of load served under the FRR Alternative].

**Limited Resource Constraint:**

"Limited Resource Constraint" shall mean, for the 2017/2018 Delivery Year and for FRR Capacity Plans the 2017/2018 and Delivery Years, for the PJM Region or each LDA for which the Office of the Interconnection is required under Tariff, Attachment DD, section 5.10(a) to establish a separate VRR Curve for a Delivery Year, a limit on the total amount of Unforced Capacity that can be committed as Limited Demand Resources for the 2017/2018 Delivery Year in the PJM Region or in such LDA, calculated as the Limited Demand Resource Reliability Target for the PJM Region or such LDA, respectively, minus the Short Term Resource Procurement Target for the PJM Region or such LDA, respectively.

**Limited Resource Price Decrement:**
"Limited Resource Price Decrement" shall mean, for the 2017/2018 Delivery Year, a difference between the clearing price for Limited Demand Resources and the clearing price for Extended Summer Demand Resources and Annual Resources, representing the cost to procure additional Extended Summer Demand Resources or Annual Resources out of merit order when the Limited Resource Constraint is binding.

**List of Approved Contractors:**

"List of Approved Contractors" shall mean a list developed by each Transmission Owner and published in a PJM Manual of (a) contractors that the Transmission Owner considers to be qualified to install or construct new facilities and/or upgrades or modifications to existing facilities on the Transmission Owner's system, provided that such contractors may include, but need not be limited to, contractors that, in addition to providing construction services, also provide design and/or other construction-related services, and (b) manufacturers or vendors of major transmission-related equipment (e.g., high-voltage transformers, transmission line, circuit breakers) whose products the Transmission Owner considers acceptable for installation and use on its system.

**Load Interest:**

"Load Interest" shall mean, for the purposes of the minimum offer price rule, responsibility for serving load within the PJM Region, whether by the Capacity Market Seller, an affiliate of the Capacity Market Seller, or by an entity with which the Capacity Market Seller is in contractual privity with respect to the subject Generation Capacity Resource.

**Load Management:**

"Load Management" shall mean a Demand Resource ("DR") as defined in the Reliability Assurance Agreement.

**Load Management Event:**

"Load Management Event" shall mean a) a single temporally contiguous dispatch of Demand Resources in a Compliance Aggregation Area during an Operating Day, or b) multiple dispatches of Demand Resources in a Compliance Aggregation Area during an Operating Day that are temporally contiguous.

**Load Ratio Share:**

"Load Ratio Share" shall mean the ratio of a Transmission Customer's Network Load to the Transmission Provider's total load.

**Load Reduction Event:**

"Load Reduction Event" shall mean a reduction in demand by a Member or Special Member for the purpose of participating in the PJM Interchange Energy Market.

**Load Serving Charging Energy:**

"Load Serving Charging Energy" shall mean energy that is purchased from the PJM Interchange Energy Market and stored in an Energy Storage Resource for later resale to end-use load.

**Load Serving Entity (LSE):**

"Load Serving Entity" or "LSE" shall have the meaning specified in the Reliability Assurance Agreement.

**Load Shedding:**

"Load Shedding" shall mean the systematic reduction of system demand by temporarily decreasing load in response to transmission system or area capacity shortages, system instability, or voltage control considerations under Tariff, Part II or Part III.

**Local Upgrades:**

"Local Upgrades" shall mean modifications or additions of facilities to abate any local thermal loading, voltage, short circuit, stability or similar engineering problem caused by the interconnection and delivery of generation to the Transmission System.  Local Upgrades shall include:

(i) Direct Connection Local Upgrades which are Local Upgrades that only serve the Customer Interconnection Facility and have no impact or potential impact on the Transmission System until the final tie-in is complete; and

(ii) Non-Direct Connection Local Upgrades which are parallel flow Local Upgrades that are not Direct Connection Local Upgrades.

**Location:**

"Location" as used in the Economic Load Response rules shall mean an end-use customer site as defined by the relevant electric distribution company account number.

**LOC Deviation**:

"LOC Deviation," shall mean, for units other than wind units, the LOC Deviation shall equal the desired megawatt amount for the resource determined according to the point on the Final Offer curve corresponding to the Real-time Settlement Interval real-time Locational Marginal Price at the resource's bus and adjusted for any reduction in megawatts due to Regulation, Synchronized Reserve, or Secondary Reserve assignments and limited to the lesser of the unit's Economic Maximum or the unit's Generation Resource Maximum Output, minus the actual output of the unit.  For wind units, the LOC Deviation shall mean the deviation of the generating unit's output equal to the lesser of the PJM forecasted output for the unit or the desired megawatt amount for the resource determined according to the point on the Final Offer curve corresponding to the Real-time Settlement Interval integrated real-time Locational Marginal Price at the resource's bus, and shall be limited to the lesser of the unit's Economic Maximum or the unit's Generation Resource Maximum Output, minus the actual output of the unit.

**Locational Deliverability Area (LDA):**

"Locational Deliverability Area" or "LDA" shall mean a geographic area within the PJM Region that has limited transmission capability to import capacity to satisfy such area's reliability requirement, as determined by the Office of the Interconnection in connection with preparation of the Regional Transmission Expansion Plan, and as specified in Reliability Assurance Agreement, Schedule 10.1.

**Locational Deliverability Area Reliability Requirement:**

"Locational Deliverability Area Reliability Requirement" shall mean the projected internal capacity in the Locational Deliverability Area plus the Capacity Emergency Transfer Objective for the Delivery Year, as determined by the Office of the Interconnection in connection with preparation of the Regional Transmission Expansion Plan, less the minimum internal resources required for all FRR Entities in such Locational Deliverability Area.  Notwithstanding the foregoing, effective with the 2024/2025 Delivery Year, during the auction process, the Office of Interconnection shall exclude from the Locational Deliverability Area Reliability Requirement any Planned Generation Capacity Resource in an LDA that does not participate in the relevant RPM Auction as projected internal capacity and in the Capacity Emergency Transfer Objective

model where the Locational Deliverability Area Reliability Requirement for the Base Residual Auction increases by more than one percent over the reliability requirement used from the prior Delivery Year's Base Residual Auction (for Incremental Auctions the Locational Deliverability Area Reliability Requirement would be compared with the reliability requirement used in the prior relevant RPM Auction associated with the same Delivery Year) for that LDA due to the cumulative addition of such Planned Generation Capacity Resources.

**Locational Price Adder:**

"Locational Price Adder" shall mean an addition to the marginal value of Unforced Capacity within an LDA as necessary to reflect the price of Capacity Resources required to relieve applicable binding locational constraints.

**Locational Reliability Charge:**

"Locational Reliability Charge" shall have the meaning specified in the Reliability Assurance Agreement.

**Locational UCAP:**

"Locational UCAP" shall mean unforced capacity that a Member with available uncommitted capacity sells in a bilateral transaction to a Member that previously committed capacity through an RPM Auction but now requires replacement capacity to fulfill its RPM Auction commitment. The Locational UCAP Seller retains responsibility for performance of the resource providing such replacement capacity.

**Locational UCAP Seller:**

"Locational UCAP Seller" shall mean a Member that sells Locational UCAP.

**Long-lead Project:**

"Long-lead Project" shall have the same meaning provided in the Operating Agreement.

**Long-Term Firm Point-To-Point Transmission Service:**

"Long-Term Firm Point-To-Point Transmission Service" shall mean firm Point-To-Point Transmission Service under Tariff, Part II with a term of one year or more.

**Loss Price:**

"Loss Price" shall mean the loss component of the Locational Marginal Price, which is the effect on transmission loss costs (whether positive or negative) associated with increasing the output of a generation resource or decreasing the consumption by a Demand Resource based on the effect of increased generation from or consumption by the resource on transmission losses, calculated

as specified in Operating Agreement, Schedule 1, section 2, and the parallel provisions of Tariff, Attachment K-Appendix, section 2.

**M2M Flowgate:**

"M2M Flowgate" shall have the meaning provided in the Joint Operating Agreement between the Midcontinent Independent Transmission System Operator, Inc. and PJM Interconnection, L.L.C.

**Maintenance Adder:**

"Maintenance Adder" shall mean an adder that may be included to account for variable operation and maintenance expenses in a Market Seller's Fuel Cost Policy.  The Maintenance Adder is calculated in accordance with the applicable provisions of PJM Manual 15, and may only include expenses incurred as a result of electric production.

**Manual Load Dump Action:**

"Manual Load Dump Action" shall mean an Operating Instruction, as defined by NERC, from PJM to shed firm load when the PJM Region cannot provide adequate capacity to meet the PJM Region's load and tie schedules, or to alleviate critically overloaded transmission lines or other equipment.

**Manual Load Dump Warning:**

"Manual Load Dump Warning" shall mean a notification from PJM to warn Members of an increasingly critical condition of present operations that may require manually shedding load.

**Marginal Value**:

"Marginal Value" shall mean the incremental change in system dispatch costs, measured as a $/MW value incurred by providing one additional MW of relief to the transmission constraint.

**Market Monitor:**

"Market Monitor**"** means the head of the Market Monitoring Unit.

**Market Monitoring Unit or MMU:**

"Market Monitoring Unit" or "MMU" means the independent Market Monitoring Unit defined in 18 CFR § 35.28(a)(7) and established under the PJM Market Monitoring Plan (Attachment M) to the PJM Tariff that is responsible for implementing the Market Monitoring Plan, including the Market Monitor.  The Market Monitoring Unit may also be referred to as the IMM or Independent Market Monitor for PJM

**Market Monitoring Unit Advisory Committee or MMU Advisory Committee:**

"Market Monitoring Unit Advisory Committee" or "MMU Advisory Committee" shall mean the committee established under Tariff, Attachment M, section III.H.

**Market Operations Center:**

"Market Operations Center" shall mean the equipment, facilities and personnel used by or on behalf of a Market Participant to communicate and coordinate with the Office of the Interconnection in connection with transactions in the PJM Interchange Energy Market or the operation of the PJM Region.

**Market Participant:**

"Market Participant" shall mean a Market Buyer, a Market Seller, an Economic Load Response Participant, or all three, except when such term is used in Tariff, Attachment M, in which case Market Participant shall mean an entity that generates, transmits, distributes, purchases, or sells electricity, ancillary services, or any other product or service provided under the PJM Tariff or Operating Agreement within, into, out of, or through the PJM Region, but it shall not include an Authorized Government Agency that consumes energy for its own use but does not purchase or sell energy at wholesale.

**Market Participant Energy Injection:**

"Market Participant Energy Injection" shall mean transactions in the Day-ahead Energy Market and Real-time Energy Market, including but not limited to Day-ahead generation schedules, real-time generation output, Increment Offers, internal bilateral transactions and import transactions, as further described in the PJM Manuals.

**Market Participant Energy Withdrawal:**

"Market Participant Energy Withdrawal" shall mean transactions in the Day-ahead Energy Market and Real-time Energy Market, including but not limited to Demand Bids, Decrement Bids, real-time load (net of Behind The Meter Generation expected to be operating, but not to be less than zero), internal bilateral transactions and Export Transactions, as further described in the PJM Manuals.

**Market Revenue Neutrality Offset:**

"Market Revenue Neutrality Offset" shall mean the revenue in excess of the cost for a resource from the energy, Synchronized Reserve, Non-Synchronized Reserve, and Secondary Reserve markets realized from an increase in real-time market megawatt assignment from a day-ahead market megawatt assignment in any of these markets due to the decrease in the real-time reserve market megawatt assignment from a day-ahead reserve market megawatt assignment in any of the reserve markets.

**Market Seller Offer Cap:**

"Market Seller Offer Cap" shall mean a maximum offer price applicable to certain Market Sellers under certain conditions, as determined in accordance with Tariff, Attachment DD. section 6 and Tariff, Attachment M-Appendix, section II.E.

**Market Violation:**

"Market Violation" shall mean a tariff violation, violation of a Commission-approved order, rule or regulation, market manipulation, or inappropriate dispatch that creates substantial concerns regarding unnecessary market inefficiencies, as defined in 18 C.F.R. § 35.28(b)(8).

**Material Modification:**

"Material Modification" shall mean any modification to an Interconnection Request that has a material adverse effect on the cost or timing of Interconnection Studies related to, or any Network Upgrades or Local Upgrades needed to accommodate, any Interconnection Request with a later Queue Position.

**Maximum Daily Starts:**

"Maximum Daily Starts" shall mean the maximum number of times that a generating unit can be started in an Operating Day under normal operating conditions.

**Maximum Emergency:**

"Maximum Emergency" shall mean the designation of all or part of the output of a generating unit for which the designated output levels may require extraordinary procedures and therefore are available to the Office of the Interconnection only when the Office of the Interconnection declares a Maximum Generation Emergency and requests generation designated as Maximum Emergency to run.  The Office of the Interconnection shall post on the PJM website the aggregate amount of megawatts that are classified as Maximum Emergency.

**Maximum Facility Output:**

"Maximum Facility Output" shall mean the maximum (not nominal) net electrical power output in megawatts, specified in the Interconnection Service Agreement, after supply of any parasitic or host facility loads, that a Generation Interconnection Customer's Customer Facility is expected to produce, provided that the specified Maximum Facility Output shall not exceed the output of the proposed Customer Facility that Transmission Provider utilized in the System Impact Study.

**Maximum Generation Emergency:**

"Maximum Generation Emergency" shall mean an Emergency declared by the Office of the Interconnection to address either a generation or transmission emergency in which the Office of the Interconnection anticipates requesting one or more Generation Capacity Resources, or Non-

Retail Behind The Meter Generation resources to operate at its maximum net or gross electrical power output, subject to the equipment stress limits for such Generation Capacity Resource or Non-Retail Behind The Meter resource in order to manage, alleviate, or end the Emergency.

**Maximum Generation Emergency Alert:**

"Maximum Generation Emergency Alert" shall mean an alert issued by the Office of the Interconnection to notify PJM Members, Transmission Owners, resource owners and operators, customers, and regulators that a Maximum Generation Emergency may be declared, for any Operating Day in either, as applicable, the Day-ahead Energy Market or the Real-time Energy Market, for all or any part of such Operating Day.

**Maximum Run Time:**

"Maximum Run Time" shall mean the maximum number of hours a generating unit can run over the course of an Operating Day, as measured by PJM's State Estimator.

**Maximum Weekly Starts:**

"Maximum Weekly Starts" shall mean the maximum number of times that a generating unit can be started in one week, defined as the 168 hour period starting Monday 0001 hour, under normal operating conditions.

**Member:**

"Member" shall have the meaning provided in the Operating Agreement.

**Merchant A.C. Transmission Facilities:**

"Merchant A.C. Transmission Facility" shall mean Merchant Transmission Facilities that are alternating current (A.C.) transmission facilities, other than those that are Controllable A.C. Merchant Transmission Facilities.

**Merchant D.C. Transmission Facilities:**

"Merchant D.C. Transmission Facilities" shall mean direct current (D.C.) transmission facilities that are interconnected with the Transmission System pursuant to Tariff, Part IV and Part VI.

**Merchant Network Upgrades:**

"Merchant Network Upgrades" shall mean additions to, or modifications or replacements of, physical facilities of the Interconnected Transmission Owner that, on the date of the pertinent Transmission Interconnection Customer's Upgrade Request, are part of the Transmission System or are included in the Regional Transmission Expansion Plan.

**Merchant Transmission Facilities:**

"Merchant Transmission Facilities" shall mean A.C. or D.C. transmission facilities that are interconnected with or added to the Transmission System pursuant to Tariff, Part IV and Part VI and that are so identified in Tariff, Attachment T, provided, however, that Merchant Transmission Facilities shall not include (i) any Customer Interconnection Facilities, (ii) any physical facilities of the Transmission System that were in existence on or before March 20, 2003 ; (iii) any expansions or enhancements of the Transmission System that are not identified as Merchant Transmission Facilities in the Regional Transmission Expansion Plan and Attachment T to the Tariff, or (iv) any transmission facilities that are included in the rate base of a public utility and on which a regulated return is earned.

**Merchant Transmission Provider:**

"Merchant Transmission Provider" shall mean an Interconnection Customer that (1) owns, controls, or controls the rights to use the transmission capability of, Merchant D.C. Transmission Facilities and/or Controllable A.C. Merchant Transmission Facilities that connect the Transmission System with another control area, (2) has elected to receive Transmission Injection Rights and Transmission Withdrawal Rights associated with such facility pursuant to Tariff, Part IV, section 36, and (3) makes (or will make) the transmission capability of such facilities available for use by third parties under terms and conditions approved by the Commission and stated in the Tariff, consistent with Tariff, section 38.

**Metering Equipment:**

"Metering Equipment" shall mean all metering equipment installed at the metering points designated in the appropriate appendix to an Interconnection Service Agreement.

**Minimum Annual Resource Requirement:**

"Minimum Annual Resource Requirement" shall mean, for Delivery Years through May 31, 2017,  the minimum amount of capacity that PJM will seek to procure from Annual Resources for the PJM Region and for each Locational Deliverability Area for which the Office of the Interconnection is required under Tariff, Attachment DD, section 5.10(a) to establish a separate VRR Curve for such Delivery Year.  For the PJM Region, the Minimum Annual Resource Requirement shall be equal to the RTO Reliability Requirement minus [the Sub-Annual Resource Reliability Target for the RTO in Unforced Capacity].  For an LDA, the Minimum Annual Resource Requirement shall be equal to the LDA Reliability Requirement minus [the LDA CETL] minus [the Sub-Annual Resource Reliability Target for such LDA in Unforced Capacity]. The LDA CETL may be adjusted pro rata for the amount of load served under the FRR Alternative.

**Minimum Down Time:**

For all generating units that are not combined cycle units, "Minimum Down Time" shall mean the minimum number of hours under normal operating conditions between unit shutdown and unit startup, calculated as the shortest time difference between the unit's generator breaker

opening and after the unit's generator breaker closure, which is typically indicated by telemetered or aggregated State Estimator megawatts greater than zero. For combined cycle units, "Minimum Down Time" shall mean the minimum number of hours between the last generator breaker opening and after first combustion turbine generator breaker closure, which is typically indicated by telemetered or aggregated State Estimator megawatts greater than zero.

**Minimum Extended Summer Resource Requirement:**

"Minimum Extended Summer Resource Requirement" shall mean, for Delivery Years through May 31, 2017, the minimum amount of capacity that PJM will seek to procure from Extended Summer Demand Resources and Annual Resources for the PJM Region and for each Locational Deliverability Area for which the Office of the Interconnection is required under Tariff, Attachment DD, section 5.10(a) to establish a separate VRR Curve for such Delivery Year. For the PJM Region, the Minimum Extended Summer Resource Requirement shall be equal to the RTO Reliability Requirement minus [the Limited Demand Resource Reliability Target for the PJM Region in Unforced Capacity]. For an LDA, the Minimum Extended Summer Resource Requirement shall be equal to the LDA Reliability Requirement minus [the LDA CETL] minus [the Limited Demand Resource Reliability Target for such LDA in Unforced Capacity]. The LDA CETL may be adjusted pro rata for the amount of load served under the FRR Alternative.

**Minimum Generation Emergency:**

"Minimum Generation Emergency" shall mean an Emergency declared by the Office of the Interconnection in which the Office of the Interconnection anticipates requesting one or more generating resources to operate at or below Normal Minimum Generation, in order to manage, alleviate, or end the Emergency.

**Minimum Participation Requirements:**

"Minimum Participation Requirements" shall mean a set of minimum training, risk management, communication and capital or collateral requirements required for Participants in the PJM Markets, as set forth herein and in the Form of Annual Certification set forth as Tariff, Attachment Q, Appendix 1. Participants transacting in FTRs in certain circumstances will be required to demonstrate additional risk management procedures and controls as further set forth in the Annual Certification found in Tariff, Attachment Q, Appendix 1.

**Minimum Run Time:**

For all generating units that are not combined cycle units, "Minimum Run Time" shall mean the minimum number of hours a unit must run, in real-time operations, from the time after generator breaker closure, which is typically indicated by telemetered or aggregated State Estimator megawatts greater than zero, to the time of generator breaker opening, as measured by PJM's State Estimator. For combined cycle units, "Minimum Run Time" shall mean the time period after the first combustion turbine generator breaker closure, which is typically indicated by telemetered or aggregated State Estimator megawatts greater than zero, and the last generator breaker opening as measured by PJM's State Estimator.

**MISO:**

"MISO" shall mean the Midcontinent Independent System Operator, Inc. or any successor thereto.

**Mixed Technology Facility:**

"Mixed Technology Facility" shall mean a facility composed of distinct generation and/or electric storage technology types behind the same Point of Interconnection.  Co-Located Resources and Hybrid Resources form all or part of Mixed Technology Facilities.

**MOPR Floor Offer Price:**

"MOPR Floor Offer Price" shall mean a minimum offer price applicable to certain Market Seller's Capacity Resources under certain conditions, as determined in accordance with Tariff, Attachment DD, sections 5.14(h), 5.14(h-1), and 5.14(h-2).

**Multi-Driver Project:**

"Multi-Driver Project" shall have the same meaning provided in the Operating Agreement.

**Native Load Customers:**

"Native Load Customers" shall mean the wholesale and retail power customers of a Transmission Owner on whose behalf the Transmission Owner, by statute, franchise, regulatory requirement, or contract, has undertaken an obligation to construct and operate the Transmission Owner's system to meet the reliable electric needs of such customers.

**NERC:**

"NERC" shall mean the North American Electric Reliability Corporation or any successor thereto.

**NERC Interchange Distribution Calculator:**

"NERC Interchange Distribution Calculator" shall mean the NERC mechanism that is in effect and being used to calculate the distribution of energy, over specific transmission interfaces, from energy transactions.

**Net Benefits Test:**

"Net Benefits Test" shall mean a calculation to determine whether the benefits of a reduction in price resulting from the dispatch of Economic Load Response exceeds the cost to other loads resulting from the billing unit effects of the load reduction, as specified in Operating Agreement,

Schedule 1, section 3.3A.4 and the parallel provisions of Tariff, Attachment K-Appendix, section 3.3A.4.

**Net Cost of New Entry:**

"Net Cost of New Entry" shall mean the Cost of New Entry minus the Net Energy and Ancillary Service Revenue Offset.

**Net Obligation:**

"Net Obligation" shall mean the amount owed to PJMSettlement and PJM for purchases from the PJM Markets, Transmission Service, (under Tariff, Parts II and III , and other services pursuant to the Agreements, after applying a deduction for amounts owed to a Participant by PJMSettlement as it pertains to monthly market activity and services. Should other markets be formed such that Participants may incur future Obligations in those markets, then the aggregate amount of those Obligations will also be added to the Net Obligation.

**Net Sell Position:**

"Net Sell Position" shall mean the amount of Net Obligation when Net Obligation is negative.

**Network Customer:**

"Network Customer" shall mean an entity receiving transmission service pursuant to the terms of the Transmission Provider's Network Integration Transmission Service under Tariff, Part III.

**Network External Designated Transmission Service:**

"Network External Designated Transmission Service" shall have the meaning set forth in Reliability Assurance Agreement, Article I.

**Network Integration Transmission Service:**

"Network Integration Transmission Service" shall mean the transmission service provided under Tariff, Part III.

**Network Load:**

"Network Load" shall mean the load that a Network Customer designates for Network Integration Transmission Service under Tariff, Part III. The Network Customer's Network Load shall include all load (including losses, Non-Dispatched Charging Energy, and Load Serving Charging Energy) served by the output of any Network Resources designated by the Network Customer. A Network Customer may elect to designate less than its total load as Network Load but may not designate only part of the load at a discrete Point of Delivery. Where an Eligible Customer has elected not to designate a particular load at discrete points of delivery as Network Load, the Eligible Customer is responsible for making separate arrangements under Tariff, Part

II for any Point-To-Point Transmission Service that may be necessary for such non-designated load.  Network Load shall not include Dispatched Charging Energy.

**Network Operating Agreement:**

"Network Operating Agreement" shall mean an executed agreement that contains the terms and conditions under which the Network Customer shall operate its facilities and the technical and operational matters associated with the implementation of Network Integration Transmission Service under Tariff, Part III.

**Network Operating Committee:**

"Network Operating Committee" shall mean a group made up of representatives from the Network Customer(s) and the Transmission Provider established to coordinate operating criteria and other technical considerations required for implementation of Network Integration Transmission Service under Tariff, Part III.

**Network Resource:**

"Network Resource" shall mean any designated generating resource owned, purchased, or leased by a Network Customer under the Network Integration Transmission Service Tariff.  Network Resources do not include any resource, or any portion thereof, that is committed for sale to third parties or otherwise cannot be called upon to meet the Network Customer's Network Load on a non-interruptible basis, except for purposes of fulfilling obligations under a reserve sharing program.

**Network Service User:**

"Network Service User" shall mean an entity using Network Transmission Service.

**Network Transmission Service:**

"Network Transmission Service" shall mean transmission service provided pursuant to the rates, terms and conditions set forth in Tariff, Part III, or transmission service comparable to such service that is provided to a Load Serving Entity that is also a Transmission Owner.

**Network Upgrades:**

"Network Upgrades" shall mean modifications or additions to transmission-related facilities that are integrated with and support the Transmission Provider's overall Transmission System for the general benefit of all users of such Transmission System. Network Upgrades shall include:

(i) **Direct Connection Network Upgrades** which are Network Upgrades that are not part of an Affected System; only serve the Customer Interconnection Facility; and have no impact or potential impact on the Transmission System until the final tie-in is complete.  Both Transmission Provider and Interconnection Customer must agree as to what constitutes Direct

Connection Network Upgrades and identify them in the Interconnection Construction Service Agreement, Schedule D.  If the Transmission Provider and Interconnection Customer disagree about whether a particular Network Upgrade is a Direct Connection Network Upgrade, the Transmission Provider must provide the Interconnection Customer a written technical explanation outlining why the Transmission Provider does not consider the Network Upgrade to be a Direct Connection Network Upgrade within 15 days of its determination.

(ii) **Non-Direct Connection Network Upgrades** which are parallel flow Network Upgrades that are not Direct Connection Network Upgrades.

**Neutral Party:**

"Neutral Party" shall have the meaning provided in Tariff, Part I, section 9.3(v).

**New Entry Capacity Resource with State Subsidy:**

"New Entry Capacity Resource with State Subsidy" shall mean (1) starting with the 2022/2023 Delivery Year, the MWs (in installed capacity) comprising a Capacity Resource with State Subsidy that have not cleared in an RPM Auction pursuant to its Sell Offer at or above its resource-specific MOPR Floor Offer Price or the applicable default New Entry MOPR Floor Offer Price or (2) starting with the Base Residual Auction for the 2022/2023 Delivery Year, any of those MWs (in installed capacity) comprising a Capacity Resource with State Subsidy that was not included in an FRR Capacity Plan at the time of the Base Residual Auction or the subject of a Sell Offer in a Base Residual Auction occurring for a Delivery Year after it last cleared an RPM Auction and since then has yet to clear an RPM Auction pursuant to its Sell Offer at or above its resource-specific MOPR Floor Offer Price or the applicable default New Entry MOPR Floor Offer Price.  Notwithstanding the foregoing, any Capacity Resource that previously cleared an RPM Auction before it became entitled to receive a State Subsidy shall not be deemed a New Entry Capacity Resource, unless, starting with the Base Residual Auction for the 2022/2023 Delivery Year, the Capacity Resource with State Subsidy was not the subject of a Sell Offer in a Base Residual Auction or included in an FRR Capacity Plan at the time of the Base Residual Auction for a Delivery Year after it last cleared an RPM Auction.

**New PJM Zone(s):**

"New PJM Zone(s)" shall mean the Zone included in the Tariff, along with applicable Schedules and Attachments, for Commonwealth Edison Company, The Dayton Power and Light Company and the AEP East Operating Companies (Appalachian Power Company, Columbus Southern Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company and Wheeling Power Company).

**New Service Customers:**

"New Service Customers" shall mean all customers that submit an Interconnection Request, a Completed Application, or an Upgrade Request that is pending in the New Services Queue.

**New Service Request:**

"New Service Request" shall mean an Interconnection Request, a Completed Application, or an Upgrade Request.

**New Services Queue:**

"New Services Queue" shall mean all Interconnection Requests, Completed Applications, and Upgrade Requests that are received within each six-month period ending on March 31 and September 30 of each year shall collectively comprise a New Services Queue.

**New York ISO or NYISO:**

"New York ISO" or "NYISO" shall mean the New York Independent System Operator, Inc. or any successor thereto.

**Nodal Reference Price:**

The "Nodal Reference Price" at each location shall mean the 97th percentile price differential between day-ahead and real-time prices experienced over the corresponding two-month reference period in the prior calendar year.   Reference periods will be Jan-Feb, Mar-Apr, May-Jun, Jul-Aug, Sept-Oct, Nov-Dec.  For any given current-year month, the reference period months will be the set of two months in the prior calendar year that include the month corresponding to the current month.  For example, July and August 2003 would each use July-August 2002 as their reference period.

**No-load Cost:**

"No-load Cost" shall mean the hourly cost required to theoretically operate a synchronized unit at zero MW. It consists primarily of the cost of fuel, as determined by the unit's no load heat (adjusted by the performance factor) times the fuel cost. It also includes operating costs, Maintenance Adders, and emissions allowances.

**Nominal Rated Capability:**

"Nominal Rated Capability" shall mean the nominal maximum rated capability in megawatts of a Transmission Interconnection Customer's Customer Facility or the nominal increase in transmission capability in megawatts of the Transmission System resulting from the interconnection or addition of a Transmission Interconnection Customer's Customer Facility, as determined in accordance with pertinent Applicable Standards and specified in the Interconnection Service Agreement.

**Nominated Demand Resource Value:**

"Nominated Demand Resource Value" shall mean the amount of load reduction that a Demand Resource commits to provide either through direct load control, firm service level or guaranteed

load drop programs.  For existing Demand Resources, the maximum Nominated Demand Resource Value is limited, in accordance with the PJM Manuals, to the value appropriate for the method by which the load reduction would be accomplished, at the time the Base Residual Auction or Incremental Auction is being conducted.

**Nominated Energy Efficiency Value:**

"Nominated Energy Efficiency Value" shall mean the amount of load reduction that an Energy Efficiency Resource commits to provide through installation of more efficient devices or equipment or implementation of more efficient processes or systems.

**Non-Dispatched Charging Energy:**

"Non-Dispatched Charging Energy" shall mean all Direct Charging Energy that an Energy Storage Resource Model Participant receives from the electric grid that is not otherwise Dispatched Charging Energy.

**Non-Firm Point-To-Point Transmission Service:**

"Non-Firm Point-To-Point Transmission Service" shall mean Point-To-Point Transmission Service under the Tariff that is reserved and scheduled on an as-available basis and is subject to Curtailment or Interruption as set forth in Tariff, Part II, section 14.7.  Non-Firm Point-To-Point Transmission Service is available on a stand-alone basis for periods ranging from one hour to one month.

**Non-Firm Sale:**

"Non-Firm Sale" shall mean an energy sale for which receipt or delivery may be interrupted for any reason or no reason, without liability on the part of either the buyer or seller.

**Non-Firm Transmission Withdrawal Rights:**

"No-Firm Transmission Withdrawal Rights" shall mean the rights to schedule energy withdrawals from a specified point on the Transmission System. Non-Firm Transmission Withdrawal Rights may be awarded only to a Merchant D.C. Transmission Facility that connects the Transmission System to another control area. Withdrawals scheduled using Non-Firm Transmission Withdrawal Rights have rights similar to those under Non-Firm Point-to-Point Transmission Service.

**Non-Performance Charge:**

"Non-Performance Charge" shall mean the charge applicable to Capacity Performance Resources as defined in Tariff, Attachment DD, section 10A(e).

**Nonincumbent Developer:**

"Nonincumbent Developer" shall have the same meaning provided in the Operating Agreement.

**Non-Regulatory Opportunity Cost:**

 "Non-Regulatory Opportunity Cost" shall mean the difference between (a) the forecasted cost to operate a specific generating unit when the unit only has a limited number of starts or available run hours resulting from (i) the physical equipment limitations of the unit, for up to one year, due to original equipment manufacturer recommendations or insurance carrier restrictions, (ii) a fuel supply limitation, for up to one year, resulting from an event of Catastrophic Force Majeure; and, (b) the forecasted future Locational Marginal Price at which the generating unit could run while not violating such limitations.  Non-Regulatory Opportunity Cost therefore is the value associated with a specific generating unit's lost opportunity to produce energy during a higher valued period of time occurring within the same period of time in which the unit is bound by the referenced restrictions, and is reflected in the rules set forth in PJM Manual 15.  Non-Regulatory Opportunity Costs shall be limited to those resources which are specifically delineated in Operating Agreement, Schedule 2.

**Non-Retail Behind The Meter Generation:**

"Non-Retail Behind The Meter Generation" shall mean Behind the Meter Generation that is used by municipal electric systems, electric cooperatives, or electric distribution companies to serve load.

**Non-Synchronized Reserve:**

"Non-Synchronized Reserve" shall mean the reserve capability of non-emergency generation resources that can be converted fully into energy within ten minutes of a request from the Office of the Interconnection dispatcher, and is provided by equipment that is not electrically synchronized to the Transmission System.

**Non-Synchronized Reserve Event:**

"Non-Synchronized Reserve Event" shall mean a request from the Office of the Interconnection to generation resources able and assigned to provide Non-Synchronized Reserve in one or more specified Reserve Zones or Reserve Sub-zones, within ten minutes to increase the energy output by the amount of assigned Non-Synchronized Reserve capability.

**Non-Variable Loads:**

"Non-Variable Loads" shall have the meaning specified in Operating Agreement, Schedule 1, section 1.5A.6, and the parallel provisions of Tariff, Attachment K-Appendix, section 1.5A.6.

**Non-Zone Network Load:**

"Non-Zone Network Load shall mean Network Load that is located outside of the PJM Region.

**Normal Maximum Generation:**

"Normal Maximum Generation" shall mean the highest output level of a generating resource under normal operating conditions.

**Normal Minimum Generation:**

"Normal Minimum Generation" shall mean the lowest output level of a generating resource under normal operating conditions.

**5.12    Conduct of RPM Auctions**

The Office of the Interconnection shall employ an optimization algorithm for each Base Residual Auction and each Incremental Auction to evaluate the Sell Offers and other inputs to such auction to determine the Sell Offers that clear such auction.

    a)    Base Residual Auction

For each Base Residual Auction, the optimization algorithm shall consider:

- all Sell Offers submitted in such auction;

- the Variable Resource Requirement Curves for the PJM Region and each LDA;

- any constraints resulting from the Locational Deliverability Requirement and any applicable Capacity Import Limit;

- for Delivery Years starting June 1, 2014 and ending May 31, 2017, the Minimum Annual Resource Requirement and the Minimum Extended Summer Resource Requirement for the PJM Region and for each Locational Deliverability Area for which a separate VRR Curve is required by Tariff, Attachment DD, section 5.10(a); for the 2017/2018 Delivery Year, the Limited Resource Constraints and the Sub-Annual Resource Constraints for the PJM Region and for each Locational Deliverability Area for which a separate VRR Curve is required by Tariff, Attachment DD, section 5.10(a); and for the 2018/2019 and 2019/2020 Delivery Years, the Base Capacity Demand Resource Constraints and the Base Capacity Resource Constraints for the PJM Region and for each Locational Deliverability Area for which a separate VRR Curve is required by Tariff, Attachment DD, section 5.10(a);

- For the Delivery Years through May 31, 2018, the PJM Region Reliability Requirement minus the Short-Term Resource Procurement Target;

- For the 2018/2019 Delivery Year and subsequent Delivery Years, the PJM Reliability Requirement; ~~and~~

- For the 2024/2025 and subsequent Delivery Years, the Locational Deliverability Requirement Reliability Requirement, including any revised Locational Deliverability Area Reliability Requirement based on the actual participation of Planned Generation Capacity Resources in the relevant Base Residual Auction; and

- For the 2020/2021 Delivery Year and subsequent Delivery Years, the requirement that the cleared quantity of Summer-Period Capacity

Performance Resources equal the cleared quantity of Winter-Period Capacity Performance Resources for the PJM Region.

The optimization algorithm shall be applied to calculate the overall clearing result to minimize the cost of satisfying the reliability requirements across the PJM Region, regardless of whether the quantity clearing the Base Residual Auction is above or below the applicable target quantity, while respecting all applicable requirements and constraints, including any restrictions specified in any Credit-Limited Offers. Where the supply curve formed by the Sell Offers submitted in an auction falls entirely below the Variable Resource Requirement Curve, the auction shall clear at the price-capacity point on the Variable Resource Requirement Curve corresponding to the total Unforced Capacity provided by all such Sell Offers. Where the supply curve consists only of Sell Offers located entirely below the Variable Resource Requirement Curve and Sell Offers located entirely above the Variable Resource Requirement Curve, the auction shall clear at the price-capacity point on the Variable Resource Requirement Curve corresponding to the total Unforced Capacity provided by all Sell Offers located entirely below the Variable Resource Requirement Curve. In determining the lowest-cost overall clearing result that satisfies all applicable constraints and requirements, the optimization may select from among multiple possible alternative clearing results that satisfy such requirements, including, for example (without limitation by such example), accepting a lower-priced Sell Offer that intersects the Variable Resource Requirement Curve and that specifies a minimum capacity block, accepting a higher-priced Sell Offer that intersects the Variable Resource Requirement Curve and that contains no minimum-block limitations, or rejecting both of the above alternatives and clearing the auction at the higher-priced point on the Variable Resource Requirement Curve that corresponds to the Unforced Capacity provided by all Sell Offers located entirely below the Variable Resource Requirement Curve. For the 2020/2021 Delivery Year and subsequent Delivery Years, the supply curve formed by the Sell Offers submitted within an LDA for which a separate VRR Curve is established, shall only consider the quantity of MW from Summer-Period Capacity Performance Resources that are equally matched with Winter-Period Capacity Performance Resources within the LDA, such that only the equally matched quantity of opposite-season Sell Offers are considered in satisfying the LDA's reliability requirement.

The Sell Offer price of a Qualifying Transmission Upgrade shall be treated as a capacity price differential between the LDAs specified in such Sell Offer between which CETL is increased, and the Import Capability provided by such upgrade shall clear to the extent the difference in clearing prices between such LDAs is greater than the price specified in such Sell Offer. The Capacity Resource clearing results and Capacity Resource Clearing Prices so determined shall be applicable for such Delivery Year. The Capacity Resource clearing results and Capacity Resource Clearing Prices determined for Summer-Period Capacity Performance Resources shall be applicable for the calendar months of June through October and the following May of such Delivery Year; and shall be applicable for Winter-Period Capacity Performance Resources for the calendar months of November through April of such Delivery Year.

　　　b)　　Scheduled Incremental Auctions.

For purposes of a Scheduled Incremental Auction, the optimization algorithm shall consider:

- For the Delivery years through May 31, 2018, the PJM Region Reliability Requirement, less the Short-term Resource Procurement Target;

- For the 2018/2019 Delivery Year and subsequent Delivery Years, the PJM Reliability Requirement;

- Updated LDA Reliability Requirements taking into account any updated Capacity Emergency Transfer Objectives;

- The Capacity Emergency Transfer Limit used in the Base Residual Auction, or any updated value resulting from a Conditional Incremental Auction;

- All applicable Capacity Import Limits;

- For the Delivery Years through May 31, 2018, for each LDA, such LDA's updated Reliability Requirement, less such LDA's Short-Term Resource Procurement Target;

- For the 2018/2019 Delivery Year and subsequent Delivery Years, for each LDA, such LDA's updated Reliability Requirement, and for the 2024/2025 Delivery Year and subsequent Delivery Years, including any revised Locational Deliverability Area Reliability Requirement based on the actual participation of Planned Generation Capacity Resources in the relevant Incremental Auction;

- For Delivery Years starting June 1, 2014 and ending May 31, 2017, the Minimum Annual Resource Requirement and the Minimum Extended Summer Resource Requirement for the PJM Region and for each LDA for which PJM is required to establish a separate VRR Curve for the Base Residual Auction for the relevant Delivery Year; for the 2017/2018 Delivery Year, the Limited Resource Constraints and the Sub-annual Resource Constraints for the PJM Region and for each Locational Deliverability Area for which a separate VRR Curve is required by Tariff, Attachment DD, section 5.10(a); and for the 2018/2019 and 2019/2020 Delivery Years, the Base Capacity Demand Resource Constraints and the Base Capacity Resource Constraints for the PJM Region and for each Locational Deliverability Area for which a separate VRR Curve is required by Tariff, Attachment DD, section 5.10(a);

- For the 2020/2021 Delivery Year and subsequent Delivery Years, the requirement that the cleared quantity of Summer-Period Capacity Performance Resources equal the cleared quantity of Winter-Period Capacity Performance Resources for the PJM Region;

- A demand curve consisting of the Buy Bids submitted in such auction and, if indicated for use in such auction in accordance with the provisions below, the Updated VRR Curve Increment;

- The Sell Offers submitted in such auction; and

- The Unforced Capacity previously committed for such Delivery Year.

(i)    When the requirement to seek additional resource commitments in a Scheduled Incremental Auction is triggered by Tariff, Attachment DD, section 5.4(c)(2), the Office of the Interconnection shall employ in the clearing of such auction the Updated VRR Curve Increment.

(ii)    When the requirement to seek additional resource commitments in a Scheduled Incremental Auction is triggered by Tariff, Attachment DD, section 5.4(c)(1), and the conditions stated in Tariff, Attachment DD, section 5.4(c)(2) do not apply, the Office of the Interconnection first shall determine the total quantity of (A) the amount that the Office of the Interconnection sought to procure in prior Scheduled Incremental Auctions for such Delivery Year that does not clear such auction, plus, for the Delivery Years through May 31, 2018, the Short-Term Resource Procurement Target Applicable Share for such auction,  minus (B) the amount that the Office of the Interconnection sought to sell back in prior Scheduled Incremental Auctions for such Delivery Year that does not clear such auction, plus (C) the difference between the updated PJM Region Reliability Requirement or updated LDA Reliability Requirement and, respectively, the PJM Region Reliability Requirement, or LDA Reliability Requirement, utilized in the most recent prior auction conducted for such Delivery Year plus any amount required by section 5.4(c)(2)(ii), plus (D) the reduction in Unforced Capacity commitments associated with the transition provisions of Tariff, Attachment DD, sections 5.14B, 5.14C*, 5.14E, and 5.5A(c)(i)(B)* and RAA, Schedule 6, section L.9, minus (E) the quantity of new Unforced Capacity commitments for the 2016/2017 and 2017/2018 Delivery Years associated with the transition provisions in Tariff, Attachment DD, section 5.14D where this quantity is assumed to have been procured in the form of non-Capacity Performance Resources for purposes of this paragraph E. If the result of such equation is a positive quantity, the Office of the Interconnection shall employ in the clearing of such auction a portion of the Updated VRR Curve Increment extending right from the left-most point on that curve in a megawatt amount equal to that positive quantity defined above, to seek to procure such quantity.  If the result of such equation is a negative quantity, with exception for the Third Incremental Auction for the 2017/2018 Delivery Year, the Office of the Interconnection shall employ in the clearing of the auction a portion of the Updated VRR Curve Decrement, extending and ascending to the left from the right-most point on that curve in a megawatt amount corresponding to the negative quantity defined above, to seek to sell back such quantity.  In seeking to sell back such quantity for the Third Incremental Auction for the 2017/2018 Delivery Year, the Office of the Interconnection shall employ in the clearing of the auction a curve represented by a straight line connecting two points with the first point located at 0 megawatts and at a price set to the lowest price point of the Updated VRR Curve Decrement and the second point located at a megawatt amount corresponding to the negative quantity defined above and at a price set to the Resource Clearing Price of the 2017/2018 Base Residual Auction.

(iii)    When the possible need to seek agreements to release capacity commitments in any Scheduled Incremental Auction is indicated for the PJM Region or any

LDA by Tariff, Attachment DD, section 5.4(c)(3)(i), the Office of the Interconnection first shall determine the total quantity of (A) the amount that the Office of the Interconnection sought to procure in prior Scheduled Incremental Auctions for such Delivery Year that does not clear such auction, plus, for the Delivery Years through May 31, 2018, the Short-Term Resource Procurement Target Applicable Share for such auction,  minus (B) the amount that the Office of the Interconnection sought to sell back in prior Scheduled Incremental Auctions for such Delivery Year that does not clear such auction, plus (C) the difference between the updated PJM Region Reliability Requirement or updated LDA Reliability Requirement and, respectively, the PJM Region Reliability Requirement, or LDA Reliability Requirement, utilized in the most recent prior auction conducted for such Delivery Year minus any capacity sell-back amount determined by PJM to be required for the PJM Region or such LDA by Tariff, Attachment DD, section 5.4(c)(3)(ii), plus (D) the reduction in Unforced Capacity commitments associated with the transition provisions of Tariff, Attachment DD, sections 5.14B, 5.14C, 5.14E, *and 5.5A(c)(i)(B)* and RAA, Schedule 6, section L.9, minus (E) the quantity of new Unforced Capacity commitments for the 2016/2017 and 2017/2018 Delivery Years associated with the transition provisions in Tariff, Attachment DD, section 5.14D where this quantity is assumed to have been procured in the form of non-Capacity Performance Resources for purposes of this paragraph E; provided, however, that the amount sold in total for all LDAs and the PJM Region related to a delay in a Backbone Transmission upgrade may not exceed the amounts purchased in total for all LDAs and the PJM Region related to a delay in a Backbone Transmission upgrade. If the result of such equation is a positive quantity, the Office of the Interconnection shall employ in the clearing of such auction a portion of the Updated VRR Curve Increment extending right from the left-most point on that curve in a megawatt amount equal to that positive quantity defined above, to seek to procure such quantity.  If the result of such equation is a negative quantity, with exception for the Third Incremental Auction for the 2017/2018 Delivery Year, the Office of the Interconnection shall employ in the clearing of the auction a portion of the Updated VRR Curve Decrement, extending and ascending to the left from the right-most point on that curve in a megawatt amount corresponding to the negative quantity defined above, to seek to sell back such quantity.  In seeking to sell back such quantity for the Third Incremental Auction for the 2017/2018 Delivery Year, the Office of the Interconnection shall employ in the clearing of the auction a curve represented by a straight line connecting two points with the first point located at 0 megawatts and at a price set to the lowest price point of the Updated VRR Curve Decrement and the second point located at a megawatt amount corresponding to the negative quantity defined above and at a price set to the Resource Clearing Price of the 2017/2018 Base Residual Auction.

(iv)   If none of the tests for adjustment of capacity procurement in subsections (i), (ii), or (iii) is satisfied for the PJM Region or an LDA in a Scheduled Incremental Auction, the Office of the Interconnection first shall determine the total quantity of (A) the amount that the Office of the Interconnection sought to procure in prior Scheduled Incremental Auctions for such Delivery Year that does not clear such auction, plus, for the Delivery Years through May 31, 2018, the Short-Term Resource Procurement Target Applicable Share for such auction, minus (B) the amount that the Office of the Interconnection sought to sell back in prior Scheduled Incremental Auctions for such Delivery Year that does not clear such auction.  If the result of such equation is a positive quantity, the Office of the Interconnection shall employ in the clearing of such auction a portion of the Updated VRR Curve Increment extending right from

the left-most point on that curve in a megawatt amount equal to that positive quantity defined above, to seek to procure such quantity. If the result of such equation is a negative quantity, the Office of the Interconnection shall employ in the clearing of the auction a portion of the Updated VRR Curve Decrement, extending and ascending to the left from the right-most point on that curve in a megawatt amount corresponding to the negative quantity defined above, to seek to sell back such quantity. For the Delivery Years through May 31, 2018, if more than one of the tests for adjustment of capacity procurement in subsections (i), (ii), or (iii) is satisfied for the PJM Region or an LDA in a Scheduled Incremental Auction, the Office of the Interconnection shall not seek to procure the Short-Term Resource Procurement Target Applicable Share more than once for such region or area for such auction

(v)    If PJM seeks to procure additional capacity in an Incremental Auction for the 2014-15, 2015-16 or 2016-17 Delivery Years due to a triggering of the tests in subsections (i), (ii), (iii) or (iv) then the Minimum Annual Resource Requirement for such Auction will be equal to the updated Minimum Annual Resource Requirement (based on the latest DR Reliability Targets) minus the amount of previously committed capacity from Annual Resources, and the Minimum Extended Summer Resource Requirement for such Auction will be equal to the updated Minimum Extended Summer Resource Requirement (based on the latest DR Reliability Targets) minus the amount of previously committed capacity in an Incremental Auction for the 2014-15, 2015-16 or 2016-17 Delivery Years from Annual Resources and Extended Summer Demand Resources. If PJM seeks to release prior committed capacity due to a triggering of the test in subsection (iii) then PJM may not release prior committed capacity from Annual Resources or Extended Summer Demand Resources below the updated Minimum Annual Resource Requirement and updated Minimum Extended Summer Resource Requirement, respectively.

(vi)    If the above tests are triggered for an LDA and for another LDA wholly located within the first LDA, the Office of the Interconnection may adjust the amount of any Sell Offer or Buy Bids otherwise required by subsections (i), (ii), or (iii) above in one LDA as appropriate to take into account any reliability impacts on the other LDA.

(vii)    The optimization algorithm shall calculate the overall clearing result to minimize the cost to satisfy the Unforced Capacity Obligation of the PJM Region to account for the updated PJM Peak Load Forecast and the cost of committing replacement capacity in response to the Buy Bids submitted, while satisfying or honoring such reliability requirements and constraints, in the same manner as set forth in subsection (a) above.

(viii)    Load Serving Entities may be entitled to certain credits ("Excess Commitment Credits") under certain circumstances as follows:

(A)    For either or both of the Delivery Years commencing on June 1, 2010 or June 1, 2011, if the PJM Region Reliability Requirement used for purposes of the Base Residual Auction for such Delivery Year exceeds the PJM Region Reliability Requirement that is based on the last updated load forecast prior to such Delivery Year, then such excess will be allocated to Load Serving Entities as set forth below;

(B)    For any Delivery Year beginning with the Delivery Year that commences June 1, 2012, the total amount  that the Office of the Interconnection sought to sell back pursuant to subsection (b)(iii) above in the Scheduled Incremental Auctions for such Delivery Year that does not clear such auctions, less the total amount that the Office of the Interconnection sought to procure pursuant to subsections (b)(i) and (b)(ii) above in the Scheduled Incremental Auctions for such Delivery Years that does not clear such auctions, will be allocated to Load Serving Entities as set forth below;

(C)    the amount from (A) or (B) above for the PJM Region shall be allocated among Locational Deliverability Areas pro rata based on the reduction for each such Locational Deliverability Area in the peak load forecast from the time of the Base Residual Auction to the time of the Third Incremental Auction; provided, however, that the amount allocated to a Locational Deliverability Area may not exceed the reduction in the corresponding Reliability Requirement for such Locational Deliverability Area; and provided further that any LDA with an increase in its load forecast shall not be allocated any Excess Commitment Credits;

(D)    the amount, if any, allocated to a Locational Deliverability Area shall be further allocated among Load Serving Entities in such areas that are charged a Locational Reliability Charge based on the Daily Unforced Capacity Obligation of such Load Serving Entities as of June 1 of the Delivery Year and shall be constant for the entire Delivery Year.  Excess Commitment Credits may be used as Replacement Capacity or traded bilaterally.

c)    Conditional Incremental Auction

For each Conditional Incremental Auction, the optimization algorithm shall consider:

- The quantity and location of capacity required to address the identified reliability concern that gave rise to the Conditional Incremental Auction;

- All applicable Capacity Import Limits;

- the same Capacity Emergency Transfer Limits that were modeled in the Base Residual Auction, or any updated value resulting from a Conditional Incremental Auction; and

- the Sell Offers submitted in such auction.

The Office of the Interconnection shall submit a Buy Bid based on the quantity and location of capacity required to address the identified reliability violation at a Buy Bid price equal to 1.5 times Net CONE.

The optimization algorithm shall calculate the overall clearing result to minimize the cost to address the identified reliability concern, while satisfying or honoring such reliability requirements and constraints.

        d)      Equal-priced Sell Offers

If two or more Sell Offers submitted in any auction satisfying all applicable constraints include the same offer price, and some, but not all, of the Unforced Capacity of such Sell Offers is required to clear the auction, then the auction shall be cleared in a manner that minimizes total costs, including total make-whole payments if any such offer includes a minimum block and, to the extent consistent with the foregoing, in accordance with the following additional principles:

        1)      as necessary, the optimization shall clear such offers that have a flexible megawatt quantity, and the flexible portions of such offers that include a minimum block that already has cleared, where some but not all of such equal-priced flexible quantities are required to clear the auction, pro rata based on their flexible megawatt quantities; and

        2)      when equal-priced minimum-block offers would result in equal overall costs, including make-whole payments, and only one such offer is required to clear the auction, then the offer that was submitted earliest to the Office of the Interconnection, based on its assigned timestamp, will clear.



PJM Interconnection, L.L.C.
2750 Monroe Blvd.
Audubon, PA 19403-2497

Chenchao Lu
Assistant General Counsel
T: (610) 666-2255 | F: (610) 666-8211
Chenchao.Lu@pjm.com

December 23, 2022

The Honorable Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426

Re:    *PJM Interconnection, L.L.C.*, Docket No. EL23-___-000
       Section 206 Filing Alleging that the Locational Deliverability Area Reliability
       Requirement is Unjust and Unreasonable as Applied in a Particular Locational
       Deliverability Area in the 2024/2025 Base Residual Auction And Requesting that
       the Commission Establish a Refund Effective Date of December 23, 2022, and
       Request for an Extended Comment Period of 28 Days.

Dear Secretary Bose:

Pursuant to section 206 of the Federal Power Act ("FPA"),[1] and Rule 206 of the

Federal Energy Regulatory Commission's ("FERC" or the "Commission") Rules of

Practice and Procedure,[2] PJM Interconnection, L.L.C. ("PJM") hereby demonstrates that

the Locational Deliverability Area Reliability Requirement,[3] absent the proposed changes

described herein, results in an unjust and unreasonable auction outcome.  Specifically, the

calculation of the Locational Deliverability Area Reliability Requirement, as set forth in

the Tariff and PJM Manuals, produces an unjust and unreasonable result when Planned

Generation Capacity Resources, including large thermal resources and Intermittent

Resources are modeled in a small Locational Deliverability Area ("LDA") and such

resources do not participate in the Base Residual Auction ("BRA").  This is because the

---

[1] 16 U.S.C. § 824e.

[2] 18 C.F.R. § 385.206.

[3] Terms not otherwise defined herein shall have the same meaning as set forth in the Open Access Transmission Tariff ("Tariff") and Amended and Restated Operating Agreement of PJM Interconnection, L.L.C.

Kimberly D. Bose, Secretary
December 23, 2022
Page 2

Locational Deliverability Area Reliability Requirement in an LDA is a function of both

forecasted load and expected supply resources in the LDA. Ultimately, the impact of

including Planned Generation Capacity Resources in the calculation of the Locational

Deliverability Area Reliability Requirement that then do not participate in the BRA

produces an unjust and unreasonable outcome in small LDAs. Such outcomes would be

inconsistent with the actual market fundamentals because they do not reflect the actual

supply and demand of the LDA. In short, the application of the Locational Deliverability

Area Reliability Requirement in its present form involving small LDAs results in a

mismatch with prices not reflecting the actual reliability requirements of the LDA. As the

Commission has a statutory obligation to ensure that rates are just and reasonable, the

narrow changes as proposed herein are necessary to ensure just and reasonable outcomes

that are consistent with the reliability requirements of the LDA.[4]

In conducting the 2024/2025 BRA, a significant amount of Planned Generation

Capacity Resources, including large thermal resources and planned Intermittent Resources

in the Delmarva Power & Light South ("DPL-S") LDA that were expected to participate

in the auction based on the expected in-service date in the resources' Interconnection

Service Agreements ("ISAs") did not offer in the auction despite being included in the

Locational Deliverability Area Reliability Requirement. As a result, the Locational

Deliverability Area Reliability Requirement for DPL-S was significantly overstated for the

2024/2025 BRA. More particularly, based on preliminary auction data, PJM estimates that

---

[4] As noted below, PJM is concurrently filing a section 205 application with its proposed tariff remedy to address this issue. This separate section 206 application is being made out of an abundance of caution so as to provide the Commission with the ability to make modifications to PJM's proposed tariff remedy, if it so chooses, without running afoul of the *NRG* precedent governing FPA section 205 applications *NRG Power Marketing, LLC v. FERC*, 862 F.3d 108 (D.C. Cir. 2017). Should PJM's section 205 application be granted, PJM places parties on notice that it would consider this FPA section 206 filing to be moot and withdrawn.

Kimberly D. Bose, Secretary
December 23, 2022
Page 3

as a result of this confluence of events in this small LDA, should PJM complete the auction

and award capacity commitments, the clearing price for the DPL-S LDA (and the revenues

received by Capacity Market Sellers in this small LDA) would be more than four times

what the clearing price should be if the Planned Generation Capacity Resources that did

not offer in the auction are excluded from the Locational Deliverability Area Reliability

Requirement given that they did not offer into the BRA. To put that into perspective, the

clearing price for the DLP-S LDA from the 2023/2024 BRA was $69.95/MW-day.[5]

More important and fundamental to this complaint, the potential auction outcome,

absent the proposed amendment, would not reflect the actual reliability needs of the

affected zone (in this case, DPL-S). Such an aberrant auction outcome must be avoided

for the 2024/2025 BRA to ensure that the final auction results are just and reasonable rates

and reflective of the actual reliability requirements in the affected LDA.

To address this issue, PJM proposes revisions that would adjust the Locational

Deliverability Area Reliability Requirement based on the actual supply of resources that

submitted offers into the auction to accurately reflect the actual reliability needs in the

LDA. PJM is submitting this FPA section 206 filing in advance of completing the auction

process associated with the 2024/2025 BRA and prior to making any capacity awardsThis

FPA section 206 filing also provides notice that refunds may be owed by requesting that

the Commission establish a refund effective date of December 23, 2022, the date of this

filing, pursuant to FPA section 206(b).[6]

---

[5] *PJM 2023/2024 RPM Base Residual Auction Results*, PJM Interconnection, L.L.C., 1 (June 21, 2022), https://www.pjm.com/~/media/markets-ops/rpm/rpm-auction-info/2023-2024/2023-2024-base-residual-auction-report.ashx.

[6] 16 U.S.C. § 824e(b).

Kimberly D. Bose, Secretary
December 23, 2022
Page 4

While PJM acknowledges that the offer window for the 2024/2025 BRA has closed, the auction itself has not concluded. Specifically, the Tariff explicitly details the auction process after the bidding window closes, which requires PJM "to evaluate the Sell Offers and other inputs to such auction to determine the Sell Offers that clear such auction."[7] As part of this clearing, PJM utilizes an optimization algorithm that considers various factors to "minimize the cost of satisfying the reliability requirements across the PJM Region."[8] It is not until this process has concluded and Capacity Market Sellers are awarded capacity commitments for any cleared Capacity Resources that the 2024/2025 BRA is closed.

Here, PJM is not proposing any modifications to activities or deadlines associated with the 2024/2025 BRA that have already occurred or passed. Instead, PJM proposes to prospectively include an additional factor to be considered in the optimization algorithm when evaluating the Sell Offers and other inputs for the 2024/2025 BRA *before* the results are determined and the capacity awards are made. Absent the ability to include this additional factor in the optimization algorithm, PJM would be forced to utilize a materially inaccurate Locational Deliverability Area Reliability Requirement that does not reflect the actual capacity needs of the particular LDA in question and would result in an unjust and unreasonable outcome. Such an outcome would be inconsistent with the Commission's statutory duty to ensure just and reasonable rates by precluding this additional factor (i.e., excluding resources that do not participate in the auction from the Locational Deliverability Area Reliability Requirement) from being considered *before* the auction closes and capacity commitments are made based on unjust and unreasonable results.

---

[7] Tariff, Attachment DD, section 5.12.

[8] Tariff, Attachment DD, section 5.12(a).

Kimberly D. Bose, Secretary
December 23, 2022
Page 5

When the Commission finds that existing Tariff terms are unjust, unreasonable, or unduly discriminatory under FPA section 206, it must establish the just and reasonable terms needed to replace the terms and conditions it found unlawful.[9]  PJM's proposal to remedy this issue is to provide PJM the ability to consider an updated Locational Deliverability Area Reliability Requirement in the optimization algorithm.  This updated Locational Deliverability Area Reliability Requirement would exclude Planned Generation Capacity Resources that do not participate in the BRA where the reliability requirement of such area materially increases (by more than one percent) from the prior year due to the addition of such resources.

This update to the Tariff is necessary because, as further explained below, the Locational Deliverability Area Reliability Requirement can be significantly increased by the inclusion of large Planned Generation Capacity Resources and planned Intermittent Resources in the planning models due to the corresponding need to address potential forced outages of large Planned Generation Capacity Resources or the seasonal variation of Intermittent Resources.  However, if such large Planned Generation Capacity Resources and planned Intermittent Resources are not offered into the BRA, the Locational Deliverability Area Reliability Requirement should be revised to reflect the actual reliability needs of the LDA for the relevant Delivery Year so that both supply and demand are accurately reflected in the optimization algorithm.

PJM is authorized to represent that the Independent Market Monitor for PJM is supportive of this filing.  Given the upcoming holidays, PJM requests that the Commission

---

[9] 16 U.S.C. § 824e.

Kimberly D. Bose, Secretary
December 23, 2022
Page 6

establish a 28-day comment period to provide additional time for comments.[10]   In any

event, given that PJM's separate FPA section 205 filing contains identical proposed

amendments as detailed herein, PJM requests that comment period be aligned with the

comment period set in the separate but related FPA section 205 filing made on this same

date.  Additionally, given that the proposed amendment in PJM's separate FPA section 205

filing would sufficiently address the issue identified herein, PJM requests that the

Commission not act on this FPA section 206 filing if it becomes moot because the relief

requested is granted through action on the FPA section 205 filing.  This section 206 filing

simply gives the Commission the ability to direct a different Tariff solution should the

Commission choose to do so while not running afoul of the precedent governing section

205 applications.[11]

## I.      BACKGROUND

One of PJM's primary responsibilities as a regional transmission organization is to

ensure that there is a sufficient amount of electrical capacity within its system to provide

reliable electricity to its consumers during periods of peak demand.  PJM accomplishes

this objective through its capacity market by conducting auctions, referred to as the

Reliability Pricing Model ("RPM") Auctions,[12] in which electricity suppliers submit offers

---

[10] Although PJM seeks market certainty and therefore is submitting this filing at this time, the actual 2024/2025 Delivery Year does not start until June 1, 2024 and the next BRA is scheduled to commence on June 14, 2022. As a result, PJM believes that Commission action on the section 205 filing and this Complaint within the traditional 60 day period would still reasonably provide a degree of market certainty. Notwithstanding, PJM reiterates that prompt action, is appropriate.

[11] *See NRG Power Marketing, LLC v. FERC*, 862 F.3d 108 (D.C. Cir. 2017).

[12] RPM Auctions include a BRA, and typically three Incremental Auctions, associated with each Delivery Year.

Kimberly D. Bose, Secretary
December 23, 2022
Page 33

this BRA is subject to change based on a revised Locational Deliverability Area Reliability

Requirement.

## VII.   CORRESPONDENCE

The following individuals are designated for inclusion on the official service list

in this proceeding and for receipt of any communications regarding this filing:

| | |
|---|---|
| Craig Glazer | Chenchao Lu |
| Vice President–Federal Government Policy | Assistant General Counsel |
| PJM Interconnection, L.L.C. | PJM Interconnection, L.L.C. |
| 1200 G Street, N.W., Suite 600 | 2750 Monroe Blvd. |
| Washington, D.C. 20005 | Audubon, PA 19403 |
| (202) 423-4743 (phone) | (610) 666-2255 (phone) |
| *craig.glazer@pjm.com* | (610) 666-8211 (fax) |
| | *Chenchao.Lu@pjm.com* |

## VIII.   DOCUMENTS ENCLOSED

This filing consists of the following:

1.      This transmittal letter; and

2.      Revisions to the Tariff (in redlined and clean format (as Attachments A
        and B, respectively).

## IX.   COMPLIANCE WITH RULE 206

In compliance with Rule 206 of the Commission's Rules of Practice and

Procedure,[46] PJM provides the following additional information:

**A.      *Identification and Explanation of the Action/Inaction Violating
          Applicable Statutory and Regulatory Requirements (Rules 206(b)(1) and
          (b)(2))***

This issue is addressed in Parts I, II, and III above.

---

[46] 18 C.F.R. § 385.206.

Kimberly D. Bose, Secretary
December 23, 2022
Page 34

### B.    Financial Impacts (Rules 206(b)(3) and (b)(4))

As discussed above, the BRA result for a particular LDA is not just and reasonable given the artificially inflated Locational Deliverability Area Reliability Requirement. The effect of the auction results would require the load in the particular LDA at issue to be responsible for paying over one hundred million dollars in excess of what is necessary for capacity associated with the 2024/2025 Delivery Year.

### C.    Operational or Non-Financial Impacts (Rule 206(b)(5))

PJM's filing is limited to the financial impact with the BRA clearing price for the LDA at issue so there is no impact to the actual operations of the electric grid. There are no other non-financial impacts associated with the Tariff and provisions at issue in this filing.

### D.    Related Proceedings (Rule 206(b)(6))

The issues presented in this filing are not pending in any existing Commission proceeding or a proceeding in any other forum.

### E.    Relief Requested (Rule 206(b)(7))

PJM's requested relief is discussed in Parts II and III above.

### F.    Supporting Documents (Rule 206(b)(8))

This filing fully supports the requested relief.

### G.    Informal Dispute Resolution Procedures Used and Alternative Dispute Resolution (Rule 206(b)(9))

This requirement is not applicable to this filing.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | | |
|---|---|---|---|
| PJM Interconnection, L.L.C. | ) | Docket Nos. | ER23-729-000 |
| | ) | | EL23-19-000 |
| | ) | | (Not Consolidated) |

**PROTEST OF PINE GATE RENEWABLES, LLC**

Pursuant to Rule 211 of the Federal Energy Regulatory Commission's ("FERC" or "Commission") Rules of Practice and Procedure,[1] Pine Gate Renewables, LLC ("Pine Gate"), on behalf of its subsidiary company, Pine Gate Mid-Atlantic, LLC, hereby submits this protest in the above-captioned proceedings.[2] Pine Gate also supports the protest submitted in these proceedings by the American Clean Power Association, Solar Energy Industries Association, and Advanced Energy United (collectively, the "Clean Energy Associations").[3] As discussed below, the Commission should: (1) reject PJM Interconnection, L.L.C.'s ("PJM") proposed amendment to the Locational Deliverability Area Reliability Requirement ("LDA Reliability Requirement") filed pursuant to section 205 of the Federal Power Act ("FPA")[4] (the "Section 205 Filing")[5] and (2) not grant PJM's requested relief in the complaint filed pursuant to FPA section 206[6] that seeks to apply

---

[1]      18 C.F.R. § 385.211.

[2]      Pine Gate previously filed a timely doc-less Motion to Intervene in this proceeding. *See* Doc-Less Motion to Intervene of Pine Gate Renewables, LLC, Docket Nos. ER23-729-000, EL23-19-000 (Jan. 17, 2023).

[3]      Protest of the American Clean Power Association, Solar Energy Industries Association, and Advanced Energy United, Docket Nos. ER23-729-000, EL23-19-000 (Jan. 20, 2023) ("Clean Energy Associations Protest").

[4]      16 U.S.C. § 824d.

[5]      Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for an Extended Comment Period of 28 Days of PJM Interconnection, L.L.C., Docket No. ER23-729-000 (Dec. 23, 2022).

[6]      16 U.S.C. § 824e.

the proposed amendment to the LDA Reliability Requirement to a particular Locational Deliverability Area ("LDA") in the 2024/2025 Base Residual Auction ("BRA") ("Section 206 Filing").[7]  Pine Gate takes no position as to the price of capacity in the Delmarva Power & Light South ("DPL-S") LDA, but rather submits this Protest to bring to the Commission's attention the legal infirmities of the Section 205 and 206 Filing and underscore how PJM's actions, if accepted by the Commission, would undermine investor confidence in the PJM capacity market.

## I.    BACKGROUND

### A.    The Section 205 Filing and Section 206 Filing

The Section 205 and 206 Filings set forth the basic mechanics of the PJM capacity market and PJM's role in administering Reliability Pricing Model ("RPM") auctions.[8]  In the Section 205 Filing, PJM seeks to revise the definition of LDA Reliability Requirement in the PJM Open Access Transmission Tariff ("Tariff").[9]  Significantly, the proposed revisions "would allow PJM, during the auction process, to exclude Planned Generation Capacity Resources from the calculation of the LDA Reliability Requirement if the addition of such resources materially increases the reliability requirement and such resources do not participate in the [RPM] auction."[10]

In the Section 206 Filing, PJM first alleges that the LDA Reliability Requirement, absent the proposed changes, results in an unjust and unreasonable outcome for the 2024/2025 BRA in the DPL-S LDA.[11]  PJM then proposes revisions that "would adjust the LDA Reliability

---

[7]    Section 206 Filing Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area in the 2024/2025 Base Residual Auction And Requesting that the Commission Establish a Refund Effective Date of December 23, 2022, and Request for an Extended Comment Period of 28 Days, Docket No. EL23-19-000 (Dec. 23, 2022).

[8]    Section 205 Filing at 6-8; Section 206 Filing at 6-9.

[9]    Section 205 Filing at 18-20.

[10]    *Id.* at 1.

[11]    Section 206 Filing at 4-5.

Requirement based on the actual supply of resources that submitted offers into the auction to accurately reflect the actual reliability needs in the LDA."[12]  PJM requests a refund effective date of December 23, 2022.[13]

## B. Pine Gate

Pine Gate originates, develops, finances, and operates utility-scale solar and energy storage projects that generate clean, renewable power. Pine Gate works with energy buyers, corporations, utilities, local communities, and capital partners to develop and operate solar and energy storage projects across the country, with an emphasis on projects in the PJM region.  Pine Gate is currently developing approximately 4,000 megawatts ("MW") of solar and energy storage projects in the PJM region.

Relevant here, Pine Gate is developing two battery storage projects in DPL-S that will connect directly to the PJM transmission system: Purple Cat Storage located in Kent County, Delaware and Blue Hen Storage located in Sussex County, Delaware (collectively, the "Delmarva Storage Projects.")  Each project will supply DPL-S with 50 MW of dispatchable capacity at a 4-hour duration. The Delmarva Storage Projects are both in early development stages and do not yet have interconnection service agreements ("ISA") in place.  Pine Gate therefore did not bid either of the Delmarva Storage Projects into the 2024/2025 BRA and the Projects were not modeled in the LDA Reliability Requirement at issue in this proceeding. Given the chronic delays in PJM's generator interconnection queue processing, it is highly unlikely that the Delmarva Storage Projects would be available for the 2024/2025 Delivery Year.

---

[12]    *Id.* at 3.

[13]    *Id.*

Like many energy storage projects currently being developed in PJM, the Delmarva Storage Projects face a number of challenges in DPL-S unrelated to the instant filings. The principal challenge is PJM's generator interconnection process. Pine Gate currently expects that the Delmarva Storage Projects will be included in Transition Cycle #1, as described in PJM's recent interconnection reform proposal.[14] This means that the Projects would not be available to participate in the PJM capacity market until the 2027/2028 Delivery Year even though Pine Gate submitted these projects into the PJM generator interconnection queue in 2020. Furthermore, Pine Gate expects that the Delmarva Storage Projects will face tens of millions of dollars in transmission upgrade costs due largely to the flawed manner in which PJM, like other RTOs and transmission providers, studies the interconnection of electric storage resources.[15] Put simply, the delays in the PJM generator interconnection queue and the high cost of interconnection make completing and financing new capacity in DPL-S difficult already. As discussed further below, PJM's filings, if accepted, would further hamper development of much-needed capacity resources in DPL-S and undermine investor confidence in wholesale markets generally.

## II.    PROTEST

### A.  The Section 205 and 206 Filings Violate the Filed Rate Doctrine and Rule Against Retroactive Ratemaking.

The filed rate doctrine prohibits a regulated utility—including regional transmission organizations ("RTO") such as PJM—from charging rates for its services that are different from

---

[14]    Tariff Revisions for Interconnection Process Reform, Request for Commission Action by October 3, 2022, and Request for 30-Day Comments Period of PJM Interconnection, L.L.C., Docket No. ER22-2110-000, 37-39 (June 14, 2022).

[15]    *See* Comments of Pine Gate Renewables, LLC, Docket No. RM22-14-000, 51-55 (Oct. 13, 2022) (explaining that the Commission should require the use of operating assumptions for interconnection studies that reflect the proposed operation of the resource); Limited Comments of Pine Gate Renewables, LLC, Docket No. AD20-9-000, 5 (Sept. 21, 2021).

the rates that are properly filed with the Commission.[16]  The principle underlying the filed rate doctrine is that market participants should be able to review the rates on file with the Commission and feel secure that the utility (i.e., PJM) cannot charge a different rate.  The corollary rule against retroactive ratemaking "prohibits the Commission from adjusting current rates to make up for a utility's over or under-collection in prior periods."[17]  The filed rate doctrine and rule against retroactive ratemaking function in tandem to promote rate predictability.[18]

The Section 205 and 206 Filings constitute a rather straightforward attempt to violate both the filed rate doctrine and rule against retroactive ratemaking.  Fundamentally, with the Section 205 and 206 Filings, PJM seeks to apply a revised definition of LDA Reliability Requirement that was simply not part of the PJM Tariff at the time of the 2024/2025 BRA.  The PJM Tariff represents the filed rate here and PJM is compelled to apply the terms of that Tariff that were properly on file with the Commission in administering the 2024/2025 BRA.  PJM's attempts to apply the revised definition of LDA Reliability Requirement retroactively would conflict with clear court mandates regarding the prospective application of new and revised Tariff terms.[19]

Though courts have recognized two circumstances in which a rate adjustment may take effect *prior* to a section 205 filing, neither of those is present here.  In particular, courts have explained that the rule against retroactive ratemaking does not apply: (1) when parties are aware that a rate is tentative and may be later adjusted with retroactive effect; or (2) when they have

---

[16]     *See, e.g., Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1991) (explaining that the filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority."); *Town of Norwood v. FERC*, 217 F.3d 24, 28 (1st Cir. 2000) (stating that the filed rate doctrine has evolved over time but is based on the notion that "utility filings with the regulatory agency prevail over unfiled contracts or other claims seeking different rates or terms than those reflected in the filings with the agency."), *cert. denied*, 532 U.S. 993 (2001).

[17]     *Keogh v. Chicago Northwestern Rwy. Co.*, 260 U.S. 156 (1922).

[18]     *Towns of Concord*, *Norwood, & Wellesley , Mass. v. FERC*, 955 F.2d 67, 71 n.2  (D.C. Cir. 1992).

[19]     *See, e.g., Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 793 (D.C. Cir. 1990).

agreed to make a rate effective retroactively.[20]  Significantly, PJM Market Participants have had no notice that the 2024/2025 BRA would be subject to the market rules that PJM now seeks to hastily implement in the Section 205 Filing.  These market participants made business decisions to participate in the 2024/2025 BRA and post the requisite collateral based on the existing PJM Tariff that is on file with the Commission.

PJM attempts to downplay the importance of notice to market participants of the filed rate by noting that it sometimes makes adjustments to the LDA Reliability Requirements after the bidding window closes but before results are posted for Price Responsive Demand.[21]  However, the fact that the Tariff permits adjustments for Price Responsive Demand does not give PJM license—or Market Participants adequate notice—that PJM can make other changes to the LDA Reliability Requirement after bidding has closed in order to achieve a more desirable auction result. Pine Gate notes that the permissible changes for Price Responsive Demand are generally known in advance, limited in scope, and made based on objective criteria. They are not made with the express purpose of lowering the clearing price or to effectuate a more desirable auction outcome, as is the case here.

Furthermore, PJM fails to distinguish the instant filings from Commission and judicial precedent applying the filed rate doctrine and rule against retroactive ratemaking. PJM's argument relies entirely on the absence of a date certain that has passed.  According to PJM, the date certain has not passed because the Tariff requires additional process between the closing of the bidding

---

[20]    *Cf., Exxon Co. U.S.A. v. FERC*, 182 F.3d 30, 49 (D. C. Cir. 1999) (noting that "the rule against retroactive ratemaking does not extend to cases in which [customers] are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service") (internal quotation marks omitted); *Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 744 (D.C. Cir. 1992) (finding FERC's decision to make the rate change effective prior to the effective date proper because the parties had contracted to make the rate retroactive and a waiver was not against the public interest).

[21]    Section 205 Filing at 23.

window and the posting of auction results "before the full effectuation of the filed-rate via validation and finalization of the results and the awarding of . . . capacity commitments."[22]  PJM's argument is specious because PJM itself has delayed the finalization of auction results by choosing to withhold the results until the Commission has acted on the instant filings. Moreover, PJM misunderstands the purpose of the date certain in the precedent upon which it relies.  As Commissioner Danly makes clear, the purpose of the date certain in applying the filed rate doctrine is to put parties on notice *before* the potential violation of the Tariff occurs.[23] Here, PJM has already violated its Tariff by failing to post results as soon as possible as the Tariff requires. The relevant date certain in this case is not the posting of the results but rather the closing of the bidding window because that is the point in time at which Market Participants were entitled to notice of prospective changes to the Tariff.

### B. The PJM Tariff Does Not Provide PJM with Authority to Make the Section 205 and Section 206 Filings.

The Section 205 and 206 Filings cannot be saved by PJM's overly-broad interpretation of the Tariff.  Both the Section 205 and Section 206 Filings go to great lengths to attempt to demonstrate how—despite the requirements of the file rate doctrine—it is permissible for PJM to retroactively apply the revised definition of LDA Reliability Requirement to the 2024/2025 BRA. For the reasons below and set forth in the Clean Energy Associations Protest, this is not the case.[24]

First, the Tariff does not permit PJM to use the interim period between when the auction closes and when results are posted as an opportunity to propose new changes to how PJM calculates LDA Reliability Requirements.  As Clean Energy Associations argue, PJM has delayed

---

[22]    *Id.* at 26 (citing *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (D.C. Cir. 2021) and *EDF Renewables, Inc.* 181 FERC ¶ 61,189, Commissioner Danly Dissent (2022) ("*EDF Renewables*").

[23]    *EDF Renewables,* Commissioner Danly Dissent at P 6.

[24]    Clean Energy Associations Protest at 5-10.

posting the auction results in an attempt to create this window of opportunity and cast the Tariff revisions in the Section 205 Filing as a prospective change in order to circumvent the rule against retroactive ratemaking.[25] The Tariff clearly states that PJM must post the auction results as soon as possible. No reasonable interpretation of the Tariff would allow PJM to claim that it is *impossible* simply because PJM wishes to propose a change and claim that it is prospective.

Furthermore, while PJM is correct that the Tariff allows it to propose changes to BRA results to correct errors,[26] the 2024/2025 BRA results were not erroneous. PJM followed its Tariff and manuals and, as Clean Energy Associations make clear, was aware or should have been aware that many resources with signed ISAs do not offer in the BRA for a variety of legitimate reasons.[27] While it is likely true that the LDA Reliability Requirement for DPL-South was higher than what is needed for reliability and capacity prices for DPL-South were higher than they would have been if PJM calculated the LDA Reliability Requirement differently, this does not mean that the 2024/2025 BRA results were erroneous. Thus, the Tariff provision allowing PJM to correct errors does not apply.

Pine Gate does not dispute PJM's contention that the resources that would have been affected by a change in the LDA Reliability Requirement in DPL-S did not offer into the 2024/2025 BRA and therefore did not rely on this planning parameter or capacity award in this instance.[28] However, PJM is incorrect in concluding that this means no violation of the filed rate doctrine has occurred. Furthermore, the Commission should nonetheless reject PJM's Filing

---

[25]    *Id.* at 7-8.

[26]    Section 205 Filing at 30.

[27]    Clean Energy Associates Protest at 12-16.

[28]    Section 205 Filing at 25.

because of the precedent it would set and impact it would have on investor confidence, as discussed below.

Finally, PJM claims that section 9.2(b) of the Tariff provides notice to customers that PJM may make emergency changes where there is imminent severe economic harm to electric consumers.[29] As stated above and by the Clean Energy Associations, Pine Gate does not dispute that the high clearing price in DPL-S is regrettable and may be more than is needed to maintain reliability in DPL-S. However, PJM is incorrect that the Commission's previous application of this provision to shortage pricing events in PJM is applicable here.[30] Capacity markets are different from energy markets; capacity auctions occur months or years in advance of the Delivery Year. PJM holds Incremental Auctions that are designed to address precisely this type of discrepancy in auction results and, at the very least, call into question whether the harm to consumers would be imminent or severe by the time the of the 2024/2025 Delivery Year. Moreover, as Clean Energy Associations have demonstrated, PJM should have known in advance that this outcome was possible under its current Tariff. If PJM were truly concerned with imminent severe economic harm, it could have pursued a remedy many months prior to the auction. If the issue only became apparent closer to the auction date, as PJM contends and Clean Energy Associations disputes, then PJM could have asked for a prospective waiver of the Tariff requirement to post auction results as soon as possible and asked the Commission to open an FPA section 206 investigation into the modeling assumptions used to set the LDA Reliability Requirement. Pine Gate urges the Commission to balance the need for integrity in capacity market auctions in the long-term with the short-term need to avoid severe economic harm for DPL-S in this instance.

---

[29]     *Id.* at 28.

[30]     *Id.* at 29.

**C. The Section 205 and 206 Filings Risk Further Eroding Investor Confidence in the PJM Capacity Market.**

The Section 205 and 206 Filings represent yet another blow to investor confidence in the PJM capacity market. The various Commission proceedings addressing the Minimum Offer Price Rule ("MOPR") and the Market Seller Offer Cap ("MSOC") have already done much to rattle investor confidence in future capacity market revenues.[31] While Pine Gate understands and appreciates that the PJM capacity market, like all regulatory constructs, will always be a work in progress, it must be underscored that regulatory certainty is critical to driving investment in PJM and fostering the development needed capacity.

Yet, ff accepted, the Section 205 and 206 Filings would serve to stifle the development of much-needed capacity in DPL-S. As Clean Energy Associations have pointed out, the capacity shortfall in DPL-S is not merely a modeling error.[32] PJM recently retained Indian River Unit 4, a coal facility located in DPL-S, in part to address generation deliverability issues that would have caused reliability violations.[33] Pine Gate is developing the Delmarva Storage Projects to provide dispatchable capacity to DPL-S. But these projects, which already face significant interconnection and financial barriers, would be materially harmed if investors lose confidence in projected capacity market revenues and the integrity of PJM's capacity market more generally.

Moreover, an order accepting the Section 205 or 206 Filings would set a dangerous precedent that an RTO can set aside auction results whenever it determines that the results were undesirable and without providing adequate notice to Market Participants. Pine Gate urges the

---

[31]    *See, e.g., Calpine Corp. v. PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,239 (2019) (implementing expanded MOPR); *Independent Market Monitor for PJM v. PJM Interconnection, L.L.C.*, 174 FERC ¶ 61,212 (2021) (requiring changes to the MSOC methodology).

[32]    Clean Energy Associations Protest at 15-16.

[33]    *NRG Power Marketing LLC*, 179 FERC ¶ 61,156, P 42 (2022); Reliability Must-Run Rate Schedule of NRG Power Marketing, LLC, Docket No. ER22-1539-000, Attachment A (Apr. 1, 2022) (setting forth the generation deliverability violations that prevent the deactivation of Indian River Unit 4).

Commission to consider the repercussions of such precedent beyond the specific impacts on the 2024/2025 BRA results for DPL-S.  In order to secure financing to build new capacity, like the Delmarva Storage Projects, investors must forecast projected revenue streams many years into the future. In PJM, capacity market revenues are an essential component of the financial analysis that underpins investment in a given project. The more stable and predictable capacity prices are, the less these revenues are discounted by investors. Additional uncertainty regarding future capacity prices makes individual projects more expensive to build and operate by adding to the cost of capital. By accepting the Section 205 or 206 Filing, the Commission risks undermining investor confidence in the PJM capacity market, driving up the cost of capital to develop new capacity in the PJM region, and ultimately producing rates that are not just and reasonable.

## III.    CONCLUSION

For the reasons set forth above, Pine Gate requests that the Commission: (1) reject PJM's proposed amendment to the LDA Reliability Requirement in the Section 205 Filing; and (2) not provide PJM's requested relief in the FPA Section 206 Filing, which would apply the proposed amendment to the LDA Reliability Requirement to a particular LDA in the 2024/2025 BRA.

Respectfully Submitted,

 */s/ Brett White*
Brett White
Vice President, Regulatory Affairs
Pine Gate Renewables
130 Roberts Street
Asheville, NC 28801
(919) 880-4879
bwhite@pgrenewables.com

 */s/ Frank Swigonski*
Frank Swigonski
Director, ISO/RTO Affairs
Pine Gate Renewables
130 Roberts Street
Asheville, NC 28801
(623) 202-3748
frankswigonski@pgrenewables.com

## CERTIFICATEOF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Washington, D.C., this 20th day of January 2023.

*/s/ Brett White*
Brett White
Vice President, Regulatory Affairs
130 Roberts Street
Asheville, NC 28801
(919) 880-4879
bwhite@pgrenewables.com

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **PJM Interconnection, L.L.C.** | ) | **Docket Nos. ER23-729-000** |
| | ) | **EL23-19-000** |
| | ) | **NOT CONSOLIDATED** |

**COMMENTS OF**
**OLD DOMINION ELECTRIC COOPERATIVE**
**IN SUPPORT OF**
**FILING BY PJM INTERCONNECTION, LLC**

Pursuant to the Combined Notice of Filings #1 issued by the Federal Energy Regulatory Commission ("Commission") on December 27, 2022, Old Dominion Electric Cooperative ("ODEC") respectfully submits these comments in support of PJM Interconnection, L.L.C.'s ("PJM") filings submitted on December 23, 2022 in the above-captioned proceedings.  In its December 23 filings, PJM has proposed prospective revisions to its Open Access Transmission Tariff ("Tariff") in order to address and prevent "imminent severe economic harm to electric consumers"[1] that would otherwise result from the Locational Deliverability Area Reliability Requirement for one particular Locational Deliverability Area ("LDA"), Delmarva Power & Light South ("DPL-S").  The filings demonstrate that the existing Locational Deliverability Area Reliability Requirement definition will lead to unjust and unreasonable clearing prices that do not reflect the actual reliability needs for the DPL-S LDA from the 2024/2025 Base Residual Auction ("BRA") in Reliability Pricing Model ("RPM").  PJM estimates that absent corrective action, clearing prices in the DPL-S LDA could be **more than four times** what the clearing prices should be to achieve the designed reliability level.[2]

---

[1] PJM Tariff Section 9.2(b).
[2] PJM December 23 filings at 2.

the FPA section 205 filing with regard to establishing that the existing Locational Deliverability Area Reliability Requirement definition is unjust and unreasonable as supplied to small LDAs like DPL-S with large Planned Generation Capacity Resources that do not offer into the BRA. However, the FPA section 206 filing provides the Commission with flexibility to make modifications to PJM's proposed remedy without violating the limitations on the Commission's discretion and authority to modify FPA section 205 filings.[19]

## II.    COMMENTS IN SUPPORT OF PJM'S FILINGS

For the reasons discussed below, ODEC urges the Commission to accept PJM's proposed Tariff revisions effective December 24, 2022.

### A.    The Commission Must Remedy the Impending Unjust and Unreasonable Clearing Prices for the 2024/2025 BRA

PJM's December 23 filings demonstrate that unless the PJM Tariff is modified to correct the Locational Deliverability Area Reliability Requirement definition and allow PJM's optimization algorithm to consider reality regarding resources that offer into the RPM Auctions as capacity, clearing prices in the DPL-S LDA will be artificially increased. This is a result of the requirement to include in the Locational Deliverability Area Reliability Requirement, Planned Generation Capacity Resources that did not participate in the 2024/2025 BRA.[20]    PJM has also demonstrated that there is no benefit to justify these increased prices, such as increased reliability, because the increase in clearing prices is based on the *expectation* of Planned Generation Capacity Resources participating in the 2024/2025 BRA, as opposed to the *actual* Planned Generation

---

[19] *See* PJM's filing in Docket No. EL23-19 at 2, note 4, citing *NRG Power Marketing, LLC v FERC*, 862 F.3d 108 (D.C. Cir. 2017).

[20] ODEC recognizes that PJM's FPA section 205 filing need only demonstrate that PJM's proposed changes are just and reasonable, not that the existing Tariff provisions are unjust and unreasonable.  However, ODEC believes the Commission should take note of the significant unjust and unreasonable clearing prices that will be imposed in the DPL-S LDA absent Commission action.

Capacity Resources that participated in the 2024/2025.  The fact that prices are being increased and LSEs (and, thereby, consumers) will pay for an inappropriately calculated Reliability Requirement is in and of itself sufficient basis for the Commission to take action to prevent the imposition of unjust and unreasonable capacity prices for the DPL-S LDA.  When there are no discernable benefits from increased prices, the rates cannot possibly satisfy the requirement that customers receive benefits that are at least roughly commensurate with costs.[21]  The imposition of increased clearing prices that are artificially inflated as much as **four times** the amount that would be expected if the Locational Deliverability Area Reliability Requirement excluded non-participating Planned Generation Capacity Resources is particularly unjust and unreasonable.

ODEC is a not-for-profit power supply electric cooperative that supplies capacity and energy to its eleven electric distribution cooperative members, all of which are located within the PJM control area.  ODEC and its members serve load in the DPL-S LDA, and ODEC has a capacity obligation associated with this load.  Therefore, ODEC is among the LSEs that would pay the artificially high, unreasonable clearing prices.  As a cooperative utility, ODEC's members would have to bear these increased capacity prices without receiving any benefit in return.  Such an outcome is unjust and unreasonable but can be prevented with the relief sought by PJM in its December 23 filings.

In addition to the immediate problem of unjust and unreasonable rates, the Commission should be concerned that unless the Locational Deliverability Area Reliability Requirement is corrected, the market signal that results from the VRR Curve will be distorted.  As PJM explains, the Locational Deliverability Area Reliability Requirement with large Planned Generation Capacity Resources and Intermittent Resources that did not materialize in the 2024/2025 BRA

---

[21] *See Illinois Commerce Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009).

signals "the need for additional capacity to account for potential forced outages associated with an outsized resource for a small LDA."[22]  The Commission should take corrective action to prevent distorted price signals that will incorrectly indicate a need for capacity based on an inappropriately calculated reliability requirement.[23]

### B.  PJM's Proposed Remedy is Just and Reasonable

PJM's proposed remedy of a revised Tariff definition for Locational Deliverability Area Reliability Requirement and improved optimization algorithm that considers the actual participation of Planned Generation Capacity Resources in the relevant RPM Auction is narrowly tailored to address the problem described above and detailed in PJM's filing.  PJM's proposed remedy is also applicable beyond the immediate BRA, so it should provide PJM and market participants with certainty and protection against unrealistic Locational Deliverability Area Reliability Requirements in future RPM Auctions.

ODEC believes that PJM's proposed remedy is just, reasonable, and not unduly discriminatory or preferential. Therefore, PJM's FPA section 205 filing should be accepted by the Commission, as filed.  However, in the event the Commission determines that PJM's proposed remedy is not just and reasonable, then ODEC urges the Commission to exercise its authority under FPA section 206 to (1) determine that the existing Tariff is unjust and unreasonable in its provisions for the Locational Deliverability Area Reliability Requirement; and (2) establish a just and reasonable replacement capacity rate that can be implemented with a refund effective date of December 23, 2022, so that PJM can apply the remedy to the 2024/2025 BRA results.

---

[22] PJM December 23 filings at 20.
[23] *See id.* at 8, note 13 ("an inaccurate Locational Deliverability Area Reliability Requirement does not represent the actual reliability needs of the LDA and would result in incorrect price signals potentially up to the cap if the quantity is sufficiently large.")

ODEC understands that some entities might seek modifications to PJM's proposal. For example, some might argue that Capacity Market Sellers should be permitted to resubmit their Sell Offers. ODEC does not at this time take a position on whether resubmission of Sell Offers should be permitted. However, ODEC urges the Commission not to allow such arguments or modifications to delay action to provide a remedy to the unjust and unreasonable clearing prices that will result in the DPL-S LDA as a result of the current Locational Deliverability Area Reliability Requirement. PJM's proposed remedy should be accepted as just and reasonable, and arguments for a remedy that some might argue is better than PJM's proposal are not a basis for the Commission to reject PJM's filings.[24]

## C. PJM's Filings are Timely and Should be Approved Effective December 23, 2022 or December 24, 2022.

PJM submits that although it has already begun the BRA for the 2024/2025 Delivery Year, it has not yet completed the auction process. Therefore, if the Commission accepts PJM's proposed modification, PJM could apply the new rule in the current auction process before posting final auction results for the 2024/2025 BRA.[25] PJM requests an effective date of December 24, 2022 for the FPA section 205 filing, or a refund effective date of December 23, 2022 for its FPA section 206 filing. PJM seeks a waiver of the 60-day prior notice provisions to the extent necessary to permit its FPA section 205 filing to become effective December 24, 2022, one day after PJM submitted its filing to the Commission.

ODEC agrees with PJM that the circumstances presented in its December 23 filings provide good cause to grant a waiver of the prior notice requirement. ODEC does not take lightly PJM's

---

[24] *See, e.g., PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,114 at P 30 (2019)(" . . . we find PJM's proposal, which PJM filed pursuant to FPA section 205, to be just and reasonable; we need not find that it is the most just and reasonable, nor do we need to offer alternative proposals.") (citations omitted).
[25] PJM December 23 filings at 22-23.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, LLC. | ) | Docket Nos. EL 23-19-000, |
| | ) | ER 23-729-000 |

**MOTIONS TO INTERVENE AND INITIAL COMMENTS**
**OF THE MARYLAND OFFICE OF PEOPLE'S COUNSEL**

Pursuant to Rules 211 and 214 of the Rules of Practice of the Federal Energy

Regulatory Commission ("FERC" or the "Commission"), 18 C.F.R. §§385.211, 385.214,

the Maryland Office of People's Counsel ("OPC") hereby submits its motions to

intervene in the above-captioned proceedings, initiated by the filings of PJM

Interconnection, LLC ("PJM"), dated December 23, 2022 (sometimes referred to herein,

collectively, as the "PJM Filings") and noticed as received for filing by the Commission

in its notice dated December 27, 2022. OPC also hereby submits its initial comments on

the PJM Filings.


**I.    Motions to Intervene.**

OPC is an agency of the State of Maryland established under Maryland law. Md.

Code, Public Utilities Art., §§2-201 *et seq.*  By statute, OPC is authorized and charged,

among other matters, to represent and "protect the interests of" Maryland's residential

and non-commercial customers of electric service before state and federal regulatory

agencies, including the Commission. *Id.*, § 205(b). Maryland is within the footprint of the

wholesale electric markets administered by PJM and Maryland's consumers are supplied

1

with electricity from those markets. The PJM Filings and the outcome of these proceedings will affect the price and other elements of the supply of electricity, particularly for the Delmarva Peninsula, including Maryland's eastern shore. Accordingly, OPC has a direct interest affected by the PJM Filings and these proceedings and, for that reason, moves to intervene in both proceedings.

## II.    Communications and Service.

All communications, pleadings and orders with respect to this proceeding should be sent to the following individuals at the indicated address:

William Fields, Deputy People's Counsel
Philip Sussler, Assistant People's Counsel

David S. Lapp, People's Counsel
Maryland Office of People's Counsel
6 St. Paul Street, Suite 2102
Baltimore, MD 21202
(410) 767-8150

William.fields@maryland.gov
Philip.sussler@maryland.gov

2

### III.    Initial Comments on the PJM Filings.

The PJM Filings address and seek to remedy an extraordinary and anomalous event affecting the Base Residual Auction ("BRA) for the 2024/25 Delivery Year of PJM's Reliability Pricing Model ("RPM") capacity market, which caused the auction's preliminary results to depart very significantly from supply and demand fundamentals in PJM's capacity market. This circumstance narrowly affects the Delmarva Power and Light South load deliverability area ("DPL South LDA").  Commission approval of PJM's proposed remedy is necessary to avoid or, at least mitigate, a major increase in power costs to the electric consumers located in this LDA, which would otherwise occur absent the relief requested in the PJM Filings.[1]

To initiate these proceedings, PJM made two filings with the Commission, each dated December 23, 2022: the first, under section 205 of the Federal Power Act ("FPA") (the "205 Filing"); and the second, a separate complaint under FPA, section 206 (the "206 Filing"). In the 205 Filing, PJM proposes to revise prospectively the definition of the Locational Deliverability Area Reliability Requirement (the "LDARR") contained in the PJM Open Access Transmission Tariff ("Tariff"). The effect of the proposed revision

---

[1] PJM notes that, the BRA clearing price for the DPL South LDA "would be more than four times what it otherwise should be if the Locational Deliverability Area Reliability Requirement is updated to accurately reflect only those resources that actually participated in the BRA." 205 Filing, pp. 9, 17.  OPC's rough calculation of the cost impact of this change, absent PJM's proposed remedy, is an incremental average increase of the electric bill of approximately $24/MWh for the 24/25 Delivery Year, or $24/month, for the average customer consuming 1,000 kilowatt-hours in a month and resident in the DPL South LDA (including Maryland's eastern shore area). This increase (to occur for the period June 1, 2024 to May 31, 2025 (the 24/25 BRA Delivery Year)) is about 25% of PJM's reported average all-in wholesale power cost reported for 2022.

would be to exclude "Planned Generation Capacity Resources" ("PGCRs") from the calculation of the LDARR when these resources do not participate in the PJM's Reliability Pricing Model ("RPM") Auctions and that non-participation would have a material effect on the outcomes of the RPM auctions.[2]  In the 205 Filing, PJM seeks Commission approval of the tariff change effective to the date of the conduct of the 24/25 BRA in December, 2022, allowing PJM to adjust the results for the DPL South LDA of the BRA for the 2024/25 Delivery Year, because PJM has not yet finalized the auction results pursuant to the procedures governing the BRA.

In the 206 Filing, PJM requests, in the alternative, that the Commission find that: (i)  the outcome of the 24/25 BRA affecting the DPL South LDA, assuming the adjustment sought in the 205 Filing is not approved by the Commission,  is unjust and unreasonable under the FPA; (ii) the clearing price for the 24/25 BRA, affecting DPL South LDA, be modified by order of the Commission pursuant to the Commission's authority under FPA, Section 206; and (iii) PJM's proposed ability to adjust the RPM capacity auctions in similar circumstances, described also in the 205 Filing, be approved prospectively.

The triggering event for the PJM Filings was the failure of a material amount of generating resources under development in the DPL South LDA to participate in the 24/25 BRA for the RPM Delivery Period 2024/25. This failure led to establishing a

---

[2] PJM proposes that the measure of "material effect" occurs when PGCRs "[do] not participate in the auction in LDAs where the reliability requirement materially increases by more than one percent compared with values used in the relevant RPM Auctions from the prior Delivery Year due to the addition of such [PGCRs]." PJM 205 Filing, p. 10.

4

fictional level for the supply/demand parameter for the DPL South LDA, the DPL South LDA Reliability Requirement ("LDARR"), in the conduct of the 24/25 BRA for that LDA which was well in excess of the resources actually needed to meet the LDA's resource adequacy requirements. This, in turn, resulted in an excessive auction clearing price applicable to the LDA. That excessive auction clearing price—which bears no relation to actual supply and demand fundamentals— will apply if not remedied as requested by PJM.[3]

This anomalous result flowed from the special conditions of the DPL South LDA in the context of the run-up to the 2024/25 BRA and the technical workings of PJM's modeling for the framework of the auction. Those special conditions include a relatively small load zone and the relatively large amounts of capacity of individual PGCRs under development in the zone. PJM modelled those conditions to establish the framework for the auction, but the PGCRs ultimately did not participate in the auction. The non-participation of PGCRs in the auction meant that the actual LDARR (reflective of actual supply-demand conditions) for the DPL South LDA was significantly lower than the LDARR resulting from PJM's modeling and used to define the auction parameters.  This occurred because of the outsized inflating effect on the LDARR from the non-participating resources, magnified by their size relative to the LDA's load, their

---

[3] 205 Filing, p. 9 ("In this case, as a result of a confluence of events (the application of the Locational Deliverability Area Reliability Requirement increasing the reliability requirement based on the expected participation of Planned Generation Capacity in a small LDA that then did not actually offer into the auction) the prices [of the 24/25 BRA applicable to the DPL South LDA] become no longer linked to the actual reliability requirements of the LDA and the reliability needs of the LDA are not properly reflected in the [24/25 BRA] auction results.").

intermittency, and the winter-peaking nature of the LDA load. This mismatch does not reflect the actual supply-demand balance (plus appropriate levels of reserves) which the RPM and PJM modeling of the auction is intended to achieve.[4]

In these extraordinary circumstances, PJM's proposed remedy is appropriate (whether adopted by the Commission under either FPA, section 205 or 206)—namely, to exclude the non-participating PGCRs from the determination of the auction outcome, in order to restore the supply-demand fundamentals which the auction is intended to achieve.

OPC is mindful that "after-the-fact" changes in PJM's rules for procurement, if it is argued that the PJM Filings' remedy for the 24/25 BRA effects such a change, are not preferred. However, as documented in the PJM filings, there are special and extraordinary circumstances affecting the DPL South LDA in the 24/25 BRA that require this outcome. These circumstances include the distortions created by the interaction of the small size of the DPL LDA, the disparate LDARR modeling impacts due to the non-participating PGCRs, the resulting complete disjunction of clearing price and actual supply-demand fundamentals if PJM's remedy is rejected, and the very adverse rate consequences for consumers in the DPL LDA if not addressed as proposed by PJM in the PJM Filings.

While entailing ostensibly different issues, there is also a pending filing with the Commission wherein NRG Power Marketing LLC ("NRG") seeks a reliability must-run

---

[4] *See, e.g.*, 205 Filing, pp. 17-18.

("RMR") arrangement for the Indian River Unit 4 generating unit, also located in the

DPL South LDA. FERC Docket No. ER22-1539. In that proceeding, NRG seeks an

annual fixed cost revenue requirement under the RMR of over $69 million. Over the 4

years and 7 months of the proposed term of the RMR (extending through the 24/25 BRA

Delivery Year), the total fixed costs sought by NRG will be $320 million, plus $31

million in going forward capital additions. The costs of the Indian River Unit 4 RMR, if

approved by the Commission, will be allocated to load in the DPL LDA, including the

DPL South LDA. These RMR costs, also directed at securing grid reliability, are

recovered for a generator resource which does not participate in the RPM, raising

concerns about double payment by load under the RPM and RMR contracts for the same

(or overlapping) capacity-type services. In its pleadings filed in ER22-1539, OPC has

objected to numerous elements of NRG's requested RMR revenue requirements. Their

final determination by the Commission is pending, but the excessive rate requested by

NRG is currently in effect, subject to refund.[5]

Each development—the 24/25 BRA outcome affecting the DPL South LDA and the

NRG Indian River Unit 4 RMR revenue requirement affecting the DPL LDA—without

an appropriate remedy is adverse to electric consumers and contrary to the FPA

requirement for just and reasonable rates. The remedy for the 24/25 BRA is as urged by

PJM in the PJM Filings and supported by OPC in this filing, and the remedy for the NRG

---

[55] NRG Power Marketing LLC, 179 FERC ¶ 61,156 (May 31, 2022) (Order Accepting and Suspending Reliability Must-Run Agreement and Establishing Hearing and Settlement Judge Procedures).

RMR is as urged by OPC in its pleadings in ER22-1539. The combined effects of the two developments magnify the very adverse rate consequences—all targeted at electric consumers in a relatively small load zone—if not remedied. The Commission's decisions in both proceedings, if they are to be consistent with the public interest, should be informed by this larger context. OPC respectfully submits that the Commission should approve the remedy urged by PJM in the PJM Filings in these proceedings.

8

## CONCLUSION.

In the extraordinary circumstances addressed in these proceedings and for the foregoing reasons, OPC supports PJM's proposed remedies, as reflected in the PJM Filings.

Respectfully submitted,

DAVID S. LAPP
People's Counsel


/s/ Philip L. Sussler
William F. Fields
Deputy People's Counsel
Philip L. Sussler
Assistant People's Counsel
Maryland Office of People's Counsel
6 Saint Paul Street, Suite 2102
Baltimore, MD 21202
(410) 767-8150
Philip.sussler@maryland.gov


Dated: January 20, 2023

9

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served in accordance with 18

C.F.R. § 385.2010 upon each person designated on the official service list compiled by

the Secretary for this proceeding, by email.

/s/ Philip L. Sussler
Philip L. Sussler
Assistant People's Counsel
Maryland Office of People's Counsel
6 Saint Paul Street, Suite 2102
Baltimore, MD 21202
(410) 767-8150
Philip.sussler@maryland.gov

**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | |
| | ) | ER23-729-000 |
| | ) | EL23-19-000 |

**COMMENTS OF THE PENNSYLVANIA PUBLIC UTILITY COMMISSION TO PJM'S 2024/2025 BASE RESIDUAL AUCTION MODIFICATION FILINGS**

    The Pennsylvania Public Utility Commission (PAPUC) files these Comments in response to the December 23, 2022, filings of PJM Interconnection, L.L.C., under sections 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d, 824e.  While the PAPUC has joined the comments of the Organization of PJM States, Inc., the PAPUC writes separately to highlight the high burden which changes to PJM's auction rules should face if made while bids are outstanding.

**I.    BACKGROUND**

    The Base Residual Auction (BRA) for the 2024/2025 delivery year commenced on December 7, 2022, and the auction window closed on December 13, 2022.  The BRA combined with incremental auctions which follow are the mechanism by which PJM secures capacity for a forward delivery year.  For this auction, PJM had indicated it would post results on December 20, 2022, however, due to the reasons set forth in PJM's filing, PJM did not post the results on that date.

    On December 21, 2022, PJM held a meeting with stakeholders where it first explained the problem with the 2024/2025 BRA.  In part due to the short lead time

between auctions which are normally a year apart and procure capacity three years in advance, the 2024/2025 BRA only procured capacity 18 months in advance, for the delivery year which begins in June 2024.  Planned generation which has a signed Interconnection Service Agreement (ISA) would thus normally have three years to enter service.  With that much shorter runway, planned generation might be less willing to take on a capacity commitment if they are unsure their resource would be prepared to serve load in the relevant delivery year.  Along with other potential causes, PJM's modelling assumption that all resources with a signed ISA would offer into the BRA broke down.

Because of this, the Reliability Requirement calculated by PJM's models took into account generation risks which would exist if the planned generation entered the capacity market, and the Reliability Requirement for the DPL-South Locational Deliverability Area increased by 12%.  Yet, because that planned generation did not offer into the capacity market, that increased Reliability Requirement was based on faulty modelling assumptions, and prices would increase significantly for the DPL-South Locational Deliverability Area.

Also during the December 21 PJM briefing, stakeholders noted concern with the solution PJM now offers to FERC.  Among other things, stakeholders were concerned that bids relied on the assumptions that PJM now seeks to change, and consequently PJM should not change its BRA rules while bids are outstanding.

## II.    PJM'S PROPOSED SOLUTION IS APPROPRIATE

While the timing of PJM's filing making changes to PJM's auction structure while bids are outstanding creates a highly concerning precedent, notwithstanding that fact, the PAPUC believes PJM's solution is appropriate.

FERC should generally avoid changing auction rules while bids are outstanding. One circumstance where FERC should consider allowing such a change is where both of the following elements are met:

(1) the tariff change is shown to be appropriate and uncontroversial if the rule were solely to be applied to future auctions, and

(2) the costs to customers if the change were not to occur provide no benefit to those customers.

Based on PJM's explanations the PAPUC believes these elements are met.  The load in DPL-South did not increase for the 2024/2025 delivery year.  The increase in Capacity Emergency Transfer Objective, and thus the Reliability Requirement, was driven by the inclusion of Planned Generation Capacity Resources alone.  The demand side of the capacity market increased because of the risk of planned large generation or planned intermittent generation not providing capacity.  With the inclusion of those planned resources, the Capacity Emergency Transfer Objective increases to provide what is, in effect, outside insurance against that risk.  When those resources did not ultimately offer into the market, the increased demand became solely an artifact of the market.  Thus, the increased price does not provide benefit to the load in the DPL-South Locational Deliverability Area, where load did not change and is not experiencing

increased reliability risks compared to the 2023/2024 BRA absent the inclusion of the planned generation. PJM's solution is targeted and removes the illusory assumption in its model that planned generation would enter. This creates a more accurate Reliability Requirement.

## III.    CONCLUSION

For these reasons, the PAPUC requests that its Comments be considered by FERC in this proceeding. FERC should approve PJM's requested changes based on the record created in this proceeding while recognizing the high burden that should be required if tariff changes are to be made which affect auction rules after bids have been entered.

Respectfully submitted,

/s/ Christian A. McDewell
Christian A. McDewell
Assistant Counsel
Pennsylvania Public Utility Commission
P.O. Box 3265
Harrisburg, PA  17105-3265
Tel:  717-787-5000
cmcdewell@pa.gov
*Counsel for the Pennsylvania*
*Public Utility Commission*

Dated:  January 20, 2023

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am on this date serving a copy of the foregoing

document upon each person designated on the official service list compiled by the

Federal Energy Regulatory Commission in accordance with the requirements of Rule

2010 of the Commission's Rules of Practice and Procedure.

Respectfully submitted,

/s/ Christian A. McDewell
Christian A. McDewell
Assistant Counsel
*Counsel for the Pennsylvania*
*Public Utility Commission*

P.O. Box 3265
Harrisburg, PA  17105-3265
Tel:  (717) 787-5000

Dated:  January 20, 2023

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | **Docket Nos. ER23-729-000** |
| | ) | **EL23-19-000** |
| | ) | |
| | ) | **(Not Consolidated)** |

## PROTEST OF THE PJM POWER PROVIDERS GROUP

Pursuant to Rule 211 of the Federal Energy Regulatory Commission's ("Commission" or "FERC") Rules of Practice and Procedure,[1] and the Commission's December 27, 2022 Combined Notice of Filings #1, The PJM Power Providers Group ("P3")[2] submits this Protest, along with supporting affidavits from former FERC Chairman Joseph T. Kelliher ("Kelliher Affidavit") (Attachment A) and Dr. Roy J. Shanker ("Shanker Affidavit") (Attachment B). This Protest addresses the December 23, 2022 filings in the above-captioned dockets by PJM Interconnection, L.L.C. ("PJM").

### SUMMARY

PJM's proposals in these proceedings invite the Commission to look past PJM's violation of its own Tariff, ignore nearly a century's worth of precedent on the filed rate doctrine, jettison the Commission's commitment to market integrity, and adopt a proposed Tariff change for which PJM has carried none of its statutory responsibilities and which will not even address the issue that gave rise to these proceedings. In short, PJM has hit a Grand Slam of bad ideas.

---

[1] 18 C.F.R. § 385.211 (2022).

[2] P3 is a non-profit organization dedicated to advancing federal, state and regional policies that promote properly designed and well-functioning electricity markets in the PJM Interconnection, L.L.C. ("PJM") region. Combined, P3 members own over 67,000 MWs of generation assets and produce enough power to supply over 50 million homes in the PJM region covering 13 states and the District of Columbia. For more information on P3, visit www.p3powergroup.com. The comments contained herein represent the position of P3 as an organization, but not necessarily the views of any member with respect to any issue.

PJM's filings mischaracterize and omit numerous material facts regarding the Tariff, the steps PJM took in applying it for the December 2022 Base Residual Auction ("BRA"), and the extent to which PJM had—or at least should have had—advance notice that the clearing price for the Delmarva Power & Light – South ("DPL-South" or "DPL-S") Locational Deliverability Area ("LDA") would rise to the level produced by the December 2022 BRA.  Ultimately, those mistakes have caused PJM to miss the mark both on diagnosing the issue it is concerned about and in crafting its proposed solution.  The real issue underlying this proceeding is that PJM's method of determining the LDA Reliability Requirements—*i.e.,* its method of forecasting the generation resources that will be available in an LDA and will participate in a particular BRA— is rendered inaccurate by Tariff provisions exempting Planned Generation Capacity Resources and certain existing resources from the Reliability Pricing Model ("RPM") must-offer requirement.

Despite PJM's misdirection, one thing is as clear as day:  according to the Tariff, the only step of the BRA that PJM has not yet completed is posting the final results that it calculated pursuant to the Tariff.  Aside from that ministerial step, PJM has applied the existing Tariff rules for the December 2022 BRA in their entirety, and PJM has possessed—but refused to post—the final results of that Tariff-dictated process since December 19, 2022.

PJM's refusal to do so violates the Tariff requirement that, after conducting the BRA, PJM must post the results "as soon thereafter as possible."[3]

Further, PJM's proposal to apply its proposed solution to the December 2022 BRA after completing all but one step in the Tariff's rules applicable to that auction represents a blatant violation of the filed rate doctrine and the rule against retroactive ratemaking.  Under long-

---

[3] Tariff, Attach. DD § 5.11(e).

standing judicial precedent, the filed rate doctrine and rule against retroactive ratemaking apply with equal force to the non-rate terms of the Tariff and the rates resulting from application of the Tariff—both of which PJM's proposal would retroactively alter. PJM's arguments to the contrary are unavailing. As explained by the Chairman Kelliher, a FERC order accepting PJM's proposal for the December 2022 BRA would create terrible precedent, undermine the Commission's commitment to competitive markets, and have ripple effects well beyond PJM.

PJM has also failed to carry its statutory burdens under the Federal Power Act ("FPA") and the Administrative Procedure Act ("APA"). Specifically, PJM has not demonstrated that its proposed solution is just and reasonable, whether adopted as a rate change under FPA section 205 or as a replacement rate under FPA section 206. In fact, as explained by Dr. Shanker, PJM's proposed solution will not even address the issue that gave rise to PJM's filings. Neither has PJM carried its burden to demonstrate, under FPA section 206, that the existing Tariff is unjust and unreasonable. PJM's half-hearted attempt to challenge the existing Tariff fails for several reasons, including that PJM has presented no solid evidence regarding the financial impact—in the December 2022 BRA or future BRAs—of applying the current Tariff under the specific circumstances PJM alleges to be problematic. Further, in presenting its proposed changes under FPA section 205 and FPA section 206, PJM has utterly failed to satisfy its burden to present evidence sufficient to support its proposal, as required by the APA, and thus has failed to give the Commission the evidence necessary to lawfully accept PJM's proposal.

Finally, as Dr. Shanker explains, there is a much simpler and more effective solution to the issue that gave rise to PJM's filings. If PJM wishes to improve the accuracy of the LDA Reliability Requirements that it uses as auction parameters, PJM could impose a deadline, in advance of the BRA, by which any resource that is exempt from the RPM must-offer obligation

would be required to exercise that option and notify PJM of its decision. PJM could incorporate that information into its LDA Reliability Requirement calculations, thus eliminating the forecast risk that animated these proceedings, while permitting resources that are exempt from the RPM must-offer obligation to retain their option not to participate in the BRA.

For all of these reasons, the Commission should reject PJM's section 205 and section 206 filings and permit PJM to fully and thoughtfully consider these issues with stakeholders through the normal stakeholder process.

## I.    BACKGROUND

PJM's forward capacity market, the RPM, consists of a highly structured process set forth in detail by the Tariff. In the normal course, PJM conducts an annual BRA to obtain commitments to supply capacity during a Delivery Year three years in the future, with follow-on Incremental Auctions in between the BRA and the Delivery Year.[4] The price signals produced by the RPM auctions are intended, in part, to attract investment in the new and existing generation resources that are needed to support electric reliability in the PJM region.[5]

The product procured through those auctions is the Capacity Performance product, which adjusts each capacity resource's capacity revenue based on its performance during emergency conditions.[6] Most, but not all, generation resources are required to offer into all RPM auctions, unless they qualify for an exception.[7] That requirement is commonly referred to as the RPM

---

[4] Tariff, Attach. DD § 5.4.

[5] *See, e.g.*, *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,157, at P 112 (2016); *see also* Shanker Affidavit at 36 ("PJM adopted this design with an eye to creating a 'correct' representation of the future and presumably a balancing of the risks described above and the related constructive price signals to market participants.").

[6] Tariff, Attach. DD § 5.5A (capacity resource types).

[7] *Id.* § 6.6A(a).

"must-offer obligation."[8]  However, the Tariff exempts the following types of resources from the

RPM must-offer obligation: Planned Generation Capacity Resources, Intermittent Resources,

Capacity Storage Resources, Demand Resources, Energy Efficiency Resources, and Hybrid

Resources consisting exclusively of components that in isolation would be Intermittent

Resources or Capacity Storage Resources.[9]

The Tariff sets forth the mechanics of the auction process in detailed terms.  Among other

things, PJM is required to (1) develop the parameters that will be used in each BRA, (2) publish

information about those parameters, (3) obtain and review Sell Offers from Market Sellers based

on those auction parameters, and (4) compute the auction clearing prices based on those

parameters and conduct a market power review of the results.[10]  The clearing prices are

calculated by an optimization algorithm, the rules of which are set forth in the Tariff.[11]  PJM's

rights and obligations concerning its review of those clearing prices are explicitly spelled out in

the Tariff.[12]  PJM has extremely limited ability to adjust those results.  The Tariff expressly

describes the narrow circumstances under which PJM can use the optimization algorithm to

recompute the clearing prices and the equally narrow circumstances under which the results

produced by the auction may be considered non-final.[13]  The Tariff also sets forth a precise

---

[8] Shanker Affidavit at 16-17, 36; *see also* Tariff, Attach. DD § 6.6A(a) (referring to the "must-offer requirement").

[9] Tariff, Attach. DD § 6.6A(c).

[10] *Id.* §§ 5.11. 5.12, and 6.2.

[11] *Id.* §§ 5.12 and. 5.14.

[12] *See, e.g., id.* § 6.2 (permitting PJM to recompute the optimization algorithm to clear the auction with Market Seller Offer Caps in place); *id*. at § 15(allowing PJM to review each LDA that has a Locational Price Adder).

[13] *Id.* § 6.2.

timeline for the auction process, and requires that, after an auction is conducted, PJM must post the results "as soon thereafter as possible."[14]

Due to a series of major market overhauls driven, in part, by the Commission and, in part, by PJM's acquiescence to political winds of change, the three-year forward auction schedule has been thrown out of the window in recent years.[15]  PJM obtained Commission approval to conduct the BRAs for the 2023/2024, 2024/2025, 2025/2026 and 2026/2027 Delivery Years between 2022 and 2023.[16]  The BRA for the 2024/2025 Delivery Year was scheduled to commence on December 7, 2022.

One of the parameters of the December 2022 BRA, and all BRAs, is the LDA Reliability Requirement.[17]  The LDA Reliability Requirement represents the amount of local generation and imports needed to serve that LDA's load, and it is based on PJM's calculation of the Capacity Export Transfer Objective ("CETO") for that particular LDA.[18]  Since the dawn of PJM's days as a Regional Transmission Operator ("RTO"), PJM has used the same model to develop its CETO calculations—*i.e.,* the Probabilistic Reliability Index Study Model ("PRISM").[19]  Each LDA Reliability Requirement is based on PJM's calculation of the CETO for that particular LDA.[20]  PJM's CETO calculations require it to make forecasts regarding the generation resources that PJM expects to exist in an LDA within the planning horizon at issue.[21]  Those

---

[14] Tariff, Attach. DD § 5.11(e).

[15] *See PJM Interconnection, LLC*, 178 FERC ¶ 61,122 at P 13 (2022).

[16] *Id.* at PP 7, 13.

[17] *See* Tariff, Attach. DD §§ 5.11(a), (a)(v); Shanker Affidavit at 13.

[18] Shanker Affidavit at 10-13.

[19] *Id.* at 10.

[20] *Id.* at 10-14.

[21] *Id.* at 14 ("[I]n calculating the CETO for an LDA, PJM includes Planned Resources that it forecasts to be available inside of the LDA for the BRA Delivery Year as part of the in-LDA Capacity Resources.").

forecasts necessarily require PJM to make various assumptions regarding those generation resources, including whether each of them will offer into the RPM.[22]

Those assumptions involve tradeoffs from a system planning perspective.  How conservative or not those assumptions will determine how the load in each LDA will be served.  If PJM assumes a relatively low amount of generation will exist in the LDA, more transmission capacity will be needed to serve the load via imports from outside the LDA.  Conversely, if PJM assumes a relatively high amount of generation will exist in the LDA, a higher percentage of the load will be served by local generation resources and less transmission capacity will be needed for imports.  In turn, those assumptions will impact the price signal the RPM will send concerning the need for generation resources within the LDA.

In developing the parameters specifically for the December 2022 BRA, PJM conducted and published multiple analyses, including a sensitivity study in July 2022 ("July 2022 Sensitivity Study").[23]  The July 2022 Sensitivity Study showed that, if 260 MW of generation resources that were expected to participate in the BRA did not end up participating, the clearing price for the DPL-South LDA would reach the cap of $431.26 per MW-day.[24]  PJM did not adjust its assumptions regarding the DPL-South LDA based on the July 2022 Sensitivity Study.[25]

---

[22] Shanker Affidavit at 14-17.

[23] *Id.* at 22; *see also* PJM, 2023/2024 Auction Information, BRA Scenario Analysis, *available at* https://pjm.com/markets-and-operations/rpm (Excel spread sheet labeled "2023-2024-bra-scenario-analysis.xlsx" created July 1, 2022 by Josh Bruno)).  The URL link provided here is to the location on the PJM website at which the July 2022 Sensitivity Study was stored during the preparation of this Protest and the Shanker Affidavit.  In preparing the Shanker Affidavit and this Protest, Dr. Shanker and P3 accessed that document through the PJM website on multiple occasions.  However, it appears that on or about January 20, 2023—*i.e.*, the comment deadline for these proceedings—PJM removed the July 2022 Sensitivity Study from its website.  Accordingly, P3 has included, as Attachment C to this Protest, the version of the July 2022 Sensitivity Study that Dr. Shanker and P3 downloaded from the PJM website.  *See* Attachment C.

[24] Shanker Affidavit at 22-23.

[25] *See generally* PJM 205 Filing.

On December 7, 2022, PJM opened the December 2022 BRA.[26]  Pursuant to the Tariff,

Sell Offers and PRD offers were due on December 13.[27]  On December 21, 2022, PJM

announced that, due to "a narrow set of circumstances" impacting the DPL-South LDA, PJM

would withhold the final results of the auction and make an "emergency Section 205 filing" and

"also likely submit a companion Section 206 filing."[28]  PJM later indicated that it would

"release[]" auction outcomes that it described as "indicative" and "preliminary."[29]  However,

based on stakeholder feedback, PJM later announced that it would not "post indicative results."[30]

On December 23, PJM submitted the two filings at issue in these proceedings, one pursuant to

FPA section 205 and one pursuant to FPA section 206.[31]

---

[26] PJM Interconnection, L.L.C., Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for Extended Comment Period of 28 Days, Dkt. No. ER23-729-000, at 8 (filed Dec. 23, 2022) ("PJM 205 Filing").

[27] *Id.*

[28] https://insidelines.pjm.com/pjm-updates-members-on-2024-2025-capacity-auction-results; Shanker Affidavit at 9.

[29] https://insidelines.pjm.com/pjm-updates-members-on-2024-2025-capacity-auction-results.

[30] https://insidelines.pjm.com/pjm-updates-members-on-2024-2025-capacity-auction-results.  P3 was among the stakeholders that requested that PJM not post "indicative results," because the Tariff does not allow for the calculation of "indicative results" or the posting thereof.  P3's position has consistently been that, in accordance with the Tariff, PJM should have posted the final results on December 20, 2022, as planned and consistent with PJM's historic practice of posting results within two weeks of the opening of the BRA.  *See* https://insidelines.pjm.com/pjm-capacity-auction-for-2024-2025-delivery-year-opens/ (announcing that the December 2022 BRA "bidding window will close on Dec. 13, and results will be reported on Dec. 20").

[31] *See* PJM 205 Filing; PJM Interconnection, L.L.C., Section 206 Filing Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area in the 2024/2025 Base Residual Auction And Requesting that the Commission Establish a Refund Effective Date of December 23, 2022, and Request for an Extended Comment Period of 28 Days, Dkt. No. EL23-19-000 (filed Dec. 23, 2022) ("PJM Complaint").

II.    **PROTEST**

   A.  **PJM Has Violated its Tariff by Refusing to Close the December 2022 Auction and Post the Final Clearing Prices Produced by the Existing Rules**

The BRA auction is a precisely structured process, with each of the required steps expressly prescribed by the Tariff.  For other steps, the Tariff provides PJM discretion to make judgement calls within the bounds of the Tariff.  For some steps, PJM has no discretion.  Here, PJM has deviated from the Tariff-defined auction process, abused its discretion, and exceeded its authority under the Tariff.

Prior to each BRA, PJM is required to establish and post the auction parameters that will be used in the BRA.[32]  Among other things, PJM must post the LDA Reliability Requirement "for each [LDA] for which a separate Variable Resource Requirement Curve has been established for such [BRA], including . . . the CETO and CETL values for all Locational Deliverability Areas."[33]  To administer the auction, PJM must then receive Buy Bids and Sell Offers based on the auction parameters, and "[d]etermin[e] the clearing price that reflects all such inputs."[34]  The process for determining the clearing price is straightforward: PJM uses a computer to run an "optimization algorithm" using the Tariff prescribed inputs,[35] and that algorithm follows specific computational steps to calculate the Preliminary Zonal Capacity Prices, Adjusted Zonal Capacity Prices, and Final Zonal Capacity Prices.[36]  The outputs of that optimization algorithm are the clearing prices.[37]  With those results in hand, PJM must then

---

[32] *See* Tariff, Attach. DD § 5.11.

[33] *Id.* § 5.11(a)(v).

[34] *Id.* § 3.2(h).

[35] *See id.* § 5.12.

[36] *See id.* § 5.14(f).

[37] *See id.* § 5.14.

9

**JA399**

conduct a market power review and, if required, "recompute [the] algorithm with [market seller offer caps] in place."[38]

"***After conducting***" the auction by following those steps, PJM is required to "post the results of [the] auction ***as soon thereafter as possible***[.]"[39]

Thus while posting auction results is both the logical and required last step in the auction process, it is also clear that the posting is, as Chairman Kelliher explains, a "ministerial step" that is done after the actual auction has been conducted.[40]  PJM cannot use the ministerial act of posting a Tariff-mandated result to bootstrap an exit ramp by which PJM can modify parameters that were posted, and relied upon, *before* the auction was conducted as a means of modifying potentially unpalatable results that emerge *after* the auction has been conducted consistent with the existing Tariff.

Running the optimization algorithm and conducting the required market power review pursuant to the existing Tariff provisions are each steps in conducting an auction.  As the Tariff clearly prescribes, *after conducting the auction*, PJM must post the results "as soon … as possible."  With respect to the December 2022 BRA, it was possible for PJM to post the results on December 20th as was originally planned[41] and it is abundantly clear that the results were known to PJM at the time.[42]   However, PJM did not like the results and therefore unilaterally decided not to post them.  PJM's failure to post the auction results constitutes a clear violation of its Tariff.

---

[38] Tariff, Attach. DD § 6.2.

[39] *See id.* § 5.11(e) (emphasis added)

[40] Kelliher Affidavit at 14.

[41] *See* https://insidelines.pjm.com/pjm-capacity-auction-for-2024-2025-delivery-year-opens/ (announcing that the December 2022 BRA "bidding window will close on Dec. 13, and results will be reported on Dec. 20").

[42] *See* https://insidelines.pjm.com/pjm-updates-members-on-2024-2025-capacity-auction-results.

To be sure, the Tariff does provide that clearing prices could be subject to further revision after PJM completes the above steps, but only in two specific circumstances, neither of which apply in this instance.

First, PJM must file with FERC—within seven days of the deadline for sellers to submit Sell Offers in the BRA—a report of any determinations made under Tariff Sections 5.14(h) (concerning the Minimum Offer Price Rule), 6.5(a)(ii) (concerning mitigation of Planned Generation Capacity Resources), and 6.7(c) (concerning unit-specific Avoidable Cost Rates).[43] If PJM makes such a FERC filing and no entity objects or if, in the event that an objection is filed, FERC does not issue an order within sixty days modifying PJM's decision, PJM's determination "shall be final."[44]  However, if an entity does object to the PJM determination at issue and FERC issues a decision within sixty days modifying PJM's determination, then the "[f]inal auction results shall reflect any decision made by FERC regarding the report."[45] Although that provision appears to permit clearing prices to be changed after PJM has followed the Tariff-mandated BRA process, that provision is irrelevant to this case because PJM has not claimed that the BRA clearing prices are non-final by operation of Section 6.2.[46]

Second, Section 5.11(e) of the Tariff provides that—"[i]f PJM discovers a potential *error* in the *initial posting of auction results*"—PJM can follow a particular process to "post modified results" and "corrected auction results."[47]  That process includes specific deadlines that PJM

---

[43] *See* Tariff, Attach. DD § 6.2(c).

[44] *Id.*

[45] *Id.*

[46] *See* Kelliher Affidavit at 11-14; Shanker Affidavit 3-4 (discussing overall conclusions requiring the publishing of the BRA results).

[47] *See* Tariff, Attach. DD § 5.11(e).

must meet when notifying Market Participants of the error and determining whether to post modified auction results and, ultimately, corrected modified auction results.

That particular portion of Section 5.11(e) does not apply to this case because PJM has not identified a legitimate "error" in the clearing prices. An "error" means a "mistake."[48] In the context of applying the Tariff, that means a mistake in applying the terms and conditions of the Tariff. But PJM has admitted to no mistake in its application of the Tariff.[49] PJM asserts that it properly conducted the BRA according to the existing Tariff rules. The alleged problem PJM has identified is that, due to the existing Tariff rules permitting Planned Generation Capacity Resources and Intermittent Resources to decline to participate in a BRA without providing PJM advance notice, the long-standing method for determining the LDA Reliability Requirement will produce higher prices in an LDA if Planned Generation Capacity Resources and Intermittent Resources exercise their right not to submit Sell Offers in the BRA.[50]

PJM does not assert that it made a mistake in applying either of those rules—*i.e.* the calculation of the LDA Reliability Requirement or the RPM must-offer exemption for Planned Generation Capacity Resources and Intermittent Resources. PJM simply does not like the numerical result that properly applying those rules produced for the DPL-South LDA in the December 2022 BRA. But whether or not PJM likes the numerical result is irrelevant under the Tariff. The Tariff does not permit PJM to conceal the auction clearing prices from Market Participants when the Tariff is faithfully and accurately applied and produces a legitimate clearing price. To the extent PJM believes that the existing rules might produce an unjust and unreasonable result under certain factual circumstances even though the Tariff is properly

---

[48] Error Definition, *Black's Law Dictionary* (11th ed. 2019).

[49] *See* PJM 205 Filing at 8; Kelliher Affidavit at 3.

[50] *See* PJM 205 Filing at 8-10; Shanker Affidavit at 32-33.

applied, P3 asserts that such a scenario would represent an opportunity for prospective improvement, similar to numerous other instances in which PJM and its stakeholders, after reviewing the auction results, have decided to alter some element of the capacity market rules to enhance the capacity market's effectiveness. But an opportunity for improvement that manifests through proper administration of the Tariff rules is not an "error" under Section 5.11(e).

Further, even assuming *arguendo* that PJM had properly identified an "error" in the clearing prices, the presence of such an error does not relieve PJM of the obligation to post the auction results as soon as possible after the BRA. Although Section 5.11(e) provides that "the deadlines set forth" in that section "shall not apply if the referenced auction results are under publicly noticed review by the FERC,"[51] that language has no bearing on PJM's obligation to post the initial auction results. Pursuant to the first sentence of the first paragraph in Section 5.11(e), the auction results must be filed "as soon . . . as possible" after conducting the BRA. "As soon . . . as possible" is not a "deadline;" it is a legal standard. The only "deadlines" in Section 5.11(e) appear in the first, second, and fourth sentences of the second paragraph of that section—which require PJM to act by 5:00 p.m. of the fifth, seventh, and tenth Business Days "following the initial publication of the results of the auction." Thus, even if PJM identifies an "error" in the clearing prices and the auction results are under publicly noticed FERC review, those conditions would only suspend the specific 5:00 p.m. deadlines listed in the Section 5.11(e).[52] PJM would still be required to post the results as soon as possible after conducting the BRA.

---

[51] *See* Tariff, Attach. DD § 5.11(e).

[52] In any event, PJM has not been relieved of any these 5:00 p.m. deadlines in connection with the December 2022 BRA, because the Commission has issued no public notice stating that it is reviewing the auction results pursuant to Section 5.11(e).

Furthermore, these two very limited exceptions do not permit PJM to post "indicative" auctions results rather than final auction results. Nowhere does the Tariff contemplate the posting of "indicative" auction results; rather such an action would be contrary to the competitive framework of BRA. It would not only be a clear violation of the Tariff, but would also sow confusion and chaos among Market Participants, regulators, and consumers alike.

With regard to the December 2022 BRA, based on PJM's own public statements, PJM had the results of the optimization algorithm by December 19, 2022, and possible even earlier. Nearly a month has passed since that date, and PJM still has not posted the results. PJM has therefore violated its obligation to post the results as soon as possible after conducting the BRA. Upon rejecting PJM's Section 205 and Section 206 filings, for the reasons discussed below, the Commission should direct PJM to immediately post the final and binding results of the December 2022 BRA even though this posting will be well past what can be considered a reasonable interpretation of the Tariff.

### B. PJM's Proposal to Change the Rules for The December 2022 Auction Violates the Filed Rate Doctrine and the Rule Against Retroactive Ratemaking

The FPA provisions "mandating the open and transparent filing of rates and broadly proscribing their retroactive adjustment are known collectively as the filed rate doctrine."[53] That doctrine "bind[s] regulated entities to charge only the rates filed with FERC and to change their rates only prospectively."[54] As a result, the Commission "has no authority under the [FPA] to allow retroactive change in the [filed] rates."[55]

---

[53] *Okla. Gas & Elec. Co. v. FERC ("Oklahoma Gas")*, 11 F.4th 821, 829 (D.C. Cir. 2021) (quoting *Old Dominion Elec. Coop. v. FERC ("Old Dominion")*, 892 F.3d 1223, 1230 (D.C. Cir. 2018)) (internal quotations omitted).

[54] *Oklahoma Gas*, 11 F.4th at 829.

[55] *Id.* (quoting *Old Dominion*, 892 F.3d at 1230) (internal quotations omitted).

14

**JA404**

PJM's proposal to change the rules of the December 2022 BRA and recompute the clearing prices under the new rules would, if permitted, violate the filed rate doctrine. PJM has already administered the BRA pursuant to the terms of the Tariff and computed the clearing prices for the region and each LDA (including DPL-South) consistent with those terms. Further, by PJM's own admission, PJM has taken the extraordinary step of computing an alternative clearing price for the DPL-South LDA using a method (*i.e.* the one PJM proposed in this proceeding) that currently is <u>not</u> permitted by the Tariff. The filed rate doctrine requires the Commission to reject PJM's attempt to change the Tariff rules applicable to the December 2022 BRA and the resulting clearing price for the DPL-South LDA. As explained by Chairman Kelliher in the affidavit attached hereto, the Commission's failure to do so would establish a radioactive precedent that would undermine confidence not only in the RTO/ISO markets, but in the Commission itself.[56]

       i.   *The Filed Rate Includes the Existing Optimization Algorithm, the Auction Parameters Used as Inputs Thereto, and the Resulting Clearing Prices*

It is well established that the filed rate doctrine applies with equal force to both the "rates" and the "non-rate terms" set forth in a tariff.[57] "The [FPA] provides no grounds for distinguishing rate and non-rate terms, but rather binds parties to the terms in the filed rate."[58] The filed rate doctrine applies with equal strength in the context of competitive wholesale markets and the non-rate terms set forth in RTO/ISO tariffs, specifically including PJM's.[59]

---

[56] *See* Kelliher Affidavit at 4, 23-25.

[57] *See* 16 U.S.C. § 824d(d); *see also Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966-67 (1986) ("[T]he filed rate doctrine is not limited to 'rates' *per se*.").

[58] *Oklahoma Gas*, 11 F.4th at 830.

[59] *See Old Dominion*, 892 F.3d at 1230.

15

As concerns the December 2022 BRA, the filed rate includes numerous non-rate terms and the ultimate clearing prices computed pursuant to those terms. The non-rate terms include, *inter alia*, the following: the rules governing the various auction parameters to be used in the BRA, the rules by which PJM is required to develop—and notify sellers of—those auction parameters in advance of the BRA, the rules concerning sellers' development and submission of Sell Offers based on the parameters developed prior to commencing the BRA, PJM's review of those Sell Offers, the rules governing the optimization algorithm used to compute clearing prices, the process PJM must follow to review the results of the optimization algorithm's computations, the specific grounds on which PJM is permitted to make adjustments to parameters and recompute the optimization algorithm, and the obligation to post those results "as soon thereafter as possible." Critically, the method of determining the LDA Reliability Requirement for DPL-South—and whether PJM is permitted to make adjustments to that auction parameter—is an explicit, non-rate term in PJM's Tariff.[60]

Of necessity, the Tariff requires PJM to establish the DPL-South LDA Reliability Requirement prior to conducting the BRA.[61] That has been the case since the RPM was established,[62] and PJM applied the Tariff in that manner in conducting the December 2022

---

[60] Kelliher Affidavit at 8, 16, 19.

[61] *See, e.g.*, Tariff, Attach. DD §§ 5.11(a), (a)(v) (requiring PJM to post—"*prior to conducting the [BRA]*"—the "*[LDA] Reliability Requirement* and the Variable Resource Requirement ["VRR"] Curve for each [LDA] for which a separate [VRR] Curve has been established for such [BRA], including the details of any adjustments to account for Price Responsive Demand ["PRD"] and any associated PRD Reservation Prices, and the CETO and CETL values for all [LDAs]") (emphases added); *id.* § 5.12(a) (explaining that the Reliability Requirements, and VRRs based thereon, are necessary parameters of the optimization algorithm that produces the BRA clearing prices for the region and each LDA); *id.* § 5.10(a)(vi)(B) (requiring that, in order to establish the parameters of the VRR Curve, "[PJM] shall determine the PJM Region Reliability Requirement and the *[LDA] Reliability Requirement* for each [LDA] for which a [VRR] Curve has been established for such [BRA] on or before February 1, *prior to the conduct of the [BRA]* for the first Delivery Year in which the new values will be applied, in accordance with the Reliability Assurance Agreement.") (emphases added).

[62] *PJM Interconnection, LLC,* 117 FERC ¶ 61,331 (2006) (approving settlement filed by PJM and multiple PJM market participants establishing RPM and creating 23 LDAs).

BRA.[63]  Based on those parameters, sellers then submit their Sell Offers into the BRA.[64]  The

Tariff then requires PJM to run the optimization algorithm based on the LDA Reliability

Requirement, and other auction parameters, and the submitted Sell Offers.[65]

All of those steps, expressly set forth in the Tariff, are "non-rate terms" of the filed rate

which PJM has already taken in administering the December 2022 BRA.  Further, the clearing

prices produced by the December 2022 BRA as a result of PJM's following those terms of the

Tariff represent the "rate terms" of the filed rate—*i.e.* the rates PJM will charge for the

December 2022 BRA under the existing Tariff.  In other words, as a factual matter, the

December 2022 BRA has concluded.  By its own admission, PJM has applied the terms of the

existing Tariff and produced clearing prices pursuant to those rules.[66]  Market Sellers are entitled

to rely on—and did, in fact, rely on—those non-rate and rate terms of the filed rate,[67] and neither

PJM nor FERC is authorized to retroactively impose different non-rate or rate terms for the

December 2022 BRA.[68]  And yet, PJM is now concealing the results of that process and seeking

approval to implement new non-rate terms of the filed rate, retroactively apply the filed rate with

---

[63] *See* https://pjm.com/markets-and-operations/rpm (providing planning parameter spreadsheets and documents categorized by Delivery Year, including the 2024/2025 Delivery Year, and their website publication dates); *see also* PJM Manual 18: PJM Capacity Market, PJM Interconnection, L.L.C., at 102-104, available at https://www.pjm.com/-/media/documents/manuals/m18.ashx.

[64] *See PJM Manual 18: PJM Capacity Market,* PJM Interconnection, L.L.C., 102-104 (RPM Auction timeline) https://www.pjm.com/-/media/documents/manuals/m18.ashx ; *see also* PJM 205 Filing at 24 ("Undeniably, Capacity Market Sellers have submitted bids into the auction based on the planning parameters.").

[65] Tariff, Attach. DD § 5.12.

[66] *See, e.g.,* PJM 205 Filing at 2 ("the application of the Locational Deliverability Area Reliability Requirement in its present form involving small LDAs results in a mismatch with prices not reflecting the actual reliability requirements of the LDA.").

[67] *See* Kelliher Affidavit at 16; Shanker Affidavit at 30-32; *see also* PJM 205 Filing at 24.

[68] *E.g.*, *ISO New England Inc. New England Power Generators Ass'n, Inc. v. Iso New England Inc.,* 176 FERC ¶ 61,176 at 12 (2021); *Rolling Hills Generating, L.L.C.* 181 FERC ¶ 61,190 (2022) (Danly, Comm'r, dissenting at P 2); *see also* Kelliher Affidavit at 6-7; *id.* at 18 ("The Commission has no authority to provide equitable exceptions or retroactive modifications to a Tariff, regardless of whether the change is to a rate or non-rate provision.").

the new non-rate terms, and produce new clearing prices for the December 2022 BRA.  If

permitted, that would constitute a blatant violation of the filed rate.

It would also fly in the face of decades of Commission precedent.[69]  Approving PJM's

rate change for the December 2022 BRA would also be counter to the Commission's entire

catalog of precedent on forward capacity market deadlines.[70]  As explained below, establishing

the precedent PJM seeks in these proceedings would have dire consequences for the RTO/ISO

markets, severely undermining investor confidence in those markets.  The Commission should

unequivocally reject PJM's invitation to do so.

### ii.  PJM's Arguments to the Contrary Are Unavailing

PJM first argues that applying its proposed Tariff change to the December 2022 BRA is

only a prospective change because "the auction remains ongoing" until PJM "post[s] the final

auction results."[71]  There are three problems with that rationale.

First, whether the auction "remains ongoing" is irrelevant to the filed rate doctrine

analysis.  Even if the auction is still "ongoing"—which, as a factual matter, is not the case—PJM

---

[69] *See* Kelliher Affidavit at 4, 28-29.

[70] *Rolling Hills Generating, L.L.C.*  181 FERC ¶ 61,190 (Danly, Comm'r, dissenting at P 2) ("the filed rate doctrine is a nearly impenetrable shield' and does not yield, 'no matter how compelling the equities.…the Commission has no statutory authority to provide equitable exceptions or retroactive modifications to the tariff. And it does not matter whether the proposed change is to a rate or non-rate term." (internal quotations and citations omitted)); *EDF Renewables, Inc.*, 181 FERC ¶ 61,189 (Danly, Comm'r, dissenting at P 2) (same);  *Savion LLC*, 181 FERC ¶ 61,188 (2022) (Danly, Comm'r, dissenting at P 2)(same); *Lightsource Renewable Energy Dev., LLC,* 181 FERC ¶ 61,187 (2022) (Danly, Comm'r, dissenting at P 2) (same);  *Andro Hydro, LLC,*  178 FERC ¶ 61,007 (2022) (Danly, Comm'r, concurring at PP 1-3) (finding "[t]he Commission has no power to retroactively change the filed rate" in the context of generator missing an ISO-NE tariff-mandated deadline to participate in sixteenth annual Forward Capacity Auction);  *ISO New England Inc. New England Power Generators Ass'n, Inc. v. Iso New England Inc.,* 176 FERC ¶ 61,176 at P 12 ("the filed rate doctrine forbids a  regulated entity from charging rates for its services other than those properly on file with the appropriate federal regulatory authority. The corollary rule against retroactive ratemaking prohibits the Commission from adjusting current rates to make up for a utility's over- or under-collection in prior periods.**");** *ISO New England Inc. New England Power Generators Ass'n, Inc. v. Iso New England Inc.,* 175 FERC ¶ 71,177 at P 53 (2021) (same).

[71] PJM 205 Filing at 23.

skips over the fact that it has already applied numerous non-rate terms of the existing Tariff as part of that "ongoing" process, and those steps are now in the rear-view mirror. PJM's requested relief would require back-tracking to rerun those steps under new rules, rather than simply completing as-yet-untaken steps in the "ongoing" process under new rules. Before this proceeding began, PJM set the parameters of the December 2022 BRA over several months; opened the window for submitting BRA offers on December 7, 2022; received the Sell Offers reflecting the existing auction parameters[72]; closed the window for submitting Sell Offers on December 13, 2022; ran the optimization algorithm to compute clearing prices; applied its market power mitigation rules without issue, as indicated by the fact that PJM filed no market power mitigation report with the Commission "[w]ithin seven days after the deadline for submission of Sell Offers;" and apparently reviewed the auction results sufficiently to satisfy itself that it has no concerns with the optimization algorithm's results other than the price produced in the DPL-South LDA.

All of those steps were taken pursuant to the existing Tariff. And in order for PJM to implement its requested relief in a manner that would produce competitive results,[73] it would need to retake all of them. Troublingly, PJM has indicated that it would not retake all of those steps, and would instead "simply" rerun the optimization algorithm under the new rules.[74] But, even if PJM could "simply" rerun the optimization algorithm, that step alone would represent retroactive application of non-rate terms of the filed rate. It would also impermissibly disregard market participants' substantial reliance interests related to the existing Tariff.[75]

---

[72] PJM 205 Filing at 24 ("Undeniably, Capacity Market Sellers have submitted bids into the auction based on the planning parameters.").

[73] Shanker Affidavit at 30-32.

[74] *See* PJM 205 filing at 23.

[75] Shanker Affidavit at 30-32; *see* Kelliher Affidavit at 25-28.

Second, as a matter of Tariff operation, the auction is not actually "ongoing." As explained above, the BRA process is strictly prescribed in the Tariff. The only permissible method of computing clearing prices is by running the optimization algorithm after properly setting the required auction parameters. The Tariff provides no mechanism by which PJM can validly obtain "preliminary auction data" or "preliminary price calculations" of the type it describes in its filing.[76] Further, PJM itself has publicly admitted that it has computed final clearing prices, under both the existing Tariff and the rule changes it has proposed in this proceeding.[77] Accordingly, the clearing prices on which PJM has based its filing are valid computations produced by properly running the optimization algorithm.[78] In the former case, the clearing prices produced by the Tariff are known—and resources that cleared the auction are entitled to those prices as the "rate" terms of the filed rate. PJM's expressed concern gives away the farm: the stated purpose of PJM's filings is to prevent the clearing prices produced by the existing Tariff from taking effect, which necessarily requires PJM to know the clearing prices that would take effect.

---

[76] Section 5.14(f) of Attachment DD of the Tariff does provide that in determining the Zonal Capacity Prices based on the optimization algorithm, where, in relevant part, PJM shall "calculate and post the Preliminary Zonal Capacity Prices for each Delivery Year following the [BRA] for such Delivery Year." Tariff, Attach. DD § 5.14(f)(i). The Preliminary Zonal Capacity Prices, however, are not analogous to the "preliminary auction data" or "preliminary price calculations" that the PJM describes in its filing, which PJM characterizes as permitting PJM to garner rough approximations of clearing prices for LDAs. Determined in accordance with the optimization algorithm, the Preliminary Zonal Capacity Prices for each Zone are calculated as the sum of (i) the marginal value of system capacity for the PJM Region, without taking into consideration locational constraints; (ii) the Location Price Adder for the LDA in which the Zone is located; (iii) an adjustment to account for adders paid to Annual Resources and Extended Summer Demand Resources in the LDA for which the zone is located; (iv) an adjustment to account for Make-Whole Payments; and (v) an adjustment to provide payment for PRD credits. *Id.*

[77] PJM 205 Filing at 2-3.

[78] P3 asserts that, if the clearing prices on which PJM based its filings in this proceeding are not valid computations produced by properly running the optimization algorithm, then whatever steps PJM took to obtain those clearing prices is impermissible under the Tariff and constitute an additional Tariff violation by PJM. Further, as discussed below, if PJM obtained the clearing prices in any manner other than through properly and fully applying the Tariff rules, including the optimization algorithm, then PJM cannot carry its statutory burden to demonstrate that its Tariff changes in this proceeding are acceptable.

Third, it cannot be the case that the December 2022 BRA is "ongoing" and subject to rule changes until PJM "posts the final auction results," whenever that might be. That would permit PJM to unilaterally and indefinitely suspend the operation of the BRA, despite having already taken all of the Tariff-prescribed steps short of posting the results. The filed rate doctrine is not so flimsy. If the rate term of the filed rate has been calculated pursuant to the Tariff-prescribed process, it empirically exists regardless of whether PJM wants to release it to the public. PJM's theory to the contrary—*i.e.* unless and until "final results [are] posted, there is not a final rate for which any entity has an entitlement"[79]—is fundamentally at odds with the principles of transparency at the heart of the filed rate doctrine and the statutory provisions from which it arises.

Next, PJM argues that its proposed Tariff change does not violate the filed rate doctrine because the Tariff "provides notice of the ability of PJM to make emergency filings to address 'imminent severe economic harm.'"[80] There are two problems with that claim. First, a provision allowing PJM to make emergency FPA Section 205 filings only provides notice that PJM may make FPA Section 205 filings with proper, prospective-only application. It does not provide PJM the authority to make FPA Section 205 filings with retroactive effect, nor does it provide sellers and customers with notice that PJM may do so—whether in connection with an underway BRA or otherwise. Second, PJM's argument presumes that "imminent severe economic harm" is present in this case. In this case, PJM has applied a Tariff that has been found to be just and reasonable and the clearing prices produced are consistent with economic principles and reflect the supply and demand dynamics in the DPL-South LDA, inclusive of PJM's best estimate of

---

[79] PJM 205 Filing at 24.

[80] *Id.* at 26 (quoting Tariff § 9.2(b)).

supply conditions within DPL-South exactly as it has done in previous auctions for all separately

identified LDAs.  A properly applied Tariff that produces an economically rational result that is

consistent with the overall auction paradigm cannot fairly be characterized as "severe economic

harm."  Rather, it reflects a competitive market outcome for an LDA that is short on generation,

and a just and reasonable rate for attracting the generation resources that LDA needs within the

timeframe in which it needs them.[81]

PJM also argues that it can change the LDA Reliability Requirement for the December

2022 BRA without violating the filed rate doctrine because the Tariff specifically places sellers

on notice that the LDA Reliability Requirement might change.  That argument misinterprets the

Tariff provision at issue and misunderstands the "boundaries of the statutory requirements that

comprise the filed rate doctrine."[82]  The specific Tariff provision that PJM cites, Tariff,

Attachment DD Section 5.11(e), concerns the specific information PJM must post after it

conducts the BRA, and when it must post that information:  "After conducting the [RPM]

Auctions, *PJM will post the results* of each auction as soon thereafter as possible, *including any*

*adjustments* to PJM Region or LDA Reliability Requirements to reflect [PRD] with a PRD

Reservation Price equal to or less than the applicable [BRA] clearing price."[83]  Contrary to

PJM's assertion, Section 5.11(e) does not grant PJM the authority to adjust the LDA Reliability

Requirements—whether to reflect PRD or otherwise.  PJM's authority to adjust the LDA

Reliability Requirements to reflect PRD stems from Tariff Section 5.10(a), which provides that

PJM shall reflect PRD "in the derivation of the [VRR] Curve, in accordance with the

---

[81] Shanker Affidavit at 24 ("The purpose of RPM is to provide price signals for where generation is needed and it is needed in DPL-South.").

[82] *See Oklahoma Gas*, 11 F.4th at 831.

[83] Tariff, Attach. DD § 5.11(e) (emphases added).

methodology specified in the PJM Manuals."[84]  Further, even when PRD is offered into a BRA—which PJM did <u>not</u> indicate occurred with respect to the DPL-South LDA in the December 2022 BRA[85]—that PRD does not alter the LDA Reliability Requirement parameter that was set in advance of the BRA.  Rather, the PRD changes the shape of the demand curve *during* the optimization algorithm's calculations.  The solution produced by the optimization algorithm allows PJM to procure less capacity in the LDA and can impact the clearing price for the LDA, but that is methodologically distinct from altering the LDA Reliability Requirement that was used as an *ex ante* parameter in the optimization algorithm that generated that result.[86] The parameters that were used in the optimization algorithm are still correct and unchanged, even if PRD offers might reduce the final demand with the applicable LDA.

### iii.  *PJM's Equitable Arguments Do Not Penetrate the Filed Rate Doctrine*

PJM's arguments that the results of the December 2022 BRA under the existing Tariff would produce "severe economic harm" are not only unfounded, they are entirely irrelevant to the question of whether PJM's proposed changes can be implemented for the December 2022 BRA.  The filed rate doctrine and the rule against retroactive ratemaking is "a nearly impenetrable shield" that "leave[s] the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations."[87]

---

[84] Tariff, Attach. DD § 5.10(a).

[85] *See generally* PJM 205 Filing (failing to identify any PRD offers in December 2022); PJM Complaint (same); *see also* Tariff, Attachment DD § 5.10(a); PJM, Manual 18, at 39-45, available at https://www.pjm.com/-/media/documents/manuals/m18.ashx.

[86] Shanker Affidavit at 9.

[87] *Old Dominion*, 892 F.3d at 1230 (citing *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 794-797 (D.C. Cir. 1990); *West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 12 (D.C. Cir. 2014); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578 (1981)).

The courts have left zero play in the joints on this issue. As the Supreme Court has explained, "[t]his rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination."[88] The D.C. Circuit has repeatedly applied the rule in that manner when reviewing Commission orders, including in recent cases involving RTO/ISO tariffs, despite litigants' repeated appeals to the equitable considerations raised by the filed rate doctrine's harsh financial consequences.

PJM's appeal to equity rings hollow for another reason, too. As noted, what PJM characterizes as "severe economic harm" is, in fact, a price signal indicating that the DPL-South LDA needs additional generation. Not just planned facilities with uncertain commercial operation dates, but actual steel in the ground that will produce electrons.[89] For PJM's market to work, and attract the investment needed, it needs to be given the opportunity to work. As explained below, if the rules of a particular BRA can be changed post-auction, or even mid-auction, whenever PJM is concerned that proper application of the existing Tariff will produce prices that PJM does not like, that would significantly increase the risk of any capital deployed in the market. That increased risk would translate into higher offer prices, reflecting the resulting risk premiums, and ultimately could make it difficult for resource owners and investors to deploy the capital needed to develop and maintain the resource fleet required to serve the demands of consumers in the PJM region.[90] Further, permitting these types of *ex post* Tariff changes would discourage good risk management and hedging practices due to the uncertainty around what risks

---

[88] *Louisville & N.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915).

[89] Shanker Affidavit at 24.

[90] *Id.*

need to be managed and hedged.[91]  Fortunately, the filed rate doctrine stands as a firewall against

that prospect in this proceeding, preventing the further degradation of the PJM market through a

rushed, outcome-oriented market design change.  In short, strict adherence to the filed rate

doctrine here will produce the most equitable and durable result, in addition to the only legally

supportable one.

        *iv.  Adopting PJM's Interpretation of the Filed Rate Doctrine Would Create*
            *Terrible Precedent with Ripple Effects Well Beyond PJM*

Under the competitive market paradigm, the Commission has consistently recognized the

importance of providing rate certainty and maintaining market integrity.  Without fail, the

Commission has adamantly resisted requests to the rerun RTO auctions in order to provide

remedial relief in FPA Section 206 complaint proceedings or in response to judicial remands, on

the grounds that doing so would "undermine confidence in markets."[92]  The courts also have

recognized the importance of "ensuring rate predictability" in their consideration of Commission

orders relating to changes in RTO market rules.[93]  If the Commission were to accept PJM's

proposal, it would throw all of that policy and precedent out of the window.  In doing so, the

---

[91] *See* Shanker Affidavit at 24 ("This is the RPM auction working as designed and post-auction manipulation will not fix the underlying issue or capacity position and will only serve to undermine confidence in the market."). *Further*, as specifically concerns the December 2022 BRA, due to the likelihood that buyers in the DPL-South LDA have hedged their capacity price risk and/or adopted other risk management strategies, there are serious questions about whether and to what extent buyers and/or consumers will be directly impacted by the December 2022 BRA's clearing price for the DPL-South LDA.

[92] *PJM Interconnection, LLC*, 169 FERC ¶ 61,237 at P 10 (2019) (noting the Commission "generally does not order a remedy that requires re-running a market because market participants participate in the market with the expectation that that rules in place and the outcomes will not change after the results are set); *PJM Interconnection, LLC*, 161 FERC ¶ 61,252 at P 59 (2017); *Astoria Generating Co. LP v. New York Indep. Sys. Operator, Inc.*, 140 FERC ¶ 61,189 at P. 141 (2012); *PPL EnergyPlus v. N.Y. Indep. Sys. Operator Corp.*, 115 FERC ¶ 61,383 at P 30 (2006); *Calif. Indep. Sys. Operator Corp.*, 120 FERC § 61,271 at P 24 (2007); *New York Indep. Sys. Operator, Inc.*, 113 FERC § 61,340 at P 17 (2005); *Pacific Gas Transmission Co.*, 82 FERC ¶ 61,227, 61,875 (1998) (holding that despite a finding of violation "the public interest in market stability outweighs the need for reposting"); *Pan-Alberta Gas (U.S.) Inc. v. Pacific Gas & Elec. Co.*, 72 FERC ¶ 61,092, 61,505 (1995) (finding that despite a violation in capacity allocation, setting aside a transaction would "cause a disruption in the market.")); Kelliher Affidavit at 25,

[93] Kelliher Affidavit at 25 (citing *Old Dominion*, 892 F.3d at 1230).

Commission would undermine confidence in the PJM market, all other RTO markets, and the Commission itself.[94]

The Commission has emphasized that abiding by market rules is necessary to enable an RTO to effectively administer wholesale markets.[95]  Consistent with that principle, the Commission has generally disfavored rerunning markets because the harm outweighs the benefit—even in instances where, unlike here, an RTO has committed an error implementing its existing tariff.[96]  In such instances, the Commission has held that rerunning the market "would do far more harm to wholesale electricity markets than is justifiable or appropriate … and would be fundamentally unfair to market participants."[97]  It is indisputable that rerunning auctions creates regulatory risk going forward and dissuades investors from investing capital in a market where the results of auctions are constantly subject to later change.[98]  Accordingly, the Commission has a perfect record of declining requests for that remedial relief because granting it would breed insurmountable regulatory uncertainty.[99]

The Commission also has a longstanding policy of disfavoring last minute Section 205 tariff changes—even where, unlike here, those changes would be only prospective—because those changes would upset settled expectations and reliance on current RTO tariff provisions.[100]

---

[94] Kelliher Affidavit at 25.

[95] *GenOn Energy Mgmt, LLC v. ISO New England*, 152 FERC ¶ 61,044 at P 50 (2015); *Northeast Utils. Serv. Co.*, 135 FERC ¶ 61,123 at P 13 (2011) (emphasizing it is important to abide by RTO market rules to enable effective administration of RTO markets); Kelliher Affidavit at 26.

[96] *Bangor Hydro-Elec. Co. v. ISO New England Inc.*, 97 FERC ¶ 61,339 at 62,590 (2001), *reh'g denied*, 98 FERC ¶ 61,298 (2002); Kelliher Affidavit at 26.

[97] *Bangor Hydro-Elec. Co.*, 97 FERC ¶ 61,339 at 62,590.

[98] *Midwest Indep. Transmission Sys. Operator, Inc.*, 162 FERC ¶ 61,173 at P 19 (2018); *PJM Interconnection, LLC*, 161 FERC ¶ 61,252 at P 58 (2017); Kelliher Affidavit at 27.

[99] *PJM Interconnection, LLC,* 161 FERC § 61,252 at P 55; Kelliher Affidavit at 27.

[100] Kelliher Affidavit at 27.

For instance, the Commission rejected a FPA Section 205 filed by ISO New England, Inc. that would be effective 48 days later, but still in time for the applicable auction, characterizing the filing as an "eleventh hour" filing that would upset expectations based on the current tariff provisions.[101]

Upholding the principles of competitive markets is no less important now than in the past. Accordingly, the Commission should affirm its bedrock policy and precedent disfavoring retroactive market design changes by denying PJM's invitation to eviscerate the filed rate doctrine as applied to the December 2022 BRA. If the Commission were to do otherwise, market participants would no longer be able to rely on any PJM (or any other RTO/ISO) market assumptions, statements, or publications as everything would always be subject to change *ex post* at the whim of the RTO/ISO. And the resulting flimsiness of RTO/ISO market rules would extend well beyond PJM. Market participants and investors with positions in *all* Commission jurisdiction markets would be faced with heretofore unprecedented degrees of regulatory uncertainty, undermining confidence in the markets. That is not a legacy this Commission should welcome.

> v. *Permitting PJM's Proposed Tariff Change to Take Effect by Operation of Law Would Run Afoul of the Filed Rate Doctrine, Require Expedited Judicial Review, and Exacerbate the Cloud of Uncertainty Already Looming over the PJM Capacity Market*

The fact that the Commission currently is short one member, raising the specter of a possible 2-2 deadlock vote on PJM's proposed Tariff changes under FPA Section 205, makes it critical that a majority of the Commission promptly and unambiguously uphold the filed rate doctrine and reject PJM's attempt to conduct the December 2022 BRA under alternative rules.

---

[101] *ISO New England, Inc.*, 132 FERC ¶ 61,136 at P 22 (2010); Kelliher Affidavit at 27-28.

Pursuant to FPA Section 205(g)(1), if the Commission permits PJM's proposed Tariff change under Section 205 to take effect for the December 2022 BRA "without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change," then the Commission's "failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of" seeking agency rehearing.[102]  In this scenario, that outcome would be nothing short of a disaster for the December 2022 BRA, which likely would be subject to litigation for several years.[103]

Although rate changes can take effect by operation of law, the U.S. Constitution and the structure of the FPA each impose limits on what exactly is permitted to take effect by operation of law.  Specifically, the Due Process Clause and the Takings Clause of the Constitution, and the FPA's statutory provisions that constitute the filed rate doctrine, bind public utilities, including PJM, regardless of whether the Commission issues an order on a utility's proposed rate changes.[104]  A public utility cannot, whether intentionally or unintentionally, take advantage of short-staffing at the Commission to put in place a rate that blatantly violates the Constitution or the filed rate doctrine.

For example, if PJM suddenly decided now, in January 2023, to take advantage of a lack of quorum (or potential 2-2 deadlock) at the Commission in order to impose a new stated rate for the BRA conducted in May 2022 for the 2023/2024 Delivery Year, that rate change would run

---

[102] *See* 16 U.S.C. § 824d(g)(1).

[103] That outcome also could cause cascading delays to future auctions.

[104] *See, e.g.*, 16 U.S.C. § 824d(a) ("All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges *shall be just and reasonable*, and *any such rate or charge that is not just and reasonable is hereby declared to be unlawful*."); *see also infra* n.105-106.

afoul of the FPA even in the absence of a Commission order.  Because Congress has deemed the filed rate to have the force and effect of law, and market sellers with resources that cleared in the BRA for the 2023/2024 Delivery Year are entitled to rely on that filed rate, an action by PJM that deprives those sellers of that right—with no meaningful opportunity to adjudicate their claims before the Commission and receive a decision from the agency—would constitute a deprivation of their rights under the Constitution's Due Process Clause.[105]  Further, if the rate that PJM retroactively imposed in that example was below the cost that a seller would incur to satisfy the capacity supply obligation it obtained through the BRA, PJM's action would also be confiscatory, in violation of the Constitution's Takings Clause.[106]  The Courts have long held that the Takings Clause imposes a lower bound on the FPA's "just and reasonable" standard. That floor exists regardless of whether the confiscatory rate placed on file under the FPA was the subject of a Commission order.  Constitutional rights do not dissolve just because the Commission is unable to issue a written, majority decision.

Accordingly, applying FPA Section 205(g) to permit a rate change that violates the filed rate doctrine to take effect in the absence of Commission action would violate the Due Process Clause and, depending on the nature of the rate change, potentially the Takings Clause.  As a result, in this proceeding, if PJM's Tariff change is permitted to take effect for the December 2022 BRA by operation of Section 205(g), that application of Section 205(g) would be

---

[105] *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'").

[106] *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 308 (1989) ("If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments."); *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n*, 262 U.S. 679, 690 (1923) ("Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render service are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment.").

unconstitutional and PJM's Tariff change would necessarily be void *ab initio* on at least one Constitutional ground.

Of course, reaching a judicial resolution on the problems that applying FPA Section 205(g) presents in this situation could take several years.  The uncertainty posed by that litigation is likely to bring the simmering frustrations with PJM and FERC's treatment of the RPM to a boil.  Due to the whipsawing changes to PJM's Minimum Offer Price Rule, both pendulum swings of which are the subject of years'-long pending judicial appeals, and the Commission's sea-change in PJM's Market Seller Offer Cap rules, which are also still pending judicial appeal, the PJM RPM is currently a political windsock.  The last thing the RPM needs at this time is another knee-jerk reaction, motivated by political concerns, that is sure to layer on additional litigation risk and further alienate needed investment capital.  For all of the reasons discussed in this Section II.B, the Commission should conclude that PJM's proposal to apply its Tariff changes to the December 2022 BRA is impermissible, reject that proposal without delay, and begin to repair the investment climate of the PJM markets.

### C. Even if the Filed Rate Doctrine Were Not Operative, PJM Has Not Carried its Statutory Burdens Under the FPA or the APA

Whether for the December 2022 BRA, future auctions, or both, PJM has not demonstrated that its proposal is just and reasonable either as a rate change under FPA Section 205 or as a replacement rate under FPA Section 206, nor has PJM demonstrated that the existing Tariff is unjust and unreasonable under FPA Section 206.  Further, PJM has not presented sufficient information to satisfy its obligation, under Section 7(c) of the APA,[107] to provide sufficient evidence to support its proposed Tariff change under either Section 205 or Section 206

---

[107] 5 U.S.C. § 556(d).

of the FPA. PJM's failure to satisfy these statutory obligations presents several independent

bases for the Commission to reject both of PJM's filings. The Commission should promptly do

so.

> i. *PJM Has Not Demonstrated that its Proposed Rate Is Just and Reasonable Whether as a Rate Change Under FPA Section 205 or as a Replacement Rate Under FPA Section 206*

Under FPA Section 205, PJM bears the burden of proving that its proposal to change the

Tariff pursuant to FPA Section 205 "lawful."[108] To do so, PJM must demonstrate, based on a

preponderance of evidence, that its proposed rate change is "just and reasonable" and not

"unduly discriminatory or preferential." As the proponent of the rate change, PJM must also

"ensure that there is a sufficient evidentiary record for the Commission to make a reasoned

decision,"[109] which requires PJM to, among other things, provide evidence of "a rational

connection" between its proposed Tariff change and the facts that gave rise to that proposal.[110]

PJM has failed to satisfy those FPA and APA burdens.

> 1. As an Initial Matter, PJM Has Mischaracterized the Problem it Is Trying to Solve

PJM asserts that, when the optimization algorithm produced a clearing price for the DPL-

South LDA that PJM did not like, PJM "further investigat[ed]" and "discovered the primary

driver of the anomaly."[111] Unfortunately, PJM's "investigation" only observed a symptom,

instead of diagnosing the cause of the purported "anomaly." PJM has misapprehended the

---

[108] *Emera Maine v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017) (citing *Ala. Power Co. v. FERC*, 993 F.2d 1557, 1571 (D.C. Cir. 1993)).

[109] *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 165 FERC ¶ 61,005, at P 10 (2018).

[110] *See TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 9 (D.C. Cir. 2015) (explaining that, in order to satisfy the APA, there must be "a rational connection between the facts found and the choice made") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *accord Puget Sound Energy, Inc.*, 132 FERC ¶ 61,128, at P 31 (2010) (finding that, in order for rate changes proposed under FPA Section 205 to be just and reasonable, "such solutions must fit the problems they are intended to solve").

[111] *See* PJM 205 Filing at 10.

"primary driver" of the clearing price, misdiagnosed that clearing price as an "anomaly," and crafted its proposed rate change to address the wrong problem. As a result, PJM has made a case in favor of a rate change that is fundamentally flawed. That rate change does not pass muster under the FPA, and PJM's attempt to persuade the Commission otherwise falls short under the APA.

In PJM's framing, the "issue" that animated its Section 205 filing is a "gap in the Tariff rules that address a circumstance where large Planned Generation Capacity Resources, which include planned Intermittent Resources, have an outsized impact on the reliability needs in a small LDA and those resources do not participate in the RPM Auction."[112] PJM's framing mischaracterizes the "issue" that gave rise to its Section 205 and Section 206 filings. There is no "gap" in the Tariff.[113] What PJM describes as a "gap" is simply a known risk that, like many others in the RPM process, are a function of making assumptions to forecast future market conditions. It is baked into PJM's long-standing method of calculating LDA Reliability Requirements, which requires PJM to make predictions about the uncertain development timelines and market participation of generation resources.[114]

Each LDA Reliability Requirement is based on PJM's calculation of the CETO for that particular LDA.[115] PJM's chosen method[116] of calculating CETO is based on forecasts concerning the generation resources that PJM expects to exist in the LDA within the planning horizon at issue. Among other things, PJM must specifically forecast the amount of new

---

[112] PJM 205 Filing at 18.

[113] *See id.*

[114] Shanker Affidavit at 14.

[115] *Id.* at 13-14.

[116] *Id.* at 11.

capacity that will be built in the LDA, whether that capacity will enter service when expected, and whether it will offer into the RPM. Each of those forecasts requires PJM to make various assumptions.[117]

Those assumptions involve tradeoffs from a system planning perspective. How conservative or not those assumptions will determine how the load in each LDA will be served. If PJM assumes a relatively low amount of generation will exist in the LDA, more transmission capacity will be needed to serve the load via imports from outside the LDA. Conversely, if PJM assumes a relatively high amount of generation will exist in the LDA, a higher percentage of the load will be served by local generation resources and less transmission capacity will be needed for imports. In turn, those assumptions will impact the price signal the RPM will send concerning the need for generation resources within the LDA.

That type of forecasting necessarily poses risk that the forecasts will be inaccurate. But the particular approach PJM has long-used for making its forecasts concerning generation resources when calculating CETO, and the approach PJM used in setting the LDA Reliability Requirement for DPL-South in the December 2022 BRA, heightens that risk. PJM's CETO calculation assumes that all planned and existing generation resources in an LDA will be in-service within the planning horizon and it further assumes that all of those resources will offer into the BRA. PJM ignores the facts that (1) planned resources and existing intermittent resources, storage resources, energy efficiency resources, and demand response resources all have the free option under the Tariff not to participate in a BRA;[118] and (2) there are many reasons why such resources would exercise that option, including the possibility that they could

---

[117] Shanker Affidavit at 25-29.

[118] Tariff, Attach. DD § 6.6A(c); Shanker Affidavit at 16.

face supply chain disruptions or other issues that could delay their project milestones.[119]  *The CETO forecasting error that flows from these assumptions—rather than the alleged "gap" in the Tariff—is the real issue underlying PJM's filings in these proceedings.*

If these assumptions by PJM prove to be inaccurate for a particular LDA when the BRA is conducted, the market will—by design—send a corresponding price.  If PJM's forecast assumption is high relative to the resources that show up in the BRA, prices will rise, sending the necessary corrective price signal to the market.[120]  Conversely, if PJM's forecast assumption is low relative to the resources that show up in the BRA, prices will fall, signaling a level of reduced need in that LDA.[121]

That design is rational, from the perspectives of both system reliability planning and economic theory, because it reflects the following realities: (1) the LDA is expected be short of the generation PJM forecasted that would be available and needed to serve its load, so the market should send a higher price signal to attract the investment needed to serve that load—within the timeframe in which the investment is needed; (2) if the reason the LDA is short is that one or more generators that are large in relation to the LDA's load exercised their option not to offer, the impact on the LDA Reliability Requirement will be higher than if relatively small generators failed to show up, and the clearing price will reflect this difference; and (3) as the planning horizon gets shorter, and the lead time for resource development gets tighter, bringing resources online within that horizon gets more challenging and more expensive.

---

[119] Similarly, existing Capacity Resources with the option not to offer may also have changing views of future market conditions that could cause them to decide not to sell capacity (or as much capacity) in the future as they did in the past.

[120] Shanker Affidavit at 24, 35-36.

[121] *Id.*

Contrary to PJM's assertion, this issue was not "recently identified."[122]  PJM's CETO forecasting model has been in place since before PJM was established as an RTO.[123]  The relationship between the size of an LDA and the impact that a relatively large generation resource can have on the CETO calculation underlying the LDA's Reliability Requirement is simple and has been well-understood.[124]  Every time PJM runs the PRISM Model for an LDA, which it has done multiple times per year for many years, the fact that CETO is a function of the generation assumptions is necessarily front-and-center.  Determining the amount of generation needed to serve load in the LDA and from where it will come is, after all, the purpose of developing the LDA Reliability Requirements.  PJM would have to be willfully ignorant to not observe that inaccurate assumptions about the presence of a large generation resource in a small LDA, or any other set of assumptions that significantly overestimates of the amount of generation that will be present in such an LDA, can have a significant impact on the accuracy of that LDA's CETO and the LDA Reliability Requirement based thereon.

---

[122] *See* PJM 205 Filing at 18.

[123] Shanker Affidavit at 11 (citing to PJM whitepaper titled *PJM Generation Adequacy Analysis: Technical Methods Capacity Adequacy Planning Department* dated October 2003 *available at* https://www.pjm.com/-/media/planning/res-adeq/20040621-white-paper-sections12.ashx.

[124] Dr. Shanker provides the following example:

[C]onsider an LDA with a Reliability Requirement of 1000 MW UCAP (Unforced Capacity) that has a single internal unit of 1100 MW with a 9.1% EFORd (Equivalent Forced Outage Rate demand adjusted) for a UCAP of 1000 MW. Looked at on a simple stand-alone basis the internal resources are either 1000 UCAP (90.9% of the time) or 0 UCAP (9.1% of the time). These are the 2 points on this simple internal supply probability distribution.  It should be clear that 9.1% of the time the LDA will have zero internal resources, so its CETO must be large enough to meet this requirement, e.g. at least 1000 MWs. (ignoring planned outages etc.). Alternatively assume that the same LDA has 11,000 100KW internal generators, each with an EFORd of 9.1%. Again, there is 1000 MW of internal UCAP. But now, the probability of fully random outages exceeding 9.1% of the time for 11,000 independent generators approaches zero, and again in this simple world the CETO now approaches zero.

Shanker Affidavit at 13.

**JA425**

That this phenomenon could easily manifest in the DPL-South LDA specifically in the December 2022 BRA should have been obvious to PJM. As of August 25, 2022, the PJM system had 1221 existing Capacity Resources, totaling 181,959.1 MW, excluding Planned Generation, Demand Response, Energy Efficiency, and External Generation Resources. Of that, only 56 generation units, totaling 1,688 MW, were located in DPL-South.[125] The fact that approximately 4.6% of PJM's generation units were located in DPL-South, and those units represented less than 1% of PJM's total MW, clearly indicates that DPL-South is a small zone with mostly small resources.[126] Just based on that simple math alone, PJM should have known that the CETO and LDA Reliability Requirement for DPL-South would be highly sensitive to assumptions regarding large MW additions within the LDA.[127]

As a matter of fact, based on documentation that PJM itself generated in developing the parameters to be used in the December 2022 BRA, it appears that PJM did know, or should have known, that this outcome for the DPL-South LDA was likely, or at least was a distinct possibility. In the planning parameters for the 2024/2025 Delivery Year which PJM issued in August 2022, showing changes from the 2023/2024 planning parameters, the LDA Reliability Requirement for DPL-South increased by 373 MW, or 12%.[128] This is exactly the figure that PJM now presents in its filings in these proceedings, claiming that this is a surprise problem that warrants blowing up the December 2022 BRA after it has already been run.[129] Similar to the

---

[125] Shanker Affidavit at 18-19.

[126] *Id.* at 19.

[127] *Id.* at 20 ("For three months ahead of the BRA, PJM made all market participants aware that there would a material increase in the LDA Reliability Requirement for DPL-South. Anyone with a calculator could duplicate Figure 3 from publicly posted information and also conclude that the net increase forecast of 613 MW would have to be met from an increase in Planned Resources").

[128] *Id.* at 17.

[129] *See* PJM 205 Filing at 11 (explaining that the LDA Reliability Requirement for "DPL-S, which is the smallest modeled LDA in PJM, increased by approximately 12% from the prior year").

increase in the DPL-South LDA Reliability Requirement prior to the December 2022 BRA, PJM also should have known in advance that there was a non-trivial risk that the "large Planned Generation Capacity Resource and planned Intermittent Resources"[130] that did not participate in the BRA would not do so.  After all, PJM is well aware that those types of resources do <u>not</u> have an RPM must-offer obligation,[131] and PJM has information about the development milestones of all resources seeking to interconnect to the PJM-operated transmission system.[132]  PJM is also well aware of the supply chain disruptions caused by the COVID-19 pandemic, U.S. trade policies, and general economic downturn, all of which are affecting generation project timelines.[133]  Accordingly, PJM had all of the information it needed to foresee that the unnamed "large Planned Generation Capacity Resource and planned Intermittent Resources" might not, and perhaps were unlikely to, participate in the December 2022 BRA.

Indeed, as noted by Dr. Shanker, PJM itself specifically modeled the conditions that would produce this type of pricing in the DPL-South LDA in its sensitivity studies conducted for the 2023/2024 BRA which were posted in July 2022.[134]  Specifically, PJM identified an amount of MW in the DPL-South LDA—*i.e.*, 260 MW—that, if removed from the LDA, would result in the clearing price hitting the price cap of $431.26 per MW-day.[135]  Given that PJM forecasted approximately 613 MW of Planned Resources in DPL-South for the December 2022 BRA, none

---

[130] PJM 205 Filing at 16.

[131] *See* Tariff, Attach. DD § 6.6A(c) (exempting Intermittent Resources from the RPM must-offer obligation); *Id.* at § 5.6.1 (same); Shanker Affidavit at 14-15 ("it is completely foreseeable that those resources without such an obligation do not offer into the auction").

[132] *See* Tariff, Attach. DD § 5.11A.

[133] *See* PJM 205 Filing at 27 (citing *PJM Interconnection, L.L.C.,* 171 FERC ¶ 61,208 (2020) (permitting PJM to use a revised updated PJM Region Peak Load Forecast in light of the major forecasted economic consequences of Covid-19)).

[134] 2023/2024 Auction Information, BRA Scenario Analysis, Scenario 8, *available at* https://pjm.com/markets-and-operations/rpm; *supra* n.23.

[135] Shanker Affidavit at 23.

of which are required to offer into the BRA, PJM should have known based on its own modeling that the clearing price for the DPL-South LDA could be at or near the cap.  PJM's attempt to undermine the filed rate doctrine based on its failure to see what was right in front of its face is inexcusable.

PJM's failure to thoughtfully and comprehensively investigate the optimization algorithm's clearing price for the DPL-South LDA has caused it to mischaracterize the variables that produced that clearing price.  Instead, PJM has rushed to judgment based on an oversimplified analysis, and presented a flawed rate change proposal that is untethered from the facts and void of stakeholder input.  PJM's resulting attempt to support that rate change lacks the evidentiary support needed to satisfy PJM's burden under the FPA or the APA, thereby precluding the Commission from issuing an APA-compliant order implementing that rate change.[136]

> 2.  PJM's Proposed Rate Change Fails to Address the Concerns that Gave Rise to This Proceeding, Has Not Been Shown to Produce Just and Reasonable Results, and Must Be Rejected

Regardless of whether the Commission accepts PJM's characterization of the issue as a surprise outcome caused by an unforeseeable "gap" in the Tariff, or P3's explanation that the issue is a well understood design feature of PJM's CETO forecasting model, PJM's proposed rate change does not address either issue and does not pass muster under either the FPA or the APA.[137]

---

[136] *See TransCanada*, 811 F.3d at 9; *Puget Sound Energy, Inc.*, 132 FERC ¶ 61,128 at P 31.

[137] *See Puget Sound Energy, Inc.*, 132 FERC ¶ 61,128, at P 31 (2010) (finding that, in order for rate changes proposed under FPA Section 205 to be just and reasonable, "such solutions must fit the problems they are intended to solve").

PJM's proposed solution is to (1) redefine LDA Reliability Requirement to "exclude . . . any Planned Generation Capacity Resource in an LDA that does not participate in the relevant RPM Auction as projected internal capacity and in the [CETO] model where the [LDA] Reliability Requirement for the [BRA] increases by more than one percent over the reliability requirement for the [BRA] used from the prior Delivery Year's [BRA] . . . for that LDA due to the cumulative addition of such Planned Generation Capacity Resources;" and (2) alter the optimization algorithm rules to allow PJM to include in it "any revised [LDA] Reliability Requirement based on the actual participation of Planned Generation Capacity Resources[.]"[138] In addition to the filed rate doctrine concerns described above, there are at least three problems with the merits of that proposed solution.

First, it does not address the problem that PJM itself identified in these proceedings, because it applies only to "Planned Generation Capacity Resources."  As PJM has explained, these proceedings arose because PJM made assumptions about the BRA participation of one Planned Generation Capacity Resource and a large quantity of Intermittent Resources.  PJM emphasized that Intermittent Resources pose the same concern "particularly . . . where a proportionately large quantity of solar resources are planned in a near-winter peaking LDA, such as DPL-South, because solar resources are not as productive in the winter than the summer months."[139]  Yet PJM has entirely omitted Intermittent Resources from its proposed solution.[140]

Furthermore, when it comes to forecasting a resource's participation in a BRA, several other types of resources pose the same problem as Planned Generation Capacity Resources and planned Intermittent Resources.  Section 6.6A(c) of the Tariff exempts from the RPM must-offer

---

[138] PJM 205 Filing at 21.

[139] *Id.* at 14.

[140] *Id.* at 18-20.

obligation *all* Intermittent Resources, Capacity Storage Resources, Demand Resources, Energy Efficiency Resources, and Hybrid Resources consisting exclusively of components that in isolation would be Intermittent Resources or Capacity Storage Resources.  Those resources are exempt from the RPM must-offer obligation, and thus have the option not to offer into a BRA, regardless of whether they are merely planned or already existing.  As a result, PJM faces the same uncertainty in predicting whether those resources will participate in a particular BRA as is posed by Planned Generation Capacity Resources.[141]  PJM has provided no explanation for why its proposed solution only applies to Planned Generation Capacity Resources, nor has PJM provided any evidence indicating that adjusting the optimization algorithm based only on those resources would produce accurate LDA Reliability Requirements and resulting clearing prices.  PJM has not demonstrated how this approach is just and reasonable and not unduly discriminatory or preferential.

Second, PJM's proposed solution imposes an arbitrary and unsupported threshold.  Specifically, PJM may exclude from the CETO model "any Planned Generation Capacity Resource where the [LDA] Reliability Requirement for the [BRA] increases <u>by more than one percent</u> over the reliability requirement for the [BRA] used from the prior Delivery Year's [BRA] . . . for that LDA due to the cumulative addition of such Planned Generation Capacity Resources."[142]  PJM has provided no explanation for how it arrived at that one percent threshold, how often adjustments would be made using that threshold (based on either historical experience or future expectations), or how implementing that threshold would impact reliability and clearing prices.  Although PJM has vaguely asserted that its proposal is expected to reduce the clearing

---

[141] Shanker Affidavit at 17, 36-37.

[142] PJM 205 Filing at 12.

price for the DPL-South LDA in the December 2022 BRA, PJM has provided no concrete evidence concerning the rate impact on that zone—much less the other LDAs—either for the December 2022 BRA or future auctions.  Based on the Planning Parameters PJM issued in August 2022, in which four LDAs aside from DPL-South have Reliability Requirement increases of more than one percent, it is reasonable to assume that PJM's proposed rate change will produce mid-auction adjustments more frequently than PJM has indicated.

Third, PJM has not explained how the resulting rates its proposal will produce for the DPL-South LDA in the December 2022 LDA are economically rational.  As noted, the DPL-South LDA is already short on generation and, based on the amount of internal resources that did not participate in the December 2022 BRA, it appears that the LDA is experiencing difficulty making up that shortfall.[143]  The existing Tariff, which has already been found to be just and reasonable, has produced a price that apparently reflects those fundamentals—ratcheting up to provide a stronger price signal for investment in the DPL-South LDA.  Based on the limited information PJM has provided, it appears that PJM's proposal would not provide that level of price signal.  Further, PJM has not recognized the tradeoff inherent in its proposal: although PJM asserts that updating the LDA Reliability Requirement after the submission of Sell Offers to account for non-participating resources will render the LDA Reliability Requirements more accurate, PJM ignores the fact that doing so will necessarily render Sell Offers less accurate— because they will be based on the LDA Reliability Requirement that PJM announced as an auction parameter at the beginning of the BRA, a parameter that PJM describes in these

---

[143] Absent an appropriate price signal, those difficulties could be long-lived, particularly if they are the result of Capacity Resources that lack an RPM must-offer obligation declining to offer capacity in order to avoid the potential liabilities associated with a capacity supply obligation. Shanker Affidavit at 24, 35.

proceedings as "inaccurate."[144]  PJM must, at minimum, recognize this tradeoff and provide evidence demonstrating that, notwithstanding the tradeoff and the fact that Sell Offers would be based on a parameter PJM considers to be "inaccurate," its proposed solution will produce clearing prices that accurately reflect supply and demand dynamics.

Each of the above shortcomings by PJM constitutes an independent basis for concluding that PJM has failed to carry its FPA and APA burdens to demonstrate that its proposed solution is just and reasonable, whether as a rate change under FPA Section 205 or as a replacement rate under FPA Section 206.

>   ii.   *PJM Has Not Demonstrated that the Existing Tariff is Unjust and*
>         *Unreasonable Under FPA Section 206*

Under FPA Section 206, "the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon … the complainant."[145]  Accordingly, because PJM filed the Section 206 Complaint, PJM bears the burden of proof to demonstrate that its existing Tariff is unjust, unreasonable, or unduly discriminatory or preferential.  In order to satisfy that burden, PJM must also satisfy the evidentiary burden of proof imposed by the APA, discussed above.[146]  PJM has not satisfied those burdens, nor has it made even a half-hearted attempt to do so.

As PJM explains at the outset of its Complaint, PJM filed the Complaint "out of an abundance of caution so as to provide the Commission with the ability to make modifications to

---

[144] *See* PJM 205 Filing at 20-22 (describing the LDA Reliability Requirement parameter that is updated mid-auction as the "accurate[]" version of that parameter and the LDA Reliability Requirement parameter used prior to such an update as "inaccurate").

[145] Federal Power Act § 206(b).

[146] *See supra* § II.C.i.

PJM's proposed tariff remedy, if it so chooses, without running afoul of the *NRG* precedent governing FPA section 205 applications."[147]  PJM goes on to declare that "[s]hould PJM's section 205 application be granted, PJM places parties on notice that it would consider this FPA section 206 filing to be moot and withdrawn."[148]  As those statements make clear, the purpose of PJM's Complaint is not to prove that the existing Tariff is unjust and unreasonable.  Rather, it is a precautionary procedural tool to give the Commission the option to alter PJM's proposed rate change without exceeding its authority under FPA section 205.  In other words, the Complaint's primary target is PJM's own FPA section 205 proposal, not the existing Tariff.[149]

In any event, PJM's arguments for why the existing Tariff is unjust and unreasonable fall flat for several reasons.  First, PJM has failed to "[c]learly identify the action or inaction which is alleged to violate" the FPA.[150]  PJM goes to great lengths to conceal the actual cause of the alleged problem.  Throughout both of PJM's filings, PJM blames the failure of certain "large Planned Generation Capacity Resources and planned Intermittent Resources" to participate in the BRA consistent with PJM's projections.  But it is not at all clear what action or inaction is responsible for the problem as PJM has described it.  What is responsible for the LDA Reliability Requirement allegedly being "inaccurate?"  Is it PJM's CETO model?  Is it the assumptions PJM makes about generation resources when deciding whether to include them in the CETO model?

---

[147] *See* PJM Complaint at n.4 (citing *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108 (D.C. Cir. 2017)).

[148] *Id.*

[149] Of course, the Commission did not need PJM to file a section 206 complaint to avoid running afoul of *NRG*.  The Commission can avoid running afoul of *NRG* on its own by *sua sponte* instituting a section 206 investigation.  PJM is well aware of that fact, which indicates that PJM's Complaint was also motivated by a desire to establish an earlier effective date for the section 206 docket.  The obvious implication of that motivation is that, despite its arguments to the contrary, PJM recognizes that its actions in these dockets run afoul of the filed rate doctrine and, as a result, PJM is attempting to reduce the perceived egregiousness of its retroactive changes.  Unfortunately for PJM, retroactive changes are retroactive regardless of how far back in time they reach.

[150] 18 C.F.R. § 385.206(b)(1).

Is it generation owners' decisions not to offer a modeled resource in the BRA? If so, which specific generation owners? Is it the Tariff rules exempting certain generation owners from the RPM must offer obligation? Is it PJM's failure to engage in due diligence and update the LDA Reliability Requirements in advance of the BRA when it receives information from planned resources through the interconnection process which indicates the resource is not likely to be available in the timeframe PJM previously projected? PJM's superficial and cryptic diagnosis gives the Commission no basis to conclude that any particular Tariff provision, action, or inaction is unjust and unreasonable.

Second, the limited evidence PJM has provided about the clearing prices that are produced under the existing Tariff cannot support the complaint for an additional reason: PJM has obfuscated the process by which it generated that evidence. PJM repeatedly asserts that its proposed rate change will not violate the filed rate doctrine because it has not posted the BRA results and the calculations on which it has based its filings in these proceedings are just "preliminary." And yet PJM attempts to rely on those results to declare the existing Tariff unjust and unreasonable. PJM cannot have it both ways. The December 2022 BRA results cannot simultaneously be both preliminary (for filed rate doctrine purposes) and final (for purposes of impeaching the Tariff). If those results are preliminary and do not actually represent the clearing price produced by the BRA under the existing Tariff, as PJM contends, then PJM must at least explain in detail how it calculated those results, how that method relates to the existing Tariff, and why those preliminary results impeach the Tariff despite the fact that they were not produced by strictly following the Tariff.[151]

---

[151] *See* 18 C.F.R. § 385.206(b)(8) (complaint must include "all documents that support the facts in the complaint in possession of, or otherwise attainable by, the complainant").

Third, PJM has not demonstrated that, to the extent the LDA Reliability Requirement produced by the existing Tariff is "inaccurate," that inaccuracy actually produces unjust and unreasonable results.  The only "evidence" PJM presents is the unsupported assertion that the existing Tariff produces a clearing price for the DPL-South LDA in the December 2022 BRA which is "approximately" four times higher than the clearing price that would be produced by PJM's replacement rate.  That is "argument" not "evidence," but even if it were considered evidence, it is not enough to demonstrate that the Tariff is unjust and unreasonable, particularly in light of the ample record evidence to the contrary presented in the affidavit of Dr. Shanker.  Further, even if that lone unsupported assertion could be sufficient, PJM's failure to provide any details or supporting documents or testimony renders the information unreliable and the Complaint inadequately supported.[152]  By PJM's own admission, the alleged "inaccuracy" has produced a clearing price for the DPL-South LDA that signals new generation is needed in that LDA, in which fewer resources participated than PJM forecast.  PJM has not attempted to explain why or how this price signal is unjust and unreasonable for a zone that is demonstrated to be short on generation based on PJM's own auction participation forecasts, and in which it apparently is difficult to build new generation on the timeline that PJM has assumed in its CETO model.

Each of the aforementioned deficiencies in PJM's Complaint represents an independent basis on which to reject the Complaint, and the Commission should promptly do so.

---

[152] *See* 18 C.F.R. § 385.206(b)(8) (complaint must include "all documents that support the facts in the complaint in possession of, or otherwise attainable by, the complainant").

iii. *As Demonstrated in the Attached Affidavit of Dr. Shanker, PJM Could Address the Concern it Has Identified by Establishing a Deadline, Prior to Determining the Reliability Requirement for Each Auction, by which Planned and Existing Resources with the Option not to Offer Must Notify PJM Whether They Will or Will Not Participate in the Auction*

If either PJM believes that its method of forecasting LDA Reliability Requirements is insufficiently predictive of the Planned Generation Capacity Resources and Intermittent Resources that ultimately will participate in RPM auctions, there is a much simpler and more effective solution available that will not only address PJM's concern but that also will provide increased certainty to the market.[153]

As explained above, PJM's approach to calculating an LDA's CETO and LDA Reliability Requirement assumes that all planned an existing generation resources in the LDA at issue will be in-service within the planning horizon and will offer into the BRA.  For most resources, there is little to no risk that that assumption will prove inaccurate, because the default setting in the RPM rules is that resources are <u>required</u> to offer into the BRA.[154]  A Seller may seek an exception to that must-offer obligation pursuant to Section 6.6A(c) of the Tariff, but such exceptions are permitted only if the Seller can demonstrate that the resource at issue "is reasonably expected to be physically incapable of satisfying the requirements of a Capacity Performance Resource."[155]  Further, that request must be accompanied by a plain showing the steps the Seller will take "for the resource to become physically capable of satisfying the requirements of a Capacity Performance Resource," and the Seller must provide PJM progress

---

[153] Shanker Affidavit at 35-36.

[154] *See* Tariff, Attach. DD § 6.6A ("For the 2018/2019 Delivery Year and subsequent Delivery Years, the installed capacity of every Generation Capacity Resource located in the PJM region that is capable (or that can reasonably become capable) of qualifying as a Capacity Performance Resource shall be offered as a Capacity Performance Resource . . . in all RPM Auctions for each such Delivery Year[.]").

[155] *Id.* § 6.6A(c).

reports 120 days prior to subsequent Incremental Auctions and approximately 150 days prior to subsequent BRAs.[156]  In other words, for most resources, the Tariff ensures that PJM's assumptions about the auction participation of generation resources will be highly accurate, and it does so by imposing strict obligations on Sellers to either offer into the auctions or obtain an exception that itself obligates the Seller to notify PJM well in advance of each auction as to whether its exception will apply for that auction.[157]

Those default rules do not apply to the specific types of resources that gave rise to the concerns PJM has expressed in these proceedings.  Planned Generation Capacity Resources, Intermittent Resources, Capacity Storage Resources, Demand Resources, Energy Efficiency Resources, and Hybrid Resources consisting exclusively of components that in isolation would be Intermittent Resources or Capacity Storage Resources are all exempt from the RPM must-offer obligation.[158]  Further, that blanket exemption does not impose any of the obligations that apply to generation resources that obtain an exception from the RPM must-offer obligation.[159]  Most troublingly, resources that qualify for the blanket exemption have no obligation to notify PJM about whether they will be physically capable of satisfying the requirements of a Capacity Performance Resource or whether they will exercise their option to not participate in an upcoming auction.[160]  PJM As a result, PJM's assumptions regarding whether those resources will participate are vastly more uncertain that PJM's assumptions about resources with an RPM must-offer obligation or an exception therefrom.

---

[156] Tariff, Attach. DD § 6.6A(c).

[157] *Id.* §§ 6.6A(a), (c).

[158] *Id.* § 6.6A(c); Shanker Affidavit at 16.

[159] *See* Shanker Affidavit at 16-17, 35.

[160] *See id.*

As Dr. Shanker explains, this is the true source of the LDA Reliability Requirement forecast risk that PJM has identified, and there is a straightforward, elegant solution for eliminating this risk. Dr. Shanker's proposal is "simply to require that any seller/supplier of capacity with an option not to participate in the upcoming BRA must formally execute that option in advance of the BRA, through a binding declaration to either offer or not offer in that BRA."[161] Dr. Shanker explains that, if such a resource declares that it will offer in the BRA, its offer will be subject to all of the rules that apply to offers from Planned and existing resources in that BRA.[162] In terms of timing, Dr. Shanker proposes that declarations of whether such resources will exercise their option not to offer in a BRA should be made thirty (30) days prior to PJM's posting of the planning parameters for that BRA.[163] In other words, the declarations would be due approximately 120 days prior to the BRA, which closely aligns with the existing Tariff deadline for resources that have received an exception from the must-offer obligation to notify PJM of their status for the upcoming auction.[164]

This Tariff change would preserve the option for Planned Generation Capacity Resources, Intermittent Resources, Capacity Storage Resources, Demand Resources, Energy Efficiency Resources, and Hybrid Resources consisting exclusively of components that in isolation would be Intermittent Resources or Capacity Storage Resources to not offer into RPM auctions, while also providing PJM with certainty regarding how those options will be exercised when PJM is establishing the parameters—including the CETO figures and LDA Reliability Requirements—to be used in the BRA. This will eliminate the risk that PJM's LDA Reliability

---

[161] Shanker Affidavit at 37.

[162] *Id.*

[163] *Id.*

[164] *Id.* at 38-39.

Requirements might turn out to be inaccurate and will do so with minimal burden to a subset of market participants, changing the timing of their decision to match the timing required of market participants that have obtained exceptions to the RPM must-offer obligation. As discussed in detail above, Dr. Shanker's solution is far superior to PJM's flawed proposal in these dockets.

Further, as Dr. Shanker explains, the forecast risk presented by resources that are exempt from the RPM must-offer obligation is likely to increase in the future. As more and more Planned Generation Capacity Resources, Intermittent Resources, Capacity Storage Resources, Demand Resources, Energy Efficiency Resources, and Hybrid Resources seek to enter the market, spurred on by increasingly aggressive federal and state energy policies, the uncertainty concerning the development timelines and auction participation of those resources can be expected to have increasing impacts on PJM's CETO and LDA Reliability Requirement calculations. This is yet another reason the Commission should reject PJM's reckless, rushed proposal in these proceedings. The proper course in this situation is to conduct a thoughtful stakeholder process to fully consider the nature of the issue PJM has identified and explore solutions for future auctions which, like Dr. Shanker's solution, are effective, consistent with competitive market principles, and lawful.

## III.    CONCLUSION

For the foregoing reasons, the Commission should dismiss PJM's Section 205 and Section 206 filings in these proceedings, holding that (1) applying PJM's proposed Tariff changes to the December 2022 BRA would violate the filed rate doctrine and the rule against retroactive ratemaking, and (2) PJM has not satisfied its burdens under FPA Section 205, FPA Section 206, or Section 7(c) of the APA.  In so doing, the Commission should direct PJM to immediately post the final results of the December 2022 BRA.

Respectfully submitted,

Nicholas Gladd
Nicholas Salalayko
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
(207) 791-1208
ngladd@pierceatwood.com

*Counsel for The PJM Power Providers Group*

_/s/ Glen Thomas_
Glen Thomas
Diane Slifer
GT Power Group
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
gthomas@gtpowergroup.com
dslifer@gtpowergroup.com
610-768-8080

January 20, 2023

# Attachment A

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                     )          Docket No. ER23-729-000
                                                )          Docket No. EL23-19-000

AFFIDAVIT OF THE HON. JOSEPH T. KELLIHER
ON BEHALF OF
THE PJM POWER PROVIDERS GROUP

41.   The Commission has held that abiding by market rules is necessary to enable an RTO to

effectively administer markets[82] and has generally disfavored re-running markets, explaining

that doing so is an extraordinary measure that would create market uncertainty for market

participants and require resolving complex questions.   Further, the Commission has found that

re-running markets would do more harm to electric markets than is justifiable[83] and that "re-

running the markets would likely harm customers …."[84]   The Commission has declined to re-

run markets even where – unlike here – the RTO committed an error implementing its existing

tariff, holding that doing so "would do far more harm to wholesale electricity markets than is

justifiable or appropriate … and would be fundamentally unfair to market participants."[85]   The

Commission has long recognized maintaining market confidence includes encouraging

reliance on RTO market rules.

42.   PJM's December 23rd Filings effectively ask the Commission to allow it to re-run the BRA

auction, at least in DPL-South.   While PJM has refused to post the clearing prices, they have

announced their estimate that the auction results in DPL-South are roughly four times the result

in the last BRA.[86]   Deeming that result unjust and unreasonable, a determination left to the

Commission, not PJM, PJM has asked the Commission for authority to retroactively change

the parameters that governed the auction and re-run it, in a naked bid to change the results of

the auction and lower prices in DPL-South.   PJM seems to believe that retroactively changing

[82] *GenOn Energy Mgmt, LLC v. ISO New England*, 152 FERC ¶ 61,044 at P 50 (2015); *Northeast Utils. Serv. Co*., 135 FERC ¶ 61,123 at P 13 (2011) (emphasizing it is important to abide by RTO market rules to enable effective administration of RTO markets).
[83] *Dominion Energy Mktg., Inc. v. ISO New England*, 155 FERC ¶ 61,121 at P 23 (2016); *Ameren Servs. Co*., 127 FERC ¶ 61,121 at P 17 (2009); *Bangor Hydro-Elec. Co. v. ISO New England*, 97 FERC ¶ 61,339 at 62,590 (2001), *reh'g denied*, 98 FERC ¶ 61,298 (2002).
[84] *PJM Interconnection, LLC*, 169 FERC ¶ 61,237 at P 23 (2019); *PJM Interconnection, LLC*, 161 FERC ¶ 61,252 at P 60 (2017).
[85] *Bangor Hydro-Elec. Co*., 97 FERC at 62,590.
[86] December 23rd Filings at 2, 17, 29, 31.

# Attachment B

# UNITED STATES OF AMERICA
# BEFORE THE
# FEDERAL ENERGY REGULATORY COMMISSION

|  |  |  |
|---|---|---|
| | ) | Docket No. EL23-19-000 |
| PJM Interconnection LLC, | ) | Docket No. ER23-729-000 |
| | ) | |

**Affidavit**
**Of**
**Roy J. Shanker Ph. D**.

ON BEHALF OF

THE PJM POWER PROVIDERS GROUP

January 20, 2023

current events are just the tip of the iceberg.[32] The implications and allocation of this risk was discussed above, along with a description of how this risk manifests itself in terms of price incentives to respond to both high and low prices. However, it appears that as the magnitude of this risk grows, PJM would like to somehow adjust this risk. That certainly is a fair issue for future consideration, but this risk is a fixed property of the current Tariff as identified above.

### G. Harm to Market Participants

49.    PJM's proposed "fix" to change the Planning Parameters after the parties have relied for months on the posted Planning Parameters, entered or failed to enter into business arrangements to manage their risks (e.g. hedges of some sort) and then submitted their bids that are potentially held open for months is at odd with sound market design and must be rejected. Compounding the problem, based on these changes to the Planning Parameters, despite the fact the auction was carried out in all aspects respecting the existing Tariff, and based on PJM's subjective and non-disclosed judgement, PJM then proposes to redetermine prices. To say that this is ridiculous is an understatement. Aside from the legal elements well discussed by counsel and Chairman Kelliher in the P3 filing, there are very real and material harms caused by this market confidence-crushing exercise in retroactive rate-making.

50.    Probably the biggest harm presented by PJM's unconscionable proposal relates to those parties who entered or failed to enter into swaps or hedges with third parties (financial or physical) to "cover" their capacity requirements or get a known fixed price for their Capacity prior to exposure to the risks of the auction. For example, a buyer (LSE) might have seen ESAI's forecast, done their own analyses, and concluded that the likely price was at or very near to the market cap, let's say $425 per MW-day (MWD). That party would very likely to enter into a

---

[32] *See, e.g.*, S&P Power Battery and Solar PJM forecast, at 18, available at https://www.pjm.com/-/media/committees-groups/subcommittees/las/2022/20221129/item-03a---ihs-markit---pjm-solar-and-battery-forecasts.ashx; *see also* PJM, Energy Transition in PJM: Emerging Characteristics of a Decarbonizing Grid, available at   https://www.pjm.com/-/media/library/reports-notices/special-reports/2022/20220517-energy-transition-in-pjm-emerging-characteristics-of-a-decarbonizing-grid-white-paper-final.ashx.

bilateral agreement or swap to purchase DPL-South UCAP at say $375 MWD if they could find a willing supplier. Assume that buyer approached two sellers with that offer to buy a portion of their exposure (100MW UCAP), and one seller accepted and the other rejected the offer. For the buyer who now owns 100 MW at $375 MWD, there would be understandably large regrets and damages when they find out the Planning parameters have been changed without notice or precedent.   If that party had known PJM's as yet to be disclosed changes, they would have valued such Capacity at say a hypothetical $75 MWD. They would likely perceive that they just lost $300 MWD on 100 MW purchase or $10.95 million.[33] The seller who made the deal feels pretty happy, and the seller who refused the deal (expecting to make $50 MWD more) feels defrauded by PJM for effectively injecting false information into the market  and not just with respect to the original Planning Parameters but also with respect to a false reliance on that information and no reasonable expectation that PJM could do such a thing.

51.    All three parties would likely to approach their actions in PJM's future auctions quite differently due to this type of behavior which fundamentally undermines trust and reliance on the integrity of the existing Tariff. This in turn is bad for all three parties. The buyer may be more reluctant to hedge, effectively being forced unwillingly into a situation that is now much riskier than they had ever expected in terms of participating in any Commission-regulated market. The seller who sold might be happy today, but you can bet tomorrow as the next auction approaches every seller will demand a higher risk premium knowing that things could just as easily go the other way depending on PJM's out of market determinations or whims. And the seller who lost the high sale price opportunity will now likely just be reluctant to participate in transactions at all. Collectively this loss of confidence translates into a thinner/less liquid market and higher buy/sell spreads. For end use customers the ultimate effect will be to see this risk and the resulting impacts lead to higher prices whenever they wish to enter into a hedge, or simply higher prices regardless of whether they hedge or not. Any way this goes, market efficiency takes a beating to the detriment of the market as a whole.

---

[33] $300 times 100 MW times 365 days=$10,950,000

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **PJM Interconnection, L.L.C.** | ) | **Docket No. ER23-729-000** |
| **PJM Interconnection, L.L.C.** | ) | **Docket No. EL23-19-000** |
| | | **(Not consolidated)** |

## PROTEST AND REQUEST FOR PRIVILEGED TREATMENT

Pursuant to Rule 211 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission (the "Commission" or "FERC")[1] and in accordance with the Commission's December 27, 2022 notice in the above-captioned proceedings,[2] NRG Power Marketing LLC ("NRG-PML"), Direct Energy Business Marketing, LLC ("DEBM") and Midwest Generation, LLC ("Midwest Gen" and collectively with NRG-PML and DEBM, the "NRG Companies") protest the December 23, 2022 filings by PJM Interconnection, L.L.C. ("PJM") in the above-captioned proceedings.[3] As discussed herein, the Commission must summarily reject the December 23 Filings.

---

[1] 18 C.F.R. § 385.211 (2022).

[2] *See* Combined Notice of Filings #1, Docket Nos. EG23-49-000, *et al.* (Dec. 27, 2022) (unreported).

[3] Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to Section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for an Extended Comment Period of 28 Days, Docket No. ER23-729-000 (filed Dec. 23, 2022) (the "Section 205 Filing"); Section 206 Filing Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area in the 2024/2025 Base Residual Auction and Requesting that the Commission Establish a Refund Effective Date of December 23, 2022, and Request for an Extended Comment Period of 28 Days, Docket No. EL23-19-000 (filed Dec. 23, 2022) (the "Section 206 Filing" and together with the Section 206 Filing, the "December 23 Filings"). Capitalized terms used and not otherwise defined herein have the meaning given them in the December 23 Filings or, if not defined therein, in the PJM Open Access Transmission Tariff (the "Tariff"). Each of the NRG Companies timely moved to intervene in these proceedings. *See* (doc-less) Motion to Intervene of NRG Power Marketing LLC, Docket No. ER23-729-000 (filed Dec. 27, 2022); (doc-less) Motion to Intervene of NRG Power Marketing LLC, Docket No. EL23-19-000 (filed Dec. 27, 2022); (doc-less) Motion to Intervene of Direct Energy Business Marketing, LLC, *et al.*, Docket No. ER23-729-000 (filed

Document Accession #: 20130120-5259   Filed Date: 01/20/2023

Through the December 23 Filings, PJM proposes to change the rules for the Base Residual Auction for the 2024/2025 Delivery Year (the "2024/2025 BRA") after the offer period has closed. As discussed herein and in the affidavit of Joseph A. Holtman, Vice President for Trading of NRG Energy, Inc. ("NRG"), provided in Attachment A hereto (the "Holtman Affidavit"), the NRG Companies and their affiliates made irreversible commercial decisions in reliance on the auction rules and the planning parameters posted thereunder. In doing so, they, like other market participants, relied on the unambiguous terms of the filed rate and past Commission and PJM statements making clear that market participants should be able to rely on posted planning parameters. In its determination to retroactively revise the auction results to avoid politically unpalatable results dictated by the rules in effect when the auction was conducted, PJM blithely ignores the substantial and actual reliance interests of the NRG Companies and other market participants and proposes to change the rules after-the-fact. Such action is unlawful, unjust, unreasonable, unwise and unfair. The Commission must act decisively to reject the December 23 Filings and thereby to restore at least some modicum of faith in the integrity of the auction process.

## I.

## BACKGROUND

### A.     The December 23 Filings

In the December 23 Filings, PJM proposes to revise the Tariff to allow it to adjust the Locational Delivery Area ("LDA") Reliability Requirement during the auction clearing process to

---

Jan. 13, 2023); (doc-less) Motion to Intervene of Direct Energy Business Marketing, LLC, *et al.*, Docket No. EL23-19-000 (filed Jan. 13, 2023).

Document Accession #: 20130520-5259    Filed Date: 04/20/2023

exclude Planned Generation Capacity Resources that did not offer into the applicable RPM Auction.[4]  PJM described the issue prompting the December 23 Filings as follows:

> In conducting the 2024/2025 [BRA], a significant amount of Planned Generation Capacity Resources that were expected to participate in the auction based on the expected in-service date of the resources' Interconnection Service Agreements ("ISAs") did not offer in the auction despite being included in the [LDA] Reliability Requirement.  As a result, as further explained below, the Locational Deliverability Area Reliability Requirement for one particular [LDA], Delmarva Power & Light South ("DPL-S"), was overstated for the 2024/2025 BRA.[5]

PJM claims that the revision proposed in the Section 205 Filing is "needed to allow the RPM Auctions to use an accurate [LDA] Reliability Requirement in clearing the auctions."[6]  PJM also submitted the Section 206 Filing "to provide the Commission with the ability to make modifications to PJM's proposed tariff remedy, if it so chooses . . . ."[7]

## B.    The NRG Companies

Each of the NRG Companies is a direct or indirect wholly owned subsidiary of NRG.  NRG is a Delaware corporation and an integrated wholesale power generation and retail electricity company.  NRG's common stock is publicly traded on the New York Stock Exchange under the symbol "NRG."

As indicated in their timely motions to intervene in the above-captioned proceedings, each of NRG-PML and Midwest Gen owns or controls generation facilities in the PJM footprint, and NRG-PML, DEBM and their affiliated retail marketers actively engage in bilateral wholesale and

---

[4]    *See* Section 205 Filing, Transmittal Letter at 1; Section 206 Filing at 1.

[5]    Section 205 Filing, Transmittal Letter at 2.  *See also* Section 206 Filing at 2 (same).

[6]    Section 205 Filing, Transmittal Letter at 2.

[7]    Section 206 Filing at 2 n.4.

Document Accession #: 20130620-5259  Filed Date: 04/20/2023

retail transactions in the PJM footprint.[8]  Among other things, NRG-PML markets the output of various generation facilities owned by its affiliates.  Of particular relevance here, NRG-PML markets the output of, and acts as the Capacity Market Seller for, four generating units located in the DPL-S LDA:

- Unit 8 ("Vienna 8") at the Vienna Generating Station in Vienna, Maryland, an approximately 153.0 MW (summer rating) oil-fired generating unit;

- Unit 10 ("Vienna 10") at the Vienna Generating Station, an approximately 14.3 MW (summer rating) oil-fired generating unit;

- Unit 4 ("Indian River 4") at the Indian River Power Plant in Millsboro, Delaware, an approximately 410.0 MW (summer rating) coal-fired generating unit; and

- Unit CT 10 ("Indian River CT10") at the Indian River Power Plant, an approximately 16.1 MW (summer rating) oil-fired generating unit.

NRG-PML offered the capacity of Vienna 8, Vienna 10 and Indian River CT10 into the 2024/2025 BRA.  It did not offer the Indian River 4's capacity into the 2024/2025 BRA because this unit was going to be deactivated and is only continuing to operate subject to a reliability must-run ("RMR") rate schedule.[9]

DEBM and its affiliates are also active in competitive retail electricity markets within the DPL-S LDA.  They market electricity in this region and others under various brands, including NRG Home, Direct Energy, Green Mountain Energy, Gateway Energy Services, Stream Energy and XOOM Energy.  In connection with their retail marketing activities, these entities hold retail marketing licenses from the Delaware, Maryland and Virginia commissions.

---

[8]     *See supra* note 3.

[9]     *See* Reliability Must-Run Rate Schedule, Electric Rate Schedule FERC No. 3, Docket No. ER22-1539-000 (filed Apr. 1, 2022), *accepted & suspended*, *NRG Power Mktg. LLC*, 179 FERC ¶ 61,156 (2022).

## II.

## PROTEST

NRG is a member of the Electric Power Supply Association ("EPSA") and The PJM Power Providers Group ("P3"), and the NRG Companies strongly support the protests to the December 23 Filings being submitted concurrently by EPSA and P3.  The NRG Companies are filing separately to emphasize their profound concerns, as entities that rely on the RPM Auction rules to inform commercial decisions, about the December 23 Filings and to make clear that there was actual reliance on those rules in the 2024/2025 BRA that PJM has completely ignored in proposing to change those rules after-the-fact.

A.   **The Relief Requested by PJM for the 2024/2025 BRA Violates the Filed Rate Doctrine and the Prohibition Against Retroactive Ratemaking**

Notwithstanding PJM's protestations to the contrary, granting the relief it requests as to the 2024/2025 BRA would represent a blatant and unlawful violation of the filed rate doctrine and the corollary prohibition against retroactive ratemaking.  PJM claims that it is not "proposing any modifications to activities or deadlines associated with the 2024/2025 BRA that have already occurred or passed."[10]  But this is simply untrue.  PJM cannot dodge the strictures of the filed rate doctrine through prospective application of new tariff language that allows for retroactive modification of a key planning parameter, the LDA Reliability Requirement, long after the applicable deadline for posting planning parameters has passed and activities in reliance on the posted parameters have concluded.

Under the Tariff, PJM is required to post the LDA Reliability Requirements and other planning parameters "for a Delivery Year ***prior to conducting the Base Residual Auction for such***

---

[10]      Section 205 Filing, Transmittal Letter at 4.  *See also* Section 206 Filing at 4 (same).

*Delivery Year*."[11]  More specifically, for the three Base Residual Auctions starting with the 2024/2025 BRA, PJM received Commission approval to post the planning parameters 100 days "prior to the relevant BRA."[12]  With respect to the Reliability Requirement parameters, the Tariff expressly provides that PJM "shall determine the PJM Region Reliability Requirement and *the [LDA] Reliability Requirement* for each [LDA] for which a Variable Resource Requirement Curve has been established for such Base Residual Auction . . . *prior to the conduct of the Base Residual Auction* . . . ."[13]

In the Section 205 Filing, PJM proposes to revise the Tariff to allow it to adjust the LDA Reliability Requirements "during the auction process . . . ."[14]  Specifically, PJM proposes to revise the definition of "Locational Deliverability Area Reliability Requirement" to provide that:

> effective with the 2024/2025 Delivery Year, during the auction process, the Office of Interconnection shall exclude from the Locational Deliverability Area Reliability Requirement any Planned Generation Capacity Resource in an LDA that does not participate in the relevant RPM Auction as projected internal capacity and in the Capacity Emergency Transfer Objective model where the Locational Deliverability Area Reliability Requirement for the Base Residual Auction increases by more than one percent over the reliability requirement used from the prior Delivery Year's Base Residual Auction (for Incremental Auctions the Locational Deliverability Area Reliability Requirement would be compared with the reliability requirement used in the prior relevant RPM Auction associated with the same Delivery Year) for that LDA due

---

[11]     *See* Tariff, Attachment DD, § 5.11(a) (emphasis added).  *See also id.*, § 15.

[12]     *See* Compliance Filing Concerning Certain Proposed Revised Pre-Auction Deadlines and Motion for a Shortened Comment Period of 7 Days and Request for Expedited Consideration, Docket No. EL19-58-010 (filed Jan. 21, 2022), *accepted*, *PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,122 (2022).

[13]     Tariff, Attachment DD, § 5.10(vi)(B) (emphasis added).  Similarly, the Tariff provides that "[t]he parameters of the Variable Resource Requirement Curve will be established prior to the conduct of the Base Residual Auction for a Delivery Year and will be used for such Base Residual Auction." *Id.*, § 5.10(vi)(A). Such parameters clearly include the Reliability Requirement, which is an anchor point of the Variable Resource Requirement Curve.

[14]     *See* Section 205 Filing, Attachment B (revised definition of "Locational Deliverability Area Reliability Requirement").  *See also* Section 206 Filing at 20-21 (same).

to the cumulative addition of such Planned Generation Capacity Resources.[15]

PJM insists that the proposed tariff revisions are "prospective and can be applied beginning with the current 2024/2025 BRA."[16]  PJM is wrong.

There is nothing prospective about allowing PJM to modify an LDA Reliability Requirement that was final and that PJM was required to apply in clearing the auction under the rules in effect when PJM made its December 23 Filings.  PJM cannot, through prospective application of a tariff provision allowing for retroactive adjustments, implement retroactive changes to the posted LDA Reliability Requirement.  In fact, notwithstanding PJM's sleight of hand, it is hard to imagine a more clear-cut violation of the filed rate doctrine and the corollary prohibition against retroactive ratemaking than changing the rules for an auction after the offer period has come and gone.  The courts have made clear that, under the filed rate doctrine, the Commission "has no power to alter a rate retroactively,"[17] and the Commission itself has recognized that the filed rate doctrine precludes the application of a methodology that "is not

---

[15]    Section 205 Filing, Attachment B (revisions to definition of "Locational Deliverability Area Reliability Requirement").  *See also id.* (conforming revisions to language of Section 5.12(a) of Attachment DD concerning the optimization algorithm used in clearing the Base Residual Auctions); *id.* (conforming revisions to language of Section 5.12(b) of Attachment DD concerning the optimization algorithm used in clearing the Incremental Offers).

[16]    *See* Section 205 Filing, Transmittal Letter at 22; Section 206 Filing at 22.

[17]    *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981).  *See also Old Dominion Elec. Coop. v. FERC*, 892 F.3d at 1223, 1232 (D.C. Cir. 2018) ("*ODEC*") (finding a petitioner's requested relief would "retroactively rewrite the terms of the filed rate" and holding that "[t]he filed rate doctrine and rule against retroactive rulemaking flatly forbid such a result"); *Louisiana Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 556 (D.C. Cir. 2014) (stating that "the absence of retroactive relief is a function of the filed-rate doctrine"); *OXY USA, Inc. v. FERC*, 64 F.3d 679, 700 (D.C. Cir. 1995) ("*OXY*") (holding that a new methodology for valuing petroleum shipments "could not have been imposed retroactively without violating the filed rate doctrine"); *East Tenn. Natural Gas Co v. FERC*, 863 F.2d 932, 941 (D.C. Cir. 1988) (stating that "[r]etroactive changes in rates violate the filed rate doctrine, by allowing the collection of rates other than the ones that were on file at the time of purchase"); *Public Serv. Co. of N.H. v. FERC*, 600 F.2d 944, 958 (D.C. Cir. 1979) (stating that "only prospective ratemaking is allowed").

consistent with the Tariff in effect at the time" of the relevant actions.[18]  Among other things, that

means the Commission "may not accept a rate filed under FPA § 205 that would violate those

doctrines."[19]

PJM argues that the Section 205 Filing is "entirely consistent with the filed-rate doctrine

and the rule against retroactive ratemaking" because it:

> (i) does not violate any specific deadline or date contained within
> the text of the Tariff; (ii) effectuates an *existing* tariff provision
> providing prior notice to customers that PJM may seek Commission
> approval of tariff modifications where "imminent severe economic
> harm to electric consumers requires a prompt Section 205 filing;"
> (iii) will only impact future actions not yet taken in the auction
> process – namely, the inclusion of the correct [LDA] Reliability
> Requirement in the optimization algorithm used in conducting the
> 2024/2025 BRA; and (iv) because no capacity awards have been
> made or final results posted, there is not a final rate for which any
> entity has an entitlement or settled expectation at this time.[20]

Once again, PJM is wrong.  As discussed above, at least where the 2024/2025 BRA is concerned,

the Section 205 Filing plainly ***does*** "violate a specific deadline"[21] by purporting to authorize PJM

to make adjustments to an otherwise final planning parameter in a manner not authorized under

---

[18]  *Midwest Indep. Transmission Sys. Operator, Inc.*, 153 FERC ¶ 61,101 at P 40 (2015) ("*MISO*"), *on reh'g*, 155 FERC ¶ 61,174 (2016), *aff'd sub nom. MISO Transmission Owners v. FERC*, 860 F.3d 837 (6th Cir. 2017). *Cf. also, e.g.*, *AEP Appalachian Transmission Co.*, 164 FERC ¶ 61,180 at P 18 (2018) (finding "that retroactive approval of the formula rate change results in a violation of the filed rate doctrine and the prohibition against retroactive ratemaking"); *Haviland Holdings, Inc. v. Pub. Serv. Co. of N.M.*, 107 FERC ¶ 61,034 at P 17 (2004) (finding that "the events subject to [a] complaint occurred prior to the . . . effective date of [a final rule]" and that procedures required by that rule "are not relevant to the Commission's determination on the issues in this proceeding"); *Texas E. Transmission Corp.*, 72 FERC ¶ 61,152 at 61,766-67 (1995) ("Under the filed rate doctrine, final rates approved by the Commission cannot be changed retroactively."), *aff'd sub nom. Texas E. Transmission Corp. v. FERC*, 102 F.3d 174 (5th Cir. 1996); *Tennessee Gas Pipeline Co.*, 54 FERC ¶ 61,204 at 61,603 (1991) ("The filed rate doctrine prohibits the Commission from imposing a rate different from that on file at the time gas is sold or service is made available.").

[19]  *Cogentrix Power Mgmt., LLC v. FERC*, 24 F.4th 677, 682 (D.C. Cir.).

[20]  Section 205 Filing, Transmittal Letter at 24 (internal citation omitted; quoting Tariff, § 9.2(b)).

[21]  *Id.*

the Tariff as it was in effect when that planning parameter became final and the auction was conducted.

PJM's reliance on Section 9.2(b) of the Tariff represents an unavailing attempt to shoehorn the Section 205 Filing into the notice exception to the filed rate doctrine and the prohibition against retroactive ratemaking, under which "a rate adjustment may take effect prior to a section 205 filing . . . when parties have notice that a rate is tentative and may be later adjusted with retroactive effect . . . ."[22] As the Court of Appeals has explained:

> When the very terms of the filed rate warn customers, at the time they contract for service, that the price charged will fluctuate based on an identified formula with specified cost drivers, then the rate is allowed to change when fluctuations in those cost drivers occur. That, after all, is how formulae work. And that comports with the filed rate doctrine because the rate changes are foreordained, not retroactive.[23]

There is nothing in Section 9.2(b) or any other provision of the Tariff that even remotely resembles such a formula or that could otherwise be said to make PJM's after-the-fact adjustment to the LDA Reliability Requirement for the 2024/2025 BRA "foreordained."[24]  This provision merely authorizes PJM to make tariff filings under Section 205 of the Federal Power Act (the "FPA")[25] with less than seven days' notice to stakeholders to prevent "imminent severe economic harm . . . ."[26] While this provision excuses PJM from otherwise applicable requirements for seven

---

[22]     *Consolidated Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 969 (D.C. Cir. 2003) ("*Con Edison*") (citing *Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999)).  The other recognized exception is for circumstances in which the parties "have agreed to make a rate effective retroactively."  *Id.*  That exception is plainly inapposite here.

[23]     *ODEC*, 892 F.3d at 1231.

[24]     *Id.*

[25]     16 U.S.C. § 824d (2018).

[26]     Section 205 Filing, Transmittal Letter at 24 (quoting Tariff, § 9.2(b)).  *See also* Section 206 Filing at 24 (same).

days' notice to, and consultation with, stakeholders in advance of an FPA Section 205 filing, it hardly "warn[ed]"[27] the NRG Companies or other participants in the 2024/2025 BRA that the LDA Reliability Requirements were subject to revision after the offer period for the auction closed.

Similarly nonsensical is PJM's contention that the proposed change will "only impact future actions not yet taken in the auction process . . . ."[28] Prospective modification of otherwise final planning parameters, long after the deadline for posting those parameters has passed and after the offer period has closed, plainly impacts actions that PJM has already taken in the auction process, as well as actions market participants have taken in, and in connection with, that process. A fundamental purpose of the filed rate doctrine, as well as the corollary prohibition against retroactive ratemaking, is to "ensure predictability."[29] As the courts have recognized, "[t]his kind of post hoc tinkering . . . undermine[s] the predictability which the doctrine seeks to protect."[30]

Perhaps most absurd of all is PJM's claim that there is no filed rate doctrine problem, because "no capacity awards have been made or final results posted . . . ."[31] As an initial matter, even if the 2024/2025 BRA can, in any meaningful sense, be said to remain open, it is only because PJM has, without seeking, much less obtaining, waiver from the Commission, disobeyed the tariff requirement that, "[a]fter conducting the Reliability Pricing Model Auctions, [PJM] . . . post the results of each auction as soon thereafter as possible . . . ."[32] The 2024/2025 BRA was

---

[27]     *ODEC*, 892 F.3d at 1231.

[28]     Section 205 Filing, Transmittal Letter at 24.  *See also* Section 206 Filing at 24 (same).

[29]     *OXY*, 64 F.3d at 699.  *See also, e.g.*, *Consolidated Edison*, 347 F.3d at 969 ("By authorizing only prospective rate changes, these doctrines ensure rate predictability . . . ." (citing *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 793 (D.C. Cir. 1990) ("*Columbia*"))).

[30]     *Public Util. Comm'n of Cal. v. FERC*, 894 F.2d 1372, 1383 (D.C. Cir. 1990).

[31]     Section 205 Filing, Transmittal Letter at 24.  *See also* Section 206 Filing at 24 (same).

[32]     Tariff, Attachment DD, § 5.11(e).

"conduct[ed]"[33] starting on December 7, 2022 and ending on December 13, 2022, when the offer period closed.[34] Absent waiver, PJM was, and remains, obligated under its Tariff to post the final results of the 2024/2025 BRA "as soon . . . as possible"[35] after December 13, 2022.

It is true enough that the tariff language leaves PJM some flexibility, and PJM was not necessarily required to post the final auction results by December 20, 2022, as contemplated by the auction schedule,[36] or within some specific number of days after the 2024/2025 BRA concluded. But while the phrase "as soon as possible" may be somewhat flexible, it nonetheless "[b]y its nature, . . . suggests urgency"[37] and requires that "the reason for any delay be examined."[38] Nothing in Section 5.11(e) of Attachment DD to the Tariff or any other provision of the Tariff or any of PJM's other governing documents even hints at the idea that the tasks to be completed between the closing of the auction window and the posting of auction results include anything but the mechanical and ministerial exercise of clearing the RPM Auction under the rules in effect when it was conducted – *i.e.*, during the offer period – and it is against that backdrop that the reason for the delay must be examined. There is certainly nothing in the Tariff to suggest that "as soon as possible" can be construed to mean "as soon as possible after PJM gets the auction

---

[33]     *Id.*

[34]     *See* PJM, *Auction Schedule* ("Auction Schedule"), https://pjm.com/-/media/markets-ops/rpm/rpm-auction-info/rpm-auction-schedule.ashx. A copy of the Auction Schedule is also provided in Exhibit B to the Holtman Affidavit.

[35]     Tariff, Attachment DD, § 5.11(e).

[36]     *See* Auction Schedule.

[37]     *United States v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 764 (6th Cir. 2016) ("*Brookdale*"). *Cf. also D.D. ex rel. V.D v. New York City Bd. of Educ.*, 465 F.3d 503, 514 (2d Cir. 2006) (explaining that "just because the as-soon-as-possible-requirement is flexible does not mean it lacks a breaking point").

[38]     *Brookdale*, 838 F.3d at 763.

rules modified to yield its preferred auction results."[39]   PJM had obviously performed the mechanical and ministerial exercise of clearing the 2024/2025 BRA under the existing rules before it made the December 23 Filings; otherwise, it could not have described the DPL-S LDA clearing price as being "more than four times what the clearing price should be" with its proposed adjustment.[40]   It was, therefore, entirely "possible" for PJM to post the final results of the 2024/2025 BRA on or before December 23, 2022, and there is no legitimate reason for PJM's continued delay in doing so.  Consistent with the Commission's longstanding recognition that a regulated entity should not be allowed "to benefit from its own wrongdoing,"[41] the Commission must reject PJM's claim that the 2024/2025 BRA remains open due to its own failure to abide by the Tariff.

In any event, even if there were some colorable basis for saying that the 2024/2025 BRA remains open, adjusting the LDA Reliability Requirements for that auction at this point would still violate the filed rate doctrine and the prohibition against retroactive ratemaking.  The issue is not whether the auction is open or closed; it is what "the filed rates in existence at the time" the relevant action occurred – *i.e.*, when pre-auction actions were undertaken in reliance on the posted parameters or, at latest, when the auction was conducted – allowed for this adjustment.[42]   The filed rates – the capacity market rules – in effect at the time of the relevant actions allowed for no

---

[39]     While Section 5.11(e) provides for deadlines set forth therein not to apply when auction results "are under publicly noticed review by FERC," the predicate for this suspension is that PJM has identified "a potential error in the initial posting of auction results . . . ."  Tariff, Attachment DD, § 5.11(e).  Even if PJM's dissatisfaction with the results of the 2024/2025 BRA could be considered a "potential error" (and it cannot), there has been no initial posting of the results of the 2024/2025 BRA here.

[40]     Section 205 Filing, Transmittal Letter at 2.  See also Section 206 Filing at 3.

[41]     *Columbia Gas Transmission Corp.*, 47 FERC ¶ 61,324 at 62,135 (1989).

[42]     *MISO*, 153 FERC ¶ 61,101 at P 40.

Document Access Case: 20130320-5259    Document: 88-2    Filed Date: 02/20/2023    Page: 213    Date Filed: 12/11/2023

adjustment to an LDA Reliability Requirement during the clearing process of the sort contemplated by the December 23 Filings.

PJM dismisses claims that "Market Participants should be able to rely on the [LDA] Reliability Requirements that are posted" on the grounds that such claims fail:

> to consider the fact that the Tariff already requires PJM to adjust the [LDA] Reliability Requirement *after* the bidding window closes . . . to make "any adjustments to the PJM Region or LDA Reliability Requirements to reflect Price Responsive Demand with a PRD Reservation Price equal to or less than the applicable Base Residual Auction clearing price."[43]

The cited Tariff provision relates solely to the posting of the RPM Auction results, and, as PJM must know, this provision does not authorize post-auction adjustments of any kind to the Reliability Requirements that are actually used to clear the auction.[44]

Even crediting PJM's misleading claim that the cited tariff provision authorizes one type of post-auction adjustments to the Reliability Requirements used to clear the RPM Auctions, however, that provision would hardly have put market participants on notice that other types of post-auction adjustments might be made. To the contrary, an allowance for this one type of post-auction adjustment would only reinforce expectations that other post-auction adjustments – including adjustments of the sort proposed in the December 23 Filings – would ***not*** be made. As the Supreme Court put it in discussing "the "interpretive canon, *expressio unius est exclusio alterius*, 'expressing one item of [an] associated group or series excludes another left

---

[43]    Section 205 Filing, Transmittal Letter at 23 (quoting Tariff, § 5.11(e); emphasis in original).

[44]    Rather, the Reliability Requirements used to clear the auction are adjusted to account for Price Responsive Demand before the auction, and those adjustments are reflected in the posted planning parameters. *See* PJM, *PJM Manual 18: PJM Capacity Market*, § 2.4.4 (Sept. 21, 2022), https://www.pjm.com/-/media/documents/manuals/m18.ashx. *See also* Tariff, § 5.10(a) ("Price Responsive Demand from any applicable approved PRD Plan, including any associated PRD Reservation Prices, shall be reflected in the derivation of the Variable Resource Requirement Curves, in accordance with the methodology specified in the PJM Manuals.").

unmentioned'":[45]  "If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health."[46]  In the same way, the only significance of a rule allowing for one kind of post-auction adjustment would be to confirm that other kinds of post-auction adjustments are not allowed.  It would certainly not lead any reasonable market participant to anticipate other types of post-auction adjustments, any more than the signs at the zoo would prompt a reasonable person to send get-well cards to the elephant, lion and hippo.

The bottom line is that the rules in effect when the 2024/2025 BRA was conducted required that PJM determine the LDA Reliability Requirement "prior to the conduct of the Base Residual Auction"[47] and use the demand curve calculated using that Reliability Requirement "for such Base Residual Auction."[48]  That being the case, the filed rate doctrine demands "strict adherence" to the filed rate[49] in effect when the 2024/2025 BRA was conducted, and the Commission has no "discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations."[50]

**B.    Market Participants Relied on the Rules Implicated by the December 23 Filings and PJM Ignores Commission Precedent Recognizing the Importance of Rule Stability Associated with Effects on the Broader Marketplace**

As discussed above, PJM's proposal to adjust the DPL-S LDA Reliability Requirement for the 2024/2025 BRA blatantly violates the filed rate doctrine and the prohibition against retroactive

---

[45]    *NLRB v. SW General, Inc.*, 580 U.S. 288, 302 (2017) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002)).

[46]    *Id.*

[47]    Tariff, Attachment DD, § 5.10(vi)(B).

[48]    *Id.*, § 5.10(vi)(A).

[49]    *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 132 (1990).

[50]    *ODEC*, 892 F.3d at 1230 (citation omitted).

ratemaking and must be rejected.  More broadly, the remedy proposed in the December 23 Filings, even applied prospectively to future RPM Auctions after the 2024/2025 BRA, runs counter to the spirit of the filed rate doctrine and is irreconcilable with Commission precedent recognizing that market participants rely on, and should be able to rely on, the posted planning parameters for RPM Auctions.  Consistent with that Commission precedent and as discussed in the Holtman Affidavit, NRG did, in fact, rely on the posted planning parameters for the 2024/2025 BRA, including the DPL-S LDA Reliability Requirement that PJM now proposes to retroactively adjust.

1. **PJM's Proposal is Irreconcilable with Commission Precedent Regarding Reliance on Auction Rules and Posted Planning Parameters**

The Commission previously rejected an attempt by PJM to "[c]hang[e] the rules governing an already-commenced auction," holding that such a "significant step . . . affects both the outcome of that particular auction as well as parties' confidence in the rules governing future proceedings."[51]  In reaching that conclusion, the Commission found concerns about the proposed change to be particularly acute because, as in this case, PJM was acting "in order to avoid the outcome that the already-commenced auction would have produced."[52]  That holding is in perfect accord with the Commission's longstanding policy of not re-running auctions.  That PJM has refused to finish clearing the 2024/2025 BRA does not distinguish this auction in any way that would justify a different result here.  As in the cases involving proposals to re-run completed auctions, the NRG Companies and other market participants "cannot effectively revisit their economic decisions" or "retroactively alter their conduct."[53]  Moreover, there is no allegation,

---

[51]    *PJM Interconnection, L.L.C.*, 166 FERC ¶ 61,072 at P 33 (2019).

[52]    *Id.*

[53]    *New York Indep. Sys. Operator, Inc.*, 92 FERC ¶ 61,073 at 61,307 (2000), *on reh'g*, 97 FERC ¶ 61,154 (2001).  *See also, e.g.*, *Independent Market Monitor for PJM v. PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,137 at P 77 (2021), *on reh'g*, 178 FERC ¶ 61,022 (2022); *California Indep. Sys. Operator Corp.*,

Document Accession #: 20230620-5259    Filed Date: 02/20/2023

much less evidence, that the "anomaly" prompting the December 23 Filings[54] involved any exercise of market power or market manipulation, and, in such circumstances, the Commission has stressed that adjusting clearing prices "would do far more harm to wholesale electricity markets than is justifiable or appropriate" and "would be fundamentally unfair to market participants."[55] The Commission has adhered to this rule even where, unlike here, the applicable auction rules were not followed and declining to re-run the auction effectively entails ratifying a filed rate violation.[56] In this case, there is no such tension between the filed rate doctrine and the Commission's precedent on re-running auctions:  both compel the Commission to reject PJM's after-the-fact attempt to manipulate the results of the 2024/2025 BRA.

Taking a contrary approach here would be particularly unjustified given the expected, actual and entirely desirable reliance on the posted planning parameters.  The Commission has long recognized that, "once the RPM auction parameters are posted, parties rely on those parameters to make commitments and determinations."[57] Indeed, in a 2009 order, the Commission agreed with PJM that it would "be disruptive to the market to change the [load] forecast only one

---

151 FERC ¶ 61,247 at n.46 (2015); *Astoria Generating Co. L.P. v. New York Indep. Sys. Operator, Inc.*, 140 FERC ¶ 61,189 at P 141 (2012) ("*Astoria II*"), *on reh'g*, 151 FERC ¶ 61,044, *on reh'g*, 153 FERC ¶ 61,274 (2015); *PJM Interconnection, L.L.C.*, 128 FERC ¶ 61,157 at P 63 (2009); *Astoria Generating Co. v. New York Indep. Sys. Operator, Inc.*, 139 FERC ¶ 61,244 at P 132 (2012) ("*Astoria I*"); *Bangor Hydro-Elec. Co. v. ISO New England Inc.*, 97 FERC ¶ 61,339 at 62,589-91 (2001) ("*Bangor Hydro*"), *on reh'g*, 98 FERC ¶ 61,298 (2002).

54      Section 205 Filing, Transmittal Letter at 9.  *See also* Section 206 Filing at 10 (same).

55      *Bangor Hydro*, 97 FERC ¶ 61,339 at 62,590.

56      *See Astoria I*, 139 FERC ¶ 61,244 at P 132 (2012) (declining to require the New York Independent System Operator, Inc. "to re-run the auctions occurring in the past based on such improperly-determined offer floors," because doing so "would create market uncertainty for market participants and require resolving complex questions").  *See also, e.g.*, *Astoria II*, 140 FERC ¶ 61,189 at P 141 (same).

57      *Duquesne Light Co.*, 122 FERC ¶ 61,039 at P 141 (2008) ("*Duquesne*").  *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275 at P 198 (2009) ("*PJM*") ("PJM's posting of the fundamental auction parameters . . . is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or export, and the manner in which they participate in the Base Residual Auction.").

month before the auction."[58]  Yet, in the December 23 Filings, PJM seeks to change a similarly critical planning parameter after the auction.

Importantly, while prospective application of PJM's proposal to RPM Auctions after the 2024/2025 BRA may not run afoul of the filed rate doctrine inasmuch market participants will be on notice that the LDA Reliability Requirements are subject to change,[59] that does not make PJM's proposal just and reasonable as so applied.  To the contrary, it would still be irreconcilable with the Commission's prior holdings that market participants should be able to rely on posted auction parameters and auction rules.  Accordingly, the Commission should reject the December 23 Filings outright.

###        2.        There Was Substantial and Actual Reliance on the Posted Auction Parameters and the Auction Rules in this Case

PJM concedes, as it must, that "Capacity Market Sellers have submitted bids into the auction based on the planning parameters."[60]  Nonetheless, it claims "there was no specific planning parameter reliance" in this case.[61]  That is simply not true.  In fact, as PJM has acknowledged in the past, market participants rely on posted planning parameters in making a number of important economic decisions, separate and apart from offering decisions, around the RPM Auctions.[62]  As the Commission has put it, "market participants will make business decisions

---

[58]        *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275 at P 200.

[59]        *See Columbia*, 895 F.2d at 797 (explaining that notice "changes what would be purely retroactive ratemaking into a functionally prospective process by placing the relevant audience on notice at the outset that the rates being promulgated are provisional only and subject to later revision").

[60]        Section 205 Filing, Transmittal Letter at 24.  *See also* Section 206 Filing at 24 (same).

[61]        Section 205 Filing, Transmittal Letter at 25.  *See also* Section 206 Filing at 24 (same).

[62]        *See, e.g.*, Answer of PJM Interconnection, L.L.C. to Protests and Comments at 33, Docket No. ER09-412-000 (filed Feb. 2, 2009) (the "ER09-412 Answer") ("PJM's posting of the fundamental auction parameters on February 1 is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or export, and the manner in which they participate in the Base Residual Auction.").

and enter into binding contracts, including financial hedges and bilateral arrangements, based on [posted] auction parameters."[63]  PJM's claim that there was "no specific planning parameter reliance"[64] is, like so much else in the December 23 Filings, just plain wrong.

Notwithstanding PJM's claims to the contrary, there was, in point of fact, "specific planning parameter reliance"[65] in this case.  Mr. Holtman confirms that NRG makes any number of important economic decisions based on posted planning parameters for RPM Auctions[66] and that it did, in fact, do just that with respect to the posted planning parameters for the 2024/2025 BRA.[67]  As he explains, the posted planning parameters and, more specifically, the posted DPL-S LDA Reliability Requirement and Capacity Emergency Transfer Limit strongly suggested that the DPL-S LDA would clear at or near the cap of $426.17/MW-day in the 2024/2025 BRA.[68]  That was certainly NRG's expectation based on the posted parameters, and PJM's December 23 Filings confirm that this expectation was entirely reasonable.[69]

Mr. Holtman describes how NRG's expectation that the DPL-S LDA would clear at or near the cap of $426.17/MW-day was reflected in its commercial activities around the auction.  On the generation side of the business, Mr. Holtman describes an indicative bid that NRG received from

---

[63]    *Duquesne*, 122 FERC ¶ 61,039 at P 92.

[64]    Section 205 Filing, Transmittal Letter at 25.  *See also* Section 206 Filing at 34 (same).

[65]    Section 205 Filing, Transmittal Letter at 25.  *See also* Section 206 Filing at 24 (same).

[66]    *See* Holtman Affidavit, ¶ 10.

[67]    *See id.*, ¶¶ 20-24.

[68]    *See id.*, ¶¶ 15-19.  Mr. Holtman states that "the posted planning parameters for the 2024/2025 BRA necessarily meant that the DPL-S LDA would clear at the price cap of $426.17/MW-day absent a significant increase in supply." *Id.*, ¶ 15.  That being the case, PJM's characterization of its proposed remedy as being directed to a "circumstance that was recently discovered during the auction process," Section 205 Filing, Transmittal Letter at 5, seems more than a little dubious.

[69]    PJM does not give the actual clearing price, but indicates that it is "more than four times" what it would be if its proposed adjustment were made.  Section 205 Filing, Transmittal Letter at 2.

Document Access #: 20230120-5239  Filed Date: 02/20/2023

a wholesale customer to purchase capacity in the DPL-S LDA for the 2024/2025 Delivery Year bilaterally at a price substantially higher than the adjusted clearing price contemplated by the December 23 Filings in early December.[70]  As an initial matter, the bid price illustrates that, like NRG, this sophisticated customer expected the DPL-S LDA clearing price in the 2024/2025 BRA to be substantially higher than the clearing price in the 2023/2024 BRA ($69.96/MW-day). Nonetheless, because NRG reasonably expected the DPL-S LDA to clear even higher in the 2024/2025 BRA, it declined the offer.[71]

On the retail side of the business, NRG priced offers for retail sales to commercial and industrial customers in the DPL-S LDA assuming a capacity price for the 2024/2025 Delivery Year that reflected its expectations about the DPL-S clearing price based on the posted planning parameters.[72]  That pricing almost certainly resulting in NRG losing some opportunities, but it reflected NRG's reasonable expectations about the 2024/2025 BRA.[73]  NRG factored that same capacity price into its response to a request for proposals ("RFP") issued by the State of Delaware for 70 MW of retail capacity and energy over a four-year term (including the 2024/2025 Delivery Year).[74]  NRG lost the RFP.[75]

As indicated above, it is true enough that the same reliance concerns would not be presented if PJM's proposal were only applied prospectively to RPM Auctions after the 2024/2025 BRA, because the NRG Companies and other market participants would know that the LDA Reliability

---

[70]     *See* Holtman Affidavit, ¶ 22.

[71]     *See id.*

[72]     *See id.*, ¶ 20.

[73]     *See id.*

[74]     *See id.*, ¶ 21.

[75]     *See id.*

Requirements were subject to post-auction adjustment. But, as Mr. Holtman discusses, the knowledge that the posted LDA Reliability Requirements will be subject to adjustment will defeat the purpose of posting the planning parameters in the first place and will chill beneficial bilateral contracting and hedging activities around the RPM Auction. As Mr. Holtman explains, there is no "workable or meaningful" way for market participants to price the risk that PJM will apply a one-way ratchet that, as illustrated by the magnitude of the price swing contemplated for the 2024/2025 BRA, could result in a large reduction in the clearing price.[76] Such a result would be irreconcilable with the Commission's prior holding – as well as PJM's prior recognition – that "posting of the fundamental auction parameters . . . is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or export, and the manner in which they participate in the Base Residual Auction."[77]

## C. Granting the Relief PJM Requests Would be Extremely Bad Regulatory Policy

In its haste to avoid a politically unpalatable auction outcome, PJM has proposed an ill-conceived remedy that will chill beneficial bilateral contracting and hedging activity and undermine the ability of the capacity market to help preserve reliability. Whatever the perceived short-term benefit to consumers, this remedy will ultimately do consumers, including consumers in the DPL-S LDA, far more harm than good. At a very high level, as Mr. Holtman observes, PJM's willingness to seek changes to the capacity auction rules after the auction has been conducted "sends a clear and exceptionally troubling message to market participants, including owners of existing capacity and prospective developers of new capacity, and and investors."[78] The

---

[76]    *Id.*, ¶ 32.

[77]    *PJM*, 126 FERC ¶ 61,275 at P 198.  *See also* ER09-412 Answer at 33 (same).

[78]    Holtman Affidavit, ¶ 34.

unambiguous message is that PJM market participants cannot rely on the rules set forth in the Tariff and other governing documents.[79]  Absent decisive Commission action to restore some measure of confidence in the integrity of those rules, just the fact of the December 23 Filings will undermine the PJM capacity market's ability to perform its intended function of "produc[ing] a level of investor confidence that is sufficient to ensure resource adequacy at just and reasonable rates."[80]

Acceptance of PJM's proposal would also put the Commission in the dubious role of "pick[ing] winners and losers,"[81] and doing so in a particularly irrational and perverse manner.  As Mr. Holtman explains, the "losers" under PJM's proposal would include NRG and other market participants that "relied on the posted parameters and the auction rules and made prudent decisions about bilateral contracting and hedging consistent with such reliance."[82]  These entities will be "punished for having made reasonable, prudent business decisions, while market participants and others who took no such steps with receive a windfall."[83]  Even if the fatal legal infirmities in the December 23 Filings could be ignored, such an outcome would be indefensible as a matter of regulatory policy.

The remedy proposed in the December 23 Filings is also fundamentally inconsistent with the way PJM sets the planning parameters and would seriously threaten the ability of the capacity market to send the price signals needed to maintain reliability.  PJM's remedy leaps to the conclusion that lack of participation in the capacity auction is an affirmative demonstration that a

---

[79]  *See id.*

[80]  *ISO New England Inc.*, 162 FERC ¶ 61,205 at P 21 (2018) ("*ISO-NE*") (footnotes omitted).

[81]  *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1026 (D.C. Cir. 2018) (expressing doubt as to whether it is appropriate for the Commission to "pick winners and losers").

[82]  Holtman Affidavit, ¶ 27.

[83]  *Id.*

resource will not be in service by the time of the delivery year despite an ISA and in-service date that indicate otherwise. As PJM has consistently recognized, the set of resources anticipated to be in the LDA at the time of the delivery year is fundamental to the determination of the Reliability Requirement. PJM's proposed remedy makes no effort to discern whether a resource in fact does not intend to be in-service at the onset of the delivery year. If the resource were to come on-line by the delivery year despite its lack of participation in the BRA, PJM and market participants may face the very reliability issues PJM's current methodology is intended to address.

The conflict between the remedy proposed in the December 23 Filings and PJM's longstanding approach to calculating Reliability Requirements is evident from an examination of the operation of PJM's proposal on the clearing price for the DPL-S LDA in the 2024/2025 BRA. When NRG asked PJM for an explanation of the large jump in the DPL-S LDA Reliability Requirement from the 2023/2024 BRA to the 2024/2025 BRA, PJM pointed to "historical winter forced outages levels and an expected increase in the penetration of solar resources . . . ."[84] PJM echoed that statement in the December 23 Filings, describing how planned resources, particularly intermittent resources like solar-powered resources, in a small LDA can have the effect of increasing the LDA Reliability Requirement more than they decrease the Capacity Emergency Transfer Objective.[85] As indicated in the December 23 Filings, this expectation reflected a modeling assumption that all planned resources with executed ISAs specifying commercial operation dates on or before the first day of the 2024/2025 Delivery Year would be in service during that Delivery Year.[86]

---

[84]    *Id.*, Exhibit C (e-mail from PJM).

[85]    *See* Section 205 Filing, Transmittal Letter at 13-16; Section 206 Filing at 12-15.

[86]    *See* Section 205 Filing, Transmittal Letter at 13; Section 206 Filing at 18.

Document Accession #: 20130520-5259    Filed Date: 04/20/2023

PJM's proposed remedy, however, rests on an entirely different assumption, as it implicitly assumes that the "increase in solar penetration"[87] and other new entry in the DPL-S LDA expected when the LDA Reliability Requirement was posted will not occur to the extent the planned resources were not offered into the 2024/2025 BRA. Other than PJM's desire for a lower clearing price, that assumption is the only rational explanation for PJM's proposal to adjust the LDA Reliability Requirement to exclude such resources. It bears emphasis that, while PJM insists that it would be inappropriate to engage in "speculation" about whether a resource will be "offered into the RPM auctions" or be "in-service by the Delivery Year,"[88] the reality is that PJM is doing just that through its assumptions about planned resources: first, PJM assumes that *all* of the planned resources with executed ISAs will be in-service by the Delivery Year and then it whipsaws to the contrary assumption that *none* of the planned resources not offered will be in-service by the Delivery Year. Importantly, the latter speculation, which is the logical foundation for the December 23 Filings, is unsupported and threatens to undermine reliability in the DPL-S LDA. As Mr. Holtman states, NRG's experience is that capacity revenues "are a small part of the pie for renewable resources, and developers will often move forward with projects even where they are getting no capacity revenues."[89] Consequently, one cannot validly infer from these resources' decision not to offer into the 2024/2025 BRA that they will not come online by the 2024/2025 Delivery Year, and PJM has offered no other evidence to support the proposition that an "increase in solar penetration" in the DPL-S LDA is not still to be "expected."[90]

---

[87]    Holtman Affidavit, Exhibit C (e-mail from PJM).

[88]    *See* Section 205 Filing, Transmittal Letter at 13; Section 206 Filing at 18.

[89]    Holtman Affidavit, ¶ 30.

[90]    *Id.*, Exhibit C (e-mail from PJM).

PJM's unsupported assumption is extremely troubling from a reliability perspective in that PJM is proposing to truncate a price signal that may still be needed. As Mr. Holtman discusses, this price signal will have very real implications for existing facilities and new entrants.[91] That is, of course, exactly what one would expect, because, as the Commission has held, a capacity market should "provide price signals that guide the orderly entry and exit of capacity resources . . . ."[92] For its part, NRG has previously received, and acted on, such price signals with respect to generation in this same LDA, when it decided to permanently deactivate Indian River 4 after that unit's capacity failed to clear the Base Residual Auction for the 2022/2023 Delivery Year.[93] In that case, the unit was subsequently determined by PJM to be needed to address a local transmission issue, and NRG agreed to keep it in service under an RMR arrangement.[94] As Commissioner Danly has repeatedly stated: "RMR agreements are a product of market failure and themselves cause markets to fail."[95] While some allowance may be made for RMR arrangements, like that for Indian River 4, needed for local transmission issues not necessarily captured in zonal clearing prices, it is hard to imagine a more abject market failure – and market administrator failure – than the sort of RMR arrangements that will be needed to preserve resource adequacy because PJM has improperly truncated price signals as it proposes to do here.

---

[91]     *See* Holtman Affidavit, ¶¶ 28-31.

[92]     *ISO-NE*, 162 FERC ¶ 61,205 at P 21.

[93]     *See* Reliability Must-Run Rate Schedule, Electric Rate Schedule FERC No. 3, Transmittal Letter at 5, Docket No. ER22-1539-000 (filed Apr. 1, 2022), *accepted & suspended*, *NRG Power Mktg. LLC*, 179 FERC ¶ 61,156 (2022).

[94]     *See supra* note 9.

[95]     *KES Kingsburg, L.P.*, 175 FERC ¶ 61,255, Concurring Statement at P 1 (2021) (Danly, Comm'r, concurring). *See also, e.g.*, *Greenleaf Energy Unit 2, LLC*, 172 FERC ¶ 61,111, Concurring Statement at P 2 (2020) (Danly, Comm'r, concurring) (same).

# III.

# REQUEST FOR PRIVILEGED TREATMENT

The NRG Companies respectfully request privileged treatment of portions of the Holtman Affidavit thereto pursuant to 388.112 of the Commission's regulations.[96]  The relevant portions of the Holtman Affidavit contain highly sensitive and confidential commercial information relating to the business activities of the NRG Companies and their affiliates.  Public disclosure of this information could harm their negotiating positions in future transactions and potentially also have adverse impacts on competition.  The information for which confidential treatment is requested is not generally available to the public and is exempt from the mandatory public disclosure requirements of the Freedom of Information Act ("FOIA").[97]

In accordance with Section 388.112(b)(2)(i) of the Commission's regulations,[98] the NRG Companies have provided in Attachment B a proposed protective order pursuant to which other parties will have access to the non-public materials.  The proposed protective order is a modified version of the Commission's Model Protective Order incorporating provisions, consistent with those in protective orders employed in other Commission proceedings,[99] which provide additional protection for "Highly Sensitive Privileged Materials."[100]  Notwithstanding the proposed

---

[96]     18 C.F.R. § 388.112 (2022).

[97]     5 U.S.C. § 552 (2018).  *See also Food Mktg. Inst. v. Argus Leader Media*, 139 S.Ct. 2356, 2364-66 (2019) (rejecting the "substantial competitive harm" requirement articulated in *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974), and stating that, "where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential'" and thus exempt from disclosure under FOIA).

[98]     18 C.F.R. § 388.112(b)(2)(i) (2022).

[99]     *See, e.g.*, *Astoria Generating Co., L.P. v. New York Indep. Sys. Operator, Inc.*, 136 FERC ¶ 61,155 (2011).

[100]    Specifically, the NRG Companies have modified the Model Protective Order by (1) adding a new subparagraph (ii) to paragraph 3.E in order to specify which Reviewing Representatives may have access

Document Accession #: 20130620-5253    Filed Date: 04/20/2023

protective order, the non-public materials should be treated as privileged materials reviewable by Commission Staff.  The non-public materials are marked "**CONTAINS HIGHLY SENSITIVE PRIVILEGED INFORMATION**"[101] and "**DO NOT RELEASE**."   In addition, in accordance with the Commission's notice on labelling of non-public information,[102] each page of the non-public version of this filing is marked "**CUI//PRIV,**" and blue highlighting is used to identify the privileged information.

---

to Highly Sensitive Privileged Materials; (2) amending paragraph 3 to include defined terms "Competitive Duties" (new paragraph 3.F) and "Competitive Duty Personnel" (new paragraph 3.G); and (3) attaching a separate "Non-Disclosure Certificate for Competitive Duty Personnel" and expanding the definition of "Non-Disclosure Certificate" in Section 3.D accordingly.  The only other changes to the Model Protective Order are non-substantive.

[101]    All of the privileged materials submitted in this filing have been designated as "Highly Sensitive Privileged Materials."

[102]    *See* Notice of Document Labelling Guidance for Documents Submitted to or Filed with the Commission or Commission Staff (June 14, 2018) (unreported).

# IV.

## **CONCLUSION**

**WHEREFORE**, the NRG Companies respectfully request that the Commission summarily reject the December 23 Filings.

Respectfully submitted,

**NRG POWER MARKETING LLC
DIRECT ENERGY BUSINESS MARKETING, LLC
MIDWEST GENERATION, LLC**

By:   */s/ David G. Tewksbury*

David G. Tewksbury
Stephanie S. Lim
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC  20001

Cortney Madea Slager
Vice President & Assistant General Counsel
NRG Energy, Inc.
804 Carnegie Center
Princeton, NJ  08540

Counsel for **NRG Power Marketing LLC,
Direct Energy Business Marketing, LLC and
Midwest Generation, LLC**

Dated:  January 20, 2023

Document Accession #: 20150120-5259     Filed Date: 01/20/2023

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document on each person designated on the official service lists compiled by the Secretary of the Federal Energy Regulatory Commission in these proceedings.

Dated at Washington D.C., this 20th day of January, 2023.

_/s/ David G. Tewksbury_
David G. Tewksbury

**Attachment A**

**The Holtman Affidavit**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **PJM Interconnection, L.L.C.** | ) | **Docket No. ER23-729-000** |
| **PJM Interconnection, L.L.C.** | ) | **Docket No. EL23-19-000** |
| | | **(Not consolidated)** |

## <u>AFFIDAVIT OF JOSEPH A. HOLTMAN</u>

1.    My name is Joseph A. Holtman.  My business address is 804 Carnegie Center, Princeton, New Jersey, 08540.

2.    I am the Vice President of Trading with NRG Energy, Inc. ("NRG").  In this capacity, I am responsible for NRG's wholesale and retail electricity supply activities.  This includes oversight over trading and hedging activities around NRG's generation assets and NRG's extensive retail marketing business.

3.    I am submitting this affidavit in support of certain of NRG subsidiaries' protest to a filing in which PJM Interconnection, L.L.C. ("PJM")[1] proposes to adjust the Locational Delivery Area ("LDA") Reliability Requirement for Delmarva Power & Light South ("DPL-S"), which was posted in advance of the Base Residual Auction for the 2024/2025 Delivery Year (the "2024/2025 BRA").  In support of NRG's protest, I discuss NRG's expectations arising out of the posted LDA Reliability Requirement and other planning parameters and actions NRG took in reliance on the posted planning parameters and the Tariff.  I also describe the implications of NRG's proposal for future business activity conducted by entities like NRG around the RPM Auctions.

---

[1]    Capitalized terms used and not otherwise defined herein have the meanings given such terms in the PJM Open Access Transmission Tariff (the "Tariff").

Document Accession #: 20150420-5259    Filed Date: 04/20/2015

## I.    BACKGROUND

### A.    NRG

4.    NRG is a Delaware corporation and an integrated wholesale power generation and retail electricity company.  NRG's common stock is publicly traded on the New York Stock Exchange under the symbol "NRG."

5.    Through various subsidiaries, NRG owns or controls generation in the PJM footprint and generation in adjacent markets that can be imported into the PJM market and actively participates in the organized markets administered by PJM, including the PJM capacity market.  Through various other subsidiaries, NRG is also an active retail power marketer in the PJM region, and engages in wholesale transactions to support its retail power marketing activities.  NRG's subsidiaries conduct their retail marketing activities in this region under the brand names NRG Home, Direct Energy, Green Mountain Energy, Gateway Energy Services, Stream Energy and XOOM Energy and pursuant to retail marketing licenses issued by applicable state commissions.

6.    NRG's generation assets in PJM footprint include generating units located in the DPL-S LDA, as well as other assets located external to the DPL-S LDA.  Within the DPL-S LDA, an indirect subsidiary of NRG, Vienna Power LLC, has owned since 2001 and operates the Vienna Generating Station in Vienna, Maryland, and another indirect subsidiary of NRG, Indian River Power LLC, has owned since 2001 and operates the Indian River Power Plant in Millsboro, Delaware.  The Vienna Generating Station is currently comprised of Unit 8 ("Vienna 8"), an approximately 153.0 MW (summer rating) oil-fired generating unit, and Unit 10 (Vienna 10"), an approximately 14.3 MW (summer rating) oil-fired generating unit.  The Indian River Power Plant is currently comprised of Unit 4 ("Indian River 4"), an approximately 410.0 MW (summer rating) coal-fired generating unit, and Unit CT 10

("Indian River CT10") at the Indian River Power Plant, an approximately 16.1 MW (summer rating) oil-fired generating unit.

7.    Another NRG subsidiary, NRG Power Marketing LLC ("NRG-PML") markets the output of the Vienna Generating Station and the Indian River Generating Station.  NRG-PML offered the capacity of Vienna 8, Vienna 10 and Indian River CT10 into the 2024/2025 BRA.  The capacity of Indian River 4 was not offered, because that unit is subject to a reliability must-run ("RMR") rate schedule on file with FERC.[2]

**B.    The 2024/2025 BRA**

8.    The Tariff specifies various deadlines for the conduct of Base Residual Auctions and other RPM Auctions built around the contemplated three-year forward period.  Due to delays in conducting several auctions, the forward period for various RPM Auctions, including the 2024/2025 BRA, has been compressed, and the 2024/2025 BRA was, therefore, conducted on an adjusted schedule approved by FERC.

9.    Under the FERC-approved schedule for the 2024/2025 BRA, there were specific dates for various pre-auction activities, the auction, and the posting of the auction results.[3]  The pre-auction activities commenced on July 10, 2022 with the various deadlines applicable to PJM, the Independent Market Monitor and generators.  The schedule continued with deadlines for numerous other pre-auction activities, including the August 29, 2022 deadline for PJM's posting of planning parameters.  It further provided for the 2024/2025 BRA

---

[2]    NRG filed a notice of its intent to permanently deactivate Indian River 4 effective June 1, 2022, after its capacity failed to clear the Base Residual Auction for the 2022/2023 Delivery Year.  PJM determined that Indian River 4 was needed to address a local reliability issue, and NRG agreed to continue operating it under an RMR rate schedule through December 2026.

[3]    The full schedule is provided in Exhibit A and also available on PJM's website (https://pjm.com/-/media/markets-ops/rpm/rpm-auction-info/rpm-auction-schedule.ashx).

Document Accession #: 20221220-5259    Filed Date: 02/20/2023

auction window to open on December 7, 2022 and to close on December 13, 2022.  Under

the FERC-approved schedule, PJM was to post the auction results on December 20, 2022.

**II.    NRG Took Specific Actions in Reliance on the Posted Planning Parameters for the 2024/2025 BRA**

10.    As both a generation owner and a retail marketer, NRG makes a number of important

economic decisions based on the posted planning parameters for each Base Residual

Auction.  For example, as a generation owner, NRG makes decisions about whether to sell

its resources' capacity through centralized auctions or bilaterally and/or enter into financial

hedging arrangements.  Similarly, as a retail marketer, NRG makes decisions about the

pricing of retail sales and power purchase contracts to support retail sales, as well as

financial hedging arrangements.

11.    In making commercial decisions, NRG, like other market participants, is guided by

expectations about clearing prices in the upcoming auction.  Those expectations, in turn,

are largely based on the posted planning parameters.

12.    The auction price effectively acts as the "benchmark" in these commercial decisions.  For

example, a generation owner's decisions about whether to sell its capacity bilaterally will

necessarily turn on its expectations about the price at which it could sell the same capacity

in an RPM Auction.  Just to take a hypothetical example, a generator is unlikely to enter

into a bilateral sale of capacity for a given Delivery Year at \$80/MW-day if it has a high

degree of confidence – say 75% – that it can sell the same capacity in the Base Residual

Auction for \$120/MW-day, as the probabilistically adjusted auction price (\$90/MW-day)

is higher than the bilateral price.

13.    Similarly, a retail marketer looks to the expected auction clearing price as a cost associated

with its retail sales and prices that expectation into its offers to make retail sales, whether

those are offers made generally available to a particular class of customers, such as commercial and industrial ("C&I") customers, or customer-specific offers made in response to a request for proposals ("RFP") or bilateral discussions.

14.  In accordance with the FERC-approved schedule for the 2024/2025 BRA, PJM posted the planning parameters for the 2024/2025 BRA on August 29, 2022, and posted updated planning parameters on October 24. 2022.[4]  The following chart from the posting of the updated parameters compares the planning parameters for the 2024/2025 BRA with those for the Base Residual Auction for the 2023/2024 Delivery Year (the "2023/2024 BRA"):[5]

| LDA | 2023/2024 BRA | | 2024/2025 BRA | | Delta | | | |
|---|---|---|---|---|---|---|---|---|
| | Reliability Requirement (UCAP MW) | CETL (MW) | Reliability Requirement (UCAP MW) | CETL (MW) | Reliability Requirement (UCAP MW) | CETL (MW) | Reliability Requirement (Percent) | CETL (Percent) |
| MAAC | 63,819.0 | 6,381.0 | 64,850.0 | 5,408.0 | 1,031.0 | -973.0 | 2% | -15% |
| EMAAC | 35,590.0 | 8,704.0 | 36,715.0 | 7,961.0 | 1,125.0 | -743.0 | 3% | -9% |
| SWMAAC | 14,329.0 | 8,389.0 | 14,299.0 | 7,947.0 | -30.0 | -442.0 | 0% | -5% |
| PS | 11,217.0 | 9,022.0 | 12,356.0 | 8,709.0 | 1,139.0 | -313.0 | 10% | -3% |
| PS NORTH | 5,768.0 | 4,349.0 | 6,234.0 | 4,255.0 | 466.0 | -94.0 | 8% | -2% |
| DPL SOUTH | 3,141.0 | 2,008.0 | 3,514.0 | 2,009.0 | 373.0 | 1.0 | 12% | 0% |
| PEPCO | 7,163.0 | 7,160.0 | 7,151.0 | 7,033.0 | -12.0 | -127.0 | 0% | -2% |
| ATSI | 14,649.0 | 10,213.0 | 14,434.0 | 10,465.0 | -215.0 | 252.0 | -1% | 2% |
| ATSI-Cleveland | 5,363.0 | 4,728.0 | 5,374.0 | 4,941.0 | 11.0 | 213.0 | 0% | 5% |
| COMED | 24,077.0 | 5,781.0 | 23,859.0 | 4,640.0 | -218.0 | -1,141.0 | -1% | -20% |
| BGE | 7,522.0 | 5,615.0 | 7,514.0 | 5,397.0 | -8.0 | -218.0 | 0% | -4% |
| PL | 10,251.0 | 4,916.0 | 10,214.0 | 4,337.0 | -37.0 | -579.0 | 0% | -12% |
| DAYTON | 3,924.0 | 4,022.0 | 3,922.0 | 3,918.0 | -2.0 | -104.0 | 0% | -3% |
| DEOK | 6,847.0 | 5,632.0 | 6,881.0 | 4,999.0 | 34.0 | -633.0 | 0% | -11% |

15.  As indicated by the chart, the LDA Reliability Requirement for the DPL-S LDA increased by 373 MW, or 12%, from 3,141 MW for the Base Residual Auction for the 2023/2024 Base Residual Auction (the "2023/2024 BRA") to 3,514 MW for the 2024/2025 BRA.  At the same time, the import limit into the DPL-S LDA (i.e., the Capacity Emergency Transfer

---

[4]     As indicated in the October 24, 2022 stakeholder notice provided in Exhibit B, the updated parameters "reflect[ed] the inclusion of Fixed Resource Requirement (FRR) Capacity Plans and updated Reliability Requirements, CETOs and CETLs for a few LDAs related to data adjustments involving Behind The Meter generation."  These updates did not change the LDA Reliability Requirement for the DPL-S LDA.

[5]     This chart is taken from a PJM report available at https://pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2024-2025/2024-2025-planning-period-parameters-for-base-residual-auction-pdf.ashx.

Document Accession #: 20130520-5259    Filed Date: 04/20/2023

Limit ("CETL")) remained essentially unchanged – 2,009 MW (2024/2025 BRA) versus 2,008 MW (2023/2024 BRA). The combination of a 3,514 MW reliability requirement and a 2,009 MW import limit means that approximately 1,505 MW of capacity must be procured from resources within the DPL-S LDA to meet the reliability requirement. 1,324 MW of capacity cleared in the 2023/2024 BRA.[6] Consequently, the posted planning parameters for the 2024/2025 BRA necessarily meant that the DPL-S LDA would clear at the price cap of $426.17/MW-day absent a significant increase in supply. That is a natural consequence of the fact that the demand curve (or Variable Resource Reliability ("VRR") curve) remains at the cap of 150% of Net CONE ($284.11/MW-day[7]) until the capacity cleared approaches the reliability requirement at which point the demand curve begins to slope downward. For example, if only 1,324 MW cleared against a VRR curve incorporating the posted planning parameters, that would be on the horizontal portion of the curve, and the clearing price would, therefore, be $426.17/MW-day.

16.    There is no question that, as PJM highlights in its filings, a clearing price at or around $426.17/MW-day would represent a large increase from the 2023/2024 BRA clearing price of $69.96/MW-day.[8] That being the case, NRG did not take the posted parameters at face value. Instead, NRG contacted PJM to confirm that the parameters were correct and to get a better understanding of the reason for the 12% jump in the LDA Reliability Requirement.

---

[6]    PJM, *2023/2024 RPM Base Residual Auction Results* at 15, Table 4 (June 21, 2022) (the "2023/2024 BRA Results Report"), https://pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2023-2024/2023-2024-base-residual-auction-report.ashx.

[7]    *See id.* at 6, Table 3.

[8]    Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for an Extended Comment Period of 28 Days at 3, Docket No. ER23-729-000 (filed Dec. 23, 2022) (the "Section 205 Filing").

On November 8, 2022, NRG's Senior Director of Regulatory Affairs, Neal Fitch, sent an

e-mail (provided in Exhibit C) to PJM inquiring about the validity of the parameters. PJM

replied, insisting that its posted parameters were correct, and explaining that:

> Due to historical winter forced outages levels and an expected increase in
> the penetration of solar resources, DPL-South shows an increase in winter
> loss of load risk, which results in an increase in the 2024 BRA DPL-South
> reliability requirement relative to the 2023 BRA. While for areas with loss
> of load risk fully concentrated in the summer season it may be reasonable
> to use changes in the summer peak load forecast as a guide to determine
> changes in the reliability requirement, that is not the case for zones/LDAs
> with non-negligible winter loss of load risk such as DPL-South.

17.     All else being equal, meaning all existing DPL-S capacity that cleared the 2023/2024 BRA

were to clear the 2024/2025 BRA, a significant increase in cleared capacity (approximately

180 MW) in the DPL-S LDA would be required for the 2024/2025 BRA to clear below the

cap. As shown in Table 2A of 2023/2024 BRA Results Report, released about two months

before the posting of the planning parameters for the 2024/2025 BRA, a total of 95.3 MW

of all new generation capacity offered, of which 85.7 MW cleared the 2024/2025 BRA in

*all of EMAAC* and a total of 113.1 MW of new generation capacity offered, of which

103.5 MW cleared in in *all of MAAC*. MAAC includes EMAAC, and EMAAC includes

DPL-S.

18.     As the DPL-S LDA is just a subset of the larger MAAC and EMAAC LDAs, it is hard to

see how a reasonable person familiar with conditions in the DPL-S LDA could reasonably

expect that new supply offered into the 2024/2025 BRA would be sufficient to cause the

DPL-S LDA to clear significantly below the cap. To NRG's knowledge – and consistent

with what we saw in the interconnection queue and PJM's explanation for the increased

reliability requirement – the bulk of the new supply that could reasonably be expected to

be online in time for the 2024/2025 Delivery Year is solar-powered generation. Solar- and

wind-powered resources receive relatively little capacity credit, and capacity revenues are typically not a major driver for the development of such resources.  As a result, a very large amount of capacity from planned solar-powered resources would have needed to have been offered into and cleared the 2024/2025 BRA in the DPL-S LDA to produce a clearing price significantly below the cap.

19.     Based on the straightforward math of the demand curve and NRG's experience and analysis, NRG's reasonable expectation based on the posted planning parameters was that the DPL-S LDA would clear at or near the price cap of $426.17/MW-day.  As discussed below, NRG made a number of important economic decisions based on this expectation, which followed directly from the posted planning parameters.

20.     Beginning November 8, 2022, for example, our traders began to price offers for retail sales to C&I customers in the DPL-S LDA incorporating a capacity price of ████████ for the 2024/2025 Delivery Year.  There is no precise way to determine how many C&I customers we may have lost, either to other retail marketers or to default service, as a result of such pricing, but we undoubtedly lost some customers.  ████████████████ ████████████████████████████████

21.     The same capacity price expectation (███████) was incorporated into our response, submitted on November 18, 2022, later in November, to an RFP issued by the State of Delaware for approximately 70 MW of capacity and energy over a four-year term.  Given the expectation of a high clearing price, NRG also floated the idea of a capacity cost passthrough mechanism, but the State was not amenable to such an arrangement.  The State of Delaware is currently supplied under a four-year contract which expires shortly after the 2022/2023 Delivery Year.  Its most recent RFP extends into the 2024/2025 Delivery Year.

Our offer into the State of Delaware RPF was not successful. NRG thereby lost the business of a large customer.

22.     On December 2, 2022, NRG was contacted by a wholesale customer in the DPL-S LDA, looking to *purchase* capacity from NRG, which owns and operates capacity resources in the LDA. This customer made an indicative bid to purchase ███████ of capacity for the 2024/2025 Delivery Year at a price of ███████. The customer's bid clearly indicates that, like NRG, it was expecting the DPL-S LDA to clear at a significantly higher price than it did in the previous Base Residual Auction. In my view, that expectation must be based on the posted parameters, because there is no other variable that could explain such a bid after the DPL-S LDA cleared at $69.96/MW-day in the 2023/2024 BRA.[9] Given our expectation that the DPL-S LDA would clear higher, we turned down this bid, and instead elected to receive the clearing price in the 2024/2025 BRA to be held during the December 7-13, 2022 offer period. While PJM may think it can alter the course of a capacity auction by changing the rules upon which market participants relied, it cannot turn back the clock and give those same participants an opportunity to make hedging and trading decisions anew to best position themselves for the future.

23.     The indicative bid described above was consistent with what we were seeing in the market in advance of the auction. We also witnessed other counterparty behavior consistent with the expectation of substantially higher clearing prices for the DPL-S LDA, including bilateral bids well above the price of the previous clearing price. In my view, such behavior must have been informed by expectations about the updated parameters. The parameters were the one fundamental variable that changed from the 2023/2024 BRA to the 2024/2025

---

[9]     *See* 2023/2024 BRA Results Report at 15, Table 4.

BRA in a way that would explain the higher bids. The influential driver of higher bid/offer behavior witnessed on the bilateral market clearly was reliance upon higher capacity clearing prices driven by the updated parameters.

24.     Among other things, we also entered into financial capacity transactions in the EMAAC LDA. To the extent the post-auction adjustments PJM proposes to make for the DPL-S LDA impact EMAAC prices (as EMAAC is the immediate parent LDA to DPL-S), it could impact the economics of these transactions.

25.     The timeline below summarizes the applicable 2024/2025 BRA deadlines and the business decisions NRG made leading up to the auction based on the posted planning parameters.

| Date | Deadline/Action |
|------|-----------------|
| Aug. 29, 2022 | Planning parameters posted. |
| Oct. 24, 2022 | Updated planning parameters posted. |
| Nov. 8, 2022 | NRG e-mail exchange with PJM regarding 12% jump in DPL-S LDA Reliability Requirement. |
| Nov. 8, 2022 | NRG traders instructed to incorporate expected capacity price into C&I offers. |
| Nov. 18, 2022 | NRG responds to Delaware RFP with price incorporating same expected capacity price. |
| Dec. 2, 2022 | NRG receives and declines offer to purchase ███████ of DPL-S capacity at price of ████████. |
| Dec. 7, 2022 | Auction window opened. |
| Dec. 13, 2022 | Auction window closed. |

26.     For each piece of business NRG conducted related to capacity costs for the 2024/25 Delivery Year in DPL-S in the lead-up to the BRA, NRG relied upon an expectation, based on the posted parameters, that the auction would result in much higher prices. This led to concrete decisions that I and our team made, which in turn caused NRG not to sell capacity that it had available, and which caused NRG not to be successful in winning retail business. Obviously, NRG cannot go back in time and revisit the economic decisions described above.

Document Accession #: 20150720-5259   Filed Date: 04/20/2015

27.     PJM's proposal would have FERC creating distinct classes of winners and losers.  As discussed herein, NRG lost business because it reasonably priced capacity in its bilateral retail offers based on its reliance on the PJM tariff.  Ironically, the losers would also include other entities that relied on the posted parameters and the auction rules and made prudent decisions about bilateral contracting and hedging consistent with such reliance.  These include not only PJM market participants, like NRG, but wholesale and retail customers who entered into fixed-rate contracts that locked-in reasonable expectations about the clearing price in the DPL-S LDA.  Take for example, the wholesale customer that approached NRG about purchasing capacity in the DPL-S LDA for ███████████.  This customer was acting reasonably and prudently in seeking to purchase capacity bilaterally at a price ██████████ the potential clearing price in the 2024/2025 BRA.  Nonetheless, to the extent this customer was successful in finding another seller, it is now locked into a contract price substantially higher than the clearing price with PJM's proposed adjustment.  If the Commission makes the mistake of accepting PJM's proposal, entities like NRG and this customer will be punished for having made reasonable, prudent business decisions, while market participants and others who took no such steps will receive a windfall.  Such an outcome is, to say the least, perverse from a regulatory policy perspective.

**III.     PJM's Proposed Adjustments Will Have Severe Cost Impacts on Existing and Planned Resources in the DPL-S LDA**

28.     PJM proposes to adjust the DPL-S LDA Reliability Requirement to exclude planned resources with interconnection agreements that did not offer into the 2024/2025 BRA. While it does not state the precise magnitude of this adjustment, PJM indicates that the

adjusted price would be less than one fourth of the clearing price without it.[10]  Working from a clearing price at the cap of $426.17/MW-day, PJM's statement implies clearing price at or below $106.54/MW-day.

29.    Such a reduction in the clearing price will have profound consequences for entities, like NRG, that own resources in the DPL-S LDA, as well as for entities that are developing resources in this LDA.  An accepted and desirable function of a capacity market is to guide entry and exit decisions that, in turn, ensure resource adequacy.[11]  Particularly bearing that function in mind, PJM must be cautious and thoughtful about rules changes and other actions that undervalue capacity that may be needed for reliability, as that can lead to premature retirements and discourage needed new entry.  A rushed intervention to tamp down prices may appear beneficial to consumers in the short run, but in the longer run, it may result in those same consumers facing higher costs where the price signals are being muted rather than being allowed to signal the need for (i) more capacity in a particular zone or (ii) existing capacity to remain in service and make investments to allow their continued operation.

30.    In the specific case of the DPL-S LDA, PJM told us that the driver for the 12% jump in the LDA Reliability Requirement—in other words the need for additional capacity in the LDA—was "an expected increase in solar penetration…."  PJM's proposed adjustment would exclude from the LDA Reliability Requirement any of the new solar-powered resources that did not offer into the 2024/BRA.  That implicitly assumes that, because a

---

[10]    Section 205 Filing, Transmittal Letter at 2 (asserting that the clearing price for the DPL-S LDA "would be more than four times what the clearing price should be if the Planned Generation Capacity Resources that did not offer in the auction are excluded from the [LDA] Reliability Requirement").

[11]    *See ISO New England Inc.*, 162 FERC ¶ 61,205 at P 21 (2018) (stating that a capacity market should "provide price signals that guide the orderly entry and exit of capacity resources").

**UNITED STATES OF AMERICA**

**BEFORE THE**

**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | Docket No. EL23-19-000 |
| PJM Interconnection, L.L.C. | ) | Docket No. ER23-729-000 |

---

### COMMENTS OF THE PUBLIC UTILITIES COMMISSION OF OHIO'S OFFICE OF THE FEDERAL ENERGY ADVOCATE

---

On December 23, 2022, PJM Interconnection, L.L.C. ("PJM"), pursuant to sections 205 and 206 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d and 824e, and the regulations of the Federal Energy Regulatory Commission ("FERC" or the "Commission"), 18 C.F.R. § 35.13, filed a proposal to revise the definition of Locational Deliverability Area Reliability Requirement ("LDARR") in the PJM Open Access Transmission Tariff and manuals. The proposal stemmed from PJM's 2024/2025 Base Residual Auction ("BRA"), which PJM asserts, absent the proposed changes, would result in unjust and unreasonable results because of an anomaly in the calculation of the LDARR under which PJM currently operates. The issue surfaced when Planned Generation Capacity Resources, including large thermal resources and Intermittent Resources, were modeled in a small Locational Deliverability Area ("LDA") but did not participate in the auction.

PJM filed applications under both sections 205 and 206 of the FPA to give latitude to the Commission to adopt changes to PJM's tariff with any amendments deemed necessary. In its filings, PJM stated its tariff needs to be changed because the absence of anticipated auction bidders distorted an algorithm used to calculate the LDARR and would have inflated prices in

the Delmarva Power & Light South ("DPL-S") LDA by 400 percent. PJM suspended release of the auction results, pending a response from FERC on its proposed changes.

The Public Utilities Commission of Ohio's ("PUCO") Office of the Federal Energy Advocate ("Ohio FEA") takes exception to PJM's proposal to retroactively adjust pricing mechanisms to the detriment of bidders in the affected LDA but also to the potential detriment of all bidders in PJM auctions if those auctions produce results different from PJM's expectations. Uncertainty in the single auction at issue here is problematic; creating the possibility of spreading the uncertainty in the future is a disservice to the entirety of the PJM wholesale electricity marketplace. What PJM posits as a narrowly constructed change to its tariff to correct a problem could be anything but. As described later in this filing, the Ohio FEA urges the Commission to address this issue in a way that would eliminate the problem going forward.

## I.    BACKGROUND

Under PJM's existing tariff and manuals, the LDARR used in the BRA is a function of forecasted loads and expected supply resources for each LDA. While some resources within PJM have a must-offer requirement, others do not. Specifically, Intermittent Resources and Planned Generation Capacity Resources are not required to bid, owing to the possibility that they might be unable to meet their commitments in the capacity market. Nevertheless, PJM's calculation of the LDARR for DPL-S incorporated a significant amount of Planned Generation Capacity Resources – including large thermal resources and planned Intermittent Resources – for the 2024/2025 BRA in the DPL-S LDA, based on expected in-service dates in the resources' Interconnection Service Agreements. The inclusion of these anticipated resources, as factored into the LDARR, would force the auction to over procure capacity at distorted, high prices to account for (1) potential forced outages of large Planned Generation Capacity Resources or (2)

seasonal variations and availability of Intermittent Resources. So, while the offer window for the 2024/2025 BRA closed on December 13, 2022, PJM has chosen not to conclude the auction and post clearing prices, citing tariff language that allows it to evaluate Sell Offers after the offer window closes. But it is not the Sell Offers at issue here. It is the inaccurately forecasted loads and resources that led to the unexpected auction results.

PJM comes to FERC with requests to change its tariff and manuals to accommodate what it considers a remedy:

> PJM proposes to prospectively include an additional factor to be considered in the optimization algorithm when evaluating the Sell Offers and other inputs for the 2024/2025 BRA before the results are determined and the capacity awards are made. Absent the ability to include this additional factor in the optimization algorithm, PJM would be forced to utilize a materially inaccurate Locational Deliverability Area Reliability Requirement that does not reflect the actual capacity needs of the particular LDA in question and would result in an unjust and unreasonable outcome.[1]

PJM's proposed definition of LDARR would enable it to exclude Planned Generation Capacity Resources that do not participate in the BRA where the LDARR materially increases, specifically by more than one percent, from the prior year due to the addition of such resources.[2] PJM asserted that, in light of the narrow circumstances, its proposed solution would appropriately resolve the identified problem "without the highly disruptive effect of having to reopen the auction bidding window across the entirety of PJM."[3]

---

[1] PJM BRA Section 206 filing at 4.
[2] *Id*. at 5.
[3] *Id*. at 31.

PJM's judgment that the auction results for the DPL-S LDA are unjust and unreasonable has led to the unfortunate consequence that *no* Capacity Market Seller for the entire PJM region, including all such sellers outside of the relatively tiny DPL-S LDA, has, to this date, been awarded a capacity commitment for the 2024/2025 BRA. Further, PJM sees the potential for the DPL-S LDA situation to be repeated and seeks FERC approval to tinker retrospectively with the outcome of its auctions if a similar situation happens in the future. The market uncertainty that could come from such an open-ended and indefinite ("we will know it if and when we see it") approach is unacceptable.

## II.    COMMENTS

While the Ohio FEA has serious concerns with PJM's proposed adjustment to the LDARR through the optimization algorithm, if the Commission determines this adjustment should be made, it should apply only to the 2024/2025 BRA. As explained by PJM, the filings currently before the Commission are the result of an aberrant result that PJM is now seeking to remedy after the fact. In the Ohio FEA's opinion, any post-hoc solution is likely to be suboptimal. The Ohio FEA is concerned that granting broad and vaguely-defined authorization to PJM to modify important auction parameters *after* bids have already been received lacks transparency and may potentially undermine confidence in wholesale markets.

Going forward, PJM should propose a more durable solution to ensure that future post-auction modifications to the LDARR can be avoided.  It is our understanding that a significant amount of Planned Generation Capacity Resources in the DPL-S LDA that were expected to participate in the auction based on the in-service dates specified in those resources' Interconnection Service Agreements chose not to offer in the BRA even though the resources were included in the calculation of the LDARR, thereby producing an anomalous result.

To avoid this situation in the future, we would propose that all units that are exempted from the must-offer requirement in the capacity market, such as new entrants and intermittent resources, be required to notify PJM of their intention to bid in the BRA *prior* to the publication of the auction planning parameters, so these parameters can transparently reflect true supply and demand conditions, similar to how Fixed Resource Requirement resources are required to be designated before a BRA takes place. Allowing PJM to have a blanket authorization (based on a one percent LDARR shift) to retroactively modify auction results due to observed resource bidding behavior lacks transparency and potentially undermines confidence that the auction results are just and reasonable.

Additionally, the Ohio FEA urges the Commission to take prompt action in resolving the identified issue with the 2024/2025 BRA. PJM's capacity auction schedule has already suffered from a series of delays as the Commission was considering filings related to PJM's Minimum Offer Price Rule. The PUCO repeatedly warned FERC that these delays would have significant consequences on states like Ohio that depend on PJM's capacity construct to send price signals to market participants and to form the foundation upon which retail rates can be established.[4]

Ohio's regulated electric distribution utilities ("EDUs") rely upon a competitive bid auction process to procure generation service for non-shopping customers, similar to programs in other retail choice jurisdictions. These auctions ensure the availability of reliable electricity service at competitive prices for customers who do not avail themselves of the opportunity to shop for their own supplier. Ohio's auctions are nondiscriminatory and are not preferential to any resource type. The auctions are held *after the capacity price has been established by PJM for the relevant delivery year*, so suppliers can incorporate the costs of the capacity obligation into

---

[4] FERC Docket No. EL16-49 and EL18-178 (Consolidated), Request for Rehearing of the PUCO, January 21, 2020, at 26; FERC Docket No. ER18-1314, Comments of the PUCO, June 22, 2020, at 14-15.

their bids. An independent auction administrator conducts the auctions on behalf of the distribution utility and the PUCO employs an independent consultant to ensure the outcomes are competitive and consistent with wholesale market conditions. The resulting auction prices establish the default service "price to compare" that also serves as an important competitive benchmark against which other offers available in the retail marketplace can be measured.

Due to the lack of a FERC-approved PJM capacity rate, the PUCO was forced to significantly modify and truncate the default service auction schedules of the Ohio EDUs by eliminating multi-year procurements, which deprived Ohio ratepayers of the benefits associated with staggering and laddering auction products of multiple durations, as the PUCO had originally contemplated when it approved the EDUs' default service proposals.

Now, just as PJM was on track to hold a series of catch-up auctions to re-establish the three-year forward-looking nature of the capacity construct, we are yet again faced with another delay, one which carries the same damaging consequences that PUCO has already repeatedly warned against. This delay is already imperiling Ohio's auctions for default service, even before FERC has had time to evaluate and respond to PJM's filings.

Once again, we ask FERC to act decisively and swiftly to minimize the disruptions that will occur with further delays to a process that has already been irreparably delayed and to restore order after years of uncertainty.

## III.    CONCLUSION

Guessing should not be part of PJM's preparations for a BRA. Nor is it necessary. Rather than continuing a problematic practice of assuming which resources will participate in a BRA, PJM should communicate with those which do not have a must-offer requirement before establishing auction parameters. With more accurate load and supply characteristics established

6

before bidding windows open, PJM can avoid the precarious alternative of reworking results after the window closes. The Commission has an opportunity to restore confidence in wholesale markets. Instead of adopting proposals that create uncertainty, FERC could order a quick fix for the DPL-S LDA and eliminate the potential of a going-forward repeat of the situation by directing PJM to secure more reliable information before any auctions. The Ohio FEA encourages the Commission to take this more reasoned approach and to do so quickly. Delayed 2024/2025 BRA results have a spillover effect that impacts Ohio's auctions for default service.

Respectfully submitted,

**Dave A. Yost**
Ohio Attorney General

**John H. Jones**
Section Chief

*/s/ Thomas G. Lindgren*
**Thomas G. Lindgren**
Assistant Attorney General
Public Utilities Section
30 East Broad Street, 26th Floor
Columbus, Ohio 43215-3414
614.644.8768 (telephone)
866.818.6152 (facsimile)
Thomas.Lindgren@OhioAGO.gov

**On Behalf of the Federal Energy Advocate**
**The Public Utilities Commission of Ohio**

January 20, 2023

7

**JA495**

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this date caused a copy of the foregoing document to be served on each person included on the official service list maintained for this proceeding by the Commission's Secretary, by electronic mail or such other means as a party may have requested, in accordance with Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2010.  Dated this the 20th day of January 2023, at Columbus, Ohio.

*/s/ Thomas G. Lindgren*
**Thomas G. Lindgren**
Assistant Attorney General

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **PJM Interconnection, L.L.C.** | ) | **Docket No. ER23-729-000** |
| **PJM Interconnection, L.L.C.** | ) | **Docket No. EL23-19-000** |
| | | **(Not consolidated)** |

## PROTEST OF THE ELECTRIC POWER SUPPLY ASSOCIATION

Pursuant to Rule 211 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission (the "Commission"),[1] the Electric Power Supply Association ("EPSA")[2] respectfully submits this protest to the two filings submitted on December 23, 2022, by PJM Interconnection, L.L.C. ("PJM") in the above-captioned proceedings[3]

---

[1]    18 C.F.R. § 385.211 (2022).

[2]    EPSA has separately moved to intervene in these proceedings. *See* (doc-less) Motion to Intervene of Electric Power Supply Association, Docket No. ER23-729-000 (filed Jan. 3, 2023); (doc-less) Motion to Intervene of Electric Power Supply Association, Docket No. EL23-19-000 (filed Jan. 3, 2023).   EPSA is the national trade association representing competitive power suppliers in the U.S.  EPSA members provide reliable and competitively priced electricity from environmentally responsible facilities using a diverse mix of fuels and technologies.  EPSA seeks to bring the benefits of competition to all power customers.  This pleading represents the position of EPSA as an organization but not necessarily the views of any particular member with respect to any issue.

[3]    Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to Section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for an Extended Comment Period of 28 Days, Docket No. ER23-729-000 (filed Dec. 23, 2022) (the "ER23-729 Filing"); EL23-19 Complaint Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area in the 2024/2025 Base Residual Auction And Requesting that the Commission Establish a Refund Effective Date of December 23, 2022, and Request for an Extended Comment Period of 28 Days, Docket No. EL23-19-000 (filed Dec. 23, 2022) (the "EL23-19 Complaint" and together with the ER23-729 Filing, the "December 23 Filings").  The ER23-729 Filing was filed under Section 205 of the Federal Power Act (the "FPA"), 16 U.S.C. § 824d (2018), while the EL23-19 Complaint was filed pursuant to Section 206 of the FPA, 16 U.S.C. § 824e (2018), but both of the December 23 Filings request substantially similar relief and put forward substantially similar arguments.  Capitalized terms not otherwise defined herein have the meaning set forth in PJM's

proposing modifications to the Reliability Pricing Model ("RPM") rules applicable to the 2024/2025 Base Residual Auction ("BRA").  As explained below and in the affidavit of Paul M. Sotkiewicz, Ph.D., provided as Attachment A hereto (the "Sotkiewicz Affidavit"), the December 23 Filings must be rejected because the filed rate doctrine and rule against retroactive ratemaking bar PJM from modifying the rules governing the 2024/2025 BRA when the auction window has already closed.  Moreover, even aside from that serious legal infirmity, PJM has failed to demonstrate that its proposed tariff modifications are just and reasonable or that its existing Tariff is unjust and unreasonable.  PJM's proposed modifications must be rejected because they would make it impossible for market participants to rely on the auction parameters posted by PJM ahead of each auction, deter bilateral contracting and investments, and result in prices that do not reflect reliability needs.  This is particularly true because PJM has repeatedly demonstrated, and continues to demonstrate in the December 23 Filings, a bias towards actions that will push down prices while failing to make fixes, much less timely fixes, needed to ensure that resources necessary for reliability have the opportunity and incentive to remain in the market.

## I.    BACKGROUND

The December 23 Filings seek to modify the definition of the term "Locational Deliverability Area Reliability Requirement" under the Tariff.  The Locational Deliverability Area Reliability Requirement is based on the "the projected internal capacity" in the relevant Locational Deliverability Area ("LDA"), plus the Capacity Emergency Transfer

---

Open Access Transmission Tariff (the "Tariff"), the Reliability Assurance Agreement Among Load Serving Entities in the PJM Region (the "RAA") or the December 23 Filings, as applicable.

Objective ("CETO") for the Delivery Year.[4]  However, PJM claims that the definition of the Reliability Requirement must be modified because, in clearing the 2024/2025 BRA, PJM realized that:

> a significant amount of Planned Generation Capacity Resources that were expected to participate in the auction based on the expected in-service date of the resources' Interconnection Service Agreements ("ISAs") did not offer in the auction despite being included in the Locational Deliverability Area Reliability Requirement.[5]

In particular, PJM asserts that the Locational Deliverability Area Reliability Requirement for the Delmarva Power & Light South ("DPL-S") LDA "was overstated for the 2024/2025 BRA,"[6] because "large thermal resources and planned Intermittent Resources in the [DPL-S] LDA that were expected to participate in the auction . . . did not offer in the auction despite being included in the Locational Deliverability Area Reliability Requirement."[7]  If it were to use the existing definition of the Locational Deliverability Area Reliability Requirement in the 2024/2025 BRA, PJM:

> estimates that the clearing price for the DPL-S LDA (and the revenues received by the Capacity Market Sellers in this small LDA) would be more than four times what the clearing price should be if the Planned Generation Capacity Resources that did not offer in the auction are excluded from the Locational

---

[4]    *See* Tariff, § 1 (definition of "Locational Deliverability Area Reliability Requirement").  The CETO is "the amount of electric energy that a given area must be able to import in order to remain within a loss of load expectation of one event in 25 years when the area is experiencing a localized capacity emergency, as determined in accordance with the PJM Manuals."  RAA, § 1 (definition of "Capacity Emergency Transfer Objective") (also stating that "CETO shall be calculated based in part on EFORD determined in accordance with [RAA], Schedule 5, Paragraph C").

[5]    ER23-729 Filing at 2.  *See also* EL23-19 Complaint at 2.

[6]    ER23-729 Filing at 2.

[7]    EL23-19 Complaint at 2.

Deliverability Area Reliability Requirement given that they did not offer into the BRA.[8]

To address this issue, PJM proposes to modify the definition of "Locational Deliverability Area Reliability Requirement" as follows:

> "Locational Deliverability Area Reliability Requirement" shall mean the projected internal capacity in the Locational Deliverability Area plus the Capacity Emergency Transfer Objective for the Delivery Year, as determined by the Office of the Interconnection in connection with preparation of the Regional Transmission Expansion Plan, less the minimum internal resources required for all FRR Entities in such Locational Deliverability Area. Notwithstanding the foregoing, effective with the 2024/2025 Delivery Year, during the auction process, the Office of Interconnection shall exclude from the Locational Deliverability Area Reliability Requirement any Planned Generation Capacity Resource in an LDA that does not participate in the relevant RPM Auction as projected internal capacity and in the Capacity Emergency Transfer Objective model where the Locational Deliverability Area Reliability Requirement for the Base Residual Auction increases by more than one percent over the reliability requirement used from the prior Delivery Year's Base Residual Auction (for Incremental Auctions the Locational Deliverability Area Reliability Requirement would be compared with the reliability requirement used in the prior relevant RPM Auction associated with the same Delivery Year) for that LDA due to the cumulative addition of such Planned Generation Capacity Resources.[9]

The ER23-729 Filing requests that the proposed Tariff modification be accepted effective December 24, 2022,[10] while the EL23-19 Complaint requests that the Commission establish a refund effective date of December 23, 2022.[11]

---

[8]    ER23-729 Filing at 2.  *See also* EL23-19 Complaint at 2-3.

[9]    ER23-729 Filing, Attachment A, Revisions to the PJM Open Access Transmission Tariff, (Marked/Redline Format); EL23-19 Complaint, Attachment A, Revisions to the PJM Open Access Transmission Tariff, (Marked/Redline Format).

[10]   *See* ER23-729 Filing at 5.

[11]   *See* EL23-19 Complaint at 3.

II.    **PROTEST**

The December 23 Filings must be rejected.  Critically, regardless of whether PJM's proposed modifications are reviewed under Section 205 or Section 206 of the FPA, the relief requested by PJM with respect to the 2024/2025 BRA is clearly barred.  PJM is obviously motivated by its dissatisfaction with the auction results produced by the market rules in place when the 2024/2025 BRA was conducted and wishes to change the rules to get different results.  This is exactly the sort of after-the-fact tinkering that is barred under the filed rate doctrine and its corollary, the prohibition against retroactive ratemaking.  Moreover, even setting aside this fatal flaw, PJM has failed to demonstrate that the existing Tariff is unjust and unreasonable as required to satisfy its burden under Section 206 of the FPA.  In addition, PJM's proposal, even as applied solely on a prospective basis to RPM Auctions not yet commenced, cannot be accepted under Section 205 of the FPA or adopted under Section 206 of the FPA because it is fundamentally unsound and contrary to Commission precedent as it would make it all but impossible for market participants to rely on published planning parameters for RPM Auctions.

**A.    PJM's Efforts to Modify the Rules Applicable to the 2024/2025 BRA Are Barred by the Filed Rate Doctrine and the Rule Against Retroactive Ratemaking**

As the Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") has summarized them, the filed rate doctrine and its corollary, the rule against retroactive ratemaking, prohibit "a regulated seller of [power] from collecting a rate other than the one filed with the Commission and prevent [ ] the Commission itself from imposing a rate

increase for [power] already sold."[12]   The D.C. Circuit further observed that, in the case of the FPA, "the filed rate doctrine rests on two provisions: section 205(c), which requires utilities to file rate schedules with the Commission, and section 206(a), which allows the Commission to fix rates and charges, but only prospectively."[13]   The Commission can therefore neither accept the ER23-729 Filing nor grant the relief requested in the EL23-19 Complaint.  PJM apparently recognizes the impediment that the filed rate doctrine and rule against retroactive ratemaking pose to its requests as it devotes substantial effort and space in the December 23 Filings to unavailing efforts to spin its proposed Tariff modifications as prospective.  PJM's strained arguments must be rejected.

As Dr. Sotkiewicz explains, a BRA does not occur in isolation, but instead is the culmination of months of preparation by PJM and market participants.  Months ahead of the auction, PJM and the Independent Market Monitor for PJM (the "IMM") begin to make critical determinations affecting offers, and market participants are required to provide information and make certain elections.[14]   Under Sections 5.10 and 5.11 of

---

[12]    *Towns of Concord, Norwood, and Wellesley, Mass. v. FERC*, 955 F.2d 67, 72 (D.C. Cir. 1992) ("*Town of Concord*") (alterations in original) (quoting *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) ("*Arkla*")).  *See also, e.g.*, *Oklahoma Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021) ("*Oklahoma Gas*") (the filed rate doctrine is "shorthand for the interconnected statutory requirements that bind regulated entities to charge only the rates filed with FERC and to change their rates only prospectively"); *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1226 (D.C. Cir. 2018) ("*ODEC*") ("At bottom, [the filed rate] doctrine means that 'a regulated seller of [power]' is prohibited 'from collecting a rate other than the one filed with the Commission,' and 'the Commission itself' cannot retroactively 'impos[e] a rate increase for [power] already sold.'" (citation omitted)); *Texas E. Transmission Corp.*, 72 FERC ¶ 61,152 at 61,766-67 (1995) ("Under the filed rate doctrine, final rates approved by the Commission cannot be changed retroactively."), *aff'd sub nom. Texas E. Transmission Corp. v. FERC*, 102 F.3d 174 (5th Cir. 1996).

[13]    *Town of Concord*, 955 F.2d at 71-72 (footnotes omitted).

[14]    *See* Sotkiewicz Affidavit, ¶¶ 15-31.  *See also* RPM Auction Schedule, Tab for 2024-2025 BRA (the "2024/2025 BRA Schedule"), https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/rpm-auction-schedule.ashx (setting forth pre-auction deadlines).

Attachment DD to the Tariff, PJM is required to determine and post certain information ahead of each BRA.  Specifically, Section 5.10 requires that PJM establish a Variable Resource Requirement ("VRR") Curve, including the underlying Locational Deliverability Area Reliability Requirement used to plot such VRR Curve, prior to the relevant auction.[15] Section 5.11, in turn, provides that PJM will also "post . . . information for a Delivery Year prior to conducting the Base Residual Auction for such Delivery Year," where the posted auction parameters include:

> The Locational Deliverability Area Reliability Requirement and the Variable Resource Requirement Curve for each Locational Deliverability Area for which a separate Variable Resource Requirement Curve has been established for such Base Residual Auction, including the details of any adjustments to account for Price Responsive Demand and any associated PRD Reservation Prices, and the CETO and CETL values for all Locational Deliverability Areas. . . .[16]

In the case of the 2024/2025 BRA, the auction parameters were initially posted on August 29, 2022 and then were updated on October 24, 2022.[17]  After the parameters are posted, market participants are required to make certain elections and decisions, and they also engage in bilateral contracting and hedging activity based on the posted auction parameters ahead of the actual auction.[18]  The 2024/2025 BRA auction window opened on December 7, 2022 and closed on December 13, 2022.[19]  The Tariff requires PJM to

---

[15]    *See* Tariff, Attachment DD, § 5.10(a)(vi).  *See also id.*, § 5.10(a)(ii)(C) (setting forth process for PJM to use the Locational Deliverability Area Reliability Requirement to establish the VRR Curves for LDAs).

[16]    Tariff, § 5.11(a)(v).

[17]    *See* 2024/2025 BRA Schedule; Sotkiewicz Affidavit, ¶ 28 n.24.

[18]    *See* Sotkiewicz Affidavit, ¶¶ 25-30.

[19]    *See* 2024/2025 BRA Schedule.

"post the results of each auction as soon thereafter as possible,"[20] which was scheduled to occur on December 20, 2022.[21]

As is clear from the foregoing, all of the required pre-auction activities conducted pursuant to the express requirements of the Tariff and the auction itself occurred prior, in some cases months prior, to the submittal of the December 23 Filings.  The December 23 Filings also make evident that PJM initially cleared the auction conducted between December 7, 2022 and December 13, 2022 following the rules as set forth in the Tariff. That is the only way it could have "discovered" what it views as "anomalous auction result in the DPL-S LDA . . . ."[22]  Rather than post the final results as scheduled, however, PJM made the December 23 Filings proposing to "include an additional factor to be considered in the optimization algorithm when evaluating the Sell Offers and other inputs for the 2024/2025 BRA *before* the results are determined and capacity awards are made."[23]  PJM apparently believes that the lack of posted final auction results leaves it free to upend the rules governing the auction, on the theory that "PJM is still in the process of conducting the auction clearing before the results are posted for Market Participants and any capacity commitments are awarded."[24]  PJM further claims that its proposal is "entirely consistent with the filed-rate doctrine and the rule against retroactive ratemaking" because it:

> (i) does not violate any specific deadline or date contained within the text of the Tariff; (ii) effectuates an existing tariff provision providing prior notice to customers that PJM may seek Commission approval of tariff modifications where "imminent severe economic harm to electric consumers

---

[20]     Tariff, Attachment DD, § 5.11(e).

[21]     *See* 2024/2025 BRA Schedule.

[22]     ER23-729 Filing at 9; EL23-19 Complaint at 9.

[23]     ER23-729 Filing at 4 (emphasis in original); EL23-19 Complaint at 4 (emphasis in original).

[24]     ER23-729 Filing at 8; EL23-19 Complaint at 9.

requires a prompt Section 205 filing;" (iii) will only impact future actions not yet taken in the auction process – namely, the inclusion of the correct Locational Deliverability Area Reliability Requirement in the optimization algorithm used in conducting the 2024/2025 BRA; and (iv) because no capacity awards have been made or final results posted, there is not a final rate for which any entity has an entitlement or settled expectation at this time.[25]

PJM's arguments are an affront to the underlying facts and logic. Contrary to PJM's strained arguments, the modifications it proposes can in no way be classified as "prospective" or otherwise reconciled with the demands of the filed rate doctrine and the rule against retroactive ratemaking.

First, although the Tariff does not stipulate a date certain for the posting of results,[26] this does not mean that there were no applicable Tariff deadlines implicated by PJM's requests. As indicated above, the Tariff in fact sets forth a number of actions that PJM and market participants are required to take prior to the actual running of a BRA. Critically, the Tariff requires that "[t]he parameters of the Variable Resource Requirement [("VRR")] Curve **will be established prior** to the conduct of the Base Residual Auction for a Delivery Year and **will be used for** such Base Residual Auction."[27]  In order to establish these VRR Curves, PJM needs to determine certain inputs.  Among other things:

> The Office of the Interconnection shall determine the PJM Region Reliability Requirement and the ***Locational Deliverability Area Reliability Requirement*** for each Locational Deliverability Area for which a [VRR] Curve has been established for such Base Residual Auction . . . ***prior to the conduct of the Base Residual Auction*** for the first Delivery Year in

---

[25] ER23-729 Filing at 24 (footnote omitted); EL23-19 Complaint at 24 (footnote omitted).

[26] *See* ER23-729 Filing at 25-28; EL23-19 Complaint at 25-27.

[27] Tariff, Attachment DD, § 5.10(vi)(A) (emphases added).

which the new values will be applied, in accordance
with the Reliability Assurance Agreement.[28]

As Dr. Sotkiewicz explains, the Locational Deliverability Area Reliability Requirement establishes an anchor point for the VRR Curve[29] that the Tariff stipulates "***will*** be used for [the] Base Residual Auction."[30]  The Locational Deliverability Area Reliability Requirement therefore cannot now be changed without violating the Tariff.  At the same time, Section 5.11 of Attachment DD also requires that PJM post the Locational Deliverability Area Reliability Requirement prior to the BRA.[31]

In this respect, when the Commission approved PJM's proposal to modify the timing of the 2024/2025 BRA, it expressly "recognize[d] PJM's commitment to post the specific dates of pre-auction activities no later than eight months prior to the commencement of any associated BRA in order to ensure that all market participants are aware of the relevant deadlines."[32]  In accordance with the 2024/2025 BRA Schedule, PJM posted the Locational Deliverability Area Reliability Requirement on August 29, 2022.  The fact that those auction parameters have, in PJM's view, not yet been applied in the 2024/2025 BRA are beside the point, because the Tariff mandates that the

---

[28]     *Id.*, § 5.10(vi)(B) (emphases added).  This provision requires the determination of the PJM Region Reliability Requirement and the Locational Deliverability Area Reliability Requirement by February 1 of each year.  That date was not applicable in this case because of the modified schedule for the 2024/2025 BRA.  *See PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,122 (2022) ("RPM Schedule Order").  However, the delay of the 2024/2025 BRA in no way affected the requirement that PJM establish the VRR Curve and the underlying Locational Deliverability Area Reliability Requirement prior to conducting the BRA.

[29]     *See* Sotkiewicz Affidavit, ¶ 25.

[30]     Tariff, Attachment DD, § 5.10(vi)(A).

[31]     *See id.*, § 5.11(a)(v).

[32]     RPM Schedule Order, 178 FERC ¶ 61,122 at P 15.

previously established parameters will be used to determine the VRR Curves that "will be used for such Base Residual Auction."[33]

In addition, PJM in this case has insisted that the 2024/2025 BRA is ongoing and therefore has not yet posted the final results of the auction.[34]  This delay in finalizing and publicizing the final 2024/2025 BRA results cannot be squared with the Tariff's requirement for PJM to "post the results of each auction as soon . . . as possible" after conducting the auction.[35]  To be sure, "as soon as possible" does not mean within a specific number of days.  But these words are not meaningless.  In this context, it plainly means that PJM should post the final results promptly after clearing the auction under the rules set forth in the Tariff and compiling the relevant data for posting.  It cannot reasonably be construed to mean that PJM can delay posting final results indefinitely until it can change the rules to obtain its desired outcome.  Indeed, there are any number of provisions of the Tariff that similarly require market participants to complete actions "as expeditiously as possible," or "as promptly as possible."[36]  It is unimaginable that PJM (or the Commission) would consider a party to be in compliance with such a deadline if it

---

[33]     Tariff, Attachment DD, § 5.10(vi)(A).

[34]     Although the December 23 Filings provide some indication of the potential price impacts of its actions, EPSA supports PJM's decision not to post what PJM has characterized as "indicative results" from the 2024/2025 BRA at this time.  *See* PJM Inside Lines, *UPDATE: 2024/2025 Capacity Auction*, https://insidelines.pjm.com/pjm-updates-members-on-2024-2025-capacity-auction-results/.  The Tariff does not authorize PJM to post "indicative results," and such a posting would only have compounded the damage done by PJM's failure to adhere to the deadline for posting final results and thereby concluding the entire auction process.

[35]     Tariff, Attachment DD, § 5.11(e).

[36]     *See, e.g.*, Tariff, § 217.8 (" . . . the parties to the Network Upgrade Funding Agreement shall use due diligence to execute the Network Upgrade Funding Agreement as expeditiously as possible"); Tariff, Attachment K – Appendix, § 1.9.4 (a) ("Each Market Seller that owns or controls a pool-scheduled resource, or Generation Capacity Resource whether or not pool-scheduled, shall: (i) advise the Office of the Interconnection of a Generator Forced Outage suffered or anticipated to be suffered by any such resource as promptly as possible . . . .").

were dragging its feet pending Commission action on its request to modify or eliminate the underlying obligation.

Second, even assuming that the Tariff allows PJM to delay posting the final auction results, there would still be no legal basis for PJM's claim that the auction rules remain subject to change. PJM's reliance on Section 9.2(b) of the Tariff[37] is hopelessly misplaced, because that provision only permits PJM to avoid having to consult with transmission owners and PJM members at least seven days before submitting a filing under Section 205 of the FPA.[38] That provision does not say anything about the effectiveness of any proposed changes in such a filing, nor could the Commission have approved a Tariff provision that would effectively violate the filed rate doctrine and rule against retroactive ratemaking by permitting PJM to effectuate retroactive rate changes.[39]

Third, it also defies reason for PJM to claim that its proposed amendment "will only impact future actions not yet taken in the auction process – namely, the inclusion of the correct Locational Deliverability Area Reliability Requirement in the optimization algorithm used in conducting the 2024/2025 BRA . . . ."[40] As explained above, under Section 5.10 of Attachment DD, the Locational Deliverability Area Reliability Requirement is used to establish VRR Curves *prior* to each BRA and those VRR Curves are not subject to

---

[37]    *See* ER23-729 Filing at 28-30; EL23-19 Complaint at 28-30.

[38]    *See* Tariff, § 9.2(b).

[39]    *See, e.g., Arkla*, 453 U.S. at 577 ("[T]he Commission itself has no power to alter a rate retroactively."). *Cf. City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) ("[T]he question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority."); *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006) ("An agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority.").

[40]    ER23-729 Filing at 24; EL23-19 Complaint at 24.

change.  Moreover, PJM willfully ignores the fact that its supposed "future actions" will completely disrupt the expectations of market participants that relied on the posted auction parameters for purposes of pre-auction decisions and other actions.[41]

Finally, the only reason why "there is not a final rate for which any entity has an entitlement or settled expectation at this time"[42] is because, as discussed above, PJM has unlawfully refused to accept the auction outcome produced by the rules in effect when the auction was conducted and to post the final results of the 2024/2025 BRA.  Even then, the lack of posted final auction **results** in no way means that market participants did not rely on the existing market rules or the auction parameters that were posted prior to the auction.  Indeed, as discussed in more detail below, PJM itself has previously recognized that market participants rely on the auction parameters for purposes of making binding financial decisions.

PJM also attempts to muddy the waters by claiming that its belated modifications to the Locational Deliverability Area Reliability Requirement are permitted and expected by market participants because "the Tariff already requires PJM to adjust the Locational Deliverability Area Reliability Requirement *after* the bidding window closes (but before the conclusion of the auction)," as, under Section 5.11(e) of Attachment DD, "PJM is required to make 'any adjustments to PJM Region or LDA Reliability Requirements to reflect Price Responsive Demand with a PRD Reservation Price equal to or less than the applicable Base Residual Auction clearing price.'"[43]  As an initial matter, Price Responsive Demand

---

41    *See* Sotkiewicz Affidavit, ¶¶ 17-19, 29-31 (discussing disruptions to market participants' settled expectations).

42    ER23-729 Filing at 24; EL23-19 Complaint at 24.

43    ER23-729 Filing at 23 (emphasis in original); EL23-19 Complaint at 23 (emphasis in original).

is "end-use customer load . . . capable of curtailing such load . . . ."[44]  That being the case, PJM reflects Price Responsive Demand as a reduction on the load side, rather than as an offer on the supply side.[45]  That does not mean that the underlying Reliability Requirement is modified in any way that would, like PJM's proposed adjustment, alter the auction clearing price.  As Dr. Sotkiewicz explains, information regarding Price Responsive Demand and PRD Reservation Prices is posted prior to each BRA.[46]  The full text of Section 5.11(e), in turn, makes clear that this provision is not about changing the underlying Locational Deliverability Area Reliability Requirement or the algorithm, but instead "pertains to posting auction results and the manner and form in which the information is posted."[47]  Moreover, even if clearing Price Responsive Demand could be interpreted as some kind of "adjustment" to the Locational Deliverability Area Reliability Requirement, it goes without saying that, simply because the Tariff expressly provides for one specific and limited type of adjustment, that does not give PJM license to make after-the-fact changes to any and all other aspects of the Locational Deliverability Area Reliability Requirement as it pleases.

---

[44]    RAA, § 1 (definition of "Price Responsive Demand").

[45]    *See, e.g.*, Tariff, Attachment DD, § 5.4(c)(1) (PJM shall conduct Incremental Auctions to "seek additional capacity commitments to serve the PJM Region or an LDA if the PJM Region Reliability Requirement or LDA Reliability Requirement utilized in the most recent prior auction conducted for the Delivery Year (including any reductions to such reliability requirements as a result of any Price Responsive Demand with a PRD Reservation Price equal to or lower than the clearing price in the Base Residual Auction for such Delivery Year)").

[46]    *See* Sotkiewicz Affidavit, ¶¶ 40-41; Tariff, Attachment DD, §§ 5.11(a)(iv), 5.11(a)(v).

[47]    Sotkiewicz Affidavit, ¶ 43.  *See also id.*, ¶¶ 44-45 (describing PJM's auction algorithm).

At the end of the day, the fundamental problem ignored by PJM is that the RPM

***rules***, rather than the prices resulting from those rules, are the filed rate.[48]  It is therefore

irrelevant that PJM has not posted the final auction results.  What is relevant and, indeed,

dispositive is that the RPM rules required that PJM determine the Locational Deliverability

Area Reliability Requirement ahead of time and also established the process that PJM

should apply to clear each auction.  As the Commission has made clear, what matters

are "the filed rates in existence at the time" that the 2024/2025 BRA and the filed rate

doctrine prohibits the application of a rule that is "not consistent with the Tariff in effect at

the time . . . ."[49]  The 2024/2025 BRA closed 10 days before the filing of the December 23

Filings, and the Commission cannot lawfully approve PJM's effort to modify the rules

applicable to that auction now.

---

[48]    *See, e.g., Public Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.,* 168 FERC ¶ 61,042 at P 89 (2019) ("We also find that Public Citizen is incorrect in identifying the result of each Auction as the 'filed rate' because, in the market-based rate context, the rate on file with the Commission is the Tariff describing the Auction procedures, not the prices that may change over time."); *Bangor-Hydro Elec. Co. v. ISO New England, Inc.*, 97 FERC ¶ 61,339 at 62,589-90 ("[T]he clearing prices that were calculated for the period in question were the result of a formula that was prescribed by the market rules and applied as intended by them, and therefore the clearing prices comply with ISO-NE's tariff."); *Black Oak Energy, LLC v. N.Y. Indep. Sys. Operator, Inc.*, 122 FERC ¶ 61,261 at P 32 (2008) (noting that market rules "are the filed rate"); *Allete, Inc. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 119 FERC ¶ 61,142 at P 36 (2007) (same); *ISO New England Inc.*, 90 FERC ¶ 61,141, at 61,425 (same).

[49]    *Midwest Indep. Transmission Sys. Operator, Inc.*, 153 FERC ¶ 61,101 at P 40 (2015), *on reh'g*, 155 FERC ¶ 61,174 (2016), *aff'd sub nom. MISO Transmission Owners v. FERC*, 860 F.3d 837 (6th Cir. 2017).  *See also, e.g., AEP Appalachian Transmission Co.*, 164 FERC ¶ 61,180 at P 18 (2018) (finding "that retroactive approval of the formula rate change results in a violation of the filed rate doctrine and the prohibition against retroactive ratemaking"); *Midcontinent Indep. Transmission Sys. Operator, Inc.*, 161 FERC ¶ 61,020 at PP 7-8 (2017) (finding that filed rate doctrine barred application of true-up mechanism that had been accepted effective January 1, 2017, and rejecting argument that "because the true-up for the 2016 rate year will not be calculated until June 1, 2017, and will not actually affect customers' rates until January 1, 2018, it is a 'forward-looking rate mechanism'"); *Haviland Holdings, Inc. v. Pub. Serv. Co. of N.M.*, 107 FERC ¶ 61,034 at P 17 (2004) (finding that "the events subject to [a] complaint occurred prior to the . . . effective date of [a final rule]" and that procedures required by that rule "are not relevant to the Commission's determination on the issues in this proceeding").

Applying the filed rate doctrine and rule against retroactive modification is especially important in this case because PJM acknowledges that its proposed Tariff modifications are motivated by, and seek to avoid, the results that would be produced under the rules in effect when the auction was conducted. While PJM tries to characterize the results as an "error" that may be corrected under the filed rate doctrine,[50] the December 23 Filings make clear that there was no error in applying the existing rules but that PJM simply wants to "reduce charges that Load Serving Entities would otherwise have to pay absent these revisions."[51] Such an attempt to avoid the ramifications of the rate on file is precisely what the filed rate doctrine and the rule against retroactive modification are meant to prevent.[52] And, even assuming *arguendo* PJM were correct that the existing rules would produce an unjust and unreasonable result – and, indeed, even if the effects of doing so may be perceived as "harsh"[53] – these doctrines "leave the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations."[54]

---

[50]    *See* ER23-729 Filing at 30-31; EL23-19 Complaint at 30-31.

[51]    ER23-729 Filing at 5.

[52]    *See, e.g., Town of Norwood, Mass. v. FERC*, 53 F.3d 377, 381 (D.C. Cir. 1995) ("The retroactive ratemaking doctrine prohibits the Commission from authorizing or requiring a utility to adjust current rates to make up for past errors in projections.").

[53]    *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 117 (1990).

[54]    *ODEC*, 892 F.3d at 1230 (citation omitted). *See also, e.g., Arkla*, 453 U.S. at 578 (explaining that the filed rate doctrine "bars 'the Commission's retroactive substitution of an unreasonably high or low rate with a just and reasonable rate'" (citation omitted)); *Oklahoma Gas*, 11 F.4th at 832 (noting that the filed rate doctrine "limits [the Commission's] remedial authority" (citations omitted)); *Pub. Utils. Comm'n of Cal. v. FERC*, 988 F.2d 154, 168 n.12 (D.C. Cir. 1993) (explaining that if the Commission's actions "violated the filed rate doctrine or the rule against retroactive ratemaking, we would not then invoke the Commission's assessment of the equities to overcome those violations"); *Alabama Power Co. v. ICC*, 852 F.2d 1361, 1373 (D.C. Cir. 1988) (requiring railroads "to pay refunds, based on a determination that the earlier Commission-approved rates were impermissible, runs counter to the well-established prohibition against

**B.    Even Aside from the Limitations Imposed by the Filed Rate Doctrine, the December 23 Filings Must be Rejected because PJM Has Not Demonstrated the Existing Tariff to be Unjust and Unreasonable, and Also Has Not Demonstrated Its Proposed Tariff Revisions are Just and Reasonable**

Even assuming that the filed rate doctrine and rule against retroactive ratemaking did not prohibit the Commission from granting the relief requested by PJM, the December 23 Filings must still be rejected.  As the proponent of the Tariff modifications set forth in the ER23-729 Filing, PJM bears the burden of proof of demonstrating that those modifications are just and reasonable but has failed to satisfy that burden.[55] Similarly, PJM, as the complainant under the EL23-19 Complaint, has failed to satisfy its burden of proof to demonstrate the existing Tariff provisions are unjust and unreasonable.[56]   Moreover, even assuming that the Commission has any concerns regarding the existing Tariff provisions, PJM has not put forward a proposal that the Commission could use to satisfy its obligation under Section 206 to establish a just and reasonable replacement rate that could be applied on a prospective basis.[57]

---

retroactive ratemaking"); *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 189 n. 7 (D.C.Cir.1986) ("FERC may not order a retroactive refund based on a post hoc determination of the illegality of a filed rate's prescription."); *Entergy Servs., Inc.*, 153 FERC ¶ 61,303 at P 152 (2015) ("Because the bandwidth formula is the filed rate, the Commission correctly ruled that the bandwidth formula could not be adjusted retroactively even if the bandwidth formula had been found unjust and unreasonable.").

[55]    *See, e.g., Arizona Pub. Serv. Co.*, 181 FERC ¶ 61,223 at P 54 (2022) ("In analyzing a filing made pursuant to FPA section 205, the filer has the burden to demonstrate that a proposal is just and reasonable and not unduly discriminatory or preferential.").

[56]    *See* 16 U.S.C. § 824e(b) (2018) ("In any proceeding under this section [206 of the FPA], the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant").

[57]    *See* 16 U.S.C. § 824e(a) (2018) (in the event the Commission finds an existing rate "is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order").

**1.     PJM's Proposal Would Create Substantial Uncertainty and Upset Market Expectations**

As explained previously, the Tariff requires PJM to determine the Locational Deliverability Area Reliability Requirement ahead of time so that it may develop its VRR Curves and also requires that information on the Locational Deliverability Area Reliability Requirement be posted ahead of each auction.  Given that the BRAs are held well in advance of the relevant Delivery Year, this necessarily requires PJM to develop the Locational Deliverability Area Reliability Requirement based on forecasts, which are by nature imprecise.   PJM has not demonstrated that there is anything unjust or unreasonable about such pre-determination of the Locational Deliverability Area Reliability Requirement based on the information available to PJM at the time, even if that information later turns out to have been inaccurate.[58]  To the contrary, it is appropriate and reasonable for the Locational Deliverability Area Reliability Requirement to be firmly established and posted in advance because, as PJM itself previously explained to the Commission, this "posting of the fundamental auction parameters . . . is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or export, and the manner in which they participate in the Base Residual Auction."[59]

Dr. Sotkiewicz confirms that market participants will rely on such auction parameters, including the Locational Deliverability Area Reliability Requirement, to make

---

[58]     *Cf. Joint Consumer Representatives v. PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,187 at P 32 (2015) (rejecting complaint regarding PJM's failure to update its load forecasts based on updated model where "PJM complied with its OATT by developing its 2015 PJM Peak Load Forecast according to its manuals and posting it prior to February 1, 2015" and finding that "there will inevitably be some difference between PJM's load forecast and the amount of capacity that PJM ultimately needs in a given Delivery Year" (footnotes omitted)).

[59]     *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275 at P 198 (2009).

commercial decisions, such as whether to enter into bilateral contracts, how to structure their offers and, for resources that are not subject to the must-offer obligation, whether to submit offers into the BRA in the first instance.[60]  For that same reason, the Commission has recognized that a load-serving entity's obligations under RPM are established when its load is included in PJM's auction parameters:

> [W]e conclude that Duquesne's RPM liability extends to all auctions in which its load forecasts are included.  We also agree with PJM that these obligations are set at the time that PJM establishes its RPM auction parameters.  This conclusion is warranted given the necessary reliance that market participants place on these published forecasts and is otherwise consistent with the intent and underlying purpose of the RA Agreement. . . .  [M]arket participants will make business decisions and enter into binding contracts, including financial hedges and bilateral arrangements, based on these auction parameters.[61]

By contrast, the new definition proposed in the December 23 Filings is not just and reasonable as it would effectively make the Locational Deliverability Area Reliability Requirement a moving target, thereby disrupting the expectations of market participants. As Dr. Sotkiewicz explains, if changes to the Locational Deliverability Area Reliability Requirement were made known, "Capacity Market Sellers would likely want to change their offers and may also possibly want to change their decision to offer at all if not subject to the must-offer requirement" while "[b]ilateral contract parties would want to change their contract terms and pricing."[62]    Under PJM's proposal, however, the Locational Deliverability Area Reliability Requirement would only be subject to change during the

---

[60]    *See* Sotkiewicz Affidavit, ¶¶ 17, 25, 27-29.

[61]    *Duquesne Light Co.*, 122 FERC ¶ 61,039 at P 92 (2008).  *See also Maryland Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, 127 FERC ¶ 61,274 at P 25 (2009) (quoting same))

[62]    Sotkiewicz Affidavit, ¶ 32.

auction process, meaning that market participants would have zero transparency into the revised requirement and no opportunity to modify their offers or contracts.[63]   Thus, Dr. Sotkiewicz explains, PJM's proposal would create substantial uncertainty that "also changes the offer behavior of Capacity Market Sellers and bilateral contracting parties in that they now must account for the possibility the constrained LDA in which they are located may change in ways that cannot be predicted."[64]   In rejecting requests that PJM's forward-looking energy and ancillary services ("E&AS") offset be applied to previously run BRAs, the Commission similarly recognized that it is impossible to know how market participants would want to change their offers if the auction parameters are changed after the fact:

> even if we were to re-calculate the VRR curve and other capacity auction parameters based on a new E&AS Offset, there is no way to accurately determine how market participants would have offered in those BRAs based on the new parameters.[65]

If market participants cannot rely on the posted auction parameters, "the newly introduced uncertainty may cause Capacity Market Sellers simply not to offer at all if they believe the uncertainty creates additional risks that cannot possibly be mitigated."[66]   In addition, it may "deter bilateral contracting for capacity between parties due to increasing differences in expected market outcomes between buyers and sellers in the bilateral

---

[63]   *See id.*, ¶ 33.

[64]   *Id.*, ¶ 34.

[65]   *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,153 at P 332 (2020).

[66]   Sotkiewicz Affidavit, ¶ 36.

market," as "[i]ntroducing greater uncertainty in the validity of the planning parameters simply makes hedging and risk mitigation harder for all parties in the capacity market."[67]

In short, the Tariff reasonably requires PJM to set the Locational Deliverability Area Reliability Requirement based on PJM's projections, and even to the extent that these projections wind up, in hindsight, to have been inaccurate, it would result in greater harm to disrupt market participants' expectations by modifying the Locational Deliverability Area Reliability Requirement during the course of the auction as PJM proposes.  Accordingly, not only has PJM failed to show that the existing Tariff definition is unjust and unreasonable, but its proposed remedy must be rejected.

Even if the Commission believes that PJM has shown the existing Tariff to be unjust and unreasonable, PJM's proposal cannot be accepted because, as discussed in Section II.B.2 below, it creates a disconnect with its modeling of the Locational Deliverability Area Reliability Requirement.  The Commission should direct PJM to conduct a stakeholder process or should initiate its own further proceedings to allow for the development of a just and reasonable replacement rate that will allow market participants to rely on posted auction parameters and that will only be applied prospectively to future RPM Auctions.

### 2.    PJM Has Failed to Properly Consider the Reliability Implications of its Proposed Revisions

Dr. Sotkiewicz explains that the December 23 Filings fail to present an accurate and complete picture of the reliability concerns implicated by PJM's requests.  Here, PJM claims that the Locational Deliverability Area Reliability Requirement was too high

---

[67]    *Id.*, ¶ 35.

because it was calculated including certain planned resources, including "a large quantity of planned Intermittent Resources,"[68] that did not offer into the 2024/2025 BRA.[69]    PJM therefore wants to now clear the BRA using a lowered Locational Deliverability Area Reliability Requirement that assumes those planned resources will not be in commercial operation during the 2024/2025 Delivery Year, which would significantly lower the clearing price.[70]

As Dr. Sotkiewicz explains, PJM glosses over the fact that the Locational Deliverability Area Reliability Requirement and CETO are designed to maintain a 1-day-in-25-year loss of load expectation ("LOLE"), and are calculated in a way that does "not depend on resources with RPM commitments, but rather only existing resources and any projected resources expected to be in service regardless of RPM commitments . . . ."[71]  PJM's planning process thus accounts for the fact that "resources that are in service and available to produce energy will affect reliability outcomes regardless of their RPM commitment status."[72]    Nonetheless, the December 23 Filings claim that the Locational Deliverability Area Reliability Requirement must be revised if Planned Generation

---

[68]    ER23-729 Filing at 16; EL23-19 Complaint at 16.

[69]    As the December 23 Filings explain, PJM calculates the Locational Deliverability Area Reliability Requirement taking into account planned resources because "planning models need to address the probability of forced outages" and also need to account for the fact that "Intermittent Resources . . . increase the reliability requirement if they do not operate coincident with peak periods."  ER23-729 Filing at 4.  *See also id.* at 12-15; EL23-19 Complaint at 12-15.  *See also* Sotkiewicz Affidavit, ¶¶ 48-53 (discussing calculation of the Locational Deliverability Area Reliability Requirement).

[70]    *See* ER23-729 Filing at 16; EL23-19 Complaint at 16.

[71]    Sotkiewicz Affidavit, ¶ 48.  *See also* PJM, *PJM Manual 20: PJM Resource Adequacy Analysis*, at 32 (Revision 12, Aug. 25, 2021), https://pjm.com/~/media/documents/manuals/m20.ashx (stating that, for purposes of modeling the CETO, "[a] planned generation resource addition or planned increase in rating that has executed an Interconnection Service Agreement (ISA) is modeled").

[72]    Sotkiewicz Affidavit, ¶ 50.

Capacity Resources that were included in the planning process "are not **offered** into the BRA . . . ."[73]  That is, PJM has created a "false equivalence between the reliability needs of an LDA and the supply and demand in the LDA in an RPM auction"[74] by assuming that resources that are not offered into a BRA will not actually be operating during the relevant Delivery Year.

Notably, PJM focuses only on the lack of offers by Planned Generation Capacity Resources, but fails to properly consider the fact that various resources, including planned **and existing** Intermittent Resources, are exempt from the RPM must-offer obligation,[75] and the amount of capacity offered into an RPM auction therefore does not necessarily provide an accurate gauge of the CETO or Reliability Requirement for an LDA.  This is especially true because the amount of Intermittent Resources offered into the RPM auctions has in fact decreased by as much as half, despite such resources being increasingly developed in the region.[76]  Accordingly, "[t]he implication of the data is that Intermittent Resources are choosing not to take on RPM Capacity commitments and that just because there was no offer into the BRA does not mean these resources will not be in-service for the 2024/2025 [Delivery Year]."[77]

---

[73]    ER23-729 Filing at 4 (emphasis added).  *See also* EL23-19 Complaint at 5.

[74]    Sotkiewicz Affidavit, ¶ 57.

[75]    *See id.*, ¶¶ 54-56.  *See also* Tariff, Attachment DD, § 6.6A(c) ("Intermittent Resources, Capacity Storage Resources, Hybrid Resources consisting exclusively of components that in isolation would be Intermittent Resources or Capacity Storage Resources, Demand Resources, and Energy Efficiency Resources shall not be required to offer as a Capacity Performance Resource . . . .").

[76]    *See* Sotkiewicz Affidavit, ¶ 59.

[77]    *Id.*, ¶ 60.

The December 23 Filings provide no rational basis for modifying the previously-determined Locational Deliverability Area Reliability Requirement during the BRA clearing process based solely on whether resources without a must-offer obligation choose to offer into the BRA.　As an initial matter, Dr. Sotkiewicz states that PJM's claim that it was surprised by the auction results rings hollow and fails to justify the proposed Tariff modification.[78]　More fundamentally, however, PJM's purported fix is not just and reasonable because PJM arbitrarily proposes to modify the Locational Deliverability Area Reliability Requirement in circumstances where planned resources enter the market but do not submit offers into the BRA, but not where they offer but do not clear in the relevant BRA, even though the effect is functionally the same "from a reliability perspective . . . ."[79] This would also mean that there will be dramatically different clearing prices based solely on whether planned resources offer into a BRA, without consideration of whether those resources are actually present in the relevant Delivery Year.　For example, if one assumes that many or even all of the planned Intermittent Resources modeled in the posted DPL-S Reliability Requirement do come online as scheduled for the 2024/2025 Delivery Year despite not offering into the 2024/2025 BRA, Dr. Sotkiewicz explains:

> The price signal PJM wants to send would be a fraction of the price that would prevail if PJM had allowed the reliability and auction process work as designed.　The prices would be too low for the actual reliability need.　***The prices PJM would determine might not be high enough to attract future new resources to take on an RPM commitment especially knowing PJM is willing to put its finger on the scale to reduce prices even in the face of reliability needs with its proposal.***

---

[78]　*See id.*, ¶¶ 96-108.

[79]　*Id.*, ¶ 66.　*See also id.*, ¶¶ 61—66.

> PJM's solution . . . would concoct an LDA reliability requirement that differs from the planning model determination of the LDA Reliability Requirement, for the purpose of driving a different pricing outcome. This would leave PJM in a reliability mismatch where the physical system matches the reliability needs as determined by PJM planners when all resources showed up in the DY, but not matching up with the concocted LDA Reliability Requirement used to clear the BRA.[80]

Given the risks and costs of assuming a capacity obligation, it is entirely reasonable to assume that at least some large proportion of the Intermittent Resources PJM earlier expected to come online in time for the 2024/2025 Delivery Year will, in fact, do so even if they were not offered into the 2024/2025 BRA.[81] Yet PJM's proposal irrationally and arbitrarily assumes that none of the Intermittent Resources not offered into the 2024/2025 BRA will in fact come online as scheduled. PJM also arbitrarily focuses only on Planned Generation Capacity Resources that do not submit offers into the RPM auctions, while ignoring the fact that certain types of existing resources are also exempt from the must-offer requirement and thus "can come and go as they please from RPM, and yet they, too, are included in the CETO and Reliability Requirement determination for LDAs exactly like Planned Generation Capacity Resources."[82]

Similarly arbitrary is PJM's proposal to use a one percent threshold to determine when it will modify the Locational Deliverability Area Reliability Requirement.[83] The

---

[80] *Id.*, ¶¶ 68-69 (emphasis in original).

[81] *See id.*, ¶¶ 59-60, 67.

[82] *Id.*, ¶ 55.

[83] *See* ER23-729 Filing at 10 (stating that "the Locational Deliverability Area Reliability Requirement should be revised to allow PJM to exclude from the reliability requirement calculation all Planned Generation Capacity Resources that did not participate in the auction in LDAs where the reliability requirement materially increases by more than one percent compared with the values used in the relevant RPM Auctions from the prior Delivery Year due to the addition of such Planned Generation Capacity Resources"); EL23-19 Complaint at 11 (same).

December 23 Filings claim that "[u]sing a materiality standard of one percent avoids having to arbitrarily define a MW value for what constitutes a small LDA,"[84] but never explain how PJM determined a one percent difference to be material in the first instance.[85]

As discussed, PJM's proposed modifications in the December 23 Filings fail to consider PJM's underlying modeling assumptions, and thus fail to send price signals necessary for reliability. As a result, even assuming that the Commission agrees that PJM has identified a concern with its determination of the Locational Deliverability Area Reliability Requirement that must be addressed, it must reject PJM's hastily crafted and ill-conceived proposal and should instead direct stakeholders to more thoroughly consider potential solutions for the future. For example, Dr. Sotkiewicz states that one option would be to require planned resources to commit whether they will be in service for the relevant Delivery Year ahead of the Third Incremental Auction, which takes place close to start of the Delivery Year.[86] PJM would then adjust the Locational Deliverability Area Reliability Requirement based on the resources that will actually be in service during the Delivery Year, at the same time as it makes adjustments to account for changes in the load forecast, and purchase or sell capacity as needed in the Third Incremental Auction.[87] Alternatively, Dr. Sotkiewicz states that another approach could be to change PJM's underlying modeling approach altogether so that only resources with RPM commitments (rather than resources that are in service) would be modelled.[88] Dr. Sotkiewicz

---

[84]    ER23-729 Filing at 19-20; EL23-19 Complaint at 19.

[85]    *See* Sotkiewicz Affidavit, ¶ 37.

[86]    *See id.*, ¶ 120.

[87]    *See id.*, ¶¶ 121-123. *See also id.*, ¶¶ 109-115 (discussing role of Incremental Auctions).

[88]    *See id.*, ¶¶ 124-127.

emphasizes, however, that coming up with a viable alternative will require thorough consideration of a number of serious policy and market design issues.[89]

### 3.     The December 23 Filings Reflect PJM's Bias

As detailed above, the December 23 Filings suffer from numerous fatal flaws and must be rejected.   EPSA emphasizes, however, that these filings are indicative of a broader problem that has become increasingly obvious in the recent past:  despite its role as a supposedly independent entity, PJM has repeatedly signaled that its focus is on reducing prices for load, rather than acting in accordance with its regulatory mandate to maintain reliability and ensure that suppliers needed for reliability receive adequate compensation for the services they provide.[90]

In this respect, Dr. Sotkiewicz states that, while the December 23 Filings focus on clearing prices, PJM overlooks a more serious underlying reliability issue.[91]  Specifically, PJM overlooks the following issues:

> 1) increasing levels of Intermittent Resource penetration in small LDAs do not help the LDA satisfy the 1-day-in-25 years LOLE as much as they help the RTO satisfy the 1-day-in-10 years LOLE because of the high correlation in outages/unavailability when the LDAs need them most; and 2) resources without must-offer requirements, largely Intermittent Resources on an ongoing basis, and Planned Generation Capacity Resources as they enter the market, cannot appropriately reflect their risk of non-performance going forward once they are Existing Generating Capacity Resources and thus may choose to not offer into the RPM BRA or [Incremental Auction].[92]

---

[89]     *See id.*, ¶¶ 128-129.

[90]     *See, e.g.*, 18 C.F.R. § 35.34(j)(2) (2022) (stating that a regional transmission organization like PJM must "support efficient and non-discriminatory power markets").

[91]     *See* Sotkiewicz Affidavit, ¶¶ 73-74.

[92]     *Id.*, ¶ 75.

Dr. Sotkiewicz further explains that PJM's "solution" in the December 23 Filings does not address these concerns and may even make them worse as discussed above.[93]  In fact, Dr. Sotkiewicz points out that the largest resource in DPL-S, the Indian River 4 Generating Station ("Indian River"), sought to retire after failing to clear in prior BRAs, and is now under a Reliability Must Run ("RMR") agreement because PJM found it to be necessary for transmission reliability.[94]  Nonetheless, the December 23 Filings seek to decrease the clearing price for DPL-S, rather than sending necessary price signals for the replacement of Indian River.  This is true even though clearing prices in DPL-S dropped significantly in the BRAs for the 2022/2023 and 2023/2024 Delivery Years despite the Reliability Requirements increasing for the same years.[95]  Nonetheless, PJM focuses only on the immediate price impacts for customers, rather than attempting to ensure that prices appropriately reflect reliability needs and maintain confidence in its market construct by ensuring that market participants are not subject to unnecessary risks because of rule changes that are motivated by PJM's efforts to achieve its desired results.

It is also particularly noteworthy how PJM rushed to file the December 23 Filings very soon after the close of the 2024/2025 BRA for the purpose of "reduc[ing] charges that Load Serving Entities would otherwise have to pay absent these revisions."[96]  In the same way, PJM rushed to file tariff changes under Sections 205 and 206 of the FPA to modify Transmission Constraint Penalty Factor rules that it claimed were "resulting in

---

[93]    *See id.*, ¶¶ 68--69, 76—77.  *See also id.*, ¶¶ 78-95 (providing and discussing hypothetical examples).

[94]    *See id.*, ¶ 70.

[95]    *See id.*, ¶¶ 71-72.

[96]    ER23-729 Filing at 4.  *See also, e.g.*, EL23-19 Complaint at 29, 34.

unjust and unreasonable energy market rates for consumers,"[97] without going through the stakeholder consultation process.[98]

PJM has moved much slower and more deliberately where perceived flaws cut the other way.  Notably, PJM has stubbornly refused to modify its Effective Load Carrying Capability accreditation process to properly consider the Capacity Interconnection Rights ("CIRs") of intermittent and storage resources, which is necessary to ensure that their reliability contributions are being properly valued.[99]  The IMM raised concerns almost a year ago that PJM was counting on "output [that] is not deliverable when needed for reliability because it is in excess of the defined deliverability rights (CIRs) and therefore should not be included in the definition of intermittent capacity."[100]  The IMM further stated that "[t]his results in an overstatement of the supply of capacity and reduces the clearing price in the capacity market."[101]  The IMM raised similar concerns with respect to the

---

[97]    Section 206 Filing Demonstrating the Existing Transmission Constraint Penalty Factor Rules are Unjust and Unreasonable, Request for Fast Track Processing, and Request to Shorten the Comment Period to 7 Days at 1, Docket No. EL22-26-000 (filed Jan. 31, 2022) (the "EL22-26 Complaint").  *See also* Proposed Amendment to the Transmission Constraint Penalty Factor Filed Pursuant to section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for a Shortened Comment Period of 7 Days at 4, Docket No. ER22-957-000 (filed Jan. 31, 2022) (the "ER22-957 Filing") ("[I]t is imperative that the Commission acts quickly in accepting PJM's proposed amendment to protect consumers from prolonged periods of significant cost increases").

[98]    *See* EL22-26 Complaint at 22; ER22-957 Filing at 22.

[99]    *See generally* Complaint that PJM Interconnection LLC has violated its filed Tariff, Governing Agreements, and Contracts when Identifying the Energy Output in the Accredited UCAP for Variable/Intermittent Resources Offered in PJM's Reliability Pricing Model Auctions, thus Causing Unjust, Unreasonable, and Unduly Discriminatory Rates for Load and Competing Capacity Resources, Docket No. EL23-13-000 (filed Nov. 30, 2022).

[100]   Monitoring Analytics, *Analysis of the 2022/2023 RPM Base Residual Auction*, at 31 (Feb. 22, 2022),  https://www.monitoringanalytics.com/reports/Reports/2022/IMM_Analysis_of_the_20222023_RPM_BRA_20220222.pdf.

[101]   *Id.*

2023/2024 BRA,[102] without any corrective action by PJM.  As another example, PJM is also well aware that the large number of recent Performance Assessment Intervals ("PAIs") that occurred on December 23, 2022, and December 24, 2022, are not contemplated under its Market Seller Offer Cap rules.[103]  Nonetheless, PJM has taken no steps thus far to ensure that sellers will be able to reflect the risks of incurring Non-Performance Charges during PAIs in their offers.

PJM's one-sided approach is particularly obvious in the limited relief requested in the December 23 Filings.  Not only has PJM proposed a remedy that disrupts expectations and harms suppliers that entered into bilateral contracts in reliance on the posted auction parameters, but its proposed "fix" for the identified issue focuses only on lowering the clearing price without making any attempt to permit suppliers to re-do their offers.  In this respect, while EPSA strongly urges the Commission to reject the December 23 Filings outright, to the extent that the Commission decides to grant the relief requested by PJM, it should also ensure that sellers have the opportunity to modify their offers to account for the revised rules.  This would be consistent with other situations where the Commission has taken steps to ensure that suppliers are able to modify their offers to reflect rule changes.[104]  This will not help those suppliers that have already

---

[102]    *See* Monitoring Analytics, *Analysis of the 2023/2024 RPM Base Residual Auction*, at 12-13 (Oct. 2022), https://www.monitoringanalytics.com/reports/Reports/2022/IMM_Analysis_of_the_20232024_RPM_Base_Residual_Auction_20221028.pdf.  *See also* Paul M. Sotkiewicz, O*verview of Issues Regarding CIR for ELCC Resources* (PJM Planning Committee Special Session, CIRs for ELCC Resources, June 24, 2022), https://www.pjm.com/-/media/committees-groups/committees/pc/2022/20220624-special/item-03---e-cubed-overview-of-issues-regarding-cir-for-elcc-resources.ashx.

[103]    *See* Rule 28(j) Supplemental Authority, *Vistra Corp. v. FERC*, Nos. 21-1214, *et al.* (D.C. Cir.) (filed Jan. 9, 2023).

[104]    *See ISO New England Inc.*, 175 FERC ¶ 61,172 at P 63 (2021) ("[W]e direct ISO-NE to facilitate market participants' use of the final FCA 16 values, once approved by the Commission,

entered into bilateral arrangements based on the prior auction parameters but could at least mitigate some of the harm resulting from PJM's proposal.

## III.    CONCLUSION

Wherefore, EPSA respectfully requests that the Commission reject both of the December 23 Filings and otherwise take the concerns raised herein under consideration in issuing any orders on the December 23 Filings.

Respectfully submitted,

**ELECTRIC POWER SUPPLY ASSOCIATION**

By:    _/s/ David G. Tewksbury_____
David G. Tewksbury
Stephanie S. Lim
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC  20001

Nancy Bagot
Senior Vice President
Sharon Royka Theodore
Vice President, Regulatory Affairs
Electric Power Supply Association
1401 New York Ave, NW, Suite 950
Washington, DC  20005

On behalf of the
**Electric Power Supply Association**

Dated:  January 20, 2023

---

in FCA 16 qualification and retirement submissions.  This includes ISO-NE's ensuring that market participants have the ability to modify or withdraw any submissions made based on rejected FCA 16 values, and submitting with the compliance filing any necessary Tariff revisions to revise the FCA 16 qualification process timeline.").

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day electronically served the foregoing document on each person designated on the official service lists compiled by the Secretary of the Federal Energy Regulatory Commission in these proceedings.

Dated at Washington, D.C., this 20th day of January, 2023

 */s/ Stephanie S. Lim*
Stephanie S. Lim

**ATTACHMENT A**

**THE SOTKIEWICZ AFFIDAVIT**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| **PJM Interconnection, L.L.C.** | ) | **Docket Nos. ER23-729-000** |
| | ) | **EL23-19-000** |
| | ) | |
| | ) | |
| | ) | |

**AFFIDAVIT OF PAUL M. SOTKIEWICZ, PH.D.**

### I.    INTRODUCTION AND QUALIFICATIONS

1.    My name is Dr. Paul M. Sotkiewicz. I am the President and Founder of E-Cubed Policy Associates, LLC ("E-Cubed") and formerly served as the Chief Economist in the Market Service Division of PJM Interconnection, L.L.C. ("PJM"). I have also served as an economist at the Federal Energy Regulatory Commission ("FERC" or "Commission") during the formative periods of organized wholesale markets from 1998-2000 where I worked primarily on the California ISO and New York ISO markets.

2.    I have been retained by the Electric Power Supply Association ("EPSA") to submit this affidavit in support of its Protest to PJM's December 23, 2022 filings in Docket Nos.

but the farmer then claiming that since the missing horse "has not been reported," we can close the barn door and thus claim the horse remains in the barn.

17. When the 2024/2025 BRA activities started, market participants already had settled expectations regarding the market rules going forward, and the activities leading up to the opening of the auction window. In addition, once the planning parameters are posted, market participants would also have expectations regarding the demand for capacity reflected in the VRR Curves for the RTO and modeled LDAs. The planning parameter information allows market participants to develop offers, engage in bilateral contracting, and make decisions at various BRA milestones.

18. PJM fails to grasp the very basics of good market design in that changing the market rules, as PJM proposes, would change behavior embedded in offers, bilateral contracting, and hedging decisions. There are many steps Existing and Planned Generation Capacity Resources as well as PRD, DR, and EER need to take, and decisions to be made prior to the opening of the auction offer window. To change the parameters as part of the market clearing algorithm, as PJM proposes, upsets settled expectations as market participants would not have the ability to change their decisions in reaction to PJM's changing of crucial planning parameters such as an LDA Reliability Requirement.

19. In fact, the Commission has found that changes in capacity market auction parameters once the process timeline has commenced do in fact upset "settled expectations" and has rejected changes that have the same timing considerations as those proposed by PJM in their Filings.[18]

---

[18] *ISO New England Inc.*, 170 FERC ¶ 61,187 at P 17 (2020).

37.    PJM in its filings has provided no empirical evidence, data or analytical support for its choice of a one percent threshold of change in the LDA Reliability Requirement.[25] PJM has provided no historic analysis of how often an LDA Reliability Requirement would have been changed if the actual offers Planned Generation Capacity Resources did not match the offers PJM expected in the BRAs or IAs, and what the price and commitment impacts might be.

38.    Manipulating LDA Reliability Requirements because of "unwelcome" price outcomes is a dangerous game that could lead to premature retirements of resources in areas where they are actually needed. PJM's proposal would send market signals that are not commensurate with the reliability needs and lead to the retirement of resources that are needed to maintain reliability (both transmission and resources adequacy). DPL-South is already experiencing this with the desire for the Indian River 4 facility, which is the largest resource in DPL-South, to deactivate.[26] Yet, because it is crucial to transmission reliability, Indian River 4 has filed for and operates under a Reliability-Must-Run ("RMR") agreement approved by FERC.[27]

>    ### F.    PJM Erroneously Implies It Makes Adjustments to the VRR Curve and Reliability Requirements After the Auction Window Closes

39.    Citing Section 5.11 e) of Attachment DD to its Tariff, PJM avers in its 205 Filing, "… the Tariff already requires PJM to adjust the Locational Deliverability Area Reliability Requirement after the bidding window closes (but before the conclusion of the auction). Specifically, PJM is required to make 'any adjustments to PJM Region or LDA

---

[25] *See* PJM 205 Filing at 10, 19-20. *See also* PJM 206 Filing at 5, 11, 19-20.

[26] *See* PJM Deactivations and click on "Future Deactivations."

[27] *NRG Power Mktg. LLC*, 179 FERC ¶ 61,156.

<u>Reliability Requirements to reflect Price Responsive Demand with a PRD Reservation</u>

<u>Price equal to or less than the applicable Base Residual Auction clearing price.</u>'"[28]

40.    However, Section 5.11 of Attachment DD is entitled, "Posting of Information Relevant

to the RPM Auctions" and states in subsection a) that prior to conducting a BRA, PJM

must post

iv) The PJM Region Reliability Requirement, and the Variable Resource
Requirement Curve for the PJM Region, ***including the details of any
adjustments to account for Price Responsive Demand and any associated
PRD Reservation Prices;***

v) The Locational Deliverability Area Reliability Requirement and the
Variable Resource Requirement Curve for each Locational Deliverability
Area for which a separate Variable Resource Requirement Curve has been
established for such Base Residual Auction, ***including the details of any
adjustments to account for Price Responsive Demand and any associated
PRD Reservation Prices***, and the CETO and CETL values for all Locational
Deliverability Areas;[29]

41.    So clearly, PRD bids in aggregate are provided to market participants ***ahead*** of the

auction window to provide up to date information to suppliers in formulating their offers

for the same reasons having the other information under Section 5.10 provides

transparency to the market.

42.    PJM's statement is misleading because it neglects to provide the full quote to Attachment

DD Section 5.11 e). With respect to Price Responsive Demand, Section 5.11 e) states:

After conducting the Reliability Pricing Model Auctions, PJM will post the results
of each auction as soon thereafter as possible, including <u>any adjustments to PJM
Region or LDA Reliability Requirements to reflect Price Responsive Demand
with a PRD Reservation Price equal to or less than the applicable Base Residual
Auction clearing price.</u> The posted results shall include graphical supply curves
that are (a) provided for the entire PJM Region, (b) provided for any Locational

---

[28] PJM 205 Filing at 23, the underlined is a direct quote from Section 5.11 e). *See also* PJM 206 Filing at
23.

[29] PJM Tariff, Attachment DD, Section 5.11 a) iv) -v). The same is applied for IAs. *See* PJM Tariff,
Attachment DD, Section 5.11 b).

Deliverability Area for which there are four (4) or more suppliers, and (c) developed using a formulaic approach to smooth the curves using a statistical technique that fits a smooth curve to the underlying supply curve data while ensuring that the point of intersection between supply and demand curves is at the market clearing price.[30]

43.  I underlined the direct quote from the Tariff PJM provides in its 205 Filing. Within the full context of the quote around PRD adjustments, Section 5.11 e) has nothing to do with auction clearing at all but pertains to posting auction results and the manner and form in which the information is posted. This clearly shows PJM has deliberately taken the underlined quote out of context as it has nothing to do with changing the VRR Curve as part of the market clearing algorithm as PJM proposes to do in its Filings.

44.  Furthermore, PJM's filings mischaracterize how the RPM auction algorithm works so as to fit the reference to PRD in Section 5.11(e) into PJM's chosen, but false, narrative that adjusting planning parameters already happens during the auction clearing process.

45.  The RPM auction algorithm is available publicly to all market participants.[31] The PJM auction algorithm is a mixed integer program that minimizes the sum of offer costs (production costs) of resources less the value of demanded capacity along the different segments of the VRR Curve,[32] and subject to a set of constraints including locational constraints.[33] In economic terms, the PJM auction algorithm maximizes market surplus through the combination of load purchasing capacity and suppliers selling capacity and

---

[30] PJM Tariff, Attachment DD, Section 5.11 (e).

[31] PJM Interconnection, L.L.C., *Base Residual Auction Optimization Formulation,* available at https://www.pjm.com/-/media/markets-ops/rpm/20071212-rpm-optimization-formulation.ashx.

[32] *Id*. at 2.

[33] *Id.* at 2-4.

in no place shows any iterative or post-processing means for handling PRD as PJM wrongly implies in its filing.

## V.    PJM EXPLICITLY DRAWS A FALSE EQUIVALENCE BETWEEN RELIABILITY NEEDS AND ECONOMIC SUPPLY-DEMAND BALANCES IN THE RPM AUCTIONS

46.    PJM leads its 206 Filing with the following statement:

> "…the calculation of the Locational Deliverability Area Reliability Requirement, as set forth in the Tariff and PJM Manuals, produces an unjust and unreasonable result when Planned Generation Capacity Resources, including large thermal resources and Intermittent Resources are modeled in a small Locational Deliverability Area ("LDA") and such resources do not participate in the Base Residual Auction ("BRA"). ***This is because the Locational Deliverability Area Reliability Requirement in an LDA is a function of both forecasted load and expected supply resources in the LDA.*** Ultimately, the impact of including Planned Generation Capacity Resources in the calculation of the Locational Deliverability Area Reliability Requirement that then do not participate in the BRA produces an unjust and unreasonable outcome in small LDAs. ***Such outcomes would be inconsistent with the actual market fundamentals because they do not reflect the actual supply and demand of the LDA.***"[34]

47.    PJM has made it clear that it is drawing an equivalence between the determination of the LDA Reliability Requirements and what it determines to be the supply and demand balance in the constrained LDA in the BRA or IA. Yet, PJM fails to explain to the Commission by way of example or analytics why adding Planned Generation Capacity Resources would increase the Reliability Requirement of an LDA.[35]

48.    What PJM fails to inform the Commission of is the LDA Reliability Requirement and the associated CETO do not depend on resources with RPM commitments, but rather only existing resources and any projected resources expected to be in service regardless of RPM commitments, as discussed below.

---

[34] PJM 206 Filing at 2-3 (emphasis added).

[35] PJM attempts to explain this in its 205 Filing. See PJM 205 Filing at 12-15.