Nos. 23-1778, 23-1790, 23-1808, 23-1984,
23-2544, 23-2559, 23-2560, 23-2612 (consolidated)

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

PJM Power Providers Group, *et al.*,
*Petitioners*,

v.

Federal Energy Regulatory Commission,
*Respondent.*

———————————

*On Petitions for Review of Orders of the
Federal Energy Regulatory Commission*

———————————

## JOINT APPENDIX
## VOLUME 3 OF 3
## Pages JA536 – JA764

———————————

Steffen Johnson
Nicholas Gladd
Kelsey Curtis
Wilson Sonsini Goodrich &
  Rosati, P.C.
1700 K Street NW
Washington, DC 20006
(202) 973-8800

Matthew E. Price
Anand Viswanathan
Zachary B. Cohen
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Petitioner
PJM Power Providers Group*

*Counsel for Constellation Energy
Generation, LLC*

Additional Counsel Listed on Inside Cover

Matthew R. Christiansen
  General Counsel
Robert H. Solomon
  Solicitor
Jared B. Fish
  Attorney
888 First Street N.E.
Washington, DC 20426
(202) 502-8101

*Counsel for Respondent*
*Federal Energy Regulatory*
*Commission*

Gerit F. Hull
American Municipal Power, Inc.
1111 Schrock Road, Suite 100
Columbus, OH 43229
(614) 540-0852

*Counsel for American Municipal*
*Power, Inc.*

Regina A. Iorii
Delaware Department Of Justice
820 N. French Street, 4th Floor
Wilmington, DE 19801
(302) 577-8159

*In the Capacity of Counsel for the*
*Delaware Division of the Public*
*Advocate Only*

Paul W. Hughes
David G. Tewksbury
Andrew A. Lyons-Berg
Connor J. Suozzo
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

*Counsel for Petitioners*
*The Electric Power Supply*
*Association & NRG Business*
*Marketing LLC*

Jeffrey A. Lamken
Lucas M. Walker
Jennifer E. Fischell
Jackson A. Myers
Mololamken LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2000

*Counsel for PJM*
*Interconnection, L.L.C.*

Thomas L. Rudebusch
Duncan Weinberg Genzer &
Pembroke PC
1667 K Street, NW, Suite 700
Washington, DC 20006
(202) 467-6370

*Counsel for Delaware Municipal*
*Electric Corporation, Inc.*

Robert A. Weishaar, Jr.
Mcnees Wallace & Nurick LLC
1200 G Street, NW, Suite 800
Washington, DC 20005
(202) 898-5700

*Counsel for the Delaware*
*Public Service Commission*

Miles H. Mitchell
Ransom E. Ted Davis
Maryland Public Service
Commission
6 St. Paul Street
Baltimore, MD 21202
(410) 767-8076

*Counsel for the Maryland*
*Public Service Commission*

Adrienne E. Clair
Jecoliah R. Williams
Thompson Coburn LLP
1909 K Street, NW, Suite 600
Washington, DC 20006
(202) 585-6900

*Counsel for Old Dominion*
*Electric Cooperative*

Scott H. Strauss
Peter J. Hopkins
Jeffrey A. Schwarz
Spiegel & Mcdiarmid LLP
1875 Eye Street, NW, Suite 700
Washington, DC 20006
(202) 879-4000

*Counsel for Maryland Office*
*of People's Counsel*

Jeffrey W. Mayes
Monitoring Analytics, LLC
2621 Van Buren Avenue,
Suite 160
Eagleville, PA 19403
(610) 271-8057

*Counsel for the Independent*
*Market Monitor for PJM*
*(Monitoring Analytics, LLC)*

# INDEX

## VOLUME 1

PJM Power Providers Group Petition for Review, Case No. 23-1778 (3d Cir. Apr. 24, 2023) ................................................................ JA1

Constellation Energy Generation, LLC Petition for Review, Case No. 23-1790 (3d Cir. Apr. 26, 2023) ........................................... JA5

Electric Power Supply Association Petition for Review, Case No. 23-1808 (3d Cir. Apr. 28, 2023) ....................................................... JA7

NRG Power Marketing LLC Petition for Review, Case No. 23-1984 (3d Cir. May 30, 2023) ................................................................ JA9

Constellation Energy Generation, LLC Petition for Review, Case No. 23-2544 (3d Cir. Aug. 24, 2023) ......................................... JA11

Electric Power Supply Association Supplemental Petition for Review, Case No. 23-2559 (3d Cir. Aug. 25, 2023) ........................... JA14

NRG Power Marketing LLC Supplemental Petition for Review, Case No. 23-2560 (3d Cir. Aug. 25, 2023) ........................... JA17

PJM Power Providers Group Petition for Review, Case No. 23-2612 (3d Cir. Sept. 5, 2023) ............................................................. JA20

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Order on Proposed Tariff Revisions & Dismissing Complaint, 182 FERC ¶ 61,109 (Feb. 21, 2023) ("Initial Order"), R.141 .................................................................... JA24

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Notice of Denial of Rehearing by Operation of Law & Providing for Further Consideration, 183 FERC ¶ 62,040 (Apr. 24, 2023) ("Denial Order"), R.148 ............................... JA135

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Order Addressing Arguments Raised on Rehearing, 184 FERC ¶ 61,055 (July 27, 2023) ("Rehearing Order"), R.155 .................................................................... JA136

## VOLUME 2

Certified Index To The Record ........................................................ JA256

*PJM Interconnection, L.L.C.*, FERC Docket No. ER23-729, Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to section 205 of the Federal Power Act (filed Dec. 23, 2022), R.1 .................................. JA287

    Attachment A: Revisions to the PJM Open Access Transmission Tariff (Marked/Redline Format) ...................... JA322

*PJM Interconnection, L.L.C.*, FERC Docket No. EL23-19, Section 206 Filing Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area (filed Dec. 23, 2022), R.2, Pages 1-6, 33-34 ................................................ JA350

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Protest of Pine Gate Renewables, LLC (filed Jan. 20, 2023), R. 94 ...................................................................... JA358

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of Old Dominion Electric Cooperative in Support of Filing by PJM Interconnection, LLC (filed Jan. 20, 2023), R. 98, Pages 1, 6-9 ................................. JA371

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motions to Intervene and Initial Comments of the Maryland Office of People's Counsel (filed Jan. 20, 2023), R.100 .............................................................................. JA376

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of the Pennsylvania Public Utility Commission to PJM's 2024/2025 Base Residual Auction Modification Filings (filed Jan. 20, 2023), R.107 ............................ JA386

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Protest of the PJM Power Providers Group (filed Jan. 20, 2023), R.109 ................................ JA391

Attachment A, Affidavit of the Hon. Joseph T. Kelliher ¶ 41 ...................................................................... JA441

Attachment B, Affidavit of Roy J. Shanker ¶¶ 49-50 ............. JA444

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, NRG Power Marketing LLC et al. Protest and Request for Privileged Treatment (filed Jan. 20, 2023), R.116 ....... JA448

Attachment A, Affidavit of Joseph A. Holtman ¶¶ 6-7, 10-29 ..................................................................... JA476

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of the Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (filed Jan. 20, 2023), R.122 ................................................................... JA489

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Protest of the Electric Power Supply Association (filed Jan. 20, 2023), R.123 ......................................... JA497

Attachment A, Affidavit of Paul M. Sotkiewicz ¶¶ 17, 39-45 ...................................................................... JA529

## VOLUME 3

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of the Independent Market Monitor for PJM (filed Jan. 20, 2023), R. 124 ................................. JA536

iii

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Comments of Constellation Energy Generation, LLC (filed Jan. 20, 2023), R.127 ...................................................... JA544

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motion for Leave to Answer and Answer of PJM Interconnection, L.L.C. (filed Feb. 2, 2023), R.130 .......................... JA567

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Answer and Motion for Leave to Answer of the Independent Market Monitor for PJM (filed Feb. 6, 2023), R.132 ........................................................................................ JA602

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motion for Leave to Answer and Answer of Public Interest Organizations (Sierra/NRDC) (filed Feb. 6, 2023), R.135 ........................................................................ JA609

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Motion for Leave to Answer and Answer of the PJM Power Providers Group (filed Feb. 9, 2023), R.137 ................. JA623

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Answer and Motion for Leave to Answer of the Independent Market Monitor for PJM (filed Feb. 17, 2023), R.139 ........................................................................................ JA641

*PJM Interconnection, L.L.C.*, FERC Docket No. ER23-729, Request for Rehearing of the PJM Power Providers Group (filed Mar. 23, 2023), R.142 ........................................................ JA648

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Electric Power Supply Association et al. Request for Rehearing (filed Mar. 23, 2023), R.143 ........................ JA690

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Request for Rehearing of Constellation Energy Generation, LLC (filed Mar. 23, 2023), R.145 ................................. JA742

*PJM Interconnection, L.L.C.*, FERC Docket Nos. ER23-729 and EL23-19, Request for Rehearing of the American Clean Power Association, Solar Energy Industries Association, and Advanced Energy United (filed Mar. 23, 2023), R.146.................... JA766

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) ) | Docket No. ER23-729-000 |
| PJM Interconnection, L.L.C. | ) ) | |
| v. | ) ) | |
| PJM Interconnection, L.L.C. | ) ) ) | Docket No. EL23-19-000 |

**COMMENTS OF THE INDEPENDENT MARKET MONITOR FOR PJM**

Pursuant to Rule 211 of the Commission's Rules and Regulations,[1] Monitoring Analytics, LLC, acting in its capacity as the Independent Market Monitor ("Market Monitor") for PJM Interconnection, L.L.C. ("PJM"),[2] submits these comments responding to revisions to the PJM market rules filed December 23, 2022, by PJM under Section 205 of the Federal Power Act ("December 23rd Filing"), and the contemporaneously filed Complaint under Section 206 of the FPA ("December 23rd Complaint") seeking the same revisions.

The December 23rd Filing seeks to correct a market design flaw revealed in the conduct of the Base Residual Auction for the 2024/2025 Delivery Year. If the flaw is not corrected, prices would be set at scarcity levels in the DPL-S LDA that do not reflect the actual market supply and demand fundamentals, overstate the local reliability requirement, serve no useful purpose, and are therefore unjust and unreasonable.

---

[1]    18 CFR § 385.211 (2022).

[2]    Capitalized terms used herein and not otherwise defined have the meaning used in the PJM Open Access Transmission Tariff ("OATT"), the PJM Operating Agreement ("OA") or the PJM Reliability Assurance Agreement ("RAA").

There are two issues. The first issue is that PJM's auction parameters, posted 100 days prior to the Base Residual Auction (BRA), include generation resources that are expected to be offered in the BRA because the resources are expected to be in service for the relevant delivery year based on the resources' completion of their Interconnection Service Agreement (ISA) and the stated date of commercial operation.[3] In this case, PJM included a large planned thermal generator in a small Locational Deliverability Area ("LDA") that did not actually offer in the BRA.  The second issue is that PJM's ELCC rules derate the capacity of intermittent and storage resources based on an aggregate market ELCC analysis which may significantly differ from the actual reliability contribution in a specific LDA. That occurred in this case, which further exacerbated the difference between the reliability contribution of new intermittent resources and the offsetting reduction in the needed level of imports into the Zone, termed the Capacity Emergency Transfer Objective (CETO).

PJM is correct that, without a modification consistent with PJM's proposed rule change, the capacity prices in the DPL-S would be significantly greater than the efficient and competitive level because the supply and demand fundamentals in the model do not reflect reality.

The Market Monitor supports PJM's December 23rd Filing, with suggestions for next steps. If the Commission decides to use the FPA 206 path, the Market Monitor agrees with PJM's goal but recommends a preferred solution plus suggestions for next steps.

---

[3]   PJM filed a revised schedule and deadlines for the 2024/2025 through 2026/2027 BRAs which FERC granted by order issued February 22, 2022, in Docket No. EL19-58-010. This changed PJM's deadline for posting the planning period parameters from February 1 prior to the BRA to 100 days prior to the auction. *See also* PJM OATT Attachment DD § 15.

## I.    COMMENTS

### A.    PJM's December 23rd Filing

#### 1.    Issues

PJM's December 23rd Filing identifies issues with the clearing of the Base Residual Auction (BRA) for the 2024/2025 Delivery Year that must be resolved prior to completion of the clearing process and prior to the posting of prices for the BRA. In particular, the demand for capacity was overstated in the DPL-S LDA, resulting in prices that would, absent the correction, be overstated compared to the efficient and competitive outcome that reflects actual supply and demand conditions.

To summarize, the issues are a function of the fact that there were thermal and intermittent resources that were expected to offer in the auction but did not, and a function of the fact that intermittent resources may have effective derated capacity values that are very different than the ELCC derated values attributed to them under PJM's system wide ELCC calculation approach.

More specifically, in a large LDA where a new unit is a small share of total internal resources, a new unit adds MW to internal resources equal to its capacity value and by an equal MW amount reduces the need for imports (CETO) that provide reliability when there is an outage in the LDA. In that case, the net impact of adding the new resource on the demand for capacity is zero.

But in a small LDA, like DPL-S, where a new unit is a large share of total internal resources, the net impact of adding the new resource is to increase the demand for capacity. The reason for this result is that the need for imports to provide reliability is not reduced by MW equal to the MW of the new resource because the outage of the new resource must be addressed by imports. When the unit offers its capacity, the increase in demand is less than the increase in supply (the ICAP capacity value of the new resource), but it is still an increase.

The issue arises when the expected new resource does not offer and therefore the only impact on the market is the increase in demand with no offsetting increase in supply. In the case of DPL-S, the increase in demand resulting from all the resources that were assumed to

be available but did not offer was significant, resulting in an approximately fourfold increase in clearing prices.

The same divergence between the reliability contribution of a new resource and the offsetting decline in CETO can occur as a result of a divergence between the locational reliability value of intermittent or storage resources and the reliability value of those resources as calculated by PJM using the aggregated system ELCC approach. This divergence was significant in DPL-S because DPL-S has significant winter load that is accounted for in the reliability analysis, with the result that solar resources have reduced reliability value in DPL-S when compared to their ELCC derated capacity value. This means that the reduction in CETO associated with adding the solar resources was less than the ELCC based internal reliability value. The divergence between the reliability value and the CETO reduction had the same logical impact on the demand for capacity and therefore prices as the divergence from units that were assumed to enter but did not offer.

The result of the identified issues is that the reliability requirement (the demand for capacity) in the DPL-S LDA is overstated. Absent a correction of the issue, loads in the DPL-S LDA would be required to buy more capacity than required for reliability and at a price that does not reflect the actual reliability requirement.

## 2.  Solutions

PJM's December 23rd Filing proposed revisions that would require PJM, during the auction process, to exclude the impact of new capacity resources from the calculation of the LDA reliability requirement parameter in the event that PJM had assumed that the resources would participate but the resources do not offer, in order to have an accurate LDA reliability requirement. PJM proposes that if the LDA reliability requirement were to increase by more than one percent over the LDA reliability requirement from the prior BRA as a result of the inclusion of planned generation resources in the calculation of the CETO that did not offer in the auction , PJM would be required to remove those planned generation resources from the calculation of the CETO and therefore the reliability requirement.

- 4 -

While PJM's solution is not perfect, it would successfully address the issue with the current auction results in an effective and efficient way and permit the posting of final auction results quickly. The Market Monitor supports the immediate implementation of PJM's solution to clearing the 2024/2025 Base Residual Auction under the 205 and the 206 approaches.

The Market Monitor requests that, if the Commission adopts this FPA 205 approach, the Commission adopt PJM's solution to clearing the 2024/2025 BRA and direct PJM to file the preferred approach to apply in future auctions. PJM cannot implement the preferred approach now because that would require a lengthy wait to repost parameters and rerun the auction. That would be inefficient and delay the auction results unnecessarily at a time when the auction has already been significantly delayed. In this case, the preferred approach would result in exactly the same outcome as the PJM solution.

The preferred approach would be to require all planned resources to commit to a must offer requirement by a defined date prior to the posting of auction parameters by PJM. This would avoid the arbitrary determination of materiality and directly address an important part of the issue.

PJM's approach does not address the separate ELCC derating issue. That issue also needs to be addressed. The ELCC issue can be expected to increase as the role of intermittent and storage resources increases. The Commission should direct PJM to develop a solution to the ELCC issue within a defined time period. As long as PJM continues to use the aggregated ELCC approach, one such solution would be to require the use of the lower of the LDA ELCC and the PJM default ELCC for resources in the calculation of the capacity value of the resource, in order to match the calculation of the capacity value in the CETO.

The 2024/2025 Base Residual Auction does not need to be rerun. Market participants offered competitively or were constrained to competitive offers by the market power mitigation rules, and there is no reason to believe that their offers were affected by the overstated demand. Market offers were competitive. Market offers in a rerun auction would be expected to be the same.

### B.  PJM's December 23rd Complaint

#### 1.  Issues

PJM's December 23rd Complaint (FPA 206 filing) is effectively identical to PJM's December 23rd Filing (FPA 205 filing) with the exception that under FPA 206 the Commission is permitted to modify PJM's proposed solution while under FPA 205 the Commission is not permitted to modify PJM's proposed solution.

#### 2.  Solutions

PJM's December 23rd Filing proposed revisions that would require PJM, during the auction process, to exclude the impact of new capacity resources from the calculation of the LDA reliability requirement parameter in the event that PJM had assumed that the resources would participate but the resources do not offer, in order to have an accurate LDA reliability requirement. PJM proposes that if the LDA reliability requirement were to increase by more than one percent over the LDA reliability requirement from the prior BRA as a result of resources that offered but did not clear, PJM would be required to remove those resources from the calculation of the reliability requirement.

While PJM's solution is not perfect, it would successfully address the issue with the current auction results in an effective and efficient way and permit the posting of final auction results quickly. The Market Monitor supports the immediate implementation of PJM's solution to clearing the 24/25 Base Residual Auction under the 205 and the 206 approaches.

If the Commission takes the FPA 206 approach, the Market Monitor requests that the Commission adopt PJM's solution to clearing the 24/25 BRA and include the preferred approach in place of PJM's proposed materiality threshold for application to future auctions.

The preferred approach would be to require all planned resources to commit to a must offer requirement by a defined date prior to the posting of auction parameters by PJM. This would avoid the arbitrary determination of materiality and directly address at least an important part of the issue.

PJM's approach does not address the separate ELCC issue. That issue also needs to be addressed. The ELCC issue can be expected to increase as the role of intermittent and storage

resources increases. PJM should be directed to develop a solution to the ELCC issue within a defined time period. As long as PJM continues to use the aggregated ELCC approach, one such solution would be to require the use of the lower of the LDA ELCC and the PJM default ELCC for resources.

The 2024/2025 Base Residual Auction does not need to be rerun. Market participants offered competitively or were constrained to competitive offers by the market power mitigation rules, and there is no reason to believe that their offers were affected by the overstated demand. Market offers were competitive. Market offers in a rerun auction would be expected to be the same.

## II.  CONCLUSION

The Market Monitor respectfully requests that the Commission afford due consideration to these comments as it resolves the issues raised in this proceeding.

Respectfully submitted,

Joseph E. Bowring
Independent Market Monitor for PJM
President
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8051
*joseph.bowring@monitoringanalytics.com*

John Hyatt
Senior Economist
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8050
*john.hyatt@monitoringanalytics.com*

Jeffrey W. Mayes

General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8053
*jeffrey.mayes@monitoringanalytics.com*

Dated: January 20, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Eagleville, Pennsylvania,
this 20th day of January, 2023.

_____
Jeffrey W. Mayes
General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8053
*jeffrey.mayes@monitoringanalytics.com*

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) ) ) | Docket No. ER23-729-000 |
| PJM Interconnection, L.L.C. | ) ) ) | Docket No. EL23-19-000 |
| | | **(not consolidated)** |

COMMENTS OF
CONSTELLATION ENERGY GENERATION, LLC

Pursuant to Section 206(f) and Section 211 of the Rules of Practice and Procedure of the

Federal Energy Regulatory Commission ("Commission"), 18 C.F.R. §§ 385.206(f), 385.211

(2022), and the Combined Notice of Filing #1 issued on December 27, 2022 in the above-

captioned proceedings, Constellation Energy Generation, LLC ("Constellation")[1] submits these

timely comments opposing the filings by PJM Interconnection, L.L.C. ("PJM") to amend the

definition of Locational Deliverability Area ("LDA") Reliability Requirement in PJM's Open

Access Transmission Tariff ("Tariff").  PJM filed its proposed amendment pursuant to Section

205 of the Federal Power Act ("FPA") in Docket No. ER23-729-000 ("Section 205 Filing") and

pursuant to Section 206 of the FPA in Docket No. EL23-19-000 ("Section 206 Complaint" or

"Complaint") (together, "LDA Amendment Filings").  For the reasons discussed below, the LDA

Amendment Filings should be rejected.

---

[1] Constellation separately submitted timely doc-less motions to intervene in the above-captioned dockets.

1

## I.    BACKGROUND

On December 7, 2022, PJM opened the Base Residual Auction ("BRA")[2] for the 2024/25 delivery year, and the offer window closed on December 13, 2022.[3]  In reviewing its price calculations in the Delmarva Power & Light South ("DPL-S") zone, PJM found that certain Planned Generation Capacity Resources and planned Intermittent Resources in the DPL-S LDA did not offer into the 2024/25 BRA even though those resources had been included in the modeling assumptions upon which the LDA Reliability Requirement was based.[4]  According to PJM, these resources' decision to forego offering into the 2024/25 BRA resulted in an overstated LDA Reliability Requirement for DPL-S.[5]  PJM did not identify any other LDA with an overstated LDA Reliability Requirement.

On December 19, 2022, PJM notified stakeholders that the posting of results of the auction would be delayed.  On December 20, 2022, PJM provided a notice of consultation with PJM Members under Section 9.2(b) of the Tariff at the December 20, 2022 Members Committee meeting.  Section 9.2 of the PJM tariff authorizes PJM to file with the Commission unilateral reforms to its Tariff under Section 205 after complying with a seven-day notice requirement to PJM Members and PJM Transmission Owners.  However, PJM may only file with less than 7 days' notice "where imminent harm to system reliability or imminent severe economic harm to electric consumers requires a prompt Section 205 filing."[6]  On December 21, 2022, PJM

---

[2] PJM conducts Reliability Pricing Model Auctions in which electricity suppliers submit offers to provide capacity for a particular Delivery Year, typically three years in the future.  As defined in the Tariff, Reliability Pricing Model Auctions include a BRA, and typically three Incremental Auctions, associated with each Delivery Year.

[3] Section 205 Filing at 8; Section 206 Complaint at 9.

[4] Section 205 Filing at 9-10; Section 206 Complaint at 10.

[5] Section 205 Filing at 10; Section 206 Complaint at 10.

[6] PJM Tariff at Section 9.2(b).

2

Document Accession #: 20230130-5290   Filed Date: 01/30/2023

addressed stakeholders with a presentation discussing the issue and explaining its anticipated

filings to be submitted to the Commission.[7]

On December 23, 2022, PJM submitted the LDA Amendment Filings with the

Commission.  PJM seeks to comply with the 7-day notice requirement of Section 9.2(b) of the

Tariff by arguing that the LDA Amendment Filings are necessary to prevent imminent severe

economic harm.  PJM does not assert that the LDA Amendment Filings are designed to prevent

imminent harm to system reliability.  The LDA Amendment Filings propose a Tariff revision

that, for the 2024/25 BRA and future auctions, would allow PJM to adjust—after the offer

window has closed—an LDA Reliability Requirement by excluding from the LDA Reliability

Requirement calculation all Planned Generation Capacity Resources that do not participate in the

auction in LDAs where the LDA Reliability Requirement increases by more than one percent

compared with the values from the prior Delivery Year's auctions due to the addition of such

Planned Generation Capacity Resources.[8]  In its Section 206 Complaint, PJM requests that the

Commission establish a refund effective date of December 23, 2022, the date of the filing.[9]

## II.   COMMENTS

Constellation understands and is sensitive to the pricing results that led PJM to submit

the LDA Amendment Filings.  However, PJM's proposal to change auction rules in the final

hours of its capacity auction is problematic from both a legal and a policy perspective.  PJM

completed all pre-auction activities, sellers submitted offers, and the offer window closed, with

---

[7] PJM Members Committee, *2024/2025 BRA Update and PJM Notice of Consultation with the Members Committee pursuant to Tariff Section 9.2(b) and Transmission Owners pursuant to CTOA Section 7.5.1(ii)* (Dec. 21, 2022), https://pjm.com/-/media/committees-groups/committees/mc/2022/20221221/item-03-2024-2025-bra-update-and-pjm-notice-of-consultation-with-the-members-committee.ashx.

[8] Section 205 Filing at 10, 18-19; Section 206 Complaint at 11, 19.

[9] Section 206 Complaint at 3, 32.

3

Document Accession #: 20230130-5270 Filed Date: 01/30/2023

each step completed pursuant to the Commission-approved Tariff. Seeking to change PJM's auction rules after all steps necessary to calculate prices have been concluded cannot be squared with the Tariff provision PJM asserts it is acting under (Section 9.2(b)) or the filed rate doctrine, which serves to provide regulatory certainty to buyers and sellers alike even in instances when the filed rate may lead to outcomes that need to be corrected prospectively. Establishing a precedent that such filings would be entertained in these circumstances will also have a negative effect on the market confidence of suppliers, who must continue to invest in the facilities within PJM to ensure resource adequacy. Suppliers must be able to rely on the results of Reliability Pricing Model ("RPM") auctions under the Commission-approved rules and have confidence that the rules will not be circumvented when the resulting prices, despite being foreseeable and in line with prior clearing prices, are not what the RTO desires. Acceptance of the LDA Amendment Filings has the potential to create a dangerous precedent that threatens the stability of RPM auction results and could be a harbinger of potential future efforts to authorize *ex post* market interventions by PJM more generally.

The Commission therefore should reject PJM's filings under Section 205 and 206 of the FPA. In addition to violating the filing restrictions imposed by Section 9.2(b) of the Tariff and running afoul of the filed rate doctrine, PJM's Section 205 proposal is further deficient by failing to support its proposed new authority to make retroactive adjustments to the LDA Reliability Requirement, triggered by a year-over-year LDA Reliability Requirement change and calibrated to a mere one percent change threshold. The Complaint fairs no better, similarly violating the filed rate doctrine for the 2024/25 BRA (which was complete but for the posting of results) and failing to justify the year-over-year trigger and one percent threshold as a replacement rate. To the extent the Commission nonetheless finds PJM has met its Section 206 burden of

4

demonstrating that the existing rules for calculating the LDA Reliability Requirement are not just and reasonable and has overcome its obligation to follow the filed rate, the Commission, at a minimum, should direct PJM to (i) justify why a year-over-year change in the LDA Reliability Requirement is the proper trigger to determine whether to authorize PJM to make a modification to the previously-posted planning parameters, (ii) explain why other potential solutions would not be appropriate in light of the concerns identified herein, and (iii) support its selection of a one percent threshold as the correct calibration instead of more material thresholds such as 10 percent.

Assuming *arguendo* that a year-over-year increase in an LDA Reliability Requirement is an appropriate trigger to authorize PJM to modify the LDA Reliability Requirement after the offer window is closed, then any relief ordered by the Commission with respect to the 2024/25 BRA for the DPL-S LDA should adopt the highest threshold possible to remedy the issue in DPL-S while avoiding unanticipated and inappropriate changes in market outcomes in other LDAs. To that end, the Commission should direct PJM to conduct an expedited stakeholder process to examine whether PJM's proposed trigger and one percent threshold is appropriate for all LDAs, regardless of size, and whether alternative fixes, such as modifications to the methods by which the LDA Reliability Requirement calculations are conducted, are a better solution. The results of this stakeholder process should be reflected in further Tariff revisions filed with the Commission within 90 days.

### A. PJM has not Demonstrated "Imminent Severe Economic Harm"

As a threshold matter, PJM has not demonstrated that its Section 205 Filing is consistent with the Tariff's notice requirements under Section 9.2(b), which include a showing of an

"imminent severe economic harm to electric consumers," as referenced above.[10]  PJM seeks to

justify its submission of the LDA Amendment Filings with less than seven days' notice (and thus

prior to the posting of auction results) by stating that the clearing price in DPL-S "would be more

than four times what the clearing price should be . . . . [and t]o put that into perspective, the

clearing price for the DPL-S LDA from the 2023/2024 BRA was $69.95/MW-day."[11]

Section 9.2(b) requires more than showing a price increase to justify a Section 205 filing.

The Tariff requires a showing of **_imminent_** and **_severe_** economic harm.[12]  PJM's filing contains

no explanation of specific harm, how the harm is imminent or why the harm is severe as

compared to typical or expected auction clearing price fluctuations.  PJM's statements on this

point are conclusory, and PJM provides no supporting affidavit to justify its claims.

The complete text of Section 9.2 provides:

> PJM shall consult with the Transmission Owners and the PJM Members
> Committee beginning no less than seven (7) days in advance of any Section 205
> filing under Section 9.2(a), but neither the Transmission Owners, except as
> provided for in Section 9.3, nor the PJM Members Committee shall have right
> to veto or delay any such Section 205 filing. PJM may file with less than a full 7
> day advance consultation in circumstances where imminent harm to system
> reliability or imminent severe economic harm to electric consumers requires a
> prompt Section 205 filing; _provided that PJM shall provide as much advance
> notice and consultation with the Transmission Owners and the PJM Members
> Committee as is practicable in such circumstances_, and no such emergency filing
> shall be made with less than 24 hours advance notice.[13]

PJM had information well in advance of the auction regarding the intent of planned

resources to offer in the 2024/25 auction, but PJM did not seek to address the issue prior to its

LDA Amendment Filings.  Planned Generation Capacity Resource owners must provide PJM a

---

[10] _See supra_ note 6 and accompanying text (citing PJM Tariff at Section 9.2(b)).

[11] Section 205 Filing at 2, 29, 31; Section 206 Complaint at 3, 17, 29.

[12] As referenced above, the notice requirement of Section 9.2(b) may also be fulfilled with a showing of "imminent harm to system reliability," but PJM does not seek to justify its Section 205 Filing on threats to reliability.

[13] PJM Tariff at Section 9.2(b) (emphasis added).

Document Accession #: 20230130-5270 Filed Date: 01/20/2023

Notification of Intent to offer into an upcoming auction, and in the case of the 2024/25 auction such notices were due by August 4, 2022.[14]  If the Planned Generation Capacity Resource owners did not provide notice that they intended to offer, then PJM should have known months prior to the point at which any harm was imminent.  If the Planned Generation Capacity Resource owners provided notice that they did intend to offer, but subsequently did not, PJM's filing is more understandable, but Constellation is still hard-pressed to understand how such a scenario differs from others in which the Planned Generation Capacity Resource submits offers that are too high to clear.

PJM could have contemplated both results by simply referring to its own scenario analyses of recent BRA results, which should have put them on notice that the DPL-S zone is constrained and that the absence of planned capacity would result in significant price increases.  For example, PJM ran a simulation for the 2023/24 auction on November 1, 2022, showing that removing 260 MWs from DPL-S would result in a clearing price of more than $431/MW-day as well as other scenarios.[15]  Despite this analysis showing a potential for a price increase under certain supply conditions, PJM took no action consistent with a determination of what it now alleges to be a threat of imminent severe economic harm.  PJM should not be allowed to avoid the notice standard in its Tariff if its own inaction renders the economic harm "imminent."

---

[14] *See PJM Auction Schedule (Tab: 2024-2025 BRA)*, https://pjm.com/-/media/markets-ops/rpm/rpm-auction-info/rpm-auction-schedule.ashx (identifying August 4, 2022, as the "[l]ast day for Planned Generation Owners to Provide Notification of Intent to Offer").

[15] *See 2023/24 BRA Scenario Analysis*, at Scenario 8 (Nov. 1, 2022), https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2023-2024/2023-2024-bra-scenario-analysis.ashx; *see also 2022/23 BRA Scenario Analysis*, at Scenario 8 (July 6, 2021), https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2022-2023/2022-2023-bra-scenario-analysis.ashx (showing that removing 254.5 MW from DPL-S would result in a clearing price of $154/MW-day as well as other scenarios); *2021/22 BRA Scenario Analysis*, at Scenario 8 (Sept. 4, 2018), https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2021-2022/2021-2022-bra-scenario-analysis.ashx (showing that removing 241.8 MW from DPL-S would result in a clearing price of $273/MW-day).

Document Accession #: 20230130-5290 Filed Date: 01/20/2023

Second, auction clearing prices in the DPL-S LDA have typically been higher than other LDAs, indicating persistent supply issues. PJM indicates that the DPL-S 2024/25 auction clearing prices are approximately $280/MW-day (*i.e.*, four times the referenced $69.95/MW-day prices in the LDA Amendment Filings).[16] While $280/MW-day is higher than recent BRA clearing results, the price represents an increase of less than 25 percent compared to the $225/MW-day clearing price in DPL-S from the 2018/19 auction. Such pricing is consistent with eroding supply (either internal to the LDA or via limited transmission capability) yet below the cost of new entry which is approximately $284/MW-day for DPL-S. Constellation acknowledges that these price differentials are significant and that it is reasonable to consider the reasons for such price increases. However, analyzing the actual factors that give rise to the prices in the DPL-S zone, which is characterized by persistent supply issues described herein, such outcomes are not anomalous but are instead consistent with the market characteristics of this LDA.

Indeed such a pricing outcome is also consistent with a need to incent new supply in the LDA.[17] The current tight capacity situation in the DPL-S zone is confirmed by several data points, including: (i) the clearing price in DPL-S in the most recent posted BRA (the highest of all LDAs); (ii) the percentage of offers in DPL-S clearing the auction (96 percent); and (iii) the reliability need for NRG's Indian River facility, which PJM is retaining under a Reliability Must Run contract.[18] As a result of DPL-S's current capacity supply environment, the pricing

---

[16] Section 205 Filing at 2-3, 29, 31; Section 206 Complaint at 3, 17, 29.

[17] *See PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079, at P 51 (2006) ("[W]e agree with PJM that a locational element in the capacity construct will provide better price signals to potential new entrants and allow proper reflection of the differential costs of operation by locality.").

[18] *See, e.g., NRG Power Marketing LLC*, 179 FERC ¶ 61,156 (2022) (accepting Reliability Must Run rate schedule, effective from June 1, 2022, through December 31, 2026, and establishing hearing and settlement procedures).

Document Accession #: 20230130-5270   Filed Date: 01/20/2023

outcome identified by PJM in the DPL-S LDA may very well be consistent with market fundamentals; altering the pricing outcome could actually undermine the integrity of the PJM market instead of preserve it.  In short, the price differences in the DPL-S zone described by PJM may well be justified by the supply/demand balance within that zone, and not indicative of "severe" economic harm.[19]

It is also not unusual in PJM's capacity market for an LDA's clearing prices to differ at a fourfold basis among prior BRA clearing prices in response to supply and demand fundamentals, especially in a small, constrained LDA.  For example, in the 2021/22 auction, the high LDA had a clearing price of approximately \$204/MW-day, while the RTO clearing price in the 2022/23 auction was four times lower at approximately \$50/MW-day.  As shown in the following table, significant differences in capacity clearing prices are not uncommon within PJM, further undermining the notion that the LDA Amendment Filings are needed to address anomalous severe economic harm.

---

[19] These comparisons show nominal dollar figures and do not reflect the time value of money.  If we factor that in, the \$225 clearing price from the 2018/19 BRA has the equivalent purchasing power as \$280 in current dollars—the same auction clearing price for the DPL-S zone indicated by PJM in the LDA Amendment Filings.  *See* Section 205 Filing at 2-3; Section 206 Complaint at 3.  Using figures from the Consumer Price Index maintained by the U.S. Bureau of Labor Statistics representing the average for all items, not seasonally adjusted, for the category of All Urban Consumers (CPI-U), \$225 from August 2015, the month the 2018-19 BRA results were originally posted, has the purchasing power of \$280.21 in December of 2022. *See* U.S. Bureau of Labor Statistics, Consumer Price Index, https://www.bls.gov/cpi/data.htm.

**Table 1:  Historic BRA Clearing Prices (/MW-day)[20]**

| Year | RTO | High LDA |
|------|-----|----------|
| 2023/24 | $34 | $70 |
| 2022/23 | $50 | $127 |
| 2021/22 | $140 | $204 |
| 2020/21 | $77 | $188 |
| 2019/20 | $100 | $203 |
| 2018/19 | $165 | $225 |
| 2017/18 | $120 | $215 |
| 2016/17 | $59 | $219 |
| 2015/16 | $136 | $357 |
| 2014/15 | $126 | $225 |
| 2013/14 | $28 | $247 |
| 2012/13 | $16 | $222 |

In sum, PJM has not sufficiently demonstrated that its Section 205 Filing is necessary in order to avert imminent or severe economic harm, as required by Tariff Section 9.2(b).  PJM therefore does not have authorization to make the Section 205 Filing, which should be rejected by the Commission to ensure suppliers can have confidence that the same market rules applicable at the start of an auction window will apply when the results are calculated and posted.

## B.  PJM's Proposal to Make *Ex Post* Adjustments to Capacity Auctions Violates the Filed Rate Doctrine/Prohibition Against Retroactive Ratemaking

Even assuming, *arguendo*, that PJM had the authority under its Tariff to submit the Section 205 Filing on less than seven days' notice, the filing should be rejected for violating the filed rate doctrine and prohibition against retroactive ratemaking.  For the same reason, the

---

[20] Prices rounded to nearest dollar. *See 2023/2024 RPM Base Residual Auction Results,* https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2023-2024/2023-2024-base-residual-auction-report.ashx; *Resource Clearing Prices Auction Summary* (last updated Mar. 28, 2022), https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/rpm-auctions-resource-clearing-price-summary.ashx (depicting clearing prices for 2012/13 BRA through 2022/23 BRA).

Commission should apply any remedy granted in response to the Complaint prospectively, starting with the 2025/26 BRA.

The Commission and courts have made clear that "[t]he filed rate doctrine and the rule against retroactive ratemaking leave the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations."[21]  The filed rate doctrine holds that a public utility may not charge any rate other than what has been filed with the Commission and allowed to go into effect.[22]  Under the rule against retroactive ratemaking, "[n]ot only do the courts lack authority to impose a different rate than the one approved by the Commission, but the Commission itself has no power to alter a rate retroactively."[23]  Under both FPA section 205 and 206, the Commission's authority to alter or accept a change in rates does not permit retroactive changes to filed rates.[24]  Courts have made clear that even equitable considerations, such as reliance interests, must yield to the filed rate doctrine and the rule against retroactive ratemaking.[25]

The filed rate doctrine and the rule against retroactive ratemaking apply broadly to the Commission's authority over rates, as well as non-rate terms and conditions.  Specifically, these doctrines cover not only rates but "rate schedules" and "tariffs," both of which are defined as including "all classifications, practices, rules, or regulations which in any manner affect or relate

---

[21] *See Old Dominion Elec. Coop., Inc. v. FERC*, 892 F.3d 1223, 1230 (D.C. Cir. 2018) (citing Columbia Gas Transmission Corp. v. FERC, 895 F.2d 791, 794-97 (D.C. Cir. 1990)).  *See also Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (finding that "the Commission itself has no power to alter a rate retroactively").

[22] *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981); *Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co*., 341 U.S. 246, 251-52 (1951).

[23] *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981).

[24] With regard to section 206, the Commission may, after conducting a hearing, establish the prospective rate "to be thereafter observed."  *See* 16 U.S.C. § 824e(a).

[25] *See Public Utils. Comm'n of Cal. v. FERC,* 988 F.2d 154, 168 n.12 (D.C. Cir. 1993) (internal citations omitted) (explaining with regard to the filed rate doctrine and rule against retroactive ratemaking that "[i]t bears repeating … that the Commission does not have the authority to ignore the law to achieve an equitable result").

to the aforementioned service, rates, and charges."[26]  Moreover, the Commission's filed rate

doctrine and rule against retroactive ratemaking apply not only to traditional "rates" but to non-

rate terms and conditions as well.[27]  In the case of capacity auctions, the filed rate is therefore the

set of Commission-accepted practices, rules, and regulations affecting the capacity market

service, rates, and charges pursuant to which the RTO conducts the auction.

PJM conducted the 2024/25 auction according to the filed rate.  PJM seeks to change the

auction results only after the offer window has closed and calculated prices revealed the effect of

its rate, *i.e.*, that the auction will cause an increase in the DPL-S clearing price.  It is precisely

PJM's knowledge of the pricing outcome that is the basis of its claim that the filed rate would

lead to "imminent severe economic harm."  Such *ex post* considerations—even if to achieve

equitable outcomes—are prohibited under the Commission's filed rate doctrine and rule against

retroactive ratemaking.[28]

PJM concedes that the auction has closed but argues that the auction has not been

"completed" because PJM has refrained from posting the results that formally award capacity

commitments.[29]  In the context of performing a capacity auction pursuant to its filed rate, PJM's

arguments present a distinction without a difference, and PJM's reliance on this distinction

would yield an absurd result: it would give PJM the ability to make retroactive adjustments to the

---

[26] *See* 18 C.F.R. §§ 35.1(a), §35.2(b) and (c)(1).

[27] *See, e.g., Seminole Elec. Power Coop., Inc. v. Fla. Power & Light Co.,* 139 FERC ¶ 61,254, at P 44 (2012) (finding that a time bar provision "is itself the filed rate"), *reh'g denied,* 153 FERC ¶ 61,037, at P 27 (2015) *aff'd sub nom. Seminole Elec. Coop., Inc. v. FERC,* 861 F.3d 230, 234-35 (D.C. Cir. 2017).

[28] *See Public Utils. Comm'n of Cal. v. FERC,* 988 F.2d 154, 168 n.12 (D.C. Cir. 1993) (internal citations omitted) (explaining with regard to the filed rate doctrine and rule against retroactive ratemaking that "[i]t bears repeating … that the Commission does not have the authority to ignore the law to achieve an equitable result").  *See also Old Dominion Elec. Coop., Inc. v. FERC,* 892 F.3d 1223, 1230 (D.C. Cir. 2018) (citing *Columbia Gas Transmission Corp. v. FERC,* 895 F.2d 791, 794-97 (D.C. Cir. 1990)) (holding that "[t]he filed rate doctrine and the rule against retroactive ratemaking leave the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations").

[29] Section 205 Filing at 8-9; Section 206 Complaint at 4.

rules for, and outcome of, the very same auction that PJM concedes is closed. PJM's position is further untenable because posting the results of an auction to formalize the results is a ministerial activity that is not sufficient to undo an already-run auction.[30] Market participants could expect PJM to check the results of the auction algorithms prior to posting results but should not expect PJM to modify those algorithms prior to posting results, which is what PJM proposes to do here.

There are examples in PJM's filed rate that allow PJM to postpone and adjust the outcome of an RPM auction due to market impacts from generation failing to offer into an RPM auction, but PJM's attempt in this case, citing to Section 9.2(b), is not one of them. Section 6.6(i) of Attachment DD of the Tariff gives PJM the right, among other things, to request that the Commission direct one or more existing generation resources to participate in the auction and to "postpone clearing the auction pending FERC's decision on the matter."[31] Likewise, Section 5.11(e) of Attachment DD of the Tariff provides in pertinent part:

> After conducting the Reliability Pricing Model Auctions, PJM will post the results of each auction as soon thereafter as possible, including any adjustments to PJM Region or LDA Reliability Requirements to reflect Price Responsive Demand with a PRD Reservation Price equal to or less than the applicable Base Residual Auction clearing price. . . .[32]

This Tariff language makes clear the potential for PJM to adjust the PJM Region or LDA Reliability Requirements to reflect the actual participation of Price Responsive Demand (*i.e.*, whether it cleared or not) in the parameters used for the auction.[33] In both instances,

---

[30] *See, e.g.*, *ISO New England Inc.*, 180 FERC ¶ 61,036, at PP 14-15 (2022) (rejecting attempts to change auction rules after the RTO ran the auction but before the Commission completed the process for confirming that ISO-NE followed its auction rules).

[31] *See* PJM Tariff at Attachment DD, Section 6.6(i).

[32] PJM Tariff at Attachment DD, Section 5.11(e).

[33] PJM suggests in the Section 206 Complaint (at 23) that the potential adjustment to the LDA Reliability Requirement to reflect Price Responsive Demand indicates that "there is already no expectation that the [LDA] Reliability Requirement is set in stone and cannot change after the bidding window closes." However, under the standard canon of interpretation that the expression of one thing implies the exclusion of others (*i.e.*, *expressio unius est exclusio alterius*), the express PJM provision that would allow changes in LDA Reliability Requirements to

the Tariff clearly states that an adjustment can occur after the offer window has closed

and clearing prices are calculated—features that are missing from PJM's efforts to fit the

current circumstances under Section 9.2(b).[34]  When viewed against other tariff

provisions such as Section 6.6(i) and Section 5.11(e), it becomes more apparent that

PJM's proposal here under Section 9.2(b) fails to conform with the filed rate doctrine.

PJM argues that Section 5.11(e) provides the Commission with authority to alter

auction results to correct errors.[35] PJM confuses the ability to correct auction errors with

the ability to change the filed rate after the offer window has closed.  The subject of

PJM's LDA Amendment Filings is not a "correction" of an error; it is an outcome-

oriented attempt to retroactively alter the results of a closed auction.  The fact that section

5.11(e) provides the ability to review and correct errors in RPM auctions in no way grants

PJM the authority to adjust the outcome of a filed rate when that rate, *i.e.*, the auction

process, was conducted consistent with the current rules and without error.

PJM also argues that it "is not proposing to change rates, or terms and conditions of

service, relating to its past duties" because "no capacity awards have been made or final results

posted, [so] there is not a final rate for which any entity has an entitlement or settled expectation

at this time."[36]  This interpretation of the filed rate doctrine would create an exception so broad

---

reflect Price Responsive Demand implies that changes to the LDA Reliability Requirement are unavailable in other situations such as the one at hand.

[34] The reference to a five percent threshold in Section 6.6(i) is not relevant to the arguments in PJM's LDA Amendment Filings because the trigger in Section 6.6(i) depends on a change in Zonal Capacity Prices, which is completely different from the trigger proposed by PJM in this case, *i.e.*, a year-over-year change in the LDA Reliability Requirement.

[35] Section 205 Filing at 30-31; Section 206 Complaint at 30.

[36] Section 205 Filing at 24; Section 206 Complaint at 24-25.

Document Accession #: 20250130-5270    Filed Date: 03/20/2023

that it would swallow the rule (at least for auction-based markets like capacity and financial transmission rights). Indeed, PJM concedes the following:

> Undeniably, Capacity Market Sellers have submitted bids into the auction based on the planning parameters. But in this case, it was the action of certain Capacity Market Sellers with planned resources in the DPL-S LDA that did not to participate in the auction, rather than the posted planning parameters, which gave rise to the unjust and unreasonable mismatch between prices and actual reliability conditions in this LDA. As a result, there was no specific planning parameter reliance….[37]

PJM's argument is circular. Capacity Market Sellers' reliance on the filed rate in formulating their offers cannot be undermined by PJM changing the market parameters after Sellers have offered in reliance on those parameters. PJM is suggesting that the LDA Reliability Requirement is unnecessarily inflated since the planned resources failed to offer, yet this is a circumstance that PJM should have anticipated upon examining Planned Generation Capacity Resource owners' Notifications of Intent to offer and in fact did anticipate, as indicated by the simulations published prior to the 2024/25 BRA.[38]

Stepping back, PJM concedes in the LDA Amendment Filings that Capacity Market Sellers relied on published auction parameters in formulating their offers and that the Tariff currently provides no means to adjust the LDA Reliability Requirement as a result of a Planned Generation Capacity Resource's failure to offer. The current situation is not the result of an anomaly that threatens imminent severe economic harm but is instead the consequence of both the filed rate and inaction on the part of PJM to address a known possible outcome.

---

[37] Section 205 Filing at 24-25; Section 206 Complaint at 24.
[38] *See supra* notes 14, 15 and accompanying text.

15

### C. If the Commission Does Not Reject the LDA Amendment Filings, the Commission Must Direct PJM to Support a Just and Reasonable Remedy

Even if PJM's proposal could be squared with the filed rate doctrine, PJM has not demonstrated that its proposal is just and reasonable and not unduly discriminatory for the reasons set forth below. The Commission therefore should reject the Section 205 Filing. In the event the Commission finds that PJM has demonstrated under the first prong of Section 206 that the existing rate is unjust, unreasonable, or unduly discriminatory or preferential (notwithstanding the discussion above[39]), then the Commission should adopt a replacement rate that is appropriately calibrated to address the problem identified without undermining legitimate market price signals that reflect tenuous LDA supply and import capability in the DPL-S zone.

#### i. At a Minimum, the Commission Must Require PJM to Support Its LDA Reliability Requirement Trigger and Its Selection of a One Percent Threshold

PJM proposes a Tariff revision that would allow PJM to retroactively adjust the LDA Reliability Requirement by excluding from the LDA Reliability Requirement calculation all Planned Generation Capacity Resources that do not participate in the auction in LDAs where the LDA Reliability Requirement increases by more than one percent as compared with the values from the prior Delivery Year's auctions due to the addition of such Planned Generation Capacity Resources.[40] PJM has failed to demonstrate that using a year-over-year change in the LDA Reliability Requirement is not overly broad as a trigger for PJM intervention and that, even if it is sufficiently targeted, that a one percent threshold is reasonably calibrated.

---

[39] As discussed above, PJM has not demonstrated that pricing outcomes in the DPL-S LDA are inconsistent with supply constraints in the zone.

[40] Section 205 Filing at 10, 18-19; Section 206 Complaint at 11, 19.

16

Document Accession #: 20250130-5270    Filed Date: 01/30/2025

PJM provides no support to justify why a year-over-year change in the LDA Reliability Requirement is a sufficient trigger (however calibrated) to authorize PJM to modify a key auction input.  For example, PJM has not explained whether an LDA Reliability Requirement increase could occur under circumstances unrelated to Planned Generation Capacity Resource entry.  If so, a more surgical trigger may be warranted.  The Commission should consider whether year-over-year change to an LDA Reliability Requirement is sufficiently tailored to the concern PJM raises about Planned Generation Capacity Resources that fail to offer.  Specifically, PJM should demonstrate that its concern could not be revealed by examination of Planned Generation Capacity Resource Notifications of Intent such that an LDA Reliability Requirement or any other impacted auction parameters could be adjusted in advance of sellers entering their offers.[41]

In addition to the trigger itself, PJM also fails to demonstrate that a one percent year-over-year change to an LDA Reliability Requirement is reasonably calibrated to reflect a level of materiality that merits PJM's proposed remedy.  PJM argues that the one percent threshold measures the material changes in an LDA Reliability Requirement.[42]  As a practical matter, such a threshold would grant PJM the power to change an LDA Reliability Requirement—for any size LDA—in nearly any circumstance.  The one percent threshold is not reasonably related to resource offers relative to the size of the LDA.

Hypothetical (but realistic) scenarios illustrate the point.  When considering PJM's proposal as applied to a large LDA, such as ComEd with approximately 24,000 MWs of load, a one percent threshold would be triggered if there is even a relatively small (*e.g.,* 240 MW)

---

[41] Relying on the Planned Generation Resource Notifications of Intent in this way also has the added benefit of providing other suppliers final LDA Reliability Requirement determination prior to the auction.

[42] Section 205 Filing at 19-20; Section 206 Complaint at 5.

difference in the LDA Reliability Requirement compared to prior year's LDA Reliability Requirement.  With regard to small LDAs like the DPL-S zone, one percent would be a mere 35 MW.  In either case, PJM's threshold would trigger significant discretion to revise auction results if the LDA Reliability Requirement increases to reflect nearly *any* new intermittent generation or new model combustion turbine, and applying PJM's proposal to such scenarios would result in the threshold being triggered with great frequency.  These examples illustrate the poor design of PJM's proposed remedy because the exception (*i.e.,* allowing PJM to adjust the LDA Reliability Requirement calculation during the auction if certain planned resources do not offer) would swallow the rule.

Focusing PJM's proposal on the DPL-S zone itself, PJM's LDA Amendment Filings indicate that the LDA Reliability Requirement increased by approximately 12 percent from the prior year.[43]  PJM does not offer support for its choice of a one percent threshold, and against this backdrop of a 12 percent difference, it is unclear from PJM's filings how the one percent triggering threshold is actually tailored to address the event that raised meaningful concern, let alone any broader application of the rule to other LDAs.

### ii.     Any Remedy Should Be Limited to Only the Problem at Hand

In the event the Commission finds that PJM has demonstrated under the first prong of Section 206 that the existing rate is unjust and unreasonable (which it should not), the Commission should direct a transitional approach that addresses the 2025/26 BRA results but establishes further process before setting a permanent solution.  First, the Commission could order an immediate remedy by directing PJM to recalculate the DPL-S LDA Reliability Requirement after removing the Planned Generation Capacity Resources that failed to offer in

---

[43] Section 205 Filing at 11; Section 206 Complaint at 11.

18

the DPL-S zone for the 2024/25 auction. This action would address a known issue (and no more) and would avoid delaying the posting of auction results. Then, as discussed below in Section II.C.iii, the Commission could direct PJM to address future similar issues in a more coherent way. Such an approach of implementing an immediate solution while a more robust mechanism can be developed and put in place is consistent with prior Commission precedent to avoid unnecessary auction delays.[44] Any action by the Commission should reflect the narrow facts and circumstances that gave rise to current situation,[45] including consideration of (i) the amount of Planned Generation Capacity Resources in the DPL-S zone, which formed part of the calculation of the LDA Reliability Requirement, that did not participate in the 2024/25 auction, and (ii) Generation Capacity Resource Seller's reliance on the posted planning parameters in formulating their offers.

### iii. The Commission Should Direct Further Process to Inform the Permanent Prospective Remedy

Assuming that the Commission has not only found the existing Tariff to be unjust and unreasonable but imposed a limited remedy for the 2024/25 BRA—again, actions which are inconsistent with both the law and sound market policy over the long-term—the Commission could direct PJM to conduct an expedited stakeholder process to examine whether other alternative relief, such as modifications to the methods by which the LDA Reliability

---

[44] *See, e.g., PJM Interconnection, L.L.C.,* 174 FERC ¶ 61,212, at PP 72-74 (2021) (concluding that it is "an appropriate and equitable exercise of [the Commission's] discretion not to further delay the upcoming auction while the Commission determines the just and reasonable replacement rate"); *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, at P 115 (2006) (accepting tariff provision to give discretion to the market monitor but allocating nine months for PJM to develop objective criteria to serve as the long-term solution; *Cal. Indep. Sys. Operator Corp.*, 116 FERC ¶ 61,274, at P 1402 (2006) (explaining that "[a]lthough additional features could enhance [the proposal], we find that these additional enhancements do not outweigh the need to implement without further delay the numerous benefits that the [proposed] tariff provides."); *Sw. Power Pool, Inc.*, 114 FERC ¶ 61,289, at PP 2, 3 (2006) (explaining that "[w]e recognize that the implementation of organized markets is to some extent an iterative process that requires modifications to tariff provisions"), *on reh'g,* 116 FERC ¶ 61,289, at P 54.

[45] PJM has not indicated any issues beyond those involved in the DPL-S LDA in this auction.

Document Accession #: 20250130-5290   Filed Date: 01/20/2023

Requirement calculations are conducted, may be a more effective solution for the market and, if not, what threshold for year-over-year changes in the LDA Reliability Requirement would be appropriate to use going forward. As shown above, there is an insufficient basis to accept PJM's proposed trigger and its proposed threshold of one percent, and a coherent long-term solution is much more likely to result from a process that includes stakeholder deliberation. To assure stakeholder deliberations move apace, the Commission should provide PJM a compliance directive to make a filing informed by such stakeholder deliberations within 90 days of a Commission order on PJM's LDA Amendment Filings. Such a directive would ensure that the broader fix is put in place as soon as practicable.

Alternatively, the Commission could direct the parties to brief a set of narrowly defined questions by first requiring PJM to provide justification (i) for its proposed year-over-year LDA Reliability Requirement trigger, (ii) for its selection of a one percent threshold over more material thresholds such as 10 percent, including the impact of the threshold, if any, on valid RPM price signals, and (iii) why other potential solutions, such as a revision to its overall method of calculating LDA Reliability Requirements, would not be appropriate in light of the concern that has been identified. Then other parties would have an opportunity to respond. The Commission has ordered similar narrow briefing in the context of other proceedings. For example, in other contexts the Commission found certain RPM-related Tariff provisions to be unjust and unreasonable, ordering a paper hearing to develop a record on the replacement rate and directed PJM to run its RPM auction under the prior mechanism.[46]

---

[46] *PJM Interconnection, L.L.C.,* 174 FERC ¶ 61,212, at PP 72-73 (2021) (concluding that it is "an appropriate and equitable exercise of [the Commission's] discretion not to further delay the upcoming auction while the Commission determines the just and reasonable replacement rate" and setting forth narrow paper hearing guidelines, including 45 days for initial briefs and 30 days for reply briefs).

## III. CONCLUSION

For the reasons stated herein, the Commission should reject PJM's Section 205 Filing as inconsistent with Section 9.2(b) of its Tariff and violative of the filed rate doctrine. In addition, the Section 205 Filing is deficient for failing to support its proposed rate as just and reasonable, specifically the year-over-year LDA Reliability Requirement trigger and its one percent threshold for permitting PJM to make retroactive adjustments to an LDA Reliability Requirement. PJM's Section 206 Filing should likewise be rejected as violative of the filed rate doctrine. To the extent the Commission believes that PJM has met its burden under Section 206 that the existing rate is unjust and unreasonable, the Commission should impose a narrowly-tailored solution for the 2024/25 BRA and direct additional process (either in the form of an expedited stakeholder process followed by a compliance filing or an expedited briefing schedule to develop the prospective just and reasonable replacement rate).

Respectfully submitted,

Christopher A. Wilson
Director, Federal Regulatory Affairs
Constellation Energy Generation, LLC
101 Constitution Ave NW, Suite 400 East
Washington, D.C. 20001
(202) 347-7500
FERCe-filings1@constellation.com

*/s/ Seth T. Lucia*
Seth T. Lucia
Assistant General Counsel
Constellation Energy Generation, LLC
101 Constitution Ave NW, Suite 400 East
Washington, D.C. 20001
(202) 347-7503
seth.lucia@constellation.com

Carrie Hill Allen
Sr. Vice President & Deputy General Counsel
Constellation Energy Generation, LLC
101 Constitution Ave NW, Suite 400 East
Washington, D.C. 20001
(202) 637-0344
carrie.allen@constellation.com

Dated: January 20, 2023

21

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document upon each person

designated on the official service list compiled by the Secretary in this proceeding.

Dated at Washington, D.C. this 20th day of January 2023.

/s/ *Shawn Whites*
Shawn Whites
Constellation Energy Generation, LLC

Document Accession #: 20250120-5290    Filed Date: 01/20/2025

Document Content(s)

Constellation Comments - PJM LDA Amendment Filings (Jan. 20).pdf..........1

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| | ) | **Docket Nos. ER23-729-000** |
| PJM Interconnection, L.L.C. | ) | **EL23-19-000** |
| | ) | **(not consolidated)** |

## MOTION FOR LEAVE TO ANSWER AND ANSWER OF
## PJM INTERCONNECTION, L.L.C.

PJM Interconnection, L.L.C. ("PJM"), pursuant to the Federal Energy Regulatory Commission's ("Commission") Rules of Practice and Procedure 212 and 213,[1] submits this Motion for Leave to Answer and Answer in response to the various protests submitted on January 20, 2023.[2] The issue in this proceeding is clear. The Commission's primary statutory duty is to ensure that rates produced pursuant to the PJM Open Access Transmission Tariff ("Tariff") are just and reasonable.[3] Here, absent Commission action, PJM would be required to finalize the 2024/2025 Base Residual Auction ("BRA") results by using an input to the wholesale rate that would contravene the Commission's statutory duty to ensure just and reasonable rates. Specifically, the Locational Deliverability Area Reliability Requirement[4] that would be used for the Delmarva Power & Light South ("DPL-S") Locational Deliverability Area ("LDA") would not provide an accurate reflection of the actual reliability needs of the area based on the actual participation of Planned Generation Capacity Resources in the 2024/2025 BRA.

---

[1] 18 C.F.R. §§ 385.212 and 385.213.

[2] PJM's answer is limited to providing the Commission with additional information in response to certain arguments raised in the various protests. The lack of a response to other arguments in this answer should not be viewed as conceding, but rather simply to promote administrative economy by avoiding repetition where appropriate.

[3] *Montana Consumer Counsel v. FERC*, 659 F.3d 910 (9th Cir. 2011), *certiorari denied*, 567 U.S. 934 (2012) (the Commission's mandate under the Federal Power Act is to ensure that rates charged by electricity wholesalers are just and reasonable).

[4] Terms not otherwise defined herein shall have the same meaning as set forth in the Open Access Transmission Tariff ("Tariff") and Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. ("Operating Agreement").

**JA567**

While PJM's December 23 Filings[5] certainly attracted a large number of naysayers, not a single protester attempts to justify that the previously posted Locational Deliverability Area Reliability Requirement for Delmarva Power & Light South ("DPL-S") is an accurate input that should be used for the 2024/2025 BRA.  Instead, the protests attempt to characterize a punitive and incorrect price signal as an acceptable input to the final capacity price by arguing that it is "a function of making assumptions to forecast future market conditions."[6]    Additionally, the protesters cloak their flawed assertions of retroactivity claiming that the factually invalid Locational Deliverability Area Reliability Requirement Reliability Requirement should form the basis for an inviolate rate outcome.

However, there can be no settled expectations when no capacity rate for the 2024/2025 BRA has been established and no capacity commitments have been awarded.[7]  While offers for capacity have been submitted, the submission of such offers do not and cannot as a matter of law justify an unjust and unreasonable rate that does not even go into effect until June 1, 2024.[8]  The filed rate doctrine and rule against retroactive ratemaking provides protection for an entitlement to a particular rate by preventing retroactive changes to such rates.  It does not prevent prospective changes to such rates filed pursuant to either section 205 or 206 of the FPA.  Further, the fact that

---

[5] *PJM Interconnection, L.L.C.*, Proposed Amendment to the Locational Deliverability Area Reliability Requirement, Docket No. ER23-729-000 (Dec. 23, 2022); *PJM Interconnection, L.L.C.,* Complaint Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area in the 2024/2025 Base Residual, Docket No. EL23-19-000 (Dec. 23, 2022) (together, the "December 23 Filings").

[6] *PJM Interconnection, L.L.C.*, Protest of the PJM Power Providers Group, Docket Nos. ER23-729-000 and EL23-19-000, at 32 (Jan. 20, 2023) ("P3 Protest").

[7] *See, e.g.*, *ISO New England Inc.*, 148 FERC ¶ 61,185, at P 29 (2014) ("There is a difference between upsetting the expectations of market participants, which might be the case here, and retroactive ratemaking.").

[8] *ISO New England Inc.*, 145 FERC ¶ 61,095, at P 28 (2013) ("The changes would apply only prospectively and after notice. To the extent that the revisions might upset the expectations of market participants (which is distinguishable from retroactive ratemaking), we are not persuaded that their reliance on the current definition outweighs the benefits expected to result from the change, i.e., helping to ensure that reserve requirements are met and system reliability is protected.").

2

inputs to the wholesale rate, or in this case, the Locational Deliverability Area Reliability Requirement, was required to be posted by a certain date does not serve to bar a prospective change for an input to the wholesale rate.[9]  PJM's capacity market, known as the Reliability Pricing Model ("RPM"), is a complex formula rate with inputs from both PJM and Market Participants that are capable of being prospectively changed when it or its elements are unjust and unreasonable.

None of the cases relating to the filed rate doctrine or rule against retroactive ratemaking cited by the protesters are on point or addressed a similar circumstance that is presented in PJM's December 23 Filings.  The protesters turn the Commission's responsibilities in this case on their head and seek to effectively straitjacket the Commission's ability to carry out its responsibilities as directed by Congress.  To simply countenance an unjust and unreasonable rate when brought to the Commission's attention pursuant to sections 205 and 206 of the Federal Power Act ("FPA") (and before any rate has been finalized and imposed on customers) would effectively void Congress' mandate that the Commission ensure just and reasonable rates.

There are no special provisions under the FPA for the administration of wholesale markets - just that the resulting rates must be just and reasonable.[10]  Indeed, the *Atlantic City* case cited by the PJM Power Providers ("P3") witness Kelliher as a "stinging and embarrassing court defeat" arose from ignoring the plain language of the statute.[11]  The protesters encourage the Commission to do just that - by disregarding any potentially unjust and unreasonable outcomes by advancing

---

[9] *See, e.g.*, *Cal. Indep. Sys. Operator Corp.*, 178 FERC ¶ 61,180, at P 81 (2022) ("Although the FPA does not entitle parties to more than 60-days' notice of a proposed Tariff change, from a business perspective, it is reasonable to expect market participants would contemplate that settled practices could be changed, and plan accordingly.").

[10] 16 U.S.C. §§ 824d, 824e.

[11] *See Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) (Commission "attempting to deny the utility petitioners the very statutory rights given to them by Congress").  It is noted that the *Atlantic City* case is actually the genesis for the addition of section 9.2 to the PJM Tariff upon which PJM relies, and which specifies PJM's authority for filing rate changes under the Tariff under these circumstances to prevent harm.

3

flawed retroactive ratemaking arguments.[12]  Indeed, formula rates may be changed prospectively even when the inputs are in.[13]

In short, the protesters efforts to "defend" wholesale markets bet all of their marbles on forcing the Commission to accept an inaccurate and overstated Locational Deliverability Area Reliability Requirement that they themselves do not defend.  However, the notion that market sanctity requires citizens of three states to pay a capacity rate that is approximately four times higher than it should be by requiring the use an invalid Locational Deliverability Area Reliability Requirement posted prior to the commencement of the 2024/2025 BRA would effectively neuter the Commission's broad authority that Congress delegated under sections 205 and 206 of the FPA.  Such flawed arguments should be rejected as it would create a dangerous precedent that will limit the Commission's authority to carry out its statutory responsibilities to the public to ensure just and reasonable rates.

## I.    MOTION FOR LEAVE TO ANSWER

The Commission's rules provide that a party may answer protests where the decisional authority permits the answer for good cause shown.  The Commission has accepted responses to protests when doing so will ensure a more accurate and complete record or will assist the Commission in its deliberative process by clarifying the issues.[14]  All of these criteria are met.

---

[12] *See, e.g.*, P3 Protest at 32.

[13] By way of example, a transmission formula rate like those found in the same Tariff may be changed prospectively pursuant to Sections 205 and 206 of the Federal Power Act, even after the inputs have been collected and the resulting rate generated and implemented.  *See Pub. Citizen, Inc. v. Midcontinent Inde. Sys. Operator, Inc.*, 171 FERC ¶ 61,090, at P 22 (2020) (accepting change to formula rate effective June 2020, but directing any true-up from 2019 to reflect the formula in effect as of 2019).

[14] The Commission regularly allows answers in such cases.  See, e.g., *PJM Interconnection, L.L.C.*, 139 FERC ¶ 61,165, at P 24 (2012) (accepting answers to a protest because "they have provided information that assisted [the Commission] in [its] decision-making process"); *Cal. Indep. Sys. Operator Corp.*, 129 FERC ¶ 61,241, at P 16 (2009) ("[w]e will accept the answers and responses to the requests for rehearing because they provide information that assisted us in our decision-making process"); *PJM Interconnection, L.L.C.*, 104 FERC ¶ 61,031, at P 10 (2003) (accepting answer because "it will not delay the proceeding, will assist the Commission in understanding the issues raised, and will [e]nsure a complete record upon which the Commission may act"); *KN Wattenberg Transmission*

4

## JA570

Therefore, PJM respectfully requests that the Commission grant its Motion because the Answer will help clarify the record and contribute to an understanding of the issues.

## II.    ANSWER

As the Commission is well aware, as an independent regional transmission operator, PJM has no financial interest in the auction results from its wholesale markets. However, as the administrator of the wholesale markets, PJM does have a strong interest in producing just and reasonable outcomes for all Market Participants. Thus, contrary to the unfounded assertions made by the Electric Power Supply Association that "PJM has repeatedly signaled that its focus is on reducing prices for load,"[15] PJM has independently supported issues championed by both supply and load interests where appropriate. For instance, PJM agrees with the many of the supplier comments that the existing Market Seller Offer Cap rules do not permit Capacity Market Sellers to reflect the cost of risk associated with incurring Non-Performance Charges, as well as the opportunity cost of foregone bonus performance payments. Indeed, PJM requested rehearing[16] of the Commission's recent Market Seller Offer Cap order[17] and submitted a separate brief in support of the petitions for review on appeal.

PJM did not submit similar emergency filings on issues raised by some of the suppliers for a simple and obvious reason. Namely, matters such as the Market Seller Offer Cap and the

---

*LLC*, 94 FERC ¶ 61,189, at 6 (2001) (finding good cause to accept an answer to a request for rehearing "in order to insure a complete record in this proceeding"); *Tex. E. Transmission, LP*, 131 FERC ¶ 61,164, at P 1, n.3 (2010) (accepting answer to a request for rehearing that aided the Commission's decision-making); *Southwest Power Pool, Inc.*, 126 FERC ¶ 61,153, at P 18 (2009) (accepting answers that aided the Commission's decision-making).

[15] *PJM Interconnection, L.L.C.*, Protest of the Electric Power Supply Association, Docket Nos. ER23-729-000 and EL23-19-000, at 27 (Jan. 20, 2023) ("EPSA Protest").

[16] *PJM Interconnection L.L.C.*, Request for Clarification and Rehearing, Docket Nos. EL19-47-002 and ER21-2444-001 (Oct. 4, 2021).

[17] *See Indep. Mkt. Monitor for PJM v. PJM Interconnection, L.L.C.*, 174 FERC ¶ 61,212 (2021) (granting complaint by IMM); *Indep. Mkt. Monitor for PJM v. PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,137 (2021) (establishing replacement Market Seller Offer Cap), *order on reh'g*, 178 FERC ¶ 61,121 (2022) ("MSOC Rehearing Order").

5

Capacity Interconnection Rights issues raised by the suppliers are already in front of the Commission or recently decided by the Commission.  Here, the limited issue that PJM discovered during the most recent BRA auction process (*i.e.*, significant amount of Planned Generation Capacity Resources in the DLP-S locational deliverability area that did not offer into the 2024/2025 BRA) is not one that has ever been presented to the Commission.  If the recently discovered issue had already been in front of the Commission, PJM would not have needed to submit these emergency filings.  However, that was not the case.  Thus, the fact that PJM's filings here raise a newly discovered issue related to an incorrect input, before the capacity auction results are completed, is entirely distinguishable from the other issues raised by the protestors.  In short, PJM's filings to prospectively correct the Locational Deliverability Area Reliability Requirements, so that the demand curve is representative of the actual reliability needs of a Locational Deliverability Area ("LDA"), should not and cannot be viewed as "one-sided."

PJM did not take lightly the decision to delay the outcome of the 2024/2025 BRA and fully understands the need for market certainty as soon as possible.  However, given the potential magnitude of excess overpayments for capacity in DPL-S resulting from an incorrect Locational Deliverability Area Reliability Requirement that simply does not reflect the actual reliability requirements of the area, PJM could not sit idly by and finalize the auction results without first giving the Commission an opportunity to decide how the 2024/2025 BRA should be completed.  To that end, PJM did not, and could not, unilaterally "act swiftly and decisively to modify clearing prices that it arbitrarily deems to be too high."[18]  Rather, it is the Commission that must decide whether a potential clearing price based on an inaccurate Locational Deliverability Area Reliability

---

[18] *PJM Interconnection, L.L.C.*, Protest of LS Power Development, LLC, Docket Nos. ER23-729-000 and EL23-19-000, at 4 (Jan. 20, 2023).

Requirement for the DPL-S LDA produces a just and reasonable rate.  Given that no protester even

attempted to defend DPL-S' Locational Deliverability Area Reliability Requirement as the correct

input,[19] PJM submits that finalizing the 2024/2025 BRA with this invalid auction input does not

produce a just and reasonable rate for the reasons provided in PJM's December 23 Filings.

### A.   PJM Remains in Full Compliance with the Tariff

Neither the delay of the completion of the 2024/2025 BRA nor the fact that no auction

results have been posted violates the PJM Tariff.  As the protesters concede, the Tariff does not

specify a deadline to complete the auction or a deadline to post final auction results.[20]  Rather, the

relevant Tariff provisions states that "*[a]fter conducting the Reliability Pricing Model Auctions*,

PJM will post the results of each auction as soon thereafter as possible."[21]  In other words, the

Tariff requires PJM to post "the results of each auction as soon thereafter as possible[,]" but only

"[a]fter conducting the Reliability Pricing Model Auctions."  Here, PJM has not completed the

conduct of the 2024/2025 BRA, so the requirement to post "as soon thereafter as possible" has not

been triggered.

While the term "conducting" is not explicitly defined in the Tariff, it refers to the process

of clearing and finalizing the auction results.[22]  Notably, no protester cited to a Tariff requirement

that PJM must complete the 2024/2025 BRA by a specific deadline because there is no specific

Tariff deadline for when PJM must complete the conduct of the BRA.  For the 2024/2025 BRA,

---

[19] While EPSA and Constellation suggest that the prices in DPL-S should be high given growing penetration of Intermittent Resources and the upcoming retirement of Indian River 4 Generating Station, no defense is provided to justify the use of an incorrect Locational Deliverability Area Reliability Requirement for DPL-S.  *See* EPSA Protest at 27-28; *PJM Interconnection, L.L.C.*, Comments of Constellation Energy Generation, LLC, Docket Nos. ER23-729-000 and EL23-19-000, at 8-9 (Jan. 20, 2023) ("Comments of Constellation Energy Generation").

[20] *See* EPSA Protest at 11.

[21] Tariff, Attachment DD, section 5.11(e) (emphasis added).

[22] *See* Tariff, Attachment DD, section 5.12.

under the circumstances described in the December 23 Filings (an overstated and inaccurate Locational Deliverability Area Reliability Requirement in a small LDA due to Planned Generation Capacity Resources not participating in the auction), PJM has not completed the auction clearing process or finalized any auction results. In fact, it would be inappropriate for PJM to complete the process of conducting the 2024/2025 BRA without giving the Commission an opportunity to prospectively correct an invalid input for the DPL-S LDA before the results of the 2024/2025 BRA is completed and finalized. Thus, while PJM made preliminary price calculations based on the offers submitted during the auction window to represent that the DPL-S clearing price could be approximately four times higher than it otherwise might be, these calculations have not been completed or finalized (and are not required to be by a specified Tariff deadline). PJM suspended the auction clearing before it was completed so that the Commission has an opportunity to make a determination on the merits of PJM's proposal to update the Locational Deliverability Area Reliability Requirement used in the optimization algorithm. Consequently, the conduct of the 2024/2025 very much remains open pending Commission action on PJM's December 23 Filings. Based on the foregoing, PJM is not required to post any auction results at this time, because the process of conducting the 2024/2025 BRA has not been completed.

To be sure, PJM does not take the position that the term "as soon as possible" means it can delay posting final results indefinitely. Rather, PJM intends to promptly post the 2024/2025 BRA results after the auction is cleared and finalized (*i.e.*, after conducting the auction). As PJM made clear in the December 23 Filings, PJM is suspending the completion of the 2024/2025 pending Commission action on those filings. In the meantime, because the auction has not been completed, PJM is not required to post final results for the 2024/2025 BRA.

**B. PJM's Section 205 Filing was Appropriately Submitted in Accordance with Tariff, Section 9.2(b) Given the Imminent Severe Economic Harm That Could Result from the Application of an Incorrect Locational Deliverability Area Reliability Requirement.**

Tariff, Section 9.2(b) describes the "Rights of the Transmission Provider," and explicitly states that:

> PJM may file with less than a full 7 day advance consultation in circumstances where imminent harm to system reliability or imminent severe economic harm to electric consumers requires a prompt Section 205 filing; provided that PJM shall provide as much advance notice and consultation with the Transmission Owners and the PJM Members Committee as is practicable in such circumstances, and no such emergency filing shall be made with less than 24 hours advance notice.

PJM submitted the section 205 filing pursuant to Tariff, section 9.2(b) given the "imminent severe economic harm to electric consumers" in the DPL-S zone should load could incur capacity costs that are approximately four times the amount that the load should pay if the Locational Deliverability Area Reliability Requirement accurately reflects the reliability needs of the LDA based on actual participation seen in the auction. Here, the economic harm to electric consumers is both imminent and severe. More particularly, the economic harm is imminent because should the Commission reject the December 23 Filings, PJM will be required to complete the conduct of the 2024/2025 BRA and post auction results as soon as possible. Likewise, the economic harm of such an outcome is severe because electric consumers in DPL-S would be required to unnecessarily pay higher capacity costs of approximately four times higher than they otherwise have to pay if the correct Locational Deliverability Area Reliability Requirement for DPL-S is used as an input for the 2024/2025 BRA. This type of imminent severe economic harm is precisely what the Tariff allows PJM to fix *before* the auction results are finalized. Otherwise, severe

9

economic harm would have already resulted (and would no longer be imminent) if PJM cannot fix the identified issue prior to the results being finalized.

Constellation attempts to argue that it is not unusual for an LDA's clearing price to increase fourfold from prior BRA clearing prices so that this alone is insufficient to demonstrate imminent severe economic harm as required under Tariff, section 9.2(b).[23]   What Constellation omits, however, is that there was no economic harm to electric consumers from the prior BRA clearing prices because prior results appropriately reflected the actual supply and demand fundamentals. By contrast, the economic harm to electric consumers in DPL-S for completing and finalizing the 2024/2025 BRA with an incorrect Locational Deliverability Area Reliability Requirement that does *not* reflect actual supply and demand fundamentals is that such consumers would have to pay approximately four times what they otherwise should pay for capacity.  Therefore, comparing prior clearing prices in various LDAs to the potential 2024/2025 clearing price for DPL-S is like comparing apples and oranges as prior auction prices are simply irrelevant.  As PJM noted in the December 23 Filings, the identified issue here has never occurred prior to the auction process for the 2024/2025 BRA.

### C.  PJM's Proposed Revisions are Prospective and Do Not Violate Either the Filed Rate Doctrine or the Rule Against Retroactive Rulemaking.

The filed rate doctrine generally "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority."[24]   This doctrine is rooted in the language of the Federal Power Act: section 205(c) of the FPA, which requires utilities to file rate schedules with the Commission; and section 206(a) of the FPA, which allows the Commission to fix rates and charges.  Together, these statutory provisions require the open and

---

[23] Comments of Constellation Energy Generation at 9-10.

[24] *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981).

transparent filing of rates, limiting a public utility to charge only those rates that are on file, and broadly proscribing their retroactive adjustment, commonly referred to as the "filed rate doctrine."[25]   Courts have explained that the filed rate doctrine serves two primary purposes.[26] First, it prevents regulated companies from engaging in price discrimination between customers.[27] Second, it preserves the exclusive role of the Commission's "primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant."[28]

Derived from the filed rate doctrine is the "rule against retroactive ratemaking," which focuses on how the current rate is determined.   Specifically, under the rule against retroactive ratemaking, "even charges that are imposed prospectively, and therefore satisfy the filed rate doctrine, are improper if they are based on the [utility's] losses in a prior period."[29]   In other words, "a utility may not set rates to recoup past losses, nor may the Commission prescribe rates on that principle."[30]

1. *There Can Be No Violation Of Rule Against Retroactive Ratemaking When No Rate Has Been Established From The 2024/2025 Base Residual Auction.*

As previously noted, PJM has not completed the auction so no prices (*i.e.*, rates) have been established from the recent BRA and no Capacity Resources have been awarded any capacity commitments for the 2024/2025 Delivery Year.   Because no rate has yet been established for the

---

[25] *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1227 (D.C. Cir. 2018).

[26] 64 Am. Jur. 2d Public Utilities § 52.

[27] Courts of appeals have described the doctrine as intending "to prevent discriminatory rate payments."  *Cities Serv. Gas Co. v. FPC*, 424 F.2d 411, 417 (10th Cir.1969), *cert. denied*, 400 U.S. 801 (1970).

[28] *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. at 577-78 (quoting *City of Cleveland v. FPC*, 525 F.2d 845, 854 (D.C. Cir. 1976)); *see also Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962-63 (1986).

[29] *Pub. Util. Comm'n of State of California v. FERC*, 988 F.2d 154, 161 (D.C. Cir. 1993)

[30] *City of Piqua, Ohio v. FERC*, 610 F.2d 950, 954 (D.C. Cir. 1979) (Internal quotation marks omitted.).

2024/2025 BRA, there necessarily can be no rate to change (retroactive or not) at this time. At this point in time, no unit owner has received a capacity award, been required to take on a capacity obligation in the Delivery Year or received an entitlement to a stream of capacity revenues during the Delivery Year.   In short, the rule against retroactive ratemaking and the filed rate doctrine are simply inapplicable here because there is no rate to change and no rate change is being proposed – let alone a proposal to retroactively charge customers for "losses in a prior period"[31] or to "to recoup past losses."[32]   Further, the purpose of conducting the Reliability Pricing Model ("RPM") Auctions in advance of the Delivery Year is to provide a rate that investors can rely on in investing capital for a resource to become in-service by the start of the Delivery Year.   Given that the 2024/2025 BRA has not been completed and no results have been announced, there is no rate that any investors could validly have relied on.

2. *There Can Be No Violation Of The Filed Rate Doctrine When PJM Is Not Proposing To Retroactively Amend Any Rate Or Non-Rate Term.*

Having demonstrated that PJM's proposal makes no change to any rate, PJM now turns to the protesters' argument that the filed rate doctrine also applies to non-rate terms within the Tariff that also may not be changed retroactively.[33]   The answer is simple: the December 23 Filings do not propose any retroactive changes to non-rate terms.   As protesters noted, PJM already posted the Locational Deliverability Area Reliability Requirement in compliance with Tariff, Attachment DD, section 5.11(a).   But what appears to be lost in the protests is that PJM is not proposing to change or update a non-rate term (*i.e.*, requirement to post Locational Deliverability Area Reliability Requirement prior to conducting the BRA pursuant to Tariff, Attachment DD, section

---

[31] *Pub. Util. Comm'n of State of California v. FERC*, 988 F.2d 154, 161 (D.C. Cir. 1993).

[32] *City of Piqua, Ohio v. FERC*, 610 F.2d 950, 954 (D.C. Cir. 1979).

[33] *See Oklahoma Gas & Elec. Co. v. FERC*, 11 F.4th 821, 830 (D.C. Cir. 2021).

5.11(a)).  Indeed, it would be unnecessary to repost an updated Locational Deliverability Area Reliability Requirement for DPL-S given that this updated reliability requirement would only be used for clearing the auction and is informed by offers that have already been submitted during the bidding window.  Therefore, PJM is not proposing to change (retroactively or not) the posting requirement in Tariff, Attachment DD, section 5.11(a).

Instead, PJM is proposing to prospectively update the Locational Deliverability Area Reliability Requirement, informed by offers that have been submitted during the auction window, for purposes of completing the optimization algorithm in completing the auction clearing.  Because there is no specific Tariff deadline to complete the auction clearing, PJM has not completed the conduct of the 2024/2025 BRA pending a Commission order on the December 23 Filings.  As a result, PJM's proposal to use an updated Locational Deliverability Area Reliability Requirement for purposes of completing the auction and awarding capacity commitments is prospective and does not run afoul of the filed rate doctrine.  Furthermore, the Locational Deliverability Area Reliability Requirement is unquestionably just an input to the wholesale rate (*i.e.*, final BRA clearing price) and in this context, the Commission has held that the filed rate doctrine does not attach when updating "inputs to the wholesale rate," which "are not the ultimate rate under section 205 until . . . after the auction has cleared."[34]

Arguments that Market Participants should be allowed to adjust their Sell Offers based on an updated Locational Deliverability Area Reliability Requirement are simply unpersuasive.  The auction results are dependent on not only the demand, but what resources actually offer into the auction, so any prediction of anticipated clearing prices based on a posted Locational

---

[34] *ISO New England Inc.,* 165 FERC ¶ 61,088, at P 24 (2018) (Internal quotation marks omitted).

Deliverability Area Reliability Requirement is not guaranteed.  Market Participants that choose to make business decisions based on such speculation do so at their own risk.

In any event, the purpose of a single clearing price market is to motivate Market Sellers to submit offers based on resource's marginal costs (not inclusive of a profit margin).  Therefore, any updates to the Locational Deliverability Area Reliability Requirement should not impact a resource's offer in the RPM Auctions.  As the Independent Market Monitor for PJM ("Market Monitor") observed, for the 2024/2025 BRA, "Market [P]articipants offered competitively or were constrained to competitive offers by the market power mitigation rules, and there is no reason to believe that their offers were affected by the overstated demand."[35]  As a result, under these circumstances, the auction bidding window for the 2024/2025 BRA need not be reopened for Capacity Market Sellers to adjust their offers based on an updated Locational Deliverability Area Reliability Requirement.  The benefit of a single clearing price is that it provides an efficient investment in new generation based on the clearing price.[36]  Thus, it is ultimately the clearing price, rather than the Locational Deliverability Area Reliability Requirement, that should inform Market Participants' participation decision in the RPM Auctions.

Allowing Capacity Market Sellers to adjust their offers based on an updated Locational Deliverability Area Reliability Requirement is also plainly unworkable because changed circumstances (such as project financing or permitting) may cause some Capacity Market Sellers that previously did not offer a resource to submit a Sell Offer, or vice versa.  As a result, if the bidding window was reopened to allow Capacity Market Sellers to adjust Sell Offers, it is possible

---

[35] *PJM Interconnection, L.L.C.*, Comments of the Independent Market Monitor of PJM, Docket Nos. ER23-729-000 and EL23-19-000, at 5 (Jan. 20, 2023) ("Market Monitor's Comments").

[36] Professor Ross Baldick, Single Clearing Price in Electricity Markets (Feb. 18, 2009), http://www.cramton.umd.edu/papers2005-2009/baldick-single-price-auction.pdf.

that additional changes would be needed to further update the Locational Deliverability Area Reliability Requirement based on the auction participation from such a subsequent bidding window.  This in turn could result in a circular effect of constantly having to update the Locational Deliverability Area Reliability Requirement to give Market Participants an opportunity to adjust their Sell Offers based on revised reliability requirements.  Such an outcome would clearly be unworkable and would paralyze the conduct of the auctions.

3.  *The Filed Rate Doctrine And Rule Against Retroactive Ratemaking Are Designed To Prevent Retroactive Increases Of Rates For Power That Consumers Already Consumed.*

While courts that have considered the filed rate doctrine and the rule against retroactive ratemaking have generally proclaimed that a regulated entity cannot charge a rate for its services other than those filed with the Commission, a closer examination of the relevant case law on both the filed rate doctrine and the rule against retroactive ratemaking reveals a general prohibition for retroactively charging consumers a rate that is higher from what was the approved rate at the time the services were consumed by customers.[37]  Thus, it is notable that several courts have specified that these rules "prevent[] the Commission itself from imposing a rate *increase* for [power] already sold."[38]  In other words, "the doctrine bars the Commission from imposing after-the-fact *increases*, such as surcharges . . . ."[39]  In fact, the DC Circuit explicitly clarified that FPA "§ 206(b) *authorizes only retroactive refunds (rate decreases)*, not retroactive rate increases"[40] because this "provision

---

[37] *See e.g., Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (D.C. Cir. 2021) (utility seeking to recover costs of expanding transmission despite); *Old Dominion Elec. Coop., Inc. v. FERC*, 892 F.3d 1223 (D.C. Cir. 2018) (utility seeking to recover gas procurement costs); *Pub. Util. Comm'n of State of California v. FERC*, 988 F.2d 154 (D.C. Cir. 1993) (gas utility seeking to recover costs); *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791 (D.C. Cir. 1990) (utility seeking to retroactively charge for purchased gas); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981) (gas producers seeking to recover costs).

[38] *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (emphasis added),

[39] *Pub. Util. Comm'n of State of California v. FERC*, 988 F.2d 154, 160 (D.C. Cir. 1993) (emphasis added).

[40] *City of Anaheim v. FERC*, 558 F.3d 521, 524 (D.C. Cir. 2009) (emphasis added).

15

permits FERC-ordered refunds '*of any amounts paid . . . in excess of* those which would have been paid under the just and reasonable rate.'"[41]  Additionally, the appellate court explained that both the filed rate doctrine and the rule against retroactive ratemaking "are designed to allow *purchasers* of [power] to know the consequences of purchasing decisions they make."[42]

Thus, it is clear that when evaluating the filed rate doctrine and the rule against retroactive ratemaking, courts have focused on preventing consumers from being retroactively charged a rate that is higher than what they may have expected to pay under the filed rate for the service that was provided.  In fact, all of the appellate and Supreme Court cases advanced by the protestors involve fact patterns where the utility sought to either retroactively increase rates or retroactively amend non-rate terms (*i.e.*, tariff imposed deadlines or other rules) to collect additional revenue from customers for power already sold.[43]  As a result, the fact that PJM's proposal only serves to prospectively prevent an unjust and unreasonable rate that would otherwise cost consumers in DPL-S more than four times what they should otherwise pay is significant because no rate increase is being proposed here (nor can a change be proposed given the fact that no rate for capacity has been set for the 2024/2025 Delivery Year).

---

[41] *Id*.

[42] *Pub. Util. Comm'n of State of California v. FERC*, 988 F.2d 154, 163-64 (D.C. Cir. 1993) (emphasis added).

[43] *See e.g., Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (D.C. Cir. 2021) (utility seeking to recover costs of expanding transmission despite); *Old Dominion Elec. Coop., Inc. v. FERC*, 892 F.3d 1223 (D.C. Cir. 2018) (utility seeking to recover gas procurement costs); *Pub. Util. Comm'n of State of California v. FERC*, 988 F.2d 154 (D.C. Cir. 1993) (gas utility seeking to recover costs); *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791 (D.C. Cir. 1990) (utility seeking to retroactively charge for purchased gas); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981) (gas producers seeking to recover costs).  The sole case cited in the protesters' briefs that was brought by customer interests is inapposite to the issue at hand, because the court's review in *Towns* was limited to whether "the Commission had any discretion to withhold refunds when it discovers that a utility has imposed charges not in conformity with its rate schedules." *Towns of Concord, Norwood, and Wellesley, Mass. v. FERC*, 955 F.2d 67, 72 (D.C. Cir. 1992) ("Towns").  In *Towns*, the court held that the FPA "reveals no statutory command mandating refunds when the rate charged exceeds that filed" and simply deferred to the Commission's discretion in declining to issue refunds. *Id*.

Therefore, not only is there no precedent on the filed rate doctrine or rule against retroactive ratemaking bearing facts that resemble anything close to the circumstances presented here and what PJM is proposing, the December 23 Filings would not increase costs to customers. Additionally, the proposed revisions also do not undermine either of the two primary purposes served by the filed rate doctrine. Namely, Load Serving Entities in the DPL-S will all be charged the same rate as other Load Serving Entities in the LDA based on the final results from 2024/2025 BRA. Additionally, PJM's December 23 Filings preserves the Commission's role to ensure just and reasonable rates, and in fact, urge the Commission to satisfy its statutory obligation to ensure just and reasonable rates.

### D. Protesters' Reliance and Settled Expectation Arguments are Unpersuasive.

Having demonstrated that the proposed revisions are prospective and do not violate the filed rate doctrine or the rule against retroactive ratemaking, PJM next turns to the protesters arguments pertaining to reliance and settled expectations based on the previously posted Locational Deliverability Area Reliability Requirement. The Commission has previously explained that there is a difference between upsetting the expectations of Market Participants and retroactive ratemaking.[44] In prior cases where protestors asserted that the proposed Tariff revisions would disrupt settled expectations mid-course and harm Market Participants who relied on the existing Tariff in calculating prices and entering into contracts, the Commission has considered a "balancing of interests" or "balancing of equities" in determining the appropriate outcome.[45] Thus, "[w]here filed rate doctrine and prohibition against retroactive ratemaking concerns do not apply,

---

[44] *See ISO New England Inc.*, 148 FERC ¶ 61,185, at P 29 (2014), *reh'g denied*, 150 FERC ¶ 61,129 (2015).

[45] *See id.* (explaining that the Commission accepted proposed tariff revisions after conducting a balancing of interests and determining that proposal's benefits, which included preventing consumers from paying "for non-existent capacity or [the possibility of] fac[ing] a multi-year capacity shortfall," outweighed "market participants' reliance upon the existing FCM rules."); *see also ISO New England Inc.*, 145 FERC ¶ 61,095, at P 29 (2013) (noting the Commission has used this balancing test to accept or reject proposed tariff revisions).

the Commission has in some cases considered disruptions to parties' settled expectations in determining whether a proposal is just and reasonable."[46]

For example, the Commission previously accepted ISO New England, Inc.'s ("ISO-NE") proposed revision to allow non-commercial capacity resources to file with the Commission a request for a one-year deferral of their Capacity Supply Obligation[47] under certain circumstances *and allowed these revisions to become effective for capacity auctions that already occurred*.[48]  In accepting these changes, the Commission reasoned:

> [t]he benefits expected to result from the proposed Tariff revisions, including preventing consumers from having to pay for non-existent capacity or possibly face a multi-year capacity shortfall, outweigh market participants' reliance upon the existing [capacity market] rules that do not include a provision allowing a capacity resource to seek a one-year deferral of its Capacity Supply Obligation under certain, limited circumstances.[49]

Similarly, the Commission also accepted ISO-NE's proposed revisions to expand the definition of what constitutes a "Shortage Event"[50] to include any deficiency of thirty-minute operating reserves for thirty or more minutes, as well as modifications specific to import-constrained capacity zones.[51]  In accepting these changes to the definition of Shortage Event *even for capacity auctions that were already completed*, the Commission reasoned:

> Contrary to the tenor of Protestors' arguments, the earlier effective date would not violate the principles underlying the rule against retroactive ratemaking. The changes would apply only prospectively

---

[46] *ISO New England Inc.*, 176 FERC ¶ 61,125, at P 127 (2021).

[47] A Capacity Supply Obligation is an obligation to provide capacity from a resource, or a portion thereof, to satisfy a portion of the Installed Capacity Requirement. A Capacity Supply Obligation is acquired through a Forward Capacity Auction, a reconfiguration auction, or a Capacity Supply Obligation Bilateral.  ISO New England Inc.'s Tariff section I.2.

[48] *ISO New England Inc.*, 148 FERC ¶ 61,185, at P 29 (2014).

[49] *Id.*

[50] ISO New England, Inc.'s Shortage Event is similar to PJM's Performance Assessment Interval where committed capacity resources may be assessed Non-Performance Charges when such event is triggered.

[51] *ISO New England Inc.,* 145 FERC ¶ 61,095, at P 1 (2013).

> and after notice. To the extent that the revisions might upset the expectations of market participants (which is distinguishable from retroactive ratemaking), we are not persuaded that their reliance on the current definition outweighs the benefits expected to result from the change, i.e., helping to ensure that reserve requirements are met and system reliability is protected.[52]

In balancing the interest and equities of ISO-NE's proposed changes, the Commission found that the benefits of ensuring that reserve requirements were met and system reliability is protected, outweighed any settled expectations or market participants who relied on the previously existing definition of Shortage Event.[53]

A couple of themes can be gained from these two cases. First, the Commission has established through its past precedent that proposed changes with 60 days' notice as required by FPA section 205 constitute a prospective change and do not necessarily violate the filed rate doctrine or the rule against retroactive ratemaking *even after the capacity auction was long completed*.[54]  Second, in conducting the "balancing of interests" or "balancing of equities" tests, the Commission has focused on "preventing consumers from having to pay for non-existent capacity"[55] and protecting consumers by "ensuring that reserve requirements are met and system reliability is protected"[56] and found these consumer interests outweigh any settled expectations or reliance arguments from market sellers.

Here, PJM's December 23 Filings pass the Commission's "balancing of interests" and "balancing of equities" tests.  More particularly, PJM's proposed revisions would allow for the use of a corrected input (*i.e.*, accurate Locational Deliverability Area Reliability Requirement) to the

---

[52] *Id*. at P 28.

[53] *Id*. at P 29.

[54] *ISO New England Inc*., 176 FERC ¶ 61,125, at P 128 (2021).

[55] *ISO New England Inc*., 148 FERC ¶ 61,185, P 29 (2014).

[56] *ISO New England Inc.,* 145 FERC ¶ 61,095, at P 29 (2013).

19

final capacity rate for the DPL-S LDA.  As noted above, it is telling that no protester argued that the previously posted 2024/2025 Locational Deliverability Area Reliability Requirement for DPL-S is correct on the merits.  As the Market Monitor explains, customers "would be required to buy more capacity than required for reliability and at a price that does not reflect the actual reliability requirement."[57]  The proposed update will serve to establish a just and reasonable capacity rate for the 2024/2025 BRA and prevent consumers from having to pay unnecessarily high capacity prices that do not reflect actual supply and demand fundamentals.  Further, using an input that is, based on this record, demonstrated to be incorrect to clear the 2024/2025 BRA would undermine the very purpose of the capacity market as it would result in significant over procurement of capacity at an unreasonable cost (approximately four times greater than necessary).  Thus, the benefit of PJM's proposed revisions significantly outweigh any potential disruptions to Capacity Market Sellers' settled expectations and any harm caused by reliance on the previously posted Locational Deliverability Area Reliability Requirement.

Specifically, the posting of the Locational Deliverability Area Reliability Requirement prior to the conduct of the BRA is intended to provide transparency to Market Participants and are for informational purposes only.  Nothing in the posted Locational Deliverability Area Reliability Requirement should impact a Market Participant's offer into the RPM Auctions given the underlying reason for a single clearing price market, which is to incent Market Sellers to submit the marginal cost of the resources.  Further, any Market Participants that claim to have made irreversible business decisions based on the posted Locational Deliverability Area Reliability Requirement did so by attempting to predict the clearing price for the 2024/2025 BRA, but did so at their own risk.  That is because as the clearing price depends not just on the demand that is

---

[57] Market Monitor's Comments at 4.

represented by the Locational Deliverability Area Reliability Requirement, but also the supply (and associated offers) that participate in the auctions.  Simply put, updating a previously posted Locational Deliverability Area Reliability Requirement does not disrupt any settled expectation, because there is no guarantee of what the final BRA clearing price will be based upon the information made available prior to the auction.

The identified issue, and proposed remedy, in the December 23, 2022 Filings is entirely distinguishable from the one ISO-NE case where the Commission found that equitable considerations weighed against accepting the changes.[58]  In that proceeding, market sellers submitted their de-list bids with the expectation that the economic life of an existing capacity resource would be calculated based on the tariff rules at the time of the submittal.  Specifically, under the then effective tariff rules, the economic life calculation assumed that an existing capacity resource that earned positive cash flows in the earlier years would continue to operate and sustain negative cash flows in later years as long as its overall cumulative cash flows remained positive.[59]  However, ISO-NE proposed to modify the economic life calculation to reflect that a competitive resource facing years of continual losses will seek to exit the Forward Capacity Market ("FCM") before incurring those losses that reduce its cumulative profits.[60]  In rejecting that proposal, the Commission found that the potential disruptions to market participants' settled expectations and harm caused by reliance on existing economic life calculation outweighed the benefit of updating the economic life calculation.[61]  ISO-NE's proposal in this case would be akin to PJM proposing changes to how the unit-specific Market Seller Offer Cap is calculated after the deadline for Market

---

[58] *ISO New England Inc.*, 170 FERC ¶ 61,187, at P 15 (2020).

[59] *Id.* at P 4.

[60] *Id.* at P 5.

[61] *Id.* at P 17.

Sellers to submit unit-specific Market Seller Offer Cap. Clearly, such a proposal would create severe disruptions to any settled expectations and cause harm to those who relied on the rules prior to the unit-specific deadline as it would limit the price that Capacity Market Sellers can offer resources into the RPM Auctions after they already submitted unit-specific offer caps for review and approval under a different set of rules. However, what PJM is proposing in the December 23 Filings is far more limited, has a much smaller impact on the overall market, and allows an updated input (*i.e.*, Locational Delivery Area Reliability Requirement) to be used in the auction clearing that is reflective of the actual reliability needs in the LDA.

Likewise, the Commission's order in *Maryland Public Service Commission* cited by certain protesters is also unavailing.[62] In that case, the Commission denied a complaint submitted by a group of capacity buyers who alleged that PJM's capacity auction results for four previously conducted BRAs should be re-determined.[63] In dismissing that complaint, the Commission explained that "changing a rate already determined in accordance with existing tariff provisions on which parties have relied would defeat the purpose of the forward binding commitment and undo the incentives for new capacity resources."[64] Clearly, the circumstances presented in PJM's December 23 Filings are completely different from the *Maryland Public Service Commission* case given that no rate from the 2024/2025 BRA has been determined or announced so no parties could have relied on such a nonexistent rate. Similarly, the *Public Citizen v. MISO* case cited by EPSA

---

[62] *Maryland Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, 124 FERC ¶ 61,276 (2008), *reh'g denied*, *Maryland Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, 127 FERC ¶ 61,274 (2009).

[63] *Id*.

[64] *Id*. at P 6.

is also taken out of context as there, the Commission was simply explaining that it did not need to review and approve auction results before they became final.[65]

In sum, the Commission has the authority and ability to "require or approve changes in rates or market designs that may in some ways be counter to investor expectations in order to ensure that rates are just and reasonable."[66] Here, the Commission can and should accept PJM's December 23 Filings, because the benefits of PJM's proposal (*i.e.*, reflecting actual supply and demand fundaments to ensure just and reasonable rates) are great while there can be little, if any, settled expectations or harm caused by relying on a previously posted Locational Deliverability Area Reliability Requirement. This is the appropriate approach to the balancing test that the Commission applies when addressing broad claims of settled expectations of the parties.

### E. The Commission Has Broad Statutory Authority to Ensure Just and Reasonable Rates under Section 309 of the Federal Power Act.

As clearly explained by the courts, the filed rate doctrine rests on two provisions of the FPA: section 205(c), which allows utilities to file rate schedules with the Commission, and section 206(a), which allows the Commission to fix rates and charges.[67] In other words, the filed rate doctrine and rule against retroactive ratemaking apply only to retroactive rates arising under sections 205 and 206 of the FPA. Neither the filed rate doctrine nor the rule against retroactive ratemaking bars the Commission from its broad statutory authority under section 309 of the FPA.

---

[65] *Pub. Citizen, Inc. v. Midcontinent Inde. Sys. Operator, Inc.*, 168 FERC ¶ 61,042 at P 89 (2019) (rejecting Public Citizen's argument that the Commission must review electric market clearing prices before the rate goes into effect to determine if the rate is just and reasonable "because, in the market-based rate context, the rate on file with the Commission is the Tariff describing the Auction procedures, not the prices that may change over time").

[66] *PJM Interconnection, L.L.C.*, 179 FERC ¶ 61,161, at P 23 (2022)

[67] *Towns of Concord, Norwood, & Wellesley, Mass. v. FERC*, 955 F.2d 67, 71-72 (D.C. Cir. 1992).

In particular, under FPA section 309(h), the Commission is vested with "broad remedial power" to perform "'any and all acts' 'necessary or appropriate' to carry out the FPA's statutory ends."[68]

In fact, the Commission itself explained that "courts have recognized that section 309 of the FPA provides the Commission with broad remedial authority, *including the ability to act retroactively to correct unjust situations* and to ensure that what 'should have been done' is done."[69]  Further, in stating that "[i]t is long-established that the primary aim [of the FPA] is the protection of consumers from excessive rates and charges,"[70] the DC Circuit explained that section 309 "vests the Commission with broad remedial authority . . . [and] unquestionably gives [the Commission] the authority, in fashioning remedies, to consider equitable principles."[71]  Courts have thus "endorsed FERC's authority under Section 309 to recoup erroneous refunds, to order refunds where the rate paid exceeds the filed rate, and to imply a refund protection where the Commission erred in accepting a tariff revision that lacked such a commitment."[72]  Therefore, as noted in PJM's December 23 Filing,[73] along with sections 205 and/or 206 of the FPA, section 309 of the FPA vests broad authority with the Commission to ensure that the final capacity rate associated with the 2024/2025 BRA is just and reasonable, should the Commission elect to invoke section 309 of the FPA in this proceeding.

---

[68] *Ameren Illinois Co. v. FERC*, No. 20-1277, 2023 WL 363887, at *1-2 (D.C. Cir. 2023).

[69] *Black Oak Energy, LLC*, 167 FERC ¶ 61,250, at P 16 (2019).

[70] *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016)

[71] *Id*. at 954-55.

[72] *Verso Corp. v. FERC*, 898 F.3d 1, 10 (D.C. Cir. 2018) (citations omitted).

[73] *See PJM Interconnection, L.L.C.,* Complaint Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area in the 2024/2025 Base Residual, Docket No. EL23-19-000, at 42 (Dec. 23, 2022).

**F. *Identified Issues Could Not Have been Reasonably Foreseen Prior to the Close of the 2024/2025 Offer Window.***

Various protesters attempt to lay blame on PJM for not discovering the identified issue prior to the start of the 2024/2025 BRA.  In essence, the protesters claim that PJM should have foreseen the identified issues prior to the start of the 2024/2025 BRA because Capacity Market Sellers provide notices of intent to participate prior the each auction and based on PJM's own sensitivity analysis.  Each of the reasons provided are flawed and unpersuasive.

1. *Certifications For Buyer Side Market Power And Conditioned State Support Do Not Commit Market Sellers To Offer Such Resources Into The RPM Auctions.*

Certain protesters argue that PJM should have been able to know whether Planned Generation Capacity Resources would have offered into the 2024/2025 BRA based on the certifications made for purposes of the Minimum Offer Price Rule ("MOPR"), which are submitted well in advance of the auction.[74]  While it is true that all Capacity Market Sellers are required to "certify to the Office of Interconnection for each Generation Capacity Resource the Capacity Market Seller intends to offer into the RPM Auction,"[75] this requirement exists for the sole purpose of determining whether a Generation Capacity Resource is receiving a state subsidy and therefore whether it could potentially be subject to the Minimum Offer Price Rule.  In fact, a Capacity Market Seller is not precluded from offering into the auction even if it does not make a MOPR certification by the relevant deadline.  Instead, the resource that was not the subject of a certification would simply be subject to the MOPR and required to offer above the relevant floor price.[76]  More importantly, even if a Capacity Market Seller submitted a certification that it

---

[74] *PJM Interconnection, L.L.C.*, Protest of the Clean Energy Associations, Docket Nos. ER23-729-000 and EL23-19-000, at 15 (Jan. 20, 2023).

[75] Tariff, Attachment DD, section 5.14(h-2)(1)(A).

[76] *See* Tariff, Attachment DD, section 5.14(h-2)(1)(C).

intended to offer a resource into the auction, such Capacity Market Seller is not bound to actually offer into the auction.  An intent to offer is different from a commitment to offer, so Capacity Market Sellers cannot be bound to offer into the RPM Auction simply because they certified that they intended to offer into the auction, particularly given that the capacity must offer requirement only applies to Existing Generation Capacity Resources and not Planned Generation Capacity Resources.[77]

> 2. *Notice Of Intent To Offer From Planned Generation Capacity Resources Do Not Commit Market Sellers To Offer Such Resources Into The Rpm Auctions.*

Protesters also argue that PJM solicits a notice of intent to offer from Capacity Market Sellers of Planned Generation Capacity Resources prior to the RPM Auctions so PJM could have known which resources would not be participating in the auction prior to 2024/2025 BRA.[78]  Like the MOPR certifications discussed above, a notice of intent to offer is not binding and does not commit a Capacity Market Seller to offer a Planned Generation Capacity Resource into the auction.  More importantly, the notice of intent to offer is requested by PJM only for Planned Generation Capacity Resources that have not executed an Interconnection Service Agreement prior to the auction (but has either an executed Facilities Study Agreement or System Impact Study Agreement).  Additionally there is no Tariff requirement for Market Participants to provide this notification so any notice of intent to offer cannot be binding.  The sole reason this information is requested is because only resources with executed Interconnection Service Agreements are automatically modeled in PJM's "Capacity Exchange" software.  As a result, this notice of intent allows other new resources that also qualify as Planned Generation Capacity Resources to be

---

[77] See Tariff, Attachment DD, section 6.6(a).

[78] *PJM Interconnection, L.L.C.*, Comments of Invenergy, Docket Nos. ER23-729-000 and EL23-19-000, at 6-7 (Jan. 20, 2023).

modeled in "Capacity Exchange" so that they can be offered into the RPM Auctions. In short, the solicitation for the notice of intent to offer is requested from a limited pool of Planned Generation Capacity Resources, and the mere intent to offer does not commit a resource to offer.

> 3. *PJM's Sensitivity Analysis For The 2023/2024 BRA Provides No Basis For Predicting How Capacity Market Sellers Would Actually Offer In The 2024/2025 Base Residual Auction.*

P3 and its expert, Dr. Roy Shanker, among others, argue that the recently identified issue could have been predicted by PJM given its own sensitivity analysis.[79] This argument is flawed because PJM could not foresee whether Capacity Market Sellers would have offered their Planned Generation Capacity Resources into the 2024/2025 BRA prior to any offer window opening. As noted above, the capacity market's must offer rules do not apply to Planned Generation Capacity Resources, so it is only until after the offer window closes that PJM will know with any certainty whether such resources were offered or not into the auction.

As a result, PJM's analysis where one scenario showed that that price could reach the cap in DPL-S is irrelevant to the issue identified in the December 23 Filings. The nine scenario assumptions in PJM's sensitivity analysis studied the impacts from changes in capacity supply, which could have resulted in any number of reasons. In other words, the analysis was not focused on the potential for an incorrect Locational Deliverability Area Reliability Requirement where Planned Generation Capacity Resources that were modeled in the studies did not offer into the auction. At the end of the day, no study could have predicted what Capacity Market Sellers would have offered (or not offered) into the RPM Auctions until the bidding window closes. Thus, PJM could not have predicted how many Planned Generation Capacity Resources would have actually offered into the 2024/2025 BRA irrespective of any sensitivity analysis that was conducted with

---

[79] P3 Protest at 7; *see also id.* at 38-40 ("Shanker Affidavit").

various scenarios.  In short, the large quantity of Planned Generation Capacity Resources that were modeled within a small LDA that did not participate was unprecedented and could not have reasonably be foreseen prior to the close of the auction window.

### G.  PJM's Proposal to Address the Identified Gap in the Tariff Is Just and Reasonable

As thoroughly explained in PJM's December 23 Filings, the Locational Deliverability Area Reliability Requirement used in the RPM Auctions would not accurately reflect the actual reliability needs of the LDA (in this case DPL-S) where Planned Generation Capacity Resources have an outsized impact to the reliability needs in a small LDA and such resources do not participate in the RPM Auction.  The use of a flawed Locational Deliverability Area Reliability Requirement would produce a VRR Curve that provides improper market signals (*i.e.*, signaling the need for additional capacity to account for potential forced outages associated with an outsized resource for a small LDA).  PJM's proposed solution represents a just and reasonable approach to reflect the actual participation of Planned Generation Capacity Resources in the Locational Deliverability Area Reliability Requirement so that it produces a VRR Curve that is representative of the actual reliability needs of the LDA.

1. *PJM's Proposal To Exclude Planned Generation Capacity Resources That Did Not Offer From An Updated Locational Deliverability Area Reliability Requirement Is Just And Reasonable.*

P3 erroneously asserts that PJM's proposal to exclude only Planned Generation Capacity Resources when updating the Locational Deliverability Area Reliability Requirement does not address the identified issue because Intermittent Resources were omitted from this exclusion.[80]  To the contrary, an Intermittent Resource is defined in the Tariff as "a *Generation Capacity Resource* with output that can vary as a function of its energy source, such as wind, solar, run of river

---

[80] P3 Protest at 39.

hydroelectric power and other renewable resources."[81]   In turn, the Planned Generation Capacity

Resource is defined as "a Generation Capacity Resource" that has not cleared an RPM Auction

and meets certain milestones.[82]   Therefore, new Intermittent Capacity Resources that do not offer

into the RPM Auctions are clearly included in PJM's proposal of excluding Planned Generation

Capacity Resources that do not offer from the updated Locational Deliverability Area Reliability

Requirement.   As such, PJM's proposal does address the issue identified in the December 23

Filings.

Moreover, arguments that PJM's proposal is flawed because it focuses on resources that

participated in the auction are also unpersuasive.   Planned Generation Capacity Resources that do

not participate in the auction necessarily means that the load would not rely on such resources as

capacity for the relevant Delivery Year.   As a result, such resources are appropriately excluded

from the Locational Deliverability Area Reliability Requirement if they did not participate in the

auction because even if such resources were in-service by the start of the Delivery Year, there is

no need to model the reduced reliability of such thermal resources (from risk of forced outages) or

Intermittent Resources (from misalignment of output with the riskiest hours of the year) since load

is not depending on them as capacity resources.   This means that should such resource be on an

outage or there is a misalignment of output with the riskiest hours, the Capacity Emergency

Transfer Objective does not need to be adjusted to account for those resources that did not

participate in the RPM Auction to meet a loss of load expectation.

---

[81] Tariff, Definitions I-J-K (emphasis added.)

[82] *See* RAA Definitions, Planned Generation Capacity Resource.

Removing resources that did not participate in the auction from the Locational Deliverability Area Reliability Requirement, rather than those that cleared the auction, is also the appropriate focus because resources that participated would necessarily have cleared the auction. This is because when an LDA's Locational Deliverability Area Reliability Requirement is overstated due to Planned Generation Capacity Resources that did not participate in the auction, any resources that do offer would in all likelihood clear the auction. Therefore, PJM's proposal to excluded Planned Generation Capacity Resources that do not participate in the RPM Auctions accomplishes the objective of correctly reflecting the actual reliability needs of a LDA in an updated Locational Deliverability Area Reliability Requirement. This approach has the added benefit of removing such Planned Generation Capacity Resources from the Locational Deliverability Area Reliability Requirement *prior* to clearing the auction.

2.  *PJM's Proposed Materiality Threshold Is Just And Reasonable.*

Contrary to the protesters contention that applying a one percent materiality threshold as a trigger for the proposed revision is arbitrary, using one percent as the standard is reasonable, because it is the cumulative addition of sufficiently large Planned Generation Capacity Resources in a small LDA that causes the identified issue. Thus, because the identified issue is more prevalent in a small LDA, it is in those small LDAs that is targeted by a one percent change in Locational Deliverability Area Reliability Requirement, which would be more easily triggered by a one percent threshold. It is not necessarily to apply PJM's proposed solution in every LDA because in larger LDAs, impacts from Planned Generation Capacity Resources not being offered into the RPM Auctions is immaterial, and does not require updating the Locational Deliverability Area Reliability Requirement. Thus, PJM's proposed trigger is a reasonable and targeted means to

30

address the identified issue in small LDAs without having to arbitrarily define a MW value for what constitutes a small LDA.

While certain protesters suggest this trigger should be higher so it narrowly targets only DPL-S,[83] PJM believes it is prudent to propose a one percent threshold in the event future updates are necessary in other LDAs.  To be clear, DPL-S is the only LDA with a Locational Deliverability Area Reliability Requirement that increased by more than one percent for the 2024/2025 BRA.  As a result, the proposed revision would only be applied to DPL-S for the 2024/2025 BRA.  However, the one percent materiality threshold works to avoid anomalies that could significantly impact prices in the future.  PJM only needs to propose a just and reasonable materiality threshold, which it did in the December 23 Filings.[84]  The Commission "is not required to choose the best solution, only a reasonable one."[85]

3. *The Market Monitor's "Preferred Approach" May Be A Viable Alterative That Could Potentially Be Applied To Future RPM Auctions After The 2024/2025 Base Residual Auction.*

PJM maintains that the proposal advanced in the December 23 Filings are just and reasonable.  Indeed, the Market Monitor agreed that "it would successfully address the issue with the current auction results in an effective and efficient way and permit the posting of final auction results quickly."[86]  Moreover, it is the only workable proposal that can prospectively remedy the identified issue beginning with the 2024/2025 BRA.

---

[83] Comments of Constellation Energy Generation at 20.

[84] *See PJM Interconnection, L.L.C.*, 147 FERC ¶ 61,103, at P 59 (2014).

[85] *Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) ("FERC is not required to choose the best solution, only a reasonable one."); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) ("FERC has interpreted its authority to review rates under the FPA as limited to an inquiry into whether the rates proposed by a utility are reasonable—and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs.")

[86] Market Monitor's Comments at 5.

31

Nonetheless, PJM acknowledges that the Market Monitor's "preferred approach," which was also proposed by certain other protesters, could be considered for future RPM Auctions. Specifically, requiring all Planned Generation Capacity Resources to commit to a must offer requirement by a defined date prior to the posting of auction parameters is a possible alternative solution, but it should not be applied for the 2024/2025 BRA as it would require restarting the entire auction process. Given that the 2024/2025 Delivery Year begins in less than one and a half years, it would not be prudent to further delay this auction. In fact, even the Market Monitor makes clear that it "supports the immediate implementation of PJM's solution to clearing the 24/25 Base Residual Auction" and only asks the Commission to consider this approach for future auctions.[87] As such, the Commission should accept PJM's section 205 filing consistent with its long-standing section 205 standard of review so that PJM can complete the auction under the proposed rules for the 2024/2025 BRA. Meanwhile, PJM can further explore the merits of the Market Monitor's proposal through the stakeholder process and submit a subsequent section 205 filing as appropriate.

### H. The 2025/2026 BRA Does Not Need to Be Delayed

Leeward Renewable Energy, LLC and Leeward Renewable Energy Development, LLC ("Leeward") argue that the 2025/2026 BRA should be delayed until the 2024/2025 BRA is completed and finalized.[88] A speedy resolution of the December 23 Filings will not require a delay of the 2025/2026 BRA (as well as potentially additional BRAs beyond just the 2025/2026 BRA). The RPM Auctions have been delayed through a variety of regulatory proceedings, so the 2025/2026 BRA that is set to commence on June 14, 2023 is already one year behind schedule.

---

[87] Market Monitor's Comments at 6.

[88] *PJM Interconnection, L.L.C.*, Protest of Leeward, Docket Nos. ER23-729-000 and EL23-19-000, at 11 (Jan. 20, 2023) ("Leeward Protest").

While it may not be ideal to begin pre-auction activities prior to the completion of the 2024/2025 BRA, the pre-auction activities for the 2025/2026 BRA can proceed as currently scheduled.

There is only a limited amount of Planned Generation Capacity Resources that were offered into the 2024/2025 BRA, and would be subject to the must offer requirement as an Existing Generation Capacity Resource if those resources clear the 2024/2025 BRA.  That is because a majority Planned Generation Capacity Resources, including Leeward's "portfolio of 24 renewable energy facilities across nine states totaling approximately 2,500 megawatts"[89] are Intermittent Resources that would not be subject to the capacity market must offer requirement in the first place. For the few resources that may be subject to the must offer requirement, if they clear the 2024/2025 BRA for the first time, Capacity Market Sellers of such resources could request a unit-specific offer cap prior to the existing deadline (February 14, 2023).  In the event those resources did not actually clear the auction, then Capacity Market Sellers of such resources would be treated as a Planned Generation Capacity resource, and not be subject to the must offer requirement.  Likewise, Capacity Market Sellers that may consider deactivating a resource and request an exception from the must offer requirement could submit a request prior to the existing deadline.  In the event Capacity Market Sellers changes their mind on deactivating based on the 2024/2025 BRA results, they can simply withdraw the deactivation notice, and continue to participate in the 2025/2026 BRA given that a must offer request does not bind a Capacity Market Seller to deactivate a resource, and later prohibit such resource's participation in the RPM Auctions.

PJM urges the Commission to promptly resolve the issued identified in the December 23 Filings so that the 2024/2025 BRA can be completed and subsequent auctions do not need to be further

---

[89] Leeward Protest at 3.

delayed.  Notwithstanding, the Commission may need to consider delaying subsequent BRAs in the event PJM's proposed revisions, or an alternative remedy, is not accepted by February 22, 2023.

## III.    CONCLUSION

For the reasons provided herein, the Commission should accept PJM's section 205 filing. In the alternative, should the Commission prefer a different solution, it can grant PJM's section 206 filing and direct PJM to submit a compliance filing with the Commission's preferred solution so that the changes can be prospectively applied to the 2024/2025 BRA.

Respectfully submitted,

*/s/ Chenchao Lu*

Craig Glazer
Vice President – Federal Government Policy
PJM Interconnection, L.L.C.
1200 G Street, N.W.
Suite 600
Washington, D.C.  20005
(202) 423-4743
Craig.Glazer@pjm.com

Chenchao Lu
Assistant General Counsel
PJM Interconnection, L.L.C.
2750 Monroe Boulevard
Audubon, PA  19403
(610) 666-2255
Chenchao.Lu@pjm.com

*On behalf of*
*PJM Interconnection, L.L.C.*

34

**JA600**

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Audubon, PA this 2nd day of February 2023.

_/s/ Chenchao Lu_
Chenchao Lu

35

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | Docket No. ER23-729-000 |
|  | ) |  |
| PJM Interconnection, L.L.C. | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| PJM Interconnection, L.L.C. | ) | Docket No. EL23-19-000 |
|  | ) |  |

**ANSWER AND MOTION FOR LEAVE TO ANSWER**
**OF THE INDEPENDENT MARKET MONITOR FOR PJM**

Pursuant to Rules 212 and 213 of the Commission's Rules and Regulations,[1] Monitoring Analytics, LLC, acting in its capacity as the Independent Market Monitor ("Market Monitor") for PJM Interconnection, L.L.C. ("PJM"),[2] submits this answer to the comments and protests submitted in this proceeding on January 20, 2023.

The Market Monitor supports PJM's comments on the legal questions related to the filed rate doctrine. The Market Monitor's answer focuses on the policy and market design issues raised by some commenters.

**I.  ANSWER**

The policy objections to PJM's filing from a range of participants are hyperbolic and misplaced. PJM's filing would apply an objective rule to ensure that the results of the BRA

---

[1]    18 CFR §§ 385.212 & 385.213 (2022).

[2]    Capitalized terms used herein and not otherwise defined have the meaning used in the PJM Open Access Transmission Tariff ("OATT"), the PJM Operating Agreement ("OA") or the PJM Reliability Assurance Agreement ("RAA").

for DPL-S reflect the actual supply and demand of capacity in the LDA. That should be the goal of all parties interested in ensuring that the PJM capacity market is effective, efficient and competitive.

Parties make far ranging accusations including that PJM's actions will cause financial harm, will undermine confidence in markets, will damage market integrity, will undermine the commitment to competitive markets, will damage market certainty, will undermine confidence in RTO markets, will have cascading effects on future PJM auctions and potentially on system reliability, will vitiate FERC-regulated markets; and will have far reaching implications in every market for years to come with increased costs and reduced reliability associated with profound regulatory uncertainty.[3] Parties also impugn PJM's motives, including asserting that PJM's proposal reflects PJM's desire to change the auction results, reflects PJM's preference for a different result and demonstrates PJM's concern "about out-sized financial consequences to a small percentage of PJM's load for a single planning year."[4] One filing stated, without evidence, that "PJM has repeatedly demonstrated, and continues to demonstrate in the December 23 Filings, a bias towards actions that will push down prices while failing to make fixes, much less timely fixes, needed to ensure that

---

[3]    *See* Protest and Comments of the American Clean Power Association, et al., Docket No. ER23-729-000, et al. (January 20, 2023); Comments of Constellation Energy Generation, LLC, Docket No. ER23-729-000 (January 20, 2023); Protest of the Electric Power Supply Association (EPSA), Docket No. ER23-729-000, et al. (January 20, 2023) ("EPSA"); Motion to Intervene and Comments of Invenergy Wind Development North America LLC, et al., Docket No. ER23-729-000, et al. (January 20, 2023); Motion to Intervene and Protest of Leeward Renewable Energy, LLC, et al., Docket No. ER23-729-000, et al. (January 20, 2023); NRG Power Marketing LLC, et al, Docket No. ER23-729-000, et al. (January 20, 2023); Protest of Pine Gate Renewables, LLC, Docket No. ER23-729-000, et al. (January 20, 2023); Protest of the PJM Power Providers Group, Docket No. ER23-729-000, et al. (January 20, 2023) ("Power Providers"); and Protest of Vistra Corp., Docket No. ER23-729-000, et al. (January 20, 2023).

[4]    *Id.*

resources necessary for reliability have the opportunity and incentive to remain in the market."[5]

Constellation's basic assertions are that the identified issues with the auction results were "foreseeable and in line with prior clearing prices." Regardless of whether the issue was foreseeable, failing to correct the identified issues would not result in prices that were in line with prior prices and it would be irrelevant even if true. The standard is whether the prices that PJM ultimately posts are a result of the actual supply of and demand for capacity in DPL-S. PJM's proposal meets that standard.

EPSA's wide ranging assertions are unsupported, including that PJM's proposed modifications "would make it impossible for market participants to rely on the auction parameters posted by PJM ahead of each auction, deter bilateral contracting and investments, and result in prices that do not reflect reliability needs." [6]

Some parties assert that the auction needs to be rerun as a result of PJM's filing. The 2024/2025 Base Residual Auction does not need to be rerun. Market participants offered competitively or were constrained to competitive offers by the market power mitigation rules, and there is no reason to believe that their offers were affected by the overstated demand. Market offers were competitive. Market offers in a rerun auction would be expected to be the same. No party that supported rerunning the auction offered any reason to believe otherwise. Market participants are not entitled to confirmation of their assumptions about the MW of supply that will actually offer. The assertion that PJM's parameters are a determinant of participant offer behavior is not consistent with competitive behavior in a competitive market. Competitive offers are not a function of CETO or CETL or any of the other parameters. Competitive offers are a function of the marginal costs of providing capacity.

---

[5]    EPSA at 2.

[6]    *Id.*

The underlying assertion of the objecting parties is that prices that will result from PJM's proposal are wrong. But that assertion is incorrect. Again, the standard is whether the prices that PJM ultimately posts are a result of the actual supply of and demand for capacity in DPL-S. PJM's proposal meets that standard. The prices resulting from PJM's proposal will correctly reflect supply and demand and are therefore the only correct prices in this situation. If the prices are correct, the market incentives are correct and consistent with reliability needs.

Some participants provided more constructive approaches, including that PJM's proposed solution be limited to this auction, that a 206 filing on larger issues be required and that the rules be modified to ensure that the parameters are consistent with offers.[7]

The Market Monitor's position is consistent with these approaches.[8] While PJM's solution is not perfect, it would successfully address the issue with the current auction results in an effective and efficient way and permit the posting of final auction results quickly. The Market Monitor supports the immediate implementation of PJM's solution to clearing the 2024/2025 Base Residual Auction under the 205 and the 206 approaches.

If the Commission takes the FPA 206 approach, the Market Monitor requests that the Commission adopt PJM's solution to clearing the 2024/2025 BRA and include the preferred approach in place of PJM's proposed materiality threshold for application to future auctions.

The preferred approach would be to require all planned resources to commit to a must offer requirement by a defined date prior to the posting of auction parameters by PJM. This would avoid the arbitrary determination of materiality and directly address an important part of the issue.

---

[7]    *See* Comments of the PSEG Companies, Docket No. ER23-729-000, et al. (January 20, 2023); Power Providers (Shanker Affidavit) at 6.

[8]    *See* Comments of the Independent Market Monitor for PJM, Docket No. ER23-729-000, et al. (January 20, 2023) at 6-7.

## II.  MOTION FOR LEAVE TO ANSWER

The Commission's Rules of Practice and Procedure, 18 CFR § 385.213(a)(2), do not permit answers to answers or protests unless otherwise ordered by the decisional authority. The Commission has made exceptions, however, where an answer clarifies the issues or assists in creating a complete record.[9] In this answer, the Market Monitor provides the Commission with information useful to the Commission's decision making process and which provides a more complete record. Accordingly, the Market Monitor respectfully requests that this answer be permitted.

## III. CONCLUSION

The Market Monitor respectfully requests that the Commission afford due consideration to this pleading as the Commission resolves the issues raised in this proceeding.

Respectfully submitted,

_(signature)_

Joseph E. Bowring
Independent Market Monitor for PJM
President
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403

Jeffrey W. Mayes

General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403

---

[9]  See, e.g., PJM Interconnection, L.L.C., _119 FERC ¶61,318 at P 36 (2007) (accepted answer to answer that "_provided information that assisted … decision-making process")_; California Independent System Operator Corporation_, 110 FERC ¶ 61,007 (2005) (answer to answer permitted to assist Commission in decision-making process); New Power Company v. PJM Interconnection, L.L.C., 98 FERC ¶ 61,208 (2002) (answer accepted to provide new factual and legal material to assist the Commission in decision-making process); N.Y. Independent System Operator, Inc., 121 FERC ¶61,112 at P 4 (2007) (answer to protest accepted because it provided information that assisted the Commission in its decision-making process).

(610) 271-8051
*joseph.bowring@monitoringanalytics.com*

(610) 271-8053
*jeffrey.mayes@monitoringanalytics.com*

Dated: February 3, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Eagleville, Pennsylvania,
this 3rd day of February, 2023.

Jeffrey W. Mayes
General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610)271-8053
*jeffrey.mayes@monitoringanalytics.com*

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|                              |   |                            |
|------------------------------|---|----------------------------|
|                              | ) | Docket No. ER23-19-000     |
| PJM Interconnection, L.L.C.  | ) | Docket No. ER23-729-000    |
|                              | ) |                            |
|                              | ) | (not consolidated)         |

**MOTION FOR LEAVE TO ANSWER AND ANSWER OF**
**PUBLIC INTEREST ORGANIZATIONS**

Pursuant to Rules 212 and 213 of the Federal Energy Regulatory Commission's

("Commission" or "FERC") Rules of Practice and Procedure,[1] the Natural Resources Defense

Council and Sierra Club ("Public Interest Organizations" or "PIOs") respectfully submit this

motion for leave to answer and answer regarding PJM's December 23, 2022 filings under

Section 205 and 206 of the Federal Power Act.[2]  PJM's filings arise from extraordinary

circumstances and reflect appropriate action to send accurate and reasonable price signals in the

DPL-S zone of PJM's capacity market.  Many parties, including the PJM Independent Market

Monitor and 13 of 14 state regulatory commissions, support the changes requested in PJM's

filings.

Sierra Club and NRDC file this answer to address arguments raised in several protests

that PJM has not sufficiently shown imminent, severe economic harm, and to provide additional

---

[1] 18 C.F.R. §§ 385.212 & 385.213 (2017).

[2] *PJM Interconnection, L.L.C.*, Docket No. ER23-729-000, Proposed Amendment to the
Locational Deliverability Area Reliability Requirement Filed Pursuant to section 205 of the
Federal Power Act, Request for Waiver of Notice Requirement, and Request for an Extended
Comment Period of 28 Days ("PJM 205 Filing"); *PJM Interconnection, L.L.C.*, Docket No.
EL23-19-000, Section 206 Filing Alleging that the Locational Deliverability Area Reliability
Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability
Area in the 2024/2025 Base Residual Auction and Requesting that the Commission Establish a
Refund Effective Date of December 23, 2022, and Request for an Extended Comment Period of
28 Days ("PJM 206 Filing").

context to the Commission on the remedies that certain parties urge be adopted under Section 206.

## MOTION FOR LEAVE TO ANSWER

Although the Commission's procedural rules generally do not allow for answers,[3] the Commission has accepted answers that facilitate the decisional process or aid in the explication of issues, and has explained that it will accept answers that "assist[] in our decision-making process."[4] The Natural Resources Defense Council and Sierra Club respectfully request that the Commission accept this answer to clarify the record and address specific issues raised by other protests and comments.

## ANSWER

### I.  PJM's proposed tariff change would avoid imminent, severe economic harm to consumers on the Delmarva peninsula.

PJM's initial filings, as well as the pleadings in this case, contain extensive discussion of the applicability of the filed rate doctrine, and its exceptions, to this matter.  We do not seek to repeat these arguments, but rather to offer the Commission additional information relevant to a dispute among parties about whether the auction results would cause imminent, severe economic harm.

---

[3] 18 C.F.R. §§ 385.213(a)(2), 385.713(d)(1).
[4] *Columbia Gas Transmission, LLC*, 146 FERC ¶ 61,116, at P 1, n.3 (2014), *pet. for review denied*, *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267 (D.C. Cir. 2015); *see also Algonquin Gas Transmission Co.,* 83 FERC ¶ 61,200, at 61,893, n.2 (1998) (accepting an answer in order to ensure "a complete and accurate record"), *order amending certificate*, 94 FERC ¶ 61,183 (2001); *Transwestern Pipeline Co.*, 50 FERC ¶ 61,211, 61,672, n.5 (1990) (citing *Buckeye Pipe Line Co.*, 45 FERC ¶ 61,046 (1988)) (accepting answer "where consideration of matters sought [will be] addressed in the answer will facilitate the decisional process or aid in the explication of issues.").

As PJM explains, Section § 9.2(b) of its Open Access Transmission Tariff (OATT) enables it to make a "prompt Section 205 filing" in order to prevent "imminent severe economic harm to electric consumers."  PJM contends that this tariff provision constitutes "prior notice to customers that PJM may seek Commission approval of tariff modifications where "imminent severe economic harm to electric consumers requires a prompt Section 205 filing." PJM 205 Filing at 28.

PJM explains that the estimated clearing price based on preliminary auction data "would be more than four times what the clearing price should be if the Planned Generation Capacity Resources that did not offer in the auction are excluded from the Locational Deliverability Area Reliability Requirement given that they did not offer into the BRA."[5] PJM does not state what the clearing price, or the alternative accurate price, would be, but notes that the DPL-S cleared in the last auction at $69.95/MW-day.[6]  Several protestors contend that Tariff § 9.2(b) does not provide sufficient notice to stakeholders to serve as an exception to the filed rate doctrine because PJM has not made a sufficient showing of "imminent, severe economic harm" in this case.[7]  However, the economic conditions faced by the consumers most directly affected by this

---

[5] PJM 205 Filing at 2.

[6] PJM 205 Filing at 2-3 (citing *PJM 2023/2024 RPM Base Residual Auction Results*, PJM Interconnection, L.L.C. (June 21, 2022), https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2023-2024/2023-2024-base-residualauction-report.ashx).

[7] *See, e.g.*, Protest of the PJM Power Providers Group, Docket No. ER23-729, et al., at 21 (Jan. 20, 2023), Accession No. 20230120-5248 ("P3 Protest"); Protest of the Electric Power Supply Association, Docket No. ER23-19, et al., at 8-9 (Jan. 20, 2023), Accession No. 20230120-5230; Protest of the NRG Power Marketing LLC, Docket No. ER23-729, et al., at 8-11 (Jan. 20, 2023), Accession No. 20230120-5260 ("NRG Protest"); Protest of Constellation Energy Generation, LLC, Docket No. EL23-19, et al., at 5-10 (Jan. 20, 2023), Accession No. 202230120-5250; Protest of Pine Gate Renewables, LLC, Docket No. ER23-729 et al., at 9 (rejecting PJM's characterization of the rate increase as severe, while "not disput[ing] that the high clearing price in DPL-S is regrettable and may be more than is needed to maintain reliability in DPL-S."), Accession No. 20230120-5124; Protest of Vistra Corp, Docket No. EL23-19, et al., at 7-8 (Jan. 18, 2023), Accession No. 20230118-5132.

rate spike, described below, eliminate any legitimate dispute that DPL-S consumers will suffer "economic harm" that is "imminent." Unless FERC approves PJM's proposal or otherwise corrects this situation, DPL-S consumers, many of whom already struggled to pay their utility bills each month, will be forced to pay quadruple what is necessary to maintain reliability.

The severity of economic harm cannot be assessed without context regarding the consumers who will bear these costs. DPL-S encompasses the Delmarva Peninsula, where residents face significant economic burdens. According to the U.S. Bureau of Labor Statistics, average wages for workers in the Delmarva Peninsula are significantly lower than the U.S. average. For the fourth quarter of 2020, the average weekly wage of a workers on the peninsula was $1,170 – "$168 below the national average of $1,339."[8] Those data include the most prosperous area of Delaware—New Castle County—which is outside the DPL-S LDA, meaning that average wages in the DPL-S portion of Delaware are even lower. Furthermore, the economic conditions of the Delmarva Peninsula are worsening. In Delaware, one of the three states whose counties make up the Delmarva Peninsula, the five-year average poverty rate has increased by 0.8 percent from 2006 to 2019.[9] In contrast, the U.S. five-year average poverty rate has fallen over time by 0.4 percent,[10] thus demonstrating the relative economic hardship faced by many ratepayers in the area.

Additionally, the Council on Environmental Quality's (CEQ) Climate and Economic Justice Screening Tool identifies numerous disadvantaged communities within the Delmarva

---

[8] *County employment and wages in the Delmarva Peninsula – fourth quarter 2020*, Mid-Atlantic Information Office, https://www.bls.gov/regions/mid-atlantic/news-release/countyemploymentandwages_delmarva.htm (June 11, 2021) ("Delmarva Employment Statistics").
[9] Rebecca McColl & Erin Lynch, *Overview of Poverty in Delaware*, University of Delaware Center for Community Research and Service, at 2 (Apr. 2021).
[10] *Id.*

Peninsula.[11] According to the CEQ, a census tract is considered disadvantaged if it meets "more than one burden threshold AND the associated socioeconomic threshold."[12] The CEQ defines the required socioeconomic threshold as any community that ranks above the 65th percentile of household incomes that are less than or equal to twice the Federal Poverty Level (FPL). Accordingly, such underserved populations in the Delmarva Peninsula are affected by various "burdens" such as adverse health outcomes or lower rates of educated adults and are more likely to have an income of 200 percent or less of the FPL. In other words, ratepayers in the Delmarva Peninsula face not only more burdens, but also worsened economic conditions than the average American.

Furthermore, the disproportionately high energy burden on low-income populations contributes to economic hardships. Energy burden is defined as "a measure of energy poverty that describes the percentage of household income spent on utility expenditure, such as bills for electricity, gas, and water. . . ."[13] In the U.S., despite low-income households consuming less electricity than their counterparts on average, their energy usage is higher (when normalized by housing efficiency and quality) due to energy waste.[14] Such households often use less-efficient appliances or live in older dwellings that are often in need of repair, thus causing a low-income household's energy burden to become "twice that of an average income households and three times greater than higher income households."[15] For instance, the heating energy use per square

---

[11] U.S. Council on Environmental Quality, Climate and Economic Justice Screening Tool, https://screeningtool.geoplatform.gov/en/#13.92/39.21033/-75.93537.

[12] *Id.*

[13] Chien-fei Chen et al., *Localized energy burden, concentrated disadvantage, and the feminization of energy poverty*, 25 iScience (Apr. 15, 2022), https://doi.org/10.1016/j.isci.2022.104139.

[14] *Id.*

[15] Delaware Energy Efficiency Advisory Council, Delaware Division of Energy & Climate, *Scope of Work: Low-Income Advisory Committee*, at 3 (2017).

foot in low-income households is 50 percent more than an average-income household due to structural inefficiencies.[16] High energy burdens also increases energy costs, and can have devasting consequences for low-income families, as they are often faced with difficult choices to allocate money between energy, health, food, and housing.[17] This tradeoff can lead to adverse outcomes that range from foregone health care to foreclosures and evictions.

The high energy burdens found in parts of Delaware, Maryland and Virginia further demonstrate the severity of the Delmarva Peninsula's economic circumstances. Of the three states that make up the peninsula's population, Delaware's energy burden on low-income population is the most extreme and continues to increase. For instance, between 2014-2018 and 2020, when compared to the country, the state of Delaware had the largest increase in monthly energy burden of 1.61 percent or an additional $37.53 per month.[18] With one-third of Delaware's population designated as low-income, these increasingly high energy burdens are widely experienced in communities across the state. Moreover, in such areas, economic conditions make improving energy efficiency unattainable.

Additionally, Maryland's population in the Delmarva Peninsula experiences disproportionately high energy burdens. According to the Office of People Counsel's 2018 Maryland Low-Income Market Characterization Report, the counties with the highest energy burdens in the state are located in the Delmarva Peninsula.[19] With a mean payment of $3,096,

---

[16] Arjun Makhijani, et al., *Energy Justice in Maryland's Residential and Renewable Energy Sectors,* Institute for Energy and Environmental Research (2015), https://ieer.org/wp/wp-content/uploads/2015/10/RenMD-EnergyJustice-Report-Oct2015.pdf.
[17] *Id.*
[18] Chen et al., *supra* note 13.
[19] Maryland Office of People's Counsel, *Low-Income Marylanders at Risk from High Energy Burdens, OPC Report Shows* (Sept. 13, 2022),
https://content.govdelivery.com/accounts/MDOPC/bulletins/32ccdaa.

these counties dedicate "15 percent of their annual income for their energy needs."[20] This exhibits a striking increase from the average statewide energy burden of 12 percent for low-income Maryland households and an even further increase from the 3-4 percent burden for average-income households.[21] These energy burden levels are well above the widely used affordability metric of six percent of annual household income for low-income populations, further demonstrating the severity of the economic hardship faced by many Maryland households.[22]

The high energy burden faced by many Virginia households in the Delmarva Peninsula further exhibits the economic hardships of the region. As a whole, Virginia's energy burden is 0.4 percent higher than the national average of 2.7 percent, creating an unaffordable burden for 75% of households.[23] Within the Delmarva Peninsula, nearly half of the Virginia counties experience an average energy burden that is greater than six percent: creating unreasonable economic conditions for much of the population.[24]

In light of economic conditions in DPL-S, quadrupling capacity prices in this LDA would constitute severe economic harm. A variety of sources indicate that, absent correction of the planned resource error, DPL-S will clear at the auction cap of $426.17/MW-day.[25] PJM states

---

[20] *Id.*

[21] Makhijani, et al., *supra* note 16, at 10.

[22] *Id.*

[23] Virginia Poverty Law Center, *Electricity Burden and the Myth of Virginia's Rate Utopia,* (Aug. 15, 2018), https://vplc.org/electricity-burden-and-the-myth-of-virginias-rate-utopia/.

[24] *Id.*

[25] *See* Comments of the Independent Market Monitor for PJM, Docket No. ER23-729 et. al. at 1 (Jan. 20, 2023), Accession No. 20230120-5238) ("IMM Comments") ("If the flaw is not corrected, prices would be set at scarcity levels… ."); *see also* P3 Protest, Affidavit of Roy Shanker, at 43 & fn. 28; NRG Protest at 18; Protest of LS Power Development, LLC, Docket No. ER23-729, et. al., at 3-4 (Jan. 20, 2023), Accession No. 20230120-5262 ("LS Power Protest").

that this is "more than four times" the correct price.[26] The correct price is thus less than $106.54/MW-day, meaning that DPL-S consumers will be overcharged by at least $319.62/MW-day. This full cost is only charged to load for supply located within the DPL-S zone; most of the surplus price for imported capacity credited back to load through Capacity Transfer Rights ("CTRs").[27] Taking CTRs into account, the quantity of capacity that the incorrectly high price will apply to can be estimated by the difference between the sub-zonal reliability requirement and the CETL.[28]  For DPL-S, this works out to 1,505 MW.[29] At an overpayment of $319.62/MW-day, the error in calculating clearing prices will cost DPL-S customers $175 million if not corrected. Referring to the employment and wage statistics cited above, this is about half a week's gross pay for every wage earner in the region.[30] Thus, the criteria for triggering Section 9.2(b) of the OATT are easily met.

## II. Without correction, PJM's capacity market would produce unjust and unreasonable rates for the DPL-S local deliverability area

If FERC concludes that PJM lacked authority to submit its Section 205 filing, or that the notice exception to the filed rate doctrine does not apply, then it should find that the same severe harm to ratepayers described above supports a determination that the existing market rules are

---

[26] Motion for Leave to Answer and Answer of PJM Interconnection, L.L.C., Docket No. ER23-729, et. al., at 16 (Feb. 2, 2023), Accession No. 20230202-5138 ("PJM Answer").

[27] *See* PJM Interconnection, LLC, *PJM Manual 18*, Section 6 (Sept. 2022) ("PJM Manual 18"), available at https://www.pjm.com/-/media/documents/manuals/m18.ashx.

[28] The inputs necessary to fully calculate this value have not yet been determined.  However, note that CTR credits are "typically lower than the LDA import capability (CETL)." PJM Manual 18, *supra*, at 138.  Since CTRs lower cost to load, an overestimate of CTRs makes our estimate of net cost to load conservative.

[29] *See* 2024-2025 RPM Base Residual Auction Planning Parameters, available at https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2024-2025/2024-2025-planning-period-parameters-for-base-residual-auction.ashx.

[30] *See Delmarva Employment Statistics*, *supra*.

unjust and unreasonable.[31]  Capacity prices are unjust and unreasonable when they are in excess of the level needed to attract sufficient resources to maintain resource adequacy.[32]  Here, PJM explains that the Locational Deliverability Area Reliability Requirement for DPL-S was overstated due to "the action of certain Capacity Market Sellers with planned resources in the DPL-S LDA . . . which gave rise to the unjust and unreasonable mismatch between prices and actual reliability conditions in this LDA."[33] Monitoring Analytics, the PJM Independent Market Monitor, shares this view: "If the flaw is not corrected, prices would be set at scarcity levels in the DPL-S LDA that do not reflect the actual market supply and demand fundamentals, overstate the local reliability requirement, serve no useful purpose, and are therefore unjust and unreasonable."[34]

Contrary to the assertions of certain protestors, PJM is not asserting that action is needed simply because prices are too high; rather it is the disconnect between the high price and the market fundamentals of the DPL-S LDA that make the status quo unjust and unreasonable. As PJM explains: "fundamental to this filing, the potential auction outcome, absent the proposed amendment, would not reflect the actual reliability needs of the affected zone (in this case DPL-S) and would force Load Serving Entities in this LDA to procure more capacity than is needed to meet the area's actual reliability needs."

---

[31] *Public Citizen, Inc. v. FERC*, 7 F.4th 1177 (D.C. Cir. 2021) (establishing that FERC may set aside the results of an already cleared auction if it concludes that the rates are unjust and unreasonable).

[32] *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016) ("The Commission must protect[ ] ... consumers from excessive rates and charges."); *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1177 (D.C. Cir. 1987) ("[F]rom the earliest cases, the end of public utility regulation has been recognized to be protection of consumers from exorbitant rates.").

[33] PJM 205 Filing at 25.

[34] IMM Comments at 1.

### III.  PJM's proposed resolution of the market design flaw should be implemented

FERC should approve PJM's 205 filing promptly to protect Delmarva Peninsula ratepayers from paying excessive rates not needed for reliability. Alternatively, should the Commission choose to act under Section 206, it should decline to hastily require any of the alternative remedies set forward by protestors, many of which are the subject of ongoing, intensive stakeholder discussions.

Various commenters suggest that if the Commission acts under Section 206, it should order additional changes beyond those requested by PJM.  These suggestions include:

- Create requirements that resources without a must offer requirement notify PJM of their intentions in advance of the auction;[35]

- Rerunning the 2024/25 BRA entirely, rather than simply proceeding with a correct reliability requirement;[36]

- Changing procedures for accreditation of ELCC resources;[37] and

- Relaxing the Market Seller Offer Cap (MSOC).[38]

The last two items on this list are easily dismissed, first and foremost because they are unrelated to the matter at hand; this proceeding should not be used as a forum to inject consideration of any possible issue that a market participant may take with the capacity auction.

---

[35] *See, e.g.*, Comments of the Public Utilities Commission of Ohio's Office of the Federal Energy Advocate, Docket No. ER23-729, et. al., at 5 (Jan. 20, 2023), Accession No. 20230120-5229; IMM Comments at 5-6; P3 Protest at 3-4.
[36] Protest and Comments of the American Clean Power Association et al., Docket No. ER23-729, et. al., at 18 (Jan. 20, 2023), Accession No. 20230120-5121.
[37] LS Power Protest at 8.
[38] *Id.* at 5-7.

Both of these topics are also currently under discussion in the PJM stakeholder process.[39] Changing procedures for capacity accreditation of ELCC resources and market seller offers caps are both highly complex issues presenting many technical questions and important tradeoffs. The more robust record created through the stakeholder process that would enable the Commission to engage in better informed decision making. In contrast, because of the urgency to finalize 2024/25 BRA results, this proceeding does not present the opportunity to delve deeply into the merits of these important issues, likely rendering any order imposing sweeping changes as part of a replacement rate unstable and subject to litigation risk.

Regarding the other two items—requiring advance notification of intent to offer and rerunning the 2024/25 BRA, PIOs respectfully suggest that the Commission act in the spirit of regulatory humility, and order the minimum changes required to ensure 24/25 BRA results are just and reasonable. PIOs agree with and support the Market Monitor's comments that rerunning the auction entirely "would be inefficient and delay the auction results unnecessarily at a time when the auction has already been significantly delayed…"[40] We also note comments by PJM and the Market Monitor that the purpose of a single clearing price market is to motivate offers at resources' true marginal costs, and that offers in the 2024/25 BRA were competitive.[41] In this light, it is unclear what purpose rerunning the auction would serve other than facilitating strategic offer behavior.

The proposals that resources without a must-offer requirement be required to provide advance notification of their intentions, while not obviously unreasonable, should not be rushed.

---

[39] *See Capacity Market Reform Issue Charge* (Jan. 2022) KWA #5 and KWA #9, at 3 ("RASTF Issue Charge"), available at https://www.pjm.com/-/media/committees-groups/task-forces/rastf/postings/rastf-issue-charge.ashx.
[40] IMM Comments at 5.
[41] PJM Answer at 14; *see also* IMM Comments at 5.

PIOs are concerned that market participants' high level of interest in knowing exact auction parameters reveals a desire to benefit from strategic offer behavior, and we do not believe there has been adequate time to explore if a "must notify" rule would further enable anti-competitive offers. When in doubt, FERC should do no harm. There is sufficient time for PJM stakeholders to discuss and submit such rules in time for future auctions, eliminating any urgency that would compel the Commission to act now. PJM stakeholders are already discussing whether exceptions to the must-offer requirement for certain resource types continue to serve a valid purpose, and the flaws revealed by this year's auction will surely grant new urgency to these discussions.[42]

Finally, the Market Monitor has focused on the mismatch between some ELCC resources' system-wide and local resource adequacy value.[43] The Market Monitor suggests that one solution "would be to require the use of the lower of the LDA ELCC and the PJM default ELCC."[44] This proposal is unreasonable, as it would understate the resource adequacy value of resources in LDAs that are not transmission constrained. The result would be to undermine accounting for the long-recognized reliability benefits that RTOs bring by operating the system for a large region.[45] And again, the issues of resource accreditation and mismatches between resource accreditation and seasonal reliability needs are complex and under discussion at PJM's RASTF, making summary resolution by the Commission inadvisable.

---

[42] *See RASTF Issue Charge*, KWI #9, at 3.

[43] IMM Comments at 6-7; *see also* PJM 205 Filing at 14.

[44] IMM Comments at 7.

[45] *See* Fed. Energy Reg. Comm'n, Regional Transmission Organizations (Order 2000), 89 FERC ¶ 61,285 (Dec. 1999) at 89; *see also* Fed. Energy Reg. Comm'n, Regional Transmission Organizations, Notice of Proposed Rulemaking, 64 Fed. Reg. 31,390, 31,409 (June 10, 1999).

## IV. Conclusion

Absent Commission action, PJM will transfer approximately $175 million from Delmarva ratepayers to capacity suppliers. This transfer will be purely the result of a flaw in PJM's procedures, will serve no reliability need, and will provide no value to ratepayers. By any conceivable standard, this is unjust and unreasonable. As demonstrated here and in other pleadings, PJM suppliers were on notice that auction procedures could be modified in the face of results as egregious as this, obviating filed rate doctrine arguments against granting PJM's relief.

However, to foreclose any possible ambiguity, the Commission could make a Section 206 finding that the current tariff and the specific results it would produce in DPL-S for the 2024/205 delivery year are unjust and unreasonable. PJM's suggested remedy addresses the specific flaw at issue while avoiding wider changes unsupported by the record in this docket.

Respectfully submitted,

/s/ Casey Roberts
Casey A. Roberts
Senior Attorney, Sierra Club
1536 Wynkoop St., Suite 200
Denver, Colorado, 80202
T: (303) 454-3355
casey.roberts@sierraclub.org

*Counsel for Sierra Club*

/s/ Tom Rutigliano
Tom Rutigliano, Senior Advocate
Natural Resources Defense Council
1125 15th Street NW, Suite 300
Washington DC, 20005
trutigliano@nrdc.org

*Natural Resources Defense Council*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served in accordance with 18 C.F.R. § 385.2010 upon each person designated on the official service list compiled by the Secretary for this proceeding, by email.

/s/ Casey Roberts
Casey A. Roberts
Senior Attorney, Sierra Club
1536 Wynkoop St., Suite 200
Denver, Colorado, 80202
T: (303) 454-3355
casey.roberts@sierraclub.org

Dated: February 6, 2023

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | Docket Nos. ER23-729-000 |
| | ) | EL23-19-000 |
| | ) | |
| | ) | (Not Consolidated) |

## MOTION FOR LEAVE TO ANSWER
## AND ANSWER OF THE PJM POWER PROVIDERS GROUP

Pursuant to Rules 212 and 213 of the Federal Energy Regulatory Commission's

("Commission" or "FERC") Rules of Practice and Procedure,[1] The PJM Power Providers Group

("P3")[2] submits this motion for leave to answer and answer ("Answer") to the answers that PJM

Interconnection, L.L.C. ("PJM") and Monitoring Analytics, LLC ("IMM") filed in the above-

captioned dockets on February 2, 2023 and February 6, 2023, respectively.

## I.    MOTION FOR LEAVE TO ANSWER

Pursuant to Rule 212,[3] P3 seeks leave to answer PJM's and the IMM's answers.

Although Rule 213(a)(2) prohibits an answer to an answer unless otherwise directed by the

decisional authority,[4] the Commission has accepted answers such as this one where the answer

clarifies the record or provides information that assists the Commission in its decision-making

---

[1] 18 C.F.R. §§ 385.212, 385.213 (2022).

[2] P3 is a non-profit organization dedicated to advancing federal, state and regional policies that promote properly designed and well-functioning electricity markets in the PJM Interconnection, L.L.C. ("PJM") region. Combined, P3 members own over 67,000 MWs of generation assets and produce enough power to supply over 50 million homes in the PJM region covering 13 states and the District of Columbia. For more information on P3, visit www.p3powergroup.com. The comments contained herein represent the position of P3 as an organization, but not necessarily the views of any member with respect to any issue.

[3] 18 C.F.R. § 385.212 (2022).

[4] *Id.* § 385.213(a)(2).

process.[5] P3's Answer satisfies this standard because it clarifies the issues properly before the Commission and corrects certain inaccuracies contained in PJM's and the IMM's answers. Accordingly, P3 submits that there is good cause for the Commission to accept this Answer.

## II.    ANSWER

### A.    PJM's Decision to Ignore Most of the Facts and Legal Arguments Presented by the Numerous and Diverse Protesters in these Proceedings Exacerbates PJM's Failure to Satisfy its Statutory Burdens

The list of material facts and arguments that PJM has ignored in its answer is staggering. Among other things, PJM has ignored arguments concerning the specific steps PJM has or has not taken in conducting the December 2022 BRA, its failure to satisfy its statutory burdens, the economic rationality of the existing Tariff producing a high price for the generation-short Delmarva Power & Light – South ("DPL-South") zone in the December 2022 BRA, and the adverse impacts its proposal in these proceedings will have on the integrity of the PJM (and other Commission-jurisdictional) markets.[6]  Furthermore, PJM ignored compelling record evidence that strongly undermines its position, including evidence that PJM should have foreseen this particular outcome.

---

[5] *See, e.g.*, *Wis. Pub. Serv. Corp.*, 181 FERC ¶ 61,270, at P 23 (2022); *FirstLight Hydro Generating Co.*, 162 FERC ¶ 61,049, at P 11 n.11 (2018); *Equitrans L.P.*, 134 FERC ¶ 61,250, at P 6 (2011).

[6] *Compare* Protest of the PJM Power Providers Group, at 9-14, 16-17, 18-20, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023) ("P3 Protest") (explaining the Tariff-required steps for conducting the BRA); *id.* at 30-45 (explaining that PJM has not provided sufficient evidence to satisfy its burdens of proof under the FPA and APA); Protest of Elect. Power Supply Ass'n, at 17, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023) ("EPSA Protest") (similar); Protest of Am. Clean Power Ass'n, et al., at 3-18, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023) ("ACP Protest") (similar); Protest of Freepoint Solar LLC, at 7-8, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023) ("Freepoint Solar Protest") (similar); P3 Protest at 21-22, 40-41, Attach. B at 18-25, 35 (explaining that the result the existing Tariff rules have produced for DPL-South, as identified by PJM, is economically rational); EPSA Protest, Attach. A at 28-43 (similar); P3 Protest at 25-26 (explaining, with supporting affidavit of Chairman Kelliher, the adverse impacts PJM's proposal would have on market integrity); ACP Protest at 3-4 (similar); EPSA Protest at 17-21 (similar); Freepoint Solar Protest at 13-14 (similar); Protest of Leeward Renewable Energy, LLC, et al., at 6-7, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023) (similar); and Protest of Pine Gate Renewables, LLC, at 10-11, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023) (similar) *with* Answer of PJM Interconnection, L.L.C., Docket Nos. ER23-729 & EL23-19 (filed Dec. 23, 2023) ("PJM Answer") (failing to address any of the previous topics).

These examples are not exhaustive, but merely illustrative.  Each of those failures should be fatal to PJM's Federal Power Act ("FPA") section 205 and 206 filings in these proceedings. Rather than restate the many facts and arguments that PJM has ignored, which have already been presented in detail in the various protests submitted in these proceedings, P3 highlights four specific voids in PJM's answer that perhaps best elucidate the shell-game PJM is attempting to play with the Commission.

*First*, PJM's answer fails to explain what specific steps PJM has or has not taken in connection with the December 2022 Base Residual Auction ("BRA") to produce the clearing prices—including the clearing price for the DPL-South Locational Deliverability Area ("LDA")—at issue in these proceedings.  That includes the steps taken with regard to the clearing prices produced by the existing Tariff provisions, as well as the alternative clearing price for DPL-South that PJM has calculated using a method that it admits is inconsistent with the existing Tariff.  The Commission should be troubled by, and should reject, PJM's blatant attempt to treat the December 2022 BRA as a black-box by concealing the steps PJM has taken.

The BRA is anything but a black-box.  As P3 explained in its protest, the BRA consists of a precisely structured process, for which each of the required steps is expressly prescribed in the Tariff.  Because those steps are part of the filed rate, understanding them is critical to ascertaining (1) whether PJM is in compliance with its Tariff, (2) whether PJM's proposal in these proceedings would violate the filed rate doctrine, and (3) whether PJM has carried its statutory burdens.  Accordingly, P3 took pains to explain those steps in detail in its protest.

In its answer, PJM is entirely silent on the specific steps PJM took prior to submitting its December 23, 2022 filings in these dockets.  Rather than identify the specific steps it has taken and explain how they are consistent with the Tariff, PJM instead pins its hopes on the

Commission being satisfied with generic statements about "the auction clearing process" and "preliminary price calculations" and "suspend[ing] the auction clearing before it was completed." PJM attempts to further cover its tracks by arguing that it has not finished "conducting" the December 2022 BRA because it "has not completed the auction clearing process or finalized any auction results."[7] When it comes to whether, how, or to what extent PJM has complied with its Tariff, those statements are meaningless. PJM has identified no specific Tariff-based steps that PJM is required to take, but has not yet taken, to conduct the December 2022 BRA. Further, as PJM explicitly concedes in its answer, PJM has already applied its market power mitigation rules to the December 2022 BRA and determined that the offers were competitive.[8] So, too, for the IMM.[9] Those determinations by PJM and the IMM confirm that PJM has fully conducted the BRA. The fact that PJM has not identified a single specific step, or referenced a single specific Tariff provision, that remains to be satisfied in "conducting" the December 2022 BRA is fatal to PJM's position. Either PJM has taken all of the steps set forth in the Tariff for "conducting" the December 2022 BRA, in which case it has violated its Tariff by not posting the results "as soon thereafter as possible," or PJM has failed to take all of those steps without identifying which ones it has or has not taken, in which case PJM has failed to provide sufficient evidence to carry its statutory burdens under the FPA and APA. In either case, the Commission must reject PJM's proposal to retroactively change the rules of the December 2022 BRA.

---

[7] PJM Answer at 7-8.

[8] *Id.* at 14.

[9] *See* Answer of Monitoring Analytics, LLC, at 3, Docket Nos. ER23-729 & EL23-19 (filed Feb. 6, 2023) ("IMM Answer").

4

*Second*, in arguing that the clearing price the existing Tariff produced for DPL-South was not foreseeable, PJM has egregiously ignored record evidence demonstrating that the result was not only foreseeable but that PJM, in fact, foresaw it and discussed it with at least one stakeholder well in advance of the December 2022 BRA. As explained in P3's protest, PJM's July 2022 sensitivity study ("July 2022 Sensitivity Study") showed that if as little as 260 MW were removed (the equivalent of failing to show up) in the DLP-South LDA the price would clear at the $431.26 per MW-day price cap. The writing was clearly on the wall at that point.

Based on PJM's figures, there were approximately 613 MW of Planned Generation Capacity Resources in the DPL-South LDA that could have participated in the December 2022 BRA—all of which are being developed under trying economic and supply chain conditions, and none of which are required to offer into the BRA—and, based on PJM's position in these proceedings, at least one of those was large enough to have a material impact on the DPL-South clearing price. Further, approximately 100 MW of existing resources had the option to not offer into the auction.[10] Given these conditions, and almost no change in the import capability into DPL-South,[11] it was eminently reasonable to expect that the scenario identified in the July 2022 Sensitivity Study could manifest in the December 2022 BRA. In fact, at least one stakeholder reached out to PJM to confirm the validity of that expectation. As NRG Power Marketing LLC ("NRG") demonstrated in its protest in these proceedings—with evidence in the form of an email exchange with PJM on this topic—an NRG employee contacted PJM in November 2022 to confirm the validity of the twelve percent increase in the DPL-South LDA Reliability Requirement for the December 2022 BRA relative to the July 2022 BRA, and PJM responded

---

[10] *See* P3 Protest, Attach. B, at 19.

[11] *See id.*

5

that the figure was legitimate and accurately reflected DPL-South's "increase in winter loss of load risk."[12]  Amazingly, PJM's answer entirely ignores that evidence.

Furthermore, PJM's argument that the July 2022 Sensitivity Study is "irrelevant" is belied by PJM's own conduct.  As P3 noted in its Protest, it appears that PJM removed the July 2022 Sensitivity Study from its website on or about January 20, 2023—*i.e.*, the deadline for comments and protests in these proceedings.[13]  PJM did not address this fact in its answer and, as of the date of this Answer, PJM has not reposted the July 2022 Sensitivity Study to its website.  Aside from the troubling implications that conduct has for PJM's candor in these proceedings, PJM's conduct undercuts its own argument about the usefulness of the July 2022 Sensitivity Study.  If the July 2022 Sensitivity Study were truly "irrelevant," then why would PJM remove it from the website on or about the date that protesters were likely to direct the Commission to that document?  If it were truly "irrelevant," it would not be worth concealing.

*Third*, PJM chose not to address P3's argument that the language set forth in section 5.11(e) which would permit PJM to follow a process to "post modified results" and "corrected results" does not apply in this situation.[14]  In so doing, PJM appears to have jettisoned its argument that this case involves the type of "error" contemplated by section 5.11(e).  As P3 explained, the "error" provision in section 5.11(e) and the market power review process described in section 6.2(c) are the only two mechanisms in the Tariff that permit PJM to revise the clearing prices produced by the BRA.  As PJM now concedes, neither of those mechanisms apply to this case.

---

[12] *See* Protest of NRG Power Marketing LLC, Direct Energy Business Marketing, LLC, and Midwest Generation, LLC, at Exh. C, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023) ("NRG Protest").

[13] *See* P3 Protest at n.23.  P3 provided the relevant portion of the July 2022 Sensitivity Study as an attachment to its Protest.  *Id.* at Attach. C.

[14] *See id.* at 11-14.

6

*Fourth*, PJM's answer is completely silent on the issue of whether PJM has satisfied its burden, under FPA section 206, to demonstrate that the existing Tariff is unjust and unreasonable. PJM cannot carry its burden of proof with silence. The closest PJM's answer comes to this issue is its dumbfounding assertion that "not a single protester attempts to justify that the previously posted [LDA] Reliability Requirement for [DPL-South] is an accurate input that should be used for the 2024/2025 BRA."[15] That assertion flips the burden of proof under the FPA. As a matter of law, whether the Tariff can be changed under FPA section 206 depends on whether PJM demonstrates that the existing Tariff is flawed—which it has not done—not whether or how protesters defend the existing Tariff. In any event, multiple protesters, including P3, explained at length the reasons why the existing Tariff is just and reasonable despite PJM's ephemeral arguments to the contrary.[16] The protesters' arguments and evidence in support of the existing Tariff raise the bar for PJM to prove that the existing Tariff is unjust and unreasonable.[17] PJM's failure to meaningfully respond to the numerous arguments and record evidence in support of the existing Tariff and the clearing prices is fatal to PJM's FPA section 206 filing.

In sum, PJM's answer digs its hole even deeper. As P3 and others have ably demonstrated with record evidence, PJM has violated its Tariff by failing to post the auction results as soon as possible after conducting the December 2022 BRA and has fallen well short of meeting its statutory burdens under the FPA and APA in these proceedings. PJM's decision to ignore the compelling record evidence protesters have presented in these proceedings further

---

[15] PJM Answer at 2.

[16] *See, e.g.*, P3 Protest at § II.C.ii; EPSA Protest at 28-43.

[17] *See, e.g.*, *Sw. Power Pool, Inc.*, 180 FERC ¶ 61,192, at P 52 (2022) (finding that, after protesters provide probative evidence weighing against a proposed tariff change under FPA section 205, the proponents of the tariff change "could not prevail by resting solely on their prima facie evidence").

undermines PJM's filings and represents grounds for rejecting PJM's FPA section 205 and section 206 filings.

### B. PJM's Argument Concerning the Filed Rate Doctrine and Rule Against Retroactive Ratemaking Misinterprets Judicial Precedent and Erroneously Characterizes the Reliability Pricing Model as a Transmission Formula Rate

PJM argues that "the rule against retroactive ratemaking and the filed rate doctrine are simply inapplicable here because there is no rate to change and no rate change is being proposed."[18]  PJM's theory appears to be that the filed rate doctrine is not implicated in the context of the December 2022 BRA (or any other wholesale market, for that matter) until and unless PJM announces the clearing price produced by the rules in the Tariff.  In other words, in its attempt to get around the bedrock precept that the filed rate doctrine applies to both rate and non-rate terms of a tariff, PJM appears to argue that there is no such thing as a "non-rate term" in the context of a wholesale market design tariff.[19]  A century's worth of Article III judges are rolling over in their graves in response to PJM's argument.[20]  More importantly, the argument would be poorly received by the present-day D.C. Circuit, which has repeatedly found that the

---

[18] PJM Answer at 12.

[19] Although PJM's answer later appears to concede that there are non-rate terms in the BRA rules, PJM's argument for why it is not retroactively changing those non-rate terms is non-sensical.  *See* PJM Answer at 12-13.  PJM argues that it is "not proposing to change (retroactively or not) the posting" of the LDA Reliability Requirement for DPL-South, but rather is "proposing to prospectively update" that LDA Reliability Requirement "for purposes of completing the optimization algorithm in completing the auction clearing."  The relevant point, which PJM completely misses, is that it is seeking to change the LDA Reliability Requirement used in the optimization algorithm to determine the December 2022 BRA clearing prices.  The LDA Reliability Requirement to be used is a non-rate term of the filed rate.  Because PJM has already run the December 2022 BRA using the optimization algorithm and other Tariff rules that constitute the BRA, it cannot now change the LDA Reliability Requirement or any other non-rate terms of the Tariff applicable to that BRA.

[20] *See, e.g.*, *Oklahoma Gas & Elect. Co. v. FERC ("Oklahoma Gas")*, 11 F.4th 821, 829 (D.C. Cir. 2021) ("As the statutory terms make clear, the filed rate is not limited to rates per se, but also extends to matters directly affecting rates.") (cleaned up) (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966-67 (1986)); *accord N. Natural Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 90-91 (1963) (citing *Dayton-Goose Creek R. Co. v. U.S.*, 263 U.S. 456, 478 (1924)).

filed rate doctrine applies to non-rate provisions of Regional Transmission Organization tariffs—specifically including PJM's Tariff.[21]

In a move that is internally inconsistent with its above argument that the filed rate doctrine is inapplicable because there is no "rate," PJM also appears to argue that it can bypass the filed rate doctrine and rule against retroactive ratemaking because the RPM "is a complex formula rate" like a transmission formula rate.[22]  PJM does not present this as an alternative argument; rather, PJM confoundingly treats it as part-and-parcel with its argument that the filed rate doctrine does not apply because there is no "rate."  In any event, PJM errs in characterizing the RPM as a transmission formula rate.  PJM's motivation for half-heartedly advancing that notion is obvious: courts have found that transmission formula rates can facilitate certain changes that would otherwise be impermissibly retroactive.  But the RPM is a far cry from a transmission formula rate for several reasons.

First, the RPM is not a "formula;" it is a set of rules (*i.e.*, non-rate terms) that PJM must follow to produce a rate.

Second, even if the RPM could be considered a "formula," it does not provide the same type of notice to customers that the "inputs" to (or "outputs" of) the formula might change after the formula has been applied.  For one thing, transmission formula rates are relatively simple mathematical operations plainly described in a utility's transmission tariff.  The RPM rules are nothing like that type of formula.  No customer sees the pluses, minuses, and equal signs (and other mathematical operations) used in the BRA.  The BRA's mathematical operations are

---

[21] *See Oklahoma Gas*, 11 F.4th at 829-30 (finding billing limitations in Southwest Power Pool Inc.'s tariff to be "[n]on-rate terms within the tariff that may not be changed retroactively"); *Old Dominion Elect. Coop. v. FERC ("ODEC")*, 892 F.3d 1223, 1231-32 (applying the filed rate doctrine and rule against retroactive ratemaking to a tariff provision establishing cap on offers in PJM's energy market).

[22] *See* PJM Answer at 3-4, n.13.

9

conducted by a computer, using untold lines of code, that only PJM has access to.  The existence

of that type of "formula" on a PJM computer cannot suffice for providing customers the type of

"legally required notice to even first-line purchasers in the wholesale markets, such as load-

serving entities, let alone to the downstream retail customers,"[23] that the BRA results would

change in the manner PJM has proposed.

Furthermore, transmission formula rates are accompanied by protocols that prescribe a

specific process by which the inputs to the formula will be updated as the transmission owner's

costs-of-service change.  Those updates represent objective cost-of-service reconciliations—*i.e.*,

they increase or decrease rates based on actually incurred costs generally derived from a

transmission owner's FERC Form No. 1 filings—and they are made pursuant to a formal true-up

process codified in the tariff.  These foreordained changes are designed to ensure that the cost-of-

service rates are updated on a rolling basis, because transmission service is being provided on a

continuous basis.  In contrast, the changes PJM is proposing for its BRA results are neither

objective nor "foreordained."  Contrary to PJM's position, the Tariff does not contemplate any

updates to or reconciliation involving the LDA Reliability Requirements used as parameters in

the December 2022 BRA.  As evidenced by PJM's filings in these proceedings, PJM is

requesting license—unsupported by the existing Tariff—to change BRA results well after the

BRA was conducted, based on PJM's subjective assessment that prices should be lower in a

particular zone.  It is patently unreasonable to consider any market participant to have been on

notice that the rules of the BRA, or any of the BRA's inputs or outputs, were subject to change

after PJM commenced the BRA, much less after PJM had conducted the BRA as in this case.

---

[23] *ODEC*, 892 F.3d at 1231.

### C. PJM Misconstrues the Filed Rate Doctrine and Rule Against Retroactive Ratemaking as Flexible, Equitable Tools that Are Designed to Avoid Only Rate Increases for Services Rendered in the Past

PJM appears to argue that the filed rate doctrine and the rule against retroactive ratemaking apply only in cases involving "retroactive *increases* of rates for power that consumers *already consumed*."[24]  That argument is flawed on two counts.

First, the filed rate doctrine and rule against retroactive ratemaking apply with equal force to rate increases and rate decreases.[25]  The filed rate doctrine and rule against retroactive ratemaking are not equitable tools that the Commission can toggle on and off depending on the nature of the financial impacts at issue.[26]  As the courts have explained, the filed rate doctrine "bind[s] regulated entities to charge only the rates filed with FERC and to change their rates only prospectively.  When it applies, the filed rate doctrine is a nearly impenetrable shield and does not yield, no matter how compelling the equities."[27]  PJM's argument that the filed rate doctrine only applies to rate increases flies in the face of judicial precedent.[28]  Further, it completely ignores the fact that the filed rate doctrine and rule against retroactive ratemaking apply to changes in non-rate terms.  Changes in non-rate terms might or might not correlate with rate increases or decreases, depending on various circumstances, and, in any event, the courts have

---

[24] PJM Answer at 15.

[25] *See, e.g.*, *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (explaining that the rule against retroactive ratemaking "bars the Commission's retroactive substitution of an unreasonably high or low rate with a just and reasonable rate.") (emphasis added); *ODEC*, 892 F.3d at 1227 ("[T]he rule against retroactive ratemaking prohibits the Commission from adjusting current rates to make up for a utility's over- or under-collection in prior periods.") (internal quotations omitted) (quoting *Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67, 71 n.2 (D.C. Cir. 1992).

[26] *See Louisville & N.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915) (explaining that the filed rate doctrine is "undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress").

[27] *Oklahoma Gas*, 11 F.4th at 829-30 (internal quotations omitted) (quoting *ODEC*, 892 F.3d at 1230).

[28] *See supra* n.25.

not made application of the filed rate doctrine and rule against retroactive ratemaking to non-rate terms contingent on the identification of a corresponding rate increase.

Second, for the same reasons described above, the filed rate doctrine and rule against retroactive ratemaking apply regardless of whether power has already been consumed.  The filed rate doctrine applies to a tariff as soon as the tariff becomes effective, in compliance with the FPA.[29]  PJM has identified no precedent for the proposition that the filed rate doctrine and rule against retroactive ratemaking adhere to a tariff only after, and to the extent that, customers have purchased power pursuant to that tariff.  Nor can PJM convincingly make that case, because doing so would contradict a long line of judicial precedent to the contrary.[30]

### D.  PJM's Interpretation of FPA Section 309 Contravenes the Statute and Judicial Precedent

PJM argues that FPA section 309 empowers the Commission to override the filed rate doctrine and rule against retroactive ratemaking.[31]  Unfortunately for PJM, the courts have emphatically disagreed with that proposition.[32]  FPA section 309 "permits FERC to advance

---

[29] *See, e.g., Ark. La. Gas Co. v. Hall*, 453 U.S. at 577 (explaining that one of the principles underlying the filed rate doctrine is that customers have a right to the rate on file); *OXY USA, Inc. v. FERC*, 64 F.3d 679, 699 (D.C. Cir. 1995) (explaining that and the purpose of those principles is not only to prevent unjust discrimination but also to "ensure predictability" by allowing customers to rely on duly filed tariffs as the only lawful charge).

[30] *See, e.g., Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004) ("*Once filed* with a federal agency, such tariffs are the equivalent of a federal regulation.") (emphasis added) (internal quotations and citations omitted); *accord Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520 (1939) (explaining that the obligations set forth in a common carrier tariff bound "both carriers and shippers with the force of law" to perform pursuant to the terms of the tariff, including terms that dictated "prior arrangements . . . required" to "facilitate the rendition of service"); *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014) (applying filed rate doctrine in the context of PJM's interconnection rule provisions establishing the interconnection customer's eventual cost responsibility for network upgrades necessitated by its interconnection request).

[31] *See* PJM Answer at 23 ("Neither the filed rate doctrine nor the rule against retroactive ratemaking bars the Commission from its broad statutory authority under section 309 of the FPA.").

[32] See *Verso Corp. v. FERC ("Verso")*, 898 F.3d 1, 11 (D.C. Cir. 2018); *TNA Merchant Projects, Inc. v. FERC ("TNA Merchant Projects")*, 857 F.3d 354, 359 (D.C. Cir. 2017); *Niagara Mohawk Power Corp. v. FPC ("Niagara Mohawk")*, 379 F.2d 153, 158 (D.C. Cir. 1967).

remedies not expressly provided by the FPA, as long as they are consistent with the [FPA].”[33]

“Obviously, any actions that FERC takes under § 309 must conform with the purposes and

policies of Congress and cannot contravene any terms of the [FPA].  Thus, § 309 cannot be used

to supersede specific statutory strictures[.]”[34]  The filed rate doctrine and the rule against

retroactive ratemaking are quintessential strictures of the FPA, manifesting Congress’s purpose

and policy of providing customers with certainty and transparency with respect to their

Commission-jurisdictional rates.  PJM’s interpretation of section 309 would read the filed rate

doctrine and the rule against retroactive ratemaking out of existence.  The Commission has no

option but to reject that interpretation.

### E.  PJM’s Flawed Conception of the Filed Rate Doctrine and Rule Against Retroactive Ratemaking Would Permit Retroactive Tariff Changes Without Limitation as Long as the Tariff Filing or Complaint Is Filed Before the Resulting Rate Is Charged and the Corresponding Service Is Provided

As should be clear to the Commission, PJM’s varied and tenuous interpretations of the

filed rate doctrine and the rule against retroactive ratemaking amount to throwing spaghetti at the

wall in the hope that something might stick.  Were the Commission to accept any of those

arguments, it would essentially render the filed rate doctrine and rule against retroactive

ratemaking inoperative in the context of wholesale market design tariffs.  As former Chairman

Kelliher has explained in these proceedings, such a result would be exceptionally bad regulatory

policy and would ultimately subject the Commission to a humiliating defeat in court.  Because

that judicial resolution will take time, accepting PJM’s interpretation of the filed rate doctrine

and rule against retroactive ratemaking would, in the meantime, do significant harm to all

Commission-jurisdictional markets (not just the PJM market).

---

[33] *Verso*, 898 F.3d at 11.

[34] *TNA Merchant Projects*, 857 F.3d at 359 (cleaned up) (quoting *Niagara Mohawk*, 379 F.2d at 158).

13

The net result of PJM's misguided legal theory is that, in the context of a market design

tariff, the filed rate doctrine and rule against retroactive ratemaking are relevant only to the rates

produced by those tariffs, and only after the service provided in return for those rates has been

provided.  Under that theory, the filed rate doctrine and rule against retroactive ratemaking do

not apply to non-rate terms of a market design tariff, nor do they apply to rates set by such a

tariff that are to be charged for a service that has not yet been provided.  In the world PJM's legal

theory would create, the rules and rates set forth in a market design tariff could be changed

retroactively any time up until a service is provided and a tariff-dictated rate is paid for that

service—regardless of the actions taken pursuant to, or in reliance on, those rules or rates.  More

specifically, based on the facts of this case, the implication would be that BRA results would not

be final until at least three years after the BRA is conducted—and perhaps even longer given that

the funds associated with a seller's capacity supply obligations are disbursed and collected

throughout the Delivery Year.  A Commission order adopting PJM's position would invite

complaints, for years after each BRA and Incremental Auction, challenging any number of

auction parameters involving forecasts or assumptions that do not turn out to be exactly accurate

based on the decisions market participants make regarding their participation in that auction.  In

short, PJM's position would open Pandora's Box.  The Commission should leave it closed.

### F.  The IMM Invents a New Standard that Does Not Exist in the FPA or PJM's Tariff and Fails to Appreciate the Impact that Planning Parameters Have on Commercial Activities

The IMM argues that the legal standard the Commission should apply in these

proceedings is "whether the prices that PJM ultimately posts are a result of the actual supply of

14

and demand for capacity in DPL-[South]."[35]  That standard is found nowhere in the Tariff or the FPA, and the Commission should reject the IMM's proposition.

The applicable legal standard for PJM's Tariff—including the results of the December 2022 BRA—is the "just and reasonable" standard set forth in FPA section 205.  As P3 has explained, the existing BRA rules that PJM has applied to the December 2022 BRA have been found to be just and reasonable, and both the IMM and PJM have noted that all offers in that auction were competitive.  To date, that has passed muster with the Commission.  Adopting the IMM's new standard would require the Commission to analyze and determine—for every capacity auction, and perhaps even every energy market transaction—whether the price posted by PJM is the result of "the actual" supply and demand.  In other words, each price would need to be analyzed *ex post* to determine whether the "actual" supply and demand perfectly matched the *ex ante* supply and demand parameters established based on forecasts or assumptions.  This logic would extend to incremental auctions, which, in some cases, change the supply and demand dynamics that existed when the BRA was initially run.  That exercise would be highly burdensome to the Commission, PJM, and the PJM stakeholders.  Furthermore, the legal standard contemplated by the IMM likely is unworkable, because "actual" supply and demand is necessarily and inextricably intertwined with the *ex ante* assumptions that determine "actual" supply and demand behavior in an auction.  Accordingly, the Commission should resist the IMM's invitation to adopt such a legal standard in these proceedings.

Additionally, the IMM argues that, if Tariff changes that alter the planning parameters for the BRA become effective, those parameters do not need to be recalculated and the auction does not need to be rerun based on the revised parameters.  The IMM states that "[m]arket

---

[35] *See* IMM Answer at 3.

participants offered competitively or were constrained to competitive offers by the market power mitigation rules, and *there is no reason to believe that their offers were affected by the overstated demand*."[36]   However, the IMM completely ignores the testimony of NRG's witness,  Joseph A. Holtman, the Vice President of Trading for NRG, who details the strong relationship between the posting of BRA planning parameters and a myriad of commercial activities based specifically on the exact data contained in those posted parameters.[37]   Moreover, PJM's Tariff expressly provides sellers the flexibility to craft their offers, and, for some resources, their decision about whether to participate in the BRA, based on their commercial judgment as informed by the planning parameters.  For example, PJM's current Market Seller Offer Cap is the cap under which suppliers are free to exercise their commercial judgement in establishing their BRA offers, and generators without RPM must-offer obligations (such as new and intermittent generation resources) may elect to not offer at all based on the planning parameters.   Simply because suppliers offered competitively based on one set of planning parameters does not mean that those same suppliers would offer at all, or at the same level, under revised parameters.   The IMM's comments do not recognize this reality.

---

[36] IMM Answer at 3 (emphasis added).

[37] *See* NRG Protest, Attach. A at 4-11.

16

## III.    CONCLUSION

For the foregoing reasons, P3 requests that the Commission accept this answer and reject

PJM's FPA section 205 and 206 filings in these proceedings.

Respectfully submitted,

Nicholas Gladd
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
(207) 791-1208
ngladd@pierceatwood.com

*Counsel for The PJM Power Providers*
*Group*

___/s/ Glen Thomas___
Glen Thomas
Diane Slifer
GT Power Group
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
gthomas@gtpowergroup.com
dslifer@gtpowergroup.com
610-768-8080

February 9, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused the foregoing document to be served upon each person designated on the official service list compiled by the Secretary in this proceeding, in accordance with Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2010 (2022).

Dated at Portland, Maine, this 9th day of February, 2023.

Nicholas Gladd

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| | ) | |
| PJM Interconnection, L.L.C. | ) | Docket No. ER23-729-000 |
| | ) | |
| PJM Interconnection, L.L.C. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PJM Interconnection, L.L.C. | ) | Docket No. EL23-19-000 |
| | ) | |

**ANSWER AND MOTION FOR LEAVE TO ANSWER**
**OF THE INDEPENDENT MARKET MONITOR FOR PJM**

Pursuant to Rules 212 and 213 of the Commission's Rules and Regulations,[1] Monitoring Analytics, LLC, acting in its capacity as the Independent Market Monitor ("Market Monitor") for PJM Interconnection, L.L.C. ("PJM"),[2] submits this answer to the answers submitted in this proceeding on February 9, 2023, by the PJM Power Providers Group ("Power Providers") and by the Electric Power Supply Association ("EPSA"). Nothing argued by Power Providers or EPSA is relevant to the merits of either of PJM's filings. PJM's proposed revisions should be accepted and approved.

**I.  ANSWER**

Power Providers argue (at 3–4) that because PJM has or should have completed all of the steps related to the Base Residual Auction in December 2022 for 2024/2025 Delivery Year,

---

[1]    18 CFR §§ 385.212 & 385.213 (2022).

[2]    Capitalized terms used herein and not otherwise defined have the meaning used in the PJM Open Access Transmission Tariff ("OATT"), the PJM Operating Agreement ("OA") or the PJM Reliability Assurance Agreement ("RAA").

PJM's filings in this proceeding should be rejected. Power Providers provide no basis for rejecting PJM's filings. Power Providers misunderstand the process. PJM is very clear about the events. Offers were submitted, PJM ran the capacity market software in order to ensure that the tariff was being followed, and PJM determined that there was an issue. This is all standard practice. Power Providers imagine that there is a single run of the market clearing software that happens once and is the final, immutable answer. That is incorrect. PJM runs auction software to ensure compliance with the tariff and market logic, and there can be multiple runs of the software and issues may be identified and fixed in that process. The fact that multiple runs occur does not make the results of each such run a filed rate.[3] The auction is not complete and the market is not cleared until PJM approves and posts the final results.

Power Providers argue (at 5–6) that the results of the BRA for the 2024/2025 Delivery Year were foreseeable. The foreseeability of the issue is not relevant to an evaluation of the filings. Foreseeability is not a standard under which either filing must or should be evaluated.

Power Providers argue (at 6) that Section 5.11(e) of Attachment DD to the OATT, which would permit PJM to follow a process to "post modified results" does not apply. The argument is not relevant to the BRA for the 2024/2025 Delivery Year because no results have been posted. Whether or not PJM could have modified the results had they been posted is not an issue in these proceedings.

Power Providers assert (at 7) and EPSA (at 13–14) that PJM has not met its burden under Section 206 to show that its existing rules produce unjust and unreasonable results. PJM has explained in detail how the existing rules would produce unjust and unreasonable results if uncorrected. The Commission has held that a logical explanation is sufficient to

---

[3]    The Market Monitor runs its own auction software in parallel and provides those results to PJM. The Market Monitor posts the results of the Market Monitor's model and generally matches the PJM results exactly.

show that a provision is unjust and unreasonable.[4] It is significant that PJM's explanation of the market design flaw is unrefuted in the record. PJM has made clear the impact of that flaw on market clearing prices, and the Market Monitor agrees based on independent analysis. PJM is not required to show that existing provisions are unjust and unreasonable under Section 205. Once PJM has satisfied its Section 205 burden, as it has, Power Providers and EPSA must provide sufficient countervailing argument that the proposal to remedy the flaw is not just and reasonable. They do not.

Power Providers argue (at 8–14) and EPSA (at 6–9) that PJM misconstrues the filed rate doctrine. PJM has not indicated that it seeks to apply any proposed tariff provision retroactively. PJM requests prospective effective dates under both filings. Neither the Section 206 complaint nor the Section 205 filing require resolution of the scope of the filed rate doctrine in order to be decided. Again, Power Providers fail to understand the market clearing process. Running the auction software does not create a filed rate.

Power Providers argue (at 14–15) (and EPSA at 7) that the Market Monitor improperly applies a standard in this proceeding, "whether the prices that PJM ultimately posts are a result of the actual supply of and demand for capacity in DPL-[South]." The Power Providers miss the point. The Market Monitor's standard is that the outcome is efficient and competitive. That is the outcome when the actual supply and demand result in market clearing prices. This approach is basic economics. This is the standard that the Market

---

[4]    *See Managing Transmission Line Ratings*, Order No. 881-A, 179 FERC ¶ 61,125 at P 13 (2022) ("Because such changes may affect all transmission lines, the economic logic underlying the AAR requirements applies to all transmission lines. By establishing and relying on the basic economic logic underlying the relationship between more accurate transmission line ratings and wholesale rates,[footnote omitted] the Commission had ample support to conclude that applying the AAR requirements to all transmission lines will lead to just and reasonable wholesale rates."), citing Sacramento Mun. Util. Dist. v. FERC, 616 F.3d 520, 531, (D.C. Cir. 2010) (recognizing that it is "perfectly legitimate for the Commission to base its findings . . . on basic economic theory"); Assoc. Gas Distributors v. FERC, 824 F.2d 981, 1008 (D.C. Cir. 1987) ("Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall.").

Monitor has used to evaluate the competitiveness of PJM's market from the beginning of PJM markets. [5] The requirement that prices reflect the actual supply of and demand for capacity is not and has never been controversial. The standard is at the core of the Commission's policy of regulation through competition. [6] Power Providers offer no reason for departure from the Commission's longstanding policy of relying on competition to ensure just and reasonable prices.[7] Competitive prices are essential for just and reasonable rates when rates are regulated through competition.[8] There is ample Commission precedent for considering market

---

[5]    *See* Market Monitoring Unit, *PJM Interconnection State of the Market Report 1999* (June 2000) at 52.

[6]    *See, e.g., EDF Trading N. Am.*, LLC, 181 FERC ¶ 61,221 (December 16, 2022) ("These standards allow for a presumption of just and reasonable tariff rates based on a 90-day liquidity review period. 54 The purpose of the demonstration using these index liquidity standards is to determine whether a hub is a reliable measure of the market forces of supply and demand in the area."), citing  *El Paso Elec. Co.*, 148 FERC P 61,051, at P 7 (2014), *Idaho Power Co.*, 121 FERC P 61,181, at P 27 (2007), *PacifiCorp*, 95 FERC P 61,145, at 61,463 (2001), *Pinnacle W. Energy Corp.*, 92 FERC P 61,248, at 61,791 (2000); *Midcontinent Indep. Sys. Operator, Inc.*, 180 FERC ¶ 61,141 at P 277 (2022) ("The UCAP/ISAC ratio also prevents the need to modify its LOLE model and convert Reserve Requirements and Local Clearing Requirements into SAC terms, and maintains an appropriate supply and demand balance in the Auction. We agree with MISO and Potomac Economics that the proposed ratio is reasonable.").

[7]    *See Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs.¶31,089, mimeo at 144–145324 (1999) ("Order No. 2000") ("The Commission has a responsibility under FPA sections 205 and 206 to ensure that rates for wholesale power sales are just and reasonable, and has found that market-based rates can be just and reasonable where the seller has no market power. The Commission has determined that to show a lack of market power, the seller and its affiliates must not have, or must have adequately mitigated, market power in the generation and transmission of electric energy, and cannot erect other barriers to entry by potential competitors" (citing *Heartland Energy Services, Inc.*, 68 FERC ¶61,233 at 62,060 (1994); *Louisville Gas & Electric Company*, 62 FERC ¶61,016 at 61,143-44 (1993); *Louisiana Energy and Power Authority v. FERC*, 141 F.3d 364 (D.C. Cir. 1998) (court upholds Commission's use of market-based rate authority)).), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶31,092 (2000), *aff'd sub nom.* Pub. Util. Dist. No. 1 of Snohomish County, Washington v. FERC, 272 F.3d 607 (D.C. Cir. 2001).

[8]    *See, e.g.*, Public Citizen, Inc. v. FERC, 7 F.4th 1177, 1193 (2021) ("Market-based rate regulation is based on the premise that, '[i]n a competitive market, where neither buyer nor seller has significant market power, * * * the terms of their voluntary exchange are reasonable, and * * * [the] price' they negotiate will be 'close to marginal cost, such that the seller makes only a normal return on its investment.' … On that understanding, we have held that the Commission can rationally allow markets to set 'just and reasonable' prices as long as the Commission takes the necessary steps to ensure that market participants cannot wield anticompetitive market power.").

conditions, including supply and demand fundamentals, when making determinations of whether markets are competitive and market prices are just and reasonable.

EPSA argues (at 9–16) that if either of PJM's filings is accepted, sellers must be permitted to "resubmit their offers into the 2024/2025 BRA." EPSA notes but fails to refute PJM's and the Market Monitor's argument that "'there is no need to permit sellers to resubmit their offers because resources can be expected to submit offers based on their marginal costs, and 'any updates to the Locational Deliverability Area Reliability Requirement should [therefore] not impact a resource's offer in the RPM Auctions.'" EPSA neither explains why new offers are needed to ensure that they are competitive nor addresses concerns that allowing new offers could result in offers that are not competitive. EPSA has not demonstrated that allowing new offers is necessary for acceptance of either of PJM's filings. EPSA shares Power Providers' misunderstanding about the nature of PJM's clearing process. PJM would not restart the auction. PJM would run the market clearing software to correctly reflect supply and demand conditions. Regardless of how many times PJM runs the software, the auction is not complete and the market is not cleared until PJM approves and posts the final numbers. There is no filed rate doctrine issue and there is no restarting of the auction.

## II. MOTION FOR LEAVE TO ANSWER

The Commission's Rules of Practice and Procedure, 18 CFR § 385.213(a)(2), do not permit answers to answers or protests unless otherwise ordered by the decisional authority. The Commission has made exceptions, however, where an answer clarifies the issues or assists in creating a complete record.[9] In this answer, the Market Monitor provides the

---

[9] *See, e.g.*, *PJM Interconnection, L.L.C.*, 119 FERC ¶61,318 at P 36 (2007) (accepted answer to answer that "provided information that assisted … decision-making process"); *California Independent System Operator Corporation*, 110 FERC ¶ 61,007 (2005) (answer to answer permitted to assist Commission in decision-making process); *New Power Company v. PJM Interconnection, L.L.C.*, 98 FERC ¶ 61,208 (2002) (answer accepted to provide new factual and legal material to assist the Commission in decision-making process); *N.Y. Independent System Operator, Inc.*, 121 FERC ¶61,112 at P 4 (2007) (answer to

Commission with information useful to the Commission's decision making process and which provides a more complete record. Accordingly, the Market Monitor respectfully requests that this answer be permitted.

## III. CONCLUSION

The Market Monitor respectfully requests that the Commission afford due consideration to this pleading as the Commission resolves the issues raised in this proceeding.

Respectfully submitted,

Joseph E. Bowring
Independent Market Monitor for PJM
President
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8051
*joseph.bowring@monitoringanalytics.com*

Jeffrey W. Mayes

General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8053
*jeffrey.mayes@monitoringanalytics.com*

Dated: February 16, 2023

protest accepted because it provided information that assisted the Commission in its decision-making process).

- 6 -

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Eagleville, Pennsylvania,
this 16th day of February, 2023.

Jeffrey W. Mayes
General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610)271-8053
*jeffrey.mayes@monitoringanalytics.com*

**UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) ) ) | Docket No. ER23-729-001 |

<u>**REQUEST FOR REHEARING
OF THE PJM POWER PROVIDERS GROUP**</u>

Pursuant to Section 313 of the Federal Power Act ("FPA")[1] and Rule 713 of the Rules of

Practice and Procedure of the Federal Energy Regulatory Commission ("FERC" or

"Commission"),[2] the PJM Power Providers Group ("P3")[3] respectfully requests rehearing of the

Commission's February 21, 2023 order in the above-captioned proceeding ("Order"),[4] accepting

PJM Interconnection, L.L.C.'s ("PJM") proposed changes to the PJM Open Access Transmission

Tariff ("Tariff").[5]  As discussed below, the Commission must grant rehearing to remedy

numerous errors that render the Order arbitrary and capricious and contrary to law.

---

[1]     16 U.S.C. § 825*l* (2022).

[2]     18 C.F.R. § 385.713 (2022).

[3]     P3 is a non-profit organization dedicated to advancing federal, state and regional policies that promote properly designed and well-functioning electricity markets in the PJM Interconnection, L.L.C. ("PJM") region. Combined, P3 members own over 83,000 MWs of generation assets and produce enough power to supply over 63 million homes in the PJM region covering 13 states and the District of Columbia. For more information on P3, visit www.p3powergroup.com. The comments contained herein represent the position of P3 as an organization, but not necessarily the views of any member with respect to any issue.

[4]     *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (2023).

[5]     PJM Interconnection, L.L.C., Intra-PJM Tariffs, OATT, OATT Open Access Transmission Tariff (0.0.0).

1

# I.

## <u>BACKGROUND</u>

PJM's forward capacity market, the Reliability Pricing Model ("RPM"), consists of a highly structured process, with specific procedural steps and substantive requirements and limitations, described in detail in PJM's Tariff.[6]  In the normal course, PJM conducts an annual Base Residual Auction ("BRA") to obtain commitments to supply capacity during a Delivery Year three years in the future, with follow-on Incremental Auctions in between the BRA and the Delivery Year.[7]  The price signals produced by the RPM auctions are intended, in part, to attract investment in the new and existing generation resources that are needed to support electric reliability in the PJM region.[8]

The product procured through those auctions is the Capacity Performance product, which adjusts each capacity resource's capacity revenue based on its performance during emergency conditions.[9]  Most, but not all, generation resources are required to offer into all RPM auctions, unless they qualify for an exemption.[10]  That requirement is commonly referred to as the RPM "must-offer obligation."[11]  However, the Tariff exempts the following types of resources from the RPM must-offer obligation: Planned Generation Capacity Resources, Intermittent Resources, Capacity Storage Resources, Demand Resources, Energy Efficiency Resources, and Hybrid

---

[6]       *See* Tariff, Attach. DD.

[7]       *Id.* § 5.4.

[8]       *See, e.g.*, *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,157, at P 112 (2016); *see also* Shanker Affidavit at 36 ("PJM adopted this design with an eye to creating a 'correct' representation of the future and presumably a balancing of the risks described above and the related constructive price signals to market participants.").

[9]       Tariff, Attach. DD § 5.5A (capacity resource types).

[10]      *Id.* § 6.6A(a).

[11]      P3, Protest, at Attach. B (Shanker Affidavit) at 16-17, 36, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023) ("P3 Protest"); *see also* Tariff, Attach. DD § 6.6A(a) (referring to the "must-offer requirement").

2

Resources consisting exclusively of components that, in isolation, would be Intermittent

Resources or Capacity Storage Resources.[12]

The Tariff sets forth the mechanics of the auction process in detailed terms.  Among other

things, PJM is required to (1) develop the parameters that will be used in each BRA, (2) publish

information about those parameters, (3) obtain and review Sell Offers from Market Sellers based

on those auction parameters, and (4) compute the auction clearing prices based on those

parameters and conduct a market power review of the results.[13]  PJM develops a demand curve

for the BRA based on the auction planning parameters that it develops and posts in advance of

the BRA, and PJM develops a supply curve for the BRA based on the sell offers it receives upon

opening the offer window.  PJM develops supply and demand curves for the PJM region as a

whole, as well as for sub-zones known as Locational Deliverability Areas ("LDA") when certain

conditions are satisfied.  One of the important parameters used to develop the demand curve for

an LDA is the LDA Reliability Requirement, which represents the amount of local generation

and imports needed to serve that LDA's load, based on PJM's calculation of the Capacity Export

Transfer Objective ("CETO") for that particular LDA.[14]

The clearing prices produced by those supply and demand curves are calculated by an

optimization algorithm, the rules of which are set forth in the Tariff.[15]  Resources whose sell

offers are at or below the price the optimization algorithm produces for their geographic location

"clear" in the BRA, meaning they are obligated to provide capacity in the Delivery Year for that

BRA.  The price a resource receives for its capacity is the Capacity Resource Clearing Price

---

[12]     Tariff, Attach. DD § 6.6A(c).

[13]     *Id.* §§ 5.11. 5.12, and 6.2.

[14]     Shanker Affidavit at 10-13.

[15]     Tariff, Attach. DD §§ 5.12 and. 5.14.

(also referred to herein as the "clearing price") that the optimization algorithm produced for the resource's geographic location.[16]  However, the resource's capacity revenues can also be adjusted upward or downward based on how well it performs, *i.e.*, the extent to which it satisfies its capacity commitment, during certain emergency conditions that may occur during the Delivery Year.  In any event, a resource that clears in a BRA does not receive payments for its capacity commitment until the Delivery Year.

PJM's rights and obligations concerning its review of the clearing prices produced by the optimization algorithm are explicitly spelled out in the Tariff.[17]  PJM has extremely limited ability to adjust those results.  The Tariff expressly describes the narrow circumstances under which PJM can use the optimization algorithm to recompute the clearing prices and the equally narrow circumstances under which the results produced by the auction may be considered non-final.[18]  The Tariff also sets forth a precise timeline for the auction process and requires that, after an auction is conducted, PJM must post the results "as soon thereafter as possible."[19]

Although BRAs are typically conducted three years in advance of the corresponding Delivery Year, PJM's RPM auction schedule has been compressed in recent years.[20]  PJM conducted the BRA for the 2023/2024 Delivery Year in June of 2022 ("June 2022 BRA").  In

---

[16]     *See* Tariff, § I.1 Definitions C-D (32.2.0) (defining Capacity Resource Clearing Price as "the price calculated for a Capacity Resource that offered and cleared in a [BRA] or Incremental Auction, in accordance with Tariff, Attachment DD, section 5"); Tariff, Attach. DD § 5.14 ("The Capacity Resource Clearing Price for each LDA will be the marginal value of system capacity for the PJM Region, without considering locational constraints, adjusted as necessary by any applicable Locational Price Adders, Annual Resource Price Adders, Extended Summer Resource Price Adders, Limited Resource Price Decrements, Sub-Annual Resource Price Decrements, Base Capacity Demand Resource Price Decrements, and Base Capacity Resource Price Decrements, *all as determined by the Office of the Interconnection based on the optimization algorithm*.") (emphasis added).

[17]     *See, e.g., id.* § 6.2 (permitting PJM to recompute the optimization algorithm to clear the auction with Market Seller Offer Caps in place); *id.* at § 15 (allowing PJM to review each LDA that has a Locational Price Adder).

[18]     *Id.* § 6.2.

[19]     *Id.* § 5.11(e).

[20]     *See PJM Interconnection, LLC*, 178 FERC ¶ 61,122 at P 13 (2022).

4

July of 2022, PJM published multiple analyses of the June 2022 BRA as part of its process for

developing the planning parameters for the BRA associated with the 2024/2025 Delivery Year,

scheduled for December 2022 ("December 2022 BRA"). Among the analyses PJM published in

July 2022 was a sensitivity study ("July 2022 Sensitivity Study")[21] which showed that, if 260

MW of generation resources that were expected to participate in the BRA did not end up

participating, the clearing price for the DPL-South LDA would reach the cap of $431.26 per

MW-day.[22] PJM publicly posted the auction planning parameters for the December 2022 BRA,

including the LDA Reliability Requirement for the DPL-South LDA, in August 2022.

Based on PJM's planning parameters for the December 2022 BRA, between August 2022

and December 2022, market participants made commercial decisions about how and, for

resources without RPM must-offer obligations, whether they would participate in the December

2022 BRA.

On December 7, 2022, PJM opened the December 2022 BRA and announced, consistent

with the Tariff, that Sell Offers and Price Responsive Demand ("PRD") offers were due on

December 13 and the results would be posted on December 20.[23] On December 21, 2022, PJM

announced that, due to "a narrow set of circumstances" impacting the DPL-South LDA, PJM

would withhold the final results of the auction and make emergency filings under sections 205

---

[21]     *See* PJM, 2023/2024 Auction Information, BRA Scenario Analysis, *previously available at* https://pjm.com/markets-and-operations/rpm (Excel spread sheet labeled "2023-2024-bra-scenario-analysis.xlsx" created July 1, 2022 by Josh Bruno). PJM has removed the July 2022 Sensitivity Study from its website, but P3 submitted a .pdf copy of that document into the record of this proceeding. *See* P3 Protest, Attach. C; *see also id.* at n.23; P3 Answer at 5-6 (filed Feb. 9, 2023).

[22]     Shanker Affidavit at 22-23.

[23]     *See* https://insidelines.pjm.com/pjm-capacity-auction-for-2024-2025-delivery-year-opens/ (announcing that the December 2022 BRA "bidding window will close on Dec. 13, and results will be reported on Dec. 20"); *see also* PJM Interconnection, L.L.C., Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for Extended Comment Period of 28 Days, Dkt. No. ER23-729-000, at 8 (filed Dec. 23, 2022) ("PJM 205 Filing").

and 206 of the FPA.[24]  PJM later indicated that it would "release[]" auction outcomes that it

described as "indicative" and "preliminary."[25]  However, based on stakeholder feedback, PJM

later announced that it would not "post indicative results."[26]  On December 23, PJM submitted

the two filings at issue in these proceedings, one pursuant to FPA section 205 and one pursuant

to FPA section 206, proposing Tariff changes to the rules applicable to the December 2022 BRA

and future BRAs.[27]

Numerous parties protested PJM's proposed Tariff changes and argued, among other

things, that it was not supported by substantial evidence, would not address the concern that PJM

identified, would constitute a blatant violation of the filed rate doctrine and rule against

retroactive ratemaking, and would completely undermine confidence in the PJM market and the

markets of other RTOs/ISOs.  For its part, P3 provided expert affidavits from former FERC

Chairman Joseph T. Kelliher ("Kelliher Affidavit") and Dr. Roy J. Shanker ("Shanker

Affidavit") in support of those arguments and in rebuttal to PJM's unsupported claims regarding

the merits and legality of its proposal.[28]

On February 21, 2023, the Commission accepted PJM's proposal to change the rules

applicable to the December 2022 BRA under section 205 of the FPA.[29]  Among other things, the

Commission concluded that the filed rate doctrine and rule against retroactive ratemaking do not

---

[24]     *See* https://insidelines.pjm.com/pjm-updates-members-on-2024-2025-capacity-auction-results; Shanker
Affidavit at 9.

[25]     https://insidelines.pjm.com/pjm-updates-members-on-2024-2025-capacity-auction-results.

[26]     *Id.*

[27]     *See* PJM 205 Filing; PJM Interconnection, L.L.C., Section 206 Filing Alleging that the Locational
Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational
Deliverability Area in the 2024/2025 Base Residual Auction And Requesting that the Commission Establish a
Refund Effective Date of December 23, 2022, and Request for an Extended Comment Period of 28 Days, Dkt. No.
EL23-19-000 (filed Dec. 23, 2022) ("PJM Complaint").

[28]     *See* P3 Protest at Attachments A & B.

[29]     The Commission also dismissed as moot PJM's companion FPA section 206 filing.

stand in the way of accepting PJM's proposal because those legal principles apply only where a transaction has been "consummated," which the Commission concluded has not yet occurred for the December 2022 BRA.[30]  That Order is the subject of this request for rehearing.

## II.

## SPECIFICATION OF ERRORS AND STATEMENT OF ISSUES

In accordance with Rule 713(c)(2) of the Commission's Rules of Practice and Procedure,[31] P3 hereby identifies each issue on which it seeks rehearing of the February Order, and provides representative precedent in support of its position on each of those issues:

1.      The Order violated the filed rate doctrine, the rule against retroactive ratemaking, and the underlying provisions of the FPA, by changing the rules of the December 2022 BRA, and the clearing prices produced by those rules, after PJM had conducted that BRA.  16 U.S.C. § 824d; *Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520-21 (1939); *Nantahala Power & Light Co. v. Thornburg ("Nantahala")*, 476 U.S. 953, 966-67 (1986); *Oklahoma Gas & Electric Co. v. FERC ("Oklahoma Gas")*, 11 F.4th 821, 829-32 (D.C. Cir. 2021); *Old Dominion Electric Cooperative v. FERC ("ODEC")*, 892 F.3d 1223, 1230-32 (D.C. Cir. 2018).

2.      The Order's conclusion that accepting PJM's proposed Tariff change does not run afoul of the filed rate doctrine and rule against retroactive ratemaking is not supported by reasoned decision-making and therefore violates the Administrative Procedure Act ("APA").  5 U.S.C. § 706(2)(A); *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *FCC v. Fox Television Studios, Inc.* ("*Fox*"), 556 U.S. 502, 515 (2009); *Allentown Mack Sales and Service, Inc. v. NLRB ("Allentown")*, 522 U.S. 359, 374-75 (1998); *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *Missouri Public Service Commission v. FERC*, 337 F.3d 1066, 1070-75 (D.C. Cir. 2003); *Electric Consumers Resource Council v. FERC*, 747 F.2d 1511, 1514 (D.C. Cir. 1984).

3.      The Order's determination that PJM's proposed Tariff change is just and reasonable is not supported by substantial evidence and therefore violates the APA.  5 U.S.C. § 706(2)(A); *Michigan v. EPA*, 576 U.S. at 750; *Fox*, 556 U.S. at 515; *Allentown*, 522 U.S. at 374-75; *Missouri Public Service Commission v.*

---

[30]     *See* Order, 182 FERC ¶ 61,109 at P 167.

[31]     18 C.F.R. § 385.713(c)(2).

*FERC*, 337 F.3d at 1070-75; *Electric Consumers Resource Council v. FERC*, 747 F.2d at 1514.

4.  The Order's conclusion that PJM's proposed Tariff change is just and reasonable does not pass muster under the APA because the Commission's rationale is inadequately explained, inconsistent with precedent and economic theory, and fails to address contrary arguments and evidence presented to it.
5 U.S.C. § 706(2)(A); *Michigan v. EPA*, 576 U.S. at 750; *Fox*, 556 U.S. at 515; *Allentown*, 522 U.S. at 374-75; *Missouri Public Service Commission v. FERC*, 337 F.3d at 1070-75; *Electric Consumers Resource Council v. FERC*, 747 F.2d at 1514.

### III.

### <u>REQUEST FOR REHEARING</u>

**A.    The Order Violates the Filed Rate Doctrine and Rule Against Retroactive Ratemaking by Changing the Rules of the December 2022 BRA, and the Resulting Rate for DPL-South, After the BRA Had Been Conducted**

The Order represents one of the most egregious and consequential violations of the filed rate doctrine and rule against retroactive ratemaking in the Commission's history.  The Order blows through the well-established boundaries set by judicial precedent, and then goes miles beyond those boundaries by establishing a novel, unprecedented legal interpretation that effectively reads the filed rate doctrine and rule against retroactive ratemaking out of existence in the context of wholesale electricity markets administered by RTOs/ISOs—tilting the FPA significantly in favor of RTOs/ISOs and against market participants and customers.  Under the Order's interpretation of the filed rate doctrine, it does not apply until a capacity transaction is "consummated," *i.e.*, until a capacity commitment has been fully satisfied and financially settled in the delivery year,[32] despite the fact that sellers (and other market participants) are required to follow the filed rate—and make investments necessary to satisfy their capacity commitments—in the long period in between auction and transaction "consummation."  The Order's outlandish

---

[32]    Although the Order does not define the term "consummated" or "consummation," it describes that term in this particular context to mean capacity has been "delivered" pursuant to auction commitments and "charges [have] been billed or collected." Order, 182 FERC ¶ 61,109 at P 167.

legal theory produces a result that is blatantly unlawful, dreadful as a matter of regulatory policy, and threatens to unwind the Commission's commitment to competitive wholesale markets over the past two decades.[33]

The filed rate doctrine "bind[s] regulated entities to charge only the rates filed with FERC and to change their rates only prospectively."[34]  As a result, the Commission "has no authority under the [FPA] to allow retroactive change in the [filed] rates."[35]  Further, "[a]s the statutory terms make clear, the filed rate is not limited to 'rates' *per se*, but also extends to matters directly affecting rates."[36]  The filed rate doctrine thus applies with equal force to both the "rates" and the "non-rate terms" set forth in a tariff:[37]  "[t]he [FPA] provides no grounds for distinguishing rate and non-rate terms, but rather binds parties to the terms in the filed rate."[38]  The filed rate doctrine applies with equal strength in the context of competitive wholesale markets and the non-rate terms set forth in RTO/ISO tariffs, including PJM's.[39]

The Commission's Order in this proceeding pays lip service to the filed rate doctrine and rule against retroactive ratemaking, but then quickly veers off the rails by contriving a novel, tortuous, and internally inconsistent legal theory for why those principles do not prevent PJM from changing the rules of a BRA, and the resulting clearing prices, after PJM has conducted the BRA pursuant to those rules.  The Commission's legal theory guts the filed rate doctrine and rule

---

[33]    *See* Kelliher Affidavit at 24-30.

[34]    *Oklahoma Gas*, 11 F.4th at 829.

[35]    *Id.* (quoting *Old Dominion*, 892 F.3d at 1230) (internal quotations omitted).

[36]    *See id.* at 829-30 (quoting *Nantahala*, 476 U.S. at 966-67) (internal quotations and alteration omitted).

[37]    *See id.* (citing *Nantahala*, 476 U.S. at 966-67); *accord* 16 U.S.C. § 824d(d).

[38]    *Oklahoma Gas*, 11 F.4th at 830.

[39]    *See Old Dominion*, 892 F.3d at 1230.

against retroactive ratemaking.[40]  The Order's acceptance of PJM's Tariff change in this

proceeding based on that theory violates the both the FPA and the APA.

The Order asserts that the filed rate doctrine and rule against retroactive ratemaking do

not apply in this scenario because "no capacity commitments have yet been secured, no

transaction had yet been consummated, meaning that neither PJM nor any supplier had the

attendant rights or obligations, no capacity had been delivered pursuant to such commitments,

and no charges had been billed or collected."[41]  The Order thus concluded that a change to "the

BRA procedures" is "not retroactive for purposes of the filed rate doctrine if the capacity supply

obligations and the corresponding rights and obligations—including the right to a particular

capacity price—have not yet actually been awarded."[42]  This interpretation of the filed rate

doctrine and rule against retroactive ratemaking—*i.e.*, that it does not apply until and unless a

transaction has been "consummated" through financial settlement[43]—is erroneous for several

reasons.

*First*, it has no basis in the text of the FPA.  Under section 205 of the FPA, from which

the filed rate doctrine and rule against retroactive ratemaking are derived, the rate on file has the

force and effect of law regardless of whether transactions are "consummated" pursuant to the

filed rate.[44]  Further, the FPA governs, and the filed rate doctrine adheres to, much more than just

---

[40]    To the extent the Order weighs equitable factors in deciding to accept PJM's proposal as just and reasonable, that analysis is irrelevant to the question of whether or not PJM's proposal is permissible under the filed rate doctrine.  *See, e.g.*, *Oklahoma Gas*, 11 F.4th at 826 ("FERC has no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations.") (quoting *ODEC*, 892 F.3d at 1230) (internal quotations omitted).  Further, even if the Order's interpretation of the filed rate doctrine were correct, which it is not, the Order's consideration of equitable factors also fails to pass muster under the Administrative Procedure Act, as explained below.

[41]    Order, 182 FERC ¶ 61,109 at P 167.

[42]    *Id.*

[43]    *See supra* n.32.

[44]    *See* 16 U.S.C. § 824d.

the rates and charges that ultimately end up being used in a "consummated" Commission-jurisdictional transaction.[45]

According to its plain language, FPA section 205 governs "[a]ll rates and charges made, *demanded*, or received" by a utility;[46] it requires a utility's filed rate to include "all rates and charges . . . and the classification, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services;"[47] and it prohibits a utility from changing "any such rate, charge, classification, or service," and "any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public."[48] Those statutory provisions, as the source of the filed rate doctrine, "bind" the utility "to the terms in the filed tariff," both the "rate and non-rate terms."[49]

Thus, as relevant here, the FPA requires PJM to follow its filed rate—including the non-rate terms therein—regardless of whether any transactions have, or ever will be, consummated pursuant to that filed rate.[50] Where the filed rate sets forth rules for procuring capacity from resources (or even merely obtaining offers from such resources), as is the case with the BRA

---

[45]  *See, e.g.*, *Oklahoma Gas*, 11 F.4th at 830.

[46]  16 U.S.C. § 824d(a).

[47]  *Id.* § 824d(c).

[48]  *Id.* § 824d(d).

[49]  *Oklahoma Gas*, 11 F.4th at 829-30. As the courts have repeatedly explained, in no uncertain terms, the filed rate doctrine applies with equal force to "non-rate terms" of a tariff and to "matters directly affecting rates." *Id.* at 829 (quoting *Nantahala*, 475 U.S. at 966-67) (cleaned up).

[50]  *See, e.g.*, *ODEC*, 892 F.3d at 1231-32 (explaining that, *prior to the transactions at issue in the proceeding*, "the filed rate on its face assured customers that, however the market might change, charges would be capped at $1,000 per megawatt-hour" and, therefore, customers "were on explicit notice that, although market forces might cause some variation within a range, the rates charged would never exceed the agreed-upon rate cap"); *id.* at 1232 ("To toss that cap aside after the fact just because it did exactly what a cap is supposed to do—serve as a firm ceiling on market prices—would retroactively rewrite the terms of the filed rate. The filed rate doctrine and rule against retroactive ratemaking flatly forbid such a result.").

procedures,[51] the filed rate doctrine requires PJM to strictly follow those rules and change them only prospectively.  Yet, under the Order's novel interpretation of the filed rate doctrine, the doctrine (and the provisions of the Federal Power Act from which it flows) would apply only to "rates and charges" (*i.e.*, not to non-rate terms like BRA procedures) and only after a transaction based on those rates and charges has been "consummated" through financial settlement.[52]  That interpretation cannot be squared with the text of the Federal Power Act[53] or the Commission's previous interpretations thereof.[54]

*Second*, the Commission's theory is based on a misinterpretation of legal precedent.  The Order asserts that "[c]ourts have held that changes to a rate are impermissibly retroactive *only* where regulated entities or customers have already transacted pursuant to the rate—i.e., where purchases or sales have occurred."[55]  Although the Order cites several cases in support of that assertion,[56] the Commission reads those cases for more than they are worth.  To be clear, the cases cited by the Order do support the conclusion that a rate change is "impermissibly retroactive" if "regulated entities or customers have already transacted pursuant to that rate—i.e.,

---

[51]     *See* Order, 182 FERC ¶ 61,109 at P 165 ("As relevant here, for purposes of the filed rate doctrine, the rate on file with the Commission is the *BRA procedures*.") (emphasis added).

[52]     *See id.* at P 167.

[53]     *See* 16 U.S.C. § 824d (statutory text containing no reference to transaction consummation).

[54]     *See, e.g.*, *Fox, 556 U.S.* at *515* ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position."*); Bittner v. U.S.*, 143 S.Ct. 713, 772 (2023) ("[C]ourts may consider the consistency of an agency's views when we weigh the persuasiveness of any interpretation it proffers in court.") (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *cf. EDF Renewables, Inc. v. Sw. Power Pool, Inc.*, 181 FERC ¶ 61,140, at PP 75-84 (2022) (finding that Southwest Power Pool, Inc. violated the filed rate doctrine by failing to properly implement a process set forth in the tariff in advance of the transactions that would follow that process).

[55]     Order, 182 FERC ¶ 61,109 at P 166 (emphasis added).

[56]     *See id.* at P 166, n.449 (citing *ODEC*, 892 F.3d at 1226-27; *Cogentrix Energy Power Mgmt., LLC v. FERC*, 24 F.4th 677, 684 (D.C. Cir. 2022); *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1320 (D.C. Cir. 2004); *Associated Gas Distribs. v. FERC*, 898 F.2d 809, 810-11 (D.C. Cir. 1990); *City of Girard, Kan. v. FERC*, 790 F.2d 919, 924 (D.C. Cir. 1986)).

where purchases or sales have occurred."[57]  Unfortunately, that is not the conclusion the Commission drew from those cases; the Commission went much further, concluding that those cases show that rate changes are impermissibly retroactive "*only*"[58] where a transaction has already been consummated.  None of the precedents the Order cites proscribes the filed rate doctrine and rule against retroactive ratemaking to *only* those circumstances.[59]  Further, the Order's conclusion to the contrary ignores court precedent clearly explaining that the filed rate doctrine and rule against retroactive ratemaking applies before a transaction has actually occurred pursuant to the filed rate.[60]

*Third*, even assuming *arguendo* that the Commission were correct that the filed rate doctrine and rule against retroactive ratemaking apply only after a transaction is entered into or "consummated," the Commission erred in concluding that no binding commitments were made in the December 2022 BRA—*i.e.*, that no capacity commitments "and the corresponding rights and obligations" had been awarded—prior to PJM's proposal to change the rules for that BRA.  As a legal matter, before PJM made its filing in this proceeding, PJM applied its BRA procedures and secured irrevocable capacity commitments through the December 2022 BRA.[61]

Selling capacity means committing to be available when called upon at a future date.  In the context of the December 2022 BRA, PJM had solicited, and sellers had submitted, binding

---

[57]     *See Order*, 182 FERC ¶ 61,109 at P 166.

[58]     *Id.* at P 166 (emphasis added).

[59]     *See ODEC*, 892 F.3d 1223; *Cogentrix Energy Power Mgmt., LLC v. FERC*, 24 F.4th 677; *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315; *Associated Gas Distribs. V. FERC*, 898 F.2d 809; *City of Girard v. FERC*, 790 F.2d 919.

[60]     *See, e.g., Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520-21 (1939) (explaining that the filed rate doctrine binds both service provider and customer "with the force of law" and the customer was entitled to require service pursuant to the terms of the tariff, including "prior arrangements" that were necessary "[t]o facilitate the rendition of the service"); *see also ODEC*, 892 F.3d at 1231-32, *supra* n.50.

[61]     *See, e.g., Fed Cetera, LLC v. Nat'l Credit Servs.*, 938 F.3d 466, 471-72 (3rd Cir. 2019) (explaining that "to consummate" an agreement can mean that "a contract has formed, not that a party started performance on a contract").

13

**JA660**

commitments to provide capacity for the 2024-2025 delivery year before PJM submitted its

filing in this proceeding.  As P3 and others have explained at length, prior to seeking the Tariff

change at issue in this proceeding, PJM had fully conducted the BRA—*i.e.*, it followed all of the

BRA procedures for determining the clearing prices, including publishing planning parameters in

advance, taking sell offers based on those planning parameters, generating clearing prices based

on those planning parameters and the sell offers received, and conducting the necessary market

power review of the sell offers and clearing prices.  The only aspect of the BRA procedures PJM

had not satisfied prior to commencing this proceeding was the requirement that, "[a]fter

conducting the BRA," PJM must "post the results . . . as soon thereafter as possible."[62]

Thus, prior to the commencement of this proceeding, sellers made binding offers in the

December 2022 BRA to provide capacity to PJM; the optimization algorithm identified the

resources that were selected to provide capacity based on the supply and demand curves which,

in turn, necessarily established the clearing prices for the BRA; and PJM had conducted its

market power review of the sell offers and optimization algorithm results and identified no

issues.

The capacity sellers who were selected through that process were bound by the Tariff to

keep up their end of the bargain, regardless of whether or when PJM "post[ed]" the auction

results.  The Tariff does not permit sellers to back out at that point—even if they do not like the

results of the BRA.  In other words, once a resource's sell offer is cleared by the optimization

algorithm and it passes PJM's market power review, the resource is "obligated" to provide

capacity pursuant to the terms contained in the Tariff.[63]  That is the quintessence of a "capacity

---

[62]        Tariff, Attach. DD § 5.11(e); *see also* P3 Protest at 10-14.

[63]        *See, e.g.*, *New England Power Generators Ass'n v. ISO New England Inc.*, 172 FERC ¶ 61,005, at n.12
("[A] resource 'clears' when the Capacity Clearing Price is greater than or equal to the price specified in the offer.").

commitment." The fact that, under the Tariff, sellers were bound to their capacity commitments before PJM commenced this proceeding entirely contradicts the Order's conclusion "no capacity commitments" had been made based on the filed rate. The Commission's decision to let PJM change the rules and the BRA clearing prices on which those capacity commitments were made, after those commitments had been made, represents a blatant filed rate doctrine violation. In addition, the Commission's failure to address the arguments and evidence indicating that PJM had fully conducted the BRA in securing those capacity commitments—and, at the same time, violated the filed rate by calculating "preliminary" or "indicative" clearing prices not contemplated by the Tariff—amounts to an equally blatant violation of the APA.

The Commission's attempt to suspend the filed rate doctrine's application to the PJM capacity market until financial settlement occurs, several years in the future, is particularly egregious given the asymmetries that flow from the Commission's approach. Despite the Commission's perplexing statement that the filed rate doctrine does not apply because "no rights and obligations have been awarded," the Commission clearly believes that sellers are obligated to follow the filed rate prior to a transaction being consummated. As the Order explained, sellers are not permitted to resubmit sell offers in order to reflect the changes in the LDA Reliability Requirements for the December 2022 BRA, despite the fact that the Commission believes that "no rights and obligations have been awarded."[64] Furthermore, as a practical matter, in order to satisfy capacity commitments in the 2024/2025 delivery year, resource owners that cleared the December 2022 BRA will need to make significant investments in their resources—to the tune of millions of dollars in many cases—based on the "rights and obligations" conferred through the BRA.

---

[64]    Order, 182 FERC ¶ 61,109 at PP 158, 167.

In other words, under the framework adopted in the Order, capacity sellers have no right to rely on the capacity market rules in PJM's filed rate until financial settlement is complete, but in the meantime capacity sellers are obligated to comply with those capacity market rules and invest millions of dollars in reliance on those rules. And, conversely, the Order gives PJM the right to hold sellers and customers to the filed rate regardless of whether a transaction has taken place, while also permitting PJM to retroactively alter the rate and non-rate terms of the filed rate any time up until the point that a transaction is "consummated"—which the Commission describes as the point at which capacity has been delivered and all charges have been billed and collected.[65] Each of these two asymmetries, whereby (1) sellers and customers would have all of the filed rate's burdens but none of its benefits and (2) the utility would have all of the filed rate's benefits but none of its burdens, are antithetical to purpose of the filed rate doctrine.[66] The Commission's failure to recognize this asymmetry, much less attempt to explain how it is consistent with the FPA, renders the Order arbitrary and capricious.[67]

The Order's novel interpretation of the filed rate doctrine and rule against retroactive ratemaking would eviscerate those legal principles in the context of all RTO/ISO markets, not just PJM's. Any RTO/ISO, including PJM, could change its terms of service at any time—even after that service has been rendered, *e.g.*, after a capacity auction has been administered—as long as the RTO/ISO has not yet "consummated" a transaction involving that service through financial settlement, which in the capacity market context is typically several years in the future.

---

[65]    *See supra* n.32.

[66]    *Compare Oklahoma Gas*, 11 F.4th at 829 (explaining that the filed rate doctrine binds utilities follow their filed rates) *with ODEC*, 892 F.3d at 1230 (explaining that the filed rate doctrine and rule against retroactive ratemaking protect customers of the utility by "ensuring rate predictability and preventing discriminatory or extortionate pricing").

[67]    *See, e.g., Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. at 105 (agency must have "considered the relevant factors and articulated a rational connection between the facts found and the choice made").

The problematic implications of such a regulatory framework cannot be overstated.  For example, under the Commission's theory, PJM could fundamentally alter the nature of the performance requirements applicable to Capacity Performance resources after a seller commits a resource to being a Capacity Performance resource for a Delivery Year, as long as PJM completes the bait-and-switch before it financially settles the resource's capacity transactions for that Delivery Year—which might occur as much as four years after the resource owner made its capacity commitment.

Such a legal framework would render RTO/ISO market rules inherently unpredictable, undermining both the purpose of the filed rate doctrine and confidence in the RTO/ISO markets.[68]  The Commission has built its regulatory framework for the wholesale markets on the principle that market integrity and rate certainty will foster investor confidence and attract the investments needed to maintain reliable service at just and reasonable rates.  As Chairman Kelliher explained in response to PJM's filing in this proceeding, a Commission decision accepting PJM's proposal would be at odds with Commission and court precedent supporting that principle and would undermine investor confidence in not only the PJM market, but all RTO/ISO markets.[69]  Reading the filed rate doctrine and rule against retroactive ratemaking out of the RTO/ISO markets, as the Order effectively does, is fundamentally inconsistent with the Commission's long-held commitment to harnessing competitive market forces to attract the investment needed in the generation sector to maintain reliability at just and reasonable rates.  As

---

[68]    Further, the version of the filed rate doctrine adopted by the Order would also have significant implications beyond RTO/ISO markets.  The same legal principles adopted by the Order would apply to any public utility with a rate on file, not just the RTOs/ISOs.  As a result, the Order's novel and asymmetrical understanding of the filed rate doctrine would disadvantage customers taking service under any public utility's filed rate, by exposing customers to the possibility that the utility could retroactively change the terms of service in the time between when the customer signs up for that service and when the transaction for that service has been financially settled.

[69]    *See* Kelliher Affidavit at 4, 23-25.

P3 has explained in this proceeding, that "is not a legacy this Commission should welcome." The Commission's failure to meaningfully address that concern in the Order not only welcomes that legacy, it does so by sticking its head in the sand.  On rehearing, the Commission must reverse course and continue its heretofore admirable commitment to competitive markets.

In short, the Order's novel interpretation of the filed rate doctrine is unsupported by the text and structure of the Federal Power Act, completely at odds with a long line of controlling judicial precedent, and inconsistent with the very purpose of the filed rate doctrine and rule against retroactive ratemaking.  The Commission's decision to accept PJM's proposal, as applied to the December 2022 BRA, on the basis of its flawed legal interpretation is contrary to law for two distinct reasons: (1) it directly contravenes the FPA and nearly a century of filed rate doctrine precedent, and (2) it does so based on a rationale that fails to satisfy the Commission's obligations under the APA.[70]  The net result is a precedent that will broadly jeopardize the Commission's ability to ensure that rates remain just and reasonable and not unduly discriminatory on a going forward basis, in the PJM capacity market and beyond.  The Commission must grant rehearing, correct the Order's erroneous interpretation of the filed rate doctrine and rule against retroactive ratemaking, and reject PJM's proposal.

### B.     The Order's Determination that PJM's Proposal Is Just and Reasonable Is Unlawful Under the Administrative Procedure Act

The APA requires the Commission to make a "reasoned decision based upon substantial evidence,"[71] and "articulate a satisfactory explanation for its action including a rational

---

[70]     *See, e.g.*, *Michigan v. EPA*, 576 U.S. at 750 ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.  It follows that agency action is lawful only if it rests on a consideration of the relevant factors." (quoting *Allentown*, 522 U.S. at 374, and *State Farm*, 463 U.S. at 43) (internal quotations and citations omitted); *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d at 1070-75.

[71]     *N. States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994) (internal quotations omitted); *see also* 5 U.S.C. § 706(2).

connection between the facts found and the choice made."[72]  Further, Commission action is arbitrary and capricious, in violation of the APA, if the Commission "fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before the agency."[73]  The Commission's conclusion that PJM's proposal is just and reasonable falls short in all of those respects.  The Order is not based on substantial evidence concerning the approved rate change, does not demonstrate reasoned decision making or articulate a rational connection between the record evidence and the decision to approve the rate change, and both ignores and misconstrues probative evidence and arguments concerning the merits of PJM's proposal.  The Commission must grant rehearing to address these deficiencies.

> **1.      The Order's Determination that PJM's Proposal Is Just and Reasonable Does not Rely on, or Otherwise Address, the Record Evidence and, in any Event, the Evidentiary Record Cannot Support the Order's Determination**

In response to PJM's filings in this proceeding, P3 explained that the Commission could not accept PJM's proposal because PJM gave the Commission no solid evidence that its proposed Tariff change would produce just and reasonable rates and did not demonstrate a rational connection between its proposed Tariff change and the facts that gave rise to that proposal.[74]  Rather than attempt to address that argument on its merits, the Commission opted to accept PJM's filing *without citing any record evidence whatsoever concerning the rates PJM's proposal would produce*.  In other words, the majority's response to P3's protest was to sidestep

---

[72]     *State Farm*, 463 U.S. at 43.

[73]     *Id.*

[74]     P3 Protest at 31.

the record evidence altogether.  In so doing, the Commission failed to satisfy its obligations

under the APA.[75]

PJM's explanation for why its proposal in this proceeding in just and reasonable consists

of two conclusory assertions.  First, PJM asserted that, in the December 2022 BRA, the existing

Tariff would produce a clearing price for the DPL-South LDA that is approximately four times

the price that PJM's proposed Tariff change would produce.  Second, PJM asserted that, as

between those two vague outcomes, PJM's proposed Tariff change would more closely align the

LDA Reliability Requirement with actual reliability needs both in the December 2022 BRA and

in future BRAs.[76]  Those assertions are unsupported, flawed, and ultimately insufficient to

support a finding that PJM's proposal is just and reasonable and not unduly discriminatory.[77]

As an initial matter, evidence that the proposal produces a lower clearing price than that

produced by the existing Tariff has little bearing on whether the proposed rate is just and

reasonable and not unduly discriminatory.  FPA section 205 requires PJM to demonstrate, and

the Commission to determine, that the proposal is just and reasonable and not unduly

discriminatory on its own merits.  Just asserting that the proposed rate is qualitatively "better"

than the existing rate, or quantitatively lower than the existing rate, is not sufficient to support a

---

[75]    *See, e.g.*, *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d at 1070 ("The Commission must articulate the critical facts upon which it relies, and when it finds it necessary to make predictions or extrapolations from the record, it must fully explain the assumptions it relied on to resolve unknowns and the public policies behind those assumptions.") (internal quotations omitted).

[76]    *See* PJM Interconnection, L.L.C., Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for Extended Comment Period of 28 Days, Dkt. No. ER23-729-000, at 20 (filed Dec. 23, 2022) ("PJM 205 Filing") (explaining PJM's belief that the *ex ante* Tariff produced an LDA Reliability Requirement that is less accurate than PJM's proposal would produce).  Although PJM stated in Docket No. EL23-19 that, absent a Tariff change, the "effect of the auction results would require load in the [DPL-South LDA] to be responsible for paying over one hundred million dollars in excess of what is necessary for capacity associated with the 2024/2025 Delivery Year," that more specific—yet also unsupported—assertion does not appear in the evidentiary record of this proceeding, *i.e.*, Docket No. ER23-729.  *Compare* PJM 205 Filing *with* PJM Complaint.

[77]    *Electricity Consumers Resource Council v. FERC*, 747 F.2d at 1517 ("[M]ere invocation of theory is insufficient substitute for substantial evidence and reasoned explanations.").

determination that the proposed rate is just and reasonable and not unduly discriminatory.  But in asserting (without evidence) that its proposal is just and reasonable simply because it would produce a clearing price one-fourth the price produced by the *ex ante* Tariff, that is exactly how PJM attempted to carry its statutory burden in this proceeding.  In essence, PJM's legal theory is that producing a clearing price for the DLP-South LDA that is one-fourth the clearing price produced by the *ex ante* Tariff automatically renders the proposal just and reasonable and not unduly discriminatory.  The fact that PJM pinned its proposal entirely on that inadequately supported assertion highlights just how little record evidence there is in support of PJM's proposal.

Putting aside that mistake in PJM's theory, PJM's claim regarding the clearing price produced by its proposal is flawed for several reasons.   For one thing, PJM provided no explanation of how it calculated the "indicative" or "preliminary" price (or perhaps prices).  For all the Commission knows, based on the record anyway, PJM pulled its "indicative" results out of a hat.  Nowhere in PJM's filings does PJM explain whether, or to what extent, it used the optimization algorithm set forth in the Tariff to generate the "indicative" clearing price(s).  *In fact, PJM did not even demonstrate that it used the approach proposed in this proceeding in making its internal assessment that the DPL-South LDA should be one-fourth the price produced by the existing Tariff.*

Further, PJM did not even provide a rough approximation of the magnitude of the "indicative" price or the price produced by the *ex ante* Tariff.  Were the prices $4 and $16?  $20 and $80?  $40 and $120?  $100 and $400?  And how did the two clearing prices compare to historical prices in the PJM region, including the DPL-South LDA, or to the December 2022

21

BRA prices for other parts of the PJM region?[78]  PJM did not say.  And, even if PJM had

specifically identified the two prices—*i.e.,* actual and "indicative"—for the DPL-South LDA in

the December 2022 BRA, PJM provided no explanation for why the data for one LDA in one

auction would be sufficient to demonstrate that PJM's proposed Tariff change will produce just

and reasonable results.  Presumably, PJM could easily have calculated the impact that its

proposal would have had on past BRAs and used that information to show its likely impact on

the market over time.  *That* could have been statistically significant evidence of the type that

might support a determination of justness and reasonableness.  Yet PJM chose not to present that

evidence, and in the absence of such evidence, the Commission cannot simply assume evidence

into the record.

        In short, PJM's "indicative" price raised more questions than it answered.  Unfortunately,

the Commission declined to ask any of those questions itself, and ignored the protesters who did

ask them.  The Commission's failure to question PJM's "indicative" price is particularly

troubling given that, as P3 and others have explained in this proceeding, PJM understood—

months in advance—the exact market dynamics that gave rise to this proceeding, presented

evidence to the market by publicly posting it on the PJM website, expressly confirmed the

soundness of that evidence in response to an inquiry from a market participant, and then removed

the evidence from the PJM website just before protests were due in this proceeding.  In looking

the other way, the Commission turned too far.  The Commission's failure to require *any*

---

[78]        Although PJM noted, for "perspective," that "the clearing price for the DPL-S LDA from the 2023/2024 BRA was $69.95/MW-day," identifying a past price only provides "perspective" if there is a price to which it is being compared.  Here, PJM provided no price to compare against the 2023/2024 BRA price for the DPL-South LDA, much less demonstrate that the prices lend themselves to an apples-to-apples comparison.  On the other hand, protesters provided evidence demonstrating that a four-fold price increase is far from unprecedented in PJM.  *See* Constellation Energy Generation, LLC, Comments, at 9-10 (filed Jan. 20, 2023) (providing historic BRA clearing prices to demonstrate precedent for fourfold price increases).

information about PJM's "indicative" results and how PJM generated them renders that "evidence" unreliable, at best, and intentionally misleading, at worst. Either way, the result is that PJM's sole piece of "evidence" is insufficient to support a finding that PJM's proposal is just and reasonable.

Perhaps recognizing the troubling vagueness of PJM's evidence, certain commenters tried to engineer more compelling evidence by calculating specific prices to match PJM's shadowy claims. Specifically, two parties—Old Dominion Electric Cooperative ("ODEC") and Maryland's Office of People's Counsel ("Maryland OPC")—used PJM's unsupported assertion of a four-fold difference in clearing price to calculate specific, theoretical dollar figures for the clearing price and consumer rate impacts in the DPL-South LDA.[79] But that evidence is even less valid than PJM's for two reasons.

*First*, it is the fruit of a poisonous tree. It directly relies on PJM's unsupported assertion regarding the four-fold increase. The above flaws in PJM's assertion necessarily flow through any attempt to calculate specific prices or economic impacts that are based on that assertion.

*Second*, in calculating the theoretical prices and consumer rate impacts, ODEC and Maryland OPC each used methods that are fundamentally unsound. ODEC generated a range of theoretical clearing prices simply by taking the DPL-South clearing price from the July 2022 BRA and multiplying it by four, to set a lower bound, and using the maximum allowable price for DPL-South based on the planning parameters for the December 2022 BRA, to set the upper bound. ODEC provided no explanation as to why the *July 2022* BRA clearing price for DPL-South, which was based on supply and demand dynamics specific to that BRA, is a valid starting point in calculating the lower bound of an estimated price in the *December 2022* BRA; nor did

---

[79]     Answer of ODEC, at 3-4, Docket Nos. ER23-729 & EL23-19 (filed Feb. 6, 2023); Comments of Maryland OPC, at 3, n.1, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023).

ODEC explain why it is appropriate to set its lower and upper bounds using data from two separate BRAs (*i.e.*, a lower bound based on the July 2022 BRA results and an upper bound based on a December 2022 BRA parameter).  Further, the "rough calculation" of consumer rate impacts that the Maryland OPC provided is even less useful than ODEC's calculations.[80]  The Maryland OPC provided no explanation whatsoever for how it conducted the "rough calculation," which it mentioned in passing in a single footnote.[81]

In contrast to the feeble evidence in support of PJM's proposal, P3 and other parties provided reams of evidence, supported by affidavits from expert witnesses, demonstrating that PJM's proposal was unlawful.  The Commission ignored numerous critical pieces of that evidence, including that (1) every variable on the demand side of a BRA, not just the LDA Reliability Requirement, is entirely based on forecasts and assumptions, which can be off in either direction (*i.e.*, too high or too low);[82] (2) PJM's proposal only requires *one* such variable to be adjusted, after it is too late for the supply-side of the market to respond, and only if the forecast was *too high*, ignoring situations where it might be *too low*; (3) the clearing price that the optimization algorithm produced under the existing Tariff rules (*i.e.*, the rules in place when PJM conducted the December 2022 BRA) was economically rational for the DPL-South LDA— and reflective of the LDA's reliability needs—because the DPL-South LDA is already short on generation and is experiencing difficulty making up that shortfall;[83] and (4) allowing PJM to bait-and-switch sellers by changing the parameters of a BRA after sellers have submitted their offers based on a different set of parameters is not sound market design, will undermine

---

[80]    Comments of Maryland OPC, at 3, n.1, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023).

[81]    *Id.*

[82]    *See* P3 Protest at 32-34; Shanker Affidavit at 24-29, 35-36.

[83]    *See id.* at 21-22, 41.

confidence in the market, and ultimately produce a "less liquid market" with "higher buy/sell spreads."[84]

In a feat of hubris, the Commission chose to accept PJM's proposal as just and reasonable without relying on the evidence submitted in support of PJM's proposal or addressing the contrary evidence described above.  The Order's rationale for why PJM's proposal will produce just and reasonable rates consists of a few conclusory assertions sprinkled into the section of the Order that faintly address the merits of PJM's proposal—and the Order makes no reference to record evidence in support of those assertions.[85]  Specifically, the Commission stated that (1) it "agree[d] with PJM" that the Tariff change "will help ensure that load-serving entities are charged for capacity based on an LDA Reliability Requirement that reflects actual reliability needs in a manner consistent with supply and demand fundamentals;"[86] (2) the outcome "is consistent with the goals of the PJM capacity market, which are to secure sufficient capacity in the delivery year and send a long-term price signal to ensure the reliability of PJM's system;"[87] (3) "the prices resulting from PJM's proposal will accurately reflect supply and demand;"[88] and (4) the one percent materiality threshold "enabl[es] PJM to revise the LDA Reliability Requirement in the event that enough Planned Generation Capacity Resources that are expected

---

[84]        *See* P3 Protest, Attach. B at 31-32.

[85]        *See* Order, 182 FERC ¶ 61,109 at PP 150, 153, 159, 160.  To be clear, although the Order spends more than three paragraphs defending its determination that PJM's proposal is just and reasonable, nearly all of the Commission's ink on this issue was spent rejecting protesters' arguments against PJM's proposal, rather than explaining how and why PJM's proposal will produce just and reasonable rates.  As explained below, the Commission's rationale for rejecting protesters' arguments on this issue is also flawed in several respects, which represents a further violation of the Administrative Procedure Act.  *See infra* § III.B.2.

[86]        Order, 182 FERC ¶ 61,109 at P 150.

[87]        *Id.* at P 150.

[88]        *Id.* at P 153.

to offer in that LDA do not, such that the LDA's Reliability Requirement is materially increased as compared to the prior delivery year."[89]

The closest the Order comes to providing support for those assertions is citing statements from PJM and the IMM about "supply and demand fundamentals."  Neither PJM nor the IMM supported their statements about "supply and demand fundamentals" with evidence concerning the rate impact of PJM's proposal—other than the claim that PJM's proposal would reduce the price for the DPL-South LDA by 75 percent in the December 2022 BRA.  But, as explained above, the Commission did *not* rely on the suspect evidence concerning the price impact for the DPL-South LDA in the December 2022 BRA.  Absent supporting evidence, PJM's and the IMM's statements about "supply and demand fundamentals" are merely conclusory "invocation[s] of theory."[90]  By extension, so too is the Commission's regurgitation of those statements, which "is an insufficient substitute for substantial evidence and reasoned explanations."[91]

In sum, the Commission's attempt to invoke "supply and demand fundamentals" as a talisman in lieu of providing a reasoned explanation of how its determination is supported by evidence renders the Order unlawful.[92]  So too with the Commission's failure to address the contrary evidence submitted by protesters.[93]  Ultimately, because the evidence in the record

---

[89]    Order, 182 FERC ¶ 61,109 at P 160.

[90]    *Electricity Consumers Resource Council*, 747 F.2d at 1517.

[91]    *Id.*

[92]    *Id.*

[93]    *See State Farm*, 463 U.S. at 52.

26

cannot possibly support the Commission's determination, the Commission must grant rehearing

to reject PJM's proposal in this proceeding.[94]

### 2. The Order's Rationale for Finding PJM's Proposal Just and Reasonable Is Not the Product of Reasoned Decision-Making

Even if one were to look past the Commission's failure to base its conclusion on

substantial evidence, and its ignorance of contrary evidence, the anemic rationale the

Commission provided in support of its conclusion contains several additional flaws that also

render the Order unlawful under the APA.

### a) The Order Misconstrues the Relationship Between Supply and Demand in a Competitive Market

The Order concludes that PJM's proposal is just and reasonable because

"incorporate[ing] updated information regarding which Planned Generation Capacity Resources

are offering into the BRA" will "help ensure that load-serving entities are charged for capacity

based on an LDA Reliability Requirement that reflects actual reliability needs in a manner

consistent with supply and demand fundamentals."[95]  The Order further asserts that the proposal

"will help meet the capacity market's underlying goals by setting clearing prices that are based

on accurate reliability assessments."[96]  Those aspects of the Commission's determination are

based on a flawed understanding of supply and demand dynamics in a competitive market.  The

Commission's failure to properly explain its determination by meaningfully responding to the

---

[94]    *Electricity Consumers Resource Council*, 747 F.2d at 1517 (explaining that "mere economic theory may not take the place of record evidence and reasoned decision-making," and agency action will not be upheld if "the record lack[s] any meaningful evidence of a causal relationship between the rate and the theoretical design") (citing *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

[95]    Order, 182 FERC ¶ 61,109 at P 150.

[96]    *Id.*

arguments and evidence presented, with a rationale that is consistent with supply and demand fundamentals, renders the order arbitrary and capricious.

It is a bedrock principle of market economics that supply and demand are necessarily interrelated.[97]  The Order ignores that reality and attempts to treat supply and demand as hermetically sealed off from each other in the context of the PJM capacity market.  The Order's misunderstanding of the supply and demand fundamentals in the PJM capacity market was manifested in three specific ways.

*First*, the Order overstates the impact of improving a single demand-side auction parameter.  The order presumes that "incorporat[ing] updated information" regarding the participation of planned resources will necessarily produce clearing prices, and charges for load-serving entities, that reflects "actual reliability needs in a manner consistent with supply and demand fundamentals."[98]  But incorporating new information on the demand side of an auction is not helpful if that demand-side update happens in a vacuum.  In order for the auction to produce an outcome that is "consistent with supply and demand fundamentals," the supply side must have the new demand-side information sufficiently in advance of the auction to impact supplier behavior.  However, in approving PJM's proposal, the Commission endorsed an auction process that severed the relationship between supply and demand for the DPL-South LDA in the December 2022 BRA, and will similarly sever the relationship in future auctions any time PJM's original forecast of an LDA's Reliability Requirement ends up being less accurate than PJM

---

[97]    *See, e.g.*, *Hughes v. Talen Energy Mktg, LLC*, 578 U.S. 150, 157 (2016) (explaining that the PJM capacity auctions are regulated to "ensure that [they] efficiently balance[] supply and demand") (citing *FERC v. Electric Power Supply Ass'n* ("*EPSA*"), 577 U.S. 260, 269 (2016)); *EPSA*, 577 U.S. at 269 (explaining, specifically in the context of the PJM market, that "[a]s in any market, when wholesale buyers' demand for electricity increases, the price they must pay rises correspondingly").

[98]    Order, 182 FERC ¶ 61,109 at P 150.

prefers after considering the decisions that planned resources made in the auction based on PJM's original demand-side forecast.

The only rationale the Commission provided for why such a construct is just and reasonable is that the demand side will be more accurate if updated in this manner.[99]  But that is not enough for purposes of the Administrative Procedure Act.[100]  Producing a more accurate demand side of the auction might produce better *demand* fundamentals, but it does not necessarily produce better "*supply and demand* fundamentals."[101]  And there is no reason to expect that it will do so where the demand-side adjustment occurs after supply offers have been submitted, thereby necessarily rendering the auction's supply fundamentals *less* sound.  That is exactly what PJM's proposal does, whenever it is triggered, including in the December 2022 BRA, by ensuring that supply offers are based on an LDA Reliability Requirement that, by definition, is materially different from the one on which those supply offers were based.

Further, the record shows that the resulting difference in clearing prices can be significant.  PJM admits that the supply and demand dynamics under the *ex ante* Tariff produce prices that are significantly above the prices produced by the broken supply and demand dynamics under PJM's proposal (*e.g.*, a four-fold difference for the DPL-South LDA in the December 2022 BRA).  The fact that the *ex ante* Tariff employed a method that had been found to be just and reasonable and had been in use for many years, paired with the record evidence showing that the supply and demand dynamics under the *ex ante* Tariff produced an economically rational result for the generation-short DPL-South LDA in the December 2022

---

[99]     *See* Order, 182 FERC ¶ 61,109 at P 149 ("PJM's proposed Tariff revisions will help ensure a competitive outcome for capacity auctions by more closely aligning the LDA Reliability Requirement with actual reliability needs.").

[100]    *See, e.g.*, *Mo. Pub. Serv. Comm'n*, 337 F.3d at 1070; *Electricity Consumers Resource Council*, 747 F.2d at 1517.

[101]    Order, 182 FERC ¶ 61,109 at P 150 (emphasis added).

29

BRA, cut against the Commission's conclusory assertion that updating the LDA Reliability Requirements in the manner PJM proposed will improve "supply and demand fundamentals." But the Commission completely ignored that evidence. The Commission's failure to adequately explain, based on the available evidence, exactly how PJM's proposal produces sound "supply and demand fundamentals" and results in just and reasonable rates renders the Order arbitrary and capricious.

*Second*, in addition to overstating the impact of improving a single demand-side parameter, the Order also fundamentally misconstrues the market dynamics on the supply-side of PJM's capacity auctions. In response to protesters' arguments that suppliers rely on the auction planning parameters posted in advance of a BRA and use those parameters to inform their auction behavior, the Commission asserted that "no party has suggested that the shape of the demand curve impacts their costs" and that "capacity market offers should be dictated by capacity resource costs and not by expectations of demand."[102]  In other words, the Commission's position is that the sellers of a product should make decisions about whether to sell that product, and at what price, without regard for the market demand for that product. If the Commission is correct, why does the Tariff require PJM to develop a demand curve based on specified planning parameters that must be posted well in advance of the BRA? The obvious answer is that the Commission is wrong.

PJM's Tariff itself demonstrates just how antithetical the Commission's position is to the RPM as a market construct. For example, by the Tariff's own terms, sell offers that are below the market seller offer cap do not need to be cost-based. Although one would expect such offers to be cost-based in a competitive market, there is no requirement that they be cost-based.

---

[102]      Order, 182 FERC ¶ 61,109 at P 158.

Furthermore, as the Commission has recognized, sellers in the PJM capacity market rely heavily on demand-side conditions, including auction planning parameters, to inform their auction behavior.[103]  As explained below, a seller's assessment of the risks associated with its resource is based on both objective and subjective elements, which are closely informed by the BRA planning parameters, and a seller's auction behavior can change based on the demand-side conditions reflected in those planning parameters.[104]  The Order's failure to meaningfully engage with protesters' arguments, and Commission precedent, on this issue renders the Order arbitrary and capricious.

Even assuming *arguendo* that the Commission is correct that a change on the demand side of the BRA should not alter a seller's offer *price*, it is beyond dispute that demand-side conditions impact other aspects of seller behavior beyond the price the seller demands through its sell offer.  For example, for resources that do *not* have an RPM must-offer obligation, a seller's expectation about the level of demand or the shape of the demand curve, and the potential clearing price it might produce based on the seller's assessment of supply conditions, can impact their decision about whether to offer into a particular BRA or not.  In other words, for sellers that hold an option not to offer capacity to PJM, the demand-side conditions in an auction directly impact the value of that option, which in turn directly impacts their market behavior.

Furthermore, the demand side of a BRA also impacts the market behavior of resources that *do* have an RPM must-offer obligation.  The Tariff contains provisions that permit resource owners to engage in bilateral capacity transactions, to transfer the rights and obligations

---

[103]    *See, e.g., Duquesne Light Co.*, 122 FERC ¶ 61,039, at P 141 (2008) ("[O]nce the RPM auction parameters are posted, parties rely on those parameters to make commitments and determinations."); *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275, at P 198 (2009) ("PJM's posting of the fundamental auction parameters . . . is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or exports, and the manner in which they participate in the [BRA].").

[104]    *Infra* p.32-24.

associated with a generation resource—including the obligation to offer such resource into the BRA and the right to keep the capacity revenues the resource earns through the BRA.[105]  As NRG demonstrated in this proceeding, with incontrovertible evidence, the BRA planning parameters can and, in the context of the December 2022 BRA, did directly and materially impact at least one seller's decisions regarding whether to offer its capacity into the BRA or instead engage in a bilateral capacity transaction.[106]  The Commission's response to this concern was that "in future years entities can account for the potential for adjustments to the LDA Reliability Requirement in carrying out their business decisions and commercial transactions."[107]  That response is flawed in two critical respects: (1) stating that a seller can "account for potential adjustments" on the demand side of the market "in carrying out . . . business decisions and commercial transactions" is not the same as *explaining*, as required by the APA, how that type of accounting by sellers will produce sound supply fundamentals in the BRA itself; and (2) the response only addresses "future years," thereby failing to recognize that, for the December 2022 BRA, the supply side of the market has no ability to "account for the . . . adjustments to the LDA Reliability Requirement in carrying out . . . business decisions and commercial transactions."[108]

*Third*, the Commission's overly simplistic and unsupported assertion that demand-side changes are irrelevant to the supply-side of the market is fundamentally inconsistent with the very design of the RPM's Capacity Performance framework.  The Capacity Performance market design is intended to tie a resource's capacity revenues not only to the BRA clearing price, but also to its real-time performance during emergency system conditions (*i.e.*, Performance

---

[105]    *See* Tariff, Attach. DD at § 4.6(a); *id.* § 3.1.

[106]    *See* Protest of NRG, *et al.* at 18-19, Docket Nos. ER23-729 & EL23-19 (filed Jan. 20, 2023).

[107]    Order, 182 FERC ¶ 61,109 at P 157.

[108]    *Id.* at P 157.

Assessment Intervals) during the delivery year.  The Capacity Performance framework imposes the risk that a resource will incur non-performance penalties in a delivery year, and it is up to sellers to subjectively assess that risk and price it into their BRA sell offers.  Those risk assessments are based, in part, on the auction parameters PJM establishes in advance of the BRA and what those parameters mean for the supply and demand conditions in the delivery year.  One of the specific mechanisms in the Tariff for translating those factors into BRA sell offers is the provision requiring sellers to come up with their own estimates of the number of Performance Assessment Intervals in the delivery year and incorporate into their sell offers the costs associated with any risks that are "quantifiable and reasonably-supported."[109]  As a practical matter, PJM and the IMM are implementing the Tariff in a manner that effectively deprives sellers of that right, under the absurd theory that capacity commitments in PJM are risk-free.  However, as a legal matter, and a matter of market design, the Tariff expressly ties auction behavior to estimates of Performance Assessment Intervals and other subjective factors.

Whether, and to what extent, Performance Assessment Intervals are likely to occur in the Delivery Year is directly relevant to the magnitude of the non-performance risk to which a resource will be exposed.  And whether, and to what extent, Performance Assessment Intervals are likely to occur during a particular Delivery Year depends on several variables—including the region's weather, each LDA's Reliability Requirements, the transmission system's transfer capability (*i.e.*, CETO/CETL), and whether sufficient supply will be available to serve the load in a particular LDA, either from native resources or through imports.[110]  A seller's assessment of

---

[109]     Tariff, Attach. DD § 6.8.

[110]     *See, e.g.*, *Indep. Market Monitor for PJM v. PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,137, at P 71 (2021) (describing the unavoidable subjectivity in predicting Performance Assessment Intervals and permitting sellers to base sell offers on their own estimates of expected Performance Assessment Intervals "based on their own expectations").

those factors can affect the seller's economic decisions in numerous ways.  For example, if a seller expects an LDA to be oversupplied in a particular delivery year, the seller may elect to defer discretionary maintenance costs and, therefore, not include that cost in its capacity offer. Thus, by design, the Capacity Performance framework links sellers' capacity revenues with the ability for supply to meet demand not only in the BRA, but also in the Delivery Year.  The Commission's conclusion in this proceeding that the supply side of the auction should not be impacted by changes on the demand side of the auction is fundamentally inconsistent with the supply and demand fundamentals that are baked into the Capacity Performance framework.

In sum, the Order's flimsy rationale for why PJM's proposal is just and reasonable is based on a flawed understanding of demand-side fundamentals, supply-side fundamentals, and the relationship between supply and demand.  Those flaws are the result of the Commission's misinterpretation of economic principles, inadequately explained deviation from precedent, and its failure to meaningfully address arguments and evidence presented to it.  The net result is a lack of reasoned decision-making in violation of the APA.[111]

> **b)  The Order Fails to Explain How It Is Just and Reasonable and Not Unduly Discriminatory to Adjust LDA Reliability Requirements Mid-Auction Based on the Non-Participation of Certain Resources While Ignoring the Non-Participation of Other Resources**

The Order also violates the Administrative Procedure Act by willfully ignoring an important aspect of the problem it purports to solve and failing to explain how the resulting rates

---

[111]    *See, e.g.*, *State Farm*, 463 U.S. at 48 (explaining that an agency action violates the APA where there are "no findings and no analysis . . . to justify the choice made, no indication of the basis on which the agency exercised its expert discretion") (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 167 (1962) (cleaned up); *see also Burlington Truck Lines v. United States*, 371 U.S. at 167  ("[U]nless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.") (quoting *New York v. United States*, 342 US. 882, 884 (1951) (internal quotations omitted) (emphasis in original)).

will be just and reasonable without addressing those aspects of the problem.  The Commission determined that PJM's proposal is just and reasonable because it "closely align[s] the LDA Reliability Requirement with actual reliability needs," which it accomplishes by revising the LDA Reliability Requirement to exclude planned resources that PJM wrongly assumed would provide capacity to PJM through the BRA.[112]  Several commenters, including P3, explained— and PJM itself recognized—that there are several factors that could render PJM's forecasted LDA Reliability Requirements either higher or lower than they would be if calculated with different assumptions.  The Commission ignored some of those arguments and provided inadequate responses to others.

As P3 has explained at length in this proceeding, every aspect of the demand side of the auction—including the LDA Reliability Requirements—is based on forecasts, which necessarily require PJM to rely on assumptions.  To determine an LDA's Reliability Requirement, PJM calculates the CETO for that LDA based on forecasts regarding the generation resources that PJM expects to exist in the LDA within the relevant planning horizon—e.g., by the relevant Delivery Year.  To make those forecasts, PJM must make assumptions regarding which generation resources will exist by the Delivery Year and whether they will offer into the applicable BRA.  PJM's proposal permits it to adjust the LDA Reliability Requirement when its assumption turns out to be inaccurate as a result of certain circumstances, but not others.

Specifically, PJM's Tariff change requires it to adjust the LDA Reliability Requirement when Planned Generation Capacity Resources that PJM assumed would offer into a BRA do not actually offer.  As noted, PJM's reason for removing those resources from the LDA Reliability Requirement is that they will not be available to serve the LDA's reliability needs in the Delivery

---

[112]    Order, 182 FERC ¶ 61,109 at PP 149-51.

Year.  However, PJM's Tariff change does not permit it to adjust the LDA Reliability

Requirement if it is based on other resources—including Planned Generation Capacity Resources

and Existing Capacity Resources—that PJM assumes will serve the LDA's reliability needs by

providing capacity, but for which that assumption proves inaccurate after PJM receives sell

offers in the BRA.  P3 and others highlighted two specific circumstances in which that would

occur: (1) where planned resources offer into the BRA but do not clear, and (2) where existing

resources that do not have an RPM must-offer obligation elect not to participate in the BRA.

The Order missed the mark in its attempt to address each of those arguments.

    With respect to planned resources that offer into a BRA but do not clear, protesters

explained that—just as with planned resources that do not offer into a BRA—such resources will

not provide capacity to serve the relevant LDA's reliability needs.  Yet PJM will continue to

assume otherwise for purposes of the LDA Reliability Requirement it uses to construct the

demand side of the BRA.  As a factual matter, in terms of their capacity contributions to an LDA

(*i.e.*, their ability to serve an LDA's reliability needs), there is no basis to distinguish planned

resources that choose not to offer into a BRA from those that choose to offer but do not clear.  In

both cases, the capacity market result is the same: the BRA planning parameters wrongly

assumed that both would provide capacity in the Delivery Year.  The Commission's attempt to

distinguish such resources from one another, for purposes of revising the LDA Reliability

Requirement, misses the mark.

    The Commission found that "circumstances where Planned Generation Capacity

Resources offer but either do not clear or are mitigated" is not "functionally similar" to

circumstances where Planned Generation Capacity Resources do not participate in an auction,

because the submission of a capacity offer "signal[s] that the resource intends to be available to

36

serve as capacity."[113]  However, the Commission provided no explanation for why "intent"

matters.  Without such an explanation, there is no logical reason to believe that intent makes a

difference.  If I intend to clean the kitchen and offer to do so, but I don't get off the couch and do

it before my spouse does, my intent did not help the kitchen get any cleaner.  At the end of the

day, I contributed the same amount to the cleanliness of our kitchen as the teen who didn't even

offer to help.  So, too, with providing capacity to serve an LDA's reliability needs.  Intending to

do it doesn't cut the mustard.  Yet, in setting the demand side of a BRA, PJM's proposal assigns

full reliability credit to Planned Generation Capacity Resources that "intend" to provide capacity

but are not able to follow through on that in the BRA, while at the same time assigning no

reliability credit to Planned Generation Capacity Resources chose not to offer into the BRA.  The

Commission's failure to meaningfully address this internal inconsistency in PJM's proposal

renders the Order arbitrary and capricious.[114]

     The Order's treatment of protesters' arguments concerning resources that do not have an

RPM must-offer obligation and elect not to participate in a BRA is even worse.  As P3 and

others spent numerous pages explaining, the forecasting error that PJM believes renders its LDA

Reliability Requirements inaccurate is caused not only by Planned Generation Capacity

Resources, but also by existing resources that do not have an RPM must-offer obligation.[115]  In

response, the Commission stated that "planned and existing resources are not similarly situated

with respect to determining reliability needs in a given delivery year because planned resources

---

[113]     Order, 182 FERC ¶ 61,109 at P 151.

[114]     *See, e.g.*, *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d at 1070-75.

[115]     *See, e.g.*, P3 Protest at 39-40 (explaining that "the Tariff exempts all Intermittent Resources, Capacity
Storage Resources, Demand Resources, Energy Efficiency Resources, and Hybrid Resources consisting exclusively
of components that in isolation would be Intermittent Resources or Capacity Storage Resources," and, "[a]s a result,
PJM faces the same uncertainty in predicting whether those resources will participate in a particular BRA as is
posed by Planned Generation Capacity Resources") (citing Tariff, Attach. DD § 6.6A(c), and Shanker Affidavit at
17, 36-37).

have not yet achieved commercial operation," and, therefore, planned resources "face construction and other risks that make it more likely that they will be unavailable to provide capacity in some or all of the relevant delivery year, unlike existing resources."[116]

That response is both flawed and beside the point. It is flawed because the assertion that existing resources have achieved commercial operation but planned resources have not is not necessarily true. As a legal matter, whether a resource qualifies as an existing resource depends on whether it has cleared in a previous capacity auction, not whether it has achieved commercial operation. It is entirely possible, and in fact is frequently the case, that a resource becomes an existing resource years before its commercial operation date and thus can offer into BRAs as an existing resource prior to achieving commercial operation. And, if such an existing resource does not have an RPM must-offer obligation, it is similarly situated to planned resources in all relevant respects. Both such classes of resources have no RPM must-offer obligation, have not yet reached commercial operation, and "face construction and other risks" that call into question whether they will be "unavailable to provide capacity in some or all of the relevant delivery year."[117]

Further, the Commission's response is beside the point because it focuses exclusively on the likelihood that a resource will exist in the delivery year. The Commission failed to understand that, for purposes of assessing the "reliability needs in a given delivery year,"[118] the question of whether a resource is likely to exist in the delivery year is only relevant if the resource obtains a capacity commitment through a PJM capacity auction. In the context of a BRA, if an existing resource declines to offer into the BRA, it is signaling that—at that point in

---

[116]    Order, 182 FERC ¶ 61,109 at P 154.

[117]    *Id.*

[118]    *Id.*

time—it is unwilling to commit to providing capacity in the delivery year.  If two resources, one planned and one existing, tell PJM that they are not willing to take on a capacity commitment, then the question of whether they will achieve commercial operation by the delivery year is irrelevant to whether they should be counted towards the reliability needs in that delivery year. Yet PJM's proposal assumes that one (*i.e.*, the existing resource) will contribute to the reliability needs, but the other (*i.e.*, the planned resource) will not.  The Commission's Order provides no reasoned basis for that disparate treatment, much less any attempt to demonstrate the impacts that including existing resources in the LDA Reliability Requirements, and/or excluding planned resources from the LDA Reliability Requirements, will have on the demand side of the BRA and/or the ultimate BRA clearing prices.

In sum, the Commission's Order adopts a Tariff change that is *ultra vires* under the FPA, and the long line of judicial precedent on the filed rate doctrine and rule against retroactive ratemaking, and that violates the APA at every turn.  The Order's misguided determination that PJM's proposal is just and reasonable is flawed in such a way that the Commission erroneously permitted PJM to implement Tariff changes that disconnect supply and demand through a mechanism that will not even address the concern PJM is targeting.  As the Commission's Order recognizes, the PJM capacity market is already under duress.[119]  Unfortunately, the Commission's action in this proceeding only makes things worse.

The Commission must promptly grant rehearing to correct these errors by rejecting PJM's proposal.  Failure to do so would subject the December 2022 BRA results, the string of upcoming BRAs, and countless other RTO/ISO market operations and proceedings to the crippling uncertainty posed by the appellate litigation that will follow if the Order's

---

[119]        Order, 182 FERC ¶ 61,109 at P 180.

interpretation of the filed rate doctrine and rule against retroactive ratemaking is left to stand. That litigation is likely to span several years and is bound to have cascading effects—all of which are avoidable and unnecessary.  Further, given the unprecedented nature of the Order's interpretation of a doctrinal linchpin of the FPA that has been established for nearly a century, the odds are that the extensive litigation process that follows will require the Commission to revisit this proceeding, and numerous others, to properly apply the long-settled statutory requirements of FPA section 205.  The Commission should save itself, and the markets, all that trouble by properly applying the statute at this time.

## IV.

### CONCLUSION

For the foregoing reasons, P3 respectfully requests that the Commission grant rehearing of the Order and dismiss PJM's Section 205 filing in these proceedings, holding that (1) applying PJM's proposed Tariff changes to the December 2022 BRA would violate the filed rate doctrine and the rule against retroactive ratemaking, and (2) PJM has not satisfied its burdens under FPA Section 205, FPA Section 206, or Section 7(c) of the APA.

Respectfully submitted,

Nicholas Gladd
Wilson Sonsini Goodrich & Rosati, P.C.
One Boston Place
201 Washington Street, Suite 2000
Boston, MA 02108
ngladd@wsgr.com
(617) 598-7871

*Attorney for the PJM Power Providers Group*

_____/s/ Glen Thomas_____
Glen Thomas
Diane Slifer
GT Power Group
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
gthomas@gtpowergroup.com
dslifer@gtpowergroup.com
(610) 768-8080

March 23, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused the foregoing document to be served upon each person designated on the official service list compiled by the Secretary in this proceeding, in accordance with Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2010 (2022).

Dated at Boston, Massachusetts, this 23rd day of March, 2023.

Nicholas Gladd

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **PJM Interconnection, L.L.C.** | ) | **Docket No. ER23-729-___** |
| **PJM Interconnection, L.L.C.** | ) | **Docket No. EL23-19-___** |
| | | **(Not consolidated)** |

## <u>REQUEST FOR REHEARING</u>

Pursuant to Section 313(a) of the Federal Power Act (the "FPA")[1] and Rule 713 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission (the "Commission" or "FERC"),[2] the Electric Power Supply Association ("EPSA"),[3] the NRG Companies,[4] LS Power Development, LLC and Vistra Corp. (collectively, "Petitioners") respectfully request rehearing of the Commission's February 21, 2023, order in the above-captioned proceedings.[5]   In allowing PJM Interconnection, L.L.C. ("PJM")[6] to change the rules for the Base Residual Auction ("BRA") for the 2024/2025 Delivery Year (the "2024/2025 BRA") after the offer window closed, the Commission violated the filed rate doctrine and the corollary prohibition against retroactive ratemaking.   The

---

[1]      16 U.S.C. § 825*l* (2018).

[2]      18 C.F.R. § 385.713 (2022).

[3]      EPSA is the national trade association representing competitive power suppliers in the U.S.  EPSA members provide reliable and competitively priced electricity from environmentally responsible facilities using a diverse mix of fuels and technologies.  EPSA seeks to bring the benefits of competition to all power customers.  This pleading represents the position of EPSA as an organization, but not necessarily the views of any particular member with respect to any issue.

[4]      For purposes of this proceeding, the "NRG Companies" are:  NRG Power Marketing LLC, Direct Energy Business Marketing, LLC and Midwest Generation, LLC.

[5]      *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (2023) (the "February 21 Order").

[6]      Capitalized terms used and not otherwise defined herein have the meaning given them in the PJM Open Access Transmission Tariff (the "Tariff").

Commission also failed to engage in reasoned decision-making by ignoring arguments and evidence that did not support its desired outcome and failing to reconcile its action with precedent.

At bottom, as dissenting Commissioner Danly observed, the February 21 Order represents "a misguided attempt to protect consumers . . . [that] will cause more harm to consumers than had the majority left the auction results in place."[7]  The competitive wholesale markets historically fostered and promoted by the Commission provide enormous benefits to consumers,[8] but "those benefits become costs when the markets cease functioning because market participants – and investors – have lost confidence in them."[9]  In accepting PJM's December 23, 2022 filing,[10] the Commission missed an opportunity to recommit itself to these markets and to protect consumers from the inefficiency and uncompetitive pricing that will follow inevitably from dysfunctional markets or from a slide back to the "bad old days . . . [when], [a]s the Supreme Court observed,

---

[7]    February 21 Order, 182 FERC ¶ 61,109, Dissenting Statement at P 4 (the "Danly Statement") (Danly, Comm'r, dissenting).

[8]    *See, e.g.*, *Demand Response Comp. in Organized Wholesale Energy Mkts.*, Order No. 745, 134 FERC ¶ 61,187 at P 8 (2011) ("Effective wholesale competition protects customers by, among other things, providing more supply options, encouraging new entry and innovation, and spurring deployment of new technologies."), *on reh'g*, Order No. 745- A, 137 FERC ¶ 61,215 (2011); *Regional Transmission Orgs.*, Order No. 2000, 89 FERC ¶ 61,285, FERC Stats. & Regs. ¶ 31,089 at 30,993 (1999) ("Competition in wholesale electricity markets is the best way to protect the public interest and ensure that electricity consumers pay the lowest price possible for reliable service."), *on reh'g*, Order No. 2000-A, 90 FERC ¶ 61,201, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).  *See also, e.g.*, PJM, *PJM Value Proposition* (stating that PJM's markets have produced annual savings of $3.2-4 billion), https://www.pjm.com/about-pjm/~/media/about-pjm/pjm-value-proposition.ashx.

[9]    Danly Statement at P 4.

[10]    Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to Section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for an Extended Comment Period of 28 Days, Docket No. ER23-729-000 (filed Dec. 23, 2022) (the "December 23 Filing").

with blithe understatement, 'competition among utilities was not prevalent.'"[11]

The importance of a functional PJM capacity market has been underscored since the issuance of the February 21 Order by a PJM report warning of "increasing reliability risks" as resources retire faster than they are replaced[12] and emphasizing the need for "PJM markets [to] effectively correct imbalances . . . by incentivizing investment in new or expanded resources."[13]  While the forum contemplated by the February 21 Order[14] and an expedited stakeholder process being initiated by PJM[15] based on that report may offer some hope of improvement, the biggest things the Commission could do to support the PJM capacity market and to ensure that it incentivizes needed investments would be to grant rehearing of the February 21 Order and to stop issuing orders like the February 21 Order that undermine confidence in the markets the Commission regulates.  As it stands, however, the effectiveness of any new market mechanisms arising out of the expedited PJM stakeholder process or the Commission's forum will be undermined by the legitimate perception, engendered by the December 23 Filing and the February 21 Order, that PJM and the Commission are willing to "change the score after the game so that [their] favorite team wins."[16]

---

[11] *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004) (quoting *New York v. FERC*, 535 U.S. 1, 5 (2002)).

[12] PJM, *Energy Transition in PJM: Resource Retirements, Replacements & Risks* at 1 (Feb. 24, 2023), https://www.pjm.com/-/media/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx.

[13] *Id.* at 3.

[14] *See* February 21 Order, 182 FERC ¶ 61,109 at P 180.

[15] *See* Letter from Mark Takahashi to PJM Stakeholders (Feb. 24, 2023), https://www.pjm.com/-/media/about-pjm/who-we-are/public-disclosures/20230224-board-letter-re-initiation-of-the-critical-issue-fast-path-process-to-address-resource-adequacy-issues.ashx.

[16] Danly Statement at P 33.

## I.    BACKGROUND

In the December 23 Filing, PJM proposed to modify the definition of the term "Locational Deliverability Area Reliability Requirement" to allow PJM to adjust this value during the auction process to exclude Planned Generation Capacity Resources that did not offer into the applicable RPM Auction.[17]   Specifically, PJM proposed to modify this definition as follows:

> "Locational Deliverability Area Reliability Requirement" shall mean the projected internal capacity in the Locational Deliverability Area plus the Capacity Emergency Transfer Objective for the Delivery Year, as determined by the Office of the Interconnection in connection with preparation of the Regional Transmission Expansion Plan, less the minimum internal resources required for all FRR Entities in such Locational Deliverability Area [("LDA")].  Notwithstanding the foregoing, effective with the 2024/2025 Delivery Year, during the auction process, the Office of Interconnection shall exclude from the Locational Deliverability Area Reliability Requirement any Planned Generation Capacity Resource in an LDA that does not participate in the relevant RPM Auction as projected internal capacity and in the Capacity Emergency Transfer Objective model where the Locational Deliverability Area Reliability Requirement for the Base Residual Auction increases by more than one percent over the reliability requirement used from the prior Delivery Year's Base Residual Auction (for Incremental Auctions the Locational Deliverability Area Reliability Requirement would be compared with the reliability requirement used in the prior relevant RPM Auction associated with the same Delivery

---

[17]    December 23 Filing, Transmittal Letter at 1.  The December 23 Filing was submitted pursuant to Section 205 of the FPA, 16 U.S.C. § 824d (2018).  In parallel with that filing, PJM also submitted a filing pursuant to Section 206 of the FPA, 16 U.S.C. § 824e (2018), in order "to provide the Commission with the ability to make modifications to PJM's proposed tariff remedy, if it so chooses . . . ."  Section 206 Filing Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area in the 2024/2025 Base Residual Auction and Requesting that the Commission Establish a Refund Effective Date of December 23, 2022, and Request for an Extended Comment Period of 28 Days, Docket No. EL23-19-000 (filed Dec. 23, 2022).  The Commission dismissed the FPA Section 206 filing as moot in light of its acceptance of the December 23 Filing.  *See* February 21 Order, 182 FERC ¶ 61,109 at P 181.

Year) for that LDA due to the cumulative addition of such
Planned Generation Capacity Resources.[18]

In support of the proposed change, PJM stated that, in clearing the 2024/2025
BRA, it realized that "a significant amount of Planned Generation Capacity Resources
that were expected to participate in the auction based on the expected in-service date of
the resources' Interconnection Service Agreements ("ISAs") did not offer in the auction
despite being included in the Locational Deliverability Area Reliability Requirement."[19]
According to PJM, this meant that the previously posted Locational Deliverability
Reliability Requirement for the Delmarva Power & Light South ("DPL-S") LDA "was
overstated for the 2024/2025 BRA."[20]  PJM stated that using the previously posted value
would result in the clearing price:

> for the DPL-S LDA (and the revenues received by the
> Capacity Market Sellers in this small LDA) [being] more than
> four times what the clearing price should be if the Planned
> Generation Capacity Resources that did not offer in the
> auction are excluded from the Locational Deliverability Area
> Reliability Requirement given that they did not offer into the
> BRA.[21]

Petitioners[22] and a broad cross section of stakeholders, including the Public

---

[18]   December 23 Filing, Attachment A, Revisions to the PJM Open Access Transmission
Tariff (Marked/Redline Format).

[19]   December 23 Filing, Transmittal Letter at 2.

[20]   *Id.*

[21]   *Id.*

[22]   *See* Protest of the Electric Power Supply Association, Docket Nos. ER23-729-000, *et al.*
(filed Jan. 20, 2023) (the "EPSA Protest"); Protest and Request for Privileged Treatment, Docket
Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023) (the "NRG Protest"); Protest of LS Power
Development, Docket Nos. EL23-19-000, *et al.* (filed Jan. 20, 2023) (the "LS Power Protest");
Protest of Vistra Corp., Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023) (the "Vistra
Protest").

Utilities Commission of Ohio's Office of the Federal Energy Advocate,[23] renewables developers,[24] and others,[25] strongly opposed the December 23 Filing, arguing, among other things, that granting the requested relief would violate the filed rate doctrine and undermine confidence in PJM's capacity market and Commission-jurisdictional markets more broadly.  The NRG Companies also provided an affidavit from NRG Energy, Inc.'s ("NRG's") Vice President of Trading, Joseph A. Holtman, demonstrating that NRG and its affiliates had made irrevocable economic decisions in reliance on the posted DPL-S Locational Deliverability Area Reliability Requirement and the market rules set forth in the Tariff.[26]  Even supporters of the changes proposed in the December 23 Filing were compelled to admit that it "create[d] a highly concerning precedent . . . ."[27]

In the February 21 Order, the Commission accepted the December 23 Filing, finding that the "proposed Tariff revisions will help ensure a competitive outcome for capacity auctions by more closely aligning the [Locational Deliverability Area] Reliability

---

[23]    *See* Comments of the Public Utilities Commission of Ohio's Office of the Federal Energy Advocate, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023).

[24]    *See, e.g.*, Protest and Comments of the American Clean Power Association, Solar Energy Industries Association, and Advanced Energy United, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023) (the "Clean Energy Associations Protest"); Protest of Pine Gate Renewables, LLC, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023) (the "Pine Gate Protest"); Motion to Intervene and Protest of Leeward Renewable Energy, LLC and Leeward Renewable Energy Development, LLC, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023) (the "Leeward Protest").

[25]    *See, e.g.*, Protest of The PJM Power Providers Group, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023) (the "P3 Protest").

[26]    *See* NRG Protest, Attachment A, Affidavit of Joseph A. Holtman (the "Holtman Affidavit").

[27]    Comments of the Pennsylvania Public Utility Commission to PJM's 2024/2025 Base Residual Auction Modification Filings at 3, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023). *See also, e.g.*, Comments in Support of PJM's Proposal to Address the Locational Deliverability Area Reliability Requirement at 4, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023) (comments of the "Delmarva Zone Parties" acknowledging that the submittal of the December 23 Filing[] "occurred in the midst of an auction clearing, which is certainly not preferred").

Requirement with actual reliability needs."[28]  The Commission found the filed rate doctrine inapplicable because, at the time PJM filed the December 23 Filing, "no capacity commitments had yet been secured, no transaction had yet been consummated, meaning that neither PJM nor any supplier had the attendant rights or obligations, no capacity had been delivered pursuant to such commitments, and no charges had been billed or collected."[29]

## II.    REQUEST FOR REHEARING

### A.    The February 21 Order Violates the Filed Rate Doctrine and the Prohibition Against Retroactive Ratemaking

While acknowledging that the auction rules are "the rate on file,"[30] the Commission erroneously concluded that PJM's changes to the DPL-S Locational Deliverability Area Reliability Requirement long after that value was finalized in accordance with those rules did not violate the filed rate doctrine or the corollary prohibition against retroactive ratemaking.[31]  In truth, as Commissioner Danly put it, "[t]he filed rate violation in this case is straightforward":[32]  under the filed rate doctrine and the prohibition against retroactive ratemaking, the Commission "has no power to alter a rate retroactively,"[33] and that is

---

[28]     February 21 Order, 182 FERC ¶ 61,109 at P 149.

[29]     *Id.* at P 167.

[30]     *Id.* at P 165.

[31]     *See id.* at PP 163-73.

[32]     Danly Statement at P 5 (internal citation omitted).

[33]     *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) ("*Hall*").  *See also, e.g.*, *Oklahoma Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021) ("*OG&E*") (explaining the filed rate doctrine is "shorthand for the interconnected statutory requirements that bind regulated entities to charge only the rates filed with FERC and to change their rates only prospectively"); *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1232 (D.C. Cir. 2018) ("*ODEC*") (finding a petitioner's requested relief would "retroactively rewrite the terms of the filed rate" and holding that "[t]he filed rate doctrine and rule against retroactive rulemaking flatly forbid such a result"); *Louisiana Pub.*

exactly what the Commission did in the February 21 Order.

The relevant tariff language could not have been clearer, and the facts are no less clear-cut.   Under the Tariff, PJM was required to calculate and post the Locational Deliverability Area Reliability Requirements prior to 2024/2025 BRA.[34]  The Tariff further required that the VRR Curves incorporating this and other posted auction parameters "be used for such Base Residual Auction."[35]   The Tariff, as in effect when the Locational Deliverability Area Reliability Requirements for the 2024/2025 BRA were calculated and posted and through the offer period, allowed for no after-the-fact adjustments to the Locational Deliverability Area Reliability Requirements used to clear the auction.[36]

---

*Serv. Comm'n v. FERC*, 761 F.3d 540, 556 (D.C. Cir. 2014) (stating that "the absence of retroactive relief is a function of the filed-rate doctrine"); *OXY USA, Inc. v. FERC*, 64 F.3d 679, 700 (D.C. Cir. 1995) (holding that a new methodology for valuing petroleum shipments "could not have been imposed retroactively without violating the filed rate doctrine"); *East Tenn. Natural Gas Co v. FERC*, 863 F.2d 932, 941 (D.C. Cir. 1988) (stating that "[r]etroactive changes in rates violate the filed rate doctrine, by allowing the collection of rates other than the ones that were on file at the time of purchase"); *Public Serv. Co. of N.H. v. FERC*, 600 F.2d 944, 958 (D.C. Cir. 1979) (stating that "only prospective ratemaking is allowed"); *Texas E. Transmission Corp.*, 72 FERC ¶ 61,152 at 61,766-67 (1995) ("Under the filed rate doctrine, final rates approved by the Commission cannot be changed retroactively."), *aff'd sub nom. Texas E. Transmission Corp. v. FERC*, 102 F.3d 174 (5th Cir. 1996).

[34]     *See* Tariff, Attachment DD, § 5.10(vi)(B) (stating that "the Locational Deliverability Area Reliability Requirement for each Locational Deliverability Area for which a Variable Resource Requirement [("VRR")] Curve has been established for such Base Residual Auction . . . prior to the conduct of the Base Residual Auction for the first Delivery Year in which the new values will be applied"); *id.*, § 5.11(a) (providing that "PJM will post the following information for a Delivery Year prior to conducting the Base Residual Auction for such Delivery Year: . . . The Locational Deliverability Area Reliability Requirement and the Variable Resource Requirement Curve for each Locational Deliverability Area for which a separate Variable Resource Requirement Curve has been established for such Base Residual Auction").

[35]     *Id.*, § 5.10(vi)(A).

[36]     PJM argued that the Tariff "already requires PJM to adjust the Locational Deliverability Area Reliability Requirement after the bidding window closes (but before the conclusion of the auction) . . . 'to reflect Price Responsive Demand with a PRD Reservation Price equal to or less than the applicable Base Residual Auction clearing price.'"  December 23 Filing, Transmittal Letter at 23-24 (quoting Tarff, Attachment DD, § 5.11(e)).  The Commission wisely chose not to endorse this reasoning.  As Petitioners previously explained, this argument is misleading in that the only

Despite the fact that these values were already final, PJM proposed, in the December 23 Filing, to revise the DPL-S Locational Deliverability Area Reliability Requirement, and the Commission, in the February 21 Order, accepted PJM's proposal.  By allowing PJM to change a value fixed and finalized in the past, the Commission altered the filed rate retroactively.

It is no answer for the Commission to claim that the change to the DPL-S Locational Deliverability Area Reliability Requirement is not "genuinely retroactive."[37]  As Commissioner Danly stated:

> [I]f an event has already happened, it is in the past.  If it has yet to happen, it is in the future.  The event in the PJM tariff that must happen "prior" to the auction—establishing the Local Deliverability Area Reliability Requirement—already happened, as did the running of the auction.[38]

The unsupported suggestion that there is some meaningful and relevant distinction between "'genuine' and 'disingenuous' retroactivity"[39] not only fails to rescue the Commission's legal position; it also fails to satisfy the requirements of reasoned decision-making inasmuch it is "illogical on its own terms,"[40] represents an unacknowledged and unexplained departure from Commission filed rate precedent,[41] and fails to grapple with

---

adjustments made pursuant to cited tariff provision are for purposes of posting auction results. *See* EPSA Protest at 13-14; NRG Protest at 13 & n.44.  *See also* EPSA Protest, Attachment A, Affidavit of Paul M. Sotkiewicz, Ph.D., ¶¶ 39-45 (the "Sotkiewicz Affidavit").

[37]    February 21 Order, 182 FERC ¶ 61,109 at P 169.

[38]    Danly Statement at P 15.

[39]    February 21 Order, 182 FERC ¶ 61,109 at P 169.

[40]    *GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013) ("*GameFly*") (citation omitted).

[41]    *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("*Fox*") (holding that an agency must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy" (emphasis in original)); *West Deptford Energy, LLC v. FERC*,

serious objections raised by Petitioners and other protestors[42] and dissenting Commissioner Danly.[43]

Rather than engage with the clear language of the Tariff and the facts before it, the Commission attempted to distort the facts in a way that, ultimately, only serves to highlight the frailty of its legal position. Responding to arguments that PJM's proposal would retroactively change the DPL-S Locational Deliverability Area Reliability Requirement, the Commission stated:

> Simply because one section of the Tariff requires PJM to take a particular action at one stage of the auction process, such as posting the [Locational Deliverability Area] Reliability Requirement by a particular date, does not preclude PJM from prospectively updating the manner in which that [Locational Deliverability Area] Reliability Requirement is incorporated into a later phase of the auction process pursuant to a separate section of the Tariff that requires PJM to consider the auction inputs and calculate a clearing result to minimize the cost of satisfying the reliability requirement.[44]

---

766 F.3d 10, 20 (D.C. Cir. 2014) ("*West Deptford*") ("It is textbook administrative law that an agency must 'provide[] a reasoned explanation for departing from precedent or treating similar situations differently,' and Commission cases are no exception . . . ." (internal citation omitted)).

[42]     *See, e.g.*, *American Clean Power Ass'n v. FERC*, 54 F.4th 722, 728 (D.C. Cir. 2022) ("*ACPA*") (reversing order in which "FERC acted arbitrarily and capriciously by failing to meaningfully respond to Petitioner's arguments" below); *New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 211 (D.C. Cir. 2015) ("*NEPGA*") (same); *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) ("It is well established that the Commission must 'respond meaningfully to the arguments raised before it.'" (quoting *Public Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005))).

[43]     *See American Gas Ass'n v. FERC*, 593 F.3d 14, 20 (D.C. Cir. 2010) ("*AGA*") ("[W]hile FERC is not required to agree with arguments raised by a dissenting Commissioner . . . , it must, at a minimum, acknowledge and consider them." (citing *Chamber of Commerce v. SEC*, 412 F.3d 133, 137-38 (D.C. Cir. 2005))). *See also, e.g.*, *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 639 (D.C. Cir. 2017) (finding error where a multi-member board "failed to respond to key points raised by the dissent"); *Kamargo Corp. v. FERC*, 852 F.2d 1392, 1398 (D.C.Cir.1988) (stating the Commission "has no alternative but to confront the questions raised by the [commissioner's] dissent").

[44]     February 21 Order, 182 FERC ¶ 61,109 at P 171 (internal citations omitted).

But this is a gross distortion of the facts. PJM did not change "the manner in which that [Locational Deliverability Area] Reliability Requirement [was] incorporated into a later phase of the auction process . . . ."[45]  Rather, it changed – or, in the words of the February 21 Order, made an "adjustment" to[46] – the DPL-S Locational Deliverability Area Reliability Requirement itself and did so long after that value became final under the terms of the Tariff as then in effect.  That PJM was changing this value, not merely the way this value is used, is clear from the tariff language pursuant to which it acted, which states that PJM may "exclude from the Locational Deliverability Area Reliability Requirement" certain resources' capacity.[47]  It is also evident from the fact that this new language is included in the definition of the term "Locational Deliverability Area Reliability Requirement."  When one accurately characterizes what occurred, the filed rate violation is both obvious and glaring:  The Tariff required PJM to take a particular action at one stage of the auction process, namely, calculating and posting the Locational Deliverability Area Reliability Requirement by a particular date, and PJM changed that Locational Deliverability Area Reliability Requirement at a later stage of the auction process, even though the Tariff, as in effect when this value was calculated and posted, did not allow for any such changes.

Moreover, and as Petitioners previously explained,[48] PJM's proposal violates Section 5.10(a)(vi) of Attachment DD to the Tariff, which clearly states that PJM "shall

---

[45]     *Id.*

[46]     *Id.* at P 157.

[47]     December 23 Filing, Attachment A, Revisions to the PJM Open Access Transmission Tariff, (Marked/Redline Format).

[48]     *See* EPSA Protest at 6-11; NRG Protest at 5-8.

**determine** the PJM Region Reliability Requirement and the Locational Deliverability Area Reliability Requirement for each Locational Deliverability Area . . . **prior** to the conduct of the Base Residual Auction . . . ."[49]  Similarly, the Tariff also requires that "[t]he parameters of the [VRR] Curve will be established prior to the conduct of the Base Residual Auction for a Delivery Year and will be used for such Base Residual Auction,"[50] and as Commissioner Danly pointed out, "[n]o one disputes that the Locational Deliverability Area Reliability Requirement 'is an anchor point of the [VRR] Curve.'"[51]  Not only did the Commission completely fail to address Petitioners' and Commissioner Danly's arguments on this point,[52] but what little reasoning it offered is completely illogical.[53]  The Commission does not even attempt to reconcile its view that the posted auction parameters are separate from the values that PJM must actually apply in clearing the auction with the actual Tariff language, which makes clear that the Locational Deliverability Area Reliability Requirement must be determined **prior** to the conduct of the BRA, and makes clear the resulting VRR Curves "will be used for such Base Residual Auction."[54]  And, to be clear, "determine" is commonly understood to mean "to fix conclusively or authoritatively,"[55] as distinct from "make a guess and change it later if you

---

[49]    Tariff, Attachment DD, § 5.10(a)(vi)(B) (emphases added).

[50]    *Id.*, § 5.10(a)(vi)(A).

[51]    Danly Statement at P 6 (footnote omitted).

[52]    *See, e.g.*, *ACPA,* 54 F.4th at 728; *NEPGA*, 881 F.3d at 211; *TransCanada*, 811 F.3d at 12.

[53]    *See, e.g., Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983) ("*Baltimore Gas*") (agency must "consider[] the relevant factors and articulate[] a rational connection between the facts made and the choice made" (citations omitted)).

[54]    Tariff, Attachment DD, § 5.10(a)(vi)(A).

[55]    *Merriam-Webster Dictionary* (definition of "determine"), https://www.merriam-webster.com/dictionary/determine.

feel like it," as the Commission seems to suggest.

It is also well established that the filed rate doctrine is not limited to charges.[56] Indeed, the February 21 Order acknowledged that "for the purposes of the filed rate doctrine, the rate on file with the Commission is the BRA procedures."[57] Notwithstanding this acknowledgement, the Commission then turned around and claimed that "a change to those procedures is not retroactive for the purposes of the filed rate doctrine if the capacity supply obligations and the corresponding rights and obligations—including the right to a particular capacity price—have not yet actually been awarded."[58] These two statements are inherently contradictory, and the February 21 Order failed to explain why, if the filed rate sets forth the procedures governing the BRA, there is no filed rate violation until such time as there is an actual capacity award. The best the Commission can offer is that the auction rules "exist[] 'to secure commitments of Capacity Resources' and the price that suppliers will receive in exchange . . . ."[59] That is akin to claiming that there is nothing retroactive about changing election eligibility rules, after voting has concluded, to exclude the votes of all left-handed individuals, on the theory that election rules exist for the purpose of determining who won the vote and the winner has not yet been declared.

To be clear, it makes no difference that PJM's retroactive change to the DPL-S Locational Deliverability Area Reliability Requirement for the 2024/2025 BRA was

---

[56] *See, e.g., American Tel. & Tel. Co. v. Central Off. Tel., Inc.*, 524 U.S. 214, 223 (1998) (finding the filed rate doctrine to apply in a case that "'does not involve rates or ratesetting'"); *OG&E*, 11 F.4th at 830 (stating that "[n]on-rate terms within the tariff may not be changed retroactively"); *Dreamscape Design, Inc. v. Affinity Network, Inc.*, 414 F.3d 665, 668 (7th Cir. 2005) (explaining that the filed rate doctrine "also applies to non-rate provisions of a tariff").

[57] February 21 Order, 182 FERC ¶ 61,109 at P 165 (footnote omitted).

[58] *Id.* at P 167.

[59] *Id.*

implemented through prospective application of the tariff revisions proposed in the December 23 Filing.  That does not make the change "prospective in nature" or mean it is not "genuinely retroactive."[60]  To be sure, for future RPM Auctions, after the 2024/2025 BRA, the new provisions will provide notice of potential retroactive adjustments to the Locational Deliverability Area Reliability Requirement, and those adjustments will thereby qualify for the "notice" exception to the filed rate doctrine and the prohibition against retroactive ratemaking.[61]  But there can be no colorable claim that market participants had any such notice, much less that the adjustment was "foreordained,"[62] with respect to the Locational Deliverability Area Reliability Requirements for the 2024/2025 BRA.

Tellingly, nowhere in the February 21 Order does the Commission claim this change is eligible for the "notice" exception or allege that market participants had agreed to the retroactive change.[63]  By its silence on these points, the Commission implicitly conceded that, as Commissioner Danly stated, neither of the two judicially recognized "exception[s] to the filed rate doctrine and rule against retroactive ratemaking applies . . . ."[64]  With no judicially recognized exception available to it, the Commission

---

[60]    *Id.* at P 169.

[61]    *ODEC*, 892 F.3d at 1231 ("When the very terms of the filed rate warn customers, at the time they contract for service, that the price charged will fluctuate based on an identified formula with specified cost drivers, then the rate is allowed to change when fluctuations in those cost drivers occur.  That, after all, is how formulae work.  And that comports with the filed rate doctrine because the rate changes are foreordained, not retroactive.").

[62]    *Id.*

[63]    As Commissioner Danly noted, any such claim would have been unsupportable.  *See* Danly Statement at P 7 ("There is nothing in the PJM tariff providing notice that th[e] provision [relating to the calculation and posting of the Locational Deliverability Area Reliability Requirement] is tentative or subject to later adjustment . . . ." (internal citation omitted)).

[64]    *Id.* at n.18.  The courts have recognized two exceptions pursuant to "which a rate adjustment may take effect prior to a section 205 filing: when parties have notice that a rate is tentative and may be later adjusted with retroactive effect, or when they have agreed to make a

made one up.  Under this newly concocted exception, the filed rate doctrine and the prohibition against retroactive ratemaking are inapplicable because, at the time PJM submitted the December 23 Filing, "no capacity commitments had yet been secured, no transaction had yet been consummated, meaning that neither PJM nor any supplier had the attendant rights or obligations, no capacity had been delivered pursuant to such commitments, and no charges had been billed or collected."[65]   But this purported exception finds no support in the extensive body of filed rate doctrine precedent or the Tariff.

As Commissioner Danly noted, the Commission "cites a lot of cases on various points related to the filed rate doctrine, and not one of them supports its new interpretation that filed auction rules can be freely changed up until contracts 'have actually been awarded.'"[66]   In particular, the February 21 Order cited – or, to be more precise, miscited – various cases for the proposition that the courts "have held that changes to a rate are impermissibly retroactive **only** where regulated entities or customers have already transacted pursuant to the rate . . . ."[67]   But not a single one of the cases cited actually supports the proposition for which it is cited:  namely, that these are the **only**

---

rate effective retroactively."  *Consolidated Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 969 (D.C. Cir. 2003) ("*Con Edison*") (citing *Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999)).  The notice exception, in turn, has been construed as applying in just two circumstances: (1) "when a tariff has a formula for calculating a rate, which clearly states that charges will derive from application of the formula"; and (2) "when a court invalidates a filed rate as unlawful, requiring the Commission to consider making retroactive changes to the rate."  P3 Protest, Attachment A, Affidavit of the Hon. Joseph T. Kelliher on behalf of The PJM Power Providers Group, ¶¶ 13-15 (the "Kelliher Affidavit").  *See also OG&E*, 11 F.4th at 830-31.

[65]     February 21 Order, 182 FERC ¶ 61,109 at P 167.

[66]     Danly Statement at P 13.

[67]     February 21 Order, 182 FERC ¶ 61,109 at P 166 (emphasis added).  *See also id.* at n.449 (citing cases).

circumstances in which after-the-fact rate changes are impermissibly retroactive.[68]

It is true enough that the fact patterns presented in the cases cited in the February 21 Order involved entities that had "already transacted pursuant to the rate . . . ."[69] But the holdings in these cases, as well as other filed rate doctrine precedent, were not limited to their facts in any way that would justify the Commission's proposed exception to the filed rate doctrine and the prohibition against retroactive ratemaking.  To the contrary, those cases articulated a clear rule that applies equally regardless of whether the entities involved have already transacted or not.  The *ODEC* court, for instance, made crystal clear that "[t]he filed rate doctrine and the rule against retroactive ratemaking leave the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations."[70]  It rejected the proposed rate change at issue in that case on the grounds that it would have done exactly what the February 21 Order has allowed PJM to do here: "retroactively rewrite the terms of the filed rate."[71]  And, as any first-year law student knows, absent language expressly limiting a decision to the particular facts presented, "[a] holding . . . can extend through its logic beyond the specific facts of [a] particular case."[72]

---

[68]    *Id.* at P 166 (emphasis added).

[69]    *Id.* (emphasis added).  *See also id.* at n.449 (citing cases).

[70]    *ODEC*, 892 F.3d at 1230.

[71]    *Id.* at 1232.  *See also, e.g.*, *Hall*, 453 U.S. at 578 (holding that under the filed rate doctrine, the Commission "has no power to alter a rate retroactively"); *Associated Gas Distribs. v. FERC*, 898 F.2d 809, 810 (D.C. Cir. 1990) (holding that "a regulated entity may not charge, or be forced by the Commission to charge, a rate different from the one on file with the Commission for a particular good or service").

[72]    *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 38 (2010) ("*Humphries*").  *See also Smith v. People of the State of Cal.*, 361 U.S. 147, 161-62 (1959) ("I am no friend of deciding a

Rather than responding to Commissioner Danly's serious and well-reasoned objections to the majority's newly imagined exception to the filed rate doctrine and the prohibition against retroactive ratemaking, as reasoned decision-making required,[73] the Commission attempted to shift the burden onto Commissioner Danly and protestors. Specifically, the Commission attempted to justify this purported exception on the grounds that "[p]rotestors point to no precedent in which a change to a rate or non-rate term has been determined to be retroactive before a transaction has been made pursuant to it."[74] This, however, is just another dodge that fails to engage meaningfully with the objections to the Commission's approach. The Commission is the one positing a new exception to the filed rate doctrine, and, as such, the Commission is the one that must reconcile that new exception with over a century's worth of precedent.[75] The onus is not on Commissioner Danly, Petitioners or any other party to find precedent expressly rejecting an exception that the Commission only just invented.

Aside from the Commission's misapprehension as to the respective burdens here, its assertion has the problem of being factually incorrect. The Commission itself has, in fact, found proposed deviations from filed rates "to be retroactive before a transaction has been made pursuant to it,"[76] and, indeed, consistent with the fact that the filed rate

---

case beyond what the immediate controversy requires . . . . On the other hand, a case before this Court is not just a case. Inevitably its disposition carries implications and gives directions beyond its particular facts." (Frankfurter, J., concurring)).

[73]    *See, e.g.*, *AGA*, 593 F.3d at 19-21.

[74]    February 21 Order, 182 FERC ¶ 61,109 at P 166.

[75]    *See Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915) ("*Maxwell*") (articulating what has come to be known as the filed rate doctrine). *See also* Danly Statement at P 2 (referring to "upwards of 100 years of court precedent" (quoting Kelliher Affidavit, ¶ 46)).

[76]    February 21 Order, 182 FERC ¶ 61,109 at P 166.

doctrine does not just apply to charges, in the absence of any "transaction"[77] at all. In denying waivers of reporting deadlines in two pipelines' tariffs, for example, the Commission found the requested relief to be "retroactive in nature and thus prohibited by the filed rate doctrine."[78] Similarly, the Commission denied waiver on the same grounds of a deadline in a transmission provider's generator interconnection procedures, where no relevant transaction had been agreed or consummated.[79] Here, again, the Commission has failed to satisfy the requirements of reasoned decision-making by failing to acknowledge or justify the departure from its own precedent.[80]

**B.    The Commission Failed to Properly Weigh the Costs and Benefits of Permitting PJM's Proposal to Have Retroactive Effect to the 2024/2025 BRA**

The February 21 Order found that "the benefits of accepting the proposed Tariff revisions effective December 24, 2022, as requested, outweigh any reliance or expectation as to the [Locational Deliverability Area] Reliability Requirement posted in August 2022."[81] As an initial matter, the Commission's assessment of the relative benefits and costs of applying PJM's new rule with retroactive effect is entirely irrelevant, because "the filed rate doctrine and the rule against retroactive ratemaking leave the Commission *no discretion* to waive the operation of a filed rate or to retroactively change or adjust a

---

[77]    *Id.*

[78]    *TransCameron Pipeline, LLC*, 180 FERC ¶ 61,011 at P 5 (2022) ("*TransCameron*"). *See also Rover Pipeline LLC*, 180 FERC ¶ 61,033 at P 5 (2022) (same).

[79]    *See Salt Creek Solar, LLC*, 180 FERC ¶ 61,116 at P 38 (2022) ("*Salt Creek*") (finding the requested relief to be "retroactive in nature and . . . prohibited by the filed rate doctrine"). In particular, the parties had not yet entered into any generator interconnection agreement. While the parties had entered into an interconnection study agreement, such an agreement does not establish the rates, terms or conditions of any transaction for a Commission-jurisdictional service.

[80]    *See, e.g.*, *Fox*, 556 U.S. at 515; *West Deptford*, 766 F.3d at 20.

[81]    February 21 Order, 182 FERC ¶ 61,109 at P 173.

rate for good cause or for any other equitable considerations."[82]  As has been the case since the Supreme Court first articulated the filed rate doctrine over a century ago, this "undeniably strict" rule "may work hardship"[83] and have "harsh effects"[84] in some circumstances.  Nonetheless, it remains the rule and the Commission is not at liberty to evade or ignore this rule, no matter how heartfelt its belief that the resulting clearing prices would be "unnecessarily high."[85]

Even assuming *arguendo* that the filed rate doctrine did not tie the Commission's hands and that it was free to engage in a balancing of the equities, however, there is no evidence that the Commission actually "weigh[ed] the totality of the evidence before [it]"[86] in any meaningful sense.  Rather, the February 21 Order reveals that the Commission only considered evidence on one side of the scale, fixating on the possibility that, without the adjustment proposed by PJM, customers would be "required to pay four times more for capacity under the existing Tariff than under the proposed revisions"[87] and paying no mind to countervailing considerations.

Despite paying lip service to "settled expectations concerns,"[88] it is plain that the Commission did not, in fact recognize, much less accord any discernable weight to, the serious harm of allowing PJM's after-the-fact change to the DPL-S Locational

---

[82]     Danly Statement at P 5 (quoting *ODEC*, 892 F.3d at 1230 (emphasis in original)).  *See also, e.g.*, *OG&E*, 11 F.4th at 825-26 ("Once a tariff is filed, the Commission has no statutory authority to provide equitable exceptions or retroactive modifications to the tariff.").

[83]     *Maxwell*, 237 U.S. at 97.

[84]     *Maislin Inds., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 117 (1990).

[85]     February 21 Order, 182 FERC ¶ 61,109 at P 178.

[86]     *Id.* at P 179.

[87]     *Id.* at P 178 (footnote omitted).

[88]     *Id.* at P 177.

Deliverability Area Reliability Requirement. First, rather than engage with the evidence concerning concrete and substantial reliance on the posted Locational Deliverability Area Reliability Requirement, the Commission simply declared that it was "not persuaded that market participants' purported reliance on a single input, with no knowledge of the final capacity price, in making commercial transactions results in a detrimental reliance concern."[89] Indeed, nowhere in the February 21 Order does the Commission engage with the evidence offered by the NRG Companies concerning their reasonable expectations about the clearing price based on the posted value and the market rules then in effect and the important economic decisions made on the basis of those expectations.[90] Nor does the Commission consider evidence showing that ESAI Power, a market research and consulting firm, had similarly predicted, in a published report, that the auction price would reach the cap.[91] Moreover, Petitioners and others also submitted evidence showing that PJM's own analysis of the prior 2023/2024 BRA demonstrated that a clearing price at the market cap was entirely predictable given anticipated conditions.[92] The Commission thus failed to engage in reasoned decision-making, because its suggestion that market participants would not have relied on the posted Locational Deliverability Area Reliability Requirement, reflected a "clipped view of the record . . . ."[93]

---

[89]    *Id.*

[90]    *See* Holtman Affidavit, ¶¶ 15-27.

[91]    *See* LS Power Protest at 3-4 & nn.12-13.

[92]    *See* Sotkiewicz Affidavit, ¶¶ 48, 104-108; Holtman Affidavit, ¶¶ 15-19; P3 Protest, Affidavit of Roy J. Shanker Ph.D. on behalf of The PJM Power Providers Group, ¶ 39; Motion to Intervene and Limited Protest of Lotus Infrastructure, LLC at 9-10 & n.36, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023).

[93]    *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 963 (D.C. Cir. 2003) ("*Lakeland*"). *See also Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("*Genuine Parts*") (making clear that "an agency cannot ignore evidence that undercuts its judgment . . . [or] minimize such

Second, in finding that the benefits of PJM's proposal outweigh any "detrimental reliance concern,"[94] the Commission also failed to consider the fact that NRG contacted PJM regarding the posted DPL-S Locational Deliverability Area Reliability Requirement, and PJM expressly confirmed the accuracy of the posted value.[95]  The Commission now attempts to spin this issue as a matter of PJM "having provided NRG a different explanation for the increase in [the Locational Deliverability] Area Reliability Requirement," and brushes it off as "not relevant to the question of whether PJM's instant proposal is just and reasonable."[96]  But this completely misses the point.  The issue is not whether PJM's explanations were consistent.  It is that PJM effectively induced to NRG to detrimentally rely on the posted parameters and then changed them after NRG had relied on them.  The Commission's failure to consider this factor, when weighing the "disruption to settled expectations" in this case,[97] "entirely failed to consider an important aspect of the problem"[98] and thus failed to satisfy the requirements of reasoned decision-making.

Third, and perhaps most importantly, the Commission's alleged "weighing [of] the

---

evidence without adequate explanation"); *Tenneco Gas v. FERC*, 969 F2d 1187, 1214 (D.C. Cir. 1992) ("*Tenneco*") (finding that "a FERC order neglectful of pertinent facts on the record must crumble for want of substantial evidence"); *International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*, 802 F.2d 969, 975 (7th Cir. 1986) ("*International Union*") (agency may not "confine[] its attention to evidence that support[s] its conclusion and . . . ignore[] any contrary evidence").

94      February 21 Order, 182 FERC ¶ 61,109 at P 177.

95      *See* Holtman Affidavit, ¶ 16 & Exhibit C.

96      February 21 Order, 182 FERC ¶ 61,109 at P 153.

97      *Id.* at P 178.

98      *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

totality of the evidence"[99] failed to account for the "untold economic harm [from] undermining all FERC-jurisdictional markets," much less to weigh this harm against any benefit from avoiding "a high clearing price in one zone, in one auction."[100]  As the Commission itself has previously recognized, "[c]hanging the rules governing an already-commenced auction is a significant step that affects both the outcome of that particular auction as well as parties' confidence in the rules governing future proceedings," particularly when "PJM proposed the [change] in order to avoid the outcome that the already-commenced auction would have produced."[101]  This concern is even more acute here, because the ultimate purpose of a capacity market is "to produce a level of investor confidence that is sufficient to ensure resource adequacy at just and reasonable rates."[102] Petitioners and others warned of the profound harm to the PJM capacity market, in particular, and Commission-jurisdictional markets, in general, of allowing PJM's after-the-fact changes to the rules for the 2024/2025 BRA.[103]  Ultimately, as Commissioner Danly astutely noted, the February 21 Order casts doubt on the finality of any rate that is not numerically fixed, including not only market rules but also traditional formula rates, because the message is that "any part of the formula apparently can be deemed an 'input' subject to retroactive revision."[104]

---

[99]    February 21 Order, 182 FERC ¶ 61,109 at P 178.

[100]    Danly Statement at P 27.

[101]    *PJM Interconnection, L.L.C.*, 166 FERC ¶ 61,072 at P 33 (2019).  *Cf. ISO New England Inc.*, 132 FERC ¶ 61,136 at P 29 (2010) (rejecting proposed auction rule changes proposed in advance of an auction because market participants "had a reasonable expectation that the current [market] settlement rules would remain in effect for the upcoming . . . auction").

[102]    *ISO New England Inc.*, 162 FERC ¶ 61,205 at P 21 (2018).

[103]    *See, e.g.*, EPSA Protest at 28; NRG Protest at 21; Holtman Affidavit, ¶¶ 32-34; Vistra Protest at 1-4; P3 Protest at 15; Clean Energy Associations Protest at 3-4; Pine Gate Protest at 4.

[104]    Danly Statement at P 3.

In the February 21 Order, the Commission failed to fulfill its obligations under the Administrative Procedure Act (the "APA")[105] to substantively address the serious concerns of Petitioners[106] and Commissioner Danly,[107] as well as the supporting evidence provided by Petitioners and others,[108] in its alleged weighing of the record.  In fact, there is no sign in the February 21 Order that the Commission gave any thought at all to the long-term ramifications of its action.  It is thus hardly surprising that the Commission would conclude that "the balance of the interests here weighs heavily in favor of accepting PJM's proposal effective December 24, 2022,"[109] when it completely ignored all of the factors on the other side of the scale.  This utterly inadequate weighing of the supposed costs and benefits does not even come close to satisfying the demands of the APA.[110]

### C.    The Commission Erred in Finding PJM's December 23 Filing to be Just and Reasonable

Even as applied prospectively to future RPM Auctions not yet commenced, PJM's proposal was not shown to be just and reasonable and the Commission erred in concluding otherwise.

### 1.    The Post-Auction Adjustments Authorized by the Tariff Revisions Are Fundamentally at Odds with the Modeling Used to Set the Reliability Requirements

Under the tariff revisions accepted in the February 21 Order, PJM will exclude

---

[105]    5 U.S.C. §§ 551-559 (2018).

[106]    *See, e.g.*, *ACPA,* 54 F.4th at 728.

[107]    *See, e.g.*, *id.*; *AGA*, 593 F.3d at 20.

[108]    *See, e.g.*, *Genuine Parts*, 890 F.3d at 312.

[109]    February 21 Order, 182 FERC ¶ 61,109 at P 177.

[110]    *See State Farm*, 463 U.S. at 43 (agency rule is arbitrary and capricious if agency "entirely failed to consider an important aspect of the problem").

planned resources that do not submit offers into the BRA from the Locational Deliverability Area Reliability Requirement if including them would increase the Locational Deliverability Area Reliability Requirement by more than one percent.  As an initial matter, each BRA is ordinarily held three years in advance of the applicable Delivery Year, meaning that PJM has to rely on forecasted data to conduct each BRA, where such forecasts involve a multitude of variables other than the amount of planned resources affecting the Locational Deliverability Area Reliability Requirement.[111]  Such forecasts are, by their nature, necessarily imprecise,[112] but neither the December 23 Filing nor the February 21 Order explained why it is necessary or appropriate for PJM to modify just one forecasted variable – *i.e.*, planned resources – in the course of conducting an auction and then to make modifications only in one direction.[113]

Moreover, and as EPSA's expert witness, Paul M. Sotkiewicz, Ph.D., explained, PJM's proposed adjustments are fundamentally at odds with the way PJM calculates the Local Deliverability Area Reliability Requirement.[114]  As indicated in the February 21 Order, the Locational Deliverability Area Reliability Requirement is modeled on the basis of projected capacity within the applicable LDA, where such projected capacity includes existing resources and any planned resources that have executed Interconnection

---

[111]    *See, e.g.*, Tariff, Attachment DD, § 5.10 (describing various factors that PJM must consider in establishing the VRR Curves); *id.*, § 5.11 (describing information that PJM is required to post in advance of each BRA).

[112]    *See Joint Consumer Representatives v. PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,187 at P 32 (2015) (rejecting complaint regarding PJM's failure to update its load forecasts based on updated model where "PJM complied with its OATT by developing its 2015 PJM Peak Load Forecast according to its manuals and posting it prior to February 1, 2015" and finding that "there will inevitably be some difference between PJM's load forecast and the amount of capacity that PJM ultimately needs in a given Delivery Year" (footnotes omitted)).

[113]    *See, e.g.*, EPSA Protest at 18; P3 Protest at 32-34.

[114]    *See* Sotkiewicz Affidavit, ¶¶ 46-72.

Service Agreements ("ISAs") with a commercial operation date on or prior to the start of the relevant Delivery Year.[115]  Notably, for purposes of this modeling exercise, a planned resource will be included as long as it is expected to be present in the LDA during the Delivery Year (based on its having an executed ISA), regardless of whether it is required or expected to participate in the applicable RPM Auction.[116]  By contrast, the adjustment to the Locational Deliverability Area Reliability Requirement is based solely on participation in the RPM Auction, regardless of whether the planned resource is expected to be present in the LDA during the Delivery Year.  On its face, authorizing such an exercise in "subtracting apples from oranges" does not satisfy the requirements of reasoned decision-making.[117]

Dr. Sotkiewicz described a number of serious problems that flow from PJM's making an apple-based adjustment to an orange-based auction parameter.  PJM will only exclude planned resources that do not submit offers into the RPM Auctions from the Locational Deliverability Area Reliability Requirement, while existing resources that do not submit offers would continue to be included.[118]  In so doing, PJM ignores the fact that intermittent resources are not required to participate in the Reliability Pricing Model ("RPM") market and have increasingly chosen not to submit offers into the RPM

---

[115]    *See* February 21 Order, 182 FERC ¶ 61,109 at P 6.

[116]    *See* Sotkiewicz Affidavit, ¶ 50.

[117]    *MCI Telecomms. Corp. v. FCC*, 143 F.3d 606, 608 (D.C. Cir. 1998) ("*MCI*").  *See also id.* ("If the Commission simply subtracted one quantity from another, logically independent quantity, its action was unreasoned.").

[118]    *See* Sotkiewicz Affidavit, ¶¶ 54-56.

Auctions.[119]  That does not mean, however, that these resources will not actually be in operation by the start of the relevant Delivery Year[120] and thereby be functionally equivalent to an existing resource that either did not participate or did not clear in the RPM Auction.  Similarly, these adjustments would arbitrarily exclude from a Locational Deliverability Area Reliability Requirement the capacity of planned resources that did not submit offers into the RPM Auctions but continue to include the capacity of planned resources whose offers did not clear, even though they are functionally the same "from a reliability perspective . . . ."[121]

Neither PJM nor any other party disputed the accuracy of Dr. Sotkiewicz's testimony or the other record evidence demonstrating that offers are not necessarily indicative of whether a planned resource will be in operation by a particular Delivery Year.  Rather than grapple with this evidence, the Commission justified its acceptance of the December 23 Order with a series of illogical and internally inconsistent claims to the effect that:

- Planned resources that do not offer and those that submit offers but do not clear are not "functionally similar" because "[c]apacity offers signal that the resource intends to be available to serve as capacity in the relevant delivery year at a price equal to or above their capacity supply offer, even if they do not actually clear in the BRA," and because "the Tariff defines [Locational Deliverability Area] Reliability Requirement as projected internal capacity plus CETO, and these resources will serve as capacity if they clear in the

---

[119]    *See id.*, ¶¶ 57-60.  *See also* Holtman Affidavit, ¶ 30 ("In NRG's experience, capacity revenues are a small part of the pie for renewable resources, and developers will often move forward with projects even where they are getting no capacity revenues.  Particularly when the benefits of such revenues are weighed against the burdens of taking on a capacity commitment and the lost opportunity of receiving capacity performance bonuses, a developer in the DPL-S LDA may very well prefer not to offer its capacity into a Base Residual Auction even as it moves forward on its project.").

[120]    *See* Sotkiewicz Affidavit, ¶ 60; Holtman Affidavit, ¶ 30.

[121]    Sotkiewicz Affidavit, ¶ 66.

BRA."[122]

- There is no need to account for existing resources that do not submit offers, because "planned and existing resources are not similarly situated with respect to determining reliability needs in a given delivery year because planned resources have not yet achieved commercial operation" and such planned resources face risks "that make it more likely that they will be unavailable to provide capacity in some or all of the relevant delivery year, in contrast to existing resources."[123]

- Even though some of the planned resources that do not submit offers could become operational by the time of the relevant Delivery Year, it is appropriate to exclude them from the Locational Deliverability Area Reliability Requirement because "these resources will not have capacity commitments" and "even if such resources were in service by the start of the delivery year, there is no need to model the increased reliability risk since load is not depending on them as capacity resources."[124]

Taken individually, each of these claims is illogical.  For example, it defies reason to acknowledge that a capacity offer signals an intent to provide capacity "at a price equal to or above [the] capacity supply offer" and then to assert that the intent to provide capacity remains when the offer "do[es] not actually clear in the BRA,"[125] because, by definition, the failure to clear means the clearing price was below – not "equal to or above"[126] – the offer price.  On top of being individually illogical, these claims, when read together, are so hopelessly inconsistent with each other that one can only guess that, in its eagerness to accept the December 23 Filing, the Commission could not be bothered to keep its story straight.

It is hard to understand how the Commission can assert, in one breath, that only

---

[122]    February 21 Order, 182 FERC ¶ 61,109 at P 151.

[123]    *Id.* at P 154.

[124]    *Id.* at P 152.

[125]    *Id.* at P 151.

[126]    *Id.*

planned resources that submitted offers should be included in the Locational Deliverability Area Reliability Requirement, on the theory that their offers signal their "inten[t] to be available to serve as capacity in the relevant delivery year,"[127] and then claim, in the next breath, that existing resources should be included even when they did not offer.[128]  Under the Commission's logic, an existing resource's decision not to offer signals an intent ***not*** to be available to serve as capacity in the relevant delivery year,[129] and such a resource's capacity should, under the Commission's logic, be excluded from the Locational Deliverability Area Reliability Requirement, along with that of planned resources that did not offer.

In the same vein, the Commission also claimed that planned resources are unlike existing resources because planned resources have not achieved commercial operation and thus are likely to "be unavailable to provide capacity in some or all of the relevant delivery year, in contrast to existing resources."[130]  But this focus on commercial operation is a "complete non sequitur"[131] because, under the Commission's logic, any resource, whether planned or existing, that does not submit an offer has indicated that it is not available to provide capacity.[132]

While acknowledging that planned resources that did not submit offers may in fact

---

[127]   *Id.*

[128]   *See id.* at P 154.

[129]   *Id.* at P 151.

[130]   *See id.* at P 154.

[131]   *Tennessee Gas Pipeline Co. v. FERC*, 824 F.2d 78, 84 (D.C. Cir. 1987) ("*Tennessee Gas*").

[132]   *See* February 21 Order, 182 FERC ¶ 61,109 at P 151.

achieve commercial operation by the time of the relevant Delivery Year,[133] the Commission claimed that these resources should not be included in the Locational Deliverability Area Reliability Requirement because "these resources will not have capacity commitments" and "load is not depending on them as capacity resources."[134] But this completely overlooks the fact that, just a few sentences earlier, the Commission found the resource's decision whether to offer to be the determinative factor, regardless of whether the resource assumes a capacity commitment.[135]  At the same time, the Commission completely failed to address the fact that a planned resource that does not submit an offer and is now operational is indistinguishable from an existing resource that did not submit an offer.  In either case, these resources will be physically present but will lack capacity commitments.   Nonetheless, under the tariff revisions accepted in the February 21 Order, the existing resource would be deemed to impact the Locational Deliverability Area Reliability Requirement, but the planned resource that is now operational would not.[136]

        As is clear from the foregoing, the February 21 Order is "internally inconsistent"[137]

---

[133]    *See id.* at P 154.

[134]    *Id.* at P 152.

[135]    *See id.* at P 151.

[136]    *See, e.g., Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("*Allentown*") (the process by which an agency arrives at a particular "result must be logical and rational"); *Baltimore Gas*, 462 U.S. at 105 (agency must "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choice made" (citations omitted)).

[137]    *Business Roundtable v. SEC*, 647 F.3d 1144, 1153 (D.C. Cir. 2011) ("*Business Roundtable*").  *See also, e.g., Air Transp. Ass'n of Am. v. Dep't of Transp.*, 119 F.3d 38, 43 (D.C. Cir. 1997) (vacating decision that was "internally inconsistent"); *Air Line Pilots Ass'n v. FAA*, 3 F.3d 449, 453 (D.C. Cir. 1993) (finding agency decision to be "internally inconsistent and therefore unreasonable and impermissible under *Chevron*").

and "illogical on its own terms . . . ."[138]  Equally important, even if these contortions could justify the Commission's desired result (and they do not), the Commission has still failed to address the fundamental point raised by Dr. Sotkiewicz:  that PJM's modeling calculates the Locational Deliverability Area Reliability Requirement based solely on whether resources are anticipated to be physically present, without consideration of RPM participation or commitments.[139]  As Dr. Sotkiewicz stated, PJM's proposal turns this modeling practice on its head by adjusting the Locational Deliverability Area Reliability Requirement based solely on the offers of planned resources, thereby assuming that "resources that do not offer in the BRA will not be physically available," even though "resources without must-offer requirements increasingly choose to not offer into the BRAs but are physically available."[140]  The Commission utterly failed to address these arguments[141] and also failed to identify any record evidence supporting PJM's assumption

---

[138]    *GameFly*, 704 F.3d at 148 (citation omitted).  *See also, e.g., State Farm*, 463 U.S. at 43 (agency decision cannot be "so implausible that it could not be ascribed to a difference in view or the product of agency expertise"); *Chamber of Commerce of United States of Am. v. United States Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2018) ("Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action."); *Illinois Pub. Telecomm. Ass'n v. FCC*, 117 F.3d 555, 566 (D.C. Cir. 1997) (finding "seemingly illogical decision" to be arbitrary and capricious).

[139]    *See* Sotkiewicz Affidavit, ¶¶ 48-49.

[140]    *Id.*, ¶ 12.  *See also* P3 Protest at 33-34 (explaining that "planned resources and existing intermittent resources, storage resources, energy efficiency resources, and demand response resources all have the free option under the Tariff not to participate in a BRA" and "there are many reasons why such resources would exercise that option," and that it is therefore a "forecasting error" that "is the real issue").

[141]    *See, e.g., PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) ("*PPL Wallingford*") (requiring the Commission to "respond meaningfully" to concerns raised by parties); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998) ("*NorAm*") (reversing order in which the Commission "not only failed to provide an adequate response to [petitioner's] argument, it failed to take seriously its responsibility to respond at all"); *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1303 (D.C. Cir. 1992) (stating that an agency must "engage the arguments raised before it – that it conduct a process of *reasoned* decisionmaking" (emphasis in original)).

that planned resources that do not submit offers will not be operational during the relevant Delivery Year.[142]

### 2. The Commission Arbitrarily and Capriciously Ignored the Impact of PJM's Proposal on Bilateral Contracting and Hedging

The Commission also failed to address Petitioners' concerns that it is not just and reasonable to adopt a Locational Deliverability Area Reliability Requirement that is subject to change well after it has been posted.[143] As Dr. Sotkiewicz explained, the RPM rules provide for posting of the auction parameters in order to allow market participants to make commercial decisions, such as whether to enter into bilateral contracts or submit offers into the BRAs and how any such offers should be structured.[144] By contrast, a rule allowing PJM to modify the Locational Deliverability Area Reliability Requirement during the running of the BRA is bad market design because it "introduces unnecessary uncertainty for all market participants, but in an asymmetric way" and "makes hedging and risk mitigation harder for all parties in the capacity market."[145] In fact, Mr. Holtman testified that the prospect of such adjustments would cause the posted planning parameters to "have little or no value in future RPM auctions."[146]

The Commission blithely shrugged off these concerns, asserting that "in future

---

[142] *See* 16 U.S.C. § 825l(b) (2018); *Illinois Com. Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009) ("*ICC*") (explaining that a reviewing court cannot "uphold a regulatory decision that is not supported by substantial evidence on the record as a whole"); *Pacific Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1319 (D.C. Cir. 2004) ("*PG&E*") (the Commission's orders must be "based upon substantial evidence in the record" (citation omitted)).

[143] *See, e.g.*, EPSA Protest at 18-21; NRG Protest at 15-17; *id.* at 20-24; LS Power Protest at 3-4; Vistra Protest at 14-15.

[144] See Sotkiewicz Affidavit, ¶¶ 17, 25, 27-29.

[145] *Id.*, ¶ 32.

[146] Holtman Affidavit, ¶ 32.

years entities can account for the potential for adjustments to the [Locational Deliverability Area] Reliability Requirement in carrying out their business decisions and commercial transactions."[147]  But this summary conclusion is not based on record evidence, and the Commission nowhere explained how market participants are supposed to account for changes like that in this case, which would result in a clearing price being 75 percent lower than the previously expected price.[148]  As Mr. Holtman testified, there is no discounting of the projected clearing price that "could, in any workable or meaningful way, capture a potential swing of the magnitude that would result from PJM's proposed after-the-fact adjustment to the [Locational Deliverability Area] Reliability Requirement."[149]

In addition, notwithstanding the Commission's attempt to downplay the Locational Deliverability Area Reliability Requirement as a "single input,"[150] this input is posted precisely for the purpose of allowing market participants to make decisions regarding their bilateral transactions and other commercial decisions.[151]  Moreover, as the auction parameter representing "how much capacity the area needs to buy,"[152] this "single

---

[147]    February 21 Order, 182 FERC ¶ 61,109 at P 157 (footnote omitted).

[148]    *See* 16 U.S.C. § 825l(b) (2018); *ICC*, 576 F.3d at 477 (decision must be "supported by substantial evidence on the record as a whole"); *PG&E*, 373 F.3d at 1319 (order must be "based upon substantial evidence in the record" (citation omitted)).

[149]    Holtman Affidavit, ¶ 32.

[150]    February 21 Order, 182 FERC ¶ 61,109 at P 177.

[151]    *See PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275 at P 198 (2009) (PJM stating that the "posting of the fundamental auction parameters . . . is an important precondition for parties to make decisions regarding bilateral contracts, capacity imports or export, and the manner in which they participate in the Base Residual Auction").  *See also* Answer of PJM Interconnection, L.L.C. to Protests and Comments at 33, Docket No. ER09-412-000 (filed Feb. 2, 2009) (same).

[152]    Danly Statement at n.17.

input"[153] is particularly critical to those decisions.[154]  The February 21 Order utterly failed to consider that, consistent with the Commission's directive that "[i]deally, the market should encourage [load-serving entities] to engage in long-term bilateral contracting to support needed investment,"[155] PJM's RPM design was intended to "create an incentive for longer-term bilateral contracts, thus enabling more effective hedging for customers."[156] The February 21 Order is thus arbitrary and capricious because, in assessing the justness and reasonableness of PJM's proposal, the Commission "entirely failed to consider an important aspect of the problem . . . ."[157]

### 3.    The Commission's Acceptance of the One Percent Materiality Threshold Was Arbitrary and Capricious

Petitioners argued that the proposed materiality threshold for adjusting a Locational Deliverability Area Reliability Requirement, that this value have increased by more than one percent from the prior BRA, was arbitrary and unexplained.[158]  As Dr. Sotkiewicz explained, PJM "provided no empirical evidence, data or analytical support for its choice of a one percent threshold . . . ."[159]

Rather than engage with these arguments as reasoned decision-making

---

[153]    February 21 Order, 182 FERC ¶ 61,109 at P 177.

[154]    *See* Danly Statement at n.17 ("Calling [the Locational Deliverability Area Reliability Requirement] a 'single input' is like calling the particular car I am purchasing a 'single input' in determining the price I pay for the car.").  *See also* Holtman Affidavit, ¶¶ 15-19 (describing how the posted Locational Deliverability Area Reliability Requirement for the DPL-S LDA informed NRG's expectations about the clearing price in the 2024/2025 BRA).

[155]    *PJM Interconnection, L.L.C.*, 107 FERC ¶ 61,112 at P 20 (2004) (footnote omitted).

[156]    *PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079 at P 57 (2006) (PJM's explanation of the role of RPM).

[157]    *State Farm*, 463 U.S. at 43.

[158]    *See* EPSA Protest at 25-26; Sotkiewicz Affidavit, ¶ 37; Vistra Protest at 11-12.

[159]    Sotkiewicz Affidavit, ¶ 37.

requires[160] and supporting its decision with substantial evidence,[161] the Commission found this threshold appropriate on the grounds that the issue identified in the December 23 Filing typically arises in small LDAs and "the one percent threshold avoids having to arbitrarily define what constitutes a 'small' LDA."[162]  That is, however, no answer at all.  Even if the adoption of one arbitrary value avoids having to arbitrarily set a second value, that does not make the first value just and reasonable or the product of reasoned decision-making.  Neither PJM nor the Commission explained why one percent defines an LDA that is appropriately "small," as opposed to, for example, a 0.5 percent or a two percent threshold.  By the Commission's logic, a driver's guess that Exit 15 is the correct exit should be regarded as reasoned, because that guess avoids the need for guesswork at subsequent exits.  Like the Commission's justification for the one percent threshold, that would plainly be "illogical on its own terms . . . ."[163]

### 4.      The February 21 Order Failed to Address Long-Term Harm to the RPM Market and Consumers

In accepting the tariff revisions proposed in the December 23 Filing, even as applied prospectively to RPM Auctions not yet commenced, the Commission utterly failed to consider supplier interests or the long-term harm that post-posting adjustments to the Locational Deliverability Area Reliability Requirement will have on PJM's capacity market and, ultimately, on the consumers that the Commission ostensibly wishes to protect.

The Commission's ratemaking obligations under the FPA require a "balancing of

---

[160]   *See, e.g., PPL Wallingford*, 419 F.3d at 1198; *NorAm*, 148 F.3d at 1165.

[161]   *See, e.g.*, *Genuine Parts*, 890 F.3d at 312.

[162]   February 21 Order, 182 FERC ¶ 61,109 at P 160.

[163]   *GameFly*, 704 F.3d at 148 (citation omitted).

the investor and the consumer interests."[164]   Nonetheless, there is no evidence in the February 21 Order that the Commission considered investor interests at all.   Instead, PJM's proposal establishes a one-way ratchet under which suppliers are held to their supply commitments and associated performance obligations but clearing prices are subject to after-the-fact tinkering for the short-term benefit of consumers.[165]   Nowhere in the February 21 Order did the Commission even recognize the one-sided nature of PJM's proposal, much less properly consider the impact of these types of after-the-fact adjustments on suppliers and investors.

In this respect, the Commission not only gave short shrift to the settled expectations of market participants with respect to the 2024/2025 BRA, as discussed above; it also failed to acknowledge, much less seriously consider, the detrimental impacts on the ability of market participants to rely on the posted auction parameters and auction rules going forward.   PJM now has authority under its Tariff to manipulate auction results not to its liking, with the Locational Deliverability Area Reliability Requirement "a 'moving target' during [the] auction,"[166] and the Commission has also signaled that it will be receptive to future post-auction rules changes in furtherance of that same objective. To make matters worse, such changes can be effectuated "at least up until that point at

---

[164]   *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 532 (2008) (quoting *FPC v. Hope Nat. Gas Co.,* 320 U.S. 591, 603 (1944) ("*Hope*")).

[165]   *See* Danly Statement at P 21 (noting that "[t]he absurdity of the majority's interpretation of time is fully exposed when we also recognize that it only applies to certain favored parties—in this case RTOs or ISOs:  consider whether the majority would allow generator sellers to revise their capacity offers after the auction had been run but before results were posted like it allows PJM to change the reliability requirement").

[166]   *Id.* at P 35.

which the obligation is actually incurred,"[167] and may even be possible so long as "no capacity had been delivered pursuant to such commitments, and no charges had been billed or collected."[168] This holding is especially concerning in a forward capacity market that is intended to secure capacity commitments three years ahead, meaning that there will likely be changes in market conditions during that time that could be used as an excuse for later modifications to the rules and clearing prices.[169]

This will inevitably chill investment and deter participation in RPM Auctions by new resources and resources without must-offer obligations and encourage premature deactivation of other resources.[170] In fact, Dr. Sotkiewicz noted that the Indian River 4 facility in DPL-S ("Indian River") plans to retire because it failed to clear in prior BRAs, and is currently operating under a Reliability Must Run ("RMR") rate schedule,[171] while there has also been a precipitous decline in RPM participation by Intermittent Resources.[172] Dr. Sotkiewicz cautioned that increased uncertainty regarding the applicable auction parameters and market rules, such as that engendered by the February 21 Order, will only serve to further discourage resources from participating in the RPM, which is particularly concerning from a reliability perspective given the tightening supply in the DPL-S LDA.[173]

---

[167] February 21 Order, 182 FERC ¶ 61,109 at P 168.

[168] *Id.* at P 167.

[169] *See* Danly Statement at P 11.

[170] *See* EPSA Protest at 20-21; Sotkiewicz Affidavit, ¶ 36 (explaining that "newly introduced uncertainty may cause Capacity Market Sellers simply not to offer at all if they believe the uncertainty creates additional risks that cannot possibly be mitigated").

[171] *See* EPSA Protest at 27-28; Sotkiewicz Affidavit, ¶¶ 70-72.

[172] *See* EPSA Protest at 23; Sotkiewicz Affidavit, ¶¶ 59-60.

[173] *See* Sotkiewicz Affidavit, ¶¶ 38, 76-77.

Rather than tackling these issues,[174] the Commission summarily declared that PJM's proposal will result in a Locational Deliverability Area Reliability Requirement that "reflects actual reliability needs in a manner consistent with supply and demand fundamentals"[175] and "should improve price signals . . . ."[176]  That is simply wrong.  As discussed above, if planned resources that will be operational during the relevant Delivery Year are not offering into the BRAs,[177] the lack of an offer says nothing relevant about actual "supply and demand fundamentals,"[178] as those are reflected in the Reliability Requirements, or about the price needed to maintain reliability.

The February 21 Order failed to engage with the evidence proffered by Dr. Sotkiewicz regarding the supply issues in DPL-S.[179]  The closest the order came was the Commission's statement that it would not "opine on the Indian River [RMR] agreement, which is the subject of another pending proceeding,"[180] but, as best Petitioners can tell, this statement was directed to unrelated arguments by another intervenor.[181]  Dr. Sotkiewicz's testimony did not ask the Commission to opine, in any way, on the Indian River RMR agreement, as such, but instead cited Indian River's circumstances as

---

[174]   *See, e.g.*, *AGA*, 593 F.3d at 20; *PPL Wallingford*, 419 F.3d at 1198.

[175]   February 21 Order, 182 FERC ¶ 61,109 at P 150.

[176]   *Id.* at P 159.

[177]   See Sotkiewicz Affidavit, ¶ 59 (explaining that "PJM data has shown the amount of wind and solar capacity offered into the BRA has declined by 40 and 8.5 percent, respectively, between the [BRA for the 2022/2023 Delivery Year] and the [BRA for the 2023/2024 Delivery Year] despite an increasing deployment of wind and solar resources" and that the amount of unoffered intermittent resources has more than doubled in that time).

[178]   February 21 Order, 182 FERC ¶ 61,109 at P 150.

[179]   *See* Sotkiewicz Affidavit, ¶¶ 90-95.

[180]   February 21 Order, 182 FERC ¶ 61,109 at P 159.

[181]   *See id.* at P 100 (stating that another party had made arguments regarding the rate under the Indian River RMR rate schedule).

evidence that "RPM in DPL-South is not attracting RPM commitments."[182]

Similarly, the Commission claimed that "EPSA's arguments that PJM has overlooked other reliability issues . . . are outside the scope of this FPA section 205 filing."[183]  It is unclear what "reliability issues"[184] the Commission may have been referring to, unless it is questioning the relevance of EPSA's concerns that PJM's proposal "fail[ed] to consider PJM's underlying modeling assumptions, and thus [will] fail to send price signals necessary for reliability"[185] and "focuse[d] only on the immediate price impacts for customers, rather than attempting to ensure that prices appropriately reflect reliability needs and maintain confidence in its market construct . . . ."[186]  But the Commission cannot possibly be saying that these are arguments are beyond the scope, as they go directly to the justness and reasonableness of the December 23 Filing.

In this regard, it is notable that the Commission's myopic focus on immediate rate impacts ignored not only suppliers' rights, but also the long-term interests of consumers in reliable supplies of electricity, consistent with the fact that "the principal purpose of [the FPA] was to encourage the orderly development of plentiful supplies of electricity . . . at reasonable prices."[187]  By failing to engage with EPSA's serious concerns on these issues, the Commission arbitrarily and capriciously "failed to consider an important aspect

---

[182]    Sotkiewicz Affidavit, ¶ 72.  There was another party whose comments directly addressed the Indian River RMR agreement, alleging that the proposed rate was "excessive."  Motions to Intervene and Initial Comments of the Maryland Office of People's Counsel at 7, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023).

[183]    February 21 Order, 182 FERC ¶ 61,109 at P 159.

[184]    *Id.*

[185]    EPSA Protest at 26.

[186]    *Id.* at 28.

[187]    *National Ass'n for the Advancement of Colored People v. FPC*, 425 U.S. 662, 669-70 (1976).

of the problem" and did not consider the impact on investment and market participation that could jeopardize reliability and raise prices over the long term.[188]

### D.    The Commission Arbitrarily and Capriciously Found that PJM Did Not Violate Its Tariff by Failing to Post the Final Auction Results

The Commission rejected arguments of Petitioners and others, including Commissioner Danly, that PJM violated its Tariff by delaying the posting of the final results of the 2024/2025 BRA,[189] which, according to PJM, left it free to modify the auction rules. The Commission swept aside these arguments in a single, conclusory paragraph, finding that "the Tariff does not impose a deadline on PJM to complete the process of conducting and administering the BRA" and only requires PJM "to post the auction results 'as soon thereafter as possible'—after 'conducting the Reliability Pricing Model Auctions.'"[190]

That single paragraph February 21 Order offered no hint of what the tariff language "as soon thereafter as possible"[191] is supposed to mean, and it is hard to imagine the Commission being so forgiving if PJM had held up posting of final results in order to propose a change expected to increase clearing prices.  As the NRG Companies explained in their protest, this phrase "'[b]y its nature, . . . suggests urgency . . . .'"[192] Rather than engaging with this or similar arguments, the Commission offered yet another

---

[188]    *State Farm*, 463 U.S. at 43.

[189]    The Tariff requires PJM to "post the results of each auction as soon thereafter as possible . . . ."  Tariff, Attachment DD, § 5.11(e).  While it is Petitioners' position that PJM violated its obligation under this provision of the Tariff by delaying the posting of the final results of the 2024/2025 BRA to give it time to modify the auction rules, Petitioners agreed with PJM's decision not to post "indicative results" of the BRA, something that is not contemplated by the Tariff.

[190]    February 21 Order, 182 FERC ¶ 61,109 at P 172.

[191]    Tariff, Attachment DD, § 5.11(e).

[192]    NRG Protest at 11 (quoting *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 764 (6th Cir. 2016)).

"complete non sequitur,"[193] stating that "PJM is an independent regional transmission operator with no financial interest in the capacity auction results, and is specifically vested with the right to file pursuant to section 205 to make changes relating to the terms and conditions of its Tariff . . . ."[194]  PJM's alleged independence and its FPA Section 205 filing rights have no bearing whatsoever on the question of what "as soon thereafter as possible"[195] means or whether the delay in the posting of final BRA results was permitted by the Tariff.  The Commission's non-responsive answer thus does not comport with the requirements of reasoned decision-making.[196]

As the NRG Companies indicated, the posting requirement cannot reasonably be construed to mean that PJM need only post the results "as soon as possible after PJM gets the auction rules modified to yield its preferred auction results."[197]  Similarly, Commissioner Danly pointed out that this tariff language does not give PJM "license to change the Locational Deliverability Area Reliability Requirement any time PJM feels like it . . . ."[198]  But one can only infer from what little the Commission said that that is exactly what it believed.  Having put forth no limiting principle either on the timing or what PJM may seek to do, the Commission implied that PJM does, in fact, have leeway to "throw

---

[193]    *Tennessee Gas*, 824 F.2d at 84.

[194]    February 21 Order, 182 FERC ¶ 61,109 at P 172 (footnote omitted).

[195]    Tariff, Attachment DD, § 5.11(e).

[196]    *See, e.g., Judulang v. Holder*, 565 U.S. 42, 53 (2011) ("*Judulang*") (finding that agency "failed to exercise its discretion in a reasoned manner" by considering an irrelevant factor); *American Fed'n of Gov't Employees, AFL-CIO v. Fed. Lab. Relations Auth.*, 24 F.4th 666, 677 (D.C. Cir. 2022) (finding agency's "reasoning is a non sequitur" because it failed to consider "[t]he relevant question"); *American Rivers v. FERC*, 895 F.3d 32, 51 (D.C. Cir. 2018) ("*American Rivers*") (finding Commission's analysis to be "woefully light on . . . reasoned analysis and heavy on unsubstantiated inferences and non sequiturs").

[197]    NRG Protest at 11-12 (footnote omitted).

[198]    Danly Statement at P 12 (footnote omitted).

out every other auction rule in the tariff,"[199] and thereby rendered the tariff language meaningless.[200]   Again, that does not satisfy the requirements of reasoned decision-making.

### E.    The Commission's Refusal to Allow Market Participants to Re-Offer Was Arbitrary and Capricious

Petitioners and other protestors argued that, to the extent the Commission was going to grant the relief requested by PJM, it also needed to allow sellers an opportunity to modify their offers into the 2024/2025 BRA to account for the changed rules and auction parameters.[201]   The Commission brushed such arguments aside, insisting:

> Fundamentally, changes to the [Locational Deliverability Area] Reliability Requirement affect the shape of the capacity market demand curves, and no party has suggested that the shape of the demand curve impacts their costs.  Rather, we agree with PJM, the Market Monitor, and commenters that capacity market offers should be dictated by capacity resource costs and not by expectations of demand.  Inputs to the capacity price, including the actions and offers of other sellers, as well as changes to the [Locational Deliverability Area] Reliability Requirement, can impact the final auction clearing price.[202]

This "dismissive treatment" of the arguments of Petitioners and others on this issue falls far short of what reasoned decision-making required.[203]

---

[199]    *Id.*

[200]    *See Baltimore Gas*, 462 U.S. at 105 (agency must "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choice made" (citations omitted)).

[201]    *See, e.g.*, EPSA Protest at 30-31; LS Power Protest at 7-8.  *See also* Motion for Leave to Answer and Answer of the Electric Power Supply Association at 15-16, Docket Nos. ER23-729-000, *et al.* (filed Feb. 9, 2023) (the "EPSA Answer"); Protest and Comments of the American Clean Power Association, Solar Energy Industries Association, and Advanced Energy United at 18-20, Docket Nos. ER23-729-000, *et al.* (filed Jan. 20, 2023).

[202]    February 21 Order, 182 FERC ¶ 61,109 at P 158.

[203]    *NorAm*, 148 F.3d at 1165.

EPSA's arguments on this issue were supported by expert testimony from Dr. Sotkiewicz, who described a number of ways in which the Locational Deliverability Area Reliability Requirement value could be expected to inform a Capacity Market Seller's offer decisions.[204] For example, he explained, there are types of resources that are not subject to the must-offer requirement and that may have rethought their decision to offer at all based on the revised parameters.[205] The February 21 Order failed even to acknowledge, much less grapple with, Petitioners' arguments and evidence and that, alone, renders the order arbitrary and capricious reasoned decision-making.[206] Moreover, the Commission failed to support its decision with substantial evidence, as required by both the FPA and the APA.[207] It is well established that an agency may not take an "ostrich's approach," whereby it "confine[s] its attention to evidence that support[s] its conclusion and . . . ignore[s] any contrary evidence."[208]

Even assuming *arguendo* that offer decisions are exclusively "dictated by capacity resource costs and not by expectations of demand,"[209] the Commission entirely failed to

---

[204]    *See* Sotkiewicz Affidavit, ¶ 27, 32-38.

[205]    *See id.*, ¶¶ 25, 27-29.

[206]    *See, e.g.*, *ACPA*, 54 F.4th at 728; *NEPGA*, 881 F.3d at 211.

[207]    *See* 5 U.S.C. § 706(2)(E) (2018); 16 U.S.C. § 825*l*(b) (2018).

[208]    *International Union*, 802 F.2d at 975. *See also, e.g., Genuine Parts*, 890 F.3d at 312 (making clear that "an agency cannot ignore evidence that undercuts its judgment . . . [or] minimize such evidence without adequate explanation"); *Tenneco*, 969 F2d at 1214 (finding that "a FERC order neglectful of pertinent facts on the record must crumble for want of substantial evidence"); *Lakeland*, 347 F.3d at 963 (holding that the agency may not rely on a "clipped view of the record" to support its conclusion); *Green v. Shalala*, 51 F.3d 96, 102 (7th Cir. 1995) (holding that where the agency "did not grapple with significant record evidence in [its] decision," that decision "is not supported by substantial evidence" (citation omitted)); *Schurz Communications, Inc. v. FCC*, 982 F.2d 1043, 1050 (7th Cir. 1992) (finding decision to be arbitrary and capricious where the agency "ostrich fashion, did not discuss the most substantial objections to its approach, though the objections were argued vigorously to it").

[209]    February 21 Order, 182 FERC ¶ 61,109 at P 158.

engage with objections to PJM's selectively reopening this single auction input without allowing reoffers that would account for other changes in circumstances, including changes that directly impact capacity resources' costs and offers.[210]  For example, since the closing of the offer window for the 2024/2025 BRA, it has become abundantly clear that, notwithstanding prior claims to the contrary, the risk of Performance Assessment Intervals is very real and that risk imposes substantial costs on suppliers.[211]  Yet, even as the Commission accepted a filing addressing what PJM claimed to be a "recently discovered" issue,[212] it rejected requests from suppliers for a corresponding opportunity to address changed circumstances impacting through new offers.  That was arbitrary and capricious both because it was "illogical on its own terms"[213] and because it failed to grapple with serious objections to its approach.[214]

Admittedly, allowing market participants to reoffer would only mitigate, but not eliminate, the harm of allowing PJM's after-the-fact manipulation of the 2024/2025 BRA results.  But, if the Commission was going to take the extreme (and unlawful) step of changing the auction rules after the fact, it had an obligation at least to mitigate the harm.  To the extent the Commission's refusal to allow reoffers was, as Commissioner Danly suggested, informed by the Commission's longstanding policy against rerunning auctions, that refusal was misguided, because, as he observed, what the February 21 Order did

---

[210]    *See* EPSA Answer at 15-16.

[211]    *See* LS Power Protest at 5-8.

[212]    December 23 Filing, Transmittal Letter at 5.

[213]    *GameFly*, 704 F.3d at 148 (citation omitted).

[214]    *See, e.g.*, *ACPA*, 54 F.4th at 728; *NEPGA*, 881 F.3d at 211.

was "arguably worse: rather than rerun the auction, [it] simply reset the price."[215]

Commissioner Danly expressed concern that the same policy against rerunning auctions means that "if today's action is deemed unlawful by the courts, there will be no effective remedy."[216]   In response to his request for input on this question, Petitioners respectfully submit that there will be no material legal or policy impediments to correcting the Commission's error on remand.  As an initial matter, Section 309 of the FPA[217] gives the Commission broad power "to undo harms caused by its own mistaken or unlawful acts,"[218] and "to regard as being done that which should have been done . . . ."[219]  And the filed rate doctrine and the prohibition against retroactive ratemaking are not violated "when a court invalidates a filed rate as unlawful, and FERC must make retroactive changes to the rates."[220]

Equally importantly, the policy considerations that animate the Commission's policy against rerunning auctions – a policy Petitioners support – would not be present where the Commission was only reinstating the clearing price for the 2024/2025 BRA, a price determined in accordance with the auction rules then in place, and not, in fact,

---

[215]   Danly Statement at P 30.

[216]   *Id.  See also id.* at P 37 ("The most disturbing aspect of this case is the damage it inflicts that probably cannot be remedied.  As I discuss above, rerunning the auction or restoring the original prices likely would be as destabilizing as today's order.").

[217]   16 U.S.C. § 825h (2018).

[218]   *TNA Merch. Projects, Inc. v. FERC*, 857 F.3d 354, 360 (D.C. Cir. 2017).

[219]   *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 955 (D.C. Cir. 2016) (quoting *Northern Natural Gas Co. v. FERC*, 785 F.2d 338, 341 (D.C. Cir. 1986)).  *See also id.* at 956 (finding claim by the Commission that "section 205 error of law is irremediable beyond prospective relief under section 206 [to be] irreconcilable with the authority Congress granted it in section 309 to remedy its errors").

[220]   *OG&E*, 11 F.4th at 831.

rerunning the auction.[221]  The Commission's policy against rerunning auctions reflects the legitimate concern that market participants "cannot effectively revisit their economic decisions" or "retroactively alter their conduct."[222]  In this case, the relevant economic decisions had already been made and the relevant conduct had already occurred when PJM decided to change the results.  Resetting the clearing price to enforce the filed rate on which those decisions and that conduct were based would advance, rather than conflict with, the policy concerns underlying the Commission's practice of not rerunning auctions.  Moreover, any reliance on the posted results of the 2024/2025 BRA in entering into other transactions would be unreasonable under these circumstances, because no stakeholder can reasonably ignore the likelihood of legal challenges to the February 21 Order.  Stakeholders are also well aware of the magnitude of the potential clearing price change.  For its part, EPSA publicly stated its intent to seek judicial review less than a

---

[221]    To the extent there are resources that did not clear at the reset clearing price but that would have cleared at the reinstated clearing price, some accommodation might need to be made for those unwilling or unable to assume a capacity commitment for whatever portion of the 2024/2025 Delivery Year might remain.  As a practical matter, this would be an issue affecting a very small universe of resources, because PJM's report on the 2024/2025 BRA indicates that 1,448.9 MW was offered in the DPL-S LDA and 1,422 MW cleared.  *See* PJM, Report at 7, Table 3 (Feb. 28, 2023), https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2024-2025/2024-2025-base-residual-auction-report.ashx.

[222]    *New York Indep. Sys. Operator, Inc.*, 92 FERC ¶ 61,073 at 61,307 (2000), *on reh'g*, 97 FERC ¶ 61,154 (2001).  *See also, e.g.*, *Independent Market Monitor for PJM v. PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,137 at P 77 (2021) ("The Commission generally does not order a remedy that requires rerunning a market because market participants participate in the market with the expectation that the rules in place and the market outcomes will not change after the results are set."), *on reh'g*, 178 FERC ¶ 61,022 (2022); *Astoria Generating Co. L.P. v. New York Indep. Sys. Operator, Inc.*, 140 FERC ¶ 61,189 at P 141 (2012) ("Re-running past auctions would create market uncertainty for market participants and require resolving complex questions."), *on reh'g*, 151 FERC ¶ 61,044, *on reh'g*, 153 FERC ¶ 61,274 (2015); *Maryland Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, 124 FERC ¶ 61,276 at P 26 (2008) ("Changing a rate and quantity already determined in accordance with existing tariff provisions on which parties have relied would defeat the purpose of the forward binding commitment, and undo the incentives for new capacity resources" (footnote omitted)), *on reh'g*, 127 FERC ¶ 61,274 at P 24-26 (2009).

day after the February 21 Order issued[223] and a full five days before PJM posted the 2024/2025 BRA results.[224]   Moreover, no stakeholder can reasonably discount the likelihood that these challenges will be successful, particularly when a sitting FERC Commissioner described the majority as "know[ing] its decision will not withstand judicial review"[225] and a former FERC Chairman warned that accepting PJM's proposal would set the Commission up for a "stinging and embarrassing . . . defeat. . . ."[226]

## III.    STATEMENT OF ISSUES

In accordance with Rule 713(c)(2) of the Commission's Rules of Practice and Procedure,[227] Petitioners hereby identify the issues on which they seek rehearing and provide representative precedent in support of their positions on such issues:

1.    The February 21 Order violated the filed rate doctrine and prohibition against retroactive ratemaking by permitting PJM to modify the DPL-S Locational Deliverability Area Reliability Requirement that was required under the Tariff to be finalized and fixed prior to the auction and to be incorporated into the VRR Curves used in the auction.  *See, e.g., Hall*, 453 U.S. at 578; *OG&E*, 11 F.4th at 829; *ODEC*, 892 F.3d at 1232.   The February 21 Order erroneously claimed that the Commission was free to accept PJM's proposal based on its finding that "the benefits of accepting the proposed Tariff revisions effective December 24, 2022, as requested, outweigh any reliance or expectation as to the [Locational Deliverability

---

[223]    EPSA, *FERC Decision to Allow PJM Electricity Market Auction Rule Changes Undermines Reliability and Investment in Energy Future – Statement From EPSA President and CEO Todd Snitchler* (Feb. 22, 2023) ("EPSA and likely others will appeal this order and based on 100 years of precedent feel strongly that it will be overturned."), https://epsa.org/ferc-decision-to-allow-pjm-electricity-market-auction-rule-changes-undermines-reliability-and-investment-in-energy-future-statement-from-epsa-president-and-ceo-todd-snitchler/.

[224]    PJM, *PJM Capacity Auction Procures Adequate Resources: Results Indicate Supply Tightening in Some Areas* (Feb. 27, 2023), https://www.pjm.com/-/media/about-pjm/newsroom/2023-releases/20230227-pjm-capacity-auction-procures-adequate-resources.ashx.

[225]    Danly Statement at P 30.

[226]    Kelliher Affidavit at 30.

[227]    18 C.F.R. § 385.713(c)(2) (2022).

Area] Reliability Requirement posted in August 2022."[228]   This holding ignored the fact that the Commission does not have the discretion to ignore the filed rate doctrine, even if it will result in substantial hardship.  *See, e.g.*, *Maxwell*, 237 U.S. at 97.

2.   The Commission's claim that the filed rate doctrine does not apply because PJM's proposed change to the Locational Deliverability Area Reliability Requirement is not "genuinely retroactive"[229] does not reflect reasoned decision-making.  This assertion is illogical, cannot be squared with the Commission's recognition that the filed rate at issue consists of the rules governing the RPM Auctions, and ignores the plain language of the Tariff.  *See, e.g., Baltimore Gas*, 462 U.S. at 105; *GameFly*, 704 F.3d at 148.  Moreover, in concluding that the filed rate doctrine did not apply, the Commission failed to respond to arguments raised by Commissioner Danly and Petitioners, *see, e.g., ACPA*, 54 F.4th at 728; *NEPGA*, 881 F.3d at 211; *TransCanada*, 811 F.3d at 12, and instead relied on assertions that misrepresented the applicable legal standard and precedent, while also deviating from the approach taken in prior Commission orders.  *See, e.g., Fox*, 556 U.S. at 515; *West Deptford*, 766 F.3d at 20.

3.   The proposed changes do not satisfy the requirements for either of the two judicially recognized exceptions to the filed rate doctrine and the prohibition against retroactive ratemaking, *see Con Edison*, 347 F.3d at 969, and there is no legal basis for the Commission's newly concocted exception that is alleged to apply because, at the time PJM submitted the December 23 Filing, "no capacity commitments had yet been secured, no transaction had yet been consummated, meaning that neither PJM nor any supplier had the attendant rights or obligations, no capacity had been delivered pursuant to such commitments, and no charges had been billed or collected."[230]   The holdings in cases cited by the Commission for the proposition that "changes to a rate are impermissibly retroactive only where regulated entities or customers have already transacted pursuant to the rate"[231] were not limited to their facts in any way that would support such an interpretation.  *See, e.g.*, *Humphries*, 562 U.S. at 38.  To the contrary, those cases make clear that, unless one of the two recognized exceptions applies, the Commission may not "retroactively rewrite the terms of the filed rate."  *ODEC*, 892 F.3d at 1232.  The Commission also arbitrarily and capriciously ignored its own precedent finding deviations from filed rates to be retroactive even where no transaction has been made and, indeed, in the absence of any transaction at all.  *See, e.g., TransCameron*, 180 FERC ¶ 61,011 at P 5;

---

[228]   February 21 Order, 182 FERC ¶ 61,109 at P 173.

[229]   *Id.* at P 169,

[230]   *Id.* at P 167.

[231]   *Id.* at P 166.

*Salt Creek*, 180 FERC ¶ 61,116 at P 38.  *See also, e.g., Fox*, 556 U.S. at 515; *West Deptford*, 766 F.3d at 20.

4.  Even assuming *arguendo* that the filed rate doctrine and the prohibition against retroactive ratemaking were inapplicable, there is no evidence that the Commission properly weighed the totality of the evidence before it with respect to the benefits of, and harm inflicted by, PJM's proposal.  The Commission's conclusory assertion that suppliers would not have relied on the posted Locational Deliverability Area Reliability Requirement for purposes of making commercial decisions ignores record evidence regarding NRG's actual and substantial reliance, as well as other record evidence demonstrating that suppliers would reasonably have been expected to rely on this posted auction parameter.  *See, e.g.*, *Genuine Parts*, 890 F.3d at 312; *Tenneco*, 969 F2d at 1214; *Lakeland*, 347 F.3d at 963.  It also represented an unacknowledged and unexplained departure from Commission precedent recognizing that market participants should be able to rely, and do, in fact, rely on posted auction parameters.  *See, e.g., Fox*, 556 U.S. at 515.  Moreover, the Commission utterly failed to consider the long-term impacts of its order on market participants' confidence in the market and PJM's market rules, given PJM's and the Commission's now apparent willingness to modify the rules after-the-fact to achieve their desired auction results.  *See State Farm*, 463 U.S. at 43.

5.  Even setting aside the issues regarding the adjustment of the DPL-S Locational Deliverability Area Reliability Requirement for the 2024/2025 BRA, the Commission's finding that PJM's proposal was just and reasonable was arbitrary and capricious and not the product of reasoned decision-making.  The February 21 Order fails to explain why it is appropriate to modify just one of the forecasted auction variables used by PJM.  Moreover, as Dr. Sotkiewicz and others explained, PJM's apple-based adjustment of excluding resources that did not submit offers to an orange-based auction parameter that does not consider whether resources' capacity is offered into, or clears, an RPM Auction was fundamentally illogical.  The Commission's approval of that adjustment was arbitrary and capricious, irrational, and not supported by substantial evidence.  *See, e.g., Allentown*, 522 U.S. at 374; *Baltimore Gas*, 462 U.S. at 105; *GameFly*, 704 F.3d at 148; *Business Roundtable*, 647 F.3d at 1153; *Tennessee Gas*, 824 F.2d at 84.

6.  As Dr. Sotkiewicz explained, PJM's proposal to exclude planned resources that do not submit offers into the RPM Auctions is at odds with its underlying modeling of the Local Deliverability Area Reliability Requirement, which includes planned resources that are expected to be in service during the relevant Delivery Year, regardless of whether those resources are required or expected to participate in the applicable RPM Auction.  Dr. Sotkiewicz also stated that PJM's proposal would arbitrarily treat planned resources differently than existing resources that do not submit offers into the RPM

Auctions, and that offers are not indicative of whether a planned resource can be expected to be in service during a Delivery Year given substantial evidence demonstrating that planned and existing resources without must-offer obligations are increasingly declining to participate in the RPM Auctions. In addition, PJM's proposal would arbitrarily exclude planned resources that do not submit offers into the RPM Auctions while including planned resources that submit offers but do not clear. Without refuting Petitioners' arguments and evidence, the Commission accepted PJM's proposal based on a number of illogical, internally inconsistent and irrelevant findings. *See, e.g., Allentown*, 522 U.S. at 374; *Baltimore Gas*, 462 U.S. at 105; *GameFly*, 704 F.3d at 148; *Business Roundtable*, 647 F.3d at 1153; *Tennessee Gas*, 824 F.2d at 84. The Commission also arbitrarily and capriciously failed to respond to serious objections to its approach, *see, e.g., PPL Wallingford*, 419 F.3d at 1198, and failed to support its decision with substantial evidence, *see, e.g., ICC*, 576 F.3d at 477.

7.  In overlooking the impact of its decision on bilateral contracting and hedging, the Commission violated the requirements of reasoned decision-making by utterly ignoring "an important aspect of the problem. . . ." *State Farm*, 463 U.S. at 43. In this respect, the Commission not only overlooked Petitioners' arguments and testimony, but also neglected its obligation to support its decision with substantial evidence by failing to identify record evidence supporting its assertion that market participants would be able to account for potential changes to the Locational Deliverability Area Reliability Requirement in their commercial arrangements. *See, e.g.*, 5 U.S.C. § 706(2)(E) (2018); 16 U.S.C. § 825*l*(b) (2018); *ICC*, 576 F.3d at 477; *PG&E*, 373 F.3d at 1319; *International Union*, 802 F.2d at 975.

8.  The February 21 Order does not reflect reasoned decision-making, because the Commission failed to respond meaningfully to arguments that PJM's one percent threshold for adjusting the Locational Deliverability Area Reliability Requirement is arbitrary or identify substantial evidence in the record to support that threshold. *See, e.g., Genuine Parts*, 890 F.3d at 312; *PPL Wallingford*, 419 F.3d at 1198. Moreover, the Commission's reasoning that "the one percent threshold avoids having to arbitrarily define what constitutes a 'small' LDA," February 21 Order, 182 FERC ¶ 61,109 at P 160, was illogical and failed to establish that one percent is a just and reasonable threshold. *See, e.g., GameFly*, 704 F.3d at 148.

9.  Rehearing of the February 21 Order is required because, in finding the December 23 Filing to be just and reasonable, the Commission failed to demonstrate that it had fulfilled its obligation under the FPA to consider investor, in addition to consumer, interests. *See, e.g., Hope*, 320 U.S. at 603. The Commission's refusal to grapple with Petitioners' arguments that PJM's proposal would deter market participation and investment to the detriment of reliability and consumers was also arbitrary and capricious.

*See, e.g.*, *State Farm*, 463 U.S. at 43; *AGA*, 593 F.3d at 20; *PPL Wallingford*, 419 F.3d at 1198.

10.    The Commission failed to engage in any meaningful way with arguments and evidence regarding supply issues in the DPL-S LDA and the reliability implications of its order, declaring, without explanation, such issues to be beyond the scope of these proceedings.  That renders its order arbitrary and capricious and unsupported by substantial evidence.  *See, e.g., Genuine Parts*, 890 F.3d at 312; *PPL Wallingford*, 419 F.3d at 1198.

11.    The February 21 Order arbitrarily and capriciously rejected arguments by Petitioners and others that PJM had violated its obligations under the Tariff by delaying the posting of the final results of the 2024/2025 BRA in order to file modifications to the RPM rules.  Rather than substantively addressing PJM's obligations under the Tariff, the Commission responded with a non-sequitur that effectively rendered the tariff requirement meaningless.  *See, e.g., Judulang*, 565 U.S. at 53; *American Rivers*, 895 F.3d at 51; *Tennessee Gas*, 824 F.2d at 84.

12.    The Commission's refusal to permit market participants to re-offer into the 2024/2025 BRA to account for the changed circumstances was arbitrary and capricious.  The Commission failed to grapple with Petitioners' arguments and evidence, and also failed to support its decision with substantial evidence.  *See, e.g.,* 5 U.S.C. § 706(2)(E) (2018); 16 U.S.C. § 825*l*(b) (2018); *ACPA*, 54 F.4th at 728; *NEPGA*, 881 F.3d at 211.  For example, the Commission's finding that offers are determined solely by costs,[232] ignored the fact that expectations regarding costs and the risks of associated with a capacity obligation may have changed since offers were submitted and that resources not subject to the must-offer obligation may choose not to submit offers at all based on their expectations of the clearing price, which is based on demand.

---

[232]    *See* February 21 Order, 182 FERC ¶ 61,109 at P 158.

## IV.    CONCLUSION

**WHEREFORE**, for the foregoing reasons, Petitioners respectfully request that the

Commission grant rehearing as requested herein.

Respectfully submitted,

**ELECTRIC POWER SUPPLY ASSOCIATION**

By:    _/s/ David G. Tewksbury_
        David G. Tewksbury
        Stephanie S. Lim
        MCDERMOTT WILL & EMERY LLP
        The McDermott Building
        500 North Capitol Street, NW
        Washington, DC  20001

        Nancy Bagot
        Senior Vice President
        Sharon Royka Theodore
        Vice President, Regulatory Affairs
        Electric Power Supply Association
        1401 New York Ave, NW, Suite 950
        Washington, DC  20005

        On behalf of the **Electric Power Supply Association**

**LS POWER DEVELOPMENT, LLC**

By:    _/s/ Neil L. Levy_
        Neil L. Levy
        MCDERMOTT WILL & EMERY LLP
        The McDermott Building
        500 North Capitol Street, NW
        Washington, DC  20001

        Marjorie Rosenbluth Philips
        LS Power Group
        1700 Broadway, 35th Floor
        New York, NY  10019

        On behalf of **LS Power Development, LLC**

**NRG POWER MARKETING LLC**
**DIRECT ENERGY BUSINESS**
  **MARKETING, LLC**
**MIDWEST GENERATION, LLC**

By:    _/s/ David G. Tewksbury_
        David G. Tewksbury
        Stephanie S. Lim
        MCDERMOTT WILL & EMERY LLP
        The McDermott Building
        500 North Capitol Street, NW
        Washington, DC  20001

        Cortney Madea Slager
        Vice President & Assistant General
          Counsel
        NRG Energy, Inc.
        804 Carnegie Center
        Princeton, NJ  08540

        Counsel for the **NRG Power Marketing LLC, Direct Energy Business Marketing, LLC and Midwest Generation, LLC**

**VISTRA CORP.**

By:    _/s/ J. Arnold Quinn_
        J. Arnold Quinn
        Senior Vice President, Regulatory Policy
        Andrew Weinstein
        Senior Director, FERC Strategy and
          ISO-NE Market Policy
        Vistra Corp.
        325 7th Street NW, Suite 520
        Washington, DC  20004

        On behalf of **Vistra Corp.**

Dated:  March 23, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document on each person

designated on the official service lists compiled by the Secretary of the Federal Energy

Regulatory Commission in these proceedings.

Dated at Washington, D.C., this 23rd day of March 2023.

  */s/ Stephanie S. Lim*
Stephanie S. Lim

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |  |
|---|---|---|---|
| **PJM Interconnection, L.L.C.** | ) ) ) ) | **Docket Nos.** | **ER23-729-000** **EL23-19-000** |

**REQUEST FOR REHEARING OF**
**CONSTELLATION ENERGY GENERATION, LLC**

Pursuant to Rule 713[1] of the Federal Energy Regulatory Commission's ("Commission") Rules of Practice and Procedure, Constellation Energy Generation, LLC ("Constellation"), respectfully requests that the Commission grant rehearing of its February 21, 2023 Order on Proposed Tariff Revisions and Dismissing Complaint ("Order").[2]  In its Order, the Commission allowed PJM Interconnection, L.L.C. ("PJM") to modify the methodology for calculating the Locational Deliverability Area ("LDA") Reliability Requirement in its Open Access Transmission Tariff ("Tariff") and apply that new methodology to the 2024/2025 Base Residual Auction ("BRA" or "Auction") well after the date PJM was required to post planning parameters for the Auction, after suppliers submitted binding and irreversible offers, and even after PJM ran the Auction.  This violated the filed rate doctrine and rule against retroactive ratemaking.

## I.    INTRODUCTION

Market participants rely on the market rules in PJM's Tariff in judging how to participate in the capacity market.  Key among these are rules for calculating the auction parameters, including the LDA Reliability Requirement.  Because these parameters drive market outcomes, the Tariff requires PJM to post the values well in advance of its auctions.[3]  This provides market participants

---

[1] 18 C.F.R. § 385.713.

[2] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (2023).

[3] *See, e.g.*, PJM Open Access Transmission Tarif ("Tariff"), Attach. DD §§ 5.11(a)(v), 5.10(a)(vi)(B).

time to negotiate bilateral contracts and resources without a must-offer requirement to decide whether to submit a binding offer at all.  Although these market rules are not traditional stated rates, courts and the Commission consider them the filed rate.[4]

As Constellation explained in its comments,[5] allowing PJM to apply a new methodology for calculating the LDA Reliability Requirement for the 2024/2025 BRA constitutes an unprecedented violation of the filed rate doctrine and rule against retroactive ratemaking.  This is so in two respects.

*First*, the Commission authorized PJM to alter its market rules retroactively for the 2024/2025 Auction.  By the time PJM made its filings, the deadline for calculating and posting the auction parameters passed, suppliers submitted binding offers, and PJM had even run the Auction. The Commission's Order permitting these Tariff changes was impermissible.  *Second*, the Commission authorized PJM to dispose and replace valid clearing prices formed under PJM's existing rules.  By the time PJM decided to make its Section 205 and 206 submissions, it had run the Auction and lacked any discretion to redesign its market rules and alter the results[6]—all that was left to do was the ministerial act of posting the results.  The Commission could not allow PJM to rerun the Auction with the new rules.

Legally, the Commission offers no support for its decision.  The Commission confirms, on the one hand, that the filed rate includes the "BRA procedures,"[7] but it insists that it can approve changes to those rules and authorize PJM to rerun the auction based on the changes, so long as no

---

[4] *E.g.*, Order, 182 FERC ¶ 61,109 at P 165 & n.447 (collecting cases).

[5] *PJM Interconnection L.L.C.*, Docket Nos. ER23-729 *et al.*, Comments of Constellation Energy Generation, LLC at 10-15 (Jan. 20, 2023) ("Constellation Comments").

[6] While PJM does have some ability to alter results consistent with the filed rate doctrine in limited situations specifically set forth in the Tariff, none were applicable here.

[7] Order, 182 FERC ¶ 61,109 at P 165.

formal awards have been made.[8]  The Commission fails, however, to acknowledge that PJM had already applied the rules, run the auction, and lacked discretion under the Tariff to seek approval of new market rules and to rerun the auction using them.  Under the circumstances, PJM's only option was to post the clearing prices and make formal awards.  The Commission's acceptance of PJM's Tariff changes is inconsistent with precedent and would open the door to all manner of results-oriented tinkering with market rules.

Substantively, Constellation acknowledges PJM's rationale for revising the Tariff, but applying those changes to the 2024/2025 Auction will have dramatic consequences that far exceed any short-term price impacts.  Predictability is critical to wholesale auctions; the cycle of developing, operating, and retiring generators relies on the stability of the market construct.  The PJM capacity market has seen ever-changing designs over the past decade, but few come close to the magnitude of allowing the RTO to change the rules after key deadlines pass and the auction is run, for the express purpose of changing the auction result to one that is more to PJM's liking.  The immediate effect of this is to erode confidence in the market and punish market participants' good-faith reliance on the auction process, increasing risk to suppliers, inhibiting bilateral contracting, and stifling investment.  Over time, this could chill the development of new resources, raise prices, and threaten reliability when new entry is needed.

The Commission compounded its decision on the filed rate doctrine and rule against retroactive ratemaking with other errors.  Among other things, the Commission failed to grapple with record evidence in analyzing market participants' settled expectations, erroneously chose not to apply the *Mobile-Sierra* public interest standard, and failed to respond to protestors' showing that PJM had no authority to make its filing in the first place.

---

[8] *Id.* at PP 167, 171.

For these reasons and those discussed below, the Commission should grant rehearing and apply PJM's Tariff revisions effective after the 2024/2025 BRA.

## II.    STATEMENT OF ISSUES AND SPECIFICATIONS OF ERROR

Pursuant to Rule 713(c)(2), 18 C.F.R. § 385.713(c)(2), Constellation provides the following statement of issues:

1.    The Commission's Order is arbitrary, capricious, and contrary to law because it authorized PJM to amend its Tariff rules for determining auction inputs after the deadline for calculating and posting them, after PJM accepted binding offers from suppliers, and after running the Auction itself, contrary to the filed rate doctrine and the rule against retroactive ratemaking.  *E.g.*, *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577-78 (1981) ("[T]he filed rate doctrine … forbids a regulated entity [from] charg[ing] rates for its services other than those properly filed with the appropriate federal regulatory authority…. [T]he Commission itself has no power to alter a rate retroactively." (quotation marks omitted)); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986) ("[T]he filed rate doctrine is not limited to 'rates' *per se*.").

2.    The Commission's Order is arbitrary, capricious, and contrary to law because it permitted PJM to re-clear the 2024/2025 Auction using the revised LDA Reliability Requirement methodology after PJM had already determined valid and binding clearing prices that it lacked any relevant discretion to disturb.  *E.g.*, *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1230 (D.C. Cir. 2018) (*ODEC*) ("The filed rate doctrine and the rule against retroactive ratemaking leave the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations.").

3.      The Commission arbitrarily and capriciously determined that suppliers lack detrimental reliance interests on the LDA Reliability Requirement and that even if they did, short-term rate benefits to customers outweigh market participants' long-term reliance interests, without adequate reasoning, contrary to Commission precedent, and over the overwhelming weight of evidence in the record.  *E.g.*, *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (Commission orders must reflect "a principled and reasoned decision supported by the evidentiary record" (quotation marks omitted)).

4.      The Commission's review of PJM's Section 205 submission under the baseline "just and reasonable" standard rather than under the *Mobile-Sierra* "public interest" standard was arbitrary, capricious, and contrary to law.  *See New England Power Generators Ass'n v. FERC*, 707 F.3d 364, 371 (D.C. Cir. 2013) ("[A]uction rates exhibit many of the indicia of contract rates: not only did [the Commission] conclude the rates 'provide a market-based mechanism to appropriately value capacity resources based on their location,' [and] … 'rates disciplined by a market are consistent with the FPA's requirements." (citation omitted)).

5.      The Commission's Order is arbitrary, capricious, and contrary to law because it failed to respond meaningfully to Constellation's argument that PJM lacked authority to make its Section 205 filing without stakeholder review because no "imminent severe economic harm" justified an expedited filing.  *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011).

## III.    REQUEST FOR REHEARING

### A.    The Order violated the filed rate doctrine and the rule against retroactive ratemaking.

The Commission's Order constitutes a textbook violation of the filed rate doctrine and the rule against retroactive ratemaking. PJM filed its revised methodology for determining the LDA Reliability Requirement well after the deadline for calculating and posting it for use in the Auction, after PJM accepted binding offers from suppliers, and after running the Auction itself. The Tariff amendments were too late for the 2024/2025 Auction. At the same time, the Commission violated the filed rate doctrine and rule against retroactively ratemaking by allowing PJM to re-clear the Auction with the revised rules, and to set a revised rate.

### 1.    The filed rate doctrine and rule against retroactive ratemaking.

The filed rate doctrine prohibits any "regulated entity" from "charg[ing] rates for its services other than those properly filed with the appropriate federal regulatory authority."[9] The "corollary" "rule against retroactive ratemaking prohibits the Commission from adjusting current rates to make up for a utility's over- or under-collection in prior periods."[10] These "rules operate as a nearly impenetrable shield"[11] and are "undeniably strict."[12] "[T]he Commission itself has no power to alter a rate retroactively," for good cause, equitable considerations, or even where the rate is later found to be unjust and unreasonable.[13] There is no dispute that PJM's market rules for calculating auction parameters, including the LDA Reliability Requirements, constitute the filed

---

[9] *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981).

[10] *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1227, 1230 (D.C. Cir. 2018) (*ODEC*) (internal quotation marks omitted).

[11] *Id.* at 1230.

[12] *Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 222 (1998).

[13] *Hall*, 453 U.S. at 577-78; *ODEC*, 892 F.3d at 1230; *Pub. Utils. Comm'n of Cal. v. FERC*, 988 F.2d 154, 168 n.12 (D.C. Cir. 1993); *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 797 (D.C. Cir. 1990).

rate.[14]

The filed rate doctrine may seem "harsh"[15] at times, but it advances important policy goals: Market participants are entitled to "rate predictability" in making economic decisions.[16] Predictability "is crucial to businesses and markets and to attracting investment in the utility business."[17] In the context of organized markets, predictability "facilitat[es] investment decisions" and "identif[ies] and rais[es] awareness about system needs."[18]

### 2. The Commission's Order allowing PJM to alter its market rules after they had already been applied to the 2024/2025 Auction is arbitrary, capricious, and contrary to law.

The Commission violated the filed rate doctrine and the rule against retroactive ratemaking by allowing PJM to amend its rules for calculating the LDA Reliability Requirement after PJM ran the Auction. By the time that PJM sought—and the Commission approved—the Tariff amendments, the Auction was complete but for the posting of results. The Commission contends that the changes were prospective, but the record confirms they were not. Rehearing is required because Commission's decision authorizing PJM's Tariff amendments, effective for the 2024/2025 BRA, is arbitrary, capricious, and contrary to law.

As a starting point, the Commission must acknowledge the advanced stage of PJM's 2024/2025 Auction at the time PJM made its Section 205 filing to the Commission.

---

[14] Order, 182 FERC ¶ 61,109 at P 165; *see also Nantahala Power & Light Co.*, 476 U.S. at 966 ("[T]he filed rate doctrine is not limited to 'rates' *per se*"); *Pub. Citizen, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 168 FERC ¶ 61,042 at P 89 (2019) ("[T]he rate on file with the Commission is the Tariff describing the Auction procedures, not the prices that may change over time.").

[15] *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 128 (1990).

[16] *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 969 (D.C. Cir. 2003); *see also Elec. Dist. No. 1 v. FERC*, 774 F.2d 490, 493 (D.C. Cir. 1985) (Scalia, J) ("Providing the necessary predictability is the whole purpose of the … 'filed rate' doctrine…."), *abrogated on other grounds by Transwestern Pipeline Co. v. FERC*, 897 F.2d 570 (D.C. Cir. 1990).

[17] *Midcontinent Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,032 at P 40 (2021).

[18] *Price Formation in Energy & Ancillary Markets Operated by Regional Transmission Organizations & Independent Sys. Operators*, 153 FERC ¶ 61,221 at P 65 (2015).

*First*, in compliance with the Tariff and Commission Orders modifying the schedule,[19] PJM calculated and posted its planning parameters, including the LDA Reliability Requirement, on August 29, 2022.[20]  The following Tariff provisions mandate this step:

- "The parameters of the Variable Resource Requirement Curve will be established ***prior to the conduct of the Base Residual Auction*** for a Delivery Year and ***will be used for such Base Residual Auction***."[21]

- "***[P]rior to the conduct*** of the Base Residual Auction for the first Delivery Year ***in which the new values will be applied***," PJM "***shall determine*** the … Locational Deliverability Area Reliability Requirement for each Locational Deliverability Area…."[22]

- "PJM will post" the LDA Reliability Requirement and other key auction inputs "for a Delivery Year ***prior to conducting the Base Residual Auction*** for such Delivery Year."[23]

*Second*, PJM accepted binding and irreversible bids between December 7, 2022, and December 13, 2022.[24]  Once the auction window closed, sell offers could "not be withdrawn."[25] And once the auction opened, "no bilateral transactions for Capacity Resources applicable to the period covered by an auction will be processed" until "that auction is completed."[26]

*Third*, PJM ran the optimization algorithm that constitutes the Auction.[27]  In completing the Auction, PJM necessarily used the LDA Reliability Requirement under its original

---

[19] *See PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,122 (2022).

[20] Order, 182 FERC ¶ 61,109 at PP 4, 173.

[21] Tariff, Attach. DD § 5.10(a)(vi)(A) (emphases added).

[22] *Id.* § 5.10(a)(vi)(B) (emphases added).

[23] *Id.* § 5.11(a) (emphasis added).

[24] Order, 182 FERC ¶ 61,109 at P 4.

[25] Tariff, Attach. DD § 5.8(d).

[26] *Id.* § 5.6.6(b),

[27] *See PJM Interconnection, L.L.C.*, Docket No. ER23-729, Proposed Amendment at 8-9 (Dec. 23, 2022) ("PJM Transmittal Ltr."); *see also* Tariff Attach. DD § 5.12.

methodology.[28]  Based on the Auction, PJM formed a clearing price for the region and each LDA.[29]

It was only then—upon reviewing the clearing prices—that PJM made its submission to change the methodology for calculating the LDA Reliability Requirement.  This squarely runs afoul of the Tariff's requirement for PJM to calculate parameters "prior to the conduct of the ... Auction … [to] be used for such Base Residual Auction," and to post those figures.[30]  Changing the market rules for determining these parameters and applying new figures to a mulligan auction is retroactive.

Following PJM's filed market rules is critical because suppliers rely on the information provided during the auction process, including the planning parameters, in making key business decisions worth billions of dollars.  Market participants use PJM's parameters to estimate the likely clearing prices of the auction, which they in turn use in deciding whether to enter bilateral contracts or hedging arrangements.[31]  In fact, the reason that PJM posts the figures in the first place is precisely to induce these actions.  The point of the auction, after all, is "[t]o meet the capacity needs of Load Serving Entities that failed to procure enough capacity through self-supply or bilateral contracts…."[32]

---

[28] Tariff, Attach. DD §§ 5.10(a) and 5.10(a)(vi)(B).

[29] *Id.* § 5.14(f).

[30] *Id.* §§ 5.10(a)(vi)(A) and 5.11(a).

[31] *See, e.g.*, *PJM Interconnection L.L.C.*, Docket Nos. ER23-729 *et al.*, Protest of the Electric Power Supply Association, Attachment A, Sotkiewicz Affidavit, ¶¶ 17-18, 29-31 (Jan. 20, 2023) ("The planning parameter information allows market participants to develop offers, engage in bilateral contracting, and make decisions at various BRA milestones.") ("Sotkiewicz Aff."); *id.*, Protest of the PJM Power Providers Group, Attachment B, Affidavit of Roy J. Shanker, ¶ 50 (Jan. 20, 2023) ("Probably the biggest harm presented by PJM's unconscionable proposal relates to those parties who entered or failed to enter into swaps or hedges with third parties (financial or physical) to 'cover' their capacity requirements or get a known fixed price for their Capacity prior to exposure to the risks of the auction."); *id.*, Protest of NRG Power Marketing, LLC, Attachment A, Affidavit of Joseph A. Holtman, ¶¶ 10-13  (Jan. 20, 2023) ("a generation owner's decisions about whether to sell its capacity bilaterally will necessarily turn on its expectations about the price at which it could sell the same capacity in an RPM Auction.").

[32] *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331 at P 13 (2006).

As the record confirms, enabling PJM to change planning parameters after the auction is run "would make bilateral contracting much riskier, if not impossible, by undermining the reasonable expectations that underpinned the transaction."[33]  As Dr. Shanker put it, "[a]ny way this goes, market efficiency takes a beating to the detriment of the market as a whole."[34]

At the same time, suppliers not subject to the must-offer requirement, such as intermittent and hydroelectric resources,[35] must decide whether the anticipated auction clearing price is likely to justify accepting a capacity obligation, and based on the market rules, how much of a capacity supply obligation it is willing to incur.  For example, for hydroelectric resources without a must-offer obligation, a seller must decide not just price, but the quantity to offer prior to the auction. Factors such as the size of the LDA for purposes of procuring replacement capacity should the resource unexpectedly be unable to deliver in the Delivery Year directly factor into that analysis of what quantity to offer to sell, as the availability of replacement capacity, which must be purchased from the same LDA acts as a risk mitigant against capacity performance penalty exposure.  Whether a particular LDA will "bind" and therefore the size of the replacement capacity resource pool is directly related to the LDA Reliability Requirement.  If those units cannot rely on the market rules in making that assessment, they are likely to think twice about the prospect of participating in the market, thereby decreasing the supply in the market, increasing prices, and providing unreliable price signals.

The Commission offers no valid justification for retroactively approving PJM's thirteenth-hour Tariff amendments.  The Commission claims that "[s]imply because one section of the Tariff requires PJM to take a particular action at one stage of the auction process, such as posting the

---

[33] Sotkiewicz Aff. ¶ 31.

[34] Shanker Aff. ¶ 51.

[35] *See* Tariff, Attach. DD § 6.6(a).

LDA Reliability Requirement by a particular date, does not preclude PJM from prospectively updating the manner in which that LDA Reliability Requirement is incorporated into a later phase of the auction…."[36]  According to the Commission, an RTO can change market rules at any time up to the moment it issues a formal capacity award.[37]  At best, this position is incoherent.  At worst, it effectively eliminates the filed rate doctrine for wholesale auction rules.

To begin, it is unclear how the Commission can reconcile its statement that the "BRA procedures" are the filed rate[38] with its permission for PJM to amend the rules for calculating the LDA Reliability Requirement after the figure is used in the Auction.[39]  Because the market rules *are* the filed rate, RTOs are "obligated to calculate those prices in accordance with the market rules,"[40] and must "correct all prices that do not reflect operation of the … market rules."[41]  As noted above, PJM's Tariff *requires* the RTO both to determine and post the LDA Reliability Requirement it will use in an auction *prior to* the auction.[42]  It follows that changing the methodology for calculating that figure *after* running the auction, recalculating the value, and re-clearing the auction using the new value constitutes a retroactive change.[43]

Notably, the Commission departs from prior precedent rejecting virtually the same relief under virtually identical circumstances.  In 2019, following GreenHat's default, as required by the Tariff, PJM began liquidating GreenHat's Financial Transmission Rights ("FTR") in its July 2018

---

[36] Order, 182 FERC ¶ 61,109 at P 171 (footnote omitted).

[37] *Id.* at P 167.

[38] *Id.* at P 165.

[39] *See id.* at P 171.

[40] *Black Oak Energy, LLC v. N.Y. Indep. Sys. Operator, Inc.*, 122 FERC ¶ 61,261 at P 32 (2008).

[41] *Allete, Inc. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 119 FERC ¶ 61,142 at P 36 (2007).

[42] Tariff §§ 5.10(a)(vi)(B); 5.11(a)(iv).

[43] *See* Order, 182 FERC ¶ 61,109, Danly Dissent P 22.

monthly FTR auction.[44]  In conducting the auction, PJM saw that "liquidation of GreenHat's entire FTR portfolio in the manner required by the Tariff would result in significant losses to PJM members."[45]  To mitigate the effects of the liquidation, PJM sought various waivers after running the auction but before reporting the results.[46]

The Commission rejected PJM's request.  The Commission emphasized that "[c]hanging the rules governing an *already-commenced* auction is a significant step that affects both the outcome of that particular auction as well as parties' confidence in the rules governing future proceedings."[47]  The Commission continued:  "That is particularly so here, where the record indicates that PJM proposed the waiver ***in order to avoid the outcome that the already-commenced auction would have produced***."[48]  The Commission added that "[s]uch a significant change to multiple parameters of an already-commenced auction is not a remedy that is limited in scope."[49]  The Commission's rationale for denying PJM's request is virtually on all fours with those principles and the facts here.[50]

The Commission's decisions in the formula rate context are in accord.  For example, in a 2017 order concerning proposed revisions to MISO utilities' formula rates, the Commission

---

[44] *PJM Interconnection, L.L.C.*, 166 FERC ¶ 61,072 at PP 2-5 (2019).

[45] *Id.* at P 5.

[46] *Id.* at PP 5-6.

[47] *Id.* at P 33 (emphasis in original).

[48] *Id.* (emphasis added).

[49] *Id.*

[50] *See also ISO New England Inc.*, 170 FERC ¶ 61,187 at P 17 (2020) (rejecting ISO New England's proposed change to its capacity market rules because "[b]y instituting a change to [capacity auction] provisions after market participants made their commercial decisions by relying on existing Tariff language, ISO-NE disrupted settled expectations and harmed market participants' ability to rely on [capacity market rules], and thus eroded their confidence in those rules."); *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,208 at P 261 (2015) (finding no violation of the filed rate doctrine because "PJM's transition proposal does not impermissibly propose to revise the already-cleared BRAs for the 2016-2017 and 2017-2018 delivery years").

accepted a January 1, 2017 effective date, but determined, based on the filed rate doctrine, that the utilities could not use the revised rate in calculating their true-ups for the 2016 rate year.[51]  The Commission rejected the utilities' argument that the rate change was prospective given that the true-up for 2016 would not be calculated until June 2017, and would not impact customers' bill until 2018.

The same principle applies here for PJM's market rules.  Like the MISO utilities' rates that were in place during 2016, PJM's market rules were in place for the 2024/2025 Auction process.  Just because that process was ongoing in some purely ministerial sense—including because customers have not been billed—does not change what rate was in effect during the critical times.

The formula rate analogy also shows why, contrary to the Order, the methodology for establishing the auction parameters is part of the filed rate.[52]  When the Commission approves a formula rate, the algebraic equation becomes the filed rate, but the Commission does not review or approve individual numerical values.[53]  Here, PJM's methodology for calculating the LDA Reliability Requirement, including the method for calculating the planning parameters, is equivalent to the formula (i.e., the filed rate).[54]  The numerical values that result from that calculation, which are then relied on by suppliers and fed into the optimization algorithm, are equivalent to formula rate outputs.  Thus, if PJM misapplies the filed method in calculating a planning parameter, PJM may be able (or even required) to correct the figure.[55]  But PJM cannot

---

[51] *Midcontinent Indep. Sys. Operator, Inc.*, 161 FERC ¶ 61,020 at P 7 (2017).

[52] Order, 182 FERC ¶ 61,109 at P 171.

[53] *E.g.*, *Pub. Utils. Comm'n of Cal. v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001); *Commonwealth Edison Co.*, 182 FERC ¶ 61,156, at P 2 (2023).

[54] *See, e.g.*, Order, 182 FERC ¶ 61,109 P 165 ("[T]he rate on file with the Commission is the BRA procedures.").

[55] *See Black Oak Energy*, 122 FERC ¶ 61,261 at P 32; *Allete, Inc.*, 119 FERC ¶ 61,142 at P 36.

change the method for calculating planning parameters without changing the rate itself. And, as required by the filed rate doctrine, such changes may only apply prospectively.[56]

Finally, and critically, the Commission offers no limiting principle to its decision, and there is none. As the Order puts it, any change is allowed so long as "no capacity commitments ha[ve] yet been secured, no transactions ha[ve] yet been consummated, meaning that neither PJM nor any supplier had the attendant rights or obligations."[57] Thus, after receiving bids or running the auction, the Order allows PJM to seek any number of market revisions to reach a desired outcome, including changing the methodology for calculating key figures like net CONE and the energy and ancillary services offset or even the penalty rate that would apply.[58] PJM could also make structural changes to the clearing process, or even propose to eliminate the auction altogether.

This is not to say that PJM is categorically foreclosed from updating planning parameters. An RTO can benefit from the notice exception to the filed rate doctrine by informing market participants in its tariff that parameters are subject to revision before the auction—as PJM has already done in some cases.[59] But that exception does not apply here where the Tariff gave market

---

[56] *See, e.g.*, *AEP Appalachian Transmission Co.*, 164 FERC ¶ 61,180 at P 18 (2018) ("[R]etroactive approval of the formula rate change results in a violation of the filed rate doctrine and the prohibition against retroactive ratemaking."); *Ark. Pub. Serv. Comm'n v. Entergy Corp.*, 142 FERC ¶ 61,012 at P 41 (2013) ("[C]onsistent with any change to a filed rate, the effect of any changes to such terms contained within the bandwidth formula, including the manner in which data is sourced, will be prospective only.").

[57] Order, 182 FERC ¶ 61,109 at P 167; *see also id.* at P 171 ("Simply because one section of the Tariff requires PJM to take a particular action at one stage of the auction process … does not preclude PJM from prospectively updating the manner in which that [parameter] is incorporated into a later phase of the auction process….").

[58] *See* Shanker Aff. ¶ 48.

[59] *See* Tariff, Attach. DD § 5.11(e) ("After conducting the Reliability Pricing Model Auctions, PJM will post … any adjustments to PJM Region or LDA Reliability Requirements to reflect Price Responsive Demand with a PRD Reservation Price equal to or less than the applicable Base Residual Auction clearing price."); *see also NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 801 (D.C. Cir. 2007) ("[T]he filed rate doctrine and bar on retroactive ratemaking are satisfied, in keeping with their functions, "when parties have notice that a rate is tentative and may be later adjusted with retroactive effect, or where they have agreed to make a rate effective retroactively." (internal quotation marks omitted)).

participants no notice that PJM would update the LDA Reliability Requirement after the offer deadline, let alone after completing the Auction. The Commission failed to respond to Constellation's point that "the express PJM provision that would allow changes in LDA Reliability Requirements to reflect Price Responsive Demand implies that changes to the LDA Reliability Requirement are unavailable in other situations such as the one at hand."[60]

In sum, by the time PJM made its December 23 submission, it had completed virtually the entire auction process under the original rules, except for posting the results. PJM calculated and posted the LDA Reliability Requirement, it accepted binding bids, it ran the Auction, and it calculated the results. During the process, market participants relied on PJM's posted planning parameters. PJM only made its tariff filing after "peeking" at the results and deciding it did not like what it saw. At that point, it was too late to change the methodology for calculating a key auction parameter so as to reach a different and more desired outcome.

### 3. The Commission's Order allowing PJM to re-clear the 2024/2025 Auction using the revised LDA Reliability Requirement methodology is arbitrary, capricious, and contrary to law.

Relatedly, the Commission's Order violates the filed rate doctrine and the rule against retroactive ratemaking because it enables PJM to rerun the 2024/2025 Auction after PJM has already formed valid auction clearing prices. To avoid this outcome, the Commission leans on a hypertechnical difference between the auction process and the award of contracts, but as we explain, this distinction is without a difference. When PJM completed the Auction, it had no choice at that point but to post the results.

---

[60] Constellation Comments at 13 n.33.

PJM's market rules leave the RTO with little discretion in executing the Auction and posting the results. After the planning parameters are set and posted, the offers are received, and the market power review is complete, PJM:

1. "[E]mploy[s] an optimization algorithm for each Base Residual Auction and each Incremental Auction to evaluate the Sell Offers and other inputs to such auction to determine the Sell Offers that clear such auction."[61]

2. "[C]alculate[s] a clearing price" for each LDA, which "*will be* the marginal value of system capacity for the PJM Region, without considering locational constraints, adjusted as necessary by [various factors] …, all as determined by the Office of the Interconnection *based on the optimization algorithm*."[62]

3. "[P]ost[s] the results of each auction *as soon thereafter as possible*."[63]

PJM may only modify the results if it "discovers a potential error *in the initial posting* of auction results for a particular Reliability Pricing Model Auction,"[64] and under special circumstances relating to market power mitigation that are inapplicable here.[65] These are the *only* scenarios in which there is notice of a potential modification sufficient to meet the exception to the filed rate doctrine.[66]

Here, PJM conducted steps one and two. Apparently, PJM also reviewed the clearing prices from the Auction and was not satisfied with the outcome.[67] The "error" exception is inapplicable because PJM's concern is with the rules themselves, not with any flaw "in the initial posting."[68]

---

[61] Tariff, Attach. DD § 5.12.

[62] *Id.* § 5.14(a) (emphasis added).

[63] *Id.* DD § 5.11(e).

[64] *Id.*

[65] *See* Tariff, Attach. DD. § 6.2(c).

[66] *See, e.g.*, *NSTAR Elec. & Gas Corp.*, 481 F.3d at 801 (discussing the notice exception to the filed rate doctrine).

[67] *See* PJM Transmittal Ltr. at 8-9.

[68] Tariff, Attach. DD § 5.11(e).

Nothing in the Tariff gave PJM discretion *not* to post results, to post different results, or to rerun the auction.[69]  PJM had no right to "peek" at the results and throw them out.  The auction outcome became the clearing price after the optimization software completed.[70]  The Commission's decision to insert a new step in the process, after the process was complete but for the ministerial step of posting the results, is retroactive and therefore violates the filed rate doctrine and rule against retroactive ratemaking.

It is no answer for the Commission to say that "no capacity seller had received a capacity award or been required to take on a capacity obligation" at the relevant time,[71] or that "a change [here] would be prospective in nature."[72]  The result was established, and the auction winners determined, as soon as the algorithm was run.  The Commission says that based on a "long line of U.S. Supreme Court and D.C. Circuit cases," rate changes are prospective "at least up until that point at which the obligation is actually incurred,"[73] but it does not cite a single decision authorizing an RTO to change market rules for an auction after it has already run.[74]

---

[69] PJM pointed to Section 9.2(b) of the Tariff, but this modifies the time in which PJM can make a Section 205 filing; it does not provide it with *carte blanche* to modify any aspect of the Tariff with seven-days' notice.

[70] *See* Tariff, Attach DD § 5.14(a).  Indeed, even the Commission, in summarizing PJM's capacity auction process, seems to view the auction methodology as being complete after the optimization algorithm is run.  *See* Order, 182 FERC ¶ 61,109 at P 2 ("Each auction is cleared using a supply curve consisting of the supply offers submitted by sellers and administratively determined demand curves.  PJM uses an optimization algorithm to evaluate auction inputs and determine the supply offers that clear an auction and receive capacity commitments at the clearing price." (citation to tariff omitted).

[71] Order, 182 FERC ¶ 61,109 at P 167.

[72] *Id.* at P 169.

[73] *Id.* at P 168.

[74] PJM cited the Commission's waiver allowing PJM to change the PJM Region Peak Load Forecast for the Second Incremental Auction for the 2021/2022 delivery year in light of COVID, but (1) the Commission issued that waiver *before* the offer window opened, (2) PJM updated the parameter rather than the methodology for calculating it, and (3) PJM made its filing in response to an exigent circumstance.  *See PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,208 at P 20 (2020).

In addition, the Commission misses the point in responding to protestors' arguments about PJM's posting requirements in the Tariff.[75]  Protestors do not reference Section 5.11(e)'s posting requirement to complain about the time or date of the results.  Rather, the requirement to post as soon as possible confirms that PJM has no discretion but to reveal the results after running the auction, and to correct errors found.  Proposing market changes are well beyond the scope of what the Tariff permits.

For these reasons, the Commission should grant rehearing because PJM determined the clearing prices for the 2024/2025 Delivery Year when it ran the Auction.  After completing the Auction, PJM had no authority but to post the results.  The Commission's Order applying PJM's Tariff revisions to the 2024/2025 Auction, therefore, violate the filed rate doctrine and constitute retroactive ratemaking.

**B.      The Order is arbitrary and capricious because it gives short shrift to the importance of suppliers' settled expectations.**

The Order acknowledges market participants' evidence of reliance "on expected auction rules in order to engage in other market activity such as bilateral supply sales and retail hedging arrangements."[76]  But the Commission concludes that there was no detrimental reliance on PJM's posted auction parameters, and even if there were, that a new benefit to customers justifies it.[77] The record shows that the Commission is mistaken on both counts.

To begin, the record confirms that market participants rely heavily on individual planning parameters in estimating the likely clearing price as they decide whether to enter bilateral contracts or hedging arrangements.[78]  Some suppliers must decide whether to participate or at what quantity

---

[75] *See* Order, 182 FERC ¶ 61,109 at P 172.

[76] *Id.* at P 177.

[77] *Id.* at PP 177-179.

[78] *See, e.g.*, Holtman Aff. ¶¶ 10-13; Shanker Aff. ¶ 50; Sotkiewicz Aff. ¶¶

they are willing to participate, a decision that often depends in part on the perceived availability of replacement resources within the same LDA if an unexpected delivery problem occurs. The likely availability of replacement resources within the same LDA in turn directly relates to the LDA Reliability Requirement planning parameter used for the auction. The Commission offers that it is "not persuaded that market participants' purported reliance on a single input, with no knowledge of the final capacity price, in making commercial transactions results in a detrimental reliance concern,"[79] but it cites no evidence for the assertion, nor does it even explain its reasoning. The Commission's assertion that suppliers cannot rely on an input used in sophisticated modeling is *ipse dixit* and contradicted by the record. The Commission's conclusion also begs the question why PJM publicly posts the parameters before the auction at all if market participants need not rely on them.[80]

More broadly, in weighing suppliers' settled expectations against the purported benefits of PJM's filing, the Commission misses the forest for the trees. Constellation appreciates the issue that PJM has identified and does not object in principle to updating planning parameters (with notice in the Tariff) to reflect meaningful changes leading up to an auction, but the effects of doing so for the 2024/2025 Auction are staggering and will have impacts that go far beyond this proceeding. By changing market rules after an auction has been completed, the Commission will irreversibly harm suppliers' ability to rely on the stated market rules. This will increase risk to market participants, potentially suppress investment in needed capacity, and could ultimately

---

[79] Order, 182 FERC ¶ 61,109 at P 177.

[80] Nor is PJM's approach an anomaly. ISO-NE has a similar practice making key information available prior to a forward capacity auction to inform market participant's offers. It is commonly accepted that this type of information is useful to market participants in formulating offers in forward markets.

threaten grid reliability.  By contrast, as Constellation has shown, it is not unusual for PJM capacity auctions to yield LDA clearing prices that differ four-fold.[81]

The Order is strongly at odds with the Commission's general policy of going to great lengths of protecting settled expectations in competitive markets.[82]  For example, the Commission does not rerun markets *even when they were completed in error* because doing so "creates two different types of risk: (1) capital risk for resources that made investments based on auction results, and (2) regulatory risk going forward (i.e., investors would be unlikely to want to invest capital in a market if the results were subject to change at a later date due to legal error)."[83]  The Commission "eschews" courses of action that "undermine[] the markets themselves by creating uncertainty for market participants…."[84]  The exact same concerns apply here where the Commission has revised market rules for the Auction after PJM completed it.  Yet the Commission does not consider these concerns in its balancing, or justify its change in policy.[85]

Notably, this could not come at a worse time.  After enjoying years of plenty, as PJM reported last month, the region "could face deceasing reserve margins" "[f]or the first time in recent history."[86]  PJM predicts that under current policies, by the 2028/2029 Delivery Year, the

---

[81] *See* Constellation Comments at 9-10.

[82] *See, e.g.*, *ISO New England Inc.*, 170 FERC ¶ 61,187 at P 17; *Dominion Energy Mktg., Inc. v. ISO New England, Inc.*, 155 FERC 61,121 at P 23 (2016) (while it agreed that the relevant tariff was not just and reasonable, it would nonetheless not rerun a just completed capacity auction in New England to reflect the just and reasonable tariff provision because "[t]he Commission has found that rerunning the markets would do more harm to electric markets than is justifiable.")

[83] *E.g.*, *PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,237 at P 10 (2019); Order, 182 FERC ¶ 61,109, Danly Dissent P 30.

[84] *PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,237 at P 10.

[85] *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 2009).

[86] PJM, *Energy Transition in PJM: Resource Retirements, Replacements & Risks* at 17 (Feb. 24, 2023), https://www.pjm.com/-/media/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx

"projected reserve margins would be 8%."[87]  PJM says it will lean on the capacity market to correct this shortfall,[88] but that option will not be available, particularly at the most efficient price level, if investors cannot rely on the market rules.

The Commission's Order authorizing PJM to change its market rules for the 2024/2025 Auction after PJM ran the auction frustrated market participants' settled expectations and draws future auctions into doubt for market participants and investors.  The Commission did not consider these factors or its precedent in allowing PJM's submission to take effect.  That decision was arbitrary and capricious.

### C.    The Order is arbitrary and capricious because it does not consider or apply the *Mobile-Sierra* standard.

To the extent that the Commission does not apply the filed rate doctrine, it must review any proposed change to market rules for an auction made after supplier offers are received under the heightened *Mobile-Sierra* public interest standard.[89]  PJM has not come close to showing that its Tariff was so deficient going into the auction that it would seriously harm the public interest.

Although the *Mobile-Sierra* standard typically applies only to contract rates,[90] in affirming the Commission's application of the *Mobile-Sierra* standard for challenges to ISO New England's capacity auction results, the D.C. Circuit found persuasive that "the auction rates exhibit many of the indicia of contract rates: not only did [the Commission] conclude the rates 'provide a market-based mechanism to appropriately value capacity resources based on their location,' [and] … 'rates

---

[87] *Id.* at 16.

[88] *Id.* ("As capacity reserve levels tighten, the markets will clear higher on the VRR curves, sending price signals to build new generation for reliability needs.").

[89] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956) (*Mobile*); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) (*Sierra*).

[90] *PJM Interconnection, L.L.C.*, 177 FERC ¶ 61,082 at P 4 (2021).

disciplined by a market are consistent with the FPA's requirements.'"[91]  These features apply equally to PJM's capacity auctions as they do to New England's.  PJM's capacity market is a market-based mechanism used to value capacity based on various objective criteria, including location.  The outcomes, therefore, are disciplined by market forces.

Moreover, the auction process is akin to a contract negotiation.  Suppliers make offers representing the lowest price they would accept for a capacity supply obligation.  Buyers—through the auction optimization—accept the most efficient offers.  Under the Commission's theory, PJM, as a third party, could unilaterally change the parameters informing suppliers' obligations—and even the nature of the obligations themselves—*after* offers are submitted and cannot be withdrawn, so long as the offers have not been formally accepted *via* the capacity supply awards/posting of auction results.  No principle of law would enforce the "revised" offer against the supplier.  If the filed rate doctrine does not block this maneuver, then the *Mobile-Sierra* standard should certainly apply and require satisfaction of the heightened public interest standard.

It is hard to see how PJM could succeed in showing that a Tariff revision is necessary to avoid serious harm to the public interest, given the limited issue it identified and the fact that this issue will not recur after PJM's revision is applied to future auctions.  To the contrary, as we have shown, implementing PJM's proposal for the 2024/2025 Auction *harms* the public interest.

### D.    The Order is arbitrary and capricious because it failed to respond to arguments that no "imminent severe economic harm" justified PJM's filing.

Constellation and other protestors argued that PJM lacked authority to make its filing without undergoing stakeholder review because there was no "imminent severe economic harm,"

---

[91] *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 371 (D.C. Cir. 2013) (quoting *Devon Power LLC*, 134 FERC ¶ 61,208 at P 19 (2011)).

as required under the Tariff.[92]  As Constellation explained, PJM had information well in advance of the auction regarding the intent of planned resources to offer (or not offer) in the 2024/25 Auction and the potential consequences of that choice for the auction results.  And even if it hadn't, the auction results were not so extreme as to justify the filing.[93]  The Commission repeated Constellation's argument,[94] but did not respond to it *at all*.  That falls short of the Commission obligation "to respond meaningfully to objections raised by a party," and is therefore arbitrary and capricious.[95]

## IV.    CONCLUSION

For the foregoing reasons, the Commission should grant rehearing, preclude PJM from applying its Tariff revisions to the 2024/2025 Auction, and direct PJM to make capacity awards based on the original Auction results.

March 23, 2023                                    Respectfully submitted,

Carrie Hill Allen                                 */s/ Matthew E. Price*
Sr. Vice President & Deputy General Counsel       Matthew E. Price
Seth T. Lucia                                     Zachary B. Cohen
Assistant General Counsel                         Jenner & Block LLP
Constellation Energy Generation, LLC              1099 New York Ave., NW
101 Constitution Ave NW, Suite 400 East           Suite 900
Washington, D.C. 20001                            Washington, DC 20001
carrie.allen@constellation.com                    mprice@jenner.com
seth.lucia@constellation.com                      zcohen@jenner.com

Christopher A. Wilson                             *Counsel for Constellation Energy*
Director, Federal Regulatory Affairs             *Generation, LLC*
Constellation Energy Generation, LLC
101 Constitution Ave NW, Suite 400 East
Washington, D.C. 20001
(202) 347-7500
FERCe-filings1@constellation.com

---

[92] *See, e.g.*, Constellation Comments at 5-10.

[93] *Id.*

[94] Order, 182 FERC ¶ 61,109 at P 65.

[95] *E.g.*, *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011).

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in these proceedings.

Dated this 23rd day of March 2023.

*/s/ Shawn Whites*
Shawn Whites

# UNITED STATES OF AMERICA
# FEDERAL ENERGY REGULATORY COMMISSION

| | | | |
|---|---|---|---|
| PJM Interconnection, L.L.C. | ) | Docket Nos. | ER23-729-000 |
| PJM Interconnection, L.L.C. | ) | | EL23-19-000 |
| | | | (Not consolidated) |

## REQUEST FOR REHEARING OF THE
## AMERICAN CLEAN POWER ASSOCIATION,
## SOLAR ENERGY INDUSTRIES ASSOCIATION,
## AND ADVANCED ENERGY UNITED

Pursuant to section 313(a) of the Federal Power Act,[1] and Rule 713 of the Federal Energy

Regulatory Commission's ("Commission") Rules of Practice and Procedure,[2] the American

Clean Power Association ("ACP"),[3] Solar Energy Industries Association ("SEIA"),[4] and

Advanced Energy United[5] (collectively, the "Clean Energy Associations") hereby submit this

request for rehearing of the Commission's February 21, 2023 order[6] which accepted PJM

Interconnection L.L.C.'s ("PJM") proposed amendments to the Locational Deliverability Area

Reliability Requirement[7] ("LDA") pursuant to section 205 of the Federal Power Act ("FPA")[8]

(the "Section 205 Filing"[9]), and dismissed as moot PJM's associated complaint filed pursuant to

---

[1] 16 U.S.C. § 825*l* (2018).

[2] 18 C.F.R. § 385.713 (2022).

[3] ACP is a national trade association representing a broad range of entities with a common interest in encouraging the expansion and facilitation of wind, solar, energy storage, and electric transmission in the United States. The views and opinions expressed in this filing do not necessarily reflect the official position of each individual member of ACP.

[4] The comments contained in this filing represent the position of SEIA as a trade organization on behalf of the solar industry, but do not necessarily reflect the views of any particular member with respect to any issue.

[5] Advanced Energy United (formerly Advanced Energy Economy) is a national association of businesses that are making the energy we use secure, clean, and affordable. Advanced Energy United is the only industry association in the United States that represents the full range of advanced energy technologies and services, both grid-scale and distributed. Advanced energy includes energy efficiency, demand response, energy storage, wind, solar, hydro, nuclear, electric vehicles, and more.

[6] *PJM Interconnection, L.L.C.*, 182 FERC ¶ 61,109 (2023) ("February 21 Order").

[7] All capitalized terms not otherwise defined herein shall have the same meaning as set forth in the PJM Open Access Transmission Tariff ("Tariff") and Amended and Restated Operating Agreement of PJM.

[8] 16 U.S.C. § 824d (2018).

[9] Proposed Amendment to the Locational Deliverability Area Reliability Requirement Filed Pursuant to Section 205 of the Federal Power Act, Request for Waiver of Notice Requirement, and Request for an Extended Comment Period of 28 Days of PJM Interconnection, L.L.C., Docket No. ER23-729-000 (Dec. 23, 2022).

FPA Section 206[10] (the "Section 206 Filing,"[11] and together with the Section 205 Filing, the "December 23 Filings").

## I.    BACKGROUND

The December 23 Filings concerned the Base Residual Action ("BRA") for the 2024/2025 Delivery Year (the "2024/2025 BRA").  The bidding window for the 2024/2025 BRA opened December 7, 2022, and closed on December 13, 2022.[12]  PJM was scheduled to post the auction results on December 20, 2022,[13] but did not do so.  In describing the PJM capacity market auction clearing process, the February 21 Order states:

> PJM conducts capacity auctions on a forward basis to ensure that sufficient capacity is available to provide reliable energy to its customers during periods of peak demand. . . . Each auction is cleared using a supply curve consisting of the supply offers submitted by sellers and administratively determined demand curves. PJM uses an optimization algorithm to evaluate auction inputs and determine the supply offers that clear an auction and receive capacity commitments at the clearing price.[14]

Notably, PJM establishes "demand curves for the PJM region as a whole, as well as for Locational Deliverability Areas (LDA) if certain criteria are met. PJM calculates the demand curves for LDAs using the LDA Reliability Requirement."[15]

After reviewing bids and identifying (but not disclosing) higher-than-anticipated clearing prices for the Delmarva Peninsula, PJM submitted the December 23 filings.  PJM's stated goal with each filing was to address the anomalous results.  The Section 205 Filing proposed to change the way Planned Generation Capacity Resources are factored into LDA Reliability

---

[10] 16 U.S.C. § 824e (2018).

[11] Section 206 Filing Alleging that the Locational Deliverability Area Reliability Requirement is Unjust and Unreasonable as Applied in a Particular Locational Deliverability Area in the 2024/2025 Base Residual Auction, Docket No. EL23-19-000 (Dec. 23, 2022).

[12] *See* February 21 Order at P 4.

[13] *See id.*

[14] *See id.* at P 2 (citations omitted).

[15] *See id.* at P 3 (citations omitted).

Requirement after the 2024/2025 BRA had commenced.  Specifically, PJM proposed to allow

itself, "during the auction process, to exclude Planned Generation Capacity Resources from the

calculation of the LDA Reliability Requirement if the addition of such resources materially

increases the LDA Reliability Requirement and such resources do not participate in the relevant

capacity auction."[16]  The Section 206 Filing alleged, *inter alia*, that "the LDA Reliability

Requirement, absent the changes proposed in the concurrent FPA section 205 filing, results in an

unjust and unreasonable auction outcome."[17]  Following the issuance of the February 21 Order,

which accepted the Section 205 Filing and dismissed the Section 206 Filing as moot, PJM posted

revised results for the 2024/2025 BRA on February 27, 2023.[18]

For the reasons detailed below, the Clean Energy Associations submit that the

Commission erred in accepting the Section 205 Filing, as it constituted a violation of the Tariff

and the associated filed rate doctrine and rule against retroactive ratemaking.  Further, accepting

the Section 205 Filing will upend confidence in PJM's capacity market, and accordingly will not

produce a just and reasonable market outcome.  Rather than accepting the Section 205 Filing, the

Commission should instead reject the Section 205 Filing on rehearing, find that PJM's existing

capacity market rules are unjust and unreasonable under FPA Section 206, and fashion an

appropriate remedy—specifically, a full re-run of the 2024/2025 BRA that incorporates accurate

modeling assumptions.[19]  This would meet the dual goals of assuring that customers do not pay

unjust and unreasonable rates, while also ensuring that all market participants have full

awareness of market rules *prior* to capacity auctions.

---

[16] *See id.* at P 5 (citations omitted).

[17] *See id.* at P 1.

[18] *See, e.g.*,  PJM, PJM Capacity Auction Procures Adequate Resources, (Feb. 27, 2023), https://www.pjm.com/-/media/about-pjm/newsroom/2023-releases/20230227-pjm-capacity-auction-procures-adequate-resources.ashx.

[19] *See, e.g.*, Protest of the American Clean Power Association, et al., Docket No. ER23-729-000 and Docket No. EL23-19-000, at 3 (Jan. 20, 2023) ("Clean Energy Associations Protest").

## II.    STATEMENT OF ISSUES AND SPECIFICATION OF ERRORS

Pursuant to Rules 203(a)(7) and 713.11,[20] the issues presented for consideration on

rehearing are as follows:

1.  The Commission erred, and acted contradictory to law, in holding that accepting the Section 205 Filing did not violate PJM's filed rate, *i.e.*, the Tariff,[21] and longstanding precedent concerning the filed rate doctrine and rule against retroactive ratemaking.  *See, e.g.*, 16 U.S.C. § 824d(d); *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1991) (explaining that the filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority"); *Town of Norwood v. FERC*, 217 F.3d 24, 28 (1st Cir. 2000) (stating that the filed rate doctrine has evolved over time but is based on the notion that "utility filings with the regulatory agency prevail over unfiled contracts or other claims seeking different rates or terms than those reflected in the filings with the agency"), *cert. denied*, 532 U.S. 993 (2001); *see also Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966-67 (1986) ("[T]he filed rate doctrine is not limited to 'rates' *per se* . . . .").

2.  The Commission erred, and failed to engage in reasoned decisionmaking, by improperly concluding that the "the benefits of accepting the [Section 205 Filing] outweigh any reliance or expectation as to the LDA Reliability Requirement posted in August 2022,"[22] based on the record before it.  *See* 5 U.S.C. § 706(2)(A).  *See also Emera Maine v. FERC*, 854 F.3d 9, 28 (D.C. Cir. 2017) (remanding a Commission order because the Commission "failed to establish a 'rational connection' between the record evidence and its decision"); *Env't Def. Fund v. FERC*, 2 F.4th 953, 967-68 (D.C. Cir. 2021) ("[A]n action by the Commission may be set aside 'if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency. . . .'") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

3.  The Commission erred by failing to acknowledge and explain its change in policy from its prior policy, as previously set forth in *PJM Interconnection, LLC*, against "[c]hanging the rules governing an *already-commenced* auction."  166 FERC ¶ 61,072, at P 33 (2019); *see FCC v. Fox Television stations, Inc.*, 556 U.S. 502, 515-16 (2009).

4.  The Commission erred, and failed to engage in reasoned decisionmaking, by improperly concluding that accepting the Section 205 Filing would result in just and reasonable rates under FPA Section 205.  *See* 5 U.S.C. § 706(2)(A).  *See also Emera Maine*, 854 F.3d 9 at 28; *Env't Def. Fund*, 2 F.4th at 967-68.

---

[20] 18 C.F.R. §§ 385.203(a)(7); 385.713.
[21] *See* February 21 Order at P 167.
[22] *See id.* at P 173.

III.    **REQUEST FOR REHEARING**

A.    **The February 21 Order Violates the Filed Rate Doctrine and Rule Against Retroactive Ratemaking.**

In the February 21 Order, the Commission held that applying the revisions contained in the Section 205 Filing to the 2024/2025 BRA "would not violate the filed rate doctrine or constitute retroactive ratemaking."[23]  As discussed below, this holding was in error, and contrary to law.

As noted by the Court of Appeals for the District of Columbia ("D.C. Circuit"), "[t]he filed rate doctrine and the rule against retroactive ratemaking leave the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations.  These corollary rules operate as a ***nearly impenetrable shield for consumers***, ***ensuring rate predictability and preventing discriminatory or extortionate pricing***."[24]  Courts have long-recognized the importance of honoring a utility's filed rate,[25] and have also recognized that the filed rate doctrine and rule against retroactive ratemaking serve other key purposes, including offering transparent information to all participating parties and providing order to markets.[26]  Indeed, in the February 21 Order itself, the Commission stated that it "recognize[d] that promoting predictability is one of the values that courts have identified as undergirding the filed rate doctrine and the rule against retroactive ratemaking."[27]

---

[23] *See id.* at P 167.
[24] *See Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1230-31 (2018) (emphasis added) (internal citation omitted).
[25] *See, e.g.*, *Ariz. Grocery Co v. Atchison*, 284 U.S. 370, 384 (1932); *City of Girard, Kan. v. FERC*, 790 F.2d 919, 924 (D.C. Cir. 1986); *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007).
[26] *NSTAR Electric & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007).
[27] *See* February 21 Order at P 169.

5

Importantly, the filed rate doctrine and rule against retroactive ratemaking each apply to both "rates" and the "non-rate terms" set forth in a tariff.[28]  The Commission has previously confirmed that the filed rate doctrine also applies to "market rules" and "service agreements", stating, "[t]he filed rate doctrine and rule against retroactive ratemaking precedents were developed in the context of rates. However, the statutory provisions on which those rules were based apply equally to non-rate terms and conditions."[29]

The Commission's February 21 Order presents a novel and narrow interpretation of the filed rate doctrine and rule against retroactive ratemaking that conflicts with this longstanding precedent.  Essentially, the Commission holds that because "no capacity commitments had yet been secured, no transaction had yet been consummated," and "that neither PJM nor any supplier had the attendant rights or obligations, no capacity had been delivered pursuant to such commitments, and no charges had been billed or collected,"[30] no violation of the filed rate doctrine and rule against retroactive ratemaking occurred.  This interpretation of the filed rate doctrine and rule against retroactive ratemaking not only contradicts the aforementioned, longstanding legal precedent, but would allow utilities *carte blanche* to alter non-rate terms and conditions that are part of their tariffs, and which underpin future transactions (such as all Tariff rules and associated procedures related to the capacity market that must occur prior to a capacity market commitment) so long as such future transaction has not yet occurred (*i.e.*, the capacity commitment).[31]  Accordingly, not only is this interpretation legally infirm, but as discussed

---

[28] *See* 16 U.S.C. § 824d(d); *see also Nantahala Power & Light Co.*, 476 U.S. at 966-67 ("[T]he filed rate doctrine is not limited to 'rates' per se.").

[29] *See Proposed Policy Statement on Waiver of Tariff Requirements and Petitions or Complaints for Remedial Relief re Waiver of Tariff Requirements*, Docket No. PL20-7-000, at P 6 (May 21, 2020), *available at:* https://www.ferc.gov/sites/default/files/2020-06/PL20-7-000.pdf.

[30] *See* February 27 Order at P 23 (emphasis omitted).

[31] *See also* Clean Energy Associations Protest at 6-7 (explaining that "rather than utilizing the factors to be considered as part of the optimization algorithm that is part of its currently-effective filed rate and running the 2024/2025 BRA according to those factors as it is required to do, PJM is *choosing* to refuse to post the results of the

further below in Section III.B., if left to stand, would erode confidence in the PJM capacity

market, and confidence in all Commission-jurisdictional wholesale markets.

Moreover, the Commission misconstrues the precedent that it cites in Footnote 449 of the

February 21 Order to support its position that "[c]ourts have held that changes to a rate are

impermissibly retroactive only where regulated entities or customers have already transacted

pursuant to the rate – i.e., where purchases or sales have occurred."[32]  For example, in *Old

Dominion*, while the D.C. Circuit held "at bottom, that doctrine means that 'a regulated seller of

power' is prohibited 'from collecting a rate other than the one filed with the Commission,' and

'the Commission itself' cannot retroactively 'impose a rate increase for power already sold,'"[33]

the *same case* states that "[t]he filed rate doctrine and the rule against retroactive ratemaking

leave the Commission no discretion to waive the operation of a filed rate or to retroactively

change or adjust a rate for good cause or for any other equitable considerations. These corollary

rules operate as a nearly impenetrable shield for consumers, ensuring rate predictability and

preventing discriminatory or extortionate pricing."[34]  Accordingly, *Old Dominion* clearly cannot

be read to support the Commission's proposition that "changes to a rate are impermissibly

retroactive only where regulated entities or customers have already transacted pursuant to the

rate – i.e., where purchases or sales have occurred."[35]

---

2024/2025 BRA, thus preventing the auction from being declared "closed." PJM then seeks in the Section 205 Filing
to add another factor to the optimization algorithm, so that the retooled algorithm applies to the 2024/2025 BRA.
Additionally, PJM is proposing a new definition of Locational Deliverability Area Reliability Requirement to apply
before the alleged close of the 2024/2025 BRA, even though a materially different definition of Locational
Deliverability Area Reliability Requirement was in effect at the opening of the 2024/2025 BRA. By proposing these
actions mid-auction, PJM is acting contrary to the filed rate and effectively implementing a new rate scheme. This
violates the filed rate doctrine, which forbids 'utilities . . . to charge any rate other than the one on file with the
Commission.'") (citations omitted) (emphasis in original).
[32] February 21 Order at P 166.
[33] *See Old Dominion Elec. Coop.*, 892 F.3d at 1226–27 (citations omitted).
[34] *See id.* at 1230.
[35] February 21 Order at P 166 (citation omitted).

Moreover, in *Cogentrix Energy Power Mgmt., LLC v. FERC*,[36] the D.C. Circuit held that two entities could use a newly approved schedule to an RTO's tariff "to recover only costs incurred after they filed a cost-based rate with the Commission pursuant to [FPA Section 205] and the Commission had approved the rate. The Commission reasoned that the filed rate doctrine and its corollary, the rule against retroactive ratemaking, limited recovery to prospective costs."[37] The D.C. Circuit's observation that the applicable entities were "attempting to collect additional rates 'for a service that has already been rendered,'" and that such an attempt would constitute a "violation of the rule against retroactive ratemaking,"[38] certainly does not support the Commission's proposition that "changes to a rate are impermissibly retroactive only where regulated entities or customers have already transacted pursuant to the rate – i.e., where purchases or sales have occurred."[39]

In fact, the February 21 Order fails to address the core of the Clean Energy Associations' and others protestors' contentions that PJM failed to provide market participants with adequate notice (as required under the filed rate doctrine) that the 2024/2025 BRA would be subject to the market rules that PJM sought to hastily implement through its Section 205 Filing - despite the fact that market participants made business decisions to participate in the 2024/2025 BRA and post the requisite collateral in reliance on the Tariff on file with the Commission at the time (*i.e.*, before the commencement of the 2024/2025 BRA).[40]

Instead, the February 21 Order simply contends that PJM's proposal to change the LDA Reliability Requirement is just and reasonable on the merits because it will enable PJM, under

---

[36] 24 F.4th 677 (2022).
[37] *See id.* at 679.
[38] *See id.* at 684 (citations omitted).
[39] February 21 Order at P 166.
[40] *See* Clean Energy Associations Protest at 7, Pine Gate Protest at 6, Invenergy Protest at 1-5, EPSA Protest at 13, Leeward Protest at 6, Lotus Protest at 10, NRG Protest at 2, and Vistra Protest at 9, 14.

specific circumstances, to revise the LDA Reliability Requirement to incorporate updated information regarding which Planned Generation Capacity Resources are offering into the BRA.[41]  However, neither of these points, even if true, addresses or contends with the argument that market participants are entitled to notice about parameters *before a transaction occurs*, even if PJM's proposal was otherwise just and reasonable.

The February 21 Order is thus arbitrary and capricious in this regard, as it has "entirely failed to consider an important aspect of the problem"[42] that was identified by the Clean Energy Associations and others.

### B.    The February 21 Order Upends Confidence in Markets.

The Commission acted arbitrarily and capriciously, and contrary to the record before it, in holding that accepting the Section 205 Filing was just and reasonable because, *inter alia* "the benefits of accepting the proposed Tariff revisions effective December 24, 2022, as requested, outweigh any reliance or expectation as to the LDA Reliability Requirement posted in August 2022."[43] The Commission should reverse its acceptance of the Section 205 Filing, and instead adopt alternative relief, because the February 21 Order harms "certainty and confidence in PJM's capacity market,"[44] and Commission-jurisdictional wholesale markets generally.

The Commission has previously noted the importance of market participants (in PJM, no less) knowing the relevant rules *prior* to a given auction, with a stated aim of preserving confidence in markets.  For example, in denying PJM's request for a mid-auction waiver as recently as 2019, the Commission stated that "[c]hanging the rules governing an *already-commenced* auction is a significant step that affects both the outcome of that particular auction as

---

[41] *See* February 21 Order at PP 151-153.
[42] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.
[43] *See id.* at P 173.
[44] Clean Energy Associations Protest at 19.

well as parties' confidence in the rules governing future proceedings."[45]  In past orders, the

Commission has noted that "all market participants" should "be aware of the standard that will

be used."[46]  As Commissioner Danly's dissent to the February 21 Order notes, "the PJM tariff

requires that it post the reliability requirement for each area *before* the auction.  There is nothing

in the PJM tariff providing notice that this provision is tentative or subject to later adjustment,

nor any provision in the tariff that indicates any retroactive change to this rate provision will be

permitted."[47]  Multiple other protestors credibly raised concerns and presented substantial

evidence regarding the degradation of continued confidence in the accuracy of capacity market

prices, or at a minimum predictability regarding market rules, if the Section 205 Filing were

approved by the Commission.[48]

The Commission's acceptance of the Section 205 Filing has clearly harmed confidence in

the PJM capacity market, and the Commission's explanations are largely unavailing.  Rather

than directly confront its own precedent regarding the importance of, and need for, market

certainty, and corresponding unwillingness to revise auction rules *once the auction has begun*,

the Commission instead characterizes multiple protestors' concerns as simply revising "settled

expectations."[49]  The Commission claims to engage in a "balancing of interests" to evaluate the

impact on settled expectations,[50] and finds that that the balance of interests "weighs heavily in

favor of accepting PJM's proposal."[51] But as Commissioner Danly notes, this framework is

---

[45] *PJM Interconnection, LLC*, 166 FERC ¶ 61,072 at P 33.
[46] *PPL EnergyPlus, LLC*, 115 FERC ¶ 61,383, P 29 (2006).
[47] February 21 Order, Dissent at P 7 (citation omitted).
[48] Indeed, the Commission cataloged the extensive objections to PJM's proposal referencing the harm to market certainty from a mid-auction rule change.  *See* February 21 Order at P 55 n.163 and accompanying text (citing the Clean Energy Associations' argument that "allowing PJM to change the auction rules after the offers have been submitted would set a dangerous precedent and undermine confidence in the market rules broadly", and noting as well protests from Constellation, Freepoint, Invenergy, Lotus, Ohio FEA, NRG, Pine Gate Renewables, and EPSA).
[49] February 21 Order at PP 173-180.
[50] *Id.* at PP 175-76.
[51] *Id.* at P 177.

erroneous for two reasons.  First, the balance of interests is not the appropriate test when dealing with a filed rate, as discussed above.[52]  Second, in accepting the Section 205 Filing, the Commission has opened the door to *future* mid-auction rule changes.[53]  As deleterious as this proceeding has been for confidence in the 2024/2025 BRA, the prospect of unforeseeable mid-auction course corrections from PJM in *any future capacity auction* further skews the "balance of interests" here—an issue the Commission fails to seriously grapple with.  Further, given the destabilizing impacts of accepting the Section 205 Filing, the Commission has not adequately explained how the February 21 Order produces a just and reasonable outcome.

However, as discussed below, acceptance of the Section 205 Filing and revision of auction rules *after* an auction had commenced was not the only option—and the record reflects that the Commission could have found that PJM's existing capacity market rules are unjust and unreasonable.  The Commission could then have fashioned a remedy pursuant to its authority under FPA Section 206 that could have addressed the expectations of market participants while assuring just and reasonable rates in the 2024/2025 BRA.  The Clean Energy Associations recommend that the Commission order PJM to re-run the 2024/2025 BRA that incorporates accurate modeling assumptions.[54]  Although PJM's actions and the February 21 Order are undeniably harmful to market confidence and certainty (even if the auction is re-run), ultimately that outcome would *both* ensure that "capacity prices will be just and reasonable" *and* "restore investor confidence in the capacity market by providing much needed clarity."[55]  This remedy

---

[52] *Id.*, Dissent at P 25.
[53] *Id.*, Dissent at P 26 (discussing reliance upon auction rules as a concern not developed in the February 21 Order); *id.* at P 37 ("I am concerned about the long-term implications for the markets administered not only by PJM but in other regions.").
[54] Clean Energy Associations Protest at 19-20.
[55] *See id.* at 19 (quoting *PJM Interconnection, L.L.C.*, Statement of Chairman Glick and Commissioner Clements, Docket No. ER21-2582-000 (Oct. 19, 2021)).

would send the appropriate message to both customers and market participants, and would place the Commission on sounder footing for any appellate proceedings.

### C.    The February 21 Order Fails to Give Adequate Consideration to Arguments that PJM Violated the Tariff.

The February 21 Order did not adequately grapple with or address arguments that PJM violated the portions of its Tariff that required PJM to take action by posting the LDA Reliability Requirement *before* the auction process begins.[56]   The February 21 Order is thus arbitrary and capricious because it once again "failed to consider an important aspect of the problem."[57]

The February 21 Order contends that:

[s]imply because one section of the Tariff requires PJM to take a particular action at one stage of the auction process . . . [this] does not preclude PJM from prospectively updating the manner in which that LDA Reliability Requirement is incorporated into a later phase of the auction process pursuant to a separate section of the Tariff that requires PJM to consider the auction inputs and calculate a clearing result to minimize the cost of satisfying the reliability requirement.[58]

However, the February 21 Order misses the point made by protestors here: it was not just PJM's action of postponing the deadline that violated the Tariff, but postponing the deadline *while PJM knew the results of the auction*.[59]   Indeed, PJM manufactured a window of opportunity for the sole purpose of being able to call its Tariff changes proposed in the Section 205 Filing "prospective."   But the section of the Tariff cited by the February 21 Order, as allegedly authorizing PJM to postpone the deadline,[60] *does not require or allow PJM to* consider the auction inputs and calculate a clearing result to minimize the cost of satisfying the reliability requirement, but instead, for PJM to adopt an "***optimization algorithm*** [to] be applied to calculate the overall

---

[56] Tariff, Attach. DD § 5.10(a).

[57] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

[58] February 21 Order at P 171 (citing Tariff, Attach. DD §§ 5.10(a), 5.12(a)).

[59] *See, e.g.*, Clean Energy Associations Protest at 4 ("[I]f accepted, the Section 205 Filing could set precedent that any RTO can alter capacity market auction results if the RTO disagrees with the outcome."); *id.* at 5-11.

[60] *See* Tariff, Attach. DD § 5.12(a).

clearing result . . . ."[61]  Adherence to the "optimization algorithm" would have ensured fair, consistent, and nondiscriminatory application of PJM's auction clearing processes.[62]  Instead, PJM took executive action to manipulate the clearing results as PJM saw fit, which is not what the Tariff permits.

Respectfully, the Commission should reverse the findings of the February 21 Order that PJM did not violate the portions of its Tariff that required PJM to take action by posting the LDA Reliability Requirement *before* the auction process begins.

### D.    The Commission Has the Authority and a Sufficient Record to Act Under FPA Section 206.

PJM made the Section 206 Filing out of an abundance of caution "so as to provide the Commission with the ability to make modifications to PJM's proposed tariff remedy."[63]  Under FPA Section 206, if the Commission determines that a rate is unjust and unreasonable, it must then determine the just and reasonable remedy.[64] When making these remedial determinations, "the Commission's authority is at its 'zenith,'"[65] and the Commission has broad discretion when fashioning remedies in a section 206 proceeding.[66]

Because the Commission accepted the FPA Section 205 Filing, it did not even reach the question of whether PJM's existing capacity market rules were unjust and unreasonable.[67] However, there is sufficient evidence in the record for the Commission to determine that PJM's existing capacity market rules are unjust and unreasonable.  As noted by PJM:

> the impact of including Planned Generation Capacity Resources in the calculation of the Locational Deliverability Area Reliability Requirement that then do not

---

[61] *Id*. (emphasis added).
[62] *See* February 21 Order at 6.
[63] *See* Section 206 Filing at n.4.
[64] 16 U.S.C. § 824e.
[65] *Black Oak Energy, LLC*, 167 FERC ¶ 61,250, at P 28 (2019) (citing *La. Pub. Serv. Comm'n v. FERC*, 866 F.3d 426, 429 (D.C. Cir. 2017)).
[66] *Old Dominion Elec. Coop.*, 164 FERC ¶ 61,006, P 30 (2018).
[67] *See* February 21 Order at P 181.

participate in the BRA *produces an unjust and unreasonable outcome in small LDAs*. Such outcomes would be inconsistent with the actual market fundamentals because they do not reflect the actual supply and demand of the LDA. In short, the application of the Locational Deliverability Area Reliability Requirement in *its present form involving small LDAs results in a mismatch with prices not reflecting the actual reliability requirements of the LDA*. As the Commission has a statutory obligation to ensure that rates are just and reasonable, the narrow changes as proposed herein *are necessary to ensure just and reasonable outcomes that are consistent with the reliability requirements of the LDA*.[68]

PJM provided a host of information throughout its Section 206 Filing showing why its existing capacity market rules are unjust and unreasonable, particularly as applied to smaller Zones like DPL-S. For example, PJM's Resource Requirement's calculation incorporated multiple planned generation resources that did not participate in the auction, causing the actual Reliability Requirement to be lower than the calculated Reliability Requirement.[69] Due to the size of these resources, and the relatively small size of the DPL-S Zone, the result was a fourfold increase in clearing prices.[70] Given that the average wages for workers in the Delmarva Peninsula are significantly lower than the U.S., the energy burden borne by the ratepayers in the zone would be disproportionately high.[71]

PJM's failure to plan for adequate transmission to the constrained DPL-S Zone, and subsequent failure to calculate the Reliability Requirement correctly for that zone, will have a profoundly negative impact on ratepayers in the zone through disproportionately-high prices, which could give rise to a Commission finding that the result was unjust and unreasonable. However, the Commission did not need to decimate confidence in PJM's capacity market in the

---

[68] Section 206 Filing at 2 (emphasis added).
[69] Motions to Intervene and Initial Comments of the Maryland Office of People's Counsel, Docket Nos. EL23-19-000, *et al.*, at 5 (Jan. 20, 2023).
[70] Comments of the Independent Market Monitor for PJM, Docket Nos. EL23-19-000, *et al.*, at 3-4 (Jan. 20, 2023); Motion for Leave to Answer and Answer of Old Dominion Electric Cooperative, Docket Nos. EL23-19-000, *et al.*, at 3 (Feb. 6, 2023).
[71] Motion for Leave to Answer and Answer of Natural Resources Defense Council, *et al.*, Docket Nos. EL23-19-000, *et. al.*, at 4 (Feb. 6, 2023).

name of protecting those consumers by accepting the Section 205 Filing (which paradoxically will likely not protect those consumers in the long-run given that the February 21 Order has undermined confidence in PJM's capacity market).

In short, FPA Section 206 provides greater latitude to the Commission in terms of remedies. Acting pursuant to FPA Section 206 would allow the Commission to extricate itself from conundrum it has created for itself: rather than finding that a mid-auction rule change is *affirmatively just and reasonable* under FPA Section 205—which ignores decades of precedent related to the filed rate doctrine and rule against retroactive ratemaking, and would upend confidence in PJM's capacity market and not produce a just and reasonable outcome—the Commission can and should find that the rate in the DPL-S Zone resulting from the PJM capacity market rules in effect during the 2024/2025 BRA was *unjust and unreasonable* under FPA Section 206. The Commission would be empowered to order appropriate relief: specifically, a full re-run of the 2024/2025 BRA that incorporates accurate modeling assumptions.

## IV.    CONCLUSION

The Clean Energy Associations respectfully request that the Commission grant rehearing, for the reasons specified above.

Gabe Tabak, Counsel
Gene Grace, General Counsel
Sari Fink, Senior Director, Electricity Policy
American Clean Power Association
1501 M St., N.W., Suite 900
Washington, D.C. 20005
(202) 383-2500
gtabak@cleanpower.org
ggrace@cleanpower.org
sfink@cleanpower.org

*/s/ Steven Shparber*
Steven Shparber
Omar Bustami
Daniel Herder
Clark Hill PLC
1001 Pennsylvania Avenue, N.W.
Suite 1300 South
Washington, D.C. 20004
(202) 772-0915
shparber@clarkhill.com
obustami@clarkhill.com
dherder@clarkhill.com

*Counsel to the Clean Energy Associations*

Caitlin Marquis, Managing Director
Jon Gordon, Policy Director
Katherine Burnham, Senior Principal
Advanced Energy United
1010 Vermont Ave. N.W.
Washington, D.C. 20005
cmarquis@advancedenergyunited.org
jgordon@advancedenergyunited.org
kburnham@advancedenergyunited.org

Ben Norris
Senior Director of Regulatory Affairs and Counsel
Melissa Alfano
Director of Energy Markets and Counsel
Solar Energy Industries Association
1425 K St N.W., Suite 1000
Washington, D.C. 20005
(202) 566-2873
bnorris@seia.org
malfano@seia.org

Dated: March 23, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused the foregoing to be served upon each person

designated on the official service list compiled by the Secretary in the captioned proceedings.

Dated at Washington, D.C. this 23rd day of March, 2023.

*/s/ Steven Shparber*

## CERTIFICATE OF SERVICE

I certify that on December 11, 2023, I filed the foregoing brief using the Court's CM/ECF system. Service will be effected by and through the Court's CM/ECF system.

*/s/ Matthew E. Price*
Matthew E. Price